# EXHIBIT C

Brian E. Klein (Bar No. 258486)
  bklein@waymakerlaw.com
Donald R. Pepperman (Bar No. 109809)
  dpepperman@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:    (424) 652-7800
Facsimile:    (424) 652-7850

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*



# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

| | |
|---|---|
| DR. ANDREW FORREST, an individual,<br><br>      Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware Corporation, and DOES 1 through 20, inclusive,<br><br>      Defendants. | Case No. 21-CIV-05055<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) Misappropriation of Name and Likeness;**<br><br>**(2) Aiding and Abetting Fraud;**<br><br>**(3) Unfair Competition/Unfair Business Practices (Cal. B&P Code section 17200 et seq.);**<br><br>**(4) Negligence;**<br><br>**(5) Lanham Act Violations; and**<br><br>**(6) Declaratory Relief and Unjust Enrichment**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1

<u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION ............................................................................................. 1

II.   THE PARTIES .............................................................................................. 6

III.  JURISDICTION, VENUE, AND CHOICE OF LAW ............................ 7

IV.   GENERAL ALLEGATIONS ......................................................................... 8

      A.  Dr. Andrew Forrest--Australian Business and Philanthropic Icon .................. 8

      B.  The Scam Crypto Ads Featuring Dr. Forrest ................................................ 11

      C.  The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of
          Millions ......................................................................................................... 14

      D.  Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding Facebook
          Take Steps to Stop Further Ads .................................................................... 16

      E.  In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam
          Crypto Ads ..................................................................................................... 18

      F.  Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam
          Crypto Ads ..................................................................................................... 19

      G.  Facebook's Advertising Business Substantially Controls the Development of Each Ad
          Through Its Contracts with Aspiring Advertisers ......................................... 20

      H.  Facebook Substantially Contributes to the Ads Using Meta Pixel ................ 21

      I.  The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising
          Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is
          Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads ...... 23

          1. Ad Content ................................................................................................. 23

          2. Ad Creative ............................................................................................... 27

          3. Ad Delivery ............................................................................................... 28

          4. Facebook Elicits and Encourages the Creation of Illegal Content .................... 29

      J.  Facebook's Ability to Find Cryptocurrency Ads ........................................... 31

V.    FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE .................. 32

VI.   CAUSES OF ACTION ................................................................................... 35

i

Plaintiff Dr. Andrew Forrest ("Dr. Forrest") through his undersigned counsel of record, brings this Second Amended Complaint ("SAC") against Defendant Meta Platforms, Inc. formerly Facebook, Inc. (collectively "Facebook")[1] and DOES 1-20 (collectively, "defendants"), to secure damages, and injunctive and other appropriate equitable relief:

# I. INTRODUCTION

1. Since it launched Facebook ads in 2007, Facebook's advertising business has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Facebook CEO Mark Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today." Prescient in his prediction, Facebook and Zuckerberg have built an advertising empire worth hundreds of billions of dollars.

2. In October 2019, Zuckerberg gave a speech at Georgetown University, acknowledging the problem with supporting Free Speech, addressing the variety of problems that arise from that, and stating that Facebook itself had the responsibility for addressing the risk of harm even to a small number of people:

> [I]nevitably some people will use their voice to organize violence, undermine elections or hurt others, **and we have a responsibility to address these risks.** When you're serving billions of people, even if a very small percent cause harm, that can still be a lot of harm. (Emphasis added).

3. Zuckerberg went on to state that Facebook was both aware of the problems and ha[d] the ability to stop unlawful ads:

> For misinformation, we focus on making sure complete hoaxes don't go viral…. More broadly though, we've found a different strategy works best: focusing on the authenticity of the speaker rather than the content itself.

> We've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money.

> *          *          *

> The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts. We now require

---

[1] Facebook Inc., rebranded itself, changing its name to Meta Platforms, Inc. ("Meta") on or about October 2021, but Dr. Forrest refers to Meta as Facebook for clarity and unless otherwise differentiated below.

you to provide a government ID and prove your location if you want to run political ads or a large page.

*                    *                    *

We build specific systems to address each type of harmful content — from incitement of violence to child exploitation to other harms like intellectual property violations — about 20 categories in total. **We judge ourselves by the prevalence of harmful content and what percent we find proactively before anyone reports it to us. (emphasis added)**

*                    *                    *

We now have over 35,000 people working on security, and our security budget today is greater than the entire revenue of our company at the time of our IPO earlier this decade.

All of this work is about enforcing our existing policies, not broadening our definition of what is dangerous. If we do this well, we should be able to stop a lot of harm ….[2]

4.      Unfortunately for Dr. Forrest and Australians defrauded by cryptocurrency scams falsely bearing Dr. Forrest's endorsement over the last three years, Facebook's advertising business has not done its job. Australian users have lost millions when relying on a phony "endorsement" using Dr. Forrest's name image and reputation.

5.      Beginning in late March 2019, Dr. Forrest learned that fraudulent cryptocurrency advertisements were appearing on the Facebook platform that were wrongly using his name and image to endorse shady cryptocurrency schemes ("Scam Crypto Ads"). The Scam Crypto Ads, including the following example, were designed to benefit from their alleged association with business and philanthropic celebrity, Dr. Forrest. [3] [4]

---

[2] Tony Romm, *Zuckerberg: Standing for Voice and Free Expression*, Washington Post, (Oct. 17, 2019) https://www.washingtonpost.com/technology/2019/10/17/zuckerberg-standing-voice-free-expression/. (Last visited June 17, 2022).

[3] In December 2015, Dr. Forrest, who does not have any personal social media presence, opened a verified user account on Facebook at the specific request of Facebook to assist its reviewers to combat the fraudulent "Dr. Forrest" user profiles proliferating on Facebook's social media platform.

[4] It is beyond credulity to suggest this Facebook advertising customizable template-developed fake news article featuring obvious cutouts of Dr. Forrest next to a supposed newsreader with a sinister looking guy lurking, and promoted by a news outlet called "Wolf World," is what Congress was intending to protect in enacting Section 230 of the Communications Decency Act, 47 U.S.C. § 230.



6.     Further, at this time, and independent of complaints from Dr. Forrest, Facebook was aware that its advertising platform was developing and reviewing scam ads that once Facebook approved, would be successfully submitted to and disseminated to users on its user platform. Shortly after Dr. Forrest's personal staff learned of the Scam Crypto Ads in late March 2019, the staff informed Facebook that its advertising operations was still failing to stop criminals from breaching Facebook's Advertising Policies and Self-Service Ad Terms in victimizing Australians. Dr. Forrest requested in writing and verbally that Facebook's advertising business take immediate action to prevent the approval of future Scam Crypto Ads so they could not reach and be posted on Facebook's user platform. These requests were to no avail.

7.     Instead of acting on Dr. Forrest's complaints, and cleaning up obvious advertising security flaws, Facebook's senior management continued with the *status quo*. Critically, one of Facebook's advertising security flaws was that criminals could easily bypass its security measures by using "cloaking software" that disguises their identity and the ultimate "landing page" where Facebook users would arrive.

8.    To be sure, this controversy involves Facebook's advertising business in the development, and review and approval of the Scam Crypto Ads, before they are allowed to submit to auction and appear on Facebook's user platform.

9.    Facebook's advertising business has been designed to maximize the profit with the collateral damage of some users being swindled. By taking material control over the development, review and approval of ads, before they enter Facebook's user platform, fraudulent ads like the Scam Crypto Ads are custom made to inflict maximum damage without a scammer lifting a finger. As one article has noted: "Affiliates [Facebook advertisers] describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the [victims] for me.'"[5]

10.   The effect of Scam Crypto Ads is real, devastating, and life-altering. As further described *infra*, in February 2022, Gilbert Howard, a 75-year old concrete pools builder who lives an hour's drive from Dr. Forrest in suburban Perth, Western Australia, lost a substantial part of his life savings, $300,000, having been defrauded by the Scam Crypto Ads on Facebook. *"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*," Mr. Howard says. Unfortunately, there are many others like Mr. Howard.

11.   Facebook has purposely conflated the distinction between "Facebook the advertiser" and "Facebook the user platform." Facilitating a user platform on the one hand and being paid for advertising on the other, is a real and meaningful distinction. Facebook was for its first several years existence a prototypical user platform, facilitating an interactive service designed to connect users who wished to communicate with one another, sharing ideas and opinions. Faced with the conundrum of how its enormous and sophisticated platform, with masses of valuable data, could turn a profit, Facebook started a new business--an advertising agency that would charge third parties that sought to run digital ads.

---

[5] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek. (March 28, 2018) ("*Facebook Helps Shady Advertisers Pollute the Internet*"), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them. (Last visited June 17, 2022).

12.     Since its modest start after 2007, Facebook's advertising business has grown to one of the largest profit-producing businesses ever. Housing some of the world's smartest computer scientists, the most sophisticated software programmers, and offering prestigious careers to those who can monetize their 3 billion users, Facebook's advertising business is one of the largest profit-producing advertising businesses in history—earning revenue of $112 billion in 2021—over 98% of Facebook's total revenue.

13.     This SAC arises then, not just from Facebook's matchmaking of its users, but from how Facebook operates its advertising business in a manner that substantially and materially contributes to the development, review, and approval of the Scam Crypto Ads. Facebook's overall business model obfuscates a clear line of demarcation between its user platform and its advertising business, but the two operate distinctly from each other. Facebook's advertising business facilitated the development of fraudulent ads well before they are allowed to enter Facebook auctions for hopeful dissemination on Facebook's user platform.

14.     Criminal syndicates contract with Facebook's advertising business on terms which are specific to its advertising services. Facebook's Advertising Policies and Self-Service Ad Terms evince extensive oversight and ultimate control by Facebook's advertising business in the development, review, and approval of ads submitted to Facebook's user platform which then delivers ads to Australian users chosen by its sophisticated algorithms. Ultimately, Facebook is an advertising co-developer of ad inventory, and in doing so it substantially and materially contributes to the success of the fraudulent ads once they reach the user platform.

