Brian E. Klein (Bar No. 258486)
  bklein@waymakerlaw.com
Donald R. Pepperman (Bar No. 109809)
  dpepperman@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DR. ANDREW FORREST, an individual,<br><br>         Plaintiff,<br><br>   v.<br><br>FACEBOOK, INC., a corporation; and DOES 1 through 20,<br><br>         Defendants. | Case No. 5:22-cv-03699-EJD (VKD)<br><br>**PLAINTIFF DR. ANDREW FORREST'S MOTION FOR LEAVE TO AMEND THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Edward J. Davila<br><br>Hearing Date: January 19, 2023<br>Time: 9:00 a.m.<br>Courtroom: 4<br>Trial Date: Not yet set<br><br>Concurrently Filed with the Declaration of Jose R. Nuño; Request for Judicial Notice; [Proposed] Order |

WAYMAKER

# NOTICE OF MOTION

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

    **PLEASE TAKE NOTICE** that on January 19, 2023, at 9:00 a.m., or as soon after as this matter may be heard in the courtroom of the Honorable Edward J. Davila, located in the San Jose Courthouse, Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, California, 95113, plaintiff Dr. Andrew Forrest ("Dr. Forrest") will move this Court for leave to amend his Second Amended Complaint ("SAC") and file a third amended complaint ("TAC"). This motion is made pursuant to Federal Rule of Civil Procedure 15(a)(2) on the grounds that defendant Facebook Inc.'s removal to this court interrupted Dr. Forrest's state court efforts to protect and preserve his right to state a claim for negligent design, and (a) there will be no prejudice to Facebook if Dr. Forrest is allowed leave to amend; (b) the request to amend is not because of any bad faith or dilatory motives; (c) the amendment will not result in any undue delay; and (d) the amendment is not futile. Fed. R. Civ. P. 15(a); *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186-87 (9th Cir. 1987).

    On July 14, 2022, counsel for Dr. Forrest emailed counsel for Facebook asking whether Facebook would stipulate or consent to allow Dr. Forrest to file his proposed TAC and offered to provide Facebook with a copy of the draft TAC. (Declaration of Jose R. Nuño, ¶ 8.) Facebook responded that same day that it would not stipulate without looking at a draft. (*Id.*) A copy of the proposed TAC, reflecting the proposed amendments is attached as Exhibit 1. A redline document showing the changes made to the SAC is attached as Exhibit 2.

    This motion is made and based upon the following memorandum of points and authorities, the declaration of Jose R. Nuño, any matters of which this Court may take judicial notice, papers on file in connection with this motion and other such arguments and evidence as may be presented at the time of the hearing on this matter, if any.

Dated:  July 25, 2022          WAYMAKER LLP


                              By: /s/ Brian E. Klein
                                  Brian E. Klein
                                  Donald R. Pepperman
                                  Jose R. Nuño

                                  *Attorneys for Plaintiff*
                                  *Dr. Andrew Forrest*

# **TABLE OF CONTENTS**

Page(s)

I.   INTRODUCTION ................................................................................................1

II.  FACTUAL AND PROCEDURAL HISTORY .................................................2

    A.    Dr. Forrest Pleads a Negligent Design Cause of Action in State Court ...2

    B.    The State Court Improperly Dismisses the Negligent Design Cause of Action with Prejudice ................................................................................3

    C.    Dr. Forrest Prepares a Writ of Mandate to Appeal the State Court Decision ....................................................................................................6

III. LEGAL STANDARD ..........................................................................................7

IV.  ARGUMENT.......................................................................................................7

    A.    There Is No Bad Faith ...............................................................................8

    B.    There Is No Undue Delay ..........................................................................9

    C.    Facebook Will Suffer No Prejudice From the Amendment ...................10

    D.    The Proposed Amendment Is Not Futile................................................12

V.   CONCLUSION .................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.M. v. Omegle.com, LLC,*
  Case No. 3:21-cv-01674, Dkt. 36 (D. Or. July 13, 2022) .................................. 13

*Anderson v. International Paper Co.,*
  Case No. 2:13-cv-02079, 2014 WL 12601502 (C.D. Cal. Apr. 21,
  2014) .................................................................................................................. 14

*Banc of California, Inc. v. Farmers & Merchants Bank of Long Beach,*
  Case No.. SACV-16-01601, 2017 WL 2972338 (C.D. Cal. Apr. 19,
  2017) .................................................................................................................. 14

*Brown v. Stored Value Cards, Inc.,*
  953 F.3d 567 (9th Cir. 2020) ............................................................................... 7

*Cal West Nurseries, Inc. v. Superior Court,*
  129 Cal. App. 4th 1170 (2005) ............................................................................ 6

*Castner v. First National Bank of Anchorage,*
  278 F.2d 376 (9th Cir. 1960) ............................................................................. 11

*Challenge Printing Co., Inc. v. Electronics for Imaging, Inc.,*
  Case No. 5:20-cv-04659, 2021 WL 3616766 (N.D. Cal. Aug. 16,
  2021) .................................................................................................................... 7

*Clarke v. Upton,*
  703 F. Supp. 2d 1037 (E.D. Cal. 2010) ............................................................. 12

*DCD Programs, Ltd. V. Leighton,*
  833 F.2d 183 (9th Cir. 1987) ............................................................................. 10

*Duchemin v. Leidos, Inc.,*
  Case No. 18-cv-00012, 2018 WL 2229368 (S.D. Cal. May 16, 2018)........13, 14

*Dumas v. Los Angeles County Board of Supervisors,*
  45 Cal. App. 5th 348 (2020) .............................................................................. 13

*Eminence Capital, LLC v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir. 2003) ........................................................................... 10

*Fairbank v. Wunderman Cato Johnson*,
　212 F.3d 528 (9th Cir. 2000) ............................................................. 10

*Foman v. Davis*,
　371 U.S. 178 (1962)............................................................................8

*Green Valley Corp. v. Caldo Oil Co.*,
　Case No. 09-cv-04028, 2011 WL 1465883 (N.D. Cal. Apr. 18, 2011) ............ 12

*Gutterglove Inc. v. Lassel*,
　Case No. 17-1372, 2018 WL 1920080 (E.D. Cal. Apr. 24, 2018) .................... 14

*Howey v. United States*,
　481 F.2d 1187 (9th Cir. 1973) ...........................................................7

*Jackson v. Carey*,
　353 F 3d. 750 (9th Cir. 2003) ...............................................................8

*United States ex rel. Knapp v. Calibre Systems, Inc.*,
　Case No. 2:10-cv-4466, 2012 WL 1577420 (C.D. Cal. May 4, 2012) ...............9

*Lemmon v. Snap*,
　995 F.3d 1085 (9th Cir. 2021) .................................................*passim*

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
　194 F.3d 980 (9th Cir. 1999) ...............................................................8

*Morris v. Fresno Police Department*,
　Case No. 08–CV–01422, 2010 WL 4977626 (E.D. Cal. Dec. 2, 2010) ..............9

*Munro v. University of Southern California*,
　Case No. 2:16-cv-0691, 2019 WL 4544427 (C.D. Cal. July 2, 2019) .............8, 9

*In re Pacific Fertility Center Litigation*,
　Case Nos. 3:20-cv-05047, 3:20-cv-04978, 3:20-cv-05030,
　3:20-cv-04996, 3:20-cv-05041, 2021 WL 5283954 (N.D. Cal. Nov.
　12, 2021) ...................................................................................11

*Ramachandran v. City of Los Altos*,
　No. 18-cv-01223, 2020 WL 1914961 (N.D. Cal. April 20, 2020) ....................10

*Sonoma County Association of Retired Employees v. Sonoma County*,
　708 F.3d 1109 (9th Cir. 2013) ...........................................................8, 9

*Sorosky v. Burroughs Corp.*
    826 F.2d 794 (9th Cir. 1987) ................................................................. 8

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ................................................................ 11

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
    Case No. CV 07-5744, 2008 WL 11342783 (C.D. Cal. Aug. 22,
    2008) ........................................................................................................ 14

*United States Equal Employment Opportunity Commission v. Bay Club
    Fairbanks Ranch, LLC,*
    475 F. Supp. 3d 1099 (S.D. Cal. 2020) ....................................... 1, 7, 1

*United States v. Pend Oreille Public Utility District No. 1,*
    926 F.2d 1502 (9th Cir. 1991) ............................................................... 9

*United States v. Webb*,
    655 F.2d 977 (9th Cir. 1981) ................................................................. 9

*Vietnam Veterans of America v. Central Intelligence Agency,*
    288 F.R.D. 192 (N.D. Cal. 2012) ........................................................ 12

*Warner Bros. Entertainment v. Superior Court*,
    29 Cal. App. 5th 243 (2018) ................................................................ 13

**Cases**

Fed. R. Civ. P. 15(a) ................................................................................... 7

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   INTRODUCTION

Plaintiff Dr. Andrew Forrest ("Dr. Forrest") moves this Court for leave to amend his Second Amended Complaint ("SAC") to include a negligent design cause of action. Dr. Forrest's claim is based on the existence of a viable legal theory that the state court improperly dismissed with prejudice, but which should be available to him in federal court, given binding Ninth Circuit precedent.  "[L]eave to amend should be 'freely given as justice so requires' under Federal Rule of Civil Procedure 15(a)."  *United States Equal Emp. Opportunity Comm'n v. Bay Club Fairbanks Ranch, LLC*, 475 F. Supp. 3d 1099, 1102 (S.D. Cal. 2020) (quoting Fed. R. Civ. P. 15(a)).  Justice requires that Dr. Forrest be permitted to amend his SAC to re-allege his negligent design cause of action.  Dr. Forrest's proposed Third Amended Complaint ("TAC") is attached as Exhibit 1.

Dr. Forrest initially alleged a negligent design theory in both his Complaint and First Amended Complaint ("FAC") in state court, as one of five causes of action.  In response to defendant Facebook, Inc.'s ("Facebook's") demurrer to the FAC, the state court incorrectly held that Dr. Forrest had failed to cite *any* authority that the theory of negligent design applies to social media companies in the products liability context, and dismissed the claim with prejudice on this basis.  To the contrary, in both his opposition to the demurrer and hearing on the demurrer, Dr. Forrest cited *Lemmon v. Snap,* 995 F.3d 1085 (9th Cir. 2021), a Ninth Circuit decision clearly holding that that a negligent design suit can be brought against a social media company.

Dr. Forrest was on the threshold of filing a writ of mandamus to appeal the state court's erroneous dismissal of his negligent design cause of action on this ground, when Facebook removed this case to federal court, divesting the state court of jurisdiction and precluding Dr. Forrest's filing of his state court writ.  Dr. Forrest now moves this Court to allow him to plead the negligent design cause of action.  The

inclusion of the negligent design claim is even more apt here than it was in state court, given that *Snap* is a Ninth Circuit decision and controlling precedent in federal court.

The proposed amendments are made in good faith and will not unduly delay this action. The case was recently removed to this Court and is still at the pleading stage. Facebook will suffer absolutely no prejudice from the proposed amendment given that no new parties are being added. Facebook is already on notice of the amendment since the negligent design claim was previously pled in state court, and Dr. Forrest's central allegations in the proposed TAC remain unchanged from the SAC.[1] Finally, the amendment is not futile, given that the *Snap* decision clearly articulates that a negligent design tort theory may be brought against a social media company, and the decision is binding precedent on this Court. Dr. Forrest respectfully requests that this Court grant this motion.

## II.     FACTUAL AND PROCEDURAL HISTORY

### A.     Dr. Forrest Pleads a Negligent Design Cause of Action in State Court

On September 17, 2021, Dr. Forrest, a well-known Australian business mogul and philanthropist, brought this action in San Mateo County Superior Court to recover damages and obtain injunctive relief after he has been repeatedly implicated in a fraudulent scheme that has swindled hapless Facebook users out of millions of dollars. Facebook, Inc. – now known as Meta Platforms, Inc. – owns and operates Facebook.com, a multibillion-dollar social networking website that has billions of users. (Complaint ¶ 39.) On November 12, 2021, well before Facebook filed a demurrer, Dr. Forrest filed the FAC,[2] which was based on the same allegations as the

---

[1] In addition to the redline edits in the proposed TAC, Dr. Forrest has corrected a few typos in the numbering to the prayer for relief.

[2] The FAC did not make any substantive changes to the Complaint, and simply removed one cause of action for the violation of the statutory right of publicity.

Complaint, alleging five causes of action for: misappropriation of a name or likeness, aiding and abetting fraud, unfair competition, negligent failure to warn, and negligent design. (*See* FAC.) In his fifth cause of action for negligent design, Dr. Forrest alleged, among other things, that Facebook owed a duty to "use ordinary care in designing, maintaining, and distributing its products and services," Facebook breached that duty, and that "Facebook knew, or should have known, that its products and services posed an unreasonable risk, and Facebook's continued design decisions, and any disclaimers as to its products are inadequate, unreasonable, and knowingly ineffective." (*Id.* ¶¶ 124-126.)

**B.** **The State Court Improperly Dismisses the Negligent Design Cause of Action with Prejudice**

On January 18, 2022, Facebook filed a demurrer against the FAC, asking the state court to dismiss all of Dr. Forrest's causes of action with prejudice. (Demurrer ("Dem.").) While Facebook argued it did not owe Dr. Forrest a duty of care, it did not argue that the theory of negligent design does not extend to social media companies, or that Facebook did not owe a duty of care on this basis. (*Id.* at 17-18.)

On February 22, 2022, Dr. Forrest filed his opposition to the demurrer. (Opposition to Dem.) In support of his cause of action for negligent design, Dr. Forrest argued that Facebook owed Dr. Forrest a duty of care, citing to *Lemmon v. Snap*, 995 F.3d 1085 (9th Cir. 2021), a Ninth Circuit decision which held that the social media provider, Snap, Inc., could be held liable for negligent design. (Opp. to Dem. at 12 (quoting *Snap*, 995 F.3d at 1092).)

On March 8, 2022, Facebook filed a reply in support of its demurrer. (Reply ISO Dem.) Again, Facebook did not argue that the theory of negligent design, including a duty of care, does not extend to social media companies.

On April 21, 2022, the state court issued a tentative ruling sustaining Facebook's demurrer to the first through fourth causes of action without prejudice, and to the cause

of action for negligent design, with prejudice. (*See* Declaration of Jose R. Nuño ("Nuño Decl.") ¶ 4, Ex. A.) With respect to this cause of action, the only reasoning the state court gave for dismissing the claim without leave to amend was that: "Plaintiff cites no authority holding that the legal theory of products liability, including duty of care, extends to interactive computer services." (*Id*.) The state court made no mention of the *Snap* decision Dr. Forrest cited in his opposition to the demurrer in its tentative ruling. (*Id*.)

On April 22, 2022, the state court heard oral argument on the demurrer. At oral argument, Dr. Forrest's counsel again cited *Snap* as authority, quoting the state court's tentative ruling which cited to Dr. Forrest's opposition brief, and clarified:

> Your Honor, what we wrote was: 'Moreover, for a negligent design claim, it is settled that manufacturers have a 'duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public.' And we cited the Snap decision, Your Honor.

(Request for Judicial Notice ("RJN"), Ex. 1 at 4:17-23.)

Dr. Forrest's counsel then went onto explain the *Snap* decision and why, contrary to the state court's tentative ruling, *Snap* was persuasive authority that social media companies may be held liable for negligent design. Dr. Forrest's counsel stated:

> Your Honor, I wanted to explain why we believe the *Snap* decision is directly on point, and in fact is authority holding those points…
>
> And at a very high level, Your Honor, that case involved a plaintiff suing Snap which is SnapChat. SnapChat -- probably is familiar with -- is a social media platform and competitor of Facebook…
>
> And as the Ninth Circuit moves along in its decision it specifically addresses the point Your Honor was raising. On page 1092 of the decision, Your Honor, the Ninth Circuit states:

Their negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product, paren, (SnapChat) with a defect, paren, (the interplay between SnapChat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated springs from its distinct capacity as a product designer.

So, Your Honor, in this case we did cite to provide authority for bringing that fifth cause of action which should give us . . . leave to amend.

(*Id*. 5:7-6:14.)

Additionally, Dr. Forrest's counsel explained that the district court in *Snap* entertained and rejected Snap's argument that it did not owe a duty of care for its negligent product design:

And that was confirmed at the district court level, Your Honor. This is a district court case from the Central District of California.

When this case was sent back because Snap lost the appeal, the Court found the defense not to be applicable. The District Court found, again, that there was a duty of care. And this is from a decision on March 31st, 2022. And the case number is CV19-4504-MWF.

And in that decision on page 8, the Court notes that it previously determined that the plaintiffs had sufficiently alleged a duty . . . . So the Court before [] found a duty, and when it came back it found a duty, and that case is now going forward. Snap's motion to dismiss was denied.

And so, Your Honor, we think that directly addresses the issue raised in your tentative. We would ask you to give Dr. Forrest the chance to amend the Complaint along with the Fifth Cause of Action as well.

(*Id*. 6:17-7:8.)

Despite all of this, the state court did not address *Snap* at any point during the hearing, simply stating at the close of the hearing that it would affirm its tentative ruling but grant a requested extension of time to Dr. Forrest to file the SAC. (*Id*. at 12:6-12.)

On May 4, 2022, the state court entered its order ("Order"), affirming its tentative ruling in its entirety, except that Dr. Forrest was granted until June 3, 2022, to file a second amended complaint to claims one through four. (*See* Nuño Decl., ¶ 5, Ex. B; Dkt. 1-2.) As it had in its tentative ruling, the state court wrote:

> Demurrer to the Fifth Cause of Action is sustained without leave to amend because Negligent design is a products liability concept. (*See* Opp. at 12:16-18.) Plaintiff cites no authority holding that the legal theory of products liability, including duty of care, extends to interactive computer services.

(*Id.*)

This was the only reasoning the state court gave in its Order for dismissing the fifth cause of action without leave to amend. (*Id*.) On May 5, 2022, the clerk of the state court served notice of the Order by mail. (Nuño Decl., ¶ 6, Ex. C.)

## C. Dr. Forrest Prepares a Writ of Mandate to Appeal the State Court Decision

Upon receiving the Order, Dr. Forrest began preparing a writ of mandate to appeal the state court's decision. (Nuño Decl. ¶ 7.) Given the clerk's May 5, 2022, service of notice of the Order by mail, Dr. Forrest's deadline to file the writ was July 5, 2022. *See Cal W. Nurseries, Inc. v. Sup. Ct*., 129 Cal. App. 4th 1170, 1173 (2005) (absent statutory time limit, courts generally expect writ petitions to be filed no later than 60 days after serving of notice of entry of the challenged order).

On May 24, 2022, the state court entered a stipulated order granting Dr. Forrest until June 17, 2022, to file his second amended complaint. On June 17, 2022, Dr. Forrest filed his SAC, without the fifth cause of action for negligent design. (*See* Dkt.

1-3.)  On June 23, 2022, Facebook removed the entire case to federal court, divesting the state court of jurisdiction.  (Dkt. 1.)

## III.  LEGAL STANDARD

A party may amend its pleading any time before trial with leave of court.  Fed. R. Civ. P. 15(a)(2); *see also United States Equal Emp. Opportunity Comm'n*, 475 F. Supp. 3d at 1102 (citing Fed. R. Civ. P. 15(a)) ("Granting leave to amend rests in the sound discretion of the district court.").

"Requests for leave to amend should be granted with extreme liberality." *Brown v. Stored Value Cards, Inc*., 953 F.3d 567, 574 (9th Cir. 2020).  Thus, because federal policy strongly favors determination of cases on the merits, leave to amend the pleadings is freely given unless the opposing party makes a showing of one of the following factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lockheed Martin Corp. v. Network Sols., Inc*., 194 F.3d 980, 986 (9th Cir. 1999).  The Ninth Circuit has held that courts may decline to grant leave to amend for one or more of these reasons "only if there is strong evidence."  *Sonoma Cnty Ass'n of Retired Emps. v. Sonoma Cnty.,* 708 F.3d 1109, 1117 (9th Cir. 2013).  The burden of showing any of the four factors are present rests with the party opposing the amendment.  *Foman,* 371 U.S. at 182*; Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973).  In the absence of an "apparent reason" to deny, it is an abuse of discretion for a district court to refuse to grant leave to amend a complaint.  *Foman*, 371 U.S. at 182.

## IV.  ARGUMENT

Courts routinely grant motions for leave to amend under Rule 15(a)(2) where the moving party seeks to amend a complaint to include a new cause of action.  *See, e.g., Challenge Printing Co., Inc. v. Elecs. for Imaging, Inc.*, 2021 WL 3616766, at *1- 2 (N.D. Cal. Aug. 16, 2021)  Here, Dr. Forrest seeks leave to amend to add a claim for

negligent design to which none of the *Foman* factors apply.  As a result, leave to amend should be granted.  *See Jackson v. Carey*, 353 F 3d. 750, 758 (9th Cir. 2003) ("dismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment").

### A.    There Is No Bad Faith

"For a court to deny leave based on bad faith, the Court must find that the plaintiff is seeking to prolong the litigation by adding new but baseless legal theories or that the plaintiff has otherwise acted with a wrongful motive."  *Munro v. Univ. of S. Cal.*, 2019 WL 4544427, at *1 (C.D. Cal. July 2, 2019) (internal citations and quotations omitted).

Dr. Forrest's motion to amend the SAC and file the proposed TAC is brought in good faith, and nothing in the record suggests otherwise.  Dr. Forrest is not seeking to add "new but baseless legal theories," but rather, moving to re-assert his amended negligent design theory that the state court dismissed with prejudice on the sole and incorrect ground that Dr. Forrest had failed to cite authority that the theory of negligent design extends to social media companies.  As Dr. Forrest had cited in his opposition to Facebook's demurrer, and as his counsel again argued at the hearing (RJN, Ex. 1), the Ninth Circuit clearly held that social media companies can be held liable for negligent design claims in *Snap*.  After the state court disregarded this clear law, Dr. Forrest began preparing a writ of mandate to appeal the state court's decision and was on the cusp of filing, but Facebook removed this case to federal court before Dr. Forrest's time to file his writ had expired.  (Nuño Decl. ¶ 7.)  This motion is brought shortly after that removal, and the proposed allegations seek to allege the same state court cause of action in federal court, where the *Snap* precedent that Dr. Forrest cited is binding precedent.  Further, this is Dr. Forrest's first motion for leave to amend, the case remains at the pleading stage, and the record demonstrates there is no bad faith here.  *See, e.g., Sorosky v. Burroughs Corp.* 826 F.2d 794, 805 (9th Cir. 1987) (bad

faith when the amendment was solely to add a defendant to defeat diversity); *Morris v. Fresno Police Dep't.*, 2010 WL 4977626 (E.D. Cal. Dec. 2, 2010) (inference of bad faith where plaintiff was seeking leave to file an eighth amended complaint).

### B. There Is No Undue Delay

"Undue delay requires inquiry into whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading and whether the moving party justified their delay in moving to file an amended complaint." *Munro*, 2019 WL 4544427, at *2 (internal citations and quotations omitted). "[D]elay alone no matter how lengthy is an insufficient ground for denial of leave to amend." *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981); *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d 1502, 1511 (9th Cir. 1991) (same).

There is no undue delay here. Dr. Forrest alleged the negligent design theory when he filed his complaint and FAC in state court. After the state court dismissed the claim with prejudice on the grounds that Dr. Forrest had failed to cite authority showing that social media companies can be held liable for negligent design, Dr. Forrest diligently began drafting a writ of mandate to appeal that ruling. Dr. Forrest had the writ fully prepared and was on the verge of timely filing it, when Facebook removed the case to federal court. (Nuño Decl. ¶ 7.) With the state court divested of jurisdiction, Dr. Forrest lost his opportunity to appeal the state court decision on an interlocutory basis. Moreover, while the *Snap* decision that Dr. Forrest cited in support of his negligent design theory was good law and appropriately cited, it is even more weighty now that the case has been removed and the Ninth Circuit's decision in *Snap* is controlling federal precedent. In sum, there has been no delay. *See United States ex rel. Knapp v. Calibre Sys., Inc.*, 2012 WL 1577420, at *3 (C.D. Cal. May 4, 2012) (finding no undue delay and allowing amendment where moving party was diligent in prosecuting case and obtained new information that was the subject of the amendments

through discovery). Based on the fact of removal and Dr. Forrest's imminent appeal of the dismissal of his negligent design claim in state court, Dr. Forrest now brings a timely request to amend his SAC to add this viable legal theory into his federal court pleading.

### C. Facebook Will Suffer No Prejudice From the Amendment

"Prejudice is the touchstone of the inquiry under rule 15(a)." *Eminence Cap., LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003) (internal quotes omitted); *Sonoma Cnty Ass'n of Retired Emps.,* 708 F.3d at 1117. Indeed, absent prejudice, or a strong showing of any of the remaining reasons for denying leave to amend, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Cap., LLC*, 316 F.3d at 1052 (emphasis in original). The opposing party bears the burden of showing prejudice. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987); *Ramachandran v. City of Los Altos*, 2020 WL 1914961, at *7 (N.D. Cal. April 20, 2020) ("a finding of delay does not compel a finding of prejudice. Defendants must explain why the delay is prejudicial.") (citing *DCD Programs*, 833 F.2d at 187)).

Facebook will not suffer any prejudice, much less substantial prejudice, by reason of Dr. Forrest's amendment to include the negligent design claim for relief. The type of prejudice a court may consider in this instance does not include having to defend against a plaintiff's claims; rather, it is an evaluation of the work a party has performed at the time an amendment is proposed. Here, the case is still at the pleading stage and Facebook has yet to even file its responsive pleading. This Court has set an Initial Case Management Conference for October 6, 2022 (Dkt. 10), and there is no case management order that would need to be modified. Further, Facebook has been on actual notice of the substance of the amendment since Dr. Forrest filed his original Complaint, and, if anything, is in a superior position to Dr. Forrest, having presumably known about the nature of its design since the initiation of this litigation. *See United*

*States Equal Emp. Opportunity Comm'n*, 475 F. Supp. 3d at 1103 (no prejudice where new allegations involved "the same operative facts, witnesses, alleged harassers, and documentary evidence" and "the addition of similar instances of harassment to support the initial claims of discrimination will not create undue prejudice").

To the extent Facebook attempts to argue it would suffer prejudice because the cause of action was dismissed without leave to amend, this is also a non-starter under these facts. Indeed, under *Castner v. First Nat'l. Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960), a district court in its discretion may revisit prior interlocutory decisions entered by another judge in the same case if there are cogent reasons or exceptional circumstances. *Id.*; *see also Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 530-532 (9th Cir. 2000) (district court did not err in reconsidering state court's denial of summary judgment before removal, which was contended to be law of the case, because "the California summary judgment standard under [Cal. Civ. Proc. Code] § 437c is different in relevant respects from the standard under FRCP 56").

Here, such cogent and exceptional circumstances exist given that: (1) Dr. Forrest's time to file a writ of mandate had not expired in state court and this Court can consider the amendment on the same grounds as would be stated in the writ;[3] and (2) the *Snap* decision is Ninth Circuit precedent, binding on the district court if not on the California state court. There is no prejudice that can be shown that would justify denial of the proposed amendment.

---

[3] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 928 (9th Cir. 2006) ("'Under California law... a judgment is not final for purposes of res judicata during the pendency of and until the resolution of an appeal.'"); *In re Pac. Fertility Ctr. Litig.*, 2021 WL 5283954 (N.D. Cal. Nov. 12, 2021) (no *res judicata* where all appeals had not been exhausted).

## D. The Proposed Amendment Is Not Futile

Contrary to what Facebook will argue in opposing this motion, Dr. Forrest's proposed amendment in the form of the proposed TAC, is not futile. "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 219 (N.D. Cal. 2012) (quoting *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988)). "[D]enial [of a motion to amend] on this ground is rare and courts generally defer consideration of challenges to the merits of a proposed amended pleading until after leave to amend is granted and the amended pleading is filed." *Clarke v. Upton*, 703 F. Supp. 2d 1037, 1043 (E.D. Cal. 2010) (citing *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003)); *see also Green Valley Corp. v. Caldo Oil Co.*, 2011 WL 1465883, at *6 (N.D. Cal. Apr. 18, 2011) (noting "the general preference against denying a motion for leave to amend based on futility").

The addition of the negligent design claim is far from futile. As explained above, *Snap*, stands for the proposition that a social media company may be liable for a negligent design claim. In *Snap*, the parents of two boys brought a wrongful death action against Snap, Inc., seeking to hold Snap liable for its allegedly "unreasonable and negligent" design decisions. Specifically, plaintiffs alleged that Snap created: (1) Snapchat, (2) Snapchat's speed filter, and (3) an incentive system within Snapchat that enticed Snapchat users to drive at speeds exceeding 100 miles per hour, leading to the boys' deaths in a speeding accident. *Snap*, 995 F.3d at 1091.

In holding that the claim survived Snap's challenge on the basis of section 230 of the Communications Decency Act ("CDA") ("Section 230"), the Ninth Circuit held that "the duty that Snap allegedly violated 'springs from' its distinct capacity as a product designer," and has "nothing to do with its editing, monitoring, or removing of the content that its users generate through Snapchat." *Id.* at 1092. Here, similar to the

plaintiffs in *Snap*, Dr. Forrest's negligent design claim (as alleged in his FAC and proposed TAC), seeks to hold Facebook liable for "its distinct capacity as a product designer." *Id.*[4]

Even though the *Snap* decision is directly on point and indisputably states that social media providers may be liable for negligent design, the state court completely ignored *Snap* in its ruling, failing even to mention this appellate decision in its Order. (Nuño Decl., ¶ 5, Ex. B.)  And, while the state court also dismissed all five causes of action based on Section 230, it gave the same reasoning for dismissing all claims on this basis and granted leave to amend the first four causes of action, meaning that Section 230 could not have been the basis for dismissing the fifth cause of action with prejudice.  The state court committed clear error, and Dr. Forrest sought to file a writ on this basis.  *See Warner Bros. Ent. v. Sup. Ct.*, 29 Cal. App. 5th 243, 262 (2018) (granting writ, in part, because state court overlooked relevant authority briefed by plaintiff); *Dumas v. L.A. Cnty. Bd. of Supervisors*, 45 Cal. App. 5th 348, 356-57 (2020) (indicating trial court commits error when it overlooks cited authority and the moving party suffers prejudice).

In addition, Facebook would still be able to bring a Rule 12(b)(6) dispositive motion on all claims in the proposed TAC.  Indeed, "[w]hile courts determine the legal sufficiency of a proposed amendment using the same standard as applied on a Rule 12(b)(6) motion, such issues are 'often more appropriately raised in a motion to dismiss rather than in an opposition to a motion for leave to amend.'" *Duchemin v. Leidos, Inc.*, 2018 WL 2229368, at *2 (S.D. Cal. May 16, 2018) (quoting *SAES Getters S.P.A.*

---

[4] Subsequent to the state court's dismissal, a district court in the Ninth Circuit relying on *Snap* held that negligent design and negligent failure to warn claims against an interactive website were properly stated and not barred by Section 230.  *See A.M. v. Omegle.com, LLC*, Case No. 3:21-cv-01674, Dkt. 36 at 8 (D. Or. July 13, 2022).

*v. Aeronex, Inc.*, 219 F. Supp. 2d 1081, 1086 (S.D. Cal. 2001)).  In *Duchemin*, the district court found that the proposed amendment was not clearly subject to dismissal and therefore not futile, but nevertheless further ordered: "Defendant may bring a Rule 12(b)(6) motion or motion for summary judgment challenging these issues at the appropriate time." *Id.* at *2; *see also Gutterglove Inc. v. Lassel*, 2018 WL 1920080, at *1 (E.D. Cal. Apr. 24, 2018) (Granting leave to amend where futility issue would "be better resolved on a motion to dismiss or motion for summary judgment."); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 2008 WL 11342783, at *4 (C.D. Cal. Aug. 22, 2008) ("To test the validity of these claims in a more appropriate manner, the investor defendants may file a motion under Fed. R. Civ. P. 12(b)(6)")  To that end, should Facebook argue that the proposed amendment is futile (as Dr. Forrest assumes it will), this Court should allow the amendment and wait "to hear full argument at review of a motion to dismiss."  *See Anderson v. Int'l Paper Co.*, 2014 WL 12601502, at *2 (C.D. Cal. Apr. 21, 2014) (Finding futility arguments were better addressed on a motion to dismiss for failure to state a claim or a motion for summary judgment where "the parties can more fully set forth their arguments."); *Banc of Calif., Inc. v. Farmers & Merchants Bank of Long Beach*, 2017 WL 2972338, at *1 (C.D. Cal. Apr. 19, 2017) ("Resolving factual disputes and evaluating the merits of proposed claims is generally inappropriate when considering motions for leave to amend.").  Facebook is free to challenge, as it undoubtedly will, the sufficiency of Dr. Forrest's negligent design claim at the motion to dismiss stage.

In sum, given the liberal standard for granting motions to amend under Rule 15(a)(2), and the absence of any factor supporting denial of an amendment, Dr. Forrest's motion for leave to amend the SAC should be granted.

/ / /

/ / /

# V.   CONCLUSION

Based on the foregoing, Dr. Forrest respectfully requests this Court grant his motion for leave to amend his SAC and file the proposed TAC, attached as Exhibit 1.


Dated:  July 25, 2022                    WAYMAKER LLP


                                         By:/s/ Brian E. Klein
                                            Brian E. Klein
                                            Donald R. Pepperman
                                            Jose R. Nuño

                                            *Attorneys for Plaintiff*
                                            *Dr. Andrew Forrest*



EXHIBIT 1

Brian E. Klein (Bar No. 258486)
   bklein@waymakerlaw.com
Donald R. Pepperman (Bar No. 109809)
   dpepperman@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
   jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:   (424) 652-7800
Facsimile:   (424) 652-7850

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| DR. ANDREW FORREST, an individual, | Case No. 5:22-CV-03699-EJD |
| Plaintiff, | **THIRD AMENDED COMPLAINT FOR:** |
| v. | **(1) Misappropriation of Name and Likeness;** |
| FACEBOOK, INC., a Delaware Corporation, and DOES 1 through 20, inclusive, | **(2) Aiding and Abetting Fraud;** |
| Defendants. | **(3) Unfair Competition/Unfair Business Practices (Cal. B&P Code section 17200 *et seq*.);** |
| | **(4) Negligent Failure to Warn;** |
| | **(5) Lanham Act Violations;** |
| | **(6) Declaratory Relief and Unjust Enrichment; and** |
| | **(7) Negligent Design** |
| | **<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     THE PARTIES ..................................................................................................... 6

III.    JURISDICTION, VENUE, AND CHOICE OF LAW ..................................... 7

IV.     GENERAL ALLEGATIONS .............................................................................. 8

   A.   Dr. Andrew Forrest--Australian Business and Philanthropic Icon .............. 8

   B.   The Scam Crypto Ads Featuring Dr. Forrest ............................................. 11

   C.   The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of Millions ................................................................................................. 15

   D.   Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding Facebook Takes Steps to Stop Further Ads ............................................... 17

   E.   In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam Crypto Ads .................................................................................. 19

   F.   Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam Crypto Ads ......................................................................................... 20

   G.   Facebook's Advertising Business Substantially Controls the Development of Each Ad Through Its Contracts with Aspiring Advertisers ......................... 21

   H.   Facebook Substantially Contributes to the Ads Using Meta Pixel ............. 22

   I.    The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads ........ 23

        1. Ad Content .............................................................................................. 23

        2. Ad Creative ............................................................................................. 27

        3. Ad Delivery ............................................................................................ 28

        4. Facebook Elicits and Encourages the Creation of Illegal Content ....... 29

   J.   Facebook's Ability to Find Cryptocurrency Ads ....................................... 32

V.      FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE ................... 32

VI.     CAUSES OF ACTION ...................................................................................... 36

Plaintiff Dr. Andrew Forrest ("Dr. Forrest") through his undersigned counsel of record, brings this Third Amended Complaint ("TAC") against Defendant Meta Platforms, Inc. formerly Facebook, Inc. (collectively "Facebook")[1] and DOES 1-20 (collectively, "defendants"), to secure damages, and injunctive and other appropriate equitable relief:

## I.        INTRODUCTION

1.        Since it launched Facebook ads in 2007, Facebook's advertising business has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Facebook CEO Mark Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today." Prescient in his prediction, Facebook and Zuckerberg have built an advertising empire worth hundreds of billions of dollars.

2.        In October 2019, Zuckerberg gave a speech at Georgetown University, acknowledging the problem with supporting Free Speech, addressing the variety of problems that arise from that, and stating that Facebook itself had the responsibility for addressing the risk of harm even to a small number of people:

> [I]nevitably some people will use their voice to organize violence, undermine elections or hurt others, **and we have a responsibility to address these risks.** When you're serving billions of people, even if a very small percent cause harm, that can still be a lot of harm. (Emphasis added).

3.        Zuckerberg went on to state that Facebook was both aware of the problems and ha[d] the ability to stop unlawful ads:

> For misinformation, we focus on making sure complete hoaxes don't go viral…. More broadly though, we've found a different strategy works best: focusing on the authenticity of the speaker rather than the content itself.

> We've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money.

>              *              *              *

> The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts. We now require

---

[1] Facebook Inc., rebranded itself, changing its name to Meta Platforms, Inc. ("Meta") on or about October 2021, but Dr. Forrest refers to Meta as Facebook for clarity and unless otherwise differentiated below.

you to provide a government ID and prove your location if you want to run political ads or a large page.

        *            *          *

We build specific systems to address each type of harmful content — from incitement of violence to child exploitation to other harms like intellectual property violations — about 20 categories in total. **We judge ourselves by the prevalence of harmful content and what percent we find proactively before anyone reports it to us. (emphasis added)**

        *            *          *

We now have over 35,000 people working on security, and our security budget today is greater than the entire revenue of our company at the time of our IPO earlier this decade.

All of this work is about enforcing our existing policies, not broadening our definition of what is dangerous. If we do this well, we should be able to stop a lot of harm ….[2]

4.      Unfortunately for Dr. Forrest and Australians defrauded by cryptocurrency scams falsely bearing Dr. Forrest's endorsement over the last three years, Facebook's advertising business has not done its job. Australian users have lost millions when relying on a phony "endorsement" using Dr. Forrest's name image and reputation.

5.      Beginning in late March 2019, Dr. Forrest learned that fraudulent cryptocurrency advertisements were appearing on the Facebook platform that were wrongly using his name and image to endorse shady cryptocurrency schemes ("Scam Crypto Ads"). The Scam Crypto Ads, including the following example, were designed to benefit from their alleged association with business and philanthropic celebrity, Dr. Forrest.[3]

---

[2] Tony Romm, *Zuckerberg: Standing for Voice and Free Expression*, Washington Post, (Oct. 17, 2019) https://www.washingtonpost.com/technology/2019/10/17/zuckerberg-standing-for-voice-free-expression/. (Last visited June 17, 2022).
[3] It is beyond credulity to suggest this Facebook advertising customizable template-developed fake news article featuring obvious cutouts of Dr. Forrest next to a supposed newsreader with a sinister looking guy lurking, and promoted by a news outlet called "Wolf World," is what Congress was intending to protect in enacting Section 230 of the Communications Decency Act, 47 U.S.C. § 230.



6.      Further, at this time, and independent of complaints from Dr. Forrest, Facebook was aware that its advertising platform was developing and reviewing scam ads that once Facebook approved, would be successfully submitted to and disseminated to users on its user platform. Shortly after Dr. Forrest's personal staff learned of the Scam Crypto Ads in late March 2019, the staff informed Facebook that its advertising operations was still failing to stop criminals from breaching Facebook's Advertising Policies and Self-Service Ad Terms in victimizing Australians. Dr. Forrest requested in writing and verbally that Facebook's advertising business take immediate action to prevent the approval of future Scam Crypto Ads so they could not reach and be posted on Facebook's user platform. These requests were to no avail.

7.      Instead of acting on Dr. Forrest's complaints, and cleaning up obvious advertising security flaws, Facebook's senior management continued with the *status quo*. Critically, one of Facebook's advertising security flaws was that criminals could easily bypass its security measures by using "cloaking software" that disguises their identity and the ultimate "landing page" where Facebook users would arrive.

8.      To be sure, this controversy involves Facebook's advertising business in the development, and review and approval of the Scam Crypto Ads, before they are allowed to submit to auction and appear on Facebook's user platform.

9.      Facebook's advertising business has been designed to maximize the profit with the collateral damage of some users being swindled. By taking material control over the development, review and approval of ads, before they enter Facebook's user platform, fraudulent ads like the Scam Crypto Ads are custom made to inflict maximum damage without a scammer lifting a finger. As one article has noted: "Affiliates [Facebook advertisers] describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the [victims] for me.'"[4]

10.     The effect of Scam Crypto Ads is real, devastating, and life-altering. As further described *infra*, in February 2022, Gilbert Howard, a 75-year old concrete pools builder who lives an hour's drive from Dr. Forrest in suburban Perth, Western Australia, lost a substantial part of his life savings, $300,000, having been defrauded by the Scam Crypto Ads on Facebook. *"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*," Mr. Howard says. Unfortunately, there are many others like Mr. Howard.

11.     Facebook has purposely conflated the distinction between "Facebook the advertiser" and "Facebook the user platform." Facilitating a user platform on the one hand and being paid for advertising on the other, is a real and meaningful distinction. Facebook was for its first several years existence a prototypical user platform, facilitating an interactive service designed to connect users who wished to communicate with one another, sharing ideas and opinions. Faced with the conundrum of how its enormous and sophisticated platform, with masses of valuable data, could turn a profit, Facebook started a new business--an advertising agency that would charge third parties that sought to run digital ads.

---

[4] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek. (March 28, 2018) ("*Facebook Helps Shady Advertisers Pollute the Internet*"), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them. (Last visited June 17, 2022).

12.     Since its modest start after 2007, Facebook's advertising business has grown to one of the largest profit-producing businesses ever. Housing some of the world's smartest computer scientists, the most sophisticated software programmers, and offering prestigious careers to those who can monetize their 3 billion users, Facebook's advertising business is one of the largest profit-producing advertising businesses in history—earning revenue of $112 billion in 2021—over 98% of Facebook's total revenue.

13.     This TAC arises then, not just from Facebook's matchmaking of its users, but from how Facebook operates its advertising business in a manner that substantially and materially contributes to the development, review, and approval of the Scam Crypto Ads. Facebook's overall business model obfuscates a clear line of demarcation between its user platform and its advertising business, but the two operate distinctly from each other. Facebook's advertising business facilitated the development of fraudulent ads well before they are allowed to enter Facebook auctions for hopeful dissemination on Facebook's user platform.

14.     Criminal syndicates contract with Facebook's advertising business on terms which are specific to its advertising services. Facebook's Advertising Policies and Self-Service Ad Terms evince extensive oversight and ultimate control by Facebook's advertising business in the development, review, and approval of ads submitted to Facebook's user platform which then delivers ads to Australian users chosen by its sophisticated algorithms. Ultimately, Facebook is an advertising co-developer of ad inventory, and in doing so it substantially and materially contributes to the success of the fraudulent ads once they reach the user platform.

15.     Finally, given Facebook's ongoing assertion that its global business operations are beyond the jurisdictional reach of any court in the Commonwealth of Australia, a jurisdiction which has no immunity analogous to Section 230 of the Communications Decency Act ("Section 230"),[5] it is inequitable and contrary to choice of law to apply Section 230 here. This is inconsistent with the rule of dépeçage which prohibits an unfair jurisdictional arbitrage to foist

_____
[5] 47 U.S.C. § 230.

Section 230 immunity on Australians. If Facebook challenges the TAC under Section 230, choice of law and equity favors the application of Australian law on all issues of immunity.

**II.     THE PARTIES**

16.     Dr. Forrest is an individual and at all relevant times, a resident of Australia.

17.     Dr. Forrest has been a Facebook "user" since in or about 2015 when Facebook requested that he create a verified account to assist with the proliferation of fraudulent "Dr. Forrest" user profiles on Facebook's social media platform.

18.     Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. (Ticker symbol -MVRS) in late October 2021.[6]

19.     Facebook is a Delaware corporation with its principal executive offices located at 1601 Willow Road, Menlo Park, California, 94025.

20.     Dr. Forrest is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, or any of them, and therefore sues these defendants, and each of them, by such fictitious names. Dr. Forrest will seek leave of this Court to amend this TAC when the status and identities of these defendants are ascertained.

21.     Dr. Forrest is further informed and believes, and on that basis alleges, that at all times relevant, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to perform the acts alleged in the TAC, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other defendants. Each defendant, in taking the actions alleged in the TAC ratified and/or authorized the wrongful acts of each of them and are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that

---

[6] Salvador Rodriguez, *Facebook Changes Company Name to Meta*, CNBC (Oct. 28, 2021) https://www.cnbc.com/2021/10/28/facebook-changes-company-name-to-meta.html (last visited June 9, 2022).

are the subject of the TAC. Each defendant was a direct, necessary, and substantial participant in the conduct complained of in the TAC, and each of the defendants aided and abetted and rendered substantial assistance in and material contribution to the wrongs complained of in the TAC.

## III.    JURISDICTION, VENUE, AND CHOICE OF LAW

22.     This Court has subject matter jurisdiction of the claims in this TAC, which are, among other things, based on violations of California law, and the amount in controversy exceeds the jurisdictional minimum of this Superior Court.

23.     This Court has personal jurisdiction over Facebook because its corporate headquarters and principal places of business are in California. This Court also has specific personal jurisdiction over Facebook because it has sufficient minimum contacts with California, has purposely availed itself of California's benefits and protection, and does a substantial amount of business in California, such that this Court's exercise of jurisdiction over Facebook is reasonable and wholly consistent with traditional notions of fair play and substantial justice.

24.     Venue is proper San Mateo County under Code of Civil Procedure sections 395 and 395.5 because Facebook's principal place of business is in San Mateo County, and/or Facebook performs substantial amounts of business in San Mateo County.

25.     As a California court, this Court applies California choice-of-law rules. "California follows the doctrine of dépeçage, under which different states' laws can be applied to different issues in the case." *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1396 (2011).

26.     Choice of law issues in this litigation are resolved through the principal of dépeçage. This principle results in a search for the rule of law most appropriately applied to the affirmative defense of immunity under Section 230.

27.     As to choice of law, Dr. Forrest contends that Australian law does not afford immunity for an internet service provider ("ISP") when it posts allegedly harmful content from a third party.[7] Accordingly there is a material difference in the application of California law (cases

---

[7] Clause 91(1) of schedule 5 of the *Broadcasting Services Act* 1992 (Cth).

holding there is Section 230 immunity for internet service provider that only publishes third party content, versus Australian law which has no such immunity), and this Court must make a separate conflict of laws inquiry with respect to the affirmative defense of immunity.

28.     Accordingly, this Court should decide which law to apply, either Section 230 or Australian law which provides no such immunity for an internet service provider where third-party content is posted on their platform.

29.     In requesting a choice of law analysis, Dr, Forrest contends that his invocation of Australian law is narrow because it applies under the law of dépeçage to specific issues, even a single affirmative defense such as Section 230 immunity.

30.     In his prayer for relief, Dr. Forrest seeks declaratory relief that Australian law should be applied on the question of the appropriate selection of law governing immunity for Facebook.

## IV.     GENERAL ALLEGATIONS

### A.     Dr. Andrew Forrest--Australian Business and Philanthropic Icon

31.     It is no wonder fraudsters would seek to deploy the endorsement of a man such as Dr. Forrest. In the apt words of victim Gilbert Howard: *"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*." The reason for this respect is clear.

32.     Dr. Andrew Forrest, AO[8] is a prominent Australian businessman and philanthropist. He is the founder and current Executive Chairman of Fortescue Metals Group, and founder and co-chair of the Minderoo Foundation through which he now devotes his time to making significant philanthropic contributions, and pursuing humanitarian and environmental initiatives.

---

[8] In the Australian honors system, appointments to the Order of Australia confer the highest recognition for outstanding achievement and service. An Officer of the Order of Australia, or "AO" is a national honor bestowed on Australian citizens and deserving non-citizens for distinguished service of a high degree to Australia or humanity at large. Dr. Forrest was appointed as an AO in 2017.

33.     Dr. Forrest is Australia's most active philanthropist, and one of the most effective Australian business leaders of his generation. He is a true Australian business celebrity.

34.     As Fortescue's founder and chairman, he has led the company from inception to its top 20 status in the Australian economy, during which time Fortescue invested more than $20 billion USD in the resources sector. Across Fortescue and Dr. Forrest's other commercial interests, Dr. Forrest provides direct employment to well over 10,000 individuals, and many more indirectly through his projects.

35.     In 2001, Dr. Forrest co-founded the Minderoo Foundation with his wife Nicola.

36.     Minderoo has supported over 280 initiatives across Australia and internationally covering a range of causes. He has started and funded initiatives to combat and end pervasive and important humanitarian issues like modern day slavery, and has supported disenfranchised groups by focusing on indigenous rights education, responsible use of technology, children's cancer research, and early childhood development, as well as environmental issues such as wildfires, floods, plastic pollution and ocean health.

37.     In May 2017, Dr. and Mrs. Forrest announced one of Australia's largest private philanthropic donations of $400 million AUD to medical research and have continued giving. As of April 2020, their total philanthropic donations have exceeded $2 billion AUD.

38.     Dr. Forrest is a lifetime Fellow of the Australian Institute of Mining and Metallurgy. In 2017, he was appointed an Officer of the Order of Australia for his distinguished service to the mining sector, the development of employment and business opportunities, his support of sustainable foreign investment, and for his philanthropic efforts. He is Global Patron of the Centre for Humanitarian Dialogue, recipient of the Australian Sports Medal and the Australian Centenary Medal, and Vice-Patron of the SAS Resources Fund.

39.     Dr. Forrest is also a Councilor of the Global Citizen Commission, which, in April 2016, presented a series of human rights recommendations to the United Nations Secretary General to update the Universal Declaration of Human Rights.



40.     In 2013, Dr. Forrest was appointed by the Prime Minister and Cabinet of Australia to chair the review of Indigenous Training and Employment Programs, aimed at ending Indigenous disparity through employment.

41.     Dr. Forrest was Western Australia's 2017 Australian of the Year for his outstanding contribution to the community. In 2018, Dr. Forrest was inducted into the Australian Prospectors & Miners' Hall of Fame and was the inaugural winner of the EY Entrepreneur of the Year – Alumni Social Impact Award.

42.     The strength and value of Dr. Forrest's name, brand, and likeness is further evidenced from his recent business dealings, centered on building green technology businesses. Dr. Forrest's Fortescue Future Industries has signed agreements with traditional energy strongholds like Afghanistan for the development of hydro power and other geothermal projects for green industry as well as of Afghanistan's more traditional mineral resources.

43.     With such a prolific charitable profile and business acumen, Dr. Forrest's name, brand, and likeness are instantly and widely recognizable within the investing community and beyond and carry significant value.

44.     Dr. Forrest's "verified" Facebook page also lets users know that Dr. Forrest is a "well-known, often searched Page[] and profile[]," and that Facebook has "confirmed that this is the authentic Page or profile for this public figure, media company or brand." *See* Facebook Help – "What is a Verified Page of Profile?" https://www.facebook.com/help/196050490547892. A quick look at his verified Facebook page reveals the reverence many have for Dr. Forrest:

45.     In sum, Dr. Forrest's image and reputation is highly sought after and his business celebrity status provides immense commercial value and credibility to the companies, brands, products, charitable activities, and opportunities he supports.

**B.     The Scam Crypto Ads Featuring Dr. Forrest**

46.     Beginning at the end of March 2019, Dr. Forrest has suffered, and continues to suffer, irreparable harm to his public image and reputation as a consequence of a pervasive investment scam that has been featured on Facebook's user platform. The Scam Crypto Ads were co-developed by a Bulgarian-based Syndicate (the "Syndicate") and Facebook's advertising business, which Facebook, as the advertising agency, then submitted to auction on behalf of the Syndicate, finally disseminating the Scam Crypto Ads to Facebook's user platform as advertisements without Dr. Forrest's knowledge, acquiescence, or approval.

47.     Facebook has been keenly aware of Dr. Forrest's celebrity status for some time, and any suggestion to the contrary is implausible. Facebook actually went to Dr. Forrest before 2019, asking him to create a Facebook presence to help assist Facebook reviewers in combatting

against the proliferation of fraudulent profiles on its social media platforms. In December 2015 as a result of rampant "Dr. Forrest" fake profiles that were popping up, and recognizing his stature as a coveted celebrity, Facebook requested that Dr. Forrest create an account to become a "verified" Facebook user. Given the foreseeability of harm that may result to Dr. Forrest as a result of fake and fraudulent profiles and advertisements, and the special relationship Facebook began with Dr. Forrest at that time, it is thus surprising that starting in or about late March 2019, Dr. Forrest learned that Scam Crypto Ads, have been allowed by Facebook's advertising business to infiltrate Facebook's user platform, particularly considering the closeness of the connection between Facebook's conduct alleged in this TAC and Dr. Forrest's injuries.

48.     The following exemplar screenshots of Scam Crypto Ads are patently suspicious and sinister, and lack the credibility of advertisements which reasonably should not have been allowed to be co-developed by Facebook's advertising business. Using specialized and customizable templates created and then offered by Facebook's advertising interface, these exemplars are still not facially credible even as fraudulent "news reports" Facebook's self-help advertising interface materially helped scammers develop.





49.    The exemplar in paragraph 5 uses obviously cut and pasted pictures of Dr. Forrest next to a well-known Australian newsreader with a sinister looking individual lurking in the background, supposedly produced by an advertiser named "Wolf World." Other ads like those above depict Dr. Forrest's purport to divulge what Dr. Forrest did to gain additional wealth, and yet others use a fake a "ABC" news logo and mention "Andrew Forrest" by his uncommonly spelled last name, and his nickname "Twiggy."

50.    Subsequent click through material utilizes quotes, interview footage, and other actual legitimate statements attributable to Dr. Forrest, edited and doctored so as to deceivingly

appear as though Dr. Forrest is sponsoring a particular investment "opportunity" or otherwise promoting a particular product.

51.     So called "interviews" with Dr. Forrest are accompanied by dozens of fake testimonials describing how investors have become millionaires in a matter of months with even small deposits such as $250. Facebook's anticipated argument that its advertising business, including its review systems, whose very design and execution is supposedly meant to prevent such scam ads, cannot prevent Facebook's user platform from receiving and proliferating such ads, is implausible.

52.     In an attempt to save, maintain and protect his reputation and likeness, and to dissociate himself from this fraudulent scheme, Dr. Forrest has spent hundreds of thousands of dollars investigating the Syndicate, defending himself and his business reputation and likeness, enhancing his cybersecurity team's capacity and engaging external fraud detection services to permanently monitor Facebook's platform to attempt real time response to these frauds ads.

53.     In the early stages of this investigation, Dr. Forrest easily learned that the people behind these Ads were members of the Syndicate who were involved with entities from Sophia, Bulgaria and the South Pacific Island of Vanuatu who, using sham entities, fake information, and false addresses, employed Nigerian and Bulgarian pay services to deploy the Scam Crypto Ads.

54.     As an example of why the Syndicate should never have succeeded in employing Facebook's advertising business to do business with it, Facebook purports to have imposed supposed "problem solving" requirements on those proposing to use its Self-Service Ads Platform to provide details regarding the applicant, its business, and contact details before Facebook would consider and place an ad on Facebook's user platform. This requirement, Zuckerberg told his Georgetown audience in 2019, would address hoaxes and other perils of an internet that supported Free Speech—with limitations. Not so.[9]

---

[9] Discovery into this issue, information and documents not publicly available and part of Facebook's closely held and exclusive realm of control, will shed light on how the Syndicate came to be approved as a Facebook advertiser, particularly given Zuckerberg's comments in October 2019 that "[w]e've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money. … The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts."

### C. The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of Millions

55. As Facebook the advertiser promised, it did not take long for the Scam Crypto Ads to start working their voodoo.

56. An Australian woman was victimized by the Scam Crypto Ads, losing approximately $670,000. The woman said that on or about March 28, 2019, she accessed her Facebook account when she was presented with the fraudulent scam ad. She believed the ad/content was legitimate as the advertisements on Facebook—which included alleged interviews with Dr. Forrest—appeared to be reputable and from the Australian Broadcasting Commission.

57. Similarly, on or about April 1, 2019, an Australian man logged onto his Facebook account and was presented with an ad depicting Dr. Forrest sitting on a stage, which gave the appearance that he was participating in a question-and-answer session on cryptocurrency. The man clicked on the link and was swindled out of $77,254.

58. Yet another Australian victim reported that in or about March 2019, she saw a Facebook advertisement which pictured Dr. Forrest and included what appeared to be his endorsement of a Bitcoin investment opportunity. She clicked on the content and was scammed of thousands of dollars in the ensuing months.

59. One unsuspecting victim of this fraudulent scheme contacted Dr. Forrest's team after she unwittingly fell victim to the scam, stating that she was "caught up in the Bitcoin scam that Andrew Forrest was implicated in supporting. I subscribed when I saw that it was supported by him."

60. On or about June 19, 2019, Australian JB contacted Dr. Forrest advising of the fact she had been victimized on Facebook by a Dr. Forrest crypto scam.[10]

61. On or about September 12, 2019, Australian JA encountered a "news article" on Facebook which featured a photograph of Dr. Forrest and wording to the effect that "Forrest says you would be crazy not to do this because you'll make so much money." She clicked and ended up

---

[10] The TAC uses initials for privacy purposes in this section, unless otherwise noted. All names are used with the consent of the Scam Crypto Ad victims.

on a cryptocurrency website where she deposited a sum of money. After she became suspicious, and followed up, she was able to recover the money.

62.     On or about October 28, 2019, Australian Mr. RH contacted Dr. Forrest referring to an article on Facebook which stated words to the effect of Make Millions from this 'wealth loophole.' The article contained a picture of Dr. Forrest and mentioned him by name. RH contacted Dr. Forrest to inquire about the advertisement as he had a friend who had seen the same ad and was seriously thinking about investing.

63.     In 2019, 72 year old Western Australian FZ was victimized by the Scam Crypto Ads after he relied upon Facebook advertisements that featured Dr. Forrest's profile. FZ lost $250,000 which he has not been able to recover.

64.     On or about March 5, 2020, CC, an employee of Fortescue Metal Group (a company started by Dr. Forrest), encountered a Facebook Bitcoin article that mentioned Dr. Forrest by name and included his photograph, and which inferred his endorsement of some cryptocurrency product.

65.     On or about May 1, 2020, Fortescue Metal Group employee SS encountered a Facebook cryptocurrency article which mentioned Dr. Forrest by name and featured his photograph, and which inferred his endorsement of some crypto product.

66.     On or about February 2, 2021, Australian JG encountered an ad on Facebook featuring a photograph of Dr. Forrest with a phrase along the lines of "Twiggy's tips for success." He knew and understood the reference to Twiggy to refer to Andrew Forrest. He clicked on the ad and was taken to a further webpage that purported to contain a news article associating Dr. Forrest with the promotion of a cryptocurrency investment scheme.

67.     In late 2021, Ty Nicholas, a medically retired 25 year veteran of the Australian Defense Force was scammed by a Facebook Forex trading scam that Mr. Nicholas relied upon given Dr. Forrest's purported high profile and promotion of the scam. Mr. Nicholas lost $15,500 he has not been able to recoup.

68.     And as noted above, in late 2021, Gilbert Howard, lost $300,000, having been defrauded by the Scam Crypto Ads featuring Dr. Forrest. *"I look at people on Facebook I*

*respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence,"* Mr. Howard says.

### D. Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding Facebook Take Steps to Stop Further Ads

69.     The Scam Crypto Ads were clearly intended to entice persons vulnerable to the strength and credibility of Dr. Forrest's name, likeness, and reputation to send money as an investment in a fraudulent opportunity.

70.     Dr. Forrest has never authorized or otherwise allowed his name, likeness and/or reputation to be associated with, let alone endorse, any Bitcoin or other cryptocurrency product or service.

71.     Dr. Forrest began hearing about and became aware of the proliferation of the Scam Crypto Ads around late March 2019. He immediately mobilized his executive staff to identify and capture evidence of these ads, and place Facebook on notice of their dissemination so that Facebook could make them stop--immediately and permanently.

72.     Dr. Forrest went further, arranging a personal telephone call with William Easton, believed to be Facebook's highest ranking Australian officer. In this call, which occurred in early May 2019, Dr. Forrest expressed to Easton his abhorrence to the Scam Crypto Ads and their unauthorized use of his name and image as a supposed celebrity endorser. Dr. Forrest further communicated his personal demand that Facebook dedicate its enormous and sophisticated machine and human resources to prevent any further dissemination of such ads.

73.     On May 19, 2019, Dr. Forrest emailed Easton, repeating his complaints about the Scam Crypto Ads and his demand that their dissemination cease immediately and completely. Dr. Forrest wrote, in pertinent part:

> It's well known William [Easton], that you have the most sophisticated machine learning and artificial intelligence tools for targeting advertising at users. What amazes me is your absolute lack of concern, and more worrying your obstinance in using machine learning to keep your platform free of obvious scams[.] All of these threaten users like me, the integrity of public discourse, and allow innocent mums, dads, and retirees, to be robbed of their savings. If this was you or Mr. Zuckerberg being framed, or your own parents, or his, losing their hard earned retirement savings, I know you would react immediately and effectively. …





I am less inclined to resignation than to action. It's my intention to ensure this allowance of fraud by you [Facebook] ceases[.]

74. On May 20, 2019, Easton responded by email to Dr. Forrest's demands, writing in pertinent part:

I appreciate this is very frustrating for you—it's an extremely challenging, industry-wide problem which we are working to address. However I do want to be very clear – scam ads are not permitted on Facebook. They violate our Advertising Policies and have no place on the platform. …

All ads on Facebook are subject to our ad review system and our ads are checked against our policies. This happens before ads begin running, but may also be re-reviewed after they are live. Our Advertising policies prohibit scam ads, and when we detect an ad that violates our advertising Policies we disapprove it . …

In the meantime, having this content reported to us is key and I am very happy to continue to offer a direct line to me so that we can move quickly to take down these scam ads.

75. By November 2019, with the Scam Crypto Ads featuring Dr. Forrest continuing to make their way from Facebook's advertising business to Facebook's user platform, Dr. Forrest penned an open letter to Zuckerberg again demanding that Facebook's co-development and approval of Scam Crypto Ads cease. Dr. Forrest wrote in pertinent part:

Dear Mr. Zuckerberg:

My family and I have been the subject of scam advertisements on your social media network. Our images and the images of others are being used to encourage our users to invest in fraudulent cryptocurrency schemes.

The criminals responsible continue to purchase advertising space from Facebook, running new incarnations of the same scams. Your senior leadership has been informed of this. What's worse, innocent and vulnerable people are losing their life savings while Facebook (read – you) is profiting from the revenue generated by this stream of false advertisements.

This is abhorrent and you can stop it. You have the power and the technology to prevent these scam advertisements from running on your platform. Is revenue more important to you than the life savings of elderly people, Mr. Zuckerberg?

### E. In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam Crypto Ads

76.     In a February 2021 newsletter, the Australian Charity, IDCare, reported that it had seen a trend of bitcoin scam ads displaying Dr. Forrest's name and likeness.[11] Dr. Forrest shared this newsletter with Facebook, again demanding action.

77.     Dr. Forrest has continued to pursue Facebook's failure to stop the Scam Crypto Ads, without success. Even in 2022, Facebook's advertising business continues to allow scam ads to enter Facebook's user platform, proliferate, and cause numerous Facebook users financial disaster. Three years after Dr. Forrest sounded the alarm and demanded Facebook take immediate and effective action to stop co-developing and approving these ads, nothing has changed.

78.     Between late 2019 and at least February 2022, the Scam Crypto Ads have still been co-developed, reviewed and approved for public dissemination by Facebook's advertising business, injuring Dr. Forrest's name, image, likeness, and reputation, and, through their subsequent dissemination on Facebook, deceiving those users who have encountered and sometimes relied upon Dr. Forrest's supposed endorsement to their financial detriment.

79.     Dr. Forrest has been contacted over time by scores of consumers who have encountered the ads and then been swindled out of their hard-earned money–as recently as February 2022.

80.     Facebook is liable for its content development, and for its facilitation, solicitation, encouragement, material contribution to, and otherwise inducement of the financial criminal activity as alleged in the TAC. Facebook, without regard for the legality of its content, profited at the expense of Dr. Forrest's reputation and the underlying victims of the fraudulent scams, many of whom have suffered substantial financial harm as a result. Facebook capitalized on Dr. Forrest's name and likeness and took its cut of these illegally gotten proceeds by knowingly and willingly selling fraudsters advertising.

---

[11] IDCARE, *Newsletter – Covid 19 Scams, the World's Biggest Data Dump and Facebook*, (Feb. 22, 2021), https://www.idcare.org/latest-news/covid-19-scams-the-worlds-biggest-data-dump-and-facebook. (Last visited June 17, 2022).

81.     As a result, Dr. Forrest has been irreparably harmed as alleged in the TAC. In addition to defrauding Facebook users of millions of dollars, the scam raises uncertainty about whether Dr. Forrest is somehow responsible for or associated with the criminal scam in which he has no part. This has even harmed his reputation with the people closest to him, as Dr. Forrest's own father called him in a panic to question him about his role in the fraud.

82.     The whole ordeal distracts from and displaces the many positive associations with Dr. Forrest's name, clouds his impeccable reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness.

## F.     Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam Crypto Ads

83.     By inviting and accepting advertising business from the general public, (including the Syndicate), Facebook did not act solely as an internet service provider, but rather has also been acting as a digital advertising agency with typical attributes and client offerings seen with traditional advertising agencies.

84.     Facebook reports in its regular public filings with the U.S. Securities Exchange Commission that it has a number of businesses.[12] While not formally designated as a separate business unit, Facebook's advertising business is nonetheless separate and distinct from the Facebook user platform, and the ad business is almost exclusively how Facebook makes money.

85.     Facebook has computer architecture dedicated to the review, testing, and monitoring of Facebook advertisements for compliance with Facebook's Advertising Terms and Self-Service Advertising Terms. As described below, Facebook is acting as an advertising agency, if not the largest digital advertiser in the world with the capability of posting a completed ad itself.

---

[12] *See* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/4dd7fa7f-1a51-4ed9-b9df-7f42cc3321eb.pdf Meta, Inc, 10-K filing Dec.,2020 at page 7. (Last visited June 17, 2022) ("We build useful and engaging products that enable people to connect and share with friends and family through mobile devices, personal computers, virtual reality headsets, and in-home devices. We also help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest family members and friends to the public at large, and stay connected everywhere by accessing our products.")

[PROPOSED] THIRD AMENDED COMPLAINT

### G. Facebook's Advertising Business Substantially Controls the Development of Each Ad Through Its Contracts with Aspiring Advertisers

86.     As described by Zuckerberg, at the beginning of any desired ad campaign, an agreement to a contract with unique terms and conditions specific to Facebook's advertising services is required of any entity or person.[13] This is true of the Syndicate, which hired Facebook to provide advertising services, defining the relationship between Facebook and the Syndicate as that of co-developer.

87.     The Syndicate agreed to Facebook's Advertising Terms and Conditions and Self-Service Advertising Terms and Conditions as a pre-condition to Facebook co-developing the Scam Crypto Ads. Despite this agreement, the Syndicate succeeded with its fraudulent scheme even after complaints to Facebook from Dr. Forrest.

88.     Facebook's Advertising Policies specify that Facebook confirms the most basic of information that establishes true identity—*e.g.*, name and address. From Dr. Forrest's investigation, it is obvious that Facebook failed in this requirement because the Syndicate used false and incomplete information to register to advertise-- and still slipped through the net.

89.     As part of the Facebook's advertising review process called for by Facebook's Advertising Policies, Facebook checks the ad's image, text, targeting and positioning in addition to the content of the ad's landing page, and reserves the right to reject or require modification of any reviewed ads before they are allowed to appear on Facebook user platform.

90.     Facebook's Self-Service Ad Terms make this clear, specifying that its terms "apply to [the] use of Facebook Products (such as the self-service advertising interfaces and APIs) for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, the self-service Ad Interfaces) and any order [] place[d] through the Self-Serve Ad Interfaces ("Order")."

---

[13] It does not appear that such advertising clients need be Facebook users or have Facebook pages.



91.     Facebook requires its advertising customers to pay for each ad Order placed. Facebook's Self-Service Ad Terms further specify that: it "[m]ay reject or remove any ad for any reason."

92.     Facebook's Self-Service Ad Terms further specify that: "[f]rom time to time, we need to test improvements to our audiences and delivery systems, which could impact your advertising. Our testing is designed to improve the effectiveness of your advertising performance. We reserve the right to test when we believe it will be beneficial for advertiser performance.

93.     Facebook's Self Service Ad Terms further specify that Facebook "***will determine the size, placement and positioning of your ads***" and that "scheduling of delivery is subject to availability and may not be continuous." (Emphasis added.)

**H.     Facebook Substantially Contributes to the Ads Using Meta Pixel**

94.     Meta Pixel is a product offering that Facebook provides to advertisers, including the Syndicate in this case.[14]

95.     Meta Pixel is a type of "tracking pixel," which is a white or invisible 1-by-1 pixel displayed by lines of code installed in an email or on a webpage—outside of Facebook's user platform on, *e.g.*, a scammer's landing page.

96.     Facebook describes Meta Pixel to its advertisers as follows:

> The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for dynamic ads campaigns, and to analyze that effectiveness of your website's conversion funnels.[15]

97.     Advertisers install the Meta Pixel on their own websites, not in the ad that appears on Facebook.

---

[14] https://www.facebook.com/business/help/952192354843755?id=1205376682832142. (Last visited June 17, 2022).
[15] https://developers.facebook.com/docs/meta-pixel. (Last visited June 17, 2022).

98.     In selling advertisements to be shown to Facebook users, Facebook inserts its own content into the landing pages for its ads, thus changing the content created by the advertiser on the advertiser's own website.

99.     Meta Events Manager, a product Facebook offers to Facebook advertisers, gives those advertisers access to data about Facebook users that Facebook collects via the Meta Pixel.

100.    Among the "events," or actions on the advertiser's website that Facebook tracks for advertisers are certain "[s]tandard events [that] are predefined by Meta and can be used to . . . optimize for conversions and build audiences."[16]

101.    These standard events include "View Content," defined as "[a] visit to a web page you care about. For example, a product or landing page. View content tells you if someone visits a web page's URL, but not what they do or see on that web page."[17]

102.    Facebook and the Syndicate used the Meta Pixel to track whether Facebook users viewed websites containing fraudulent content. Facebook's advertising business then used its products, including Meta Events Manager, to notify fraudsters when Facebook users interacted with fraudulent content. Facebook then encouraged fraudsters to drive additional users to that content by purchasing more ads and optimizing the display of fraudulent ads to users who were more likely to engage with fraudulent content.

I.      **The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads**

1.      Ad Content

103.    Since it launched Facebook Ads in 2007, Facebook has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today."

---

[16] https://www.facebook.com/business/help/402791146561655 (last visited June 17, 2022).
[17] *Id.*

104.    In 2009, Facebook's introduction of advanced advertising metrics took its advertising business to the next level. In an October 26, 2009, article titled "*Facebook's Self-Serve Ads Are Ridiculously Easy to Make,*" Business Insider reported that Facebook's advertising business was "bustling" and would allow advertisers to reach individuals that were, for example, engaged or married, or had shown an interest in flyfishing.

105.    However, since then, Facebook's tools and services have evolved in such a sophisticated way that the 2009 version of Facebook is virtually unidentifiable. For example, as explained in a 2021 article by the Washington Post titled *"There's no Escape from Facebook, Even if You Don't Use it",* starting in or around 2010, researchers studying Facebook noticed that Facebook was placing software widgets on non-Facebook websites that would allow Facebook users to "like" or share content to Facebook without leaving the website, prompting concerns that Facebook was using data it collected to track all of a users' online activity.

106.    Facebook initially refuted the allegations, claiming that it was not using web data to track people and only used data for advertising purposes when a user clicked the widget to share content. And, in 2014, Facebook changed its practices to begin allowing its advertisers to target users based on websites users visit and other "off-Facebook" activities. This opened up a Pandora's box of data use that was exacerbated once Facebook shifted to using mobile phone applications to increase Facebook's reach (and its source of data).

107.    Moreover, the data Facebook has collected since changes in 2010 and 2014 derives much of its value from the ability to identify Facebook's users by their real-world identity. Unlike companies that use browsing cookies that can be easily cleared or blocked, Facebook ties what it learns about an individual to real identities that it requires its users to disclose, including the user's name, phone number, email address, birthday, and gender.

108.     Thus while Facebook characterizes each user's disclosure of his or her identity as increasing the value of the experience for all users, who are purportedly able to benefit from others' disclosures by connecting with and following the activities of their real-world connections, the real value is passed along to Facebook, who can meld the plethora of data it collects on and off

Facebook to build a digital dossier on real individuals and increase the market value of that information.

109. Because of this evolution in Facebook's ability to collect and use data, and charge a premium to advertisers to use that data, Facebook has seen an exponential growth in its value, the vast majority of which comes from its ad revenue:[18]



110. Indeed, Facebook's internal process includes both *ad creation* and *ad delivery*, sometimes conflated by media reports collectively into "targeting." But examining these terms individually, the first step of the "Ad creation" process is where the advertiser submits the text and images that comprise the content of their ad.

111. On the Facebook Ad Platform, each ad must be linked to a landing page. Advertisers are allowed to have multiple pages and run ads for any of them. Under this model, a/k/a "the Facebook Ad Creative," Facebook *de facto* acts as a co-developer, not just as an entity that posts an ad that is handed to them by a third party to paste on a Facebook page.

---

[18] *Meta's (formerly Facebook Inc.) advertising revenue worldwide from 2009 to 2021*, (Feb. 18, 2022), https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/. (Last visited June 17, 2022).

112. For typical ads, an advertiser provides the headline and text to accompany the ad and images or videos to show to the user. A prospective advertiser can also provide a traffic destination to send the user to if they click (*e.g.*, a Facebook page or an external URL).

113. If the advertiser provides a traffic destination, the ad will include a brief description (auto generated from HTML meta-data) about this destination. Facebook provides advertisers with a number of objectives to choose from when placing an ad; each objective tries to maximize a different optimization event the advertiser wishes to occur: "Awareness" (simply optimizing for the most impressions), Consideration (optimizing for clicks) and "Conversion" (optimizing for sales generated by clicking the ad.)

114. For each objective, the prospective Facebook advertiser bids on the objective itself. A bid can take multiple forms and includes the start and end time of the proposed ad campaign. Once this is done, Facebook then places bid in its internal ad auction(s) on the advertisers' behalf.

115. When Facebook has ad slots available, it runs an ad auction among the active advertisements bidding for that particular user. But the auction does not just use the bids placed by the advertisers. Rather, in its role as a co-developer, Facebook says: "the ad that wins an option and gets shown is the one with the highest total value. Total value is and how much an advertiser is willing to pay us to show their ad. It's a combination of three major factors: bid, estimated action rates and add quality and relevance."

116. In another hallmark of its co-developer activities, Facebook provides customizable templates for digital ad creation, then machine assists the advertiser in selecting various options on how to display digital ad content.

117. Facebook's ability to place digital ads for low amounts, without the need for hiring the traditional ad agency, has allowed Facebook to act like and replace the traditional advertising agency. Facebook's advertising digital platform has had a profound impact on traditional advertising and marketing spheres, an event that was not foreseeable when Section 230 was enacted, meaning that Section 230 could not have been intended to reach Facebook's ad development actions.

118.     Facebook's modification of digital ads before approval and publishing occurs through several factors, one being an ad's market effects. And this is not neutral tools being used to connect users. For example, if Facebook were to run identical ads targeting persons in Western Australia, but with differing budgets, the resulting audience will be different. The more money spent, the better the resulting audience.

119.     Further, audience delivery can and does change *due to the content of the ad itself* (*i.e.* the ad headline, text, and image,) collectively called the "ad creative." (Emphasis added)

120.     Despite advertisers placing the same bid on the same audience, Facebook's ad delivery will change based on the ad creative alone. The Syndicate running the Scam Crypto Ads took Facebook's assistance in locating those most likely to click on the Scam Crypto Ads.

121.     The power of image is material and results in changing the audience of the ads, beginning with the running of an ad.

122.     Facebook's optimization of the selection of ad creatives, together with market effects allows ads to be delivered to a specified audience.

2.     Ad Creative

123.     "Ad Creative" is well known in the advertising agency. Facebook Ad Creative is classified as any Facebook ad that users see on a website or app. Ad Creative can be images, videos, and other formats that get delivered to users.

124.     Simply by going online, a prospective Facebook advertiser can choose from ads Facebook created that are designed to attract users.[19]

125.     In urging ad customers to "Advertise with Confidence," Facebook invites the prospective advertiser to "Design your ad using various formats, placements, and objectives to meet your marketing goals. Facebook even instructs the would-be advertiser on "Best Practices."

126.     Facebook also modifies the type of ad through its auction process, advising that:

---

[19] https://www.facebook.com/business/ads-guide?content_id=dxR17TaPLmD3Sdl&ref=sem_smb&utm_source=GOOGLE&utm_medium=fb smbsem&utm_campaign=PFX_SEM_G_BusinessAds_US_EN_DSA_Other_Desktop&utm_conte nt=BusinessAds_US_EN_DSA_Desktop&gclid=EAIaIQobChMI1PeN3Nqe-AIVBAh9Ch2TrAZ-EAAYAiAAEgLU-_D_BwE&utm_term=dsa-1598818772528&utm_ct=EVG. (Last visited June 17, 2022).

> The pricing of Facebook ads is based on an auction system where ads compete for impressions based on bid and performance. When you run your ad, you're only be charged for the number of clicks or the number of impressions your ad received.

127. Ad Manager also lets a would-be advertiser use existing ads—already approved by Facebook to select an existing post you can edit and customize the ad creative. Therefore, as long as a *per se* unlawful ad has not been located from human review, scam ads can be repeated and sent to the same audience over and over.

128. Facebook Dynamic Creative technology builds and displays the best creative for groups of people in a broader target audience. It improves the ability to explore numerous creative combinations and audiences efficiently. Dynamic Creative also seeks to improve an ads' ROI by automating workflow used to test the ad creative.

129. Ad creative has a relatively short shelf life and will be "fatigued" and must be refreshed or it will "die" due to lack of interest, thus explaining in part why the crypto currency scams only lasted for a short time only to be replaced by a new and different ad creative as recently as February 2022.

3. <u>Ad Delivery</u>

130. "Ad delivery" is where the Facebook platform delivers ads to the specific users based on a number of factors.

131. Indeed, in examining the competition in digital markets, the U.S. House Committee on the Judiciary, through its Antitrust, Commercial, and Administrative Law Subcommittee ("Subcommittee"), released a report of over 400 pages entitled: "Investigation of Competition in the Digital Marketplace: Majority Staff Report and Recommendations." With respect to user monetization, in an interview conducted by a Congressional Subcommittee staff, "a former employee explained that as a product manager at Facebook, 'your only job is to get an extra

minute [of user's attention]. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So, the only metric is getting another minute.'"[20]

132.    Facebook's platform uses algorithms to modify both content and delivery. Without access to Facebook's ad delivery algorithm, user data and advertiser targeting data or delivery statistics, that Facebook modifies content and delivery all as one unified act to reach users and targeting choices that are known only to Facebook and not the criminals. This is truly a gift with a bow—Facebook both helps create and places the ideal ad and then sifts through its data to allow the Syndicate to sit back and wait for users to click the ad.

133.    Factors that Facebook uses include budget, an ad's performance, and the predicted relevance of the ads to users. Facebook has refused to date to produce the specific information that would explain how the Scam Crypto Ads were approved and then continued to run and repeatedly pop up despite being told by Dr. Forrest of the harm to him and others.

134.    Facebook was aware that its machine only process modifies content to likely victims of scam ads and none of this is performed by human review. Aware of this widely known fact, Facebook knew that the machine review would inevitably result in harm being perpetrated upon victims. The only questions were who would be harmed, how big the harm, and when it would occur.

135.    In sum, Facebook's advertising business does not merely "use the data that people put into the system." Rather, Facebook researches, develops, and deploys sophisticated tools and methods to amass and make sense of enormous amounts of information to deliver advertisements and information directly toward what it knows a user will respond to.

   4.    Facebook Elicits and Encourages the Creation of Illegal Content

136.    Aside from the content it co-develops, Facebook is similarly liable for its role, in whole or in part, for the creation and development of the offending content even if originated by third-parties. *See Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.

---

[20] House Committee on the Judiciary, *Investigation of Competition in The Digital Marketplace: Majority Staff Report and Recommendations*, at p. 135, October 6, 2020, available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("Subcommittee Staff Report on Digital Markets") (last visited June 17, 2022).

3d 1157, 1162 (9th Cir. 2008). Indeed, Zuckerberg has acknowledged that Facebook's is role more akin to a "media company" rather than just a tech platform for publishing, asserting that "[Facebook is] not a traditional media company. "You know, we build technology and we feel responsible for how it's used." [21] Zuckerberg has also taken responsibility in other forums, claiming that "we [Facebook] are responsible for the content [on Facebook]."[22] More recently, on March 25, 2021, Zuckerberg testified before Congress that "[i]nstead of being granted immunity, platforms should be required to demonstrate that they have systems in place for identifying unlawful content and removing it."[23]

137.    However, rather than demonstrating sufficient systems in place for identifying unlawful content and removing it, Facebook has done the opposite, encouraging the creation of illegal content across its platforms.

138.    Despite Zuckerberg's public stance, apparently meant to endear faith in Facebook's platform and the content therein, Facebook's indispensable role in carrying out fraudulent schemes is well-known in circles of fraudsters as Facebook encourages the proliferation of illegal ads on its platform like those at issue here. Advertising fraudsters have been quoted as stating that where they once had to guess what kind of person might fall for their unsophisticated cons Facebook now does that work for them as it labors to track who clicks on an ad and who buys the product, and then starts delivering the ads to others whom it thinks are likely to fall victim to the scam. "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the [victims] for me.'"[24]

---

[21] Josh Constine, *Zuckerberg Implies Facebook is a media company, just 'not a traditional media company*, Tech Crunch (Dec. 21, 2016), https://techcrunch.com/2016/12/21/fbonc/?guccounter=1. (Last visited June 17, 2022).
[22] Matt Weinberger, *Mark Zuckerberg Just Renounced a Core Piece of Silicon Valley Wisdom – And It Could Come Back to Bite Facebook*, Business Insider (April 10, 2018), https://www.businessinsider.com/mark-zuckerberg-facebook-is-responsible-for-the-content-on-its-platform-2018-4. (Last visited June 17, 2022).
[23] March 25, 2021 Congressional Hearing before the Committee on Energy and Commerce, p. 7, https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Witness%20Testimony_Zuckerberg_CAT_CPC_2021.03.25.pdf . (Last visited June 17, 2022).
[24] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.

139.    Further, internet fraud advertising hucksters explain that Facebook sales employees—with knowledge of their deceptive schemes—encourage them to buy more ads. Former Facebook employees alleged that it was "common knowledge" that some of their best clients were advertisers who used deception but were instructed to push these fraudsters to spend more to meet sales quotas of tens of millions of dollars per quarter.[25] In an interview conducted by U.S. House Subcommittee staff, "a former employee explained that as a product manager at Facebook, 'your only job is to get an extra minute [of user's attention]. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So the only metric is getting another minute.'"[26]

140.    Further, Facebook's role in developing illegal content extends beyond its methods of finding marks or encouraging scammers to buy fraudulent ads to meet sales quotas, and extends into Facebook's decisions to host its ad review process off of Australian shores, allowing third-party fraudsters to use simple geolocation cloaking software to easily target vulnerable Australian citizens.

141.    Facebook has explicitly refused to submit itself to Australian jurisdiction, choosing instead to locate its advertisement review platform offshore for ads with a final destination of Australia. However, Facebook is fully aware that scam advertisers use geolocation cloaking software to circumvent ad review policies and get their fraudulent ads delivered. In short, geolocation cloaking software is a method by which an advertiser disguises his ad as a legitimate one when it is reviewed for approval at a particular IP address, but is transformed into a fraudulent ad when it gets delivered to the advertisement's final destination.

142.    The practices and easy workarounds provided by cloaking software are well known to both Facebook and fraudulent advertisers and scam advertisements featuring Dr. Forrest have continued to proliferate on Facebook.

143.    Facebook's decision to offshore its review platform despite the extensive use of the cloaking software materially contributes to the fraud content as it encourages the proliferation and

---

[25] *Id.*
[26] Subcommittee Staff Report on Digital Markets, at p. 135.

creation of these illegal ads, and Facebook is directly involved with developing and enforcing a system that ultimately subjects its users to illegal content. These acts go far beyond the business practices of a traditional publisher, and Facebook is liable for its actions in co-developing Forrest Scam Crypto Ads for dissemination to consumers, including those on Facebook's user platform.

### J. Facebook's Ability to Find Cryptocurrency Ads

144. At all relevant times, Facebook has been in possession of technology that can find cryptocurrency-related terms and images in digital content. There is also technology that could examine a landing page or a subsequent/downstream landing page for cryptocurrency content.

145. There are many ways detection and screening can be accomplished. The techniques described above (lexical and semantic search, automated image analysis using AI, recursive web robots, and web scrapers) are well-known and used throughout the computer science field.

146. Simple key word searches for "Forrest," "Twiggy," "bitcoin," "crypto," etc., and the use of imaging technology to identify Dr. Forrest's image could have easily isolated Forrest scams in the proposed news articles and would have succeed into identifying these scams even without the cloaked landing page.

147. Facebook's advertising business's self-touted ability to control advertising scams by "verifying the identity of accounts" and requiring provision "of a government ID and pro[of] of location" action would have never allowed the obviously shady Syndicate to successfully advertise if Facebook had really not wanted it to do so.

148. Facebook reports that it removes ads but does not tell users that it has the ability to post the ads in the first place.[27]

## V. FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE

149. As set forth in this section, Facebook has engaged in unfair jurisdictional arbitrage. Dr. Forrest seeks equitable relief to correct this, including application of Australian law on the question of Section 230 immunity.

---

[27] *Meta Response to the Australian Disinformation and Misinformation Industry Code* (2021) https://digi.org.au/wp-content/uploads/2022/05/Meta_2022-Misinformation-Transparency-report-v1.0.pdf. (Last visited June 17, 2022).

150.    On or about August 27, 2019, in response to queries from Dr. Forrest's Australian lawyers, Facebook, Inc's U.S. lawyers (White & Case, LLP's Los Angeles office), wrote to Dr. Forrest's Australian legal counsel stating:

> For users residing in Australia, the Facebook service is hosted and operated by Facebook, Inc., a company organized and existing under the laws of Delaware, United States, and with its principal place of business in Menlo Park, California… Facebook Ireland is a separate entity, independent of and legally distinct from Facebook, Inc. Facebook Ireland does not own, operate, control, or host the Facebook Services for Australian users. Facebook, Inc. is the entity with which Australian users have a contractual relationship, and it operates and controls the Facebook Service for such users.

151.    However, in at least two Australian judicial proceedings relating to and arising from the Crypto Scam Ads, Facebook has taken the position that Facebook, Inc. cannot be lawfully served with service of process by Australian federal and state courts. Second, Facebook has taken the position that it is not properly be the subject of jurisdiction in legal proceedings originating in the Australian federal and state courts.

152.    On or about January 31, 2022, a Prosecution Notice issued out of the Magistrates Court of Western Australia, charging Facebook with three counts of federal crimes under The Criminal Code 1995 (Cth), Section 400.7(2) relating to its conduct in dealing with property, namely a Facebook computer cluster, where; there was a risk that the property would become an instrument of crime, in circumstances where the Accused was reckless as to the fact that these was a risk that the property would become an instrument of crime ("WA Criminal Proceedings".)

153.    The prosecutor and party who issued the Notice in the WA Criminal Proceedings was Dr. Forrest in a private capacity. Dr. Forrest obtained the consent and approval to do so from the Attorney General for the Commonwealth of Australia, Hon. Michaelia Cash.

154.    Subsequently, Facebook was served with process, and a hearing in the WA Criminal proceedings was set for March 28, 2022. Facebook received notice of this hearing.

155.    On or about March 21, 2022, Facebook wrote to Prosecutor Forrest, advising in pertinent part:

> With no disrespect intended to the courts of Western Australia, Meta does not presently perceive the jurisdiction of the Magistrates Court to summon it from the State of California to face the charges brought by Dr. Forrest[]



The purpose of this letter is, *inter alia*, to seek clarification from Dr. Forrest of the bases on which the Magistrates Court is said to possess jurisdiction. Meta does not by this letter or otherwise, intend to voluntarily submit to the jurisdiction and expressly reserves its rights. …

Please urgently advise whether, and if so on what basis, Dr. Forrest asserts: … that process or orders of the Magistrates Court of Western Australia are capable of compelling the attendance of a foreign corporation not present in the jurisdiction. As you are no doubt aware, the issue of *in personam* jurisdiction with respect to Meta is discrete, and not informed by whether the Criminal Code (CTH) (Code") confers federal extraterritorial 'subject matter' jurisdiction over foreign corporations accused of Div. 400 offences generally. (Italics added).

156. In anticipation of the March 28, 2022, hearing in the WA Criminal Proceedings, Facebook did not file any general or special appearance, and did not appear at the hearing when said proceedings were called.

157. After the March 28, 2022 hearing, the Court entered orders that service of process on Facebook had been properly affected and entered a plea of not guilty on behalf of Facebook as an absent defendant and appointed June 17, 2022 as a further hearing date.

158. On June 17, 2022, Facebook appeared in the WA Criminal Proceedings purporting to enter a conditional appearance to contest, *inter alia,* personal jurisdiction.

159. Further, on or about March 18, 2022, the Australian Competition and Consumer Commission ("ACCC") commenced proceedings against Facebook alleging violation of the Australian Consumer Law and the Australian Securities and Investments Commission Act, further alleging that Facebook aided and abetted or was knowingly concerned in false or misleading conduct and representations by advertisers of scam advertisements featuring prominent Australian public figures ("ACCC Prosecution").

160. The ACCC Prosecution alleges that Facebook ads, which promoted investment in cryptocurrency or money-making schemes, were likely to mislead Facebook users into believing the advertised schemes were associated with well-known Australian celebrities. The schemes were in fact scams, and the people featured in the ads had never approved or endorsed them. According to ACCC Chair Rod Sims, "The essence of our case is that Meta is responsible for these ads that it publishes on its platform."



161.    In an unprecedented action, on June 10, 2022, Facebook sought to ban publication of the details of the ACCC civil case. Facebook remains able to contest the jurisdiction of the Australian court in this proceeding.

162.    To summarize, on one hand, Facebook is claiming that it is beyond the jurisdiction of Australian Courts for its advertising activities involving the false endorsement and wrongful misappropriation of Australian celebrities' likeness. On the other hand, Facebook claims in this action that a U.S. federal statute, without an analogue in Australian statutory or common law, namely Section 230, should immunize for the same Australian acts and omissions which the WA Criminal Proceedings and ACCC proceeding concern.

163.    In this action the activities of the Syndicate have no connection to the United States other than the fact that they accessed and worked with Facebook's architecture of computer clusters around the world to develop, optimize, and then deliver the Scam Crypto Ads to members of the Australian public.

164.    The Scam Crypto Ads about which Dr. Forrest complains were specifically targeted to be delivered to the desktops and laptops of Facebook users across Australia who followed and admired Dr. Forrest as a successful and prominent Australian businessman.

165.    These are the same Australian Facebook users who Facebook asserts contract with it to receive the benefits of Facebook's services in Australia, and in turn grant Facebook, Inc. rights and benefits to use and profit from their Australian data.

166.    In behaving in the manner alleged in this TAC, Facebook is engaging in an inequitable jurisdictional arbitrage, refusing to submit to the jurisdiction of Australia to answer claims in order to seek to apply a uniquely U.S. statute that purports to afford immunity to Facebook.

167.    The immunity would not exist if Facebook submitted to jurisdiction in Australia, and Facebook seeks to use U.S. determinations immunizing their wrongful conduct, and as part of an overall litigation strategy, to deny Dr Forrest and all Australian citizens their rights and entitlements.

# VI.    CAUSES OF ACTION

168.    Dr. Forrest has been irreparably harmed, and the whole ordeal distracts from and displaces the many positive associations with Dr. Forrest's name, clouds his impeccable reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness. Accordingly, Dr. Forrest brings each of the following causes of action against Facebook:

## FIRST CAUSE OF ACTION

### Misappropriation of Name of Likeness

169.    Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

170.    At all relevant times, Facebook used and misappropriated Dr. Forrest's name and likeness in images and videos in violation of California common law.

171.    Facebook misappropriated Dr. Forrest's name, likeness, and brand, to keep its users engaged with illegal content in the form of the underlying fraud and allowed Facebook to gain an unwarranted commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist because the longer users are engaged, the more data Facebook is able to collect and monetize. Facebook further gained a commercial benefit by selling advertisements and ways to promote or "boost" content to underlying fraudsters and profiting from the illicit ill-gotten proceeds that served to perpetuate the fraud.

172.    Facebook's advertising business misappropriated Dr. Forrest's name, likeness, and brand by contracting to and, Dr. Forrest believes, in fact, materially contributing to the content of the Scam Crypto Ads as co-developer, and in reviewing and approving the ad as appropriate to be submitted to Facebook's user platform for auction and dissemination as a Facebook advertisement.

173.    Dr. Forrest has never consented to these unauthorized and illegal uses of his name, image, voice, likeness, or photos or videos of him. Facebook knew, or should have known, that Dr. Forrest did not authorize or consent to the misuses because Dr. Forrest himself and/or through his agents directly informed Facebook of the misuses.

174.    As a result of Facebook's wrongful conduct as alleged in the TAC, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation as a

consequence of the pervasive investment scam that has been perpetuated, aided, and abetted, and carried out through the Facebook website. Dr. Forrest's reputation and the commercial value of his name and likeness, both of which he is and has been committed to protecting and developing, have also suffered injury. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

175.    Facebook's misappropriation of Dr. Forrest's common law right to his name and likeness has been deliberate, willful, and in utter disregard of his rights.

176.    Dr. Forrest seeks all available compensatory, punitive, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraud

177.    Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

178.    At all times relevant, the DOE defendants and unknown persons and their co-conspirators who carried out the Scam Crypto Ads have committed fraud by luring unsuspecting investors to send money in exchange for a benefit that does not exist.

179.    At all times relevant, Facebook knew, or should have known, about the underlying fraud.

180.    At all times relevant, Facebook was an indispensable part of the Scam Crypto Ads, provided substantial assistance and encouragement to, materially contributed to, and otherwise aided and abetted the fraud.

181.    As alleged in this TAC, during the testing and framing of the ads' content, Facebook assists the fraudsters in refining a user audience that is most likely to click and purchase. This rotation of ads assists the fraudsters in locating their victims, and is part of the co-development of the content that Facebook provides. Facebook collects vast amounts of data and paid and unpaid content to create an experience for users and is incentivized to curate this

experience because the longer users are engaged and the more time a user spends on Facebook, the more data, content, and information Facebook is able to collect and monetize.

182.    Facebook users did not have a practical option to prevent Facebook from collecting and using their own data against them, including their private browsing history when they were logged off of Facebook, and the gathering of such data was a necessary condition to their use of Facebook and/or the ability to opt out of such data collection was so confusing that the practical effect was that there was no option to prevent Facebook's data collection.

183.    Using its vast array of data collected, Facebook intentionally provided substantial assistance and/or encouragement in the underlying fraud by changing the experience of users and delivering messages to the victims that they would like or be interested in this fraudulent content, based upon among other things, specific vulnerabilities to the underlying fraud that it was able to exploit using the data it collected on its users.

184.    Facebook further intentionally provided substantial assistance and/or encouragement to the Scam Crypto Ads by changing the user experience to the extent Facebook's advertising business, with all of the knowledge it was aware of regarding Scam Crypto Ads, by contracting to and materially contributing to the content of the ads as co-developer, reviewer, and approver of the ads as appropriate to be submitted to Facebook's user platform for auction and dissemination as Facebook advertisements.

185.    Other frauds have been carried out via this method, and news articles have quoted similar bad actors: "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the morons for me.'"[28]

186.    Facebook's advertising business provided substantial assistance and/or encouragement to the underlying fraud when it knowingly and willingly sold the underlying scammers targeted advertising that were paid for by ill-gotten proceeds. The advertisements drove Facebook's own users to the fraudulent promotions and ads, further fueling the scam and keeping

---

[28] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.

the money flowing. In fact, news articles have quoted former Facebook employees who "said it was common knowledge there that some of their best clients were affiliates who used deception. Still, the sources said, salespeople were instructed to push them to spend more."[29]

187.     Facebook's conduct was independently tortious and a substantial factor, proximately causing the harm Dr. Forrest has suffered, including irreparable harm to his public image and reputation as a consequence of the Scam Crypto Ads that Facebook has substantially encouraged and assisted. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

188.     Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### Unfair Competition Law

### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)

189.     Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

190.     Section 17200 *et seq.* of the California Business & Professions Code, which is California's Uniform Competition Law ("UCL"), is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, unfair and/or fraudulent. The UCL statute's intent and purpose is to protect both consumers and competitors. The coverage of Bus. & Prof. Code § 17200 *et seq.* is broad and intended to enjoin on-going wrongful business conduct in whatever context such activity might occur.

191.     Dr. Forrest is a "person" within the meaning of Bus. & Prof. Code § 17201. Facebook's principal place of business is located within California. Dr. Forrest maintains a Facebook user account and has a verified Facebook page.

---

[29] *Id.*

192.     Facebook has engaged in unfair and/or unlawful business practices within the meaning of Bus. & Prof. Code § 17200 *et seq*.

193.     Facebook's conduct is "unlawful" under the UCL. Within the meaning of Section 17200, virtually any violation of any civil or criminal federal, state, or municipal, statutory, or regulatory, court-made, or local law can serve as a predicate offense for an unlawful claim. Facebook acted unlawfully by misappropriating Dr. Forrest's name and likeness and violated his common law right of publicity to keep its users engaged with illegal content in the form of the underlying fraud, and in violating the Lanham Act (15 U.S.C. § 1125(a)) prohibition on false endorsement, allowing Facebook to gain a commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist.

194.     Facebook's conduct is also "unfair." The Scam Crypto Ads were facilitated by Facebook's unique method of curating user experiences to provide content that would keep a particular user engaged on the website, and thus allowing Facebook to harvest more data, and/or by leveraging this data to provide targeted ad capabilities to the underlying bad actors, and in engaging in conduct which is tethered to and in violation of the policies underlying the Lanham Act prohibition on false endorsement. Such conduct is unfair under Section 17200, causing financial and reputational harm, offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. A practice may be deemed "unfair" under the UCL even if not specifically proscribed by some other law.

195.     Dr. Forrest has standing to pursue his UCL claim because he has suffered an economic injury in fact and has lost money or property resulting from Facebook's unfair and/or unlawful conduct. Dr. Forrest has no adequate remedy at law for some of his injuries.

196.     The UCL is a strict liability statute and it is therefore not necessary to show that Facebook intended to injure or harm Dr. Forrest.

197.     Whether a business practice is unlawful or unfair presents factual questions for the ultimate factfinder to determine.

198.     An act or omission may violate the UCL even if the unfair or unlawful act or practice affects only one victim.

199. As a direct and proximate result of Facebook's unlawful and unfair conduct, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation, and has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

200. Pursuant to Bus. & Prof. Code § 17203, Dr. Forrest seeks the entry of permanent and mandatory injunctive relief against Facebook as necessary to enjoin its unfair and/or unlawful business conduct.

## FOURTH CAUSE OF ACTION

### Negligent Failure to Warn

201. Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

202. During all times relevant to this TAC, Facebook had actual or constructive knowledge of all relevant aspects of the Scam Crypto Ads, including, but not limited to, the unauthorized use of Dr. Forrest's name, images, likenesses, and protected marks which were wrongfully and repeatedly exploited to promote the scam. The harm to Dr. Forrest was reasonably foreseeable to Facebook.

203. Facebook had actual or constructive and independent knowledge of the Scam Crypto Ads, irrespective of its monitoring of third-party content, as Facebook was aware of the Scam Crypto Ads since in or about March 2019.

204. Facebook had a duty to warn Dr. Forrest that could have been satisfied even without conducting a detailed investigation. And due to its misfeasance, Facebook is responsible for making Dr. Forrest's position worse and created the risk, such that no "special relationship" is required for the duty to exist. Facebook should have warned its users, including, Dr. Forrest, of the Scam Crypto Ads.

205. Facebook's inaction fell below the standard of care. It would have been reasonable under the circumstances for Facebook to provide a warning(s) to Dr. Forrest. Facebook breached its duty of care by failing to adequately warn its users about the Scam Crypto Ads.

206. Facebook's failure to warn was a substantial factor in causing Dr. Forrest's harm.

207. As a direct and proximate consequence of Facebook's failure to warn and negligence, Dr. Forrest has been severely harmed, including harm to his reputation and the commercial value of his name, image, and likeness. Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

208. Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Lanham Act Violations

209. Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

210. Dr. Forrest is a celebrity within the meaning of the Lanham Act, specifically 15 U.S.C. § 1125(a). His "mark" is his persona, its strength reflective of the extremely high level of recognition his image and name enjoy as a successful businessman and philanthropist.

211. Facebook and the Syndicate have co-developed, and Facebook's advertising business reviewed, approved, and supplied its prior written consent of the Scam Crypto Ads for later dissemination on Facebook's user platform. This occurred for the sole and exclusive purpose of inducing Facebook users who encountered the Scam Crypto Ads to purchase the goods and/or services promoted by Dr. Forrest's purported but false endorsement.

212. Facebook acted as a digital advertising agency which helped create and co-develop the marketing and advertising campaign that became the Scam Crypto Ads.

213. A reasonable objective consumer in the marketplace would be confused into believing that Dr. Forrest endorses the Scam Crypto Ads. Specifically, his celebrity status as a highly successful businessman and philanthropist was tapped into directly in contriving the Scam Crypto Ads in order to appeal to those seeking supposedly credible investment opportunities.

214.     The Scam Crypto Ads use Dr. Forrest's actual photograph and name. Facebook used its own marketing channels, *i.e.,* its user platform, to target those users which Facebook knew to be highly susceptible to Dr. Forrest's endorsement. Those targeted have been actually confused and deceived by their encounters with the Scam Crypto Ads, often to their financial detriment, relying on the false confidence Dr. Forrest's endorsement has fostered.

215.     Facebook acted willfully in co-developing and then disseminating the Scam Crypto Ads that were never endorsed by Dr. Forrest. Moreover, Facebook changed nothing after being repeatedly notified, starting in or about late March 2019 by Dr. Forrest and his representatives: (1) that Dr. Forrest did not endorse the Scam Crypto Ads; and (2) Dr. Forrest demanded that the development and/or dissemination of any such ads cease immediately and permanently. Despite these demands, Facebook, through its advertising business, has continued to co-develop, approve, and disseminate the Scam Crypto Ads on Facebook's user platform through at least February 2022.

216.     Facebook's entire business model is based on ad revenue. And with this model comes criminals using Facebook ads that are designed to harm others. Facebook's business model is based on receiving money in the form of advertising fees from its willing involvement in co-developing, and then disseminating the Scam Crypto Ads on its user platform--in a highly targeted fashion to users Facebook believed to be most susceptible to respond favorably to the promotion of such Ads.

217.      Dr. Forrest has been harmed by Facebook's acts and omissions constituting false endorsement, causing him damages to his reputation, status and the good will associated with his stellar reputation for business acumen and philanthropy, including out-of-pocket losses in attempting to preserve his good name and mitigate the negative reputational impact of the Scam Crypto Ads.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment and Related Equitable Relief

218.     Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

219.     Dr. Forrest's reputation, name, image, and likeness all have great value to him and objectively in a manner that can be liquidated. The question of the value of his endorsement is a question for a jury, including the "going rate" for an endorsement from Dr. Forrest--for the right to exploit his reputation for a commercial purpose like promoting and endorsing cryptocurrency ads.

220.     There is an active market for the exploitation of the promotion and endorsement from business and philanthropic celebrities like Dr. Forrest.

221.     At the same time, Facebook, through its advertising business, has wrongly received ad revenue in return for co-developing, editing, and approving the Scam Crypto ads that led Facebook users to the Scam Crypto Ads.

222.     The Scam Crypto Ads misused Dr. Forrest's reputation, name, likeness, and endorsement, and have sullied and damaged him.

223.     Given that Facebook has monies which in fact should be restored in the circumstances of fraud and mistake, and the relative equities, and given the nature of the relationship of the parties, defendant's unjust enrichment ought be prevented.

224.     Facebook has therefore been unjustly enriched through the receipt of the ad revenue derived through these ads.

225.     Facebook further will be unjustly enriched if allowed to benefit unfairly from its judicial arbitrage designed and intended to deny Dr. Forrest his day in court except in a jurisdiction in which Facebook will rely, in violation of principles of equity, on Section 230 qualified immunity.

226.     No matter the material difference between the ad revenue and the greater damage in value of Dr. Forrest's reputation, Facebook has been unjustly enriched in the amount of ad revenue Facebook earned in connection with its involvement with Scam Crypto Ads, which sums should be disgorged and given to Dr. Forrest.

227.     Further, in the circumstances presented, namely Facebook's unfair jurisdictional arbitrage, equity should intervene to estop Facebook from asserting, or find that Facebook has waived, Section 230 immunity and/or other affirmative defenses it might seek to raise, and declarations and equitable relief designed to effect this equitable outcome should issue.



## **SEVENTH CAUSE OF ACTION**

### **Negligent Design**

228.     Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

229.     In or about December 2015, Facebook reached out to Dr. Forrest, asking him to create a Facebook account and to become a "verified" Facebook user.[30]  The expressed purpose behind Facebook's request was Facebook's intention to protect Dr. Forrest name and reputation as a respected and high-profile businessman on its platforms from the proliferation of "fake" Dr. Forrest profiles and other information. Dr. Forrest accepted Facebook's offer by creating an account and becoming a verified Facebook user.

230.     Once accepted, a special relationship existed between Dr. Forrest and Facebook under which Facebook accepted a duty to protect Dr. Forrest's name and reputation from misuse on its platforms, including from Scam Crypto Ads. Indeed, Facebook undoubtedly recognized Dr. Forrest's stature as a coveted celebrity and was aware that fraudsters sought to impersonate and misappropriate Dr. Forrest's name and likeness such that the harm to Dr. Forrest that has resulted from the Scam Crypto Ads was reasonably and patently foreseeable to Facebook. There is a close and causal connection between Facebook's conduct, as alleged in this TAC, and Dr. Forrest's injuries, and as a company now worth billions of dollars, Facebook shoulders moral and actual blame for Dr. Forrest's injuries.

231.     Aside from this special relationship, Facebook owed a duty to Dr. Forrest as a result of its misfeasance, as Facebook is responsible for making Dr. Forrest's position worse and created the risk of harm to which Dr. Forrest has encountered.

232.     Starting in or about April 2019, Dr. Forrest has, repeatedly and without success, demanded Facebook protect his name and reputation as promised by stopping the Scam Crypto Ads.

---

[30] According to Facebook, it has created "verified" badges for "notable" accounts that "[r]epresent a well-know, often searched person, brand or entity" and have been "featured in multiple news sources."  *See* Facebook Help – "How do I request a verified badge on Facebook?" https://www.facebook.com/help/1288173394626262

233.    Facebook owed a duty to use ordinary care in designing, maintaining, adapting and modifying its advertising and business operations so as to prevent scammers like the Bulgarian Syndicate from accessing, using, and continuing to use Facebook's advertising business and its related products and services to co-develop Scam Crypto Ads, and to refrain from materially contributing to the development of advertisements, like the Scam Crypto ads.

234.    Facebook breached its duty by, *inter alia*, designing, operating, maintaining, adapting, modifying and overseeing its advertising business without addressing and by turning a blind eye to the hazard that its co-development of the Scam Crypto Ads posed to Dr. Forrest, operating without reasonable or sufficient precautions, procedures, protocols, and requirements including effective advertiser identification checks, the deployment of anti-cloaking software tools or techniques, and simple word and image search functions.

235.    If Facebook had deployed these reasonable procedures, such procedures would have identified and rejected Scam Crypto Ads in the advertising business co-development phase.

236.    Among other things, by reason of the persistence of the Scam Crypto ads reaching the Facebook platform from March 2019 to date, particularly in the face of Dr. Forrest's clear and repeated calls for Facebook action to stop the ongoing fraud, Facebook knew, or should have known, that its products and services posed an unreasonable risk, and Facebook's continued design decisions, and any disclaimers as to its products are inadequate, unreasonable, and knowingly ineffective and fall below the standard of care.

237.    Facebook's negligence was a substantial factor in causing Dr. Forrest's harm, and as a direct and proximate consequence of Facebook's negligence, Dr. Forrest has and continues to be severely harmed.

238.    Dr. Forrest seeks all available nominal, compensatory, punitive, statutory, and other damages for the harms and losses he has and continues to suffer, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Andrew Forrest prays that this Court adjudge and decree and enter judgment in its favor and against defendant Facebook as follows:

1. That Dr. Forrest is entitled to compensatory damages in an amount to be proven at trial, as permitted by law and according to proof;

2. That Dr. Forrest be awarded punitive or exemplary damages in an amount to be determined at trial;

3. That this Court enter a permanent and mandatory injunction prohibiting Facebook from engaging in the unlawful and unfair conduct in the future;

4. That Facebook be ordered to disgorge its ill-gotten gains including advertising revenues derived from the Scam Crypto Ads;

5. That this Court undertake a Choice of Law analysis as pled in the TAC and apply Australian law to any assertion of a total or partial affirmative defense under Section 230 and appropriate declarations, and that other equitable orders issue to prevent Facebook from benefitting from its unfair and unconscionable jurisdictional arbitrage;

6. That Dr. Forrest is entitled to costs of suit; and

7. That Dr. Forrest be afforded such other and further relief, including his attorney fees, as this Court deems just and proper, and law and equity allow.

## DEMAND FOR JURY TRIAL

Plaintiff Dr. Andrew Forrest respectfully requests a jury trial on all triable issues in the above-entitled action.


DATED: July __, 2022    WAYMAKER LLP


By: _____

Brian E. Klein
Donald R. Pepperman
Jose R. Nuño

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*





EXHIBIT 2

Brian E. Klein (Bar No. 258486)
  bklein@waymakerlaw.com
Donald R. Pepperman (Bar No. 109809)
  dpepperman@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:   (424) 652-7800
Facsimile:   (424) 652-7850

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT~~SUPERIOR COURT OF THE STATE~~ OF CALIFORNIA**

**~~COUNTY OF~~ SAN JOSE DIVISION~~MATEO~~**

| | |
|---|---|
| DR. ANDREW FORREST, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware Corporation, and DOES 1 through 20, inclusive,<br><br>        Defendants. | Case No. 5:22~~1~~-C~~I~~V-0~~5055~~3699-EJD<br><br>~~SECOND~~ **THIRD AMENDED COMPLAINT FOR:**<br><br>  **(1) Misappropriation of Name and Likeness;**<br><br>  **(2) Aiding and Abetting Fraud;**<br><br>  **(3) Unfair Competition/Unfair Business Practices (Cal. B&P Code section 17200 *et seq.*);**<br><br>  **(4) Negligen~~ce~~t Failure to Warn;**<br><br>  **(5) Lanham Act Violations; ~~and~~**<br><br>  **(6) Declaratory Relief and Unjust Enrichment; and**<br><br>  **~~(6)~~(7) Negligent Design** |

1    **DEMAND FOR JURY TRIAL**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.     INTRODUCTION ........................................................................................................... 1

II.    THE PARTIES ............................................................................................................... 6

III.   JURISDICTION, VENUE, AND CHOICE OF LAW ................................................ 7

IV.    GENERAL ALLEGATIONS ........................................................................................ 8

       A.  Dr. Andrew Forrest--Australian Business and Philanthropic Icon ...................... 8

       B.  The Scam Crypto Ads Featuring Dr. Forrest .................................................... 11

       C.  The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of
           Millions ............................................................................................................... 15

       D.  Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding Facebook
           Takes Steps to Stop Further Ads ........................................................................ 17

       E.  In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam
           Crypto Ads ..................................................................................................... 19~~9~~

       F.  Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam
           Crypto Ads ......................................................................................................... 20

       G.  Facebook's Advertising Business Substantially Controls the Development of Each Ad
           Through Its Contracts with Aspiring Advertisers .......................................... 21~~1~~

       H.  Facebook Substantially Contributes to the Ads Using Meta Pixel ..................... 22

       I.   The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising
            Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is
            Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads ........ 23

            1. Ad Content ................................................................................................... 23

            2. Ad Creative .................................................................................................. 27

            3. Ad Delivery .................................................................................................. 28

            4. Facebook Elicits and Encourages the Creation of Illegal Content ....................... 29

       J.   Facebook's Ability to Find Cryptocurrency Ads ............................................... 32

V.     FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE ................... 32

VI.    CAUSES OF ACTION ................................................................................................ 36

i

Plaintiff Dr. Andrew Forrest ("Dr. Forrest") through his undersigned counsel of record, brings this ~~Second~~ Third Amended Complaint ("~~T~~SAC") against Defendant Meta Platforms, Inc. formerly Facebook, Inc. (collectively "Facebook")[1] and DOES 1-20 (collectively, "defendants"), to secure damages, and injunctive and other appropriate equitable relief:

## I.     INTRODUCTION

1.     Since it launched Facebook ads in 2007, Facebook's advertising business has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Facebook CEO Mark Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today." Prescient in his prediction, Facebook and Zuckerberg have built an advertising empire worth hundreds of billions of dollars.

2.     In October 2019, Zuckerberg gave a speech at Georgetown University, acknowledging the problem with supporting Free Speech, addressing the variety of problems that arise from that, and stating that Facebook itself had the responsibility for addressing the risk of harm even to a small number of people:

> [I]nevitably some people will use their voice to organize violence, undermine elections or hurt others, **and we have a responsibility to address these risks.** When you're serving billions of people, even if a very small percent cause harm, that can still be a lot of harm. (Emphasis added).

3.     Zuckerberg went on to state that Facebook was both aware of the problems and ha[d] the ability to stop unlawful ads:

> For misinformation, we focus on making sure complete hoaxes don't go viral…. More broadly though, we've found a different strategy works best: focusing on the authenticity of the speaker rather than the content itself.

> We've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money.

> \*          \*          \*

> The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts. We now require

---

[1] Facebook Inc., rebranded itself, changing its name to Meta Platforms, Inc. ("Meta") on or about October 2021, but Dr. Forrest refers to Meta as Facebook for clarity and unless otherwise differentiated below.

you to provide a government ID and prove your location if you want to run political ads or a large page.

      \*          \*          \*

We build specific systems to address each type of harmful content — from incitement of violence to child exploitation to other harms like intellectual property violations — about 20 categories in total. **We judge ourselves by the prevalence of harmful content and what percent we find proactively before anyone reports it to us. (emphasis added)**

      \*          \*          \*

We now have over 35,000 people working on security, and our security budget today is greater than the entire revenue of our company at the time of our IPO earlier this decade.

All of this work is about enforcing our existing policies, not broadening our definition of what is dangerous. If we do this well, we should be able to stop a lot of harm ….[2]

4. Unfortunately for Dr. Forrest and Australians defrauded by cryptocurrency scams falsely bearing Dr. Forrest's endorsement over the last three years, Facebook's advertising business has not done its job. Australian users have lost millions when relying on a phony "endorsement" using Dr. Forrest's name image and reputation.

5. Beginning in late March 2019, Dr. Forrest learned that fraudulent cryptocurrency advertisements were appearing on the Facebook platform that were wrongly using his name and image to endorse shady cryptocurrency schemes ("Scam Crypto Ads"). The Scam Crypto Ads, including the following example, were designed to benefit from their alleged association with business and philanthropic celebrity, Dr. Forrest. [3] [4]

---

[2] Tony Romm, *Zuckerberg: Standing for Voice and Free Expression*, Washington Post, (Oct. 17, 2019) https://www.washingtonpost.com/technology/2019/10/17/zuckerberg-standing-voice-free-expression/. (Last visited June 17, 2022).

[3] In December 2015, Dr. Forrest, who does not have any personal social media presence, opened a verified user account on Facebook at the specific request of Facebook to assist its reviewers to combat the fraudulent "Dr. Forrest" user profiles proliferating on Facebook's social media platform.

[4] It is beyond credulity to suggest this Facebook advertising customizable template-developed fake news article featuring obvious cutouts of Dr. Forrest next to a supposed newsreader with a sinister looking guy lurking, and promoted by a news outlet called "Wolf World," is what Congress was intending to protect in enacting Section 230 of the Communications Decency Act, 47 U.S.C. § 230.



6.     Further, at this time, and independent of complaints from Dr. Forrest, Facebook was aware that its advertising platform was developing and reviewing scam ads that once Facebook approved, would be successfully submitted to and disseminated to users on its user platform. Shortly after Dr. Forrest's personal staff learned of the Scam Crypto Ads in late March 2019, the staff informed Facebook that its advertising operations was still failing to stop criminals from breaching Facebook's Advertising Policies and Self-Service Ad Terms in victimizing Australians. Dr. Forrest requested in writing and verbally that Facebook's advertising business take immediate action to prevent the approval of future Scam Crypto Ads so they could not reach and be posted on Facebook's user platform. These requests were to no avail.

7.     Instead of acting on Dr. Forrest's complaints, and cleaning up obvious advertising security flaws, Facebook's senior management continued with the *status quo*. Critically, one of Facebook's advertising security flaws was that criminals could easily bypass its security measures by using "cloaking software" that disguises their identity and the ultimate "landing page" where Facebook users would arrive.

8.      To be sure, this controversy involves Facebook's advertising business in the development, and review and approval of the Scam Crypto Ads, before they are allowed to submit to auction and appear on Facebook's user platform.

9.      Facebook's advertising business has been designed to maximize the profit with the collateral damage of some users being swindled. By taking material control over the development, review and approval of ads, before they enter Facebook's user platform, fraudulent ads like the Scam Crypto Ads are custom made to inflict maximum damage without a scammer lifting a finger. As one article has noted: "Affiliates [Facebook advertisers] describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the [victims] for me.'"[5]

10.     The effect of Scam Crypto Ads is real, devastating, and life-altering. As further described *infra*, in February 2022, Gilbert Howard, a 75-year old concrete pools builder who lives an hour's drive from Dr. Forrest in suburban Perth, Western Australia, lost a substantial part of his life savings, $300,000, having been defrauded by the Scam Crypto Ads on Facebook. *"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*," Mr. Howard says. Unfortunately, there are many others like Mr. Howard.

11.     Facebook has purposely conflated the distinction between "Facebook the advertiser" and "Facebook the user platform." Facilitating a user platform on the one hand and being paid for advertising on the other, is a real and meaningful distinction. Facebook was for its first several years existence a prototypical user platform, facilitating an interactive service designed to connect users who wished to communicate with one another, sharing ideas and opinions. Faced with the conundrum of how its enormous and sophisticated platform, with masses of valuable data, could turn a profit, Facebook started a new business--an advertising agency that would charge third parties that sought to run digital ads.

---

[5] Zeke Faux, *How Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek. (March 28, 2018) ("*Facebook Helps Shady Advertisers Pollute the Internet*"), https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-helps-find-them. (Last visited June 17, 2022).

12.      Since its modest start after 2007, Facebook's advertising business has grown to one of the largest profit-producing businesses ever. Housing some of the world's smartest computer scientists, the most sophisticated software programmers, and offering prestigious careers to those who can monetize their 3 billion users, Facebook's advertising business is one of the largest profit-producing advertising businesses in history—earning revenue of $112 billion in 2021—over 98% of Facebook's total revenue.

13.      This ~~TS~~AC arises then, not just from Facebook's matchmaking of its users, but from how Facebook operates its advertising business in a manner that substantially and materially contributes to the development, review, and approval of the Scam Crypto Ads. Facebook's overall business model obfuscates a clear line of demarcation between its user platform and its advertising business, but the two operate distinctly from each other. Facebook's advertising business facilitated the development of fraudulent ads well before they are allowed to enter Facebook auctions for hopeful dissemination on Facebook's user platform.

14.      Criminal syndicates contract with Facebook's advertising business on terms which are specific to its advertising services. Facebook's Advertising Policies and Self-Service Ad Terms evince extensive oversight and ultimate control by Facebook's advertising business in  the development, review, and approval of ads submitted to Facebook's user platform which then delivers ads to Australian users chosen by its sophisticated algorithms. Ultimately, Facebook is an advertising co-developer of ad inventory, and in doing so it substantially and materially contributes to the success of the fraudulent ads once they reach the user platform.

15.      Finally, given Facebook's ongoing assertion that its global business operations are beyond the jurisdictional reach of any court in the Commonwealth of Australia, a jurisdiction which has no immunity analogous to Section 230 of the Communications Decency Act ("Section 230"),[6] it is inequitable and contrary to choice of law to apply Section 230 here. This is inconsistent with the rule of dépeçage which prohibits an unfair jurisdictional arbitrage to foist

---

[6] 47 U.S.C. § 230.

Section 230 immunity on Australians. If Facebook challenges the ~~TS~~AC under Section 230, choice of law and equity favors the application of Australian law on all issues of immunity.

## II. THE PARTIES

16. Dr. Forrest is an individual and at all relevant times, a resident of Australia.

17. Dr. Forrest has been a Facebook "user" since in or about 2015 when Facebook requested that he create a verified account to assist with the proliferation of fraudulent "Dr. Forrest" user profiles on Facebook's social media platform.

18. Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. (Ticker symbol -MVRS) in late October 2021.[7]

19. Facebook is a Delaware corporation with its principal executive offices located at 1601 Willow Road, Menlo Park, California, 94025.

20. Dr. Forrest is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, or any of them, and therefore sues these defendants, and each of them, by such fictitious names. Dr. Forrest will seek leave of this Court to amend this ~~TS~~AC when the status and identities of these defendants are ascertained.

21. Dr. Forrest is further informed and believes, and on that basis alleges, that at all times relevant, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to perform the acts alleged in the ~~ST~~AC, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other defendants. Each defendant, in taking the actions alleged in the ~~TS~~AC ratified and/or authorized the wrongful acts of each of them and are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that

---

[7] Salvador Rodriguez, *Facebook Changes Company Name to Meta*, CNBC (Oct. 28, 2021) https://www.cnbc.com/2021/10/28/facebook-changes-company-name-to-meta.html (last visited June 9, 2022).

~~SECOND~~ THIRD AMENDED COMPLAINT

are the subject of the ~~TS~~AC. Each defendant was a direct, necessary, and substantial participant in the conduct complained of in the ~~TS~~AC, and each of the defendants aided and abetted and rendered substantial assistance in and material contribution to the wrongs complained of in the ~~TS~~AC.

### III.     JURISDICTION, VENUE, AND CHOICE OF LAW

22.     This Court has subject matter jurisdiction of the claims in this ~~ST~~AC, which are, among other things, based on violations of California law, and the amount in controversy exceeds the jurisdictional minimum of this Superior Court.

23.     This Court has personal jurisdiction over Facebook because its corporate headquarters and principal places of business are in California. This Court also has specific personal jurisdiction over Facebook because it has sufficient minimum contacts with California, has purposely availed itself of California's benefits and protection, and does a substantial amount of business in California, such that this Court's exercise of jurisdiction over Facebook is reasonable and wholly consistent with traditional notions of fair play and substantial justice.

24.     Venue is proper San Mateo County under Code of Civil Procedure sections 395 and 395.5 because Facebook's principal place of business is in San Mateo County, and/or Facebook performs substantial amounts of business in San Mateo County.

25.     As a California court, this Court applies California choice-of-law rules. "California follows the doctrine of dépeçage, under which different states' laws can be applied to different issues in the case." *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1396 (2011).

26.     Choice of law issues in this litigation are resolved through the principal of dépeçage. This principle results in a search for the rule of law most appropriately applied to the affirmative defense of immunity under Section 230.

27.     As to choice of law, Dr. Forrest contends that Australian law does not afford immunity for an internet service provider ("ISP") when it posts allegedly harmful content from a

third party.[8] Accordingly there is a material difference in the application of California law (cases holding there is Section 230 immunity for internet service provider that only publishes third party content, versus Australian law which has no such immunity), and this Court must make a separate conflict of laws inquiry with respect to the affirmative defense of immunity.

28.     Accordingly, this Court should decide which law to apply, either Section 230 or Australian law which provides no such immunity for an internet service provider where third-party content is posted on their platform.

29.     In requesting a choice of law analysis, Dr, Forrest contends that his invocation of Australian law is narrow because it applies under the law of dépeçage to specific issues, even a single affirmative defense such as Section 230 immunity.

30.     In his prayer for relief, Dr. Forrest seeks declaratory relief that Australian law should be applied on the question of the appropriate selection of law governing immunity for Facebook.

## IV.     GENERAL ALLEGATIONS

### A.     Dr. Andrew Forrest--Australian Business and Philanthropic Icon

31.     It is no wonder fraudsters would seek to deploy the endorsement of a man such as Dr. Forrest. In the apt words of victim Gilbert Howard: *"I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence*." The reason for this respect is clear.

32.     Dr. Andrew Forrest, AO[9] is a prominent Australian businessman and philanthropist. He is the founder and current Executive Chairman of Fortescue Metals Group, and founder and co-chair of the Minderoo Foundation through which he now devotes his time to making significant philanthropic contributions, and pursuing humanitarian and environmental initiatives.

---

[8] Clause 91(1) of schedule 5 of the *Broadcasting Services Act* 1992 (Cth).
[9] In the Australian honors system, appointments to the Order of Australia confer the highest recognition for outstanding achievement and service. An Officer of the Order of Australia, or "AO" is a national honor bestowed on Australian citizens and deserving non-citizens for distinguished service of a high degree to Australia or humanity at large. Dr. Forrest was appointed as an AO in 2017.

33.     Dr. Forrest is Australia's most active philanthropist, and one of the most effective Australian business leaders of his generation. He is a true Australian business celebrity.

34.     As Fortescue's founder and chairman, he has led the company from inception to its top 20 status in the Australian economy, during which time Fortescue invested more than $20 billion USD in the resources sector. Across Fortescue and Dr. Forrest's other commercial interests, Dr. Forrest provides direct employment to well over 10,000 individuals, and many more indirectly through his projects.

35.     In 2001, Dr. Forrest co-founded the Minderoo Foundation with his wife Nicola.

36.     Minderoo has supported over 280 initiatives across Australia and internationally covering a range of causes. He has started and funded initiatives to combat and end pervasive and important humanitarian issues like modern day slavery, and has supported disenfranchised groups by focusing on indigenous rights education, responsible use of technology, children's cancer research, and early childhood development, as well as environmental issues such as wildfires, floods, plastic pollution and ocean health.

37.     In May 2017, Dr. and Mrs. Forrest announced one of Australia's largest private philanthropic donations of $400 million AUD to medical research and have continued giving. As of April 2020, their total philanthropic donations have exceeded $2 billion AUD.

38.     Dr. Forrest is a lifetime Fellow of the Australian Institute of Mining and Metallurgy. In 2017, he was appointed an Officer of the Order of Australia for his distinguished service to the mining sector, the development of employment and business opportunities, his support of sustainable foreign investment, and for his philanthropic efforts. He is Global Patron of the Centre for Humanitarian Dialogue, recipient of the Australian Sports Medal and the Australian Centenary Medal, and Vice-Patron of the SAS Resources Fund.

39.     Dr. Forrest is also a Councilor of the Global Citizen Commission, which, in April 2016, presented a series of human rights recommendations to the United Nations Secretary General to update the Universal Declaration of Human Rights.



40.     In 2013, Dr. Forrest was appointed by the Prime Minister and Cabinet of Australia to chair the review of Indigenous Training and Employment Programs, aimed at ending Indigenous disparity through employment.

41.     Dr. Forrest was Western Australia's 2017 Australian of the Year for his outstanding contribution to the community. In 2018, Dr. Forrest was inducted into the Australian Prospectors & Miners' Hall of Fame and was the inaugural winner of the EY Entrepreneur of the Year – Alumni Social Impact Award.

42.     The strength and value of Dr. Forrest's name, brand, and likeness is further evidenced from his recent business dealings, centered on building green technology businesses. Dr. Forrest's Fortescue Future Industries has signed agreements with traditional energy strongholds like Afghanistan for the development of hydro power and other geothermal projects for green industry as well as of Afghanistan's more traditional mineral resources.

43.     With such a prolific charitable profile and business acumen, Dr. Forrest's name, brand, and likeness are instantly and widely recognizable within the investing community and beyond and carry significant value.

44.     Dr. Forrest's "verified" Facebook page also lets users know that Dr. Forrest is a "well-known, often searched Page[] and profile[]," and that Facebook has "confirmed that this is the authentic Page or profile for this public figure, media company or brand." *See* Facebook Help – "What is a Verified Page of Profile?" https://www.facebook.com/help/196050490547892. A quick look at his verified Facebook page reveals the reverence many have for Dr. Forrest:

45.     In sum, Dr. Forrest's image and reputation is highly sought after and his business celebrity status provides immense commercial value and credibility to the companies, brands, products, charitable activities, and opportunities he supports.

**B.      The Scam Crypto Ads Featuring Dr. Forrest**

46.     Beginning at the end of March 2019, Dr. Forrest has suffered, and continues to suffer, irreparable harm to his public image and reputation as a consequence of a pervasive investment scam that has been featured on Facebook's user platform. The Scam Crypto Ads were co-developed by a Bulgarian-based Syndicate (the "Syndicate") and Facebook's advertising business, which Facebook, as the advertising agency, then submitted to auction on behalf of the Syndicate, finally disseminating the Scam Crypto Ads to Facebook's user platform as advertisements without Dr. Forrest's knowledge, acquiescence, or approval.

47.     Facebook has been keenly aware of Dr. Forrest's celebrity status for some time, and any suggestion to the contrary is implausible. Facebook actually went to Dr. Forrest before 2019, asking him to create a Facebook presence to help assist Facebook reviewers in combatting

SECOND THIRD AMENDED COMPLAINT

against the proliferation of fraudulent profiles on its social media platforms. In December 2015 as a result of rampant "Dr. Forrest" fake profiles that were popping up, and recognizing his stature as a coveted celebrity, Facebook requested that Dr. Forrest create an account to become a "verified" Facebook user. Given the foreseeability of harm that may result to Dr. Forrest as a result of fake and fraudulent profiles and advertisements, and the special relationship Facebook began with Dr. Forrest at that time, ~~I~~it is thus surprising that starting in or about late March 2019, Dr. Forrest ~~first came to understand~~learned that Scam Crypto Ads, have been allowed by Facebook's advertising business to infiltrate Facebook's user platform, particularly considering the closeness of the connection between Facebook's conduct alleged in this TAC and Dr. Forrest's injuries.

48. The following exemplar screenshots of Scam Crypto Ads are patently suspicious and sinister, and lack the credibility of advertisements which reasonably should not have been allowed to be co-developed by Facebook's advertising business. Using specialized and customizable templates created and then offered by Facebook's advertising interface, these exemplars are still not facially credible even as fraudulent "news reports" Facebook's self-help advertising interface materially helped scammers develop.







49.     The exemplar in paragraph 5 uses obviously cut and pasted pictures of Dr. Forrest next to a well-known Australian newsreader with a sinister looking individual lurking in the background, supposedly produced by an advertiser named "Wolf World." Other ads like those above depict Dr. Forrest's purport to divulge what Dr. Forrest did to gain additional wealth, and yet others use a fake a "ABC" news logo and mention "Andrew Forrest" by his uncommonly spelled last name, and his nickname "Twiggy."

50.     Subsequent click through material utilizes quotes, interview footage, and other actual legitimate statements attributable to Dr. Forrest, edited and doctored so as to deceivingly

appear as though Dr. Forrest is sponsoring a particular investment "opportunity" or otherwise promoting a particular product.

51.     So called "interviews" with Dr. Forrest are accompanied by dozens of fake testimonials describing how investors have become millionaires in a matter of months with even small deposits such as $250. Facebook's anticipated argument that its advertising business, including its review systems, whose very design and execution is supposedly meant to prevent such scam ads, cannot prevent Facebook's user platform from receiving and proliferating such ads, is implausible.

52.     In an attempt to save, maintain and protect his reputation and likeness, and to dissociate himself from this fraudulent scheme, Dr. Forrest has spent hundreds of thousands of dollars investigating the Syndicate, defending himself and his business reputation and likeness, enhancing his cybersecurity team's capacity and engaging external fraud detection services to permanently monitor Facebook's platform to attempt real time response to these frauds ads.

53.     In the early stages of this investigation, Dr. Forrest easily learned that the people behind these Ads were members of the Syndicate who were involved with entities from Sophia, Bulgaria and the South Pacific Island of Vanuatu who, using sham entities, fake information, and false addresses, employed Nigerian and Bulgarian pay services to deploy the Scam Crypto Ads.

54.     As an example of why the Syndicate should never have succeeded in employing Facebook's advertising business to do business with it, Facebook purports to have imposed supposed "problem solving" requirements on those proposing to use its Self-Service Ads Platform to provide details regarding the applicant, its business, and contact details before Facebook would consider and place an ad on Facebook's user platform. This requirement, Zuckerberg told his Georgetown audience in 2019, would address hoaxes and other perils of an internet that supported Free Speech—with limitations. Not so.[10]

---

[10] Discovery into this issue, information and documents not publicly available and part of Facebook's closely held and exclusive realm of control, will shed light on how the Syndicate came to be approved as a Facebook advertiser, particularly given Zuckerberg's comments in October 2019 that "[w]e've seen a[n] [i]ssue with these groups that pump out misinformation like spam just to make money. … The solution is to verify the identities of accounts getting wide distribution and get better at removing fake accounts."

SECOND THIRD AMENDED COMPLAINT

### C. The Scam Crypto Ads Featuring Dr. Forrest Bilked Innocent Australians Out of Millions

55. As Facebook the advertiser promised, it did not take long for the Scam Crypto Ads to start working their voodoo.

56. An Australian woman was victimized by the Scam Crypto Ads, losing approximately $670,000. The woman said that on or about March 28, 2019, she accessed her Facebook account when she was presented with the fraudulent scam ad. She believed the ad/content was legitimate as the advertisements on Facebook—which included alleged interviews with Dr. Forrest—appeared to be reputable and from the Australian Broadcasting Commission.

57. Similarly, on or about April 1, 2019, an Australian man logged onto his Facebook account and was presented with an ad depicting Dr. Forrest sitting on a stage, which gave the appearance that he was participating in a question-and-answer session on cryptocurrency. The man clicked on the link and was swindled out of $77,254.

58. Yet another Australian victim reported that in or about March 2019, she saw a Facebook advertisement which pictured Dr. Forrest and included what appeared to be his endorsement of a Bitcoin investment opportunity. She clicked on the content and was scammed of thousands of dollars in the ensuing months.

59. One unsuspecting victim of this fraudulent scheme contacted Dr. Forrest's team after she unwittingly fell victim to the scam, stating that she was "caught up in the Bitcoin scam that Andrew Forrest was implicated in supporting. I subscribed when I saw that it was supported by him."

60. On or about June 19, 2019, Australian JB contacted Dr. Forrest advising of the fact she had been victimized on Facebook by a Dr. Forrest crypto scam.[11]

61. On or about September 12, 2019, Australian JA encountered a "news article" on Facebook which featured a photograph of Dr. Forrest and wording to the effect that "Forrest says you would be crazy not to do this because you'll make so much money." She clicked and ended up

---

[11] The ~~TS~~AC uses initials for privacy purposes in this section, unless otherwise noted. All names are used with the consent of the Scam Crypto Ad victims.

on a cryptocurrency website where she deposited a sum of money. After she became suspicious, and followed up, she was able to recover the money.

62. On or about October 28, 2019, Australian Mr. RH contacted Dr. Forrest referring to an article on Facebook which stated words to the effect of Make Millions from this 'wealth loophole.' The article contained a picture of Dr. Forrest and mentioned him by name. RH contacted Dr. Forrest to inquire about the advertisement as he had a friend who had seen the same ad and was seriously thinking about investing.

63. In 2019, 72 year old Western Australian FZ was victimized by the Scam Crypto Ads after he relied upon Facebook advertisements that featured Dr. Forrest's profile. FZ lost $250,000 which he has not been able to recover.

64. On or about March 5, 2020, CC, an employee of Fortescue Metal Group (a company started by Dr. Forrest), encountered a Facebook Bitcoin article that mentioned Dr. Forrest by name and included his photograph, and which inferred his endorsement of some cryptocurrency product.

65. On or about May 1, 2020, Fortescue Metal Group employee SS encountered a Facebook cryptocurrency article which mentioned Dr. Forrest by name and featured his photograph, and which inferred his endorsement of some crypto product.

66. On or about February 2, 2021, Australian JG encountered an ad on Facebook featuring a photograph of Dr. Forrest with a phrase along the lines of "Twiggy's tips for success." He knew and understood the reference to Twiggy to refer to Andrew Forrest. He clicked on the ad and was taken to a further webpage that purported to contain a news article associating Dr. Forrest with the promotion of a cryptocurrency investment scheme.

67. In late 2021, Ty Nicholas, a medically retired 25 year veteran of the Australian Defense Force was scammed by a Facebook Forex trading scam that Mr. Nicholas relied upon given Dr. Forrest's purported high profile and promotion of the scam. Mr. Nicholas lost $15,500 he has not been able to recoup.

68. And~~s~~ as noted above, in late 2021, Gilbert Howard, lost $300,000, having been defrauded by the Scam Crypto Ads featuring Dr. Forrest. *"I look at people on Facebook I*

1   *respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence,"* Mr.

2   Howard says.

3       **D.    Dr. Forrest Places Facebook on Notice of the Scam Crypto Ads--Demanding
            Facebook Take Steps to Stop Further Ads**

4

5       69.    The Scam Crypto Ads were clearly intended to entice persons vulnerable to the

6   strength and credibility of Dr. Forrest's name, likeness, and reputation to send money as an

7   investment in a fraudulent opportunity.

8       70.    Dr. Forrest has never authorized or otherwise allowed his name, likeness and/or

9   reputation to be associated with, let alone endorse, any Bitcoin or other cryptocurrency product or

10  service.

11      71.    Dr. Forrest began hearing about and became aware of the proliferation of the Scam

12  Crypto Ads around late March 2019. He immediately mobilized his executive staff to identify and

13  capture evidence of these ads, and place Facebook on notice of their dissemination so that

14  Facebook could make them stop--immediately and permanently.

15      72.    Dr. Forrest went further, arranging a personal telephone call with William Easton,

16  believed to be Facebook's highest ranking Australian officer. In this call, which occurred in early

17  May 2019, Dr. Forrest expressed to Easton his abhorrence to the Scam Crypto Ads and their

18  unauthorized use of his name and image as a supposed celebrity endorser. Dr. Forrest further

19  communicated his personal demand that Facebook dedicate its enormous and sophisticated

20  machine and human resources to prevent any further dissemination of such ads.

21      73.    On May 19, 2019, Dr. Forrest emailed Easton, repeating his complaints about the

22  Scam Crypto Ads and his demand that their dissemination cease immediately and completely. Dr.

23  Forrest wrote, in pertinent part:

24          It's well known William [Easton], that you have the most sophisticated
            machine learning and artificial intelligence tools for targeting advertising
25          at users. What amazes me is your absolute lack of concern, and more
            worrying your obstinance in using machine learning to keep your platform
26          free of obvious scams[.] All of these threaten users like me, the integrity
            of public discourse, and allow innocent mums, dads, and retirees, to be
27          robbed of their savings. If this was you or Mr. Zuckerberg being framed,
            or your own parents, or his, losing their hard earned retirement savings, I
28          know you would react immediately and effectively. …



I am less inclined to resignation than to action. It's my intention to ensure this allowance of fraud by you [Facebook] ceases[.]

74.     On May 20, 2019, Easton responded by email to Dr. Forrest's demands, writing in pertinent part:

I appreciate this is very frustrating for you—it's an extremely challenging, industry-wide problem which we are working to address. However I do want to be very clear – scam ads are not permitted on Facebook. They violate our Advertising Policies and have no place on the platform. …

All ads on Facebook are subject to our ad review system and our ads are checked against our policies. This happens before ads begin running, but may also be re-reviewed after they are live. Our Advertising policies prohibit scam ads, and when we detect an ad that violates our advertising Policies we disapprove it . …

In the meantime, having this content reported to us is key and I am very happy to continue to offer a direct line to me so that we can move quickly to take down these scam ads.

75.     By November 2019, with the Scam Crypto Ads featuring Dr. Forrest continuing to make their way from Facebook's advertising b~~s~~us~~s~~iness to Facebook's user platform, Dr. Forrest penned an open letter to Zuckerberg again demanding that Facebook's co-development and approval of Scam Crypto Ads cease. Dr. Forrest wrote in pertinent part:

Dear Mr. Zuckerberg:

My family and I have been the subject of scam advertisements on your social media network. Our images and the images of others are being used to encourage our users to invest in fraudulent cryptocurrency schemes.

The criminals responsible continue to purchase advertising space from Facebook, running new incarnations of the same scams. Your senior leadership has been informed of this. What's worse, innocent and vulnerable people are losing their life savings while Facebook (read – you) is profiting from the revenue generated by this stream of false advertisements.

This is abhorrent and you can stop it. You have the power and the technology to prevent these scam advertisements from running on your platform. Is revenue more important to you than the life savings of elderly people, Mr. Zuckerberg?

**E.    In 2022, Innocent Australians Are Still Being Subjected to and Defrauded By the Scam Crypto Ads**

76.    In a February 2021 newsletter, the Australian Charity, IDCare, reported that it had seen a trend of bitcoin scam ads displaying Dr. Forrest's name and likeness.[12] Dr. Forrest shared this newsletter with Facebook, again demanding action.

77.    Dr. Forrest has continued to pursue Facebook's failure to stop the Scam Crypto Ads, without success. Even in 2022, Facebook's advertising business continues to allow scam ads to enter Facebook's user platform, proliferate, and cause numerous Facebook users financial disaster. Three years after Dr. Forrest sounded the alarm and demanded Facebook take immediate and effective action to stop co-developing and approving these ads, nothing has changed.

78.    Between late 2019 and at least February 2022, the Scam Crypto Ads have still been co-developed, reviewed and approved for public dissemination by Facebook's advertising business, injuring Dr. Forrest's name, image, likeness, and reputation, and, through their subsequent dissemination on Facebook, deceiving those users who have encountered and sometimes relied upon Dr. Forrest's supposed endorsement to their financial detriment.

79.    Dr. Forrest has been contacted over time by scores of consumers who have encountered the ads and then been swindled out of their hard-earned money–as recently as February 2022.

80.    Facebook is liable for its content development, and for its facilitation, solicitation, encouragement, material contribution to, and otherwise inducement of the financial criminal activity as alleged in the ~~S~~TAC. Facebook, without regard for the legality of its content, profited at the expense of Dr. Forrest's reputation and the underlying victims of the fraudulent scams, many of whom have suffered substantial financial harm as a result. Facebook capitalized on Dr. Forrest's name and likeness and took its cut of these illegally gotten proceeds by knowingly and willingly selling fraudsters advertising.

---

[12] IDCARE, *Newsletter – Covid 19 Scams, the World's Biggest Data Dump and Facebook*, (Feb. 22, 2021), https://www.idcare.org/latest-news/covid-19-scams-the-worlds-biggest-data-dump-and-facebook. (Last visited June 17, 2022).

81.     As a result, Dr. Forrest has been irreparably harmed as alleged in the ~~S~~TAC. In addition to defrauding Facebook users of millions of dollars, the scam raises uncertainty about whether Dr. Forrest is somehow responsible for or associated with the criminal scam in which he has no part. This has even harmed his reputation with the people closest to him, as Dr. Forrest's own father called him in a panic to question him about his role in the fraud.

82.     The whole ordeal distracts from and displaces the many positive associations with Dr. Forrest's name, clouds his impeccable reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness.

**F.     Before Facebook Posts Any Ads on the Platform, Facebook Co-Developed the Scam Crypto Ads**

83.     By inviting and accepting advertising business from the general public, (including the Syndicate), Facebook did not act solely as an internet service provider, but rather has also been acting as a digital advertising agency with typical attributes and client offerings seen with traditional advertising agencies.

84.     Facebook reports in its regular public filings with the U.S. Securities Exchange Commission that it has a number of businesses.[13] While not formally designated as a separate business unit, Facebook's advertising business is nonetheless separate and distinct from the Facebook user platform, and the ad business is almost exclusively how Facebook makes money.

85.     Facebook has computer architecture dedicated to the review, testing, and monitoring of Facebook advertisements for compliance with Facebook's Advertising Terms and Self-Service Advertising Terms. As described below, Facebook is acting as an advertising agency, if not the largest digital advertiser in the world with the capability of posting a completed ad itself.

---

[13] *See* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/4dd7fa7f-1a51-4ed9-b9df-7f42cc3321eb.pdf Meta, Inc, 10-K filing Dec.,2020 at page 7. (Last visited June 17, 2022) ("We build useful and engaging products that enable people to connect and share with friends and family through mobile devices, personal computers, virtual reality headsets, and in-home devices. We also help people discover and learn about what is going on in the world around them, enable people to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest family members and friends to the public at large, and stay connected everywhere by accessing our products.")

~~SECOND~~ THIRD AMENDED COMPLAINT

**G.** **Facebook's Advertising Business Substantially Controls the Development of Each Ad Through Its Contracts with Aspiring Advertisers**

86.     As described by Zuckerberg, at the beginning of any desired ad campaign, an agreement to a contract with unique terms and conditions specific to Facebook's advertising services is required of any entity or person.[14] This is true of the Syndicate, which hired Facebook to provide advertising services, defining the relationship between Facebook and the Syndicate as that of co-developer.

87.     The Syndicate agreed to Facebook's Advertising Terms and Conditions and Self-Service Advertising Terms and Conditions as a pre-condition to Facebook co-developing the Scam Crypto Ads. Despite this agreement, the Syndicate succeeded with its fraudulent scheme even after complaints to Facebook from Dr. Forrest.

88.     Facebook's Advertising Policies specify that Facebook confirms the most basic of information that establishes true identity—*e.g.*, name and address. From Dr. Forrest's investigation, it is obvious that Facebook failed in this requirement because the Syndicate used false and incomplete information to register to advertise-- and still slipped through the net.

89.     As part of the Facebook's advertising review process called for by Facebook's Advertising Policies, Facebook checks the ad's image, text, targeting and positioning in addition to the content of the ad's landing page, and reserves the right to reject or require modification of any reviewed ads before they are allowed to appear on Facebook user platform.

90.     Facebook's Self-Service Ad Terms make this clear, specifying that its terms "apply to [the] use of Facebook Products (such as the self-service advertising interfaces and APIs) for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, the self-service Ad Interfaces) and any order [] place[d] through the Self-Serve Ad Interfaces ("Order")."

---

[14] It does not appear that such advertising clients need be Facebook users or have Facebook pages.

91.    Facebook requires its advertising customers to pay for each ad Order placed. Facebook's Self-Service Ad Terms further specify that: it "[m]ay reject or remove any ad for any reason."

92.    Facebook's Self-Service Ad Terms further specify that: "[f]rom time to time, we need to test improvements to our audiences and delivery systems, which could impact your advertising. Our testing is designed to improve the effectiveness of your advertising performance. We reserve the right to test when we believe it will be beneficial for advertiser performance."

93.    Facebook's Self Service Ad Terms further specify that Facebook "***will determine the size, placement and positioning of your ads***" and that "scheduling of delivery is subject to availability and may not be continuous." (Emphasis added.)

**H.    Facebook Substantially Contributes to the Ads Using Meta Pixel**

94.    Meta Pixel is a product offering that Facebook provides to advertisers, including the Syndicate in this case.[15]

95.    Meta Pixel is a type of "tracking pixel," which is a white or invisible 1-by-1 pixel displayed by lines of code installed in an email or on a webpage—outside of Facebook's user platform on, *e.g.*, a scammer's landing page.

96.    Facebook describes Meta Pixel to its advertisers as follows:

> The Meta Pixel is a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for dynamic ads campaigns, and to analyze that effectiveness of your website's conversion funnels.[16]

97.    Advertisers install the Meta Pixel on their own websites, not in the ad that appears on Facebook.



---

[15] https://www.facebook.com/business/help/952192354843755?id=1205376682832142. (Last visited June 17, 2022).

[16] https://developers.facebook.com/docs/meta-pixel. (Last visited June 17, 2022).

98.     In selling advertisements to be shown to Facebook users, Facebook inserts its own content into the landing pages for its ads, thus changing the content created by the advertiser on the advertiser's own website.

99.     Meta Events Manager, a product Facebook offers to Facebook advertisers, gives those advertisers access to data about Facebook users that Facebook collects via the Meta Pixel.

100.    Among the "events," or actions on the advertiser's website that Facebook tracks for advertisers are certain "[s]tandard events [that] are predefined by Meta and can be used to . . . optimize for conversions and build audiences."[17]

101.    These standard events include "View Content," defined as "[a] visit to a web page you care about. For example, a product or landing page. View content tells you if someone visits a web page's URL, but not what they do or see on that web page."[18]

102.    Facebook and the Syndicate used the Meta Pixel to track whether Facebook users viewed websites containing fraudulent content. Facebook's advertising business then used its products, including Meta Events Manager, to notify fraudsters when Facebook users interacted with fraudulent content. Facebook then encouraged fraudsters to drive additional users to that content by purchasing more ads and optimizing the display of fraudulent ads to users who were more likely to engage with fraudulent content.

**I.      The Facebook Ad Platform Has Taken Over the Role of Traditional Advertising Agencies, Performing Bundled Ad Content, Ad Creative and Ad Delivery Such that it is Now Undeniable that Despite Labels, Facebook is a *De Facto* Co-Developer of Ads**

        **1.      Ad Content**

103.    Since it launched Facebook Ads in 2007, Facebook has revolutionized the way online advertising is operated. In a November 2007 article published by Bloomberg News, Zuckerberg was quoted as stating that "the next hundred years will be different for advertising, and it starts today."

---

[17] https://www.facebook.com/business/help/402791146561655 (last visited June 17, 2022).
[18] *Id.*

~~SECOND~~ THIRD AMENDED COMPLAINT

104.   In 2009, Facebook's introduction of advanced advertising metrics took its advertising business to the next level. In an October 26, 2009, article titled "*Facebook's Self-Serve Ads Are Ridiculously Easy to Make,*" Business Insider reported that Facebook's advertising business was "bustling" and would allow advertisers to reach individuals that were, for example, engaged or married, or had shown an interest in flyfishing.

105.   However, since then, Facebook's tools and services have evolved in such a sophisticated way that the 2009 version of Facebook is virtually unidentifiable. For example, as explained in a 2021 article by the Washington Post titled *"There's no Escape from Facebook, Even if You Don't Use it",* starting in or around 2010, researchers studying Facebook noticed that Facebook was placing software widgets on non-Facebook websites that would allow Facebook users to "like" or share content to Facebook without leaving the website, prompting concerns that Facebook was using data it collected to track all of a users' online activity.

106.   Facebook initially refuted the allegations, claiming that it was not using web data to track people and only used data for advertising purposes when a user clicked the widget to share content. And, in 2014, Facebook changed its practices to begin allowing its advertisers to target users based on websites users visit and other "off-Facebook" activities. This opened up a Pandora's box of data use that was exacerbated once Facebook shifted to using mobile phone applications to increase Facebook's reach (and its source of data).

107.   Moreover, the data Facebook has collected since changes in 2010 and 2014 derives much of its value from the ability to identify Facebook's users by their real-world identity. Unlike companies that use browsing cookies that can be easily cleared or blocked, Facebook ties what it learns about an individual to real identities that it requires its users to disclose, including the user's name, phone number, email address, birthday, and gender.

108.   Thus while Facebook characterizes each user's disclosure of his or her identity as increasing the value of the experience for all users, who are purportedly able to benefit from others' disclosures by connecting with and following the activities of their real-world connections, the real value is passed along to Facebook, who can meld the plethora of data it collects on and off

Facebook to build a digital dossier on real individuals and increase the market value of that information.

109.    Because of this evolution in Facebook's ability to collect and use data, and charge a premium to advertisers to use that data, Facebook has seen an exponential growth in its value, the vast majority of which comes from its ad revenue:[19]



110.    Indeed, Facebook's internal process includes both *ad creation* and *ad delivery*, sometimes conflated by media reports collectively into "targeting." But examining these terms individually, the first step of the "Ad creation" process is where the advertiser submits the text and images that comprise the content of their ad.

111.    On the Facebook Ad Platform, each ad must be linked to a landing page. Advertisers are allowed to have multiple pages and run ads for any of them. Under this model, a/k/a "the Facebook Ad Creative," Facebook *de facto* acts as a co-developer, not just as an entity that posts an ad that is handed to them by a third party to paste on a Facebook page.

---

[19] *Meta's (formerly Facebook Inc.) advertising revenue worldwide from 2009 to 2021*, (Feb. 18, 2022), https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/. (Last visited June 17, 2022).

112.     For typical ads, an advertiser provides the headline and text to accompany the ad and images or videos to show to the user. A prospective advertiser can also provide a traffic destination to send the user to if they click (*e.g.*, a Facebook page or an external URL).

113.     If the advertiser provides a traffic destination, the ad will include a brief description (auto generated from HTML meta-data) about this destination. Facebook provides advertisers with a number of objectives to choose from when placing an ad; each objective tries to maximize a different optimization event the advertiser wishes to occur: "Awareness" (simply optimizing for the most impressions), Consideration (optimizing for clicks) and "Conversion" (optimizing for sales generated by clicking the ad.)

114.     For each objective, the prospective Facebook advertiser bids on the objective itself. A bid can take multiple forms and includes the start and end time of the proposed ad campaign. Once this is done, Facebook then places bid in its internal ad auction(s) on the advertisers' behalf.

115.     When Facebook has ad slots available, it runs an ad auction among the active advertisements bidding for that particular user. But the auction does not just use the bids placed by the advertisers. Rather, in its role as a co-developer, Facebook says: "the ad that wins an option and gets shown is the one with the highest total value. Total value is and how much an advertiser is willing to pay us to show their ad. It's a combination of three major factors: bid, estimated action rates and add quality and relevance."

116.     In another hallmark of its co-developer activities, Facebook provides customizable templates for digital ad creation, then machine assists the advertiser in selecting various options on how to display digital ad content.

117.     Facebook's ability to place digital ads for low amounts, without the need for hiring the traditional ad agency, has allowed Facebook to act like and replace the traditional advertising agency. Facebook's advertising digital platform has had a profound impact on traditional advertising and marketing spheres, an event that was not foreseeable when Section 230 was enacted, meaning that Section 230 could not have been intended to reach Facebook's ad development actions.

118.    Facebook's modification of digital ads before approval and publishing occurs through several factors, one being an ad's market effects. And this is not neutral tools being used to connect users. For example, if Facebook were to run identical ads targeting persons in Western Australia, but with differing budgets, the resulting audience will be different. The more money spent, the better the resulting audience.

119.    Further, audience delivery can and does change *due to the content of the ad itself* (*i.e.* the ad headline, text, and image,) collectively called the "ad creative." (Emphasis added)

120.    Despite advertisers placing the same bid on the same audience, Facebook's ad delivery will change based on the ad creative alone. The Syndicate running the Scam Crypto Ads took's Facebook's assistance in locating those most likely to click on the Scam Crypto Ads.

121.    The power of image is material and results in changing the audience of the ads, beginning with the running of an ad.

122.    Facebook's optimization of the selection of ad creatives, together with market effects allows ads to be delivered to a specified audience.

    2.    Ad Creative

123.    "Ad Creative" is well known in the advertising agency. Facebook Ad Creative is classified as any Facebook ad that users see on a website or app. Ad Creative can be images, videos, and other formats that get delivered to users.

124.    Simply by going online, a prospective Facebook advertiser can choose from ads Facebook created that are designed to attract users.[20]

125.    In urging ad customers to "Advertise with Confidence," Facebook invites the prospective advertiser to "Design your ad using various formats, placements, and objectives to meet your marketing goals. Facebook even instructs the would-be advertiser on "Best Practices."

126.    Facebook also modifies the type of ad through its auction process, advising that:

---

[20] https://www.facebook.com/business/ads-guide?content_id=dxR17TaPLmD3Sdl&ref=sem_smb&utm_source=GOOGLE&utm_medium=fb smbsem&utm_campaign=PFX_SEM_G_BusinessAds_US_EN_DSA_Other_Desktop&utm_conte nt=BusinessAds_US_EN_DSA_Desktop&gclid=EAIaIQobChMI1PeN3Nqe-AIVBAh9Ch2TrAZ-EAAYAiAAEgLU-_D_BwE&utm_term=dsa-1598818772528&utm_ct=EVG. (Last visited June 17, 2022).

> The pricing of Facebook ads is based on an auction system where ads compete for impressions based on bid and performance. When you run your ad, you're only be charged for the number of clicks or the number of impressions your ad received.

127.     Ad Manager also lets a would-be advertiser use existing ads—already approved by Facebook to select an existing post you can edit and customize the ad creative. Therefore, as long as a *per se* unlawful ad has not been located from human review, scam ads can be repeated and sent to the same audience over and over.

128.     Facebook Dynamic Creative technology builds and displays the best creative for groups of people in a broader target audience. It improves the ability to explore numerous creative combinations and audiences efficiently. Dynamic Creative also seeks to improve an ads' ROI by automating workflow used to test the ad creative.

129.     Ad creative has a relatively short shelf life and will be "fatigued" and must be refreshed or it will "die" due to lack of interest, thus explaining in part why the crypto currency scams only lasted for a short time only to be replaced by a new and different ad creative as recently as February 2022.

### 3.     Ad Delivery

130.     "Ad delivery" is where the Facebook platform delivers ads to the specific users based on a number of factors.

131.     Indeed, in examining the competition in digital markets, the U.S. House Committee on the Judiciary, through its Antitrust, Commercial, and Administrative Law Subcommittee ("Subcommittee"), released a report of over 400 pages entitled: "Investigation of Competition in the Digital Marketplace: Majority Staff Report and Recommendations." With respect to user monetization, in an interview conducted by a Congressional Subcommittee staff, "a former employee explained that as a product manager at Facebook, 'your only job is to get an extra

minute [of user's attention]. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So, the only metric is getting another minute.'"[21]

132.    Facebook's platform uses algorithms to modify both content and delivery. Without access to Facebook's ad delivery algorithm, user data and advertiser targeting data or delivery statistics, that Facebook modifies content and delivery all as one unified act to reach users and targeting choices that are known only to Facebook and not the criminals. This is truly a gift with a bow—Facebook both helps create and places the ideal ad and then sifts through its data to allow the Syndicate to sit back and wait for users to click the ad.

133.    Factors that Facebook uses include budget, an ad's performance, and the predicted relevance of the ads to users. Facebook has refused to date to produce the specific information that would explain how the Scam Crypto Ads were approved and then continued to run and repeatedly pop up despite being told by Dr. Forrest of the harm to him and others.

134.    Facebook was aware that its machine only process modifies content to likely victims of scam ads and none of this is performed by human review. Aware of this widely known fact, Facebook knew that the machine review would inevitably result in harm being perpetrated upon victims. The only questions were who would be harmed, how big the harm, and when it would occur.

135.    In sum, Facebook's advertising business does not merely "use the data that people put into the system." Rather, Facebook researches, develops, and deploys sophisticated tools and methods to amass and make sense of enormous amounts of information to deliver advertisements and information directly toward what it knows a user will respond to.

   4.    Facebook Elicits and Encourages the Creation of Illegal Content

136.    Aside from the content it co-develops, Facebook is similarly liable for its role, in whole or in part, for the creation and development of the offending content even if originated by third-parties. *See Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.

---

[21] House Committee on the Judiciary, *Investigation of Competition in The Digital Marketplace: Majority Staff Report and Recommendations*, at p. 135, October 6, 2020, available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("Subcommittee Staff Report on Digital Markets") (last visited June 17, 2022).

3d 1157, 1162 (9th Cir. 2008). Indeed, Zuckerberg has acknowledged that Facebook's is role more akin to a "media company" rather than just a tech platform for publishing, asserting that "[Facebook is] not a traditional media company. "You know, we build technology and we feel responsible for how it's used." [22] Zuckerberg has also taken responsibility in other forums, claiming that "we [Facebook] are responsible for the content [on Facebook]."[23] More recently, on March 25, 2021, Zuckerberg testified before Congress that "[i]nstead of being granted immunity, platforms should be required to demonstrate that they have systems in place for identifying unlawful content and removing it."[24]

137.    However, rather than demonstrating sufficient systems in place for identifying unlawful content and removing it, Facebook has done the opposite, encouraging the creation of illegal content across its platforms.

138.    Despite Zuckerberg's public stance, apparently meant to endear faith in Facebook's platform and the content therein, Facebook's indispensable role in carrying out fraudulent schemes is well-known in circles of fraudsters as Facebook encourages the proliferation of illegal ads on its platform like those at issue here. Advertising fraudsters have been quoted as stating that where they once had to guess what kind of person might fall for their unsophisticated cons Facebook now does that work for them as it labors to track who clicks on an ad and who buys the product, and then starts delivering the ads to others whom it thinks are likely to fall victim to the scam. "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the [victims] for me.'"[25]

---

[22] Josh Constine, *Zuckerberg Implies Facebook is a media company, just 'not a traditional media company*, Tech Crunch (Dec. 21, 2016), https://techcrunch.com/2016/12/21/fbonc/?guccounter=1. (Last visited June 17, 2022).

[23] Matt Weinberger, *Mark Zuckerberg Just Renounced a Core Piece of Silicon Valley Wisdom – And It Could Come Back to Bite Facebook*, Business Insider (April 10, 2018), https://www.businessinsider.com/mark-zuckerberg-facebook-is-responsible-for-the-content-on-its-platform-2018-4. (Last visited June 17, 2022).

[24] March 25, 2021 Congressional Hearing before the Committee on Energy and Commerce, p. 7, https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Witness%20Testimony_Zuckerberg_CAT_CPC_2021.03.25.pdf . (Last visited June 17, 2022).

[25] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.

139.     Further, internet fraud advertising hucksters explain that Facebook sales employees—with knowledge of their deceptive schemes—encourage them to buy more ads. Former Facebook employees alleged that it was "common knowledge" that some of their best clients were advertisers who used deception but were instructed to push these fraudsters to spend more to meet sales quotas of tens of millions of dollars per quarter.[26] In an interview conducted by U.S. House Subcommittee staff, "a former employee explained that as a product manager at Facebook, 'your only job is to get an extra minute [of user's attention]. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So the only metric is getting another minute.'"[27]

140.     Further, Facebook's role in developing illegal content extends beyond its methods of finding marks or encouraging scammers to buy fraudulent ads to meet sales quotas, and extends into Facebook's decisions to host its ad review process off of Australian shores, allowing third-party fraudsters to use simple geolocation cloaking software to easily target vulnerable Australian citizens.

141.     Facebook has explicitly refused to submit itself to Australian jurisdiction, choosing instead to locate its advertisement review platform offshore for ads with a final destination of Australia. However, Facebook is fully aware that scam advertisers use geolocation cloaking software to circumvent ad review policies and get their fraudulent ads delivered. In short, geolocation cloaking software is a method by which an advertiser disguises his ad as a legitimate one when it is reviewed for approval at a particular IP address, but is transformed into a fraudulent ad when it gets delivered to the advertisement's final destination.

142.     The practices and easy workarounds provided by cloaking software are well known to both Facebook and fraudulent advertisers and scam advertisements featuring Dr. Forrest have continued to proliferate on Facebook.

143.     Facebook's decision to offshore its review platform despite the extensive use of the cloaking software materially contributes to the fraud content as it encourages the proliferation and

---

[26] *Id.*
[27] Subcommittee Staff Report on Digital Markets, at p. 135.

SECOND THIRD AMENDED COMPLAINT

creation of these illegal ads, and Facebook is directly involved with developing and enforcing a system that ultimately subjects its users to illegal content. These acts go far beyond the business practices of a traditional publisher, and Facebook is liable for its actions in co-developing Forrest Scam Crypto Ads for dissemination to consumers, including those on Facebook's user platform.

### J. Facebook's Ability to Find Cryptocurrency Ads

144. At all relevant times, Facebook has been in possession of technology that can find cryptocurrency-related terms and images in digital content. There is also technology that could examine a landing page or a subsequent/downstream landing page for cryptocurrency content.

145. There are many ways detection and screening can be accomplished. The techniques described above (lexical and semantic search, automated image analysis using AI, recursive web robots, and web scrapers) are well-known and used throughout the computer science field.

146. Simple key word searches for "Forrest," "Twiggy," "bitcoin," "crypto," etc., and the use of imaging technology to identify Dr. Forrest's image could have easily isolated Forrest scams in the proposed news articles and would have succeed into identifying these scams even without the cloaked landing page.

147. Facebook's advertising business's self-touted ability to control advertising scams by "verifying the identity of accounts" and requiring provision "of a government ID and pro[of] of location" action would have never allowed the obviously shady Syndicate to successfully advertise if Facebook had really not wanted it to do so.

148. Facebook reports that it removes ads but does not tell users that it has the ability to post the ads in the first place.[28]

## V. FACEBOOK IS ENGAGED IN UNFAIR JURISDICTIONAL ARBITRAGE

149. As set forth in this section, Facebook has engaged in unfair jurisdictional arbitrage. Dr. Forrest seeks equitable relief to correct this, including application of Australian law on the question of Section 230 immunity.

---

[28] *Meta Response to the Australian Disinformation and Misinformation Industry Code* (2021) https://digi.org.au/wp-content/uploads/2022/05/Meta_2022-Misinformation-Transparency-report-v1.0.pdf. (Last visited June 17, 2022).

SECOND THIRD AMENDED COMPLAINT

1    150.    On or about August 27, 2019, in response to queries from Dr. Forrest's Australian

2    lawyers, Facebook, Inc's U.S. lawyers (White & Case, LLP's Los Angeles office), wrote to Dr.

3    Forrest's Australian legal counsel stating:

4            For users residing in Australia, the Facebook service is hosted and
             operated by Facebook, Inc., a company organized and existing under the
5            laws of Delaware, United States, and with its principal place of business in
             Menlo Park, California… Facebook Ireland is a separate entity,
6            independent of and legally distinct from Facebook, Inc. Facebook Ireland
             does not own, operate, control, or host the Facebook Services for
7            Australian users. Facebook, Inc. is the entity with which Australian users
             have a contractual relationship, and it operates and controls the Facebook
8            Service for such users.

9    151.    However, in at least two Australian judicial proceedings relating to and arising

10   from the Crypto Scam Ads, Facebook has taken the position that Facebook, Inc. cannot be

11   lawfully served with service of process by Australian federal and state courts. Second, Facebook

12   has taken the position that it is not properly be the subject of jurisdiction in legal proceedings

13   originating in the Australian federal and state courts.

14   152.    On or about January 31, 2022, a Prosecution Notice issued out of the Magistrates

15   Court of Western Australia, charging Facebook with three counts of federal crimes under The

16   Criminal Code 1995 (Cth), Section 400.7(2) relating to its conduct in dealing with property,

17   namely a Facebook computer cluster, where; there was a risk that the property would become an

18   instrument of crime, in circumstances where the Accused was reckless as to the fact that these was

19   a risk that the property would become an instrument of crime ("WA Criminal Proceedings".)

20   153.    The prosecutor and party who issued the Notice in the WA Criminal Proceedings

21   was Dr. Forrest in a private capacity. Dr. Forrest obtained the consent and approval to do so from

22   the Attorney General for the Commonwealth of Australia, Hon. Michaelia Cash.

23   154.    Subsequently, Facebook was served with process, and a hearing in the WA

24   Criminal proceedings was set for March 28, 2022. Facebook received notice of this hearing.

25   155.    On or about March 21, 2022, Facebook wrote to Prosecutor Forrest, advising in

26   pertinent part:

27           With no disrespect intended to the courts of Western Australia, Meta does
             not presently perceive the jurisdiction of the Magistrates Court to summon
28           it from the State of California to face the charges brought by Dr. Forrest[]

The purpose of this letter is, *inter alia*, to seek clarification from Dr. Forrest of the bases on which the Magistrates Court is said to possess jurisdiction. Meta does not by this letter or otherwise, intend to voluntarily submit to the jurisdiction and expressly reserves its rights. …

Please urgently advise whether, and if so on what basis, Dr. Forrest asserts: … that process or orders of the Magistrates Court of Western Australia are capable of compelling the attendance of a foreign corporation not present in the jurisdiction. As you are no doubt aware, the issue of in *personam* jurisdiction with respect to Meta is discrete, and not informed by whether the Criminal Code (CTH) (Code") confers federal extraterritorial 'subject matter' jurisdiction over foreign corporations accused of Div. 400 offences generally. (Italics added).

156. In anticipation of the March 28, 2022, hearing in the WA Criminal Proceedings, Facebook did not file any general or special appearance, and did not appear at the hearing when said proceedings were called.

157. After the March 28, 2022 hearing, the Court entered orders that service of process on Facebook had been properly affected and entered a plea of not guilty on behalf of Facebook as an absent defendant and appointed June 17, 2022 as a further hearing date.

158. On June 17, 2022, Facebook appeared in the WA Criminal Proceedings purporting to enter a conditional appearance to contest, *inter alia,* personal jurisdiction.

159. Further, on or about March 18, 2022, the Australian Competition and Consumer Commission ("ACCC") commenced proceedings against Facebook alleging violation of the Australian Consumer Law and the Australian Securities and Investments Commission Act, further alleging that Facebook aided and abetted or was knowingly concerned in false or misleading conduct and representations by advertisers of scam advertisements featuring prominent Australian public figures ("ACCC Prosecution").

160. The ACCC Prosecution alleges that Facebook ads, which promoted investment in cryptocurrency or money-making schemes, were likely to mislead Facebook users into believing the advertised schemes were associated with well-known Australian celebrities. The schemes were in fact scams, and the people featured in the ads had never approved or endorsed them. According to ACCC Chair Rod Sims, "The essence of our case is that Meta is responsible for these ads that it publishes on its platform."

161.     In an unprecedented action, on June 10, 2022, Facebook sought to ban publication of the details of the ACCC civil case. Facebook remains able to contest the jurisdiction of the Australian court in this proceeding.

162.     To summarize, on one hand, Facebook is claiming that it is beyond the jurisdiction of Australian Courts for its advertising activities involving the false endorsement and wrongful misappropriation of Australian celebrities' likeness. On the other hand, Facebook claims in this action that a U.S. federal statute, without an analogue in Australian statutory or common law, namely Section 230, should immunize for the same Australian acts and omissions which the WA Criminal Proceedings and ACCC proceeding concern.

163.     In this action the activities of the Syndicate have no connection to the United States other than the fact that they accessed and worked with Facebook's architecture of computer clusters around the world to develop, optimize, and then deliver the Scam Crypto Ads to members of the Australian public.

164.     The Scam Crypto Ads about which Dr. Forrest complains were specifically targeted to be delivered to the desktops and laptops of Facebook users across Australia who followed and admired Dr. Forrest as a successful and prominent Australian businessman.

165.     These are the same Australian Facebook users who Facebook asserts contract with it to receive the benefits of Facebook's services in Australia, and in turn grant Facebook, Inc. rights and benefits to use and profit from their Australian data.

166.     In behaving in the manner alleged in this ~~TS~~AC, Facebook is engaging in an inequitable jurisdictional arbitrage, refusing to submit to the jurisdiction of Australia to answer claims in order to seek to apply a uniquely U.S. statute that purports to afford immunity to Facebook.

167.     The immunity would not exist if Facebook submitted to jurisdiction in Australia, and Facebook seeks to use U.S. determinations immunizing their wrongful conduct, and as part of an overall litigation strategy, to deny Dr Forrest and all Australian citizens their rights and entitlements.

## VI.    CAUSES OF ACTION

168.    Dr. Forrest has been irreparably harmed, and the whole ordeal distracts from and displaces the many positive associations with Dr. Forrest's name, clouds his impeccable reputation, and ultimately decreases the commercial value of his brand, name, image, and likeness. Accordingly, Dr. Forrest brings each of the following causes of action against Facebook:

### FIRST CAUSE OF ACTION

### Misappropriation of Name of Likeness

169.    Dr. Forrest re-alleges the preceding paragraphs of this ~~TS~~AC as if fully set forth herein.

170.    At all relevant times, Facebook used and misappropriated Dr. Forrest's name and likeness in images and videos in violation of California common law.

171.    Facebook misappropriated Dr. Forrest's name, likeness, and brand, to keep its users engaged with illegal content in the form of the underlying fraud and allowed Facebook to gain an unwarranted commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist because the longer users are engaged, the more data Facebook is able to collect and monetize. Facebook further gained a commercial benefit by selling advertisements and ways to promote or "boost" content to underlying fraudsters and profiting from the illicit ill-gotten proceeds that served to perpetuate the fraud.

172.    Facebook's advertising business misappropriated Dr. Forrest's name, likeness, and brand by contracting to and, Dr. Forrest believes, in fact, materially contributing to the content of the Scam Crypto Ads as co-developer, and in reviewing and approving the ad as appropriate to be submitted to Facebook's user platform for auction and dissemination as a Facebook advertisement.

173.    Dr. Forrest has never consented to these unauthorized and illegal uses of his name, image, voice, likeness, or photos or videos of him. Facebook knew, or should have known, that Dr. Forrest did not authorize or consent to the misuses because Dr. Forrest himself and/or through his agents directly informed Facebook of the misuses.

174.    As a result of Facebook's wrongful conduct as alleged in the ~~TS~~AC, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation as a

consequence of the pervasive investment scam that has been perpetuated, aided, and abetted, and carried out through the Facebook website. Dr. Forrest's reputation and the commercial value of his name and likeness, both of which he is and has been committed to protecting and developing, have also suffered injury. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

175.    Facebook's misappropriation of Dr. Forrest's common law right to his name and likeness has been deliberate, willful, and in utter disregard of his rights.

176.    Dr. Forrest seeks all available compensatory, punitive, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraud

177.    Dr. Forrest re-alleges the preceding paragraphs of this TSAC as if fully set forth herein.

178.    At all times relevant, the DOE defendants and unknown persons and their co-conspirators who carried out the Scam Crypto Ads have committed fraud by luring unsuspecting investors to send money in exchange for a benefit that does not exist.

179.    At all times relevant, Facebook knew, or should have known, about the underlying fraud.

180.    At all times relevant, Facebook was an indispensable part of the Scam Crypto Ads, provided substantial assistance and encouragement to, materially contributed to, and otherwise aided and abetted the fraud.

181.    As alleged in this TSAC, during the testing and framing of the ads' content, Facebook assists the fraudsters in refining a user audience that is most likely to click and purchase. This rotation of ads assists the fraudsters in locating their victims, and is part of the co-development of the content that Facebook provides. Facebook collects vast amounts of data and paid and unpaid content to create an experience for users and is incentivized to curate this

experience because the longer users are engaged and the more time a user spends on Facebook, the more data, content, and information Facebook is able to collect and monetize.

182.     Facebook users did not have a practical option to prevent Facebook from collecting and using their own data against them, including their private browsing history when they were logged off of Facebook, and the gathering of such data was a necessary condition to their use of Facebook and/or the ability to opt out of such data collection was so confusing that the practical effect was that there was no option to prevent Facebook's data collection.

183.     Using its vast array of data collected, Facebook intentionally provided substantial assistance and/or encouragement in the underlying fraud by changing the experience of users and delivering messages to the victims that they would like or be interested in this fraudulent content, based upon among other things, specific vulnerabilities to the underlying fraud that it was able to exploit using the data it collected on its users.

184.     Facebook further intentionally provided substantial assistance and/or encouragement to the Scam Crypto Ads by changing the user experience to the extent Facebook's advertising business, with all of the knowledge it was aware of regarding Scam Crypto Ads, by contracting to and materially contributing to the content of the ads as co-developer, reviewer, and approver of the ads as appropriate to be submitted to Facebook's user platform for auction and dissemination as Facebook advertisements.

185.     Other frauds have been carried out via this method, and news articles have quoted similar bad actors: "Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. 'They go out and find the morons for me.'"[29]

186.     Facebook's advertising business provided substantial assistance and/or encouragement to the underlying fraud when it knowingly and willingly sold the underlying scammers targeted advertising that were paid for by ill-gotten proceeds. The advertisements drove Facebook's own users to the fraudulent promotions and ads, further fueling the scam and keeping

---

[29] *Facebook Helps Shady Advertisers Pollute the Internet*, Bloomberg Businessweek.

the money flowing. In fact, news articles have quoted former Facebook employees who "said it was common knowledge there that some of their best clients were affiliates who used deception. Still, the sources said, salespeople were instructed to push them to spend more."[30]

187.     Facebook's conduct was independently tortious and a substantial factor, proximately causing the harm Dr. Forrest has suffered, including irreparable harm to his public image and reputation as a consequence of the Scam Crypto Ads that Facebook has substantially encouraged and assisted. Moreover, Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

188.     Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

**Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

189.     Dr. Forrest re-alleges the preceding paragraphs of this ~~TS~~AC as if fully set forth herein.

190.     Section 17200 *et seq.* of the California Business & Professions Code, which is California's Uniform Competition Law ("UCL"), is written in the disjunctive and broadly covers three varieties of unfair competition – acts that are unlawful, unfair and/or fraudulent. The UCL statute's intent and purpose is to protect both consumers and competitors. The coverage of Bus. & Prof. Code § 17200 *et seq.* is broad and intended to enjoin on-going wrongful business conduct in whatever context such activity might occur.

191.     Dr. Forrest is a "person" within the meaning of Bus. & Prof. Code § 17201. Facebook's principal place of business is located within California. Dr. Forrest maintains a Facebook user account and has a verified Facebook page.

---

[30] *Id.*

192.    Facebook has engaged in unfair and/or unlawful business practices within the meaning of Bus. & Prof. Code § 17200 *et seq*.

193.    Facebook's conduct is "unlawful" under the UCL. Within the meaning of Section 17200, virtually any violation of any civil or criminal federal, state, or municipal, statutory, or regulatory, court-made, or local law can serve as a predicate offense for an unlawful claim. Facebook acted unlawfully by misappropriating Dr. Forrest's name and likeness and violated his common law right of publicity to keep its users engaged with illegal content in the form of the underlying fraud, and in violating the Lanham Act (15 U.S.C. § 1125(a)) prohibition on false endorsement, allowing Facebook to gain a commercial benefit from Dr. Forrest's business reputation and social status as a wealthy philanthropist.

194.    Facebook's conduct is also "unfair." The Scam Crypto Ads were facilitated by Facebook's unique method of curating user experiences to provide content that would keep a particular user engaged on the website, and thus allowing Facebook to harvest more data, and/or by leveraging this data to provide targeted ad capabilities to the underlying bad actors, and in engaging in conduct which is tethered to and in violation of the policies underlying the Lanham Act prohibition on false endorsement. Such conduct is unfair under Section 17200, causing financial and reputational harm, offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. A practice may be deemed "unfair" under the UCL even if not specifically proscribed by some other law.

195.    Dr. Forrest has standing to pursue his UCL claim because he has suffered an economic injury in fact and has lost money or property resulting from Facebook's unfair and/or unlawful conduct. Dr. Forrest has no adequate remedy at law for some of his injuries.

196.    The UCL is a strict liability statute and it is therefore not necessary to show that Facebook intended to injure or harm Dr. Forrest.

197.    Whether a business practice is unlawful or unfair presents factual questions for the ultimate factfinder to determine.

198.    An act or omission may violate the UCL even if the unfair or unlawful act or practice affects only one victim.

199.     As a direct and proximate result of Facebook's unlawful and unfair conduct, Dr. Forrest has suffered—and continues to suffer—irreparable harm to his public image and reputation, and has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

200.     Pursuant to Bus. & Prof. Code § 17203, Dr. Forrest seeks the entry of permanent and mandatory injunctive relief against Facebook as necessary to enjoin its unfair and/or unlawful business conduct.

## FOURTH CAUSE OF ACTION

### Negligent Failure to Warn

201.     Dr. Forrest re-alleges the preceding paragraphs of this ~~S~~TAC as if fully set forth herein.

202.      During all times relevant to this T~~S~~AC, Facebook had actual or constructive knowledge of all relevant aspects of the Scam Crypto Ads, including, but not limited to, the unauthorized use of Dr. Forrest's name, images, likenesses, and protected marks which were wrongfully and repeatedly exploited to promote the scam. The harm to Dr. Forrest was reasonably foreseeable to Facebook.

203.      Facebook had actual or constructive and independent knowledge of the Scam Crypto Ads, irrespective of its monitoring of third-party content, as Facebook was aware of the Scam Crypto Ads since in or about March 2019.

204.     Facebook had a duty to warn Dr. Forrest that could have been satisfied even without conducting a detailed investigation. And due to its misfeasance, Facebook is responsible for making Dr. Forrest's position worse and created the risk, such that no "special relationship" is required for the duty to exist. Facebook should have warned its users, including, Dr. Forrest, of the Scam Crypto Ads.

205.     Facebook's inaction fell below the standard of care. It would have been reasonable under the circumstances for Facebook to provide a warning(s) to Dr. Forrest. Facebook breached its duty of care by failing to adequately warn its users about the Scam Crypto Ads.

206. Facebook's failure to warn was a substantial factor in causing Dr. Forrest's harm.

207. As a direct and proximate consequence of Facebook's failure to warn and negligence, Dr. Forrest has been severely harmed, including harm to his reputation and the commercial value of his name, image, and likeness. Dr. Forrest has spent hundreds of thousands of dollars in defending his reputation and likeness, increasing his own personal security, and attempting to restore his public image by investigating and responding to the harm.

208. Dr. Forrest seeks all available compensatory, punitive, statutory, and other damages for past harm, as well as the value of any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### Lanham Act Violations

209. Dr. Forrest re-alleges the preceding paragraphs of this ~~TS~~AC as if fully set forth herein.

210. Dr. Forrest is a celebrity within the meaning of the Lanham Act, specifically 15 U.S.C. § 1125(a). His "mark" is his persona, its strength reflective of the extremely high level of recognition his image and name enjoy as a successful businessman and philanthropist.

211. Facebook and the Syndicate have co-developed, and Facebook's advertising business reviewed, approved, and supplied its prior written consent of the Scam Crypto Ads for later dissemination on Facebook's user platform. This occurred for the sole and exclusive purpose of inducing Facebook users who encountered the Scam Crypto Ads to purchase the goods and/or services promoted by Dr. Forrest's purported but false endorsement.

212. Facebook acted as a digital advertising agency which helped create and co-develop the marketing and advertising campaign that became the Scam Crypto Ads.

213. A reasonable objective consumer in the marketplace would be confused into believing that Dr. Forrest endorses the Scam Crypto Ads. Specifically, his celebrity status as a highly successful businessman and philanthropist was tapped into directly in contriving the Scam Crypto Ads in order to appeal to those seeking supposedly credible investment opportunities.

214.    The Scam Crypto Ads use Dr. Forrest's actual photograph and name. Facebook used its own marketing channels, *i.e.,* its user platform, to target those users which Facebook knew to be highly susceptible to Dr. Forrest's endorsement. Those targeted have been actually confused and deceived by their encounters with the Scam Crypto Ads, often to their financial detriment, relying on the false confidence Dr. Forrest's endorsement has fostered.

215.    Facebook acted willfully in co-developing and then disseminating the Scam Crypto Ads that were never endorsed by Dr. Forrest. Moreover, Facebook changed nothing after being repeatedly notified, starting in or about late March 2019 by Dr. Forrest and his representatives: (1) that Dr. Forrest did not endorse the Scam Crypto Ads; and (2) Dr. Forrest demanded that the development and/or dissemination of any such ads cease immediately and permanently. Despite these demands, Facebook, through its advertising business, has continued to co-develop, approve, and disseminate the Scam Crypto Ads on Facebook's user platform through at least February 2022.

216.    Facebook's entire business model is based on ad revenue. And with this model comes criminals using Facebook ads that are designed to harm others. Facebook's business model is based on receiving money in the form of advertising fees from its willing involvement in co-developing, and then disseminating the Scam Crypto Ads on its user platform--in a highly targeted fashion to users Facebook believed to be most susceptible to respond favorably to the promotion of such Ads.

217.    Dr. Forrest has been harmed by Facebook's acts and omissions constituting false endorsement, causing him damages to his reputation, status and the good will associated with his stellar reputation for business acumen and philanthropy, including out-of-pocket losses in attempting to preserve his good name and mitigate the negative reputational impact of the Scam Crypto Ads.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment and Related Equitable Relief

218.    Dr. Forrest re-alleges the preceding paragraphs of this ~~S~~TAC as if fully set forth herein.

219. Dr. Forrest's reputation, name, image, and likeness all have great value to him and objectively in a manner that can be liquidated. The question of the value of his endorsement is a question for a jury, including the "going rate" for an endorsement from Dr. Forrest--for the right to exploit his reputation for a commercial purpose like promoting and endorsing cryptocurrency ads.

220. There is an active market for the exploitation of the promotion and endorsement from business and philanthropic celebrities like Dr. Forrest.

221. At the same time, Facebook, through its advertising business, has wrongly received ad revenue in return for co-developing, editing, and approving the Scam Crypto ads that led Facebook users to the Scam Crypto Ads.

222. The Scam Crypto Ads misused Dr. Forrest's reputation, name, likeness, and endorsement, and have sullied and damaged him.

223. Given that Facebook has monies which in fact should be restored in the circumstances of fraud and mistake, and the relative equities, and given the nature of the relationship of the parties, defendant's unjust enrichment ought be prevented.

224. Facebook has therefore been unjustly enriched through the receipt of the ad revenue derived through these ads.

225. Facebook further will be unjustly enriched if allowed to benefit unfairly from its judicial arbitrage designed and intended to deny Dr. Forrest his day in court except in a jurisdiction in which Facebook will rely, in violation of principles of equity, on Section 230 qualified immunity.

226. No matter the material difference between the ad revenue and the greater damage in value of Dr. Forrest's reputation, Facebook has been unjustly enriched in the amount of ad revenue Facebook earned in connection with its involvement with Scam Crypto Ads, which sums should be disgorged and given to Dr. Forrest.

227. Further, in the circumstances presented, namely Facebook's unfair jurisdictional arbitrage, equity should intervene to estop Facebook from asserting, or find that Facebook has waived, Section 230 immunity and/or other affirmative defenses it might seek to raise, and declarations and equitable relief designed to effect this equitable outcome should issue.

**SEVENTH CAUSE OF ACTION**

**Negligent Design**

228.    Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth herein.

————In or about December 2015, Facebook reached out to Dr. Forrest, asking him to create a Facebook account and to become a "verified" Facebook user.[31]  The expressed purpose behind Facebook's request was Facebook's intention to protect Dr. Forrest name and reputation as a respected and high-profile businessman on its platforms from the proliferation of "fake" Dr. Forrest profiles and other information.

229.    Dr. Forrest accepted Facebook's offer by creating an account and becoming a verified Facebook user.

230.    Once accepted, a special relationship existed between Dr. Forrest and Facebook under which Facebook accepted a duty to protect Dr. Forrest's name and reputation from misuse on its platforms, including from Scam Crypto Ads. Indeed, Facebook undoubtedly recognized Dr. Forrest's stature as a coveted celebrity and was aware that fraudsters sought to impersonate and misappropriate Dr. Forrest's name and likeness such that the harm to Dr. Forrest that has resulted from the Scam Crypto Ads was reasonably and patently foreseeable to Facebook. There is a close and causal connection between Facebook's conduct, as alleged in this TAC, and Dr. Forrest's injuries, and as a company now worth billions of dollars, Facebook shoulders moral and actual blame for Dr. Forrest's injuries.

231.    Aside from this special relationship, Facebook owed a duty to Dr. Forrest as a result of its misfeasance, as Facebook is responsible for making Dr. Forrest's position worse and created the risk of harm to which Dr. Forrest has encountered.

---

[31] According to Facebook, it has created "verified" badges for "notable" accounts that "[r]epresent a well-know, often searched person, brand or entity" and have been "featured in multiple news sources."  *See* Facebook Help – "How do I request a verified badge on Facebook?" https://www.facebook.com/help/1288173394626262

232. Starting in or about April 2019, Dr. Forrest has, repeatedly and without success, demanded Facebook protect his name and reputation as promised by stopping the Scam Crypto Ads.

233. Facebook owed a duty to use ordinary care in designing, maintaining, adapting and modifying its advertising and business operations so as to prevent scammers like the Bulgarian Syndicate from accessing, using, and continuing to use Facebook's advertising business and its related products and services to co-develop Scam Crypto Ads, and to refrain from materially contributing to the development of advertisements, like the Scam Crypto ads.

234. Facebook breached its duty by, *inter alia*, designing, operating, maintaining, adapting, modifying and overseeing its advertising business without addressing and by turning a blind eye to the hazard that its co-development of the Scam Crypto Ads posed to Dr. Forrest, operating without reasonable or sufficient precautions, procedures, protocols, and requirements including effective advertiser identification checks, the deployment of anti-cloaking software tools or techniques, and simple word and image search functions.

235. If Facebook had deployed these reasonable procedures, such procedures would have identified and rejected Scam Crypto Ads in the advertising business co-development phase.

236. Among other things, by reason of the persistence of the Scam Crypto ads reaching the Facebook platform from March 2019 to date, particularly in the face of Dr. Forrest's clear and repeated calls for Facebook action to stop the ongoing fraud, Facebook knew, or should have known, that its products and services posed an unreasonable risk, and Facebook's continued design decisions, and any disclaimers as to its products are inadequate, unreasonable, and knowingly ineffective and fall below the standard of care.

237. Facebook's negligence was a substantial factor in causing Dr. Forrest's harm, and as a direct and proximate consequence of Facebook's negligence, Dr. Forrest has and continues to be severely harmed.

227. 238. Dr. Forrest seeks all available nominal, compensatory, punitive, statutory, and other damages for the harms and losses he has and continues to suffer, as well as the value of

any gains, profits, or advantages wrongfully obtained by Facebook, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Andrew Forrest prays that this Court adjudge and decree and enter judgment in its favor and against defendant Facebook as follows:

1.     That Dr. Forrest is entitled to compensatory damages in an amount to be proven at trial, as permitted by law and according to proof;

2.     That Dr. Forrest be awarded punitive or exemplary damages in an amount to be determined at trial;

3.     That this Court enter a permanent and mandatory injunction prohibiting Facebook from engaging in the unlawful and unfair conduct in the future;

4.     That Facebook be ordered to disgorge its ill-gotten gains including advertising revenues derived from the Scam Crypto Ads;

5.     That this Court undertake a Choice of Law analysis as pled in the TSAC and apply Australian law to any assertion of a total or partial affirmative defense under Section 230 and appropriate declarations, and that other equitable orders issue to prevent Facebook from benefitting from its unfair and unconscionable jurisdictional arbitrage;

6.     That Dr. Forrest is entitled to costs of suit; and

7.     That Dr. Forrest be afforded such other and further relief, including his attorney fees, as this Court deems just and proper, and law and equity allow.

## **DEMAND FOR JURY TRIAL**

Plaintiff Dr. Andrew Forrest respectfully requests a jury trial on all triable issues in the above-entitled action.

DATED: Ju~~lyne~~ ~~17~~__, 2022          WAYMAKER LLP

By: _____
    Brian E. Klein
    Donald R. Pepperman
    Jose R. Nuño

    *Attorneys for Plaintiff*
    *Dr. Andrew Forrest*