Brian E. Klein (Bar No. 258486)
  bklein@waymakerlaw.com
Donald R. Pepperman (Bar No. 109809)
  dpepperman@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| DR. ANDREW FORREST, an individual,<br><br>  Plaintiff,<br><br>  v.<br><br>FACEBOOK, INC., a corporation; and DOES 1 through 20,<br><br>  Defendants. | Case No. 5:22-cv-03699-EJD (VKD)<br><br>**PLAINTIFF DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Edward J. Davila<br><br>Hearing Date: February 2, 2023<br>Time: 9:00 a.m.<br>Courtroom: 4<br>Trial Date: Not yet set |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND........................................................................................... 2

    A.   Dr. Forrest is a Famous Person Whose Personal "Mark" Has Great Value ............... 2

    B.   Facebook's Advertising Business ................................................................................ 2

    C.   Facebook's Advertising Business Co-Developed the Scam Crypto Ads .................... 5

III. LEGAL STANDARD ...................................................................................................... 6

IV.  ARGUMENT.................................................................................................................... 7

    A.   The Lanham Act Claim is Not Subject to Section 230 Immunity and is Well-Pled ... 7

    B.   The State Law Claims Are Not Barred by Section 230 Immunity .............................. 9

        1.   Facebook is a Co-Developer of the Scam Crypto Ads ..................................... 9

        2.   Facebook's Acts Go Beyond the Provision of Neutral Tools........................ 11

        3.   Facebook Misreads Dr. Forrest's Allegations as Treating it as a Publisher .. 13

    C.   Dr. Forrest's State Law Claims Are Well-Pled .......................................................... 14

        1.   Dr. Forrest Has Stated a Viable Misappropriation of Name and Likeness Claim ............................................................................................................... 15

        2.   Dr. Forrest Has Stated an Actionable UCL Claim......................................... 16

        3.   Dr. Forrest Has Stated a Viable Aiding and Abetting the Fraud Claim ........ 18

        4.   Dr. Forrest Has Properly Stated a Negligent Failure to Warn Claim ............ 19

        5.   Dr. Forrest Has Stated a Viable Unjust Enrichment Claim ........................... 21

    D.   The Court Should Reject Facebook's Improper Jurisdictional Arbitrage Efforts ..... 22

        1.   Section 230 Should Not Be Applied Extraterritorially ................................. 22

        2.   Facebook's Choice of Law Provision Does Not Support Applying Section 230............................................................................................................... 23

        3.   Australian Law Should Apply Rather Than Section 230................................ 24

V.   LEAVE TO AMEND SHOULD BE PERMITTED ....................................................... 25

VI.  CONCLUSION .............................................................................................................. 25

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdul-Jabbar v. General Motors Corp.*,
85 F.3d 407 (9th Cir. 1996) ...................................................................................7

*Ahern v. Dillenback*,
1 Cal. App. 4th 36 (1991) ....................................................................................20

*In re Apple Inc. App Store Simulated Casino-Style Games Litigation, et al.*
Case No. 5:21-md-02985-EJD, Case No. 5:21-md-03001-EJD, Case No. 5:21-cv-02777-EJD
2022 WL 4009918 (N.D. Cal. Sept. 2, 2022.) ...........................................1, 2, 11, 14

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ............................................................................8, 9

*Astiana v. Hain Celestial Group Inc.*,
783 F.3d 753 (9th Cir. 2015) ...............................................................................22

*Barrett v. Apple, Inc.*,
523 F. Supp. 3d 1132 (N.D. Cal. 2021) ..............................................................19

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................6

*Casey v. United State. Bank National Association*,
127 Cal. App. 4th 1138 (2005) ...........................................................................18

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal.4th 163 (1999) ..........................................................................................16

*Chen v. Los Angeles Truck Centers*, LLC,
7 Cal. 5th 862 (2019) ..........................................................................................24

*Chen v. Paypal, Inc.*,
61 Cal. App. 5th 559 (2021) ................................................................................18

*Children's Health Defense v. Facebook, Inc.*
546 F. Supp. 3d 909 (N.D. Cal. 2021) ...............................................................8-9

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1991) ...............................................................................17

*Cross v. Facebook, Inc.*,
14 Cal. App. 5th 190 (2017) ................................................................................15

*Doe v. Mindgeek USA Inc.*,
  574 F. Supp. 3d 760 (C.D. Cal. 2021) ...........................................................10, 11, 12

*Doe #1 v. MG Freesites, Ltd., et al.*,
  21-cv-00220-LSC, 2022 WL 407147 (N.D. Al. Feb. 9, 2022) ..................................12

*Dryoff v. Ultimate Software Group, Inc.*,
  934 F.3d 1093 (9th Cir. 2019) .....................................................................20

*Elliot v. Donegan*,
  469 F. Supp. 3d 40 (E.D.N.Y. 2020) .........................................................13, 14

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.*,
  946 F.3d 1040 (9th Cir. 2019) .......................................................................8

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ............................................................... *passim*

*Federal Trade Commission v. LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)..........................................................................10

*Fifty-Six Hope Road Music, Ltd., v. A.V.E.L.A., Inc.*,
  778 F.3d 1059 (9th Cir. 2015) ........................................................................8

*In re First Alliance Mortgage Co.*,
  471 F.3d 977 (9th Cir. 2006) ........................................................................18

*First Nationwide Savings v. Perry*,
  11 Cal. App. 4th 1657 (1992) .......................................................................21

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019)...........................................................................11

*Gafcon, Inc. v. Ponsor & Associates*,
  98 Cal. App. 4th 1388 (2002) .......................................................................17

*In re Gilead Science Securities Litigation*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................6

*Gonzalez v. Google, LLC*,
  2 F.4th 871 (9th Cir. 2021), *reh'g denied*, 21 F. 4th 665 (9th Cir. 2022).................11-12, 22-23

*Hepp v. Facebook, Inc.*,
  14 F.4th 204 (3d Cir. 2021) ........................................................................16

*Hodsdon v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) .......................................................................17

*Holomaxx Technologies v. Microsoft Corp.*,
  783 F. Supp. 2d 1097 (N.D. Cal. 2011) ...........................................................13

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ...........................................................................................13

*Jackson v. Carey*,
353 F.3d 750 (9th Cir. 2003) ............................................................................................25

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ............................................................................................1

*LeBrun v. CBS Television Studios, Inc.*,
68 Cal. App. 5th 199 (2021) .......................................................................................21, 22

*Licci v. Lebanese Canadian Bank, SAL*,
672 F.3d 155 (2d Cir. 2012)..............................................................................................24

*Linear Technology Corp. v. Applied Materials, Inc.*,
152 Cal. App. 4th 115 (2007) ...........................................................................................17

*Lomita Land Water Co. v. Robinson*,
154 Cal. 36 (1908) ............................................................................................................18

*Lugtu v. California Highway Patrol*,
26 Cal.4th 703 (2001) .......................................................................................................20

*Maxwell v. Dolezal*,
231 Cal. App. 4th 93 (2014) .............................................................................................15

*McKell v. Washington Mutual, Inc.*,
142 Cal. App. 4th 1457 (2008) .........................................................................................17

*Morongo Band of Mission Indians v. Rose*,
893 F.2d 1074 (9th Cir. 1990) ..........................................................................................25

*Moss v. U.S. Secret Service.*,
572 F.3d 962 (9th Cir. 2009) ......................................................................................... 6-7

*Nasrawi v. Buck Consultants, LLC*,
231 Cal. App. 4th 328 (2014) ...........................................................................................18

*Newcombe v. Adolf Coors Co.*,
157 F.3d 686 (9th Cir. 1998) ............................................................................................16

*Offshore Rental Co. v. Continental Oil Co.*,
22 Cal. 3d 157 (1978)259

*Paracor Finance, Inc. v. General Electric Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) ............................................................................................25

*People ex rel v. Fremont Life Insurance Co.,*
104 Cal. App. 4th 508 (2002) ...........................................................................................16

iv

*Perfect 10, Inc., v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ...................................................................................8, 16

*Perfect 10, Inc. v. Google, Inc.,*
    No. CV 04–9484 AHM (SHx), 2008 WL 4217837 (C.D. Cal. July 16, 2008) .......................13

*Perfect 10, Inc. v. Google, Inc.,*
    No. CV 04–9484 AHM (SHx), 2010 WL 9479060 (C.D. Cal. July 30, 2010)........................15

*Perfect 10, Inc. v. Visa International Service Association,*
    494 F.3d 788 (9th Cir. 2007) ...............................................................................................16

*RJR Nabisco, Inc. v. European Community,*
    579 U.S. 325 (2016).................................................................................................22, 23

*Roadrunner Intermodal Services., Inc. v. T.G.S Transportation, Inc,*
    No. 1:17-cv-01207-DAD-BAM, 2021 WL 2188138 (E.D. Cal. May 28, 2021)....................21

*Schulz v. Neovi Data Corp.,*
    152 Cal. App. 4th 86 (2007) .................................................................................................19

*Seo v. All-Makes Overhead Doors,*
    97 Cal. App. 4th 1193 (2002) ...............................................................................................20

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ................................................................................................7

*Summit Technology, Inc. v. High-Line Medical Instruments, Co.,*
    933 F. Supp. 918 (C.D. Cal 1996) .........................................................................................17

*Turo Inc. v City of Los Angeles,*
    2:18-CV-06055-CAS-GJSx, 2020 WL 3422262 (C.D. Cal. June 19, 2020) .....................14, 19

*Turo v. City of Los Angeles,*
    847 Fed. App'x 442 (9th Cir. 2021) .......................................................................................14

*Waits v. Frito-Lay, Inc.,*
    978 F.2d 1093 (9th Cir. 1992) .............................................................................................7, 8

*Washington Mutual Bank v. Superior Court,*
    24 Cal. 4th 906 (2001) ..........................................................................................................23

*Wendt v. Host International,*
    125 F.3d 806 (9th Cir. 1997) ..................................................................................................7

**Statutes**

15 U.S.C. § 1125(a) .....................................................................................................................7

47 U.S.C. § 230(e) ..................................................................................................................8, 17

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................................6

## I.   INTRODUCTION

Attempting to avoid being confronted with its tortious actions as a co-developer and peddler of fraudulent advertisements, Facebook – now known as Meta Platforms – asks this Court to immunize its conduct as merely that of a "publisher" of "scam ads created by third-party fraudsters." (Motion to Dismiss ("Mot.") at 2.) In doing so, Facebook mischaracterizes Dr. Andrew Forrest's Second Amended Complaint ("SAC") and the case law it claims supports the motion. Dr. Forrest's well-pled SAC details Facebook's advertising business and its key role in creating fraudulent cryptocurrency ads ("Scam Crypto Ads") – purportedly endorsed by Dr. Forrest – that injured not only him, but countless other innocent Australians, many of whom lost their life savings as a result. These acts are not subject to the affirmative defense of Section 230 immunity under the Communications Decency Act ("CDA"). Facebook's arguments to the contrary should be rejected.

Section 230 was enacted in 1996 at the dawn of the dot.com era when "'[t]he prototypical service qualifying for [CDA] immunity [was] an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others.'" *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (citation omitted). At that time, Facebook and other internet conglomerates did not even exist, with Facebook forming in 2004 and launching its money-making advertising business in 2007. Simplistic at first, internet advertising has seen a technological explosion. Long gone are the days where an interactive computer service provider's algorithm suggested innocuous words to increase website traffic, or websites just served as passive conduits for third-party content. As this Court recently noted, "[t]here is no doubt that the Internet of 1996, which boasted platforms that hosted 'bulletin board' type websites, has changed" and "Section 230 is not limitless." *In re Apple Inc. App. Store Simulated Casino-Style Games Litig., et al.*, 2022 WL 4009918, at *6, 15 (N.D. Cal. Sept. 2, 2022.) So too has Facebook, with its $100 billion+ digital advertising empire now reaching the point that it knowingly co-develops fraudulent ads, and "elicits the allegedly illegal content and makes aggressive use of it in conducting its business." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008).

Dr. Forrest's allegations focus on the fact that since April 2019 Facebook's advertising business has co-developed the Scam Crypto Ads, which contain his name, images, and videos without

1

his consent. As one of Australia's most well-known businessmen and philanthropists, it unfortunately followed that numerous Australians have been victimized out of millions of dollars. Dr. Forrest only knows of the numerous victims who have reached out to him, but there are undoubtedly many more. Dr. Forrest searched for ways to report what was happening to Facebook, but Facebook does not offer a readily available avenue for reporting such frauds. Dr. Forrest thus used the resources at his disposal to contact Facebook's counsel directly, even going so far as to send a letter to Facebook's CEO Mark Zuckerberg. Facebook's response to Dr. Forrest, like its response to countless others, was callous, claiming Section 230 permits it to operate with impunity. But that callousness and Facebook's intentional jurisdictional arbitrage used to assert Section 230 immunity stops here. Dr. Forrest has properly pled six claims for relief arising from Facebook's misdeeds, and Facebook's attempt to shroud itself with unbridled impunity for its wrongful conduct should be rejected. Facebook itself acts as "more than [a] mere message board[]", it is a "creator[] of content [it]self, and [] should be treated as such." *In re Apple Inc.*, 2022 WL 4009918 at *18.

This Court should deny Facebook's motion, or at a minimum, grant leave to amend.

## II.    FACTUAL BACKGROUND

### A.    Dr. Forrest is a Famous Person Whose Personal "Mark" Has Great Value

Dr. Forrest is one of Australia's most prominent business people, philanthropists, and celebrities, and has been the recipient of that country's highest personal award. (SAC ¶¶ 32-43.) His "mark" is his persona, its strength reflective of the extremely high level of recognition his image and likeness enjoy because of his work as a successful businessman and philanthropist. (*Id.* ¶¶ 209-217.)

He provides immense commercial value and credibility to companies, charities, and brands that he endorses. (*Id.*) It is therefore no surprise that as a result of his stature, in December 2015 at Facebook's request, Dr. Forrest created a "verified" account on Facebook to help combat fraudulent "Dr. Forrest" user profiles proliferating on its social media platform. (*Id.* ¶¶ 5, n.3, 44.)

### B.    Facebook's Advertising Business

Facebook is a multibillion-dollar behemoth that was originally intended for the free posting of messages, photos, videos, and other content by users on its eponymous social media platform. (*Id.* n. 1, ¶ 11.) Facebook's digital advertising business is the commercial enterprise by which it monetizes

that free platform. (*Id.* ¶¶ 12, 83-84, 109.) Facebook generates over 90% of its annual revenue from its Facebook and Instagram platforms – more than $112 billion in 2021. (*Id.* ¶¶ 12, 109.) Individuals and companies who want to advertise on the Facebook platform enter individual agreements with it; specifically, Facebook's Advertising Terms and Self-Service Advertising Terms. (*Id.* ¶¶ 86-87.)

Facebook's advertising business is completely different than its social media platform, and the two serve different functions. (*Id.* ¶¶ 83-148.) Through its advertising business, Facebook provides full-service ad creation and development, including supplying creative ad alternatives, improving ad appearance, assisting in content development, and focusing, monitoring, and testing, ads – all critical, independent steps undertaken for exorbitant fees. (*Id.* ¶¶ 86-135.) Facebook's advertising business is designed to take material control over the development of each prospective ad, and continuously refine and improve live ads. (*Id.* ¶ 9.) Through this design, Facebook's ad systems interact in real time as part of a systemic approach to enhance each individual ad in a unique way, and Facebook's advertising arm actively improved the development of the Scam Crypto Ads featuring Dr. Forrest before Facebook submitted the ads to auction and posted them on Facebook.com or to third-party websites and applications for publishing. (*Id.* ¶ 8.) In other words, Facebook's advertising unit co-develops ads and then submits them to be published on the Facebook *user* platform or a different location for publication – all before a user ever comes across the prospective ad.

Facebook's website spells out in detail the creative aspects of its digital advertising services and provides instructions to anyone who wants to place an ad. (*Id.* ¶¶ 103-129.) A potential advertiser, using Facebook's advertising interface, provides basic identifying information, and is prompted to supply text and other information, like images. (*Id.*) From there, Facebook's advertising business goes to work. (*Id.*) Using Facebook Ad Creative, the prospective advertiser chooses from Ads that *Facebook has created* for the purpose of attracting users. (*Id.* ¶¶ 123-124.) Facebook Ads Manager allows a would-be advertiser to use existing ads already approved by Facebook which can be edited and customized in the Ad Creative. (*Id.* ¶ 127.) And beyond offering its own ads for use, Facebook's advertising business goes much further, suggesting improvements on the look and substance of the ad. (*Id.* ¶¶ 103-129.) For example, when a prospective advertiser wants to include a photo or other information in an ad, photographs and relevant information may be pulled by Facebook from the

3

user's own Facebook social media page, and recommended for use. (*Id.*) Prompts to use preferred Facebook-generated text or themes are suggested as co-development continues, and an advertiser can select an "audience" by reference to variables such as desired geographic location, audience interest and demographics, or defer that important decision to Facebook. (*Id.*)

Facebook advertising offers the prospective advertiser a palette to select from an array of "placements" and objectives. Then, granted virtually exclusive editorial control through its advertising contract, Facebook advertising checks and modifies the ad's text, positioning, and content, and determines the size and placement of ads during the co-development process. (*Id.* ¶¶ 88-89, 93.) Ads are rejected or truncated if they do not comply with its requirements, and ultimately, Facebook's advertising business tools operate as designed – offering a number of different versions for each ad, shown to the prospective advertiser along with its recommendations. (*Id.*) In doing so, Facebook's advertising business, as it retains the right to do, acts on each developing ad's proposed text, position, content, and size, to create each individual supercharged ad used with confidence by its paying advertising customer, including the Scam Crypto Ads created by the Bulgarian Syndicate ("Syndicate"), by the time it is approved and submitted to auction. *(Id.* ¶¶ 88-89, 93.)*

Facebook's advertising business deploys non-neutral tools to modify, co-create, and continuously improve ads before and once they appear on the Facebook platform. (*Id.* ¶¶ 88-143.) One such tool is called Meta Pixel. Through Meta Pixel, Facebook's advertising business collects and retrieves data, specific to that unique ad's performance, which Facebook's ad business then uses to optimize the ad in real time as it continues to be placed by Facebook's ad business on Facebook's user platform. (*Id.* ¶¶ 96-98.) Facebook's advertising business represents that Meta Pixel: (1) provides feedback to it and individual advertisers as to which versions of advertisements are performing better and options for optimizing that performance through its "custom target audience" and "lookalike audiences" tools; *critically* (2) allows it to run "dynamic advertisements" by which it will run various combinations of assets and ad copies to test and determine which perform best for the specific advertiser's target audiences; and (3) permits it to optimize the individual advertiser's campaign in favor of better performing variations of assets and copy on a continual basis. (*Id.* ¶¶ 94-102.)

Utilizing Meta Pixels and other tools, Facebook's advertising business plays an active and primary role in the continuous optimization of the advertiser's unique ad, improving, and optimizing the ad's performance in real time, well after a decision to publish on the user platform has been made. (*Id.* ¶¶ 88-135.) Given it retains the right to do so and designs its advertising systems to operate as such, Facebook's advertising service does in fact continue to: (1) determine the size, placement, and positioning of all ads for all advertisers; (2) test, improve, and optimize the performance of all ads appearing on Facebook's user space by acting on those ads in ways that materially contribute to their ongoing development and performance; and (3) develop and show various versions of each individual ad's assets and ad copies for the purpose of increasing the ad's success, whether or not an advertiser uses Facebook's ads manager tools or not. (*Id.*) In sum, Facebook designs its advertising systems to operate in such manner that at the end of this process its proprietary ads emerge and are displayed.

### C.    Facebook's Advertising Business Co-Developed the Scam Crypto Ads

"Scam Crypto Ads are custom made to inflict maximum damage without a scammer lifting a finger… [Facebook advertisers] describe watching their ad campaigns lose money as Facebook gathers data through trial and error, then seeing sales take off exponentially. 'They go out and find the [victims] for me.'" (*Id.* ¶ 9.) Facebook has long known that scammers use its advertising business and encourages them to advertise on Facebook. (*Id.* ¶¶ 138-139.) Scam ads that seek to promote financial products like cryptocurrency are contractually prohibited under Facebook's advertiser terms, but despite illusory guidelines, the result is that illegitimate ads are not rejected but rather co-developed. (*Id.* ¶¶ 103-143.) Facebook encourages scammers to spend more money to generate revenue, and further encourages the illegal ads by co-developing and delivering the ads in a manner to make them successful. (*See, e.g., id.* ¶¶ 138-139.) While Facebook's advertising system is one global system designed to co-develop ads for deployment, its review platform is not designed to, nor effective at, detecting jurisdictionally specific fraud – as in this case – the Scam Crypto Ads appearing on an Australian user's Facebook platform. (*See, e.g., id.* ¶¶ 141-143.) Facebook has long been aware of this serious flaw. (*Id.*) Facebook also encourages scam content in Australia; it is fully aware that scam advertisers use geolocation cloaking software to circumvent ad review policies, but it still

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)

chooses to host its ad review process off of Australian shores, allowing third-party fraudsters to use simple geolocation cloaking software to easily victimize vulnerable Australians. (*Id.* ¶¶ 140-143.)

The Syndicate hired Facebook as its advertising agency, seeking to attract victims to buy non-existent cryptocurrency utilizing Dr. Forrest's name and image, without his authorization, as reflected in the Scam Crypto Ads. (*Id.* ¶¶ 46, 87.) The Syndicate was not paying Facebook to just post an ad—it was paying for a material contribution to the appearance and content of the Scam Crypto Ads, who they would go to, and what the victims would pay once they were lured into wrongly believing that Dr. Forrest endorsed the purchase of cryptocurrency. (*Id.* ¶¶ 103-143.) And Facebook co-developed the Scam Crypto Ads through offshore architecture in the Philippines, Singapore, and elsewhere, with the ads specifically designed to be delivered to Australians. The Syndicate was well-aware that Facebook's individualized advertising processes would co-develop a unique ad, and that Facebook would continue to improve the ads through real-time advertising optimization after each ad was posted. (*Id.* ¶¶ 86, 91.) The Scam Crypto Ads ultimately misled and tricked innocent Australian victims out of substantial sums of money. (*Id.* ¶¶ 55-88.) Numerous victims have reached out to Dr. Forrest about collectively having lost millions of dollars to the Scam Crypto Ads, and those are just the ones who have come forward. (*Id.* ¶¶ 55-68.) There are undoubtedly many more victims.

Despite Dr. Forrest repeatedly requesting that Facebook take the necessary curative action, including through counsel before the filing of this lawsuit, Facebook's advertising business continued to co-develop and run the Scam Crypto Ads through at least February 2022. (*Id.* ¶¶ 214-216.)

## III.    LEGAL STANDARD

The Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Detailed allegations are not required, and a "complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *In re Gilead Sci. Secs. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("a district court ruling on a motion to dismiss is not sitting as a trier of fact"). A court must accept all well-pled allegations as true and indulge every reasonable inference in plaintiff's favor. *See Moss v. U.S. Secret*

*Serv.*, 572 F.3d 962, 967-68 (9th Cir. 2009). "If there are two alternative explanations… both of which are plausible, plaintiff's complaint survives[.]" *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## IV.    ARGUMENT

Facebook's arguments for dismissal fail. This section first addresses Dr. Forrest's Lanham Act claim, which is exempt from Section 230 immunity and well-pled, despite Facebook's claims to the contrary. The next two sections explain why, contrary to Facebook's arguments, Section 230 immunity does not apply to the five state law claims, and that those claims are properly stated. Lastly, this section discusses why this Court should reject Facebook's improper jurisdictional arbitrage efforts to invoke Section 230 to escape liability, and apply Australian law over Section 230 instead.

### A.    The Lanham Act Claim is Not Subject to Section 230 Immunity and is Well-Pled

Dr. Forrest's Lanham Act claim is well-pled, presenting a core intellectual property right arising from commercial speech, and is exempt from Section 230 immunity. Facebook's Lanham Act challenges all fail. (*See* Mot. 19-21.)

Before explaining why, it is important to keep in mind the following. Section 43(a) of the Lanham Act encompasses infringement of a false or misleading description or representation of a fact that would create confusion or deceive as to the affiliation, connection, association, sponsorship, approval or source of goods, services, or other commercial activity. *See* 15 U.S.C. § 1125(a). The Ninth Circuit has held that false endorsement claims are properly cognizable under section 43(a), of the Lanham Act. *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996) (citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1107-08 (9th Cir. 1992)). Facebook concedes, as it must, that in the Ninth Circuit, federal claims for false endorsement of a product or good, like cryptocurrency, are actionable under the Lanham Act. (*See* Mot. at 20.) Facebook does not, and cannot, dispute that celebrities like Dr. Forrest may sue for "false endorsement" under the Lanham Act based on the unauthorized use of persona in commercial advertising, as Courts recognize these claims for the unauthorized imitation of distinctive attributes where those attributes amount to an unregistered "trademark," like here. *See, e.g., Waits*, 978 F.2d at 1110 ("false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim."); *Wendt v. Host Int'l,* 125 F.3d 806, 812-15 (9th Cir. 1997). Thus, a Lanham Act claim that implicates intellectual property

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)

rights, like Dr. Forrest's, is not subject to Section 230 immunity; the cases Facebook relies on are not on point. For example, *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019) concerned claims for false advertising not false endorsement or association, and *Perfect 10, Inc., v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) involves state law claims. (*See* Mot. at 13.) In other words, Dr. Forrest's false endorsement claim is a traditional "intellectual property" claim and falls within the CDA's exception to immunity for such claims. *See* 47 U.S.C. § 230(e)(2) ("[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property.")

Facebook first argues that it is the wrong defendant because the statute requires confusion between Dr. Forrest's likeness and *Facebook's* goods or services. (Mot. at 20.) But this contention fizzles because the statutory phrase referring to a defendant's use of the mark (in this case, Dr. Forrest's name and likeness) "'on any goods' refers to the goods consumers may mistakenly think are approved by the owner of the mark." *Fifty-Six Hope Road Music, Ltd.*, *v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1072 (9th Cir. 2015) (citing 15 U.S.C. § 1125(a)) and holding all defendants involved in licensing and sales of T-shirts featuring Bob Marley liable for false endorsement); *Waits*, 978 F.2d. at 1111 (abrogated on other grounds) (valid judgment on Lanham Act claim against advertiser and outside advertising agency assisting in development of falsely endorsed product). As in *A.V.E.L.A.* and *Waits*, Facebook's substantial assistance in confusing consumers as to Dr. Forrest's sponsorship or approval of the Scam Crypto Ads renders it liable for the unlawful false endorsement.

Next, Facebook contends that it was not using Dr. Forrest's name "in commerce" (*i.e.*, use is not sufficiently commercial) because the Scam Crypto Ads did not purport to sell or offer any product or service. (Mot. at 20-21.) This is perplexing in light of the well-pled allegations to the contrary: the SAC clearly alleges the Scam Crypto Ads unlawfully used Dr. Forrest's name and likeness to falsely endorse a product, cryptocurrency, and many Australians saw those ads and were victimized by them. (*See, e.g.*, SAC ¶¶ 5, 56-68.) The SAC further alleges that the purchase of cryptocurrency ads was intended to benefit from association with Dr. Forrest. (*Id*.) Facebook's reliance on *Children's Health Defense v. Facebook, Inc.* 546 F. Supp. 3d 909 (N.D. Cal. 2021) is misplaced. (*See* Mot. at 20.) There, Judge Illston cites extensively to *Ariix, LLC v. NutriSearch Corp.,* 985 F.3d 1107 (9th Cir. 2021), in which the Ninth Circuit reversed the improper dismissal of a Lanham Act claim. *Children's Health*

*Def.*, 546 F. Supp. 3d at 934-37. In *Ariix*, the Ninth Circuit held that where a publisher rigged ratings to favor one company over a competitor for compensation, that conduct was actionable, commercial speech. 985 F.3d at 1117-19. The Ninth Circuit held "[c]ommercial speech is 'usually defined as speech that does no more than propose a commercial transaction[,]'" and that this determination is a "fact-driven" inquiry. *Id.* at 1115 (quoting *U.S. v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Here, as in *Ariix*, the speech in question was commercial because it was: (1) an advertisement; (2) which referred to a specific product (cryptocurrency); and (3) the speaker (Facebook) acted primarily out of an economic motivation, promulgating the speech because it was compensated for all its work on the ad. 985 F.3d at 1115-17 (citing *Bolger v. Youngs Drug Corp.* 463 U.S. 60, 66-68 (1983) (outlining factors to make fact-based inquiry as to whether speech is commercial)).

Facebook lastly hypothesizes that the Scam Crypto Ads could not cause confusion because "[n]o one could mistakenly believe that [Dr. Forrest] was endorsing a product that was not even mentioned." (Mot. at 21.) This fact-intensive overstated speculation is undercut by *Ariix,* which indicated that the public generally understands that permission is required to use someone's image for commercial purposes. *See* 985 F.3d at 1118. A Facebook user who saw the Scam Crypto Ads and recognized Dr. Forrest's image could reasonably be duped into believing that he granted permission for the use of his name and likeness, and endorsed, sponsored, and/or approved the Scam Crypto Ads – which Dr. Forrest did not. In sum, the SAC sets forth a well-pled false endorsement claim that is exempt from Section 230 immunity. (*See, e.g.,* SAC ¶¶ 5-6, 31-45, 58-80.)

**B.    The State Law Claims Are Not Barred by Section 230 Immunity**

Facebook's attempts to convince this Court to sweepingly dismiss Dr. Forrest's five other claims (misappropriation of name and likeness, aiding and abetting fraud, unfair competition, negligence, and unjust enrichment) based on Section 230 immunity should be rebuffed because Facebook co-developed the Scam Crypto Ads. Facebook's "neutral tools" and "publisher" arguments are meritless in the face of the allegations in the SAC.

1.    Facebook is a Co-Developer of the Scam Crypto Ads

It is well established that Section 230 immunity only applies to interactive service providers ("ISPs") for publishing "content created by third parties." *Roommates*, 521 F.3d at 1162. This grant

9

of publisher immunity, however, "applies only if the [ISP] is not also an 'information content provider,' which is defined as someone who is 'responsible, *in whole or in part, for the creation or development of* the offending content.'" *Id.* at 1162 (emphasis added). In contending that Section 230 immunizes its conduct here, Facebook buries its head in the sand to avoid meaningfully confronting Dr. Forrest's plausible allegations, insisting that the Scam Crypto Ads were provided by third-parties, qualifying Facebook for immunity. (*See* Mot. at 8.) Without case law or statutory support, Facebook attempts to create arbitrary and narrow standards to define a content developer, arguing that "nowhere in the SAC does [Dr. Forrest] allege that Facebook was [] directly involved in the creation of the offending ads," "coordinated with the Syndicate," or that it participated in the "doctoring of images, or drafted any of the misleading ad copy [*sic*]." (*Id.*) But the Ninth Circuit has rejected such a broad and sweeping interpretation of Section 230 immunity, holding that "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate the exception to [S]ection 230 for 'develop[ing]' unlawful content 'in whole or in part.'" *Roommates*, 521 F.3d at 1171. It inexorably follows that where a defendant co-develops unlawful content, like Facebook did here, it enjoys no immunity. *Id.* at 1168.

*Federal Trade Commission v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) is persuasive. There, the FTC sought to hold LeadClick liable for the deceptive acts of its affiliates who used fake websites to advertise weight loss products. *Id.* at 176. The Second Circuit held LeadClick was not entitled to Section 230 immunity because it helped "in the development of the deceptive content posted on fake news pages." *Id*. That court reasoned that LeadClick co-developed the content when, *inter alia*, it paid affiliates to advertise knowing false news sites were common, provided edits to fake affiliate webpages to make them more successful, and purchased media space on real news sites with the intent to resell that space to its affiliates using fake news sites. *See id*. at 178. Similarly, in *Doe v. Mindgeek USA Inc.*, the plaintiffs alleged the defendant websites were content creators when the defendants "categoriz[ed its child pornography] videos using coded language… to ensure that content is visible to the 'right fans,'"; "instruct[ed] users how to title their videos to target individuals interested in child pornography"; and encouraged "child pornography through its curation of 'video playlists on [its] platforms." 574 F. Supp. 3d 760, 770 (C.D. Cal. 2021). That court concluded that

because these acts contributed to and encouraged creation of illegal content, Section 230 immunity was inapplicable. *Id.* In contrast, in *Force*, the Second Circuit held Facebook was not a content developer when there were no allegations that it edited, or suggested edits, to the content provided by users; however, that court recognized that a defendant can materially contribute to others' content when it gives "specific instructions to those parties on how to edit [the fraud content] they were using in their ads to encourage consumers to purchase their [] products." *Force v. Facebook, Inc.*, 934 F.3d 53, 69 (2d Cir. 2019) (citing *LeadClick*, 838 F.3d at 176).

Dr. Forrest alleges Facebook assumed editorial control over the Scam Crypto Ads through its advertising business, co-developing an ad's form, appearance, and presentation, including changing its appearance, offering suggested language and themes, and offering various versions of the near-completed ad along with recommendations. (*See* SAC ¶¶ 88-93; 103-135.) He avers Facebook reviews and approves those ads, "modifies content and delivery all as one unified act to reach users and targeting choices that are known only to Facebook and not the criminals" – *i.e.,* reach the "right" people; modifies or has right to require modification of the advertisements including the image, text, and positioning; and unilaterally determines "the size, placement and positioning of [the] ads." (*Id.*) After an ad is live on the Facebook platform, Facebook reasserts editorial control over ads, including using tools to continually optimize ads on a dynamic basis, and perfecting the Scam Crypto Ads' actionable messaging. (*Id.* ¶¶ 94-135.) In other words, Facebook's "contribution of data and advertisement [services] helped create and develop" the Scam Crypto Ads. *In re Apple Inc.*, 2022 WL 4009918 at *18. And as in *LeadClick*, Facebook not only co-developed the Scam Crypto Ads, but it also provided those ads *for other* third-party websites and mobile applications to publish on *their* sites, assisting to drive traffic to the fraudulent content. Dr. Forrest's allegations constitute "material contribution" sufficient to defeat Section 230 immunity at this preliminary stage.

2. Facebook's Acts Go Beyond the Provision of Neutral Tools

On the facts pled, which must be accepted as true, Facebook is a content developer and cannot escape liability by arguing that it provides neutral tools to bad actors. The Ninth Circuit has held that an ISP's tools are only neutral when they do not encourage the creation of "illegal or actionable content." *See Mindgeek*, 574 F. Supp. 3d at 768; *see also Gonzalez v. Google, LLC*, 2 F.4th 871, 893

11

(9th Cir. 2021). Facebook attempts to flip the content development standard on its head, arguing that "[a]s long as Facebook's ad development tools do not 'require[]' or 'prompt[]' users to submit illegal content, they do not deprive Facebook of protection." (Mot. at 9 (citing *Gonzalez*, 2 F.4th at 896).) Facebook misrepresents and overstates *Gonzalez* and the law.

In *Mindgeek*, defendants – as Facebook does here – "urge[d] th[e] [c]ourt to read *Roommates* and *Gonzalez* as though [d]efendants could only be held liable for [p]laintiff's claims if they *require* or *compel* their users to make and post child pornography, rather than merely encourage its creation and development." 574 F. Supp. 3d at 771. The district court summarily rejected this interpretation of *Gonzalez* because "such a rule would produce absurd results." *Id.* The district court concluded that "*Gonzalez* does not articulate such a narrow test; its implicit holding is that the core inquiry behind whether an [ISP] is a content creator is whether defendants have taken action to encourage unlawful [or actionable] content and employ features to make a material contribution to such content." *Id.* at 772; *see also Doe #1 v. MG Freesites, Ltd., et al.*, 2022 WL 407147, at *16 (N.D. Al. Feb. 9, 2022) (holding that website was not only offering neutral tools for bad acts but encouraged them).

Dr. Forrest's allegations are consistent with the pertinent holdings from *Mindgeek.* Facebook encouraged unlawful content, and its advertising business employed features that made a material contribution to the Scam Crypto Ads. The SAC alleges in detail that: "Facebook sales employees—with knowledge of the[] [fraudsters'] deceptive schemes—encourage them to buy more ads" (SAC ¶¶ 138-139); "[f]ormer Facebook employees alleged that it was 'common knowledge' that some of their *best clients* were advertisers who used deception but were instructed to *push these fraudsters to spend more* to meet sales quotas of tens of millions of dollars per quarter" (*id.* (emphasis added)); and Facebook encourages the creation of illegal ads by co-developing and delivering the ads in a manner to make them successful – "'They go out and find the [victims] for me.'" (*Id.* ¶ 138.) The SAC further alleges that "Facebook is fully aware that scam advertisers use geolocation cloaking software to circumvent ad review policies" in Australia, and still choose "to host its ad review process off of Australian shores, allowing third-party fraudsters to use simple geolocation cloaking software to easily target vulnerable Australian citizens." (*Id.* ¶¶ 140-143.) In other words, Facebook both provides neutral tools that can be abused by bad actors, and actively encourages bad actors to create and co-

develop fraudulent ads.[1] Facebook advertising business is actively involved with developing and enforcing a system that subjects users to illegal content and makes aggressive use of this content in conducting its own business. *See Roommates*, 521 F.3d at 1172 (defendant develops content when it "elicits the allegedly illegal content and makes aggressive use of it in conducting its business.").

Facebook, as a co-developer, is liable for its own misconduct, and at a minimum, these are justiciable questions of fact not amenable to resolution at the pleading stage. *See Perfect 10, Inc. v. Google, Inc.*, 2008 WL 4217837, at *8 (C.D. Cal. July 16, 2008) ("[t]he question of whether any of [defendant's] conduct disqualifies it for immunity [as an alleged content provider] under the CDA will undoubtedly be fact-intensive" and, on that basis, "it would be improper for the Court to resolve this issue on the pleadings"); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011) (recognizing that pleadings may present a question of fact as to whether the defendant is a "content provider" "and thus not entitled [to Section 230] immunity at all.")

3.    <u>Facebook Misreads Dr. Forrest's Allegations as Treating it as a Publisher</u>

Facebook is wrong that its alleged liability is predicated on acts of a "publisher." (*See* Mot. at 11). Even if Facebook was not a content creator (but it is), Facebook's tortious acts as an advertising agency occurred before the fraudulent ads ever reached its social media arm to be published (SAC ¶ 8), such that the claims inherently do not treat Facebook as a "publisher." *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) ("We look [] to what the duty… actually requires… whether [it] would necessarily require [the] company to monitor third-party content.").

*HomeAway* is instructive. There, the city passed an ordinance prohibiting short-term vacation rentals, and requiring that online booking platforms (*e.g.*, AirBnb) *inter alia*: refrain from completing unlicensed booking transactions and refrain from collecting fees for unlicensed transactions. 918 F.3d at 680. The platforms sued the city, asserting the ordinance violated Section 230 because it required them to monitor and remove third-party content – *i.e.*, the unlicensed rental listings. *Id.* at 682-83. In

---

[1] There are undoubtedly facts relating to the "full contours" of Facebook's co-development that are only privy to Facebook, and Dr. Forrest should be entitled to such discovery should the Court require additional pleading specificity. *See Elliot v. Donegan*, 469 F. Supp. 3d 40, 59 (E.D.N.Y. 2020).

13

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS<br>5:22-CV-03699-EJD (VKD)

rejecting those arguments, the Ninth Circuit held that "the only monitoring… necessary in order to comply… relates to incoming requests to complete a booking transaction" and that while removing the unlicensed listings may be "the best option 'from a business standpoint[,]'" the underlying duty "could have been satisfied without changes to content posted by the website's users." *Id.; see also Turo Inc. v City of Los Angeles*, 2020 WL 3422262, at *7-8 (C.D. Cal. June 19, 2020)[2] (denied rideshare platform's Section 230 argument, holding the claims did not treat it as a publisher when the only content it would be required to monitor was information "supplied by users directly to the platform… and 'relate[d] to incoming [booking] requests.'") (citing *HomeAway*, 918 F.3d at 682)).

Dr. Forrest's claims arise from Facebook's acts as the co-developer of the Scam Crypto Ads *before* they even reach the platform for any "monitoring." Facebook's business model obfuscates a clear line between its user platform and its ad business, but the ad business facilitated the development of the ads well *before* they head for publication. (*See, e.g.,* SAC ¶¶ 13, 86-93, 103-135.) These are all acts and services of a traditional ad agency rather than a publisher, and make it distinguishable from cases where websites were simply passive conduits allowing users to post user-created content without review or approval. *See, e.g., Force*, 934 F.3d at 69-70 (Facebook did not review, edit, or suggest edits to the Hamas related content posted by its users). Dr. Forrest's allegations are that Facebook co-developed and processed unlawful ads for illegal cryptocurrency schemes, and thus are more akin to *HomeAway* and *Turo*, where "sets of information are supplied by users directly to the platform [] and 'relate[] to incoming requests to complete a[n] [advertising] transaction.'" *Turo*, 2020 WL 3422262, at *7-8; *see also In re Apple Inc.*, 2022 WL 4009918, at *17. The Scam Crypto Ads "don't magically become lawful" when they get posted online (*Roommates*, 521 F.3d at 1164), and Section 230 immunity does not attach.

C.    **Dr. Forrest's State Law Claims Are Well-Pled**

Like the Lanham Act claim, Dr. Forrest's remaining claims are well-pled and should withstand a motion to dismiss. Facebook's arguments to the contrary lack merit.

---

[2] *Turo v. City of Los Angeles*, 847 Fed. App'x 442 (9th Cir. 2021) (reversing injunction but declining review of Section 230 ruling).

####     1.     Dr. Forrest Has Stated a Viable Misappropriation of Name and Likeness Claim

Dr. Forrest has more than sufficiently stated a claim for misappropriation of name and likeness, under California common law, which requires: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of the plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Maxwell v. Dolezal*, 231 Cal. App. 4th 93, 97 (2014). Facebook challenges only the first two elements of this claim, but these attacks fall flat. (*See* Mot. at 14-15.)

Facebook first improperly asserts that Dr. Forrest has not alleged it used his name and likeness, but the SAC's plain allegations show this is untrue. The SAC alleges, among other things, that Facebook used his name and likeness for its data collection purposes and as a co-developer of the ads. (*See, e.g.,* SAC ¶¶ 107-109, 110-143, 171.) Had Facebook's advertising business not employed its sophisticated Ad Content, Creative, and Delivery systems, it would not meet monetization goals that exist outside of the actual revenue it receives from the advertisements (*i.e.,* by harvesting and monetizing data). It also co-developed the Scam Crypto Ads and provided those ads for other third-party websites and mobile apps to publish on *their* sites, assisting to drive traffic to the fraudulent content. (*Id.* ¶¶ 94-135.) That is, Facebook is using Dr. Forrest's name and likeness as an advertiser, placing ads for *others* to publish. Facebook's reliance on *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 210 (2017) is misplaced. (*See* Mot. at 12.) There, "[t]he gravamen of [plaintiff's] complaint is that Facebook displayed unrelated ads. . . adjacent to the content that allegedly used [his] name and likeness." 14 Cal. App. 5th at 210. In contrast, Dr. Forrest is not averring that Facebook placed unrelated ads next to Dr. Forrest's name and likeness. Rather, that Facebook used his name and likeness by taking content that featured him and directing it to Facebook users that would find him engaging enough to stay on the Facebook platform to harvest and monetize more data, and by placing its ads on third-party sites. None of the other cases cited by Facebook change this analysis.[3]

---

[3] *See, e.g., Perfect 10, Inc. v. Google, Inc.*, 2010 WL 9479060, at *13 (C.D. Cal. July 30, 2010) (plaintiff argued that Google contributed to right of publicity violations through advertisements, but

Facebook's second argument that it has not misappropriated Dr. Forrest's "likeness to its advantage or benefit" cannot withstand the SAC's allegations. (*See* Mot. at 15.) Facebook's fact-reliant challenge asserts that the allegations that it generally profits by "keeping users engaged and selling advertisements" does not "sufficiently demonstrate" use to Facebook's advantage or benefit. (*Id.*) Of course, this is not a motion for summary judgment so Facebook's assertion is premature. And this case is unlike *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998), upon which Facebook relies. (Mot. at 15.) There, the Ninth Circuit held the benefit the advertiser received – payment for the advertising space – was "unrelated to the content[] of the advertis[ing]." Dr. Forrest's allegations, which must be accepted as true, that Facebook commercially benefits from the use of his name and likeness are sufficiently pled. (*See, e.g.*, SAC ¶¶ 102, 106-109, 131, 171.)

Dr. Forrest's claim for misappropriation of his name and likeness, like his Lanham Act claim, should also fall within the purview of Section 230's intellectual property exception. There is a Circuit split on this issue, with another Circuit recently holding that Facebook was *not* entitled to Section 230 immunity on a state law-based right of publicity claim. *Compare Hepp v. Facebook, Inc.*, 14 F.4th 204 (3d Cir. 2021) *with Perfect 10, Inc. v. CCBill LLC,* 448 F.3d 1102 (9th Cir. 2007).

### 2. Dr. Forrest Has Stated an Actionable UCL Claim

Facebook is wrong that none of the conduct alleged is unlawful or unfair, or that it is "permitted" by the Legislature or public policy. (*See* Mot. at 17-18.) Section 17200 of California's Business & Professions Code is "broad" and "sweeping" and intended "to permit tribunals to enjoin on-going wrongful business conduct in whatever context [it] might occur." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180-81 (1999). Section 17200 is written in the disjunctive and prohibits acts that are unlawful, unfair, *or* fraudulent. *People ex rel v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002). The SAC alleges the first two types, despite Facebook's contrary claims and mischaracterization of the alleged predicate acts. (*See* Mot. at 17-18.)

---

"'[c]ontributing' to someone's violation… is not the same as [] 'violating' it."); *Perfect 10, Inc. v. Visa Int'l. Serv. Ass'n*, 494 F.3d 788, 809 (9th Cir. 2007) (analyzed aiding and abetting a violation of the right of publicity (Dr. Forrest does not have such a claim)).

Facebook asserts Dr. Forrest has not sufficiently alleged that its conduct is "unlawful." (Mot. at 17.) Not true, since virtually any "civil or criminal, federal, state or municipal, statutory, regulatory, or court-made," or "local law" can serve as a predicate for a section 17200 claim. *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App. 4th 1388, 1425 n.15 (2002). Dr. Forrest has alleged as "unlawful" predicate acts that Facebook has violated his common law right of publicity by unlawfully misappropriating his name and likeness (Claim 1). (SAC ¶¶ 169-176.) Dr. Forrest's false endorsement claim brought under the federal Lanham Act (Claim 5) also supplies the violation of law supporting his UCL claim. (*Id.* ¶¶ 209-217.) And, because Dr. Forrest's unlawful prong claim borrows from a federal intellectual property law beyond Section 230's draconian reach, Dr. Forrest's state law UCL claim is "consistent" with Section 230 and therefore states a claim. *See* 47 U.S.C § 230(e)(3).

Facebook is also mistaken when it contends that Dr. Forrest has not satisfied the "unfair" prong. (*See* Mot. at 17-18.) When a UCL claim is brought by a consumer or non-competitor as here, courts deem conduct to be unfair where "'the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (citations omitted). Facebook's alleged conduct satisfies one or more of these unfair criteria because Dr. Forrest alleges that "Facebook operates its advertising business in a manner that substantially and materially contributes to the development, review, and approval of the Scam Crypto Ads" to the public's detriment. (SAC ¶ 13.) Additionally, Facebook inaccurately asserts that the unfair conduct is not tethered "to any legislatively declared policy prohibiting such conduct." (*See* Mot. at 18.) To the contrary, the Lanham Act expressly prohibits false endorsement and related acts of scam and false advertising as those alleged here, and the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to . . . Section 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1991); *Summit Tech., Inc. v. High-Line Med. Instruments, Co.*, 933 F. Supp. 918, 943 (C.D. Cal 1996).

Finally, the determination as to whether conduct is "unfair" and/or "unlawful" are paradigmatic questions of fact. *See, e.g., Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134-35 (2007); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1472-73 (2008). Dr. Forrest's UCL claim for injunctive relief is properly stated.

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)

### 3.    Dr. Forrest Has Stated a Viable Aiding and Abetting the Fraud Claim

Dr. Forrest's aiding and abetting fraud claim is well-pled. A defendant is liable for aiding and abetting an intentional tort "if the defendant knows the other's conduct constitutes a breach of duty and gives substantial assistance" thereto. *Nasrawi v. Buck Consultants, LLC*, 231 Cal. App. 4th 328, 343 (2014); *see also Casey v. U.S. Bank Nat'l. Ass'n.*, 127 Cal. App. 4th 1138, 1145-46 (2005). These elements are met here.

Dr. Forrest alleges that Facebook had knowledge of the underlying fraud and the Scam Crypto Ads since March 2019, and those ads have continued to at least February 2022. (*See* SAC ¶¶ 71-75, 78.) Facebook does not dispute its actual knowledge of the Scam Crypto Ads, and instead, argues that Dr. Forrest has not alleged that Facebook acted with the requisite intent nor that it provided "substantial assistance" to the fraudulent scheme. (Mot. at 16.) These arguments ring hollow.

First, Facebook's claim that Dr. Forrest has failed to state a claim because he does not allege it "'proceeded tortiously *i.e.,* with intent to commit a tort or with negligence'" is inaccurate and inapposite. (*See* Mot. at 16 (citing *Coffman v. Kennedy*, 74 Cal. App. 3d 28, 32 (1977)).) Dr. Forrest has alleged that Facebook "proceeded tortiously" by encouraging its product managers to sell fraudulent ads to known fraudsters to meet sales quotas, modifying content and delivery to ensure that the scam ads are successful, and sharing in the ill-gotten profits from the Scam Crypto Ads. (*See, e.g.,* SAC ¶¶ 131-132, 144-148, 183-186.) Thus, Facebook's reliance on *Chen v. Paypal, Inc.*, 61 Cal. App. 5th 559, 584 (2021), where the allegations "[a]t best… amount[ed] to a claim that unscrupulous buyers" took advantage of Paypal's business practices is inapposite, since Dr. Forrest's allegations extend beyond Facebook's simple knowledge of the illicit acts and passive compliance. (*See* Mot. at 16.) And in any case, its knowing provision of services in "aiding and abetting liability under California law… requires a finding of actual knowledge, not specific intent." *In re First All. Mortg. Co.,* 471 F.3d 977, 993 (9th Cir. 2006). Intent is found through knowledge and substantial assistance in furtherance of the tort. *See Lomita Land and Water Co. v. Robinson*, 154 Cal. 36, 47 (1908). Dr. Forrest has clearly alleged that Facebook acted with actual knowledge and intent.

Second, Dr. Forrest alleges that Facebook provided "substantial assistance and/or encouragement [to] the underlying fraud," asserting that during the testing and framing of the ads,

Facebook substantially assists by refining a user audience that is most likely to be engaged by the content; intentionally changes the experience of users; and delivers messages to the victims that they would like or be interested in this fraudulent content, based *inter alia*, on specific vulnerabilities it was able to exploit using data it collected. (SAC ¶¶ 181-183.) Further, Facebook intentionally provided substantial assistance and encouragement to the Syndicate by contracting to and materially contributing to the Scam Crypto Ads, co-developing, and approving the ads submitted to Facebook's user platform for dissemination. (*Id.* ¶ 184.) For example, in its co-development process, Facebook's advertising business assisted the users in selecting various options on how to display ad content and modified ads before approval and publishing. (*See, e.g., id.* ¶¶ 88-93.) The Syndicate utilized Facebook's assistance in creating the Scam Crypto Ads, and it is Facebook's optimization that ensures the ads succeeded. (*Id.* ¶¶ 103-135.) These allegations also demonstrate Facebook's intentional and tortious conduct, and its substantial assistance. *See Turo*, 2020 WL 3422262, at \*12 (despite repeated demands that platform stop facilitating unlawful transactions, it continued and thus the "facts establish both the intent and the substantial assistance elements of the abettor claim").

*Barrett v. Apple, Inc.*, 523 F. Supp. 3d 1132 (N.D. Cal. 2021), a case Facebook relies on, does not alter this analysis. (*See* Mot. at 17.) There, this Court held that the allegations amounted to a failure to revoke granted authorizations (*i.e.,* a failure to act) such that the plaintiff did not allege the defendant acted with the requisite knowledge and intent for substantial assistance. *Barrett*, 523 F. Supp. 3d at 1148. In contrast, Dr. Forrest alleges Facebook co-develops the Scam Crypto Ads and encourages fraud to meet sales quotas, which amount to knowing, intentional acts, extending far beyond a mere failure to act. The other cases Facebook relies on also miss the mark. (*See* Mot. at 17 (citing *Diaz v. Intuit, Inc.*, 2018 WL 2215790, \*8 (N.D. Cal. May 15, 2018) (allegations that defendant failed to act insufficient to support substantial assistance); and *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86 (2007) (conclusions without facts to support substantial encouragement not enough).)

### 4.    Dr. Forrest Has Properly Stated a Negligent Failure to Warn Claim

Dr. Forrest's negligent failure to warn claim meets all of the required pleading requirements: (1) a legal duty to use due care; (2) a breach of that duty; (3) a reasonably close causal connection between that breach and the plaintiff's resulting injury; and (4) actual loss of damage to the plaintiff.

*Ahern v. Dillenback*, 1 Cal. App. 4th 36, 42 (1991). Facebook challenges only the elements of duty and causation, but both arguments are bankrupt. (Mot. at 18-19.)

With respect to duty, Facebook contends that no special relationship exists between websites and their users, and thus "Facebook has no duty to protect users [including Dr. Forrest] from third-party content on its platform." (*Id.*) But Facebook fails to account for the fact that its own misfeasance created the risk, and/or made Dr. Forrest's position worse through its co-development of the Scam Crypto Ads. When analyzing a duty of care that involves third-party acts, California courts distinguish between "misfeasance" and "nonfeasance." *See, e.g., Seo v. All-Makes Overhead Doors*, 97 Cal. App. 4th 1193, 1202 (2002). While "[l]iability for nonfeasance is limited to situations in which there is a special relationship that creates a duty to act," "[l]iability for misfeasance is based on the general duty of ordinary care to prevent others from being injured by one's conduct." *Id.* "'[M]isfeasance exists when the defendant is responsible for making the plaintiff's position worse, *i.e.*, defendant has created a risk," and unlike nonfeasance, creates an ordinary duty of care where none may have existed before. *Lugtu v. Cal. Highway Patrol*, 26 Cal.4th 703, 716 (2001).

Dr. Forrest has copiously alleged Facebook's "misfeasance," alleging among other things, that Facebook encouraged its product managers to sell fraudulent ads to known fraudsters to meet sales quotas, contracted with and assisted the Syndicate with creating the Scam Crypto Ads, inclusive of all of its co-development activities of content modification and optimization, to ensure that the fraudulent ads succeeded. (*See, e.g.,* SAC ¶¶ 88-93, 103-135.) This alleged misfeasance is more than sufficient to impose a duty owed to Dr. Forrest irrespective of any "special relationship."

Facebook relies on *Dryoff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1100 (9th Cir. 2019), in an attempt to dodge the impact of its misfeasance, arguing that a website's "content-neutral" algorithms cannot constitute misfeasance. (*See* Mot. at 19.) But as explained above, Dr. Forrest's allegations reach far beyond "machine learning algorithms" and its acts go beyond the provision of neutral tools because it actively encourages the creation of fraudulent content and co-develops such content. Dr. Forrest has more than adequately satisfied the duty element.

Facebook also challenges causation, contending that Dr. Forrest was aware of the scam ads and thus any failure to warn "could not possibly have caused the alleged harm." (Mot. at 19.) This

smoke screen argument misses the point. Dr. Forrest alleges that "Facebook has been keenly aware of [his] celebrity status… and actually went to [him] before 2019, asking him to create a Facebook presence to help assist [its] reviewers in combatting against the proliferation of fraudulent *profiles* on social media platforms." (SAC ¶ 47.) Given Facebook's concern about the fraudulent Dr. Forrest "profiles" before March 2019, it was reasonably foreseeable to Facebook that fraudulent content would also begin (if it had not already) to flood its advertising arm. Thus, while Dr. Forrest became aware of the Scam Crypto Ads in or around the end of March 2019, Facebook possessed the tools and the knowledge to identify and warn him about any Scam Crypto Ads that it was co-developing on its ad platform prior to March 2019. Yet, Facebook negligently failed to take such action.

### 5.     Dr. Forrest Has Stated a Viable Unjust Enrichment Claim

Facebook's attempt to dismiss Dr. Forrest's unjust enrichment claim misapprehends the allegations in the SAC. (*See* Mot. at 21-22.) "The spirit behind the law of unjust enrichment is to apply the law 'outside of the box' and fill in the cracks where common civil law and statutes fail to achieve 'justice.'" *LeBrun v. CBS Television Studios, Inc.*, 68 Cal. App. 5th 199, 211-12 (2021). "The doctrine applies where plaintiffs, having no enforceable contract, nevertheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances which make it inequitable for the defendant to retain the benefit without paying for its value." *Id*. at 209. This equitable doctrine extends to the facts here because Dr. Forrest has unwittingly been the victim of the unlawful use of his valuable name and image due to "a mistake [or a fraud]" such that he "*is entitled to restitution from a third person [Facebook] who had notice of the circumstances before giving value*[.]" *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1663 (1992) (emphasis in original).

Facebook's reliance on *Roadrunner Intermodal Services, Inc. v. T.G.S. Transportation, Inc.*, 2021 WL 2188138, at *14 (E.D. Cal. 2021) is misplaced. (*See* Mot. at 21.) In *Roadrunner*, the plaintiff's theory that it lost or should receive as restitution, profits reaped by the defendant lacked "proximate cause." *Id*. at *13. Here, conversely, the causal connection between Facebook's wrongful conduct and Dr. Forrest's loss is clear and foreseeable. Facebook promised to protect Dr. Forrest's respected public reputation and did the opposite while reaping advertising revenue. As alleged,

Facebook became a *knowing* third-party absconder of Dr. Forrest's value, receiving consideration from the Syndicate for its participation. (*See* SAC ¶¶ 76-93, 221-223.)

Lastly, Facebook's argument that this claim should be dismissed because it seeks to protect or receive duplicative rights or remedies misrepresents the law and is not grounds for dismissal. *See Astiana v. Hain Celestial Group Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015). Dr. Forrest seeks restitution in the manner an unjust enrichment claim provides. *See LeBrun*, 68 Cal. App. 5th at 210.

**D.      The Court Should Reject Facebook's Improper Jurisdictional Arbitrage Efforts**

Setting aside the fact that Section 230 does not immunize Facebook against Dr. Forrest's well-pled claims, this Court should also rebuff Facebook's improper jurisdictional arbitrage by which it seeks to essentially export Section 230 immunity to the harm it causes in Australia. Dr. Forrest's case is based on Facebook's wrongful conduct in Australia, and this Court should conduct a choice of law analysis. Facebook makes three unconvincing choice of law arguments to invoke Section 230 immunity, none which survive fair scrutiny.

1.      Section 230 Should Not Be Applied Extraterritorially

Facebook's argument that this Court need not conduct a choice of law analysis because "in enacting Section 230, Congress decisively answered the choice of law question," fails. (*See* Mot. at 6.) Facebook relies primarily on *Gonzalez*, where the Ninth Circuit addressed plaintiffs' argument that "the presumption against the extraterritorial application of federal statutes prevents [Section] 230 from applying to their claims." 2 F. 4th at 887. In rejecting that argument, the Ninth Circuit employed the "two-step framework for deciding questions of extraterritoriality" set out in the Supreme Court case *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016) and determined that the "focus" of Section 230 was to limit liability where it was imposed, in American Courts. (Mot. at 6.) Facebook repeatedly quotes from *Gonzalez* (accurately); however, the Ninth Circuit's holding that "domestic application" of Section 230 exists every time a party sues in the U.S. eviscerates the presumption against extraterritoriality entirely. Unlike in *Nabisco*, where the Supreme Court held it must look to see whether the conduct relevant to the statute's focus occurred in the U.S. (and thus each case would be context specific) (579 U.S. at 337), the *Gonzalez* holding does not consider any case context, ensuring that Section 230 would always apply, even if all conduct occurred abroad, as it does here. 2

22

F.4th at 888. To that end, Facebook does not address the exception noted by the Supreme Court in *Nabisco* (and recognized by *Gonzalez*) that a determination of the statute's focus may not be required when "all the relevant conduct" "took place outside the United States." *Nabisco*, 579 U.S. at 337 (citations omitted); *Gonzalez*, 2 F.4th at 887-888.

Facebook does not, and cannot, argue that Section 230 on its face is expressly intended to apply extraterritorially, and unlike the *Gonzalez* plaintiffs, all aspects of Dr. Forrest's claims occurred outside the United States. (*See* Section IV.D.3.) And in any case, whether Section 230 *can* apply to the conduct alleged, does not mean that it *should*, and Facebook's argument that *Gonzalez* disposes of the need to conduct a conflicts of law analysis involving the alleged application of Section 230 is unsupported and inconsistent with the Supreme Court's mandate.

2.    Facebook's Choice of Law Provision Does Not Support Applying Section 230

Facebook's argument in a footnote that the contractual choice of law provision in its Terms of Service ("TOS") requires invocation of Section 230 is erroneous and should not be entertained. (*See* Mot. at 7, n.3.) As the state court judge noted in rejecting Facebook's TOS argument on demurrer, Dr. Forrest's claims do not arise in contract and do not rely on the TOS to be properly stated. (*See* Dkt. No. 1-2.) This has not changed.

Facebook's basis for its assertion that its TOS apply is that Dr. Forrest maintains a verified Facebook account. (Mot. at 7, n. 3.) But Facebook ignores the fact that the only reason Dr. Forrest created that account was at Facebook's behest to assist it with its purported efforts to prevent fraud. (SAC ¶ 5, n.3.) Thus, assuming *arguendo* that the TOS apply, the choice of law provision should be unenforceable since it would produce a substantially unjust result against Dr. Forrest. *See Wash. Mut. Bank FA v. Super. Ct.*, 24 Cal. 4th 906, 918 (2001) ("[T]he forum will scrutinize such contracts with care and will refuse to apply any choice-of-law provision they may contain if to do so would result in substantial injustice to the adherent."). Dr. Forrest did not purposefully avail himself of Section 230 in creating a Facebook account at its request.

It is reasonable, in considering whether it is just to apply Section 230, to consider how Dr. Forrest would fare in presenting his claims under the law that would otherwise apply. And Australia has no Section 230 analogue, and in fact, Schedule 5, clause 91(1) of the Australian Broadcasting

23

Services Act provides that no immunity shall apply to internet "publishers" who knowingly host or transmit actionable content. (*See* SAC ¶¶ 27-30, 162.) An unjust outcome would be amplified here given the manner in which Facebook evades any reckoning in Australian courts. Australian plaintiffs, like Dr. Forrest, have no reasonable opportunity to try and plead their civil cases in Australia because, remarkably, Facebook will not appear to defend itself on the merits. (*Id.* ¶¶ 151-162.) Despite admitting "Facebook, Inc. is the entity with which Australian users have a contractual relationship," (*id.* ¶ 150) Facebook claims to have no service agent or presence in Australia. Even if service is ever accomplished, Facebook specially appears to only argue it is not subject to Australian jurisdiction or subject to its laws, and this has happened in at least two ongoing cases. (*See id.* ¶¶ 151-167.) As a result, Australian citizens are deprived of civil remedies in their own courts.[4] This Court should not countenance Facebook's attempt to use its TOS to apply Section 230 immunity.

> 3.    Australian Law Should Apply Rather Than Section 230

Facebook's argument that Section 230 would govern, even under a "traditional choice of law analysis," also fails. (*See* Mot. at 7.) Dr. Forrest's state claims are subject to conflicts of law analysis under California's governmental interests test. *See Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996); *see also Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) ("federal court… adjudicating state law claims… must apply the choice of law rules of [] forum state."). This test "sets out a three-step inquiry: 'First, the court determines [] the relevant law of each [] potentially affected jurisdictions… Second, if there is a difference, the court examines each jurisdiction's interest in [applying] its own law under the circumstances of the [] case… Third, if the court finds [] there is a true conflict, it [] evaluates and compares the nature and strength of the interest[s]…'to determine which state's interest would be more impaired if its policy were subordinated… and then ultimately applies 'the law of the state whose interest would be the more impaired.'" *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. 5th 862, 867-68 (2019) (quotations omitted).

---

[4] Should this Court desire additional information on the lack of a Section 230 analogue under Australian law (or anything else about Australian law), Dr. Forrest can submit a detailed declaration from an Australian attorney explaining, among other things, the landscape of internet website liability.

The first and second elements must be answered in the affirmative. Australia has no filtering or monitoring immunity for internet service providers and imposes liability on the very "publishing" activities that Section 230 immunizes. (SAC ¶¶ 27-30, 162.) And a true material conflict exists. *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 163 (1978) (true conflict where "each of the states involved has a legitimate but conflicting interest in applying its own law."). As to the third element of balancing competing interests, both Australia and California have an interest in applying their own law but Australia's interest is far greater. The Scam Crypto Ads and the harm they inflicted occurred in Australia. The ads, co-developed by Facebook's advertising business, targeted Australian citizens. (*See* SAC ¶¶ 83-143.) Dr. Forrest is aware of many Australians who saw the ads and lost millions of dollars. (*Id.* ¶¶ 55-68.) Facebook deliberately and improperly puts itself beyond the reach of Australian Courts and ordinary Australians. Australian law, not Section 230, should control.

**V.    LEAVE TO AMEND SHOULD BE PERMITTED**

If this Court for some reason finds that the SAC is somehow deficient (not that it should, of course), Dr. Forrest respectfully requests leave to file an amended complaint to cure any deficiency. The policy favoring amendment of complaints is to be applied with "extreme liberality" and dismissals with prejudice should occur in only "extraordinary" cases. *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). "[D]ismissal without leave to amend is improper unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

Facebook misleadingly suggests that Dr. Forrest "has already amended his complaint twice." (*See* Mot. at 1, 22-23.) This is deceptive because the first amendment was *only* to voluntarily withdraw his California Civil Code section 3344 claim, and was done well before Facebook filed a demurrer. The SAC before this Court results from the state court granting leave to amend that first amended complaint. Further, Dr. Forrest through continuing investigation has learned new facts about Facebook that support his claims and can supplement his allegations if necessary.

**VI.    CONCLUSION**

For the foregoing reasons, Dr. Forrest respectfully requests that the Court deny Facebook's motion to dismiss in its entirety.

DATED:  September 7, 2022

WAYMAKER LLP

By: _____

Brian E. Klein
Donald R. Pepperman
Jose R. Nuño

*Attorneys for Plaintiff*
*Dr. Andrew Forrest*

DR. ANDREW FORREST'S OPPOSITION TO FACEBOOK'S MOTION TO DISMISS
5:22-CV-03699-EJD (VKD)