1  ELIZABETH RYAN
2  eryan@baileyglasser.com
   176 Federal Street, 5th Floor
3  Boston MA 02110
   T: 617.439.6730
4  F: 617.951.3954
5
   LESLIE BRUECKNER (SBN 140968)
6  lbrueckner@baileyglasser.com
7  BAILEY & GLASSER LLP
   1999 Harrison Street, Suite 660
8  Oakland, CA 94612
   T: 510.272.8000
9  F: 510.463.0291
10
11 [Additional Counsel on End page]

12 *Attorneys for Plaintiff, Dr. Andrew Forrest*

13          **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
14

15              **SAN JOSE DIVISION**

16
17 DR. ANDREW FORREST,                  | Case No. 5:22-cv-03699-PCP
18          Plaintiff,                  | Judge: Hon. P. Casey Pitts
19 v.                                   | **Third Amended Complaint for:**
20 FACEBOOK, INC., a Delaware           |   (1) Misappropriation of Name and
   Corporation, and DOES 1 through 20,  |       Likeness;
21 inclusive,                           |
22                                      |   (2) Promissory Estoppel;
           Defendants.                  |
23                                      |   (3) Negligence;
24                                      |   (4) Negligent Failure to Warn;
25                                      |   (5) Unjust Enrichment; and
26                                      |   (6) Declaratory Relief.
27                                      |
                                        | **DEMAND FOR JURY TRIAL**
28

[PROPOSED] THIRD AMENDED COMPLAINT

<u>**TABLE OF CONTENTS**</u>

Page

I. INTRODUCTION ...................................................................................... 1

II. THE PARTIES ......................................................................................... 6

III. JURISDICTION AND VENUE .................................................................. 7

IV. GENERAL ALLEGATIONS REGARDING DR. FORREST AND THE SCAM ADS. ......................................................................................................... 8

    A.   Dr. Andrew Forrest – Australian Businessman and Philanthropic Icon. ... 8

    B.   Meta Has Permitted the Misuse of Dr. Forrest's Name and Image on its Social Media Platforms Since at Least 2014, Even Before the First Scam Ads. .................................................................................................. 11

    C.   In 2019, Meta Ads Began Producing Paid Scam Ads Featuring Dr. Forrest's Alleged Endorsement...................................................................... 13

    D.   Scam Ads Featuring Dr. Forrest Have Bilked Innocent Australians out of Millions ......................................................................................................... 15

    E.   Meta Has Known Since 2019 that the Scam Ads Misappropriate Dr. Forrest's Image and Defraud Australians. .................................................... 16

        1.   Dr. Forrest Notified Meta Through Multiple Channels that It Was Running Scam Ads........................................................................ 16

        2.   Notice of the More Recent Scam Ads Has Been Given Through Preservation and Cease and Desist Letters, Yet Andrew Forrest's Likeness Is Still Being Misappropriated........................... 19

V. META'S ADVERTISING BUSINESS IS DISTINCT FROM ITS SOCIAL MEDIA PLATFORMS ............................................................................. 20

VI. META ADS PRODUCES ADVERTISEMENTS USING ITS COMPREHENSIVE ADS MANAGER APPLICATION.......................... 25

VII. DURING ITS PRODUCTION PROCESS, META ADS CONTROLS HOW ADS WILL LOOK AND WHO WILL RECEIVE THEM, BEFORE ADS ARE ALLOWED TO COMPETE FOR SPACE ON META'S SOCIAL MEDIA PLATFORMS. ........................................................................................... 28

VIII. META HAS NOT EXERCISED AND DOES NOT EXERCISE REASONABLE CARE IN THE DESIGN AND OPERATION OF ITS AD BUSINESS. ................. 33

    A.   Meta Ads Has the Technical Ability to Detect and Screen Out Scam Ads Featuring Dr. Forrest, But Chooses Not To. ......................................... 33

    B.   Meta Ads Has the Ability to Use Non-Content-Based Checks to Weed

Out Fake Accounts, Compromised Accounts, and Financial Scammers Whose Ads Violate Australian Law, But Chooses Not To ......................... 35

    1.    Meta Ads Allows Advertisers to Buy Ads Without Verifying the Advertiser's Identity. ...................................................... 35

    2.    Meta Allows Advertisers to Buy Financial Product Ads Without Verifying Their Authority to Sell Financial Products. ..... 39

    3.    In Violation of its Own Policies, Meta Produces Cryptocurrency Ads for Unapproved Sellers. .............................................. 42

C.    Meta Only Reviews Component Parts and Not the Ad as a Whole, Allowing Some Scam Ads to Go Undetected as a Result. ......................... 42

D.    For Certain Scam Ads, Meta's Decision to Conduct Ad Review Off-Shore Allowed Advertisers to Circumvent Meta's Review Process Via Cloaking Software ........................................................................... 43

IX.    META ENGAGES IN UNFAIR JURISDICTIONAL ARBITRAGE THAT PREJUDICES DR. FORREST. ......................................................................... 44

X.    EXTRATERRITORIAL LOCUS OF RELEVANT CONDUCT ............................... 49

PRAYER FOR RELIEF ............................................................................................................. 59

DEMAND FOR JURY TRIAL ................................................................................................. 60

Plaintiff Dr. Andrew Forrest ("Dr. Forrest"), through counsel, brings this Third Amended Complaint ("TAC") against Defendant Meta Platforms, Inc., formerly Facebook, Inc. ("Meta")[1] and DOES 1-20 (collectively, "Defendants"), to secure damages, injunctive relief, and other appropriate equitable relief.

## I.   INTRODUCTION

1.      Plaintiff Dr. Andrew Forrest is an Australian businessman, philanthropist, and public figure who has been plagued for years by paid ads and sponsored content produced by Meta Ads and run on Meta's Australian social media platforms, in which he falsely appears to be promoting fake cryptocurrency and other fraudulent financial schemes ("Scam Ads").[2]

2.      The Scam Ads started running in 2019 and have not stopped to this day, despite this lawsuit having been pending for over two years. In fact, their number appears to be growing. An example Scam Ad is pictured below: [3]

---

[1] Facebook, Inc., changed its name to Meta Platforms, Inc., on or about October 2021. This Third Amended Complaint uses the terms "Meta" and "Meta Inc." to refer to Meta Platforms, Inc. and uses the term "Meta Ads" to refer to Meta's advertising business. Except where otherwise indicated, the term "Facebook" refers to the social media platform known as Facebook, which is one of Meta's social media platforms.

[2] Scam Ads as used in this TAC include: advertisements produced by Meta in any form, including displays labeled "sponsored" and any landing pages linked to such advertisements, that run on Meta's social media platforms and third party platforms or websites, and that feature Dr. Forrest and involve financial or cryptocurrency scams.

[3] This Scam Ad has been preserved in the Meta Ad Library at the following link: https://www.facebook.com/ads/library/?id=704000364789556. (last visited 12/1/23).

The fraudulent landing page linked by this Scam Ad is still live, and viewers should take care not to click the "AussieNSK.com" link when viewing the Ad. Additional Scam Ads are shown in Attachments A, B hereto.

---



3.    During the period from April to November 2023 alone, over *one thousand* Scam Ads featuring Dr. Forrest's image have appeared on Facebook in Australia.

4.    Meta's advertising business ("Meta Ads") produces these ads using basic material supplied by criminal scammers to its automated Ads Manager application. Meta knows the scammers' products are frauds and knows Dr. Forrest did not endorse them. Yet, despite repeated requests from Dr. Forrest, Meta will not stop producing them.

5.    Dr. Forrest's name and likeness are instantly and widely recognizable across Australia both in the business sector and beyond. Known in Australia as

"Twiggy," he has a unique and compelling personal brand that is highly sought-after and of great commercial value. Dr. Forrest relies on his status and credibility to advance important social causes, like climate change and human rights. The Scam Ads are damaging that brand every day they appear.

6.     The Scam Ads have not just injured Dr. Forrest's reputation. They have also ruined the lives of countless Australians who invested their life savings in fraudulent financial products and schemes based on their belief that, if Dr. Forrest endorsed them, they must be sound.

7.     The Scam Ads were produced by Meta Ads, a part of Meta that is entirely distinct from Meta's social media platforms (Facebook, Instagram, Messenger, and WhatsApp). Meta Ads actively controls each and every aspect of the advertising business for its paying ad customers, and it does so with little regard for the damage caused by its negligent business practices.

8.     Meta knows full well that its advertising business routinely produces fraudulent ads such as those featuring Dr. Forrest or other public figures.

9.     In 2019, Meta (then Facebook) promised Dr. Forrest in writing that it would deploy its resources "specifically" to prevent Scam Ads misusing his name and image. Yet, four years later, Meta contends that, despite its vast resources and unparalleled access to the world's top computer engineering talent, it remains somehow powerless to stop producing Scam Ads.

10.    This is not true. In reality, the Scam Ads are the direct and foreseeable result of Meta's failure to use reasonable care in the way it designed, maintains, and

THIRD AMENDED COMPLAINT                                              3

conducts its advertising business. Among other things:

a.    Meta fails to deploy available technology that would allow it to identify and reject ads that use Dr. Forrest's image before they are completed and paid for, and then allowed to compete for advertising space on its social media platforms.

b.    Meta fails to use non-content-based checks in its advertising business to weed out unlicensed financial scammers who operate in violation of Australian law.

c.    Meta fails to give ads featuring cryptocurrency and other financial investment schemes heightened scrutiny during the Meta Ads' production process (or review them at all), despite knowing that such ads are rife with fraud, in violation of its own policies.

d.    Meta reviews only the constituent parts of an ad, which renders its review process unable to stop certain Scam Ads before they are posted to social media platforms.

e.    Meta decided to locate its ad review centers off-shore, which enables the extensive use of geolocation "cloaking software" by fraudsters that renders Meta's off-shore screeners unable to detect certain Scam Ads.

11.    Meta could conduct its Meta Ads' advertising business in a way that prevents commercial speech in the form of the Scam Ads.

12.    But Meta chooses not to conduct its advertising business responsibly, for two reasons.

13.    First, to maximize revenue, Meta prioritizes the generation of advertising revenue by designing and operating its advertising business in a manner that virtually assures that anyone, hawking anything, can successfully become a paying Meta Ads customer. Meta claims to review ads through its automated processes but, as set forth below, that review, if it occurs at all, is woefully deficient. Because any effective review program would slow its production of ads, Meta simply does not do it.

14.     Second, Meta believes that Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230"), immunizes its activities in Australia, regardless of whether the underlying conduct has any direct connection to the United States, or involves the provision of internet services.

15.     Indeed, Meta's corporate structure, the terms of service it imposes on users and advertisers in Australia, its intra-group agreements, and its recalcitrance in submitting to jurisdiction in Australia are all a result of deliberate corporate choices designed to export Section 230 immunity to cover Meta's advertising and other activities abroad, so that Meta can continue to run its advertising business exactly as it wants, without regard to any harm it causes anywhere in the world.

16.     In addition to negligence, Dr. Forrest brings claims based on (1) Meta's knowing participation in the misappropriation of Dr. Forrest's image; (2) promissory estoppel; (3) Meta's failure to warn its Australian users that the Scam Ads featuring Dr. Forrest are fake and should not be trusted; (4) unjust enrichment; and (5) declaratory relief.

17.     As stated above, Scam Ads featuring Dr. Forrest have persisted for almost five years as of the date of filing this TAC. Above all else, Dr. Forrest wants these Scam Ads to *stop*, not only to protect his own image and reputation, but to prevent innocent Australians from continuing to be victimized by Scam Ads. Meta has made it clear that, unless it is told to stop by a court, it will continue to produce Scam Ads designed to defraud vulnerable Australians.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.      THE PARTIES

18.      Dr. Forrest is an individual and at all relevant times, a resident of Australia.

19.      Meta Platforms, Inc. (formerly Facebook, Inc.) (hereinafter "Meta" or "Meta Inc."), is a Delaware corporation with its principal offices located at 1601 Willow Road, Menlo Park, California 94025.

20.      At all relevant times, Meta, including through its subsidiaries and executives, collectively directed, controlled, had the authority to control, or participated in all aspects of the strategy, operation, planning, management, policies, design, and development of its advertising business, including in the acts and practices set forth in this TAC.

21.      Meta's relevant executives involved in the company's decision-making and development and approval of Meta Ads' business strategy, operation, planning, management, policies, design, and development include, but are not limited to Founder, Chairman, and CEO Mark Zuckerberg.

22.      On information and belief, at all times relevant, Meta was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of the scammers and, in performing or failing to perform the acts alleged in the TAC, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the scammers.

23.     Each defendant, in taking the actions alleged in the TAC, ratified and/or authorized the wrongful acts and is individually sued as a participant and aider and abettor in the improper acts, plans, schemes, and transactions that are the subject of the TAC.

24.     Each defendant was a direct, necessary, and substantial participant in the conduct complained of in the TAC, and each of the defendants aided and abetted and rendered substantial assistance in and material contribution to the wrongs complained of in the TAC.

## III.     JURISDICTION AND VENUE

25.     Meta removed this case to this Court from San Mateo Superior Court based on federal question jurisdiction under 28 U.S.C. § 1331 arising from Plaintiff's claim under the Lanham Act, 15 U.S.C. § 1125(a).[4]

26.     Diversity jurisdiction also exists under 23 U.S.C. § 1332 because Meta's corporate headquarters are in the United States, Dr. Forrest is a citizen of a foreign state (Australia), and the amount in controversy exceeds $75,000.

27.     This Court has personal jurisdiction over Meta because Meta's corporate headquarters and principal place of business are in this judicial district. This Court also has specific personal jurisdiction over Meta because it has sufficient minimum contacts with California, has purposely availed itself of California's benefits and protection, and does a substantial amount of business in California, such that this Court's exercise of

---

[4] Dr. Forrest has withdrawn the Lanham Act claim due to recent changes in the law.

jurisdiction over Meta is reasonable and wholly consistent with traditional notions of fair play and substantial justice.

28.    Venue is proper in this District under 18 U.S.C. § 2334(a).

## IV.    GENERAL ALLEGATIONS REGARDING DR. FORREST AND THE SCAM ADS.

### A.    Dr. Andrew Forrest – Australian Businessman and Philanthropic Icon.

29.    Dr. Forrest has never authorized or otherwise allowed his name or image to be associated with any cryptocurrency product or service, or any financial scheme or investment. Nor has he ever endorsed any such product, service, scheme, or investment.

30.    But it is no surprise that fraudsters would seek to fabricate the endorsement of Dr. Forrest. In the apt words of Gilbert Howard, an Australian who lost money to the Scam Ads: "I look at people on Facebook I respect. If Andrew Forrest endorses it, it must be ok. He must have done his due diligence." The reason for this respect is clear.

31.    Dr. Forrest, AO,[5] is a prominent Australian businessman and philanthropist. He is the founder and current Executive Chairman of Fortescue Metals Group, and founder and co-chair of the Minderoo Foundation, through which he now

---

[5] In the Australian honors system, appointments to the Order of Australia confer the highest recognition for outstanding achievement and service. An Officer of the Order of Australia, or "AO" is a national honor bestowed on Australian citizens and deserving non-citizens for distinguished service of a high degree to Australia or humanity at large. Dr. Forrest was appointed as an AO in 2017 for his distinguished service to the mining sector, the development of employment and business opportunities, his support of sustainable foreign investment, and for his philanthropic efforts.

devotes his time to making significant philanthropic contributions and pursuing humanitarian and environmental initiatives.

32.     Dr. Forrest is Australia's most active philanthropist, and one of the most effective Australian business leaders of his generation. He is a true Australian business icon.

33.     As Fortescue's founder and chairman, he has led the company from inception to its top 20 status in the Australian economy, during which time Fortescue invested more than $20 billion USD in the resources sector. Across Fortescue and Dr. Forrest's other commercial interests, Dr. Forrest provides direct employment to well over 10,000 individuals, and many more indirectly through his projects.

34.     In 2001, Dr. Forrest and his family members co-founded the Minderoo Foundation.

35.     Minderoo Foundation has supported over 280 initiatives across Australia and internationally covering a range of causes. Through Minderoo, Dr. Forrest has started and funded initiatives to combat critical humanitarian problems, like modern day slavery, and has supported disenfranchised groups by focusing on Indigenous rights, responsible use of technology, children's cancer research, and early childhood development, as well as environmental issues such as wildfires, floods, plastic pollution, and ocean health.

36.     In 2013, Dr. Forrest was appointed by the Prime Minister and Cabinet of Australia to chair the review of Indigenous training and employment programs, aimed at ending Indigenous disparity through employment.

THIRD AMENDED COMPLAINT                                                                      9

37.     Dr. Forrest is also a Councilor of the Global Citizen Commission, which, in April 2016, presented a series of human rights recommendations to the United Nations Secretary General to update the Universal Declaration of Human Rights.

38.     In May 2017, Dr. Forrest and his family announced one of Australia's largest private philanthropic donations of $400 million AUD to support medical research. They have continued giving since then. As of April 2020, their total philanthropic donations have exceeded $2 billion AUD. In June 2023, they announced a donation of an additional $5 billion AUD to the Minderoo Foundation, bringing Minderoo's endowment to approximately $7.6 billion AUD. As of that month, their total philanthropic donations exceeded $7 billion AUD.

39.     Dr. Forrest was Western Australia's 2017 Australian of the Year for his outstanding contribution to the community. In 2018, Dr. Forrest was inducted into the Australian Prospectors & Miners' Hall of Fame and was the inaugural winner of the EY Entrepreneur of the Year – Alumni Social Impact Award.

40.     Dr. Forrest is a lifetime Fellow of the Australian Institute of Mining and Metallurgy. He is a Global Patron of the Centre for Humanitarian Dialogue, recipient of the Australian Sports Medal and the Australian Centenary Medal, and Vice-Patron of the Special Air Service Resources Fund.

41.     The strength and value of Dr. Forrest's name, brand, and image are further evidenced by his recent business dealings, centered on building green technology businesses. Dr. Forrest's Fortescue Future Industries has signed agreements with traditional energy producers like Afghanistan for the development of hydro power

and other geothermal projects for green industry as well as Afghanistan's more

traditional mineral resources.

42.     With such a prolific charitable profile and business acumen, Dr. Forrest's

name and image are instantly recognizable throughout Australia, in the investing

community and beyond, and carry significant value, which is no doubt why thieves

want to misuse his identity and goodwill for nefarious purposes.

43.     Indeed, recent Scam Ads seek to capitalize on Dr. Forrest's brand,

describing him as having a "landmark name in the world of financial news" and stating

that his name is "associated with successful business projects" and his reputation is

"key to the reliability and success of this project." *See* Attachment A, hereto, at 6.

**B.     Meta Has Permitted the Misuse of Dr. Forrest's Name and Image on its Social Media Platforms Since at Least 2014, Even Before the First Scam Ads.**

44.     Scammers operating on Meta's (then Facebook's) Australian social media

platforms have been co-opting Dr. Forrest's name and image in order to swindle

innocent Australians since 2014. The form and sophistication of these criminal ruses

continues to evolve; the latest iterations of the Scam Ads require an amendment to the

pleadings to bring this matter current.

45.     Prior to 2014, Dr. Forrest did not have a social media presence and did not

have a Facebook page or profile.

46.     During 2014, it came to Dr. Forrest's attention that his image was being

used by a number of internet scammers who were setting up "imposter" pages

appearing to belong to Dr. Forrest. These imposter pages invited contact from

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Australians and sought to gain trust by invoking a lie that the page was connected to Dr. Forrest.

47.    At his own expense, Dr. Forrest commenced an investigation to determine who was behind these fake pages.

48.    That investigation revealed that it was scammers, believed to be based outside of the United States and Australia and using false identities, who were creating the pages. Dr. Forrest repeatedly brought this to the attention of Meta and Meta's legal department. Dr. Forrest was assured then that Meta would take steps to stop the imposter pages.

49.    Thus, as of at least 2014, Meta was aware that Dr. Forrest's name and image were being misused to dupe Australian users of Meta's social media platforms who admired or trusted Dr. Forrest. Dr. Forrest repeatedly took what steps he could to persuade Meta to have these imposter sites taken down, including directly contacting and communicating with Meta's legal department.

50.    It was during this process that Meta urged Dr. Forrest to set up a "verified" Facebook page, which Meta told Dr. Forrest would allow it to protect his name and image and to combat the scammers.

51.    Even though Dr. Forrest did not want to be on social media, in response to Meta's urging he agreed to the creation of a verified non-interactive, static page.

52.    After that verified page became active, Facebook took down some imposter pages. But others continued to appear, despite Meta's promises to the contrary.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.     In 2019, Meta Ads Began Producing Paid Scam Ads Featuring Dr. Forrest's Alleged Endorsement.**

53.     The "imposter" pages featuring Dr. Forrest were just the beginning of his problems with Meta.

54.     Starting in or about late March 2019, Dr. Forrest was surprised to learn— from several victims of the Scam Ads—that fake ads using his name and likeness to endorse cryptocurrency and other fraudulent investment products were running on the Facebook platform in Australia. These Scam Ads were produced by Meta Ads, not by social media user postings.

55.     The Scam Ads used quotes, interview footage, and other actual statements attributable to Dr. Forrest, but were edited and doctored to deceptively appear as though Dr. Forrest was sponsoring a particular investment "opportunity" or otherwise promoting a particular financial product.

56.     Some of the first Scam Ads featured so-called "interviews" with Dr. Forrest, accompanied by dozens of fake testimonials describing how investors had become millionaires in a matter of months with even small deposits, such as $250.

57.     More recent Scam Ads, including the approximately 1,154 Scam Ads that have appeared on Meta's Australian platform since April 2023, take the form of videos with doctored footage, also known as deepfakes. [6]

---

[6] https://www.facebook.com/ads/library/?id=228855026379900. (last accessed 11/6/23).

THIRD AMENDED COMPLAINT                                                    13

1
2
3
4
5
6
7
8
9
10
11
12
13



14      58.      A click-through of the recent Scam Ads leads to landing pages where

15  users can put in their contact information, which, upon information and belief,

16  generates targets for the criminal organization sponsoring the Scam Ads to direct more

17  fraudulent pitches to.

18      59.      In an attempt to protect his reputation, to dissociate himself from these

19  fraudulent activities, and protect Australians, Dr. Forrest has spent hundreds of

20  thousands of dollars investigating the criminals behind the Scam Ads, defending

21  himself and his business reputation, enhancing his cybersecurity team's capabilities,

22  and engaging external fraud detection services to monitor Meta's real time response to

23  these Scam Ads.

24      60.      In the early stages of this investigation, Dr. Forrest learned that the people

25  behind the Scam Ads were involved with entities from various foreign countries, using

26
27
28

sham entities, fake information, and false addresses, and employing foreign pay

services to deploy the Scam Ads.

61.     Currently, upon information and belief, the scammers involved in

engaging Meta's services to produce and distribute the current Scam Ads are located in

areas outside the United States, including Eastern Europe and Southeast Asia.

**D.     Scam Ads Featuring Dr. Forrest Have Bilked Innocent Australians out of Millions**

62.     The effect of the Scam Ads on Australian users has been far reaching.

63.     One Australian woman was victimized by the Scam Ads, losing

approximately $670,000. The woman said that on or about March 28, 2019, she accessed

her Facebook account and was presented with a Scam Ad that included alleged

interviews with Dr. Forrest and suggested an association with the Australian

Broadcasting Corporation.

64.     Similarly, on or about April 1, 2019, an Australian man logged onto his

Facebook account and was presented with an ad depicting Dr. Forrest sitting on a stage,

which gave the appearance that he was participating in a question-and-answer session

on cryptocurrency. The man clicked on the link and was ultimately swindled out of

$77,254.

65.     Yet another Australian victim reported that, in or about March 2019, she

saw a Facebook advertisement that pictured Dr. Forrest and included what appeared to

be his endorsement of a Bitcoin investment opportunity. She clicked on the content and

was scammed of thousands of dollars in the ensuing months.

66.     Another unsuspecting victim of this fraudulent scheme contacted Dr. Forrest's team after she unwittingly fell victim to the scam, stating that she was "caught up in the Bitcoin scam that Andrew Forrest was implicated in supporting. I subscribed when I saw that it was supported by him."

67.     On or about June 19, 2019, Australian JB contacted Dr. Forrest advising him of the fact she had been victimized on Facebook by a Dr. Forrest crypto scam, which she accessed through a Scam Ad.[7]

68.     In 2019, 72-year-old Western Australian FZ was victimized by the Scam Ads when he relied upon Facebook advertisements that featured Dr. Forrest's image. FZ lost $250,000, which he has not been able to recover.

**E.     Meta Has Known Since 2019 that the Scam Ads Misappropriate Dr. Forrest's Image and Defraud Australians.**

**1.     Dr. Forrest Notified Meta Through Multiple Channels that It Was Running Scam Ads**

69.     After Dr. Forrest learned of the proliferation of the Scam Ads in March 2019, he mobilized an effort to identify and capture evidence of these Scam Ads, and place Meta on notice of them so it could stop them—immediately and permanently.

70.     In May 2019, Dr. Forrest went further, arranging a telephone call with William Easton, the Managing Director and Vice President of Meta in Australia. In this call, Dr. Forrest described the Scam Ads to Easton and their misuse of his image as a supposed endorser. Dr. Forrest demanded that Meta dedicate its enormous and

---

[7] This TAC uses initials for privacy purposes in this section, unless otherwise noted. All names used are used with the consent of the Scam Ad victims.

sophisticated machine learning and human resources to prevent any further dissemination of the Scam Ads.

71.     On May 19, 2019, Dr. Forrest followed up with an email to Easton, repeating his demand that the Scam Ads cease, and stating that if they did not, he would take action. Dr. Forrest wrote, in pertinent part:

> It's well known William [Easton], that you have the most sophisticated machine learning and artificial intelligence tools for targeting advertising at users. What amazes me is your absolute lack of concern, and more worrying your obstinance in using machine learning to keep your platform free of obvious scams[.] All of these threaten users like me, the integrity of public discourse, and allow innocent mums, dads, and retirees, to be robbed of their savings. If this was you or Mr. Zuckerberg being framed, or your own parents, or his losing their hard earned retirement savings, I know you would react immediately and effectively. …
>
> I am less inclined to resignation than to action. It's my intention to ensure this allowance of fraud by you [Meta] ceases[.]

72.     On May 20, 2019, Easton responded by email, acknowledging Meta was aware of the problem, assuring Dr. Forrest he was doing the right thing by reporting the Scam Ads to him, and promising him that Meta would move quickly to take them down:

> I appreciate this is very frustrating for you—it's an extremely challenging, industry-wide problem which we are working to address. However I do want to be very clear – scam ads are not permitted on Facebook. They violate our Advertising Policies and have no place on the platform. …
>
> All ads on Facebook are subject to our ad review system and our ads are checked against our policies. This happens before ads begin running, but may also be re-reviewed after they are live. Our Advertising policies prohibit scam ads, and when we detect an ad that violates our advertising Policies we disapprove it. …

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> In the meantime, having this content reported to us is key and I am
> very happy to continue to offer a direct line to me so that we can
> move quickly to take down these scam ads.

73.     But Meta did not "move quickly to take down" the Scam Ads, despite

Eastman's promise. Rather, Meta appeared not to do anything at all, because the Scam

Ads continued.

74.     On October 18, 2019, attorneys for Meta responded to another letter from

Dr. Forrest regarding the Scam Ads misusing his name and image. The October 18 letter

admitted that "these ads are strictly prohibited" and stated that Meta was committed

"to protecting people that use the Facebook Service."

75.     The letter further stated that Meta shared Dr. Forrest's "frustration with

these policy-violating ads." It promised to honor Meta's commitment to Dr. Forrest:

> specifically, the Facebook Entities have adjusted their detection mechanisms to
> better find these types of policy-violating ads featuring Dr. Forrest. This may
> include use of certain keywords (e.g. relevant names), images, and other signals
> in both targeted searches and automated detection models. To put it plainly,
> Facebook's enforcement systems—proactive, reactive, machine and human—are
> looking for misleading ads featuring your client.

76.     The letter closed by promising to "work cooperatively with [Dr. Forrest]

to stop third party advertisers from running the policy-violating advertisements at

issue, and to remove such advertisements from the Facebook Service[,]" just as William

Easton had promised months earlier in his letter of May 20, 2019.

77.     Despite this renewed promised to "stop third party advertisers from"

continuing to run Scam Ads, they continued to appear.

78.     In November 2019, with the Scam Ads continuing to make their way from

Meta's advertising business to its social media platforms, Dr. Forrest penned an open

letter to Mark Zuckerberg, the CEO of Facebook, again demanding that the production

and approval of Scam Ads cease. Dr. Forrest wrote in pertinent part:

> Dear Mr. Zuckerberg:
>
> My family and I have been the subject of scam advertisements on
> your social media network. Our images and the images of others
> are being used to encourage your users to invest in fraudulent
> cryptocurrency schemes.
>
> The criminals responsible continue to purchase advertising space
> from Facebook, running new incarnations of the same scams. Your
> senior leadership has been informed of this. What's worse, innocent
> and vulnerable people are losing their life savings while Facebook
> (read – you) is profiting from the revenue generated by this stream
> of false advertisements.
>
> This is abhorrent and you can stop it. You have the power and the
> technology to prevent these scam advertisements from running on
> your platform. Is revenue more important to you than the life
> savings of elderly people, Mr. Zuckerberg?

Mr. Zuckerberg did not respond to Dr. Forrest's open letter.

> **2.      Notice of the More Recent Scam Ads Has Been Given Through
> Preservation and Cease and Desist Letters, Yet Andrew Forrest's
> Likeness Is Still Being Misappropriated.**

79.      Despite this lawsuit, Scam Ads featuring Dr. Forrest's misappropriated

image are *still* being produced and disseminated by Meta Ads, further damaging Dr.

Forrest's reputation and undoubtedly luring more Australians to invest in fraudulent

products.

80.      Dr. Forrest identified *1,154* fraudulent advertisements using his image

and/or manipulated footage of him in the six-month period between April 26, 2023,

and November 14, 2023.

---

THIRD AMENDED COMPLAINT                                                    19

81.     Dr. Forrest sent Meta seven detailed preservation and cease and desist letters during this period identifying the new Scam Ads, requesting that they be taken down, and asking that evidence of the new Scam Ads be preserved for purposes of this litigation.

82.     Meta has not responded to these letters other than to state that the evidence will be preserved.

83.     Despite Dr. Forrest's repeated pleas, new Scam Ads continue to appear on Meta's social media platforms in Australia.

## V.     META'S ADVERTISING BUSINESS IS DISTINCT FROM ITS SOCIAL MEDIA PLATFORMS

84.     Meta Ads is an advertising business, not an interactive computer service. It has a separate purpose, a separate function, and is run on a separate ads platform (Ads Manager) that generates commercial speech in the form of completed, paid-for ads. It uses its own features and applications, and follows a different business model than Meta's social media platforms.[8]

85.     Unlike Meta's social media platforms, Meta's advertising business does not facilitate user access to the internet.

86.     Rather, as Meta itself represented in a 2015 data services agreement, the purpose of Meta's advertising business is to "market and sell advertising to advertisers targeting the user community."

---

[8] Meta reports in its public filings with the SEC that it has a number of businesses. *See* 10-K filing, December 2020, at 7. (last accessed 12/1/23). While not formally a separate corporate entity, Meta Ads is distinct from the social media platform business.

87.     Different Terms and Conditions apply to advertisers who contract with Meta Ads than those that apply to the users of Meta's social media platforms.[9] For example, among other differences Meta Ad's Terms and Conditions evince extensive oversight and control by Meta in the development, review and approval of ads. No such control is imposed on users.

88.     Customers advertising in Australia who use Meta Ads to produce their ads contract with a separate subsidiary of Meta, Meta Platforms Ireland Ltd.("Meta Ireland"), and Meta Inc.

89.     In contrast, the users of Meta's Australian social media platforms contract with and are subject to Terms and Conditions imposed by Meta Inc.

90.     Meta Ads' reach extends even beyond the walls of Meta's social media platforms.[10] Meta Ads produces ads through a Meta Ads feature called "Audience Network" that run on non-Facebook channels, including "partner" sites, and third-party affiliated websites or mobile applications.[11]

91.     Operated through its ad applications and tools, Meta Ads is not designed to and does not provide or enable computer access by multiple users to a computer

---

[9] *See e.g.*, Meta User Terms and Conditions, 2023; Meta Self-service Advertising Terms 2023; Meta Advertising Terms and Conditions, 2023. For prior terms and conditions *see e.g.* archive.org: Facebook Terms and Conditions, 2019; Facebook Terms and Conditions, June 2012; Facebook Terms and Conditions, December 2012; Facebook Terms and Conditions, 2007; Facebook Terms and Conditions, 2005; and other terms and conditions from 2018 to present. (All last accessed 12/1/23).

[10] *See* About Meta Audience Network. (last accessed 12/1/23).

[11] *See* 2021 Annual Report ("2021 AR") at 63. (last accessed 12/1/23).

---

THIRD AMENDED COMPLAINT                                                    21

server within the meaning of 47 U.S.C. § 203(f)(2). It does not allow users to communicate with one another in a public or private setting like the prototypical messaging board or by transmitting private messages between users. The fact that an internet service provider exists under the Meta Inc. umbrella does not make Meta Ads itself an interactive computer service.

92.     The history of Facebook, Inc., and its public filings illustrate the clear demarcation between Meta Ads and Meta's social media platforms.

93.     Facebook, Inc., was founded in February 2004 by Mark Zuckerberg on the campus of Harvard University. In September of that year, Zuckerberg introduced Facebook as a forum for Harvard students to post messages to their friends. Facebook soon expanded to other colleges and universities.

94.     The "Facebook Platform" for users was launched in May 2007.

95.     At that time Facebook was solely a social media platform that allowed users to post their own content, for free, and interact with each other digitally, for free.

96.     In November 2007, Facebook separately launched its "ads platform" and became much more than a social media platform. It publicly announced its monetization plan, and started a new business, Facebook Advertising (called Meta Ads in this TAC). In a November 2007 article in *Bloomberg News*, Zuckerberg announced "the next hundred years will be different for advertising, and it starts today."[12] Prescient in his prediction, Facebook and Zuckerberg have built an advertising empire worth

---

[12] *Bloomberg Law, Facebook Declares New Era for Advertising*, Bloomberg Law (November 6, 2007).

hundreds of billions of dollars. Dr. Forrest's claims are about the collateral damage they have created along the way.

97.     Zuckerberg's announcement corresponded with the launch of Meta's ad platform, designed and implemented to let Meta's advertising customers establish accounts and launch and manage their advertising campaigns, using tools and features designed by Meta.[13]

98.     In approximately 2007, Meta also launched "Facebook Marketplace," a user-to-user e-commerce site akin to a newspaper classified section that allowed users to post ads for free. Meta Ads was, and is, nothing like this.

99.     Between 2007 and 2011, Meta Ads experienced astonishing growth, accounting for over 85% of Meta's 2011 revenue.[14] By 2019, Meta Ads was responsible for more than 98% of Meta's income stream.[15] Meta Ads' revenue in 2022 was $113 billion.[16]

100.    In 2012, Meta filed its registration to become a publicly traded company.[17] Its Annual Reports filed since then make clear that Meta's advertising business is operationally and functionally distinct from its social media platforms.

---

[13] *See* Facebook's Form S-1 Registration Statement ("IPO") at 91. *See also* 2015 Annual Report https://www.sec.gov/Archives/edgar/data/1326801/000132680116000043/fb-12312015x10k.htm ("2015 AR"), at 6. (All last accessed 12/1/23).

[14] IPO at 13.

[15] *See* 2019 AR at 62. (last accessed 12/1/23).

[16] 2022 AR at 7. (last accessed 12/1/23).

[17] IPO.

101.    The clear line of demarcation that separates Meta's advertising and social media platforms is articulated in its own words in its IPO filing and Annual Reports. For example, Meta consistently identifies three customer bases: users, developers, and advertisers, making clear these constituencies are separate.[18]

102.    In describing its efforts to improve its products for its advertising customers, and thus Meta Ads' financial performance, Meta highlighted different efforts targeted at each customer group: "[w]e intend to invest in additional products for our advertisers and marketers while continuing to balance our monetization objectives with our commitment to optimizing the user-experience."[19]

103.    With regard to Meta Ads, Meta's Annual Reports consistently describe a business model focused not on connecting users, or the free exchange of content, as the social media platform business is, but on making money. In its own words, Meta acknowledges its monetary success depends upon maintaining the confidence of advertising customers that "their investment in advertising with [Meta] will generate a competitive return relative to other investments[.]" Meta Ads' business objective is to "provide [advertisers] with a compelling return on their investment."[20]

104.    In discussing its advertising business's risk factors, Meta has stressed their significance to the enterprise: "[w]e generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with

---

[18] IPO at 1; *see also* 2012 and 2020 ARs at 15 and 21. (All last accessed 12/1/23).
[19] IPO at 5.
[20] 2018 AR at 12; 2021 AR at 22. (All last accessed 12/1/23).

THIRD AMENDED COMPLAINT                                    24

Facebook, could seriously harm our business."[21]

105.    The risks facing Meta with regard to the continued success of its user

platform are stated separately and are different from the risks facing Meta's advertising

business.

106.    Meta's revenue growth priorities center on Meta Ads and its features,

called Ad Products and Tools. In the 2016 Annual Report for example, Meta

represented that its advertising priorities were: "(ii) growing the number of marketers

using our ad products; and (iii) making our ads more relevant and effective through

continued adoption of new ad formats and tools for marketers."[22] This focus on Meta

Ads reflects the fact that "substantially all" of Meta's revenue is generated "by

displaying ad products on Facebook, Instagram and third-party affiliated websites or

mobile applications."[23]

107.    In short, Meta Ads is a business separate and distinct from Meta's social

media platforms.

## VI.    META ADS PRODUCES ADVERTISEMENTS USING ITS COMPREHENSIVE ADS MANAGER APPLICATION.

108.    Through its comprehensive "suite" of advertising tools and applications,

Meta Ads controls every aspect of the production of each ad, thereby gaining a

substantial amount of information about each advertiser, its products, and its objectives.

The production process provides Meta with ample opportunities to detect ads that are

---

[21] IPO at 12.
[22] 2016 AR at 33. (last accessed 12/1/23).
[23] *Id.* at 39.

fraudulent or that misappropriate information or images that belong to others, before such ads are included in the inventory vying for advertising space on Meta's social media platforms.[24]

109.    Ad customers engage with Meta Ads on this separate platform, accessing a set of products and tools which, using prompted input from prospective advertisers, produce ads and ad campaigns destined for one or more of Meta's social media platforms and other third party sites and applications.

110.    Currently, ad customers access these products and tools through an application called Ads Manager. The purpose of Ads Manager is to sign up prospective advertisers and to generate the best ad in light of each ad customer's goals. When prospective ad customers access Ads Manager, they are required to input the information necessary to create a business page, to set up a payment method, and supply their phone numbers. After this, they are asked to list the goal for the ad.

111.    Potential advertisers are then prompted to state whether their ads are related to credit, employment or housing, or about social issues, elections, or politics.

112.    At this stage, prospective advertisers are supplied with, by default, tools or features that are designed to improve the look of their ads to appeal to their audience.

---

[24] Full information and documents regarding Meta's processes and tools is not publicly available and is part of Facebook's closely held and exclusive realm of control. Discovery will shed further light into how these processes work. Similarly Meta's terms and conditions, and policies, change constantly, *see* fn. 9, and discovery will be necessary to understand the full scope of all processes and policies applicable to the allegations of this TAC.

113.    Advertisers also select certain demographics from a drop down list, including, critically, the audience's location (e.g., Australia), age range, and gender. Advertisers can then select "Advantage Detailed Targeting+," which expands prospective advertisers' reach beyond the selected audience.

114.    Dr. Forrest is informed and believes that: (1) no client or ad review is done before the ad is completed and paid for on the Ads Manager application; (2) no filters are put into place to prevent Scam Ads from being produced and paid for and posted on Meta's social media platforms. Such review, had it been reasonably performed at a reasonable point in the ad process, would have resulted in Meta Ads refusing to do business with those advancing Scam Ads.[25]

115.    After each ad transaction is completed and paid for in the Ads Manager application, Meta Ads tells these advertisers that their ads will automatically be reviewed against its Advertising Policies before the ads start running. If an ad is rejected, prospective advertisers receive notice, and information regarding their options.

116.    Meta's Annual Reports, including 2020 and 2021, indicate that there is a strong commercial motive behind the decision not to conduct any, or any effective, review in Ads Manager where fraud could be detected early, namely, to capture the revenue for prospective ads at an early stage, and book it to its subsidiary entities

---

[25] Facebook has refused to produce specific information that would explain how the Scam Ads were approved and continued to run despite being told by Dr. Forrest of the harm to him and others.

responsible for reselling the ad inventory.

117.    Specifically, Meta's 2021 Annual Report discloses that "[a]dvertising revenue is generated by displaying ad products on Facebook Instagram, Messenger, and third party affiliated websites or mobile applications. … We recognize revenue from the display of impression-based ads when the ad is displayed to users. … In general, we report advertising revenue on a gross basis, since we control the advertising inventory before it is transferred to our customers. Our control is evidenced by our sole ability to monetize the advertising inventory before it is transferred to our customers."[26]

118.    In addition, Meta is not a passive bystander with regard to the success of its produced ads. Meta profits from engagement, whether for good or for harm. Dr. Forrest is a well-known public figure, and ads featuring him and his image generate engagement. Meta also profits by collecting data about its users. Ads featuring Dr. Forrest give Meta valuable tracking data on users across its Australian platform who are interested in him, and those who will respond to ads involving him. Meta profits in both ways.

**VII.    DURING ITS PRODUCTION PROCESS, META ADS CONTROLS HOW ADS WILL LOOK AND WHO WILL RECEIVE THEM, BEFORE ADS ARE ALLOWED TO COMPETE FOR SPACE ON META'S SOCIAL MEDIA PLATFORMS.**

119.    During the ad production process, Meta's Ads Manager software drives and ultimately determines what the completed, paid-for ads will look like, and who will see them. Ads Manager does all its work before an ad is subjected to any alleged

---

[26] 2021 AR at 86. (last accessed 12/1/23).

review, and before being allowed to compete for available advertising space on Meta's social media platforms and beyond. Meta Ads, not the advertiser, has ultimate control over the ad's look and the audience for each ad.

120.    For example, the "Dynamic Creative" tool takes an advertiser's ad components, such as images, videos, text, audio and then "mixes and matches them" to change the look of an ad to improve its performance.[27]

121.    Meta Ads' Dynamic Creative tool optimizes the ad creative for each person viewing the ads. Meta Ads enables this tool by default during the ad production process. This tool varies the look of the ad and its destination based on each person's likelihood to respond. To accomplish this commercially advantageous goal for its customers, Ads Manager lists approximately 15 possible optimizations that it may apply to the ad creative, including creating videos from images and selecting and highlighting key phrases and sentences from the text.[28]

122.    Upon information and belief, at least some of the Scam Ads at issue were produced by Meta using Dynamic Creative, including this one:

---

[27] https://www.facebook.com/business/help/170372403538781?id=244556379685063. (last accessed 12/1/23).

[28] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25

123.    "Advantage+ Creative," is another feature of Meta Ads that is applied by default during ad production.[29] Advantage+ Creative uses generative AI.[30] The Advantage+ Creative tool automatically optimizes ads to versions the "audience is more likely to interact with."[31] These changes are intended to make the ads more appealing when they are ultimately shown to individual viewers on Facebook and/or

26
27
28

[29] "Creative" is a term of art used in advertising to refer to ad components such as text and images.

[30] About Advantage+ Creative, Meta Business Help Center. (last accessed 12/1/23).

[31] https://www.facebook.com/business/help/297506218282224?id=649869995454285. (last accessed 12/1/23).

Instagram and off-site via Meta Ads' Audience Network tool.[32]

124.    Advantage+ Creative can add music selected by Meta based on the ad's content, fine-tune the ad's visuals, or add 3D animation.

125.    Ads Manager currently includes a tool called "A/B Testing." This tool is designed and deployed to "help improve ad performance" by testing multiple versions of each advertisers' ad "creative" with "different text, audience or placement," to determine which ad will be most successful when shown to potential customers on and off Meta's social media platforms. If this feature is selected in the ad production process, advertisers are forwarded to A/B Test "set-up" after production of their ad is completed and paid for.[33]

126.    Meta Ads' active involvement does not stop with the ad's appearance. Meta Ads also effectively controls to whom ad customers' ads are eventually shown.

127.    Prospective ad customers can also select "Advantage Detailed Targeting+" to expand prospective advertisers' reach beyond their own selections when it is likely to improve ad performance.

128.    Meta's Tailored Campaigns tool is described as its most advanced ads technology "to help maximize campaign performance with less [advertiser] effort."[34] Tailored Campaigns fully automates the ad campaign process — Meta "pre-loads" the

---

[32] *Id.*

[33] The Ads Manager's default setting for A/B Testing is "on" so that it will be deployed by Meta Ads for each advertiser unless affirmatively declined.

[34] Tailored Campaigns, *see* FAQs. (last accessed 12/1/23).

right settings to achieve maximum performance.[35]

129.   "Audience Network" is another feature offered to ad customers during ad production. Audience Network allows advertisers to extend their campaigns to reach people on mobile apps partnered with, but not owned or controlled by, Meta.[36]

130.   Meta studied the effectiveness of Audience Network and found that "conversion rates were eight times higher among people who saw ads across Facebook, Instagram, and Audience Network" compared to people who only saw ads on Facebook.[37]

131.   In other words, Meta sells ad inventory not only on its own social media platforms, Facebook, and Instagram, but also places ads on third party applications. And Meta's advertising outside the platforms substantially drives the success of the platforms.

132.   Meta Ads' advertising tools include additional tools designed to decide for ad customers what ads will look like and who will get them. These additional ad tools include "Detailed Targeting" and "Lookalike Audience."

133.   Ultimately, advertisers using Meta's Ads Manager do not decide what their ads will look like, where their ads will be placed, or to whom their ads will be shown. Rather, Meta Ads makes those decisions.

134.   On information and belief, at least some of the Scam Ads were produced

---

[35] *Id.*

[36] About Meta Audience Network, Meta Business Help Center. (last accessed 12/1/23).

[37] *Id.*

through Ads Manager with its ad production offerings and advertising features.

135.    These Meta Ads tools supercharge Meta's ability to produce and drive the Scam Ads to vulnerable viewers, and have been a substantial factor in the continuing production, dissemination, and success of Scam Ads.

## VIII.   META HAS NOT EXERCISED AND DOES NOT EXERCISE REASONABLE CARE IN THE DESIGN AND OPERATION OF ITS AD BUSINESS.

136.    In its October 18, 2019, letter to Dr. Forrest described above, Meta describes the steps it would take to stop Scam Ads featuring Dr. Forrest specifically. Had Meta reasonably deployed the "detection mechanisms" it mentioned at a responsible point in the ad production process within Ads Manager, not after, it could have effectively stopped the proliferation of Scam Ads produced by its Meta Ads business.

137.    Meta could have chosen to design and manage its advertising business to prevent or minimize the kind of Scam Ads that gave rise to this litigation. The fact that Meta chose — and continues to choose — not to do so is negligent. This breach foreseeably and proximately injured and is injuring Dr. Forrest and the countless victims of the Scam Ads.

### A.    Meta Ads Has the Technical Ability to Detect and Screen Out Scam Ads Featuring Dr. Forrest, But Chooses Not To.

138.    At all relevant times, Meta has possessed technology that can find defined terms and images—like Dr. Forrest's name or his appearance in a video plus the mention of "investment opportunity" or cryptocurrency-related images—in the digital components of ads. As Meta represents that it can review an ad's landing page during

its automated review, it follows that it could examine a landing page or a subsequent, downstream landing page for a prospective ad for the discrete criteria that the Scam Ads contain, and stop it before it is accepted.

139.    There are many ways this detection and screening can be accomplished. The techniques that can be used include, but are not limited to, lexical and semantic searches, automated image analyses using AI, recursive web robots, and web scrapers. These techniques are well-known and used throughout the computer science field.

140.    Simple key word searches for "Forrest," "Twiggy," "investment opportunity," "bitcoin," "crypto," etc., and the use of imaging technology to identify Dr. Forrest's image could have easily isolated the Scam Ads and would have identified them before Meta Ads accepted and produced the Scam Ads with the intention and understanding that they be posted on Meta's social media platforms.

141.    Indeed Meta admitted as much itself in its October 2019 letter, when it promised to use "certain keywords (e.g., relevant names), images, and other signals in both targeted searches and automated detection models" to stop the Scam Ads.

142.    Indeed, a search for "Andrew Forrest" in Meta's Ad Library identifies advertisements that use Dr. Forrest's image but do not use his name in text. Thus, whether an advertisement uses Dr. Forrest's image or his name, Meta can use similar search software to identify Scam Ads and reject advertising customers before they use Ads Manager to complete their ad campaigns.

143.    Thus, if it wanted to do so, Meta Ads could easily stop producing the Scam Ads. It just needs to refuse to produce ads for anyone looking to run an ad

depicting or quoting Dr. Forrest, and refuse to take payments from them.

144.    Even after Dr. Forrest alerted Meta to the fraudulent nature of the Scam Ads and their misuse of his name and image, Meta did not require any advertiser seeking to run an advertisement involving Dr. Forrest to demonstrate that it was authorized by him in any way.

145.    Meta knows that Dr. Forrest has never sought and is not seeking to advertise anything on Facebook or any of Meta's other social media platforms. If anyone is willing to pay Meta Ads to produce, target, or run an ad involving Dr. Forrest, Meta knows that ad is not authorized. It simply needs to turn the job down. That, alone, would prevent the Scam Ads in the future.

**B.    Meta Ads Has the Ability to Use Non-Content-Based Checks to Weed Out Fake Accounts, Compromised Accounts, and Financial Scammers Whose Ads Violate Australian Law, But Chooses Not To.**

**1.    Meta Ads Allows Advertisers to Buy Ads Without Verifying the Advertiser's Identity.**

146.    Meta is aware, through complaints from outside the platform, that third-party scammers seeking to purchase advertising submit false identification and credentials, often use stolen credit cards and compromised accounts or lines of credit, all for the purposes of evading Meta's security checks.

147.    At the time the original Scam Ads appeared on Meta's Australian social media platforms, Meta did not require ad customers seeking to run an ad featuring cryptocurrency or financial investment opportunities to verify that they had a license to sell such a product or possessed authentic business assets. Instead, Meta only required

that advertisers supply a name and a credit card to be accepted as an ad customer.

148.    Meta has since changed its policies to purportedly require that "advertisers must use authentic business assets to run ads across our technologies. If we find that an inauthentic user account, ad account, Page or Business Account was used to run ads, an advertiser may face advertising restrictions."[38]

149.    Meta's current policies also purportedly require the following authentication documents for incorporated or registered business entities purchasing ads:

- Company tax identification number (TIN): Depending on your residence, we may also reach out to you for completion of certain tax forms.

- Proof of identity: A digital image of a valid, government-issued ID with photo for all beneficial owners (an owner with 10% or more ownership of total shares). The image should include the front and back of the ID. A passport is preferred, but a government military ID, state issued ID or driver's license is also accepted.

- Business formation document: This shows the name of the beneficial owners (an owner with 10% or more ownership of total shares). Depending on your location, these documents may be called business or corporate charters, certificates of incorporation or company registration forms.[39]

150.    If Meta Ads had complied with its own policies, including reasonable background checks, Meta would have discovered and prevented the Scam Ads.

151.    One reason that Meta Ads has not undertaken common-sense precautions

---

[38] https://transparency.fb.com/policies/ad-standards/business-assets/account-authenticity. (last accessed 12/1/23).

[39] https://www.facebook.com/business/help/193400874040813?id=1792465934137726. (last accessed 11/4/23).

like two-factor authentication is purely economic: Meta Ads generates more revenue when ads are published, even if later taken down. If an ad or advertiser is rejected at the outset, then Meta will only incur a cost and no revenue.

152.    Meta itself acknowledges the problems caused by the use of false identities in ads, and releases periodic reports that identify networks of fake account and pages that deceive users.[40] Yet it has not stopped producing Scan Ams using misappropriated identities.

153.    Meta has filters or other methods it can use to screen out scam accounts before an ad is created, through its "Meta Verified" subscription program.[41] But Meta chooses not to require validation for businesses it sells advertising to, even for advertisers selling potentially risky products.

154.    Scammers are also not only able to post ads through their own accounts, but they routinely circumvent Meta's weak security measures to take control over popular accounts with a large following. Recently, individuals posting Scam Ads took over the "exeed" [sic] page and began posting about an Australian quantum computing financial platform. Prior to this takeover, the "exeed" page hosted content related to an Italian esports team.[42]

---

[40] https://about.fb.com/news/2021/11/october-2021-coordinated-inauthentic-behavior-report/. (last accessed 12/1/23).

[41] https://www.facebook.com/business/tools/meta-verified-for-business. (last accessed 12/1/23).

[42] exeed, Facebook, https://www.facebook.com/ExeedOfficial. (last accessed 11/16/23).

155.     A Scam Ad[43] run through the exeed page was paid for with Thai Baht and was viewed by between 30,000 and 35,000 Australians:



---

[43] This Scam Ad has been preserved on the Meta Ad Library at the following link: https://www.facebook.com/ads/library/?id=245915081794489. (last accessed 12/1/23).

The fraudulent landing page linked by this Scam Ad may still be live, and viewers should take care not to click the "ProbillAI.com" link when viewing the Ad.

### 2. Meta Allows Advertisers to Buy Financial Product Ads Without Verifying Their Authority to Sell Financial Products.

156. Meta knows full well that fake cryptocurrency and other fraudulent financial investment products are among the most common forms of fraud on social media. Yet it does little to stop them.

157. According to Meta's current policy for financial product ads, it *may* ask advertisers of financial products or services to prove that their business is authorized by the relevant regulatory body to advertise such products, and it *may* review the information provided, but such proof is not a prerequisite to initiating an ad.[44]

158. By telling advertisers only that they *may* have to demonstrate their authority and that they *may* be reviewed, Meta signals that providing proof of authorization is not and may never be requested, and that Meta itself may never check it. In other words, unlicensed sellers can get their ads on Meta, even for ads that, like Scam Ads, designate "Australia" as the intended audience.

159. Australia regulates the sale of investment products. *See* Corporations Act 2001 (Cth) § 911A(1). To sell financial services in Australia, including providing financial advice or dealing in a financial product, a business or individual must have an Australian Financial Services License ("AFSL") from the Australian Securities and

---

[44] https://transparency.fb.com/policies/ad-standards/content-specific-restrictions/financial-services; https://www.facebook.com/business/help/719892839342050. (All last accessed 12/1/23).

Investments Commission ("ASIC").[45]

160.    It is illegal to conduct a financial services business in Australia without an AFSL, and doing so exposes a person to both criminal and civil penalties, including fines and imprisonment.

161.    Meta is aware of the existence of the requirements of Australian law and lists of licensees are publicly available and searchable for free, so it can easily check on the status of its customers.[46]

162.    Meta Ads, however, did not and does not require advertisers seeking to run Scam Ads in Australia to prove they hold an AFSL before their ads are accepted. [47]

163.    On information and belief, the individuals responsible for the Scam Ads did not have an AFSL. The scammers who purchased Scam Ads and operated the websites to which the Scam Ads linked were and are carrying on an illegal financial service business under Corporations Act § 911A(1).

164.    The Scam Ads promoted, and continue to promote, the sale of unlicensed investment products on Meta's social media platforms, and were directed to Australian users, despite the fact that scam advertisers are not licensed to sell financial products in Australia.

---

[45] https://asic.gov.au/for-finance-professionals/afs-licensees/. (last accessed 12/1/23).

[46] https://connectonline.asic.gov.au/RegistrySearch/faces/landing/SearchRegisters.jspx?_adf.ctrl-state=t2wnyml0b_4. (last accessed 12/1/23).

[47] https://transparency.fb.com/policies/ad-standards/content-specific-restrictions/financial-services. (last accessed 12/1/23). Prior to 2022, Meta appears not have had specific policies requirements regarding the sale of investment products.

---

165.    Meta Ads produced and continues to produce Scam Ads at the behest of criminals who lack the license needed to sell financial products in Australia.

166.    Meta Ads' failure to require proof that sellers are licensed by the ASIC creates a marketplace for the sale of illegal investments in Australia. Meta Ads' failure has harmed, and continues to harm, both Dr. Forrest and countless Australians who have been tricked into buying scam financial products by ads misappropriating Dr. Forrest's image.

167.    Other responsible industry players, like Google, require an account to be verified by Google to sell investment products in the country targeted before an ad is run.

168.    For example, Google's verification requirements have included the following for Australia since 2022:

> to show financial services ads in Australia - including showing ads to Australian users who appear to be seeking financial services - advertisers need to be verified by Google. As part of the verification process, advertisers must demonstrate that they are licensed by the Australian Securities and Investments Commission (ASIC). Please note that the financial services verification requirement covers categories of financial services not regulated by the ASIC.
>
> To obtain verification, **most advertisers will first need to obtain third party verification from our vendor, G2. As part of G2's third party verification process, advertisers must demonstrate that the relevant Australian financial services regulator directly authorizes them to undertake financial services activities or that they are exempt from the requirement**. Once verified by G2, advertisers should apply to Google for financial services verification using the unique third party verification code they receive from G2.

(emphasis added). [48]

---

[48] https://support.google.com/adspolicy/answer/12175793?hl=en. (last accessed

**3.    In Violation of its Own Policies, Meta Produces Cryptocurrency Ads for Unapproved Sellers.**

169.    Although Meta knows that ads featuring cryptocurrency are often fraudulent, it has not required its Meta Ads business to establish any effective procedures to review such proposed ads.

170.    Since 2018, Meta's policies require that ads selling cryptocurrency products and services must have Meta's written permission to promote crypto products.[49] To obtain written permission, a seller must also show that they are licensed by the relevant government agency, which in Australia is the Australian Transaction Reports and Analysis Centre or the ASIC.[50]

171.    But on information and belief, the Scam Advertisers had no such license and yet were allowed by Meta to purchase thousands of ads involving cryptocurrency.

172.    Meta's failure to follow its policies for Scam Ads featuring cryptocurrency, and failure to use reasonable care, led to some of the injuries cited in this complaint.

**C.    Meta Only Reviews Component Parts and Not the Ad as a Whole, Allowing Some Scam Ads to Go Undetected as a Result.**

173.    Meta's ad review process is flawed because it only reviews the constituent parts of an ad and not the ad as a whole. That makes it easy for Meta's automated reviewer to miss the fact that a misappropriated image of a public figure (such as Dr.

---

12/1/23).

[49] Cryptocurrency Products and Services, Meta Transparency Center. (last accessed 11/3/23).

[50] *Id.*

Forrest) is being used to make it appear that he or she is endorsing fraudulent cryptocurrency or investment schemes.

174.    When reviewed as a whole, the Scam Ads clearly promote a fraudulent and restricted product.

175.    Meta admits that ads contain numerous constituent parts and pieces of information and that these ads are typically processed through the ad review system in their constituent parts or components.[51]

176.    By reviewing only the constituent parts of the ad, rather than the advertisement as a whole, Meta's processes failed to detect Scam Ads featuring Dr. Forrest.

**D.     For Certain Scam Ads, Meta's Decision to Conduct Ad Review Off-Shore Allowed Advertisers to Circumvent Meta's Review Process Via Cloaking Software.**

177.    Meta also fails to exercise reasonable care because it uses computer servers outside of Australia to review ads that advertisers propose to run in Australia.

178.    This allows criminals to easily bypass Meta's security by using geolocation "cloaking software." Cloaking software changes the ultimate "landing page" a viewer sees when they click on an ad link, based on where the viewer is located. Using this software, a scammer can direct an ad reviewer in one location to an innocuous-looking landing page, while directing the Australian user to the scam site. For some of the Scam Ads (including those that gave rise to this action), cloaking

---

[51] Defence of the First Named Defendant, Record No. 2020/1218P between Wissam Al Mana and Facebook Ireland Limited *et al.* at 7.

software was used.

179.   This cloaking software works because Meta, in an effort to avoid the jurisdiction of the Australian courts, has chosen to locate its advertisement review platform offshore for ads that will run in Australia. However, Meta is fully aware that scam advertisers use cloaking software to circumvent Meta's Advertising Standards and get their fraudulent ads delivered.

180.   Meta's decision to offshore its review platform despite the extensive use of cloaking software materially enables the scammers' fraud.

## IX.   META ENGAGES IN UNFAIR JURISDICTIONAL ARBITRAGE THAT PREJUDICES DR. FORREST.

181.   In 2022, Meta earned approximately $1.7 billion in revenue from its Australian social media platforms, which provide service to 17 million Australian users.

182.   In connection with Meta's services to Australians, Meta is engaged in a jurisdictional arbitrage that materially prejudices Dr. Forrest.

183.   Jurisdictional arbitrage can involve locating, organizing, and structuring the business functions of a corporation or lines of business to reduce or even eliminate legal obligations. Jurisdictional arbitrage occurs where a business seeks to avoid unfavorable law or judicial enforcement in a particular location, and structures entities and operations to circumvent potential liability, finding legal shelter elsewhere.

184.   Meta is no stranger to jurisdictional arbitrage. In 2017, for example, Meta was identified to be using subsidiary entities in Ireland and Singapore to substantially reduce its U.S. corporate tax rate.

185.     In May 2018, Meta took proactive steps to put 1.5 billion users of its social media platforms, including all Australian users, out of reach of the European Union's ("EU's") incoming General Data Protection Regulations ("GDPR").

186.     Because Meta's products and services are delivered to users and advertisers over the internet, to pursue arbitrage, Meta makes certain corporate choices as to the way it owns and operates its user services in Australia.

187.     On the basis of the ownership and structures that Meta has in fact chosen, Meta asserts that it does not do business in Australia and is not subject to Australian law, where there is no equivalent to Section 230 immunity. But with respect to Dr. Forrest's claims brought in California, Meta asserts that it is entitled to Section 230 immunity. In doing so, Meta is seeking to circumvent Australian law, denying Dr. Forrest access to justice in either Australia or in California.

188.     The known structuring features of Meta's platforms in Australia that prejudice Dr. Forrest are as follows:

189.     Meta distinguishes the legal entities contracting with users from those with advertisers. Starting in July 2018, users on the Australia platform contract with Meta Inc. and advertising customers seeking to post ads on the Australian platform contract with both Meta Inc. and with Meta Ireland.

190.     Australia users and advertisers originally contracted only with Meta Ireland, which was solely responsible for the Australian platform when Dr. Forrest first complained to Meta, in 2014, about fraud on the platform. However, since July 2018, coincidental with the introduction of the GDPR, Meta Inc. is now the contracting party

with its Australian users and is said to be the owner and operator of the Australian

platform.

191.    Neither Meta Inc. nor Meta Ireland is registered to do business in

Australia, nor do they have a principal place of business in Australia.

192.    At the same time, the Terms and Conditions that Meta imposes on users

of its social media platforms and its advertising customers in Australia require them to

bring suit against Meta in the United States, where Meta can invoke Section 230 as a

defense to liability. The Terms and Conditions further provide that any litigation

relating to the Australian platform is governed by California law.

193.    Yet Meta reserves the right to sue its users anywhere it wants by requiring

that its users "agree that, in its sole discretion, Meta may bring any claim, cause of

action, or dispute we have against you in any competent court in the country in which

you reside that has jurisdiction over the claim."[52]

194.    Neither Meta Inc. nor Meta Ireland has an official address for service of

process in Australia. Meta Inc.'s Australian legal representatives are instructed to refuse

service of process for Meta Inc. and Meta Ireland.

195.    Meta also services its Australian users from offshore. Meta's automated

digital review of advertising occurs offshore from Australia; any manual review of

advertising content is undertaken in weakly regulated, low-labor-cost Asian countries;

and the law enforcement liaison and data centers for Meta's Australian social media

---

[52] www.facebook.com/legal/terms. (last accessed 12/1/23).

THIRD AMENDED COMPLAINT                                                              46

platforms are in Singapore.

196.    Consistent with the foregoing, Meta has taken the position in this litigation that it can only be sued in the United States for the harms that it has inflicted on Dr. Forrest in Australia.

197.    In a letter dated August 27, 2019, in response to queries from Dr. Forrest's Australian lawyers, Meta's U.S. lawyers (of White & Case, LLP's Los Angeles office), wrote to Dr. Forrest's Australian legal counsel, on behalf of both Meta Inc. and Meta Ireland, stating that, "[f]or users residing in Australia, the Facebook service is hosted and operated by Facebook, Inc., a company organized and existing under the laws of Delaware, United States, and with its principal place of business in Menlo Park, California…"[53]

198.    The August 27 letter went on to state that "Facebook Ireland is a separate entity, independent of and legally distinct from Facebook, Inc. Facebook Ireland does not own, operate, control, or host the Facebook Services for Australian users. Facebook, Inc. is the entity with which Australian users have a contractual relationship, and it operates and controls the Facebook Service for such users."

199.    The August 27 letter further stated that:

  a.  "[t]he Facebook Entities [responsible for the Scam Ads – i.e., Facebook Inc. and Facebook Ireland] are incorporated outside of the

---

[53] The letter is unsigned but appears to be attributable to Aaloki Sharma, who White & Case represents to be "Facebook's global litigation counsel" leading a team with encyclopedic knowledge of jurisdictions around the world. The letter purports to also be on behalf of Facebook Ireland Ltd.

Commonwealth of Australia and do not submit to Australian jurisdiction"
(emphasis added);

b.  "our firm is not instructed to accept service of any proceedings or
documents on behalf of Facebook, Inc. or any other Facebook entity;"

c.  "the Facebook Entities are unable to proactively monitor the Facebook
Service for unlawful content;"

d.  "the Facebook Entities are not publishers of content and, contrary to
what the [August 9] Letter suggests, does not 'publish' advertisements
appearing on the Facebook Service." (emphasis added).

200.    Thus, Meta denies that it is subject to the jurisdiction of Australia, and
asserts it is not liable because it "does not publish" the Scam Ads. However, in defense
of the claims in this case, Meta has asserted it is a publisher and thus entitled to Section
230 immunity. This illustrates Meta's use of jurisdictional arbitrage in unequivocal
terms.

201.    In summary, Meta seeks to defeat Dr. Forrest's claims by invoking Section
230 – a "Good Samaritan" provision enacted to protect internet service providers from
the inimical position they were put in as potentially liable as both publishers and
distributors for user content over which they had no control. Here, ironically, Meta has
invoked this "Good Samaritan" statutory immunity to affirmatively defeat Dr. Forrest's
claims regarding advertising content, where the availability of the Section 230 immunity
only arises from jurisdictional arbitrage undertaken by Meta.

202.    This cynical strategy would, if successful, effectively deny Dr. Forrest any

1   reasonable access to justice in any jurisdiction. This outcome is unconscionable and

2   unfair.

3       203.    Dr. Forrest accordingly seeks equitable relief in the form of a declaration

4   that Section 230 does not apply to Meta's conduct in this case.

5

6   **X.    EXTRATERRITORIAL LOCUS OF RELEVANT CONDUCT**

7       204.    Dr. Forrest filed this case in California because of Meta's ongoing

8   assertion that its global business operations are beyond the jurisdictional reach of any

9   foreign court.

10      205.    Dr. Forrest is a citizen of Australia and resides in Australia.

11      206.    The victims of the Scam Ads are exclusively Meta users who accessed

12  Meta's social media platforms in Australia, where the overwhelming majority of the

13  Scam Ads were targeted and shown.

14      207.    The activities of the Scam Advertisers—criminals all located outside the

15  United States—have no connection to the United States other than the fact that they

16  accessed and worked with Meta's architecture of computer clusters in Singapore and

17  Southeast Asia to develop, optimize, and then deliver the Scam Ads to members of the

18  Australian public.

19      208.    Upon information and belief, any automated review of Scam Ads targeted

20  at Meta users in Australia is undertaken by computer hardware outside of Australia, in

21  Singapore and other parts of Asia. To the extent any review of the Scam Ads is

22  undertaken by natural persons, such review is undertaken outside Australia.

23      209.    Ad revenue for the early Scam Ads was received by Meta Ireland.

210.    Upon information and belief, ad revenue for the current Scam Ads is processed by Meta Ireland.

211.    Ad revenue for the current Scam Ads is billed and paid for in a variety of currencies.

212.    The Scam Ads at issue in this lawsuit were specifically targeted to be delivered to the computers and mobile devices of users of Meta's social media platforms across Australia who follow and admire Dr. Forrest as a successful and prominent Australian businessman and philanthropist.

213.    If, as expected, Meta raises Section 230 as an affirmative defense to this complaint, the Australian locus and impact of the fraud make application of Section 230 immunity contrary to the presumption against extraterritoriality.

## CAUSES OF ACTION

214.    Dr. Forrest has been irreparably harmed, as Meta's actions detract from the positive associations with Dr. Forrest's name, cloud his reputation, and ultimately decrease the commercial value of his name and image. Dr. Forrest brings each of the following causes of action against Meta. As to each cause of action, Dr. Forrest re-alleges the preceding paragraphs of this TAC as if fully set forth therein.

### FIRST CAUSE OF ACTION
### Misappropriation of Name and Likeness

215.    At all relevant times, Meta knowingly used and misappropriated Dr. Forrest's name and likeness in images and videos in violation of California common law.

216.     Meta's advertising business misappropriated Dr. Forrest's name and likeness by contracting and receiving payment to produce Scam Ads that it produced and was paid for in order that they then be shown to Australians via Meta's social media platforms, including Facebook and Instagram, and third party sites through Meta Ads' Audience Network.

217.     Meta knowingly and willingly participated in the misappropriation of Dr. Forrest's name and likeness. Meta gained a commercial benefit through its Meta Ads business by charging prospective customers to produce Scam Ads with products and tools designed and deployed to optimize ad success.

218.     Meta also gained a commercial advantage through its misappropriation because the Scam Ads kept its users engaged due to public interest in Dr. Forrest.

219.     Dr. Forrest has never consented to these unauthorized and illegal uses of his name, voice, likeness, or photos or videos of him. Meta knew, or should have known, that Dr. Forrest did not authorize or consent to the misuses because Dr. Forrest himself and his agents directly informed Meta of the misappropriation.

220.     Dr. Forrest's name, image, and likeness, and his right to publicity are his intellectual property.

221.     As a result of Meta's wrongful conduct, Dr. Forrest was harmed. His name and likeness is his intellectual property and has a commercial value. It was used without his consent.

222.     In addition, the misappropriation created the false impression that he was associated with criminal scammers, causing damage to his reputation. Moreover, Dr.

Forrest has spent hundreds of thousands of dollars defending his reputation and name, and attempting to restore his public image by investigating and responding to the harm.

223.    Meta's prior and on-going misappropriation of Dr. Forrest's common law right to his name and likeness has been deliberate, willful, and in disregard of his rights.

224.    Dr. Forrest seeks all available compensatory, punitive, and other damages for past harm, injunctive relief, as well as the value of any profits wrongfully obtained by Meta, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Promissory Estoppel

225.    In 2016, Meta convinced Dr. Forrest that creating a "verified" user page on Facebook would assist Meta in protecting Dr. Forrest from fraud on its social media platforms.

226.    On May 20, 2019, and October 18, 2018, Meta promised to stop the misappropriation of Dr. Forrest's image and name in Scam Ads posted to Meta's social media platforms.

227.    Meta has not stopped Scam Ads from appearing on Meta's social media platforms or taken the Scam Ads down — and in fact they appear to be multiplying.

228.    Meta knew or should have known that Dr. Forrest would rely on its promises and conduct to his detriment.

229.    Meta has reneged on its promise to protect Dr. Forrest from the misuse of his image on its platforms, as well as breached the promises set forth above, both

1  expressly and by its conduct.

2  230.    These wrongful acts of Meta caused and continue to cause injury to Dr.

3
4  Forrest in an amount in to be determined at trial.

5                        **THIRD CAUSE OF ACTION**
                              **Negligence**
6

7  231.    Meta designed, managed, operated, controlled, and benefitted from its

8  Meta Ads business.

9
10  232.    Meta knew or should have known that its Meta Ads business was

11  responsible for producing Scam Ads it knew or should have known were designed to

12  be shown to harm Australians by scamming them out of large sums of money, and

13
14  would harm Dr. Forrest by misappropriating his image, associating him with financial

15  scams, and damaging his reputation.

16  233.    Meta knew or should have known that Australian users of Meta's social

17
18  media platforms acting reasonably would have believed that the Scam Ads were

19  legitimate and the products they sold were endorsed by Dr. Forrest.

20  234.    Meta owes a duty to the public, including Dr. Forrest, to design and

21
22  operate its advertising business in a commercially reasonable manner. *See* Cal. Civil

23  Code § 1714. Meta breached this duty by knowingly acting as an advertising agency for

24  the Scam Advertisers, knowingly producing Scam Ads pre-loaded with Meta Ads tools

25  and features that Meta knew or should have known were designed to optimize the

26
27  victimization of vulnerable Australian users, and knowingly disseminating the Scam

28  Ads.

235.    Meta also breached its duty by the conduct described herein, including but not limited to: (a) knowingly designing its advertising business and its Ads Manager application to produce and facilitate ads by unverified businesses selling unlicensed or unregistered cryptocurrency or investment products; (b) knowingly designing and employing defective procedures to screen or vet advertisers selling unlicensed or unregistered cryptocurrency, investment products, and ads that misused Dr. Forrest's image; and (c) knowingly designing and employing review procedures that were ineffective, and that allowed Scam Ads to be produced and delivered by Meta Ads to then compete for available advertising space on Meta's social media platforms and beyond with the intention that they be viewed by Meta's users.

236.    Meta knew, or had reason to know, that the Scam Advertisers were and are not legitimate financial service businesses and were and are not licensed to sell investment products in Australia.

237.    Meta knew that its ad review process was ineffective, as it allows advertising for illegal sales, and it fails to deploy filters at a reasonable time during, not after, the Meta Ads production process.

238.    Meta knows that it fails to follow its own ad review and ad acceptance policies.

239.    As a direct and proximate result of Meta's breach of its duty, Dr. Forrest and other Australians were harmed and sustained the injuries described in this complaint.

240.    It was foreseeable that Meta users would lose money as a result of the

Scam Ads produced and allowed by Meta. It was foreseeable that Dr. Forrest's reputation would be damaged by the running of the Scam Ads, suggesting he endorsed the scams they promoted. And it was foreseeable that Dr. Forrest's reputation would be harmed when individual Australians fell victim to the scams which were falsely associated with him.

241.    A reasonably prudent advertising agency in Meta's position would, *inter alia*: (a) better design its review process such that the Meta Ads advertising business would identify and reject Scam Ads during the production of such ads -- before they were paid for by scammers or afforded the chance to be disseminated to vulnerable users and others; (b) adopt effective verification processes for sellers of products such as financial products and services; and (c) review the advertisements it produces effectively before they are disseminated.

242.    As a result of Meta's negligence, Dr. Forrest was injured as described above, as were unwitting Meta users.

243.    Given their ongoing nature, Dr. Forrest's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate. Dr. Forrest seeks injunctive relief to remedy his ongoing harms and losses.

244.    Dr. Forrest seeks judgment against Meta for all his monetary and other damages, injunctive and other equitable relief, and the value of any gains, profits, or advantages wrongfully obtained by Meta, in an amount to be proven at trial, together with his costs of suit, attorneys' fees and such other and further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Negligent Failure to Warn

245.    At all relevant times, Meta has known that its Meta Ads advertising business has produced Scam Ads that used Dr. Forrest's name and likeness without his consent, to sell some investment products with his false endorsements. The harm the ads caused to Dr. Forrest is reasonably foreseeable to Meta.

246.    Meta had actual or constructive knowledge of the Scam Ads and the unreasonable harm they posed, irrespective of its review or monitoring of content on its social media platforms, from Dr. Forrest and other sources including, *inter alia*, the federal Australian Competition and Consumer Commission and Australian media.

247.    Since at least March 2019, through the present, Meta should have supplied reasonable warnings to users on its Australian Facebook, Instagram, and Messenger social media platforms, to notify them of the Scam Ads and their fraudulent form and purpose.

248.    Meta's duty to warn about Scam Ads could have been satisfied even without conducting a detailed investigation. Meta's duty to warn would not require it to remove or change any user content or otherwise affect how it publishes or monitors user content.

249.    A reasonable warning could be given to all Australian Meta users. Such warnings would involve only content that Meta itself produced, and could be given at *de minimus* cost, and with no appreciable burden on Meta or the operation of its Australian user platforms.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

250.    As a direct and proximate result of Meta's failure to provide reasonable warnings to its Australian users, Dr. Forrest has suffered and continues to suffer monetary and other harms and losses. Meta's failure to warn is a substantial factor in causing Dr. Forrest's harm. If Australians users had been warned about the Scam Ads, fewer would have fallen victims to the scams, and fewer would have associated the Scam Ads or their losses with Dr. Forrest, minimizing the harm to his reputation.

251.    Due to its misfeasance in the design and operation of its Meta Ads advertising business, Meta is responsible for making Dr. Forrest's position worse and creating the risk, such that no "special relationship" is required for a duty to warn to exist.

252.    Although no "special relationship" is required for a duty to warn in this case, a special relationship did exist between Meta and Dr. Forrest by virtue of Meta's having successfully counselled Dr. Forrest to create a "verified" Facebook page so that Meta could protect his name, image, and reputation from fraudulent misuse.

253.    Given their ongoing nature, Dr. Forrest's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate. Dr. Forrest seeks injunctive relief to remedy his ongoing harms and losses.

254.    Dr. Forrest seeks judgment against Meta for all his monetary and other damages, injunctive and other equitable relief, and the value of any profits wrongfully obtained by Meta, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment

255.    Meta, through its Meta Ads advertising business, has wrongly received ad revenue in return for producing Scam Ads while on notice of and with knowledge that such Scam Ads and the criminals accessing Meta Ads to make them were frauds, who were using and paying for ads in order to deceive and defraud vulnerable Australian consumers including Meta's users.

256.    For these reasons, and because Scam Ads misused Dr. Forrest's reputation, name, likeness, and endorsement, this revenue has been and remains unjustly retained by Meta.

257.    Meta has been unjustly enriched through the receipt of ad revenue derived in connection with these ads, which sums should be disgorged to Dr. Forrest, and through the increased engagement of its users.

## SIXTH CAUSE OF ACTION
### Declaratory Relief

258.    A justiciable controversy exists and is ripe for adjudication as to whether Meta should be able to assert, as it does, the application of 47 U.S.C. § 230 to immunize it from liability for the wrongful conduct herein alleged by Dr. Forrest.

259.    As set forth above, Meta has engaged in improper jurisdictional arbitrage, improperly seeking the extraterritorial application of Section 230 with the intent to deny Dr. Forrest the right to seek available redress in Australia or the United States for the harm caused to him by Meta's conduct in operating its Australian social media platforms.

260.     As a consequence, Meta should be estopped and otherwise equitably precluded from relying upon its claimed affirmative defense asserting immunity under 47 U.S.C. § 230 for the claims stated by Dr. Forrest herein, and this Court should determine, in the exercise of its discretion, which law applies to each of the disputes in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Andrew Forrest prays that this Court enter judgment in his favor and against defendant Meta as follows:

1.     That Dr. Forrest is entitled to damages in an amount to be proven at trial but in no event less than $75,000, as permitted by law and according to proof;

2.     That Dr. Forrest is entitled to specific performance of Meta's promises;

3.     That Dr. Forrest be awarded punitive or exemplary damages in an amount to be determined at trial;

4.     That this Court issue injunctive relief prohibiting Meta from engaging in the unlawful and unfair conduct described herein in the future;

5.     That Meta be required to add a warning to any advertisements that feature Dr. Forrest and include a false endorsement of financial products, regarding their misleading nature;

6.     That Meta has been unjustly enriched and should be ordered to disgorge its ill-gotten gains including advertising revenues derived from the Scam Ads;

7.     That this Court grant declaratory relief providing that Meta is estopped and precluded from relying upon its claimed affirmative defense of immunity under 47

U.S.C. § 230 and this Court should determine, in the exercise of its discretion, which law

applies to each of the disputes in this action;

8.      That Dr. Forrest be afforded such other and further relief, including his

attorneys' fees, as this Court deems just and proper, and law and equity allow; and

9.      That Dr. Forrest is entitled to costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff Dr. Andrew Forrest respectfully requests a jury trial on all triable issues

in the above-entitled action.

Dated: December 1, 2023

**BAILEY & GLASSER LLP**

*/s/ Elizabeth Ryan*
Elizabeth Ryan (admitted *pro hac vice*)
eryan@baileyglasser.com
John Roddy (admitted *pro hac vice*)
jroddy@baileyglasser.com
176 Federal Street, 5th Floor
Boston MA 02110
T: 617.439.6730
F: 617.951.3954

Leslie Brueckner (SBN 140968)
lbrueckner@baileyglasser.com
Arthur Bryant (SBN 208365)
abryant@baileyglasser.com
1999 Harrison Street, Suite 660
Oakland, CA 94612
T: 510.272.8000
F: 510.463.0291

Katherine E. Charonko (admitted *pro hac vice*)
kcharonko@baileyglasser.com
209 Capitol Street
Charleston WV 25301
T: 304.345.6555
F: 304.342.1110

Elizabeth L. Stryker (admitted *pro hac vice*)
estryker@baileyglasser.com
94 Long Street, Suite 200
Westover WV 26501
T: 304.594.0087
F: 304.594.9709

**DEREK G. HOWARD LAW FIRM, INC.**

Derek G. Howard (Bar No. 118082)
derek@derekhowardlaw.com
Ashley M. Romero (Bar No. 286251)
ashley@derekhowardlaw.com
42 Miller Avenue
Mill Valley, CA 94941
T: 415.432.7192
F: 415.524.2419

*Attorneys for Plaintiff Dr. Andrew Forrest*

1

**CERTIFICATE OF SERVICE**

This is to certify that on December 1, 2023 a copy of the foregoing was served

upon counsel of record for Defendant via the Court's ECF system.

*/s/ Elizabeth Ryan*
Elizabeth Ryan

**ATTACHMENTS**

## ATTACHMENT A

Scam Ads Preserved on Meta Ad Library

| Scam Advertiser | Our World |
| --- | --- |
| **Advertiser Account ID** | 139205762617431 |
| **Caption** | In a time of economic challenges brought on by high inflation and rising interest rates, a group of influential Australian billionaires have taken on the responsibility of easing the financial burden on citizens. Andrew <<Twiggy>> Forrest, Gina Rinehart, and Dick Smith have joined forces to create a financial platform that has been supported by the government under the leadership of Treasurer Jim Chalmers. |
| | This unique program opens the door to every citizen, providing the opportunity to invest with a minimum deposit of $351. At the same time, the expected average income is an impressive $7,210 per week. Billionaires and the government have made investments accessible to a wide audience, helping people protect their finances from the negative effects of economic factors. |
| | The main goal of the program is to provide citizens with the tools to ensure financial stability in the face of economic uncertainty. Government support from Treasurer Jim Chalmers underscores the importance of partnerships between business and government in promoting public welfare. |
| | Billionaires who founded this program benefit from expanding their influence and reputation in society. Creating a financial platform focused on helping citizens allows them to position themselves as socially responsible leaders. |
| | Government support also contributes to a positive perception of the program in society and emphasizes the importance of joint efforts in solving financial problems. |
| | Cooperation with the government and providing access to investments with minimum investments demonstrates concern for the well-being of citizens. It also contributes to increasing trust in business and government, which is an important factor in strengthening economic stability in the country. |
| | The financial platform created by billionaires and supported by the government is becoming a shining example of how joint efforts of business and government can lead to positive changes in the lives of citizens. This initiative not only helps to cope with financial difficulties, but also strengthens social responsibility and interaction between key players in society |

| **Screenshot** |  |
| --- | --- |
| **Call to Action** | START NOW |
| **Number of Versions** | 6 |
| **Currency Used** | United States Dollars |
| **Landing Page** | Aussiei.com |

**Screenshot of Landing Page**



| Scam Advertiser | Best Offer |
|---|---|
| **Advertiser Account ID** | 120847777789694 |
| **Caption** | In a time of economic challenges brought on by high inflation and rising interest rates, a group of influential Australian billionaires have taken on the responsibility of easing the financial burden on citizens. Andrew <<Twiggy>> Forrest, Gina Rinehart, and Dick Smith have joined forces to create a financial platform that has been supported by the government under the leadership of Treasurer Jim Chalmers. |
| | This unique program opens the door to every citizen, providing the opportunity to invest with a minimum deposit of $351. At the same time, the expected average income is an impressive $7,210 per week. Billionaires and the government have made investments accessible to a wide audience, helping people protect their finances from the negative effects of economic factors. |
| | The main goal of the program is to provide citizens with the tools to ensure financial stability in the face of economic uncertainty. Government support from Treasurer Jim Chalmers underscores the importance of partnerships between business and government in promoting public welfare. |
| | Billionaires who founded this program benefit from expanding their influence and reputation in society. Creating a financial platform focused on helping citizens allows them to position themselves as socially responsible leaders. |
| | Government support also contributes to a positive perception of the program in society and emphasizes the importance of joint efforts in solving financial problems. |
| | Cooperation with the government and providing access to investments with minimum investments demonstrates concern for the well-being of citizens. It also contributes to increasing trust in business and government, which is an important factor in strengthening economic stability in the country. |
| | The financial platform created by billionaires and supported by the government is becoming a shining example of how joint efforts of business and government can lead to positive changes in the lives of citizens. This initiative not only helps to cope with financial difficulties, but also strengthens social responsibility and interaction between key players in society |

| Screenshot |  | |
| --- | --- | --- |
| **Call to Action** | Learn More | |
| **Number of Versions** | 6 | |
| **Currency Used to Pay for Ad** | Great British Pounds | |
| **Landing Page** | Aussiensk.com | |
| **Screenshot of Landing Page** | | |

| Scam Advertiser | Best Profit |
|---|---|
| **Advertiser Account ID** | 121724304367121 |
| **Caption** | A landmark name in the world of financial news - Gina Rinehart, Dick Smith and Andrew Forrest have teamed up to unveil an innovative project that aims to improve the quality of life for every Australian. This team of billionaires have decided to take it a step further and they want you to partner with them too.<br><br>The investment platform created by this powerful trio offers a unique opportunity for everyone in Australia to be part of a project that aims to raise the standard of living in the country. But why should you consider investing in their project?<br><br>1. Opportunity for everyone: A minimum investment of just $350.00 makes this projecct accessible to every citizen. Now you too can contribute to Australia's future.<br><br>2. Economic growth: Gina Rinehart, Dick Smith and Andrew Forrest are names that are associated with successful business projects. They put their resources into projects that contribute to economic growth and infrastructure development in the country. Your investment will contribute to this positive change.<br><br>3. Social Responsibility: This team also focuses on social aspects. Their investments are aimed at improving education, healthcare and housing conditions for all citizens. Your investment will help sustain these important initiatives.<br><br>4. Support and Trust: The reputation of Gina Reinhart, Dick Smith and Andrew Forrest is key to the reliability and success of this project. They are working with a team of experts to ensure transparency and secure operations.<br><br>This is your chance to contribute to Australia's future and make money at the same time. Billionaires Gina Rinehart, Dick Smith and Andrew Forrest have created an investment platform and they invite you to join them. Don't miss this opportunity to be part of history and make a better future for yourself and all Australians.<br><br>Take your first step towards financial independence and prosperity. Your participation is your future. |

| Screenshot |  |
| --- | --- |
| **Call to Action** | Start Now |
| **Number of Versions** | 2 |
| **Currency Used to Pay for Ad** | Hong Kong Dollars |
| **Landing Page** | Aussiensk.com |
| **Landing Page Screenshot** | |

| Scam Advertiser | Conversation apparently |
|---|---|
| **Advertiser Account ID** | 1650078696682488 |
| **Caption** | One day will be enough to realize that this is not what we have seen before. Important names in the country's financial structure are leading Australia into the land of the future.<br><br>The project brings profitable trades after calculating the risks, choosing the most profitable way to trade.<br>The country's leading businessmen whose names speak for themselves: Mike Henry, Andrew Forrest - have created thousands of jobs and brought billions of dollars in taxes to the state coffers.<br>Now they are changing the lives of all Australians.<br><br>Why does the project need everyone?<br><br>1. Your money should work for you in the long term. Investors have an income of 30,000 a month or more.<br>2. Taxation is minimized.<br>3. Inflation will take your money out of the bank.<br>4. The minimum deposit for everyone is 350 dollars to get started. |
| **Screenshot** |  |
| **Call to Action** | Start Now |
| **Number of Versions** | 4 |

| | |
|---|---|
| **Currency Used to Pay for Ad** | United States Dollars |
| **Landing Page** | Koikdqaskflemxkasoe.com |
| **Screenshot of Landing Page** |  |

| Scam Advertiser | A stable future |
|---|---|
| **Advertiser Account ID** | 103686984509659 |
| **Caption** | In a single day, it becomes apparent that what unfolds before us is unlike anything witnessed before. Influential figures in the nation's financial landscape are propelling Australia into the realms of the future.<br><br>This ground-breaking initiative is turning $350 into a steady monthly income of 30k+ by carefully calculating risk and choosing the most profitable areas of trading.<br><br>The eminent figures steering this endeavor, names synonymous with success – Mike Henry and Andrew Forrest, have not only generated thousands of employment opportunities but have also contributed billions of dollars to state coffers in taxes. Their impact is reshaping the lives of all Australians.<br><br>Wondering why this project is indispensable for everyone?<br><br>- Maximize Your Money: Your money should be working for you in the long run. Investors enjoy a consistent income of $30,000 or more each month.<br><br>- Taxation Efficiency: The project is designed to minimize taxation, ensuring that you retain a larger portion of your earnings.<br><br>- Inflation Hedge: Guard your money against the erosive effects of inflation. Inflation won't devalue your money when it's strategically invested.<br><br>- Accessible Entry: The barrier to entry is minimal – a mere $350 deposit is all it takes for anyone.<br><br>Start your financial journey with confidence.<br>Click Learn More. |

| Screenshot |  |
| --- | --- |
| **Call to Action** | Start Now |
| **Number of Versions** | 3 |
| **Currency Used to Pay for Ad** | Peruvian Sol |
| **Landing Page** | iaskcokroqodxkaibk.com |

**Screenshot of Landing Page**



| Scam Advertiser | Learn more |
|---|---|
| **Advertiser Account ID** | 130832490112561 |
| **Caption** | None |
| **Screenshot** |  |
| **Call to Action** | Learn more |
| **Number of Versions** | 8 |
| **Currency Used to Pay for Ad** | Unknown |
| **Landing Page** | Rapkryty.com |

**Screenshot of Landing Page**

11/13/23, 8:23 AM                    AFR&#AFT;Freshwater Strategy poll: Support for Labor, Anthony Albanese, Voice on the slides

Politics    Federal    Federal election                                                    Print article

# Gina Reinhardt's Investment in an Innovative AI-Based Program

**Phillip Coorey** *Political editor*

Sep 25, 2023 – 5.00am

In recent years, Gina Rinehart, one of the world's most prominent business magnates and philanthropists, has directed her substantial resources towards a groundbreaking initiative in the field of artificial intelligence. This innovative program, driven by cutting-edge AI technologies, promises to revolutionize various industries and spearhead a new era of technological advancement.

Gina Rinehart's unwavering commitment to fostering technological innovation has led her to invest significantly in this AI-based program. Her vision is to harness the power of artificial intelligence to address pressing global challenges, drive economic growth, and create sustainable solutions for the future.

**The core components of this ambitious initiative include:**

https://newscast.site/7fbdkd4wkP0cDcaxpwOehfy_6bfopp29ib9vQp0mlccir7uWCLmjmsPkelOKXdkBd6c                                    1/5

| Scam Advertiser | COM OW |
| --- | --- |
| **Advertiser Account ID** | 113740930493515 |
| **Caption** | ★★★★★ 5/5 (2436 votes)<br>ONLY FOR AUSTRALIAN CITIZENS |
| **Screenshot** |  |
| **Call to Action** | COM OW |
| **Number of Versions** | 2 |
| **Currency Used to Pay for Ad** | Brazilian Real |
| **Landing Page** | Cheapxfftau.com |

**Screenshot of Landing Page**

AFR/AFT Freshwater Strategy poll: Support for Labor, Anthony Albanese, Voice on the slides

Politics    Federal    Federal election                                    Print article

# Gina Reinhardt's Investment in an Innovative AI-Based Program

**Phillip Coorey** *Political editor*

Sep 25, 2023 – 5.00am

In recent years, Gina Rinehart, one of the world's most prominent business magnates and philanthropists, has directed her substantial resources towards a groundbreaking initiative in the field of artificial intelligence. This innovative program, driven by cutting-edge AI technologies, promises to revolutionize various industries and spearhead a new era of technological advancement.

Gina Rinehart's unwavering commitment to fostering technological innovation has led her to invest significantly in this AI-based program. Her vision is to harness the power of artificial intelligence to address pressing global challenges, drive economic growth, and create sustainable solutions for the future.

**The core components of this ambitious initiative include:**

| Scam Advertiser | exeed |
|---|---|
| **Advertiser Account ID** | @ExeedOfficial |
| **Caption** | Australia's richest companies have created this unique project that brings every Aussie n $48,500 a month.<br><br>The best part is, you don't have to be an investment guru to make it happen!<br><br>Here's how to get started:<br><br>1. CIick the "Learn More" button to deIve deeper.<br><br>2. Visit our website to get the full scoop on this life-changing initiative.<br><br>3. Fill out the quick form—accuracy is key!<br><br>4. Wait for a call from our expert team. They're here to guide you every step of the way.<br><br>No experience in investing? No problem! Our experts will guide you through a simplified, step-by-step method designed to minimize risks. |
| **Screenshot** |  |
| **Call to Action** | START NOW |

| **Number of Versions** | 3 |
|---|---|
| **Currency Used to Pay for Ad** | United States Dollars |
| **Landing Page** | Theikariaajuice.com |

| | |
|---|---|
| **Scam Advertiser** | exeed |
| **Advertiser Account ID** | @ExeedOfficial |
| **Caption** | The easiest way to turn $35O into $48OO of steady passive income per week.<br><br>No experience in investing? No problem! Our experts will guide you through a simplified, step-by-step method designed to minimize risks.<br><br>Sounds too good to be true? Follow this link and find out how easy it really is to make money. Passive.<br><br>There is no secret here. It's very simple. A new automated pIatform that autonomously performs stock market transactions only brings you profits. Considering that the biggest companies have taken taxes all to themselves in this project. |
| **Screenshot** |  |
| **Call to Action** | START NOW |

| | |
|---|---|
| **Number of Versions** | 1 |
| **Currency Used to Pay for Ad** | Thai Baht |
| **Landing Page** | Probillai.com |

| Scam Advertiser | Andrew Forrest |
|---|---|
| Advertiser Account ID | 107537535770814 |
| Caption | Chairman Fortescue Metals, Minderoo Foundation, Philanthropist |
| Screenshot |  |
| Call to Action | Business, Business, Business Center |
| Number of Versions | 1 |
| Currency Used to Pay for Ad | Unknown |
| Landing Page | N/A |

**ATTACHMENT B**

Cryptocurrency Ad on Meta Ad Library

| Scam Advertiser | Naná Rizinni |
|---|---|
| **Advertiser Account ID** | @thanmusica |
| **Caption** | ★ ★ ★ ★ ★ 5/5 (3563 votes)<br>ONLY FOR AUSTRALIAN CITIZENS |
| **Screenshot** |  |
| **Call to Action** | ★ ★ ★ ★ ★ 5/5 (3563 votes)<br>ONLY FOR AUSTRALIAN CITIZENS |
| **Number of Versions** | 5 |
| **Landing Page** | Lottomaniana.com |

## Screenshot of Landing Page

11/7/23, 11:12 AM                                                    llotfomaniana.com

Home     About     How It Works     Who Is This For     Testimonials     Join Us

## Welcome to Our Website

Aussies, Discover the Secrets of Earning on Stock Markets and Cryptocurrencies with Artificial Intelligence!



## Why You Should Pay Attention