15.     Finally, given Facebook's ongoing assertion that its global business operations are beyond the jurisdictional reach of any court in the Commonwealth of Australia, a jurisdiction which has no immunity analogous to Section 230 of the Communications Decency Act ("Section 230"),[6] it is inequitable and contrary to choice of law to apply Section 230 here. This is inconsistent with the rule of dépeçage which prohibits an unfair jurisdictional arbitrage to foist

---

[6] 47 U.S.C. § 230.

1  Section 230 immunity on Australians. If Facebook challenges the SAC under Section 230, choice

2  of law and equity favors the application of Australian law on all issues of immunity.

3  **II.      THE PARTIES**

4           16.      Dr. Forrest is an individual and at all relevant times, a resident of Australia.

5           17.      Dr. Forrest has been a Facebook "user" since in or about 2015.

6           18.      Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. (Ticker

7  symbol -MVRS) in late October 2021.[7]

8           19.      Facebook is a Delaware corporation with its principal executive offices located at

9  1601 Willow Road, Menlo Park, California, 94025.

10          20.      Dr. Forrest is unaware of the true names and capacities, whether individual,

11  corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, or any of them,

12  and therefore sues these defendants, and each of them, by such fictitious names. Dr. Forrest will

13  seek leave of this Court to amend this SAC when the status and identities of these defendants are

14  ascertained.

15          21.      Dr. Forrest is further informed and believes, and on that basis alleges, that at all

16  times relevant, each and every defendant was the agent, servant, employee, joint venturer, partner,

17  subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to

18  perform the acts alleged in the SAC, each was acting individually as well as through and in the

19  foregoing alleged capacity and within the course and scope of such agency, employment, joint

20  venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed

21  the acts and omissions of the other defendants. Each defendant, in taking the actions alleged in the

22  SAC ratified and/or authorized the wrongful acts of each of them and are individually sued as

23  participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that

24  are the subject of the SAC. Each defendant was a direct, necessary, and substantial participant in

25

26

27  _____
[7] Salvador Rodriguez, *Facebook Changes Company Name to Meta*, CNBC (Oct. 28, 2021)
28  https://www.cnbc.com/2021/10/28/facebook-changes-company-name-to-meta.html (last visited
    June 9, 2022).

1   the conduct complained of in the SAC, and each of the defendants aided and abetted and rendered

2   substantial assistance in and material contribution to the wrongs complained of in the SAC.

3   **III.    JURISDICTION, VENUE, AND CHOICE OF LAW**

4          22.    This Court has subject matter jurisdiction of the claims in this SAC, which are,

5   among other things, based on violations of California law, and the amount in controversy exceeds

6   the jurisdictional minimum of this Superior Court.

7          23.    This Court has personal jurisdiction over Facebook because its corporate

8   headquarters and principal places of business are in California. This Court also has specific

9   personal jurisdiction over Facebook because it has sufficient minimum contacts with California,

10  has purposely availed itself of California's benefits and protection, and does a substantial amount

11  of business in California, such that this Court's exercise of jurisdiction over Facebook is

12  reasonable and wholly consistent with traditional notions of fair play and substantial justice.

13         24.    Venue is proper San Mateo County under Code of Civil Procedure sections 395 and

14  395.5 because Facebook's principal place of business is in San Mateo County, and/or Facebook

15  performs substantial amounts of business in San Mateo County.

16         25.    As a California court, this Court applies California choice-of-law rules. "California

17  follows the doctrine of dépeçage, under which different states' laws can be applied to different

18  issues in the case." *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1396 (2011).

19         26.    Choice of law issues in this litigation are resolved through the principal of

20  dépeçage. This principle results in a search for the rule of law most appropriately applied to the

21  affirmative defense of immunity under Section 230.

22

23         27.    As to choice of law, Dr. Forrest contends that Australian law does not afford

24  immunity for an internet service provider ("ISP") when it posts allegedly harmful content from a

25  third party.[8] Accordingly there is a material difference in the application of California law (cases

26  holding there is Section 230 immunity for internet service provider that only publishes third party

27

28  _____

[8] Clause 91(1) of schedule 5 of the *Broadcasting Services Act* 1992 (Cth).

1  content, versus Australian law which has no such immunity), and this Court must make a separate

2  conflict of laws inquiry with respect to the affirmative defense of immunity.

3       28.    Accordingly, this Court should decide which law to apply, either Section 230 or

4  Australian law which provides no such immunity for an internet service provider where third-party

5  content is posted on their platform.

6       29.    In requesting a choice of law analysis, Dr, Forrest contends that his invocation of

7  Australian law is narrow because it applies under the law of dépeçage to specific issues, even a

8  single affirmative defense such as Section 230 immunity.

9       30.    In his prayer for relief, Dr. Forrest seeks declaratory relief that Australian law

10 should be applied on the question of the appropriate selection of law governing immunity for

11 Facebook.

12 **IV.    GENERAL ALLEGATIONS**

13      **A.    Dr. Andrew Forrest--Australian Business and Philanthropic Icon**

14      31.    It is no wonder fraudsters would seek to deploy the endorsement of a man such as

15 Dr. Forrest. In the apt words of victim Gilbert Howard: *"I look at people on Facebook I respect.*

16 *If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*." The reason

17 for this respect is clear.

18      32.    Dr. Andrew Forrest, AO[9] is a prominent Australian businessman and

19 philanthropist. He is the founder and current Executive Chairman of Fortescue Metals Group, and

20 founder and co-chair of the Minderoo Foundation through which he now devotes his time to

21 making significant philanthropic contributions, and pursuing humanitarian and environmental

22 initiatives.

23      33.    Dr. Forrest is Australia's most active philanthropist, and one of the most effective

24 Australian business leaders of his generation. He is a true Australian business celebrity.

25

---

26 [9] In the Australian honors system, appointments to the Order of Australia confer the highest recognition for outstanding achievement and service. An Officer of the Order of Australia, or

27 "AO" is a national honor bestowed on Australian citizens and deserving non-citizens for distinguished service of a high degree to Australia or humanity at large. Dr. Forrest was appointed

28 as an AO in 2017.

34.     As Fortescue's founder and chairman, he has led the company from inception to its top 20 status in the Australian economy, during which time Fortescue invested more than $20 billion USD in the resources sector. Across Fortescue and Dr. Forrest's other commercial interests, Dr. Forrest provides direct employment to well over 10,000 individuals, and many more indirectly through his projects.

35.     In 2001, Dr. Forrest co-founded the Minderoo Foundation with his wife Nicola.

36.     Minderoo has supported over 280 initiatives across Australia and internationally covering a range of causes. He has started and funded initiatives to combat and end pervasive and important humanitarian issues like modern day slavery, and has supported disenfranchised groups by focusing on indigenous rights education, responsible use of technology, children's cancer research, and early childhood development, as well as environmental issues such as wildfires, floods, plastic pollution and ocean health.

37.     In May 2017, Dr. and Mrs. Forrest announced one of Australia's largest private philanthropic donations of $400 million AUD to medical research and have continued giving. As of April 2020, their total philanthropic donations have exceeded $2 billion AUD.

38.     Dr. Forrest is a lifetime Fellow of the Australian Institute of Mining and Metallurgy. In 2017, he was appointed an Officer of the Order of Australia for his distinguished service to the mining sector, the development of employment and business opportunities, his support of sustainable foreign investment, and for his philanthropic efforts. He is Global Patron of the Centre for Humanitarian Dialogue, recipient of the Australian Sports Medal and the Australian Centenary Medal, and Vice-Patron of the SAS Resources Fund.

39.     Dr. Forrest is also a Councilor of the Global Citizen Commission, which, in April 2016, presented a series of human rights recommendations to the United Nations Secretary General to update the Universal Declaration of Human Rights.

40.     In 2013, Dr. Forrest was appointed by the Prime Minister and Cabinet of Australia to chair the review of Indigenous Training and Employment Programs, aimed at ending Indigenous disparity through employment.

41.     Dr. Forrest was Western Australia's 2017 Australian of the Year for his outstanding contribution to the community. In 2018, Dr. Forrest was inducted into the Australian Prospectors & Miners' Hall of Fame and was the inaugural winner of the EY Entrepreneur of the Year – Alumni Social Impact Award.

42.     The strength and value of Dr. Forrest's name, brand, and likeness is further evidenced from his recent business dealings, centered on building green technology businesses. Dr. Forrest's Fortescue Future Industries has signed agreements with traditional energy strongholds like Afghanistan for the development of hydro power and other geothermal projects for green industry as well as of Afghanistan's more traditional mineral resources.

43.     With such a prolific charitable profile and business acumen, Dr. Forrest's name, brand, and likeness are instantly and widely recognizable within the investing community and beyond and carry significant value.

44.     Dr. Forrest's "verified" Facebook page also lets users know that Dr. Forrest is a "well-known, often searched Page[] and profile[]," and that Facebook has "confirmed that this is the authentic Page or profile for this public figure, media company or brand." *See* Facebook Help – "What is a Verified Page of Profile?" https://www.facebook.com/help/196050490547892. A quick look at his verified Facebook page reveals the reverence many have for Dr. Forrest:

1



2

3

4

5

6

7

8

9

10

11

12

13

14

15    45.    In sum, Dr. Forrest's image and reputation is highly sought after and his business

16    celebrity status provides immense commercial value and credibility to the companies, brands,

17    products, charitable activities, and opportunities he supports.

18    **B.    The Scam Crypto Ads Featuring Dr. Forrest**

19    46.    Beginning at the end of March 2019, Dr. Forrest has suffered, and continues to

20    suffer, irreparable harm to his public image and reputation as a consequence of a pervasive

21    investment scam that has been featured on Facebook's user platform. The Scam Crypto Ads were

22    co-developed by a Bulgarian-based Syndicate (the "Syndicate") and Facebook's advertising

23    business, which Facebook, as the advertising agency, then submitted to auction on behalf of the

24    Syndicate, finally disseminating the Scam Crypto Ads to Facebook's user platform as

25    advertisements without Dr. Forrest's knowledge, acquiescence, or approval.

26    47.    Facebook has been keenly aware of Dr. Forrest's celebrity status for some time,

27    and any suggestion to the contrary is implausible. Facebook actually went to Dr. Forrest before

28    2019, asking him to create a Facebook presence to help assist Facebook reviewers in combatting

11

1   against the proliferation of fraudulent profiles on social media platforms. It is thus surprising that

2   starting in or about late March 2019, Dr. Forrest first came to understand that Scam Crypto Ads,

3   have been allowed by Facebook's advertising business to infiltrate Facebook's user platform.

4          48.      The following exemplar screenshots of Scam Crypto Ads are patently suspicious

5   and sinister, and lack the credibility of advertisements which reasonably should not have been

6   allowed to be co-developed by Facebook's advertising business. Using specialized and

7   customizable templates created and then offered by Facebook's advertising interface, these

8   exemplars are still not facially credible even as fraudulent "news reports" Facebook's self-help

9   advertising interface materially helped scammers develop.





49.     The exemplar in paragraph 5 uses obviously cut and pasted pictures of Dr. Forrest next to a well-known Australian newsreader with a sinister looking individual lurking in the background, supposedly produced by an advertiser named "Wolf World." Other ads like those above depict Dr. Forrest's purport to divulge what Dr. Forrest did to gain additional wealth, and yet others use a fake a "ABC" news logo and mention "Andrew Forrest" by his uncommonly spelled last name, and his nickname "Twiggy."

50.     Subsequent click through material utilizes quotes, interview footage, and other actual legitimate statements attributable to Dr. Forrest, edited and doctored so as to deceivingly appear as though Dr. Forrest is sponsoring a particular investment "opportunity" or otherwise promoting a particular product.

51.     So called "interviews" with Dr. Forrest are accompanied by dozens of fake testimonials describing how investors have become millionaires in a matter of months with even small deposits such as $250. Facebook's anticipated argument that its advertising business, including its review systems, whose very design and execution is supposedly meant to prevent such scam ads, cannot prevent Facebook's user platform from receiving and proliferating such ads, is implausible.

52.     In an attempt to save, maintain and protect his reputation and likeness, and to dissociate himself from this fraudulent scheme, Dr. Forrest has spent hundreds of thousands of dollars investigating the Syndicate, defending himself and his business reputation and likeness,

1  enhancing his cybersecurity team's capacity and engaging external fraud detection services to

2  permanently monitor Facebook's platform to attempt real time response to these frauds ads.

3      53.     In the early stages of this investigation, Dr. Forrest easily learned that the people

4  behind these Ads were members of the Syndicate who were involved with entities from Sophia,

5  Bulgaria and the South Pacific Island of Vanuatu who, using sham entities, fake information, and

6  false addresses, employed Nigerian and Bulgarian pay services to deploy the Scam Crypto Ads.

7      54.     As an example of why the Syndicate should never have succeeded in employing

8  Facebook's advertising business to do business with it, Facebook purports to have imposed

9  supposed "problem solving" requirements on those proposing to use its Self-Service Ads Platform

10  to provide details regarding the applicant, its business, and contact details before Facebook would

11  consider and place an ad on Facebook's user platform. This requirement, Zuckerberg told his

12  Georgetown audience in 2019, would address hoaxes and other perils of an internet that supported

13  Free Speech—with limitations. Not so.[10]

14  **C.    The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of Millions**

15

16      55.     As Facebook the advertiser promised, it did not take long for the Scam Crypto Ads

17  to start working their voodoo.

18      56.     An Australian woman was victimized by the Scam Crypto Ads, losing

19  approximately $670,000. The woman said that on or about March 28, 2019, she accessed her

20  Facebook account when she was presented with the fraudulent scam ad. She believed the

21  ad/content was legitimate as the advertisements on Facebook—which included alleged interviews

22  with Dr. Forrest—appeared to be reputable and from the Australian Broadcasting Commission.

23      57.     Similarly, on or about April 1, 2019, an Australian man logged onto his Facebook

24  account and was presented with an ad depicting Dr. Forrest sitting on a stage, which gave the

25  ───────────────

26  [10] Discovery into this issue, information and documents not publicly available and part of Facebook's closely held and exclusive realm of control, will shed light on how the Syndicate came to be approved as a Facebook advertiser, particularly given Zuckerberg's comments in October 2019 that "[w]e've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money. … The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts."

27

28

14

SECOND AMENDED COMPLAINT

appearance that he was participating in a question-and-answer session on cryptocurrency. The man clicked on the link and was swindled out of $77,254.

58.     Yet another Australian victim reported that in or about March 2019, she saw a Facebook advertisement which pictured Dr. Forrest and included what appeared to be his endorsement of a Bitcoin investment opportunity. She clicked on the content and was scammed of thousands of dollars in the ensuing months.

59.     One unsuspecting victim of this fraudulent scheme contacted Dr. Forrest's team after she unwittingly fell victim to the scam, stating that she was "caught up in the Bitcoin scam that Andrew Forrest was implicated in supporting. I subscribed when I saw that it was supported by him."

60.     On or about June 19, 2019, Australian JB contacted Dr. Forrest advising of the fact she had been victimized on Facebook by a Dr. Forrest crypto scam.[11]

61.     On or about September 12, 2019, Australian JA encountered a "news article" on Facebook which featured a photograph of Dr. Forrest and wording to the effect that "Forrest says you would be crazy not to do this because you'll make so much money." She clicked and ended up on a cryptocurrency website where she deposited a sum of money. After she became suspicious, and followed up, she was able to recover the money.

62.     On or about October 28, 2019, Australian Mr. RH contacted Dr. Forrest referring to an article on Facebook which stated words to the effect of Make Millions from this 'wealth loophole.' The article contained a picture of Dr. Forrest and mentioned him by name. RH contacted Dr. Forrest to inquire about the advertisement as he had a friend who had seen the same ad and was seriously thinking about investing.

63.     In 2019, 72 year old Western Australian FZ was victimized by the Scam Crypto Ads after he relied upon Facebook advertisements that featured Dr. Forrest's profile. FZ lost $250,000 which he has not been able to recover.

---

[11] The SAC uses initials for privacy purposes in this section, unless otherwise noted. All names are used with the consent of the Scam Crypto Ad victims.

64.     On or about March 5, 2020, CC, an employee of Fortescue Metal Group (a company started by Dr. Forrest), encountered a Facebook Bitcoin article that mentioned Dr. Forrest by name and included his photograph, and which inferred his endorsement of some cryptocurrency product.

65.     On or about May 1, 2020, Fortescue Metal Group employee SS encountered a Facebook cryptocurrency article which mentioned Dr. Forrest by name and featured his photograph, and which inferred his endorsement of some crypto product.

66.     On or about February 2, 2021, Australian JG encountered an ad on Facebook featuring a photograph of Dr. Forrest with a phrase along the lines of "Twiggy's tips for success." He knew and understood the reference to Twiggy to refer to Andrew Forrest. He clicked on the ad and was taken to a further webpage that purported to contain a news article associating Dr. Forrest with the promotion of a cryptocurrency investment scheme.

67.     In late 2021, Ty Nicholas, a medically retired 25 year veteran of the Australian Defense Force was scammed by a Facebook Forex trading scam that Mr. Nicholas relied upon given Dr. Forrest's purported high profile and promotion of the scam. Mr. Nicholas lost $15,500 he has not been able to recoup.

68.     As as noted above, in late 2021, Gilbert Howard, lost $300,000, having been defrauded by the Scam Crypto Ads featuring Dr. Forrest. ***"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence,"*** Mr. Howard says.

**D.     Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding Facebook Take Steps to Stop Further Ads**

69.     The Scam Crypto Ads were clearly intended to entice persons vulnerable to the strength and credibility of Dr. Forrest's name, likeness, and reputation to send money as an investment in a fraudulent opportunity.

70.     Dr. Forrest has never authorized or otherwise allowed his name, likeness and/or reputation to be associated with, let alone endorse, any Bitcoin or other cryptocurrency product or service.

71.     Dr. Forrest began hearing about and became aware of the proliferation of the Scam Crypto Ads around late March 2019. He immediately mobilized his executive staff to identify and capture evidence of these ads, and place Facebook on notice of their dissemination so that Facebook could make them stop--immediately and permanently.

72.     Dr. Forrest went further, arranging a personal telephone call with William Easton, believed to be Facebook's highest ranking Australian officer. In this call, which occurred in early May 2019, Dr. Forrest expressed to Easton his abhorrence to the Scam Crypto Ads and their unauthorized use of his name and image as a supposed celebrity endorser. Dr. Forrest further communicated his personal demand that Facebook dedicate its enormous and sophisticated machine and human resources to prevent any further dissemination of such ads.

73.     On May 19, 2019, Dr. Forrest emailed Easton, repeating his complaints about the Scam Crypto Ads and his demand that their dissemination cease immediately and completely. Dr. Forrest wrote, in pertinent part:

> It's well known William [Easton], that you have the most sophisticated machine learning and artificial intelligence tools for targeting advertising at users. What amazes me is your absolute lack of concern, and more worrying your obstinance in using machine learning to keep your platform free of obvious scams[.] All of these threaten users like me, the integrity of public discourse, and allow innocent mums, dads, and retirees, to be robbed of their savings. If this was you or Mr. Zuckerberg being framed, or your own parents, or his, losing their hard earned retirement savings, I know you would react immediately and effectively. …

> I am less inclined to resignation than to action. It's my intention to ensure this allowance of fraud by you [Facebook] ceases[.]

74.     On May 20, 2019, Easton responded by email to Dr. Forrest's demands, writing in pertinent part:

> I appreciate this is very frustrating for you—it's an extremely challenging, industry-wide problem which we are working to address. However I do want to be very clear – scam ads are not permitted on Facebook. They violate our Advertising Policies and have no place on the platform. …

> All ads on Facebook are subject to our ad review system and our ads are checked against our policies. This happens before ads begin running, but may also be re-reviewed after they are live. Our Advertising policies prohibit scam ads, and when we detect an ad that violates our advertising Policies we disapprove it . .…

1
2
> In the meantime, having this content reported to us is key and I am very happy to continue to offer a direct line to me so that we can move quickly to take down these scam ads.

3   75.    By November 2019, with the Scam Crypto Ads featuring Dr. Forrest continuing to

4   make their way from Facebook's advertising bsuiness to Facebook's user platform, Dr. Forrest

5   penned an open letter to Zuckerberg again demanding that Facebook's co-development and

6   approval of Scam Crypto Ads cease. Dr. Forrest wrote in pertinent part:

7
> Dear Mr. Zuckerberg:

8
9
> My family and I have been the subject of scam advertisements on your social media network. Our images and the images of others are being used to encourage our users to invest in fraudulent cryptocurrency schemes.

10
11
12
13
> The criminals responsible continue to purchase advertising space from Facebook, running new incarnations of the same scams. Your senior leadership has been informed of this. What's worse, innocent and vulnerable people are losing their life savings while Facebook (read – you) is profiting from the revenue generated by this stream of false advertisements.

13
14
15
> This is abhorrent and you can stop it. You have the power and the technology to prevent these scam advertisements from running on your platform. Is revenue more important to you than the life savings of elderly people, Mr. Zuckerberg?

16   **E.    In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam Crypto Ads**

17

18   76.    In a February 2021 newsletter, the Australian Charity, IDCare, reported that it had

19   seen a trend of bitcoin scam ads displaying Dr. Forrest's name and likeness.[12] Dr. Forrest shared

20   this newsletter with Facebook, again demanding action.

21   77.    Dr. Forrest has continued to pursue Facebook's failure to stop the Scam Crypto

22   Ads, without success. Even in 2022, Facebook's advertising business continues to allow scam ads

23   to enter Facebook's user platform, proliferate, and cause numerous Facebook users financial

24   disaster. Three years after Dr. Forrest sounded the alarm and demanded Facebook take immediate

25   and effective action to stop co-developing and approving these ads, nothing has changed.

26

27
28
[12] IDCARE, *Newsletter – Covid 19 Scams, the World's Biggest Data Dump and Facebook*, (Feb. 22, 2021), https://www.idcare.org/latest-news/covid-19-scams-the-worlds-biggest-data-dump-and-facebook. (Last visited June 17, 2022).

78.     Between late 2019 and at least February 2022, the Scam Crypto Ads have still been co-developed, reviewed and approved for public dissemination by Facebook's advertising business, injuring Dr. Forrest's name, image, likeness, and reputation, and, through their subsequent dissemination on Facebook, deceiving those users who have encountered and sometimes relied upon Dr. Forrest's supposed endorsement to their financial detriment.

79.     Dr. Forrest has been contacted over time by scores of consumers who have encountered the ads and then been swindled out of their hard-earned money–as recently as February 2022.

80.     Facebook is liable for its content development, and for its facilitation, solicitation, encouragement, material contribution to, and otherwise inducement of the financial criminal activity as alleged in the SAC. Facebook, without regard for the legality of its content, profited at the expense of Dr. Forrest's reputation and the underlying victims of the fraudulent scams, many of whom have suffered substantial financial harm as a result. Facebook capitalized on Dr. Forrest's name and likeness and took its cut of these illegally gotten proceeds by knowingly and willingly selling fraudsters advertising.

81.     As a result, Dr. Forrest has been irreparably harmed as alleged in the SAC. In addition to defrauding Facebook users of millions of dollars, the scam raises uncertainty about whether Dr. Forrest is somehow responsible for or associated with the criminal scam in which he has no part. This has even harmed his reputation with the people closest to him, as Dr. Forrest's own father called him in a panic to question him about his role in the fraud.

82.     The whole ordeal distracts from and displaces the many positive associations with Dr. Forrest's name, clouds his impeccable reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness.

**F.      Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam Crypto Ads**

83.     By inviting and accepting advertising business from the general public, (including the Syndicate), Facebook did not act solely as an internet service provider, but rather has also been

1  acting as a digital advertising agency with typical attributes and client offerings seen with

2  traditional advertising agencies.

3        84.    Facebook reports in its regular public filings with the U.S. Securities Exchange

4  Commission that it has a number of businesses.[13] While not formally designated as a separate

5  business unit, Facebook's advertising business is nonetheless separate and distinct from the

6  Facebook user platform, and the ad business is almost exclusively how Facebook makes money.

7        85.    Facebook has computer architecture dedicated to the review, testing, and

8  monitoring of Facebook advertisements for compliance with Facebook's Advertising Terms and

9  Self-Service Advertising Terms. As described below, Facebook is acting as an advertising agency,

10  if not the largest digital advertiser in the world with the capability of posting a completed ad itself.

11       **G.**    **Facebook's Advertising Business Substantially Controls the Development of**

12            **Each Ad Through Its Contracts with Aspiring Advertisers**

13        86.    As described by Zuckerberg, at the beginning of any desired ad campaign, an

14  agreement to a contract with unique terms and conditions specific to Facebook's advertising

15  services is required of any entity or person.[14] This is true of the Syndicate, which hired Facebook

16  to provide advertising services, defining the relationship between Facebook and the Syndicate as

17  that of co-developer.

18        87.    The Syndicate agreed to Facebook's Advertising Terms and Conditions and Self-

19  Service Advertising Terms and Conditions as a pre-condition to Facebook co-developing the

20  Scam Crypto Ads. Despite this agreement, the Syndicate succeeded with its fraudulent scheme

21  even after complaints to Facebook from Dr. Forrest.

22

23

---

24  [13] *See* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/4dd7fa7f-1a51-4ed9-b9df-
7f42cc3321eb.pdf Meta, Inc, 10-K filing Dec.,2020 at page 7. (Last visited June 17, 2022) ("We

25  build useful and engaging products that enable people to connect and share with friends and
family through mobile devices, personal computers, virtual reality headsets, and in-home devices.

26  We also help people discover and learn about what is going on in the world around them, enable
people to share their opinions, ideas, photos and videos, and other activities with audiences

27  ranging from their closest family members and friends to the public at large, and stay connected
everywhere by accessing our products.")

28  [14] It does not appear that such advertising clients need be Facebook users or have Facebook pages.

88.     Facebook's Advertising Policies specify that Facebook confirms the most basic of information that establishes true identity—*e.g.*, name and address. From Dr. Forrest's investigation, it is obvious that Facebook failed in this requirement because the Syndicate used false and incomplete information to register to advertise-- and still slipped through the net.

89.     As part of the Facebook's advertising review process called for by Facebook's Advertising Policies, Facebook checks the ad's image, text, targeting and positioning in addition to the content of the ad's landing page, and reserves the right to reject or require modification of any reviewed ads before they are allowed to appear on Facebook user platform.

90.     Facebook's Self-Service Ad Terms make this clear, specifying that its terms "apply to [the] use of Facebook Products (such as the self-service advertising interfaces and APIs) for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, the self-service Ad Interfaces) and any order [] place[d] through the Self-Serve Ad Interfaces ("Order")."

91.     Facebook requires its advertising customers to pay for each ad Order placed. Facebook's Self-Service Ad Terms further specify that: it "[m]ay reject or remove any ad for any reason."

92.     Facebook's Self-Service Ad Terms further specify that: "[f]rom time to time, we need to test improvements to our audiences and delivery systems, which could impact your advertising. Our testing is designed to improve the effectiveness of your advertising performance. We reserve the right to test when we believe it will be beneficial for advertiser performance."

93.     Facebook's Self Service Ad Terms further specify that Facebook "***will determine the size, placement and positioning of your ads***" and that "scheduling of delivery is subject to availability and may not be continuous." (Emphasis added.)

**H.     Facebook Substantially Contributes to the Ads Using Meta Pixel**

94.     Meta Pixel is a product offering that Facebook provides to advertisers, including the Syndicate in this case.[15]

---

[15] https://www.facebook.com/business/help/952192354843755?id=1205376682832142. (Last visited June 17, 2022).

95.     Meta Pixel is a type of "tracking pixel," which is a white or invisible 1-by-1 pixel displayed by lines of code installed in an email or on a webpage—outside of Facebook's user platform on, *e.g.*, a scammer's landing page.

96.     Facebook describes Meta Pixel to its advertisers as follows:

> The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for dynamic ads campaigns, and to analyze that effectiveness of your website's conversion funnels.[16]

97.     Advertisers install the Meta Pixel on their own websites, not in the ad that appears on Facebook.

98.     In selling advertisements to be shown to Facebook users, Facebook inserts its own content into the landing pages for its ads, thus changing the content created by the advertiser on the advertiser's own website.

99.     Meta Events Manager, a product Facebook offers to Facebook advertisers, gives those advertisers access to data about Facebook users that Facebook collects via the Meta Pixel.

100.    Among the "events," or actions on the advertiser's website that Facebook tracks for advertisers are certain "[s]tandard events [that] are predefined by Meta and can be used to . . . optimize for conversions and build audiences."[17]

101.    These standard events include "View Content," defined as "[a] visit to a web page you care about. For example, a product or landing page. View content tells you if someone visits a web page's URL, but not what they do or see on that web page."[18]

102.    Facebook and the Syndicate used the Meta Pixel to track whether Facebook users viewed websites containing fraudulent content. Facebook's advertising business then used its products, including Meta Events Manager, to notify fraudsters when Facebook users interacted

---

[16] https://developers.facebook.com/docs/meta-pixel. (Last visited June 17, 2022).

[17] https://www.facebook.com/business/help/402791146561655 (last visited June 17, 2022).

[18] *Id.*

with fraudulent content. Facebook then encouraged fraudsters to drive additional users to that content by purchasing more ads and optimizing the display of fraudulent ads to users who were more likely to engage with fraudulent content.

I.  **The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads**

1.  <u>Ad Content</u>

103.   Since it launched Facebook Ads in 2007, Facebook has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today."

104.   In 2009, Facebook's introduction of advanced advertising metrics took its advertising business to the next level. In an October 26, 2009, article titled "*Facebook's Self-Serve Ads Are Ridiculously Easy to Make,*" Business Insider reported that Facebook's advertising business was "bustling" and would allow advertisers to reach individuals that were, for example, engaged or married, or had shown an interest in flyfishing.

105.   However, since then, Facebook's tools and services have evolved in such a sophisticated way that the 2009 version of Facebook is virtually unidentifiable. For example, as explained in a 2021 article by the Washington Post titled "*There's no Escape from Facebook, Even if You Don't Use it",* starting in or around 2010, researchers studying Facebook noticed that Facebook was placing software widgets on non-Facebook websites that would allow Facebook users to "like" or share content to Facebook without leaving the website, prompting concerns that Facebook was using data it collected to track all of a users' online activity.

106.   Facebook initially refuted the allegations, claiming that it was not using web data to track people and only used data for advertising purposes when a user clicked the widget to share content. And, in 2014, Facebook changed its practices to begin allowing its advertisers to target users based on websites users visit and other "off-Facebook" activities. This opened up a

1   Pandora's box of data use that was exacerbated once Facebook shifted to using mobile phone

2   applications to increase Facebook's reach (and its source of data).

3       107.    Moreover, the data Facebook has collected since changes in 2010 and 2014 derives

4   much of its value from the ability to identify Facebook's users by their real-world identity. Unlike

5   companies that use browsing cookies that can be easily cleared or blocked, Facebook ties what it

6   learns about an individual to real identities that it requires its users to disclose, including the user's

7   name, phone number, email address, birthday, and gender.

8       108.    Thus while Facebook characterizes each user's disclosure of his or her identity as

9   increasing the value of the experience for all users, who are purportedly able to benefit from

10  others' disclosures by connecting with and following the activities of their real-world connections,

11  the real value is passed along to Facebook, who can meld the plethora of data it collects on and off

12  Facebook to build a digital dossier on real individuals and increase the market value of that

13  information.

14      109.    Because of this evolution in Facebook's ability to collect and use data, and charge a

15  premium to advertisers to use that data, Facebook has seen an exponential growth in its value, the

16  vast majority of which comes from its ad revenue:[19]

27  [19] *Meta's (formerly Facebook Inc.) advertising revenue worldwide from 2009 to 2021*, (Feb. 18,

28  2022), https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/.
    (Last visited June 17, 2022).

SECOND AMENDED COMPLAINT



110.    Indeed, Facebook's internal process includes both *ad creation* and *ad delivery*, sometimes conflated by media reports collectively into "targeting." But examining these terms individually, the first step of the "Ad creation" process is where the advertiser submits the text and images that comprise the content of their ad.

111.    On the Facebook Ad Platform, each ad must be linked to a landing page. Advertisers are allowed to have multiple pages and run ads for any of them. Under this model, a/k/a "the Facebook Ad Creative," Facebook *de facto* acts as a co-developer, not just as an entity that posts an ad that is handed to them by a third party to paste on a Facebook page.

112.    For typical ads, an advertiser provides the headline and text to accompany the ad and images or videos to show to the user. A prospective advertiser can also provide a traffic destination to send the user to if they click (*e.g.*, a Facebook page or an external URL).

113.    If the advertiser provides a traffic destination, the ad will include a brief description (auto generated from HTML meta-data) about this destination. Facebook provides advertisers with a number of objectives to choose from when placing an ad; each objective tries to maximize a different optimization event the advertiser wishes to occur: "Awareness" (simply optimizing for

the most impressions), Consideration (optimizing for clicks) and "Conversion" (optimizing for sales generated by clicking the ad.)

114.    For each objective, the prospective Facebook advertiser bids on the objective itself. A bid can take multiple forms and includes the start and end time of the proposed ad campaign. Once this is done, Facebook then places bid in its internal ad auction(s) on the advertisers' behalf.

115.    When Facebook has ad slots available, it runs an ad auction among the active advertisements bidding for that particular user. But the auction does not just use the bids placed by the advertisers. Rather, in its role as a co-developer, Facebook says: "the ad that wins an option and gets shown is the one with the highest total value. Total value is and how much an advertiser is willing to pay us to show their ad. It's a combination of three major factors: bid, estimated action rates and add quality and relevance."

116.    In another hallmark of its co-developer activities, Facebook provides customizable templates for digital ad creation, then machine assists the advertiser in selecting various options on how to display digital ad content.

117.    Facebook's ability to place digital ads for low amounts, without the need for hiring the traditional ad agency, has allowed Facebook to act like and replace the traditional advertising agency. Facebook's advertising digital platform has had a profound impact on traditional advertising and marketing spheres, an event that was not forseeable when Section 230 was enacted, meaning that Section 230 could not have been intended to reach Facebook's ad development actions.

118.    Facebook's modification of digital ads before approval and publishing occurs through several factors, one being an ad's market effects. And this is not neutral tools being used to connect users. For example, if Facebook were to run identical ads targeting persons in Western Australia, but with differing budgets, the resulting audience will be different. The more money spent, the better the resulting audience.

119.    Further, audience delivery can and does change *due to the content of the ad itself* (*i.e.* the ad headline, text, and image,) collectively called the "ad creative." (Emphasis added)

120.   Despite advertisers placing the same bid on the same audience, Facebook's ad delivery will change based on the ad creative alone. The Syndicate running the Scam Crypto Ads took's Facebook's assistance in locating those most likely to click on the Scam Crypto Ads.

121.   The power of image is material and results in changing the audience of the ads, beginning with the running of an ad.

122.   Facebook's optimization of the selection of ad creatives, together with market effects allows ads to be delivered to a specified audience.

2.    <u>Ad Creative</u>

123.   "Ad Creative" is well known in the advertising agency. Facebook Ad Creative is classified as any Facebook ad that users see on a website or app. Ad Creative can be images, videos, and other formats that get delivered to users.

124.   Simply by going online, a prospective Facebook advertiser can choose from ads Facebook created that are designed to attract users.[20]

125.   In urging ad customers to "Advertise with Confidence," Facebook invites the prospective advertiser to "Design your ad using various formats, placements, and objectives to meet your marketing goals. Facebook even instructs the would-be advertiser on "Best Practices."

126.   Facebook also modifies the type of ad through its auction process, advising that:

> The pricing of Facebook ads is based on an auction system where ads compete for impressions based on bid and performance. When you run your ad, you're only be charged for the number of clicks or the number of impressions your ad received.

127.   Ad Manager also lets a would-be advertiser use existing ads—already approved by Facebook to select an existing post you can edit and customize the ad creative. Therefore, as long as a *per se* unlawful ad has not been located from human review, scam ads can be repeated and sent to the same audience over and over.

---

[20] https://www.facebook.com/business/ads-guide?content_id=dxR17TaPLmD3Sdl&ref=sem_smb&utm_source=GOOGLE&utm_medium=fb smbsem&utm_campaign=PFX_SEM_G_BusinessAds_US_EN_DSA_Other_Desktop&utm_conte nt=BusinessAds_US_EN_DSA_Desktop&gclid=EAIaIQobChMI1PeN3Nqe-AIVBAh9Ch2TrAZ-EAAYAiAAEgLU-_D_BwE&utm_term=dsa-1598818772528&utm_ct=EVG. (Last visited June 17, 2022).

128.    Facebook Dynamic Creative technology builds and displays the best creative for groups of people in a broader target audience. It improves the ability to explore numerous creative combinations and audiences efficiently. Dynamic Creative also seeks to improve an ads' ROI by automating workflow used to test the ad creative.

129.    Ad creative has a relatively short shelf life and will be "fatigued" and must be refreshed or it will "die" due to lack of interest, thus explaining in part why the crypto currency scams only lasted for a short time only to be replaced by a new and different ad creative as recently as February 2022.

3.    Ad Delivery

130.    "Ad delivery" is where the Facebook platform delivers ads to the specific users based on a number of factors.

131.    Indeed, in examining the competition in digital markets, the U.S. House Committee on the Judiciary, through its Antitrust, Commercial, and Administrative Law Subcommittee ("Subcommittee"), released a report of over 400 pages entitled: "Investigation of Competition in the Digital Marketplace: Majority Staff Report and Recommendations." With respect to user monetization, in an interview conducted by a Congressional Subcommittee staff, "a former employee explained that as a product manager at Facebook, 'your only job is to get an extra minute [of user's attention]. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So, the only metric is getting another minute.'"[21]

132.    Facebook's platform uses algorithms to modify both content and delivery. Without access to Facebook's ad delivery algorithm, user data and advertiser targeting data or delivery statistics, that Facebook modifies content and delivery all as one unified act to reach users and targeting choices that are known only to Facebook and not the criminals. This is truly a gift with a bow—Facebook both helps create and places the ideal ad and then sifts through its data to allow the Syndicate to sit back and wait for users to click the ad.

---

[21] House Committee on the Judiciary, *Investigation of Competition in The Digital Marketplace: Majority Staff Report and Recommendations*, at p. 135, October 6, 2020, available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("Subcommittee Staff Report on Digital Markets") (last visited June 17, 2022).

133.    Factors that Facebook uses include budget, an ad's performance, and the predicted relevance of the ads to users. Facebook has refused to date to produce the specific information that would explain how the Scam Crypto Ads were approved and then continued to run and repeatedly pop up despite being told by Dr. Forrest of the harm to him and others.

134.    Facebook was aware that its machine only process modifies content to likely victims of scam ads and none of this is performed by human review. Aware of this widely known fact, Facebook knew that the machine review would inevitably result in harm being perpetrated upon victims. The only questions were who would be harmed, how big the harm, and when it would occur.

135.    In sum, Facebook's advertising business does not merely "use the data that people put into the system." Rather, Facebook researches, develops, and deploys sophisticated tools and methods to amass and make sense of enormous amounts of information to deliver advertisements and information directly toward what it knows a user will respond to.

    4.    <u>Facebook Elicits and Encourages the Creation of Illegal Content</u>

136.    Aside from the content it co-develops, Facebook is similarly liable for its role, in whole or in part, for the creation and development of the offending content even if originated by third-parties. *See Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F. 3d 1157, 1162 (9th Cir. 2008). Indeed, Zuckerberg has acknowledged that Facebook's is role more akin to a "media company" rather than just a tech platform for publishing, asserting that "[Facebook is] not a traditional media company. "You know, we build technology and we feel responsible for how it's used." [22] Zuckerberg has also taken responsibility in other forums, claiming that "we [Facebook] are responsible for the content [on Facebook]."[23] More recently, on March 25, 2021, Zuckerberg testified before Congress that "[i]nstead of being granted immunity,

[22] Josh Constine, *Zuckerberg Implies Facebook is a media company, just 'not a traditional media company*, Tech Crunch (Dec. 21, 2016), https://techcrunch.com/2016/12/21/fbonc/?guccounter=1. (Last visited June 17, 2022).
[23] Matt Weinberger, *Mark Zuckerberg Just Renounced a Core Piece of Silicon Valley Wisdom – And It Could Come Back to Bite Facebook*, Business Insider (April 10, 2018), https://www.businessinsider.com/mark-zuckerberg-facebook-is-responsible-for-the-content-on-its-platform-2018-4. (Last visited June 17, 2022).

1    platforms should be required to demonstrate that they have systems in place for identifying

2    unlawful content and removing it."[24]

3         137.    However, rather than demonstrating sufficient systems in place for identifying

4    unlawful content and removing it, Facebook has done the opposite, encouraging the creation of

5    illegal content across its platforms.

6         138.    Despite Zuckerberg's public stance, apparently meant to endear faith in Facebook's

7    platform and the content therein, Facebook's indispensable role in carrying out fraudulent schemes

8    is well-known in circles of fraudsters as Facebook encourages the proliferation of illegal ads on its

9    platform like those at issue here. Advertising fraudsters have been quoted as stating that where

10   they once had to guess what kind of person might fall for their unsophisticated cons Facebook

11   now does that work for them as it labors to track who clicks on an ad and who buys the product,

12   and then starts delivering the ads to others whom it thinks are likely to fall victim to the scam.

13   "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers

14   data through trial and error, then seeing the sales take off exponentially. 'They go out and find the

15   [victims] for me.'"[25]

16        139.    Further, internet fraud advertising hucksters explain that Facebook sales

17   employees—with knowledge of their deceptive schemes—encourage them to buy more ads.

18   Former Facebook employees alleged that it was "common knowledge" that some of their best

19   clients were advertisers who used deception but were instructed to push these fraudsters to spend

20   more to meet sales quotas of tens of millions of dollars per quarter.[26] In an interview conducted by

21   U.S. House Subcommittee staff, "a former employee explained that as a product manager at

22   Facebook, 'your only job is to get an extra minute [of user's attention]. It's immoral. They don't

23   ask where it's coming from. They can monetize a minute of activity at a certain rate. So the only

24   metric is getting another minute.'"[27]

25

26   [24] March 25, 2021 Congressional Hearing before the Committee on Energy and Commerce, p. 7, https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/

27   Witness%20Testimony_Zuckerberg_CAT_CPC_2021.03.25.pdf . (Last visited June 17, 2022).
[25] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.

28   [26] *Id.*
[27] Subcommittee Staff Report on Digital Markets, at p. 135.

140.    Further, Facebook's role in developing illegal content extends beyond its methods of finding marks or encouraging scammers to buy fraudulent ads to meet sales quotas, and extends into Facebook's decisions to host its ad review process off of Australian shores, allowing third-party fraudsters to use simple geolocation cloaking software to easily target vulnerable Australian citizens.

141.    Facebook has explicitly refused to submit itself to Australian jurisdiction, choosing instead to locate its advertisement review platform offshore for ads with a final destination of Australia. However, Facebook is fully aware that scam advertisers use geolocation cloaking software to circumvent ad review policies and get their fraudulent ads delivered. In short, geolocation cloaking software is a method by which an advertiser disguises his ad as a legitimate one when it is reviewed for approval at a particular IP address, but is transformed into a fraudulent ad when it gets delivered to the advertisement's final destination.

142.    The practices and easy workarounds provided by cloaking software are well known to both Facebook and fraudulent advertisers and scam advertisements featuring Dr. Forrest have continued to proliferate on Facebook.

143.    Facebook's decision to offshore its review platform despite the extensive use of the cloaking software materially contributes to the fraud content as it encourages the proliferation and creation of these illegal ads, and Facebook is directly involved with developing and enforcing a system that ultimately subjects its users to illegal content. These acts go far beyond the business practices of a traditional publisher, and Facebook is liable for its actions in co-developing Forrest Scam Crypto Ads for dissemination to consumers, including those on Facebook's user platform.

**J.      Facebook's Ability to Find Cryptocurrency Ads**

144.    At all relevant times, Facebook has been in possession of technology that can find cryptocurrency-related terms and images in digital content. There is also technology that could examine a landing page or a subsequent/downstream landing page for cryptocurrency content.

145.    There are many ways detection and screening can be accomplished. The techniques described above (lexical and semantic search, automated image analysis using AI, recursive web robots, and web scrapers) are well-known and used throughout the computer science field.

146.     Simple key word searches for "Forrest," "Twiggy," "bitcoin," "crypto," etc., and the use of imaging technology to identify Dr. Forrest's image could have easily isolated Forrest scams in the proposed news articles and would have succeed into identifying these scams even without the cloaked landing page.

147.     Facebook's advertising business's self-touted ability to control advertising scams by "verifying the identity of accounts" and requiring provision "of a government ID and pro[of] of location" action would have never allowed the obviously shady Syndicate to successfully advertise if Facebook had really not wanted it to do so.

148.     Facebook reports that it removes ads but does not tell users that it has the ability to post the ads in the first place.[28]

## V.     FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE

149.     As set forth in this section, Facebook has engaged in unfair jurisdictional arbitrage. Dr. Forrest seeks equitable relief to correct this, including application of Australian law on the question of Section 230 immunity.

150.     On or about August 27, 2019, in response to queries from Dr. Forrest's Australian lawyers, Facebook, Inc's U.S. lawyers (White & Case, LLP's Los Angeles office), wrote to Dr. Forrest's Australian legal counsel stating:

> For users residing in Australia, the Facebook service is hosted and operated by Facebook, Inc., a company organized and existing under the laws of Delaware, United States, and with its principal place of business in Menlo Park, California… Facebook Ireland is a separate entity, independent of and legally distinct from Facebook, Inc. Facebook Ireland does not own, operate, control, or host the Facebook Services for Australian users. Facebook, Inc. is the entity with which Australian users have a contractual relationship, and it operates and controls the Facebook Service for such users.

151.     However, in at least two Australian judicial proceedings relating to and arising from the Crypto Scam Ads, Facebook has taken the position that Facebook, Inc. cannot be lawfully served with service of process by Australian federal and state courts. Second, Facebook

---

[28] *Meta Response to the Australian Disinformation and Misinformation Industry Code* (2021) https://digi.org.au/wp-content/uploads/2022/05/Meta_2022-Misinformation-Transparency-report-v1.0.pdf. (Last visited June 17, 2022).

1   has taken the position that it is not properly be the subject of jurisdiction in legal proceedings

2   originating in the Australian federal and state courts.

3        152.    On or about January 31, 2022, a Prosecution Notice issued out of the Magistrates

4   Court of Western Australia, charging Facebook with three counts of federal crimes under The

5   Criminal Code 1995 (Cth), Section 400.7(2) relating to its conduct in dealing with property,

6   namely a Facebook computer cluster, where; there was a risk that the property would become an

7   instrument of crime, in circumstances where the Accused was reckless as to the fact that these was

8   a risk that the property would become an instrument of crime ("WA Criminal Proceedings".)

9        153.    The prosecutor and party who issued the Notice in the WA Criminal Proceedings

10   was Dr. Forrest in a private capacity. Dr. Forrest obtained the consent and approval to do so from

11   the Attorney General for the Commonwealth of Australia, Hon. Michaelia Cash.

12        154.    Subsequently, Facebook was served with process, and a hearing in the WA

13   Criminal proceedings was set for March 28, 2022. Facebook received notice of this hearing.

14        155.    On or about March 21, 2022, Facebook wrote to Prosecutor Forrest, advising in

15   pertinent part:

16          With no disrespect intended to the courts of Western Australia, Meta does
       not presently perceive the jurisdiction of the Magistrates Court to summon

17          it from the State of California to face the charges brought by Dr. Forrest[]
       The purpose of this letter is, *inter alia*, to seek clarification from Dr.

18          Forrest of the bases on which the Magistrates Court is said to possess
       jurisdiction. Meta does not by this letter or otherwise, intend to voluntarily

19          submit to the jurisdiction and expressly reserves its rights. …

20          Please urgently advise whether, and if so on what basis, Dr. Forrest
       asserts: … that process or orders of the Magistrates Court of Western

21          Australia are capable of compelling the attendance of a foreign
       corporation not present in the jurisdiction. As you are no doubt aware, the

22          issue of in *personam* jurisdiction with respect to Meta is discrete, and not
       informed by whether the Criminal Code (CTH) (Code") confers federal

23          extraterritorial 'subject matter' jurisdiction over foreign corporations
       accused of Div. 400 offences generally. (Italics added).

24        156.    In anticipation of the March 28, 2022, hearing in the WA Criminal Proceedings,

25   Facebook did not file any general or special appearance, and did not appear at the hearing when

26   said proceedings were called.

27

28

157.    After the March 28, 2022 hearing, the Court entered orders that service of process on Facebook had been properly affected and entered a plea of not guilty on behalf of Facebook as an absent defendant and appointed June 17, 2022 as a further hearing date.

158.    On June 17, 2022, Facebook  appeared in the WA Criminal Proceedings purporting to enter a conditional appearance to contest, *inter alia,* personal jurisdiction.

159.    Further, on or about March 18, 2022, the Australian Competition and Consumer Commission ("ACCC") commenced proceedings against Facebook alleging violation of the Australian Consumer Law and the Australian Securities and Investments Commission Act, further alleging that Facebook aided and abetted or was knowingly concerned in false or misleading conduct and representations by advertisers of scam advertisements featuring prominent Australian public figures ("ACCC Prosecution").

160.    The ACCC Prosecution alleges that Facebook ads, which promoted investment in cryptocurrency or money-making schemes, were likely to mislead Facebook users into believing the advertised schemes were associated with well-known Australian celebrities. The schemes were in fact scams, and the people featured in the ads had never approved or endorsed them. According to ACCC Chair Rod Sims, "The essence of our case is that Meta is responsible for these ads that it publishes on its platform."

161.    In an unprecedented action, on June 10, 2022, Facebook sought to ban publication of the details of the ACCC civil case. Facebook remains able to contest the jurisdiction of the Australian court in this proceeding.

162.    To summarize, on one hand, Facebook is claiming that it is beyond the jurisdiction of Australian Courts for its advertising activities involving the false endorsement and wrongful misappropriation of Australian celebrities' likeness. On the other hand, Facebook claims in this action that a U.S. federal statute, without an analogue in Australian statutory or common law, namely Section 230, should immunize for the same Australian acts and omissions which the WA Criminal Proceedings and ACCC proceeding concern.

163.    In this action the activities of the Syndicate have no connection to the United States other than the fact that they accessed and worked with Facebook's architecture of computer

1    clusters around the world to develop, optimize, and then deliver the Scam Crypto Ads to members

2    of the Australian public.

3            164.    The Scam Crypto Ads about which Dr. Forrest complains were specifically

4    targeted to be delivered to the desktops and laptops of Facebook users across Australia who

5    followed and admired Dr. Forrest as a successful and prominent Australian businessman.

6            165.    These are the same Australian Facebook users who Facebook asserts contract with

7    it to receive the benefits of Facebook's services in Australia, and in turn grant Facebook, Inc.

8    rights and benefits to use and profit from their Australian data.

9            166.    In behaving in the manner alleged in this SAC, Facebook is engaging in an

10   inequitable jurisdictional arbitrage, refusing to submit to the jurisdiction of Australia to answer

11   claims in order to seek to apply a uniquely U.S. statute that purports to afford immunity to

12   Facebook.

13           167.    The immunity would not exist if Facebook submitted to jurisdiction in Australia,

14   and Facebook seeks to use U.S. determinations immunizing their wrongful conduct, and as part of

15   an overall litigation strategy, to deny Dr Forrest and all Australian citizens their rights and

16   entitlements.

17   **VI.     CAUSES OF ACTION**

18           168.    Dr. Forrest has been irreparably harmed, and the whole ordeal distracts from and

19   displaces the many positive associations with Dr. Forrest's name, clouds his impeccable

20   reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness.

21   Accordingly, Dr. Forrest brings each of the following causes of action against Facebook:

22                                    **<u>FIRST CAUSE OF ACTION</u>**

23                              **Misappropriation of Name of Likeness**

24           169.    Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth

25   herein.

26           170.    At all relevant times, Facebook used and misappropriated Dr. Forrest's name and

27   likeness in images and videos in violation of California common law.

28

171.   Facebook misappropriated Dr. Forrest's name, likeness, and brand, to keep its users engaged with illegal content in the form of the underlying fraud and allowed Facebook to gain an unwarranted commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist because the longer users are engaged, the more data Facebook is able to collect and monetize. Facebook further gained a commercial benefit by selling advertisements and ways to promote or "boost" content to underlying fraudsters and profiting from the illicit ill-gotten proceeds that served to perpetuate the fraud.

172.   Facebook's advertising business misappropriated Dr. Forrest's name, likeness, and brand by contracting to and, Dr. Forrest believes, in fact, materially contributing to the content of the Scam Crypto Ads as co-developer, and in reviewing and approving the ad as appropriate to be submitted to Facebook's user platform for auction and dissemination as a Facebook advertisement.

173.   Dr. Forrest has never consented to these unauthorized and illegal uses of his name, image, voice, likeness, or photos or videos of him. Facebook knew, or should have known, that Dr. Forrest did not authorize or consent to the misuses because Dr. Forrest himself and/or through his agents directly informed Facebook of the misuses.

174.   As a result of Facebook's wrongful conduct as alleged in the SAC, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation as a consequence of the pervasive investment scam that has been perpetuated, aided, and abetted, and carried out through the Facebook website. Dr. Forrest's reputation and the commercial value of his name and likeness, both of which he is and has been committed to protecting and developing, have also suffered injury. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

175.   Facebook's misappropriation of Dr. Forrest's common law right to his name and likeness has been deliberate, willful, and in utter disregard of his rights.

176.   Dr. Forrest seeks all available compensatory, punitive, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

1

**SECOND CAUSE OF ACTION**

2

**Aiding and Abetting Fraud**

3    177.   Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth

4    herein.

5    178.   At all times relevant, the DOE defendants and unknown persons and their co-

6    conspirators who carried out the Scam Crypto Ads have committed fraud by luring unsuspecting

7    investors to send money in exchange for a benefit that does not exist.

8    179.   At all times relevant, Facebook knew, or should have known, about the underlying

9    fraud.

10    180.   At all times relevant, Facebook was an indispensable part of the Scam Crypto Ads,

11    provided substantial assistance and encouragement to, materially contributed to, and otherwise

12    aided and abetted the fraud.

13    181.   As alleged in this SAC, during the testing and framing of the ads' content,

14    Facebook assists the fraudsters in refining a user audience that is most likely to click and purchase.

15    This rotation of ads assists the fraudsters in locating their victims, and is part of the co-

16    development of the content that Facebook provides. Facebook collects vast amounts of data and

17    paid and unpaid content to create an experience for users and is incentivized to curate this

18    experience because the longer users are engaged and the more time a user spends on Facebook, the

19    more data, content, and information Facebook is able to collect and monetize.

20    182.   Facebook users did not have a practical option to prevent Facebook from collecting

21    and using their own data against them, including their private browsing history when they were

22    logged off of Facebook, and the gathering of such data was a necessary condition to their use of

23    Facebook and/or the ability to opt out of such data collection was so confusing that the practical

24    effect was that there was no option to prevent Facebook's data collection.

25    183.   Using its vast array of data collected, Facebook intentionally provided substantial

26    assistance and/or encouragement in the underlying fraud by changing the experience of users and

27    delivering messages to the victims that they would like or be interested in this fraudulent content,

28

37

based upon among other things, specific vulnerabilities to the underlying fraud that it was able to exploit using the data it collected on its users.

184.    Facebook further intentionally provided substantial assistance and/or encouragement to the Scam Crypto Ads by changing the user experience to the extent Facebook's advertising business, with all of the knowledge it was aware of regarding Scam Crypto Ads, by contracting to and materially contributing to the content of the ads as co-developer, reviewer, and approver of the ads as appropriate to be submitted to Facebook's user platform for auction and dissemination as Facebook advertisements.

185.    Other frauds have been carried out via this method, and news articles have quoted similar bad actors: "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the morons for me.'"[29]

186.    Facebook's advertising business provided substantial assistance and/or encouragement to the underlying fraud when it knowingly and willingly sold the underlying scammers targeted advertising that were paid for by ill-gotten proceeds. The advertisements drove Facebook's own users to the fraudulent promotions and ads, further fueling the scam and keeping the money flowing. In fact, news articles have quoted former Facebook employees who "said it was common knowledge there that some of their best clients were affiliates who used deception. Still, the sources said, salespeople were instructed to push them to spend more."[30]

187.    Facebook's conduct was independently tortious and a substantial factor, proximately causing the harm Dr. Forrest has suffered, including irreparable harm to his public image and reputation as a consequence of the Scam Crypto Ads that Facebook has substantially encouraged and assisted. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

---

[29] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.
[30] *Id.*

188.   Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Unfair Competition Law

### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

189.   Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth herein.

190.   Section 17200 *et seq*. of the California Business & Professions Code, which is California's Uniform Competition Law ("UCL"), is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, unfair and/or fraudulent. The UCL statute's intent and purpose is to protect both consumers and competitors. The coverage of Bus. & Prof. Code § 17200 *et seq*. is broad and intended to enjoin on-going wrongful business conduct in whatever context such activity might occur.

191.   Dr. Forrest is a "person" within the meaning of Bus. & Prof. Code § 17201. Facebook's principal place of business is located within California. Dr. Forrest maintains a Facebook user account and has a verified Facebook page.

192.   Facebook has engaged in unfair and/or unlawful business practices within the meaning of Bus. & Prof. Code § 17200 *et seq*.

193.   Facebook's conduct is "unlawful" under the UCL. Within the meaning of Section 17200, virtually any violation of any civil or criminal federal, state, or municipal, statutory, or regulatory, court-made, or local law can serve as a predicate offense for an unlawful claim. Facebook acted unlawfully by misappropriating Dr. Forrest's name and likeness and violated his common law right of publicity to keep its users engaged with illegal content in the form of the underlying fraud, and in violating the Lanham Act (15 U.S.C. § 1125(a)) prohibition on false endorsement, allowing Facebook to gain a commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist.

194.    Facebook's conduct is also "unfair." The Scam Crypto Ads were facilitated by Facebook's unique method of curating user experiences to provide content that would keep a particular user engaged on the website, and thus allowing Facebook to harvest more data, and/or by leveraging this data to provide targeted ad capabilities to the underlying bad actors, and in engaging in conduct which is tethered to and in violation of the policies underlying the Lanham Act prohibition on false endorsement. Such conduct is unfair under Section 17200, causing financial and reputational harm, offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. A practice may be deemed "unfair" under the UCL even if not specifically proscribed by some other law.

195.    Dr. Forrest has standing to pursue his UCL claim because he has suffered an economic injury in fact and has lost money or property resulting from Facebook's unfair and/or unlawful conduct. Dr. Forrest has no adequate remedy at law for some of his injuries.

196.    The UCL is a strict liability statute and it is therefore not necessary to show that Facebook intended to injure or harm Dr. Forrest.

197.    Whether a business practice is unlawful or unfair presents factual questions for the ultimate factfinder to determine.

198.    An act or omission may violate the UCL even if the unfair or unlawful act or practice affects only one victim.

199.    As a direct and proximate result of Facebook's unlawful and unfair conduct, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation, and has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

200.    Pursuant to Bus. & Prof. Code § 17203, Dr. Forrest seeks the entry of permanent and mandatory injunctive relief against Facebook as necessary to enjoin its unfair and/or unlawful business conduct.

## FOURTH CAUSE OF ACTION

### Negligent Failure to Warn

201.    Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth herein.

202.     During all times relevant to this SAC, Facebook had actual or constructive knowledge of all relevant aspects of the Scam Crypto Ads, including, but not limited to, the unauthorized use of Dr. Forrest's name, images, likenesses, and protected marks which were wrongfully and repeatedly exploited to promote the scam. The harm to Dr. Forrest was reasonably foreseeable to Facebook.

203.     Facebook had actual or constructive and independent knowledge of the Scam Crypto Ads, irrespective of its monitoring of third-party content, as Facebook was aware of the Scam Crypto Ads since in or about March 2019.

204.    Facebook had a duty to warn Dr. Forrest that could have been satisfied even without conducting a detailed investigation. And due to its misfeasance, Facebook is responsible for making Dr. Forrest's position worse and created the risk, such that no "special relationship" is required for the duty to exist. Facebook should have warned its users, including, Dr. Forrest, of the Scam Crypto Ads.

205.    Facebook's inaction fell below the standard of care. It would have been reasonable under the circumstances for Facebook to provide a warning(s) to Dr. Forrest. Facebook breached its duty of care by failing to adequately warn its users about the Scam Crypto Ads.

206.    Facebook's failure to warn was a substantial factor in causing Dr. Forrest's harm.

207.    As a direct and proximate consequence of Facebook's failure to warn and negligence, Dr. Forrest has been severely harmed, including harm to his reputation and the commercial value of his name, image, and likeness. Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

208.    Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION

**Lanham Act Violations**

209.    Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth herein.

210.    Dr. Forrest is a celebrity within the meaning of the Lanham Act, specifically 15 U.S.C. § 1125(a). His "mark" is his persona, its strength reflective of the extremely high level of recognition his image and name enjoy as a successful businessman and philanthropist.

211.    Facebook and the Syndicate have co-developed, and Facebook's advertising business reviewed, approved, and supplied its prior written consent of the Scam Crypto Ads for later dissemination on Facebook's user platform. This occurred for the sole and exclusive purpose of inducing Facebook users who encountered the Scam Crypto Ads to purchase the goods and/or services promoted by Dr. Forrest's purported but false endorsement.

212.    Facebook acted as a digital advertising agency which helped create and co-develop the marketing and advertising campaign that became the Scam Crypto Ads.

213.    A reasonable objective consumer in the marketplace would be confused into believing that Dr. Forrest endorses the Scam Crypto Ads. Specifically, his celebrity status as a highly successful businessman and philanthropist was tapped into directly in contriving the Scam Crypto Ads in order to appeal to those seeking supposedly credible investment opportunities.

214.    The Scam Crypto Ads use Dr. Forrest's actual photograph and name. Facebook used its own marketing channels, *i.e.,* its user platform, to target those users which Facebook knew to be highly susceptible to Dr. Forrest's endorsement. Those targeted have been actually confused and deceived by their encounters with the Scam Crypto Ads, often to their financial detriment, relying on the false confidence Dr. Forrest's endorsement has fostered.

215.    Facebook acted willfully in co-developing and then disseminating the Scam Crypto Ads that were never endorsed by Dr. Forrest. Moreover, Facebook changed nothing after being

repeatedly notified, starting in or about late March 2019 by Dr. Forrest and his representatives: (1) that Dr. Forrest did not endorse the Scam Crypto Ads; and (2) Dr. Forrest demanded that the development and/or dissemination of any such ads cease immediately and permanently. Despite these demands, Facebook, through its advertising business, has continued to co-develop, approve, and disseminate the Scam Crypto Ads on Facebook's user platform through at least February 2022.

216.    Facebook's entire business model is based on ad revenue. And with this model comes criminals using Facebook ads that are designed to harm others. Facebook's business model is based on receiving money in the form of advertising fees from its willing involvement in co-developing, and then disseminating the Scam Crypto Ads on its user platform--in a highly targeted fashion to users Facebook believed to be most susceptible to respond favorably to the promotion of such Ads.

217.     Dr. Forrest has been harmed by Facebook's acts and omissions constituting false endorsement, causing him damages to his reputation, status and the good will associated with his stellar reputation for business acumen and philanthropy, including out-of-pocket losses in attempting to preserve his good name and mitigate the negative reputational impact of the Scam Crypto Ads.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment and Related Equitable Relief

218.    Dr. Forrest re-alleges the preceding paragraphs of this SAC as if fully set forth herein.

219.    Dr. Forrest's reputation, name, image, and likeness all have great value to him and objectively in a manner that can be liquidated. The question of the value of his endorsement is a question for a jury, including the "going rate" for an endorsement from Dr. Forrest--for the right to exploit his reputation for a commercial purpose like promoting and endorsing cryptocurrency ads.

220.    There is an active market for the exploitation of the promotion and endorsement from business and philanthropic celebrities like Dr. Forrest.



221.    At the same time, Facebook, through its advertising business, has wrongly received ad revenue in return for co-developing, editing, and approving the Scam Crypto ads that led Facebook users to the Scam Crypto Ads.

222.    The Scam Crypto Ads misused Dr. Forrest's reputation, name, likeness, and endorsement, and have sullied and damaged him.

223.    Given that Facebook has monies which in fact should be restored in the circumstances of fraud and mistake, and the relative equities, and given the nature of the relationship of the parties, defendant's unjust enrichment ought be prevented.

224.    Facebook has therefore been unjustly enriched through the receipt of the ad revenue derived through these ads.

225.    Facebook further will be unjustly enriched if allowed to benefit unfairly from its judicial arbitrage designed and intended to deny Dr. Forrest his day in court except in a jurisdiction in which Facebook will rely, in violation of principles of equity, on Section 230 qualified immunity.

226.    No matter the material difference between the ad revenue and the greater damage in value of Dr. Forrest's reputation, Facebook has been unjustly enriched in the amount of ad revenue Facebook earned in connection with its involvement with Scam Crypto Ads, which sums should be disgorged and given to Dr. Forrest.

227.    Further, in the circumstances presented, namely Facebook's unfair jurisdictional arbitrage, equity should intervene to estop Facebook from asserting, or find that Facebook has waived, Section 230 immunity and/or other affirmative defenses it might seek to raise, and declarations and equitable relief designed to effect this equitable outcome should issue.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Andrew Forrest prays that this Court adjudge and decree and enter judgment in its favor and against defendant Facebook as follows:

1.    That Dr. Forrest is entitled to compensatory damages in an amount to be proven at trial, as permitted by law and according to proof;

2.    That Dr. Forrest be awarded punitive or exemplary damages in an amount to be

1   determined at trial;

2        3.        That this Court enter a permanent and mandatory injunction prohibiting Facebook

3   from engaging in the unlawful and unfair conduct in the future;

4        4.        That Facebook be ordered to disgorge its ill-gotten gains including advertising

5   revenues derived from the Scam Crypto Ads;

6        5.        That this Court undertake a Choice of Law analysis as pled in the SAC and apply

7   Australian law to any assertion of a total or partial affirmative defense under Section 230  and

8   appropriate declarations, and that other equitable orders issue to prevent Facebook from

9   benefitting from its unfair and unconscionable jurisdictional arbitrage.;

10        4,        That Dr. Forrest is entitled to costs of suit; and

11        5.        That Dr. Forrest be afforded such other and further relief, including his attorney

12   fees, as this Court deems just and proper, and law and equity allow.

13                          **DEMAND FOR JURY TRIAL**

14        Plaintiff Dr. Andrew Forrest respectfully requests a jury trial on all triable issues in the

15   above-entitled action.

16

17   DATED: June 17, 2022                    WAYMAKER LLP

18

19

20                                  By:  _____

21                                       Brian E. Klein
                                         Donald R. Pepperman
22                                       Jose R. Nuño

23                                       *Attorneys for Plaintiff Dr. Andrew Forrest*

24

25

26

27

28

**PROOF OF SERVICE**
No. 21-CIV-05055

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 505 S. Flower Street, Suite 3500, Los Angeles, CA 90071.

On **June 17, 2022**, I served true copies of the document(s) described as:

**SECOND AMENDED COMPLAINT**

on the party(ies) in this action as follows:

| | |
|---|---|
| Jacob M. Heath<br>jheath@orrick.com<br>Abigail Colella<br>acolella@orrick.com<br>Sema Virrueta<br>svirrueta@orrick.com<br>Jonathan Liu<br>jonathanliu@orrick.com<br>Orrick, Herrington & Sutcliffe<br>1000 Marsh Road<br>Menlo Park, CA 94025-1015<br>Telephone:  (650) 614-7400<br><br>*Attorneys for Defendant* | Daniel S. Guerra<br>dguerra@orrick.com<br>**Orrick, Herrington & Sutcliffe**<br>405 Howard Street<br>San Francisco, CA 94105<br>Telephone: (415) 773-5545<br><br>*Attorney for Defendant* |

**[X]     BY ELECTRONIC MAIL:**
I caused the document(s) to be sent to the respective e-mail addresses of the parties. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. .

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on  **June 17, 2022** at Los Angeles, California.

_____
**Rebecca Isomoto**