1  ELIZABETH RYAN
   eryan@baileyglasser.com
2  BAILEY & GLASSER LLP
   176 Federal Street, 5th Floor
3  Boston MA 02110
   T: 617.439.6730
4  F: 617.951.3954
5
   LESLIE BRUECKNER (SBN 140968)
6  lbrueckner@baileyglasser.com
   BAILEY & GLASSER LLP
7  1999 Harrison Street, Suite 660
   Oakland, CA 94612
8  T: 510.272.8000
   F: 510.463.0291
9
10 [Additional Counsel on End page]

11 *Attorneys for Plaintiff, Dr. Andrew Forrest*

12
13              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
14                   **SAN JOSE DIVISION**

15 | DR. ANDREW FORREST,                          | Case No. 5:22-cv-03699-PCP
16 |                                              | Judge: Hon. P. Casey Pitts
17 |         Plaintiff,                           |
   | v.                                           | **Plaintiff's Opposition to Defendant's Motion**
18 |                                              | **to Dismiss Third Amended Complaint with**
   | META PLATFORMS, INC., a Delaware             | **Prejudice**
19 | Corporation, and DOES 1 through 20,          |
   | inclusive,                                   |
20 |                                              | Date:        April 11, 2024
21 |         Defendants.                          | Time:        10:00 a.m.
22 |                                              | Courtroom:   Courtroom 8
23 |                                              | Judge:       Hon. Casey P. Pitts
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.    The Scam Ads Giving Rise To This Lawsuit. ...................................... 3

    B.    Meta's Advertising Business Is Distinct From Its User Platforms. ...................... 4

III.  ARGUMENT .......................................................................................................... 5

    A.    The Presumption Against Extraterritoriality Bars Application Of Section 230 To Dr. Forrest's Claims. ................................................................. 5

        1.    The Presumption Applies Because All Relevant Conduct Occurred Abroad ............................................................................. 6

        2.    Meta's Arguments Regarding The Presumption Lack Merit ................ 8

    B.    Even If Section 230 Could Apply Extraterritorially, It Is Facially Inapplicable To This Case. ............................................................... 10

        1.    Meta Ads Is Not An "Interactive Computer Service Provider." ............. 10

        2.    The Scam Ads Are Not Supplied By "Another Information Content Provider." .................................................................... 15

        3.    Meta Ads Is Not A "Publisher" With Respect To The Scam Ads ........... 17

    C.    Dr. Forrest Has Stated Viable Claims For Relief ................................. 19

        1.    Dr. Forrest Has Stated A Viable Misappropriation Claim ...................... 19

        2.    Dr. Forrest Has Stated A Viable Claim For Negligence And Negligent Failure To Warn. .................................................... 20

        3.    Dr. Forrest Has Stated A Viable Unjust Enrichment Claim. ................ 23

        4.    Dr. Forrest Has Stated A Viable Claim For Declaratory Relief. ........... 24

    D.    Dr. Forrest's Claims Are Not Time Barred. .......................................... 24

    E.    Meta's Attempt To Preempt Future Amendments Should Be Rejected. ............ 25

IV.   CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abels v. Bank of Am., N.A.*,
   No. 11-CV-208 YGR, 2012 WL 1980839 (N.D. Cal. May 31, 2012) ................................... 8

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023) ........................................................................................... 2, 5, 6, 10

*Allen v. A.H. Robins Co.*,
   752 F.2d 1365 (9th Cir. 1985) ....................................................................................... 8

*Astiana v. Hain Celestial Group Inc.*,
   783 F.3d 753 (9th Cir. 2015) ....................................................................................... 24

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ....................................................................................... 1

*Beckman v. Match.com, LLC*,
   743 F. App'x 142 (9th Cir. 2018) ................................................................................. 22

*Blazevska v. Raytheon Aircraft Co.*,
   522 F.3d 948 (9th Cir. 2008) ....................................................................................... 10

*Calise v. Meta Platforms, Inc.*,
   No. 21-cv-06186-JSW, 2022 WL 1240860 (N.D. Cal. Apr. 27, 2022)
   ................................................................................................................... 2, 14, 17, 19

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003) ..................................................................................... 11

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ......................................................................................... 6

*CYBERsitter, LLC v. Google Inc.*,
   905 F. Supp. 2d 1080 (C.D. Cal. 2012) .................................................................. 14, 16

*Divino Grp. LLC v. Google LLC*,
   No. 19-CV-04749-VKD, 2021 WL 51715 (N.D. Cal. Jan. 6, 2021) ............................... 2

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) ....................................................................................... 23

*Doe v. Reddit*,
   No. SACV2100768JVSKESX, 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021) .................... 11

ii

*Durning v. Citibank, N.A.*,
    950 F.2d 1419 (9th Cir. 1991) ............................................................................ 9

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ......................................................... 14, 17, 22

*Ebeid v. Facebook, Inc.*,
    No. 18-cv- 07030, 2019 WL 2059662 (N.D. Cal. May 9, 2019) ....................... 14

*F.T.C. v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016) .......................................................... 12, 13, 19

*F.T.C. v. LeanSpa, LLC*,
    920 F. Supp. 2d 270 (D. Conn. 2013) .................................................. 14, 16

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...................................................... 1, 6, 9, 18

*Force v. Facebook*,
    934 F.3d 53 (2d Cir. 2019) ........................................................ 9, 10, 12, 18

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................................... 22

*Gonzalez v. Google, Inc*,
    No. 4:16-cv-03282-DMR, 2017 WL 6040930 (N.D. Cal. Nov. 6, 2017) ............ 9

*Gonzalez v. Google*,
    LLC, 2 F.4th 871 (9th Cir. 2021) ..................................................... 8, 9, 10

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979) ........................................................................ 13

*Holomaxx Techs. v. Microsoft Corp.*,
    783 F. Supp. 2d 1097 (N.D. Cal. 2011) ............................................... 13

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) .............................................................. 17

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ........................................................... 21

*Jackson v. Airbnb, Inc.*,
    654 F. Supp. 3d 990 (C.D. Cal. 2023) ................................................ 22

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ........................................................... 16

*Kiobel v. Royal Dutch Petroleum*,
    569 U.S. 108 (2013) ..................................................................... 6, 10

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:22-CV-03699-PCP

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ............................................................... 22

*Klayman v. Zuckerberg*,
   910 F. Supp. 2d 314 (D.D.C. 2012) ......................................................... 17

*Lloyd v. Facebook, Inc.*,
   No. 21-cv-10075-EMC, 2022 WL 4913347 (N.D. Cal. Oct. 3, 2022) ................. 14

*Loomer v. Zuckerberg*,
   No. 22-cv-02646-LB, 2023 WL 6464133 (N.D. Cal. Sept. 30, 2023) ................. 14

*In re Maxwell Commc'n Corp. plc by Homan*,
   93 F.3d 1036 (2d Cir. 1996)................................................................ 7, 8

*Morrison v. Nat'l Australia Bank*,
   561 U.S. 247 (2010)...................................................................... 5, 12

*Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd.*,
   No. 4:14-cv-00859-RWS, 2015 WL 1782661 (E.D. Mo. 2015) ................... 16, 19

*Nestlé USA Inc. v. Doe*,
   593 U.S. 628 (2021)........................................................................ 5, 6

*Newcombe v. Adolf Coors Co.*,
   157 F.3d 686 (9th Cir. 1998) ................................................................. 20

*Newton v. Meta Platforms, Inc.*,
   No. 23-cv-00116-JD, 2023 WL 5749258 (N.D. Cal. Sept. 6, 2023) .................. 15

*Perfect 10, Inc. v. Google, Inc.*,
   No. 04-cv-9484 AHM (SHX), 2008 WL 4217837 (C.D. Cal. July 16, 2008)............... 16, 19

*Rigsby v. GoDaddy Inc.*,
   59 F.4th 998 (9th Cir. 2023) ............................................................. 12, 17

*Ripple Labs Inc. v. YouTube LLC*,
   No. 20-cv-02747-LB, 2020 WL 6822891 (N.D. Cal. Nov. 20, 2020).................. 18

*RJR Nabisco, Inc. v. European Cmty*,
   579 U.S. 325 (2016).................................................................. 5, 6, 10

*Roadrunner Intermodal Servs., Inc. v. T.G.S. Transp., Inc.*,
   No. 1:17-cv-01207-DAD-BAM, 2021 WL 2188138 (E.D. Cal. May 28, 2021) ..................................................................................... 23

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...................................................... 14

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
   No. 4:22-MD-03047-YGR, 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) ............ 13, 18, 21

*Swift v. Zynga*,
No. C 09-05443 SBA, 2010 WL 4569889 (N.D. Cal. Nov. 3, 2010) ................................. 16

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) ................................ 11

*Valle Del Sol, Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013) ................................ 11

*Wacker v. Hammerking Productions Inc.*,
608 F. Supp. 3d 947 (C.D. Cal. 2022) ................................ 24

*Waits v. Frito-Lay, Inc.*,
978 F.2d 1093 (9th Cir. 1992) ................................ 19

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ................................ 6, 7, 9

*Ynfante v. Google LLC*,
No. 22-cv-6831 (JGK), 2023 WL 3791652 (S.D.N.Y. June 1, 2023) ................................ 15

*Zeran v. Am. Online, Inc.*,
129 F.3d. 327 (4th Cir. 1997) ................................ 11

*In re Zoom Video Commc'ns Inc. Priv. Litig.*,
525 F. Supp. 3d 1017 (N.D. Cal. 2021) ................................ 12

**California Cases**

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
225 Cal.App.4th 1451 (2014) ................................ 23

*Cross v. Facebook, Inc.*,
14 Cal.App.5th 190 (2017) ................................ 19

*Delgado v. Trax Bar and Grill*,
36 Cal.4th 224 (2005) ................................ 22

*Hacala v. Bird Rides, Inc.*,
90 Cal.App.5th 292 (2023) ................................ 21, 22

*LeBrun v. CBS Television Studios, Inc.*,
68 Cal.App.5th 199 (2021) ................................ 23

*Maxwell v. Dolezal*,
231 Cal.App.4th 93 (2014) ................................ 19

*Melton v. Boustred*,
183 Cal.App.4th 521 (2010) ................................ 21

*Rickley v. Goodfriend*,
    212 Cal.App.4th 1136 (2013) ............................................................... 22

*Seo v. All Makes Overhead Door*,
    97 Cal.App.4th 1193 (2002) ................................................................. 22

*Social Media Cases*,
    JCCP 5255 (Cal. Super. Ct. Oct. 13, 2023) ........................................ 21

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
    10 Cal.App.5th 56 (2017) ..................................................................... 8

**Other State Cases**

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021) ................................................................... 18

*J.S. v. Village Voice Media Holdings, L.L.C.*,
    184 Wash. 2d 95 (2015) ....................................................................... 14

**Federal Statutes**

15 U.S.C.
    § 1012 ................................................................................................... 13

47 U.S.C.
    § 230 ............................................................................................. *passim*
    § 230(a)(1) ............................................................................................. 6
    § 230(a)(5) ............................................................................................. 6
    § 230(c)(1) ............................................................................... 2, 9, 10, 12
    § 230(f)(2) ....................................................................................... 10, 11

**Other Authorities**

*Restatement (Third) of Foreign Relations* (1986) ......................................... 8

Woods, A.K., *Does Section 230 Immunity Apply Globally* (published Dec. 18,
    2023) ...................................................................................................... 7

## I.    INTRODUCTION

This case presents yet another instance where defendant Meta Platforms, Inc. ("Meta" or "Meta Inc.") is attempting to avoid liability for harm caused by material on its social media platforms ("SMPs"). Unlike most other cases, however, this lawsuit has nothing to do with facilitating user-to-user communications to "promote the free exchange of [user] information and ideas over the Internet." *Barnes v. Yahoo!, Inc*., 570 F.3d 1096, 1099 (9th Cir. 2009) (citation omitted). Rather, this case involves a global *advertising* business run by Meta ("Meta Ads"), a part of Meta that is entirely distinct from its various SMPs. Using its own sophisticated software, Meta Ads produces illegal ads that use false endorsements by public figures to trick Meta's SMP users into purchasing fraudulent financial products.

The specific ads at issue in this case feature plaintiff Dr. Andrew Forrest**,** a renowned Australian philanthropist, environmentalist, and businessman who has been targeted by thousands of fraudulent ads in which he falsely appears to be promoting fake cryptocurrency and other fraudulent financial schemes ("Scam Ads"). The Scam Ads, which are generated abroad and run only in Australia, started in 2019 and continue to this day, despite Meta having promised Dr. Forrest in 2019 that it would "work cooperatively with [Dr. Forrest] to stop third party advertisers from running the policy-violating advertisements at issue, and to remove such advertisements from the Facebook Service …." Third Amended Complaint ("TAC") ¶ 76.

In its motion to dismiss, Meta scarcely bothers to defend itself on the merits. Instead, it argues that Section 230 of the Communications Decency Act ("CDA"), a statute enacted to allow providers of "interactive computer services" to "perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete," *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008), grants it total immunity for fraudulent ads that run on Meta's SMPs anywhere in the world, including (in this case) Australia.

Section 230, however, was never intended to serve as a "get out of jail free" card for for-profit advertisers like Meta Ads, let alone to immunize such advertisers for conduct that

occurs entirely overseas. Moreover, Section 230 is an affirmative defense as to which *Meta* has the burden of proof. *See Divino Grp. LLC v. Google LLC*, No. 19-CV-04749-VKD, 2021 WL 51715, at *11 (N.D. Cal. Jan. 6, 2021). Meta makes no real effort to meet that burden here. Instead, it seeks to shrug off Dr. Forrest's claims by simply arguing that, because its wide-ranging business activities include *some* traditional SMP publishing activity, that means its separate advertising business is immune from suit. That argument, however, is contrary to the language and purposes of Section 230, which make clear that the availability of the narrow defense set forth in Section 230(c)(1) depends on the actual *conduct* at issue.

Here, the conduct at issue is solely that of a professional advertising business that is but one part of a company that *also* hosts SMPs. No court has ever held that Section 230 extends that far. But even if it did, because all the relevant conduct related to the Scam Ads occurred outside the United States, application of Section 230 would be barred by the presumption against extraterritoriality, a doctrine designed to ensure that "the United States law governs domestically but does not rule the world." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023).

Meta's other main argument—that Dr. Forrest has failed to state a claim on the merits—is equally baseless. Meta contends that, because the basic material for the Scam Ads was supplied by "third party fraudsters," Meta has no cognizable duty to Dr. Forrest, even though it actually produces the ads for the fraudsters that run on its SMPs. Meta's argument fails for a host of reasons set forth below, the most basic of which is that Dr. Forrest is seeking to hold Meta liable for its *own* misconduct, not that of "third party fraudsters."

Dr. Forrest specifically alleges that Meta:

(1) fails to deploy available technology that would allow it to identify and reject ads that use Dr. Forrest's image before they are completed and paid for, TAC ¶¶ 138-45;

(2) fails to use non-content-based checks in its advertising business to weed out unverified businesses and unlicensed financial scammers who operate in violation of Australian law, *id.* ¶¶ 146-68;

(3) fails to give ads featuring cryptocurrency and other financial investment schemes

heightened scrutiny during the Meta Ads' production process (or review them at all), despite knowing that such ads are rife with fraud, in violation of its own policies, *id.* ¶¶ 147, 156-58;

(4) reviews only the constituent parts of an ad separately and not the contents as a whole, which renders its review process unable to detect certain Scam Ads before they are posted to social media platforms, *id.* ¶¶ 173-76; and

(5) decided to locate its ad review centers off-shore, which enables the extensive use of geolocation "cloaking software" by fraudsters that renders Meta's off-shore screeners unable to detect certain Scam Ads. *Id.* ¶¶ 177-80.

These are not the acts of "third-party fraudsters"—these are Meta's *own* failures to design and conduct its ad business in a non-negligent fashion. And they are the result of Meta's conscious choice not to conduct its advertising business responsibly, secure in its belief that all of its activities are protected by Section 230. But Section 230 was never intended to apply to the type of conduct at issue here. The motion to dismiss should be denied.

## II. STATEMENT OF FACTS

### A. The Scam Ads Giving Rise To This Lawsuit.

Dr. Forrest first discovered the Scam Ads in 2019. The TAC alleges in detail his efforts since then to stop the Scam Ads. *Id.* ¶¶ 69-78. Despite the filing of this lawsuit more than two years ago, the Scam Ads continue to this day. In fact, their number appears to be growing: during the period from April to November 2023 alone, over *one thousand* Scam Ads featuring Dr. Forrest's image appeared on Facebook in Australia (*id.* ¶ 3)—a number that Meta does not dispute.

In 2019, Meta told Dr. Forrest that it possessed certain "detection mechanisms" that would allow it to detect and prevent further Scam Ads featuring his image. TAC ¶ 75. Meta admitted the Scam Ads violated Meta policies and promised to "work cooperatively with [Dr. Forrest] to stop third party advertisers from running the policy-violating advertisements at issue, and to remove such advertisements from the Facebook Service …" *Id.* ¶ 76. Despite that promise, Meta appears to have done nothing to stop or even slow the ads. *Id.* ¶¶ 79-83.

The ongoing Scam Ads damage Dr. Forrest's reputation and brand every time they

appear. *Id.* ¶ 5. The Scam Ads have also ruined the lives of countless Australians who invested their life savings in fraudulent financial products and schemes based on their belief that, if Dr. Forrest endorsed them, they must be sound. *Id.* ¶ 6; *see also id.* ¶¶ 62-68.

### B.    Meta's Advertising Business Is Distinct From Its User Platforms.[1]

Meta Ads is an advertising business, not an interactive computer service. TAC ¶ 84. Meta's advertising business does not facilitate users' access to the internet or the free exchange of ideas. *Id.* ¶ 85. It has a separate purpose and function, and is run on a separate platform using a separate application ("Ads Manager"). *Id.* ¶¶ 84, 88. Meta's advertising business was launched years after the Facebook social media platform was started. *Id.* ¶ 96.

Meta Ads generates pure commercial speech in the form of completed, paid-for ads. *Id.* ¶ 84. The purpose of Meta's advertising business is to "market and sell advertising to advertisers," *id.* ¶¶ 85-86, not to connect anyone to the internet. In fact, an advertising customer must leave Ads Manager to communicate with a Meta SMP user. *Id.* ¶ 91.

Separate Terms and Conditions govern Meta's relationship with advertisers, terms that grant Meta extensive oversight and control of the development, review, approval and delivery of ads, *id.* ¶ 87, together with a license to display the ads in perpetuity. Meta imposes no such control or oversight on users, who post content themselves with no such oversight from Meta. *Id.* A separate subsidiary of Meta, Meta Platforms Ireland Ltd., contracts with customers advertising in Australia. In contrast, Meta's Australian SMP users contract with, and are subject to, Terms and Conditions imposed by Meta Platforms, Inc. *Id.* ¶¶ 88-89.

Meta Ads is not merely an "in-house" advertising arm for its SMPs. It also produces advertisements through a feature called "Audience Network" that run on non-Meta applications, including third-party affiliated websites and mobile applications. *Id.* ¶ 90.

In 2012, Meta registered to become a publicly traded company. Meta's Annual Reports filed since then confirm that Meta Ads is operationally and functionally distinct from its social

---

[1] The TAC contains numerous allegations illustrating the distinction between Meta's advertising business and Meta's SMPs (*see, e.g.,* TAC ¶¶ 84-118) and the extent of Meta's control over the advertisements it produces using its Ads Manager software (*see, e.g., id.* ¶¶ 119-33).

media platforms in all pertinent respects. *Id.* ¶¶ 100-104. With regard to Meta Ads, Meta's Annual Reports consistently describe a business model focused not on connecting users, or the free exchange of content, as the social media platform business is, but on making money by producing and delivering ads. *Id.* ¶ 103.

## III.   ARGUMENT

### A.   The Presumption Against Extraterritoriality Bars Application Of Section 230 To Dr. Forrest's Claims.

Meta's Section 230 defense to the TAC's claims is barred by the powerful presumption against extraterritoriality, a canon of statutory interpretation providing that, absent clearly expressed congressional intent to the contrary, federal laws are construed to only have domestic application. *See Abitron Austria GmbH v. Hetronic Int'l*, 600 U.S. 412, 428 (2023).

Applying the presumption against extraterritoriality usually involves "a two-step framework." *Id.* at 417 (citation omitted). The first step asks whether the presumption against extraterritoriality has been rebutted by the statute's text. *See RJR Nabisco, Inc. v. European Cmty*, 579 U.S. 325, 337 (2016). If the presumption has not been expressly rebutted, the second step asks whether the conduct relevant to the statute's "focus" occurred in the United States. *Id.* If it did not, then the presumption applies. *Abitron*, 600 U.S. at 419.[2]

The Supreme Court has made clear, however, that where "all the relevant conduct … took place outside the United States," the Court's work is done: the presumption applies, and step two is irrelevant. *RJR Nabisco*, 579 U.S. at 337 (quoting *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 124 (2013)); *see also Abitron*, 600 U.S. at 425 ("courts do not need to determine [a] statute's 'focus' when all conduct regarding the violations took place outside the United

---

[2] The fact that a defendant is headquartered in the United States does not defeat the presumption. *See Nestlé USA Inc. v. Doe*, 593 U.S. 628, 632-634 (2021) (applying presumption against extraterritoriality to preclude Alien Tort Statute claims alleging that U.S. companies aided and abetted forced labor overseas, where all of the "conduct that directly caused the injury" occurred overseas, despite fact that the defendant corporations "allegedly made 'major operational decisions' in the United States"); *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 266 (2010) (applying presumption even though plaintiff's losses resulted from deceptive conduct that occurred in Florida, noting that "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States.").

States") (cleaned up; citations omitted); *Nestlé,* 593 U.S. at 634 (plaintiffs' complaint "impermissibly seek[s] extraterritorial application of the [Alien Tort Statute] [because] [n]early all the conduct that they say aided and abetted forced labor … occurred in Ivory Coast.").

### 1.    The Presumption Applies Because All Relevant Conduct Occurred Abroad.

Under this two-step framework, Section 230 does not apply to any of Dr. Forrest's claims. As to step one, the CDA's text contains no "affirmative indication that it applies extraterritorially." *RJR Nabisco*, 579 U.S. at 337. In fact the opposite is true. *See* 47 U.S.C. § 230(a)(1) and (5) (congressional findings emphasizing the value of the internet to *Americans*). Moreover, because all of the conduct giving rise to Dr. Forrest's claims occurred abroad, *see* TAC ¶¶ 204-213, the presumption applies regardless of Section 230's focus. *See Abitron*, 600 U.S. at 425; *RJR Nabisco*, 579 U.S. at 337; *Kiobel*, 569 U.S. at 124; *Nestlé*, 593 U.S. at 634.

But even if it were necessary to consider step two, the presumption would still bar Meta's Section 230 defense because none of the "conduct relevant to [the CDA's] focus" occurred in the U.S. *Abitron,* 600 U.S. at 418. In considering a statute's focus, a court cannot simply consider one provision in isolation; rather, it must consider that provision within the context of the entire statute. *WesternGeco LLC v. ION Geophysical Corp.,* 585 U.S. 407, 414 (2018) ("[w]hen determining the focus of a statute, we do not analyze the provision at issue in a vacuum.").

In enacting Section 230, Congress sought to provide "Good Samaritan" protections from civil liability for internet service providers who chose to restrict access to objectionable material online. *See Roommates.com*, 521 F.3d at 1163. "In other words," the Ninth Circuit has explained, "Congress sought to immunize the removal of user-generated content, not the creation of content." *Id.*; *see also Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc*., 519 F.3d 666, 669 (7th Cir. 2008) (Easterbrook, J.) (explaining why Section 230(c) cannot be understood as a general prohibition of civil liability for website operators and other online content hosts). The CDA's overall focus, then, is on objectionable content appearing on the internet, an internet that benefits "all Americans," 47 U.S.C. § 230(a)(1), not

on erecting broad immunity for foreign conduct by U.S. internet service providers. Under the two-part extraterritoriality test, the only conduct relevant to *that* focus is conduct that gave rise to the appearance of the Scam Ads on Facebook in Australia. As a result, the presumption applies.[3]

Application of the presumption is especially warranted because Australia does not have any equivalent to Section 230. TAC ¶ 187. Allowing Section 230 to be applied to deny substantive rights available to Australian residents in Australia, leaving them with no recourse, is certain to create the type of "international discord" that the presumption against extraterritoriality was established to prevent. *See WesternGeco,* 585 U.S. at 412-13.

As the TAC alleges, Meta's entire corporate structure, the terms of service it imposes on users and advertisers in Australia, its intra-group agreements, as well as its recalcitrance in submitting to jurisdiction in Australia (discussed below) are a result of deliberate corporate choices. *See* TAC ¶¶ 181-203. These choices are designed to export Section 230 immunity to cover Meta's advertising and other activities abroad, including Australia, so that Meta can continue to run its advertising business as it wants, without regard to harm it causes anywhere in the world. *See id.*[4]

In light of Meta's inequitable policies, even if the presumption against extraterritoriality did not apply here, under principles of international comity the Court should exercise its discretion to decline to apply Section 230 to Dr. Forrest's claims. *See In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("[I]nternational comity is a separate notion from the 'presumption against extraterritoriality.'") These principles, as reflected in §

---

[3] *See generally* Woods, A.K., *Does Section 230 Immunity Apply Globally* (arguing that interpreting Section 230 to be a global immunity shield "is inconsistent with the history and purpose of Section 230, and it is inconsistent with the courts' own foreign affairs jurisprudence.") (published December 18, 2023 and available at https://www.lawfaremedia.org/article/does-section-230-immunity-apply-globally).

[4] In particular, Meta's Terms of Service with its users and advertisers require them to bring suit against Meta in the United States under California law, where Meta can invoke Section 230 as a complete defense to their claims. *Id.* ¶ 192. At the same time, Meta reserves to itself the right to sue its users anywhere it wants. *Id.* ¶ 193.

403(1) of the *Restatement (Third) of Foreign Relations* (1986), provide that "states normally refrain from prescribing laws that govern activities connected with another state 'when the exercise of such jurisdiction is unreasonable.'" *In re Maxwell Commc'n*, 93 F.3d at 1047–48. The Restatement factors weigh in favor of not applying Section 230 in this case because Australia has a strong interest in protecting its citizens from fraud, evidenced by its lack of immunity, and the likelihood of conflicts is high.

### 2. Meta's Arguments Regarding The Presumption Lack Merit.

Meta mischaracterizes Dr. Forrest's extraterritoriality argument when it contends that Dr. Forrest is asking this Court to apply "Australian law" to this case. Def. Mem. at 2, 7. To be clear, Dr. Forrest is merely arguing that the presumption against extraterritoriality bars application of Section 230 to his *state law* claims.

Perhaps Meta means to suggest that Section 230 should apply here—despite the presumption—because Dr. Forrest could have sued Meta in Australia under Australian law, thereby avoiding Section 230 entirely. However, as noted above, Meta deliberately structured its entire business to avoid the reach of Australia's civil jurisdiction. *See* TAC ¶¶ 181-203. In keeping with that strategy, Meta *itself* told Dr. Forrest that the entities responsible for the Scam Ads—Facebook Inc. and Facebook Ireland—"are incorporated outside the Commonwealth of Australia and *do not submit to Australian jurisdiction.*" *Id.* ¶ 199 (emphasis added). In light of that assertion, Meta should be estopped from claiming that Section 230 bars his claims even if the Court concludes that the presumption against extraterritoriality does not apply.[5]

The few extraterritoriality cases Meta cites do not warrant a different result. Meta contends *Gonzalez v. Google*, LLC, 2 F.4th 871, 880 (9th Cir. 2021), *vacated sub. nom Google v. Gonzalez*, 598 U.S. 617 (2023), stands for the proposition that "Congress intended Section 230 to apply to claims filed in American courts, regardless of the place where the claims

---

[5] *See Allen v. A.H. Robins Co.*, 752 F.2d 1365, 1371 (9th Cir. 1985) (applying equitable estoppel to bar limitations defense); *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal.App.5th 56, 79, 215 Cal.Rptr.3d 835, 853 (2017) (whether defendant "either waived or is estopped from asserting" contract-based affirmative defense created a triable issue of fact); *Abels v. Bank of Am., N.A.*, No. 11-CV-208 YGR, 2012 WL 1980839, at *2 (N.D. Cal. May 31, 2012) (citing elements of equitable estoppel under California law).

principally arose." Def. Mem. at 7. But the Ninth Circuit's ruling was vacated by the United States Supreme Court and therefore lacks any precedential value. *See Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991). That aside, *Gonzalez* is factually distinguishable and has been superseded.

First, although the underlying facts in *Gonzalez* involved acts of terrorism on foreign soil, the *Gonzalez* plaintiffs were *U.S.* citizens seeking compensation for injuries suffered in *the U.S.*[6] As a result, the Ninth Circuit did not examine whether the presumption should apply in the unique circumstances here —where Meta seeks to export Section 230 immunity despite inflicting injury on an *Australian* citizen forced to sue in the United States because Meta contests jurisdiction abroad. Clearly, it should not.

Second, *Gonzalez*'s assertion that "the focus of Section 230(c)(1) is limiting liability," and thus "the conduct relevant to the statute's focus occurs at the location associated with the imposition of liability," violates the Supreme Court's admonition that, when determining a statute's focus a court must not "analyze the provision at issue in a vacuum." *WesternGeco*, 585 U.S. at 414. As explained above, the CDA's focus as a whole was not to create broad immunity for any and all content posted on the internet; rather, it was "to immunize the removal of user generated content, not the creation of content." *Roommates.com*, 521 F.3d at 1163. For that reason, too, *Gonzalez* lacks any persuasive authority.

The only other decision cited by Meta involving the extraterritorial application of Section 230—*Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019)—is distinguishable for similar reasons. As in *Gonzalez*, the Second Circuit rejected the argument that the presumption against extraterritoriality barred application of Section 230 based on its conclusion that the primary focus of Section 230 is "limiting civil liability in U.S. Courts." *Id*. at 74. That ruling suffers from the same defects as *Gonzalez* and fails for all the reasons stated above.

---

[6] The *Gonzalez* plaintiffs alleged that they "suffered, and will continue to suffer, severe psychological and emotional harm, as well as loss of solatium as a result of the terrorist act that killed Nohemi Gonzalez." *Gonzalez v. Google, Inc*, No. 4:16-cv-03282-DMR, 2017 WL 6040930 (N.D. Cal. Nov. 6, 2017), Third Amended Complaint ¶ 480. Thus, unlike Dr. Forrest's claims here, the *Gonzalez* plaintiffs' proximate cause of harm and their injuries occurred in the United States.

Moreover, the Second Circuit failed to take *Kiobel* into account when it suggested, based on *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948 (9th Cir. 2008), that the presumption against extraterritoriality is "simply not implicated" by "a statutory provision [like Section 230(c)(1)] that affords an affirmative defense to civil liability." *Force*, 934 F.3d at 73. *Blazevska* found that a statute of repose was not subject to the presumption against extraterritoriality because it "merely eliminate[d] the power of any party to bring a suit for damages ... after the limitation period." 522 F.3d at 953. In citing *Blazevska*, the Second Circuit failed to recognize that Section 230 does not erect a procedural barrier to suit; rather, it is an affirmative defense to liability and thus—unlike the statute at issue in *Blazevska—does* "directly regulate conduct." 2 F.4th at 888 n.7.

The Supreme Court has made clear, moreover, that the presumption against extraterritoriality applies with full force to statutes that do *not* directly regulate conduct. *See Kiobel*, 569 U.S. at 116 (applying presumption to bar claims filed under "strictly jurisdictional" statute that "does not directly regulate conduct or afford relief."); *see also RJR Nabisco*, 579 U.S. at 337 (holding that presumption applies "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction.").

For all these reasons, the presumption against extraterritoriality bars Meta's Section 230 defense. Any other result would render meaningless the Supreme Court's "longstanding admonition that United States law governs domestically but does not rule the world." *Abitron*, 600 U.S. at 428 (cleaned up; citation omitted).

### B.    Even If Section 230 Could Apply Extraterritorially, It Is Facially Inapplicable To This Case.

Meta's Section 230 affirmative defense also fails because Meta Ads is not an interactive computer service provider ("ICSP") within the meaning of Section 230(f)(2); rather, it is an advertising business that produces commercial speech and does not engage in any of the conduct that Section 230 was intended to protect.

### 1.    Meta Ads Is Not An "Interactive Computer Service Provider."

As noted above, a court cannot dismiss an action based on an affirmative defense like

Section 230 unless the allegations in the complaint establish the defense. *Doe v. Reddit*, No. SACV2100768JVSKESX, 2021 WL 5860904, at *3 (C.D. Cal. Oct. 7, 2021). Here, the TAC expressly alleges that Meta Ads is not an interactive computer service provider within the meaning of the CDA. *See* Section II(B), supra, and TAC ¶¶ 7, 84-109 (containing detailed allegations as to how Meta Ads' business is distinct from Meta's SMPs). For this reason, Meta's affirmative defense necessarily fails.[7]

To begin with, the CDA defines an "interactive computer service provider" as an "information service, system, or access software provider that *provides or enables computer access by multiple users to a computer server.*" Section 230(f)(2) (emphasis added). This definition is focused on *conduct* —the conduct of *providing* or *enabling* computer access—not on the provider's corporate relationships. It certainly does not encompass the entire "Metaverse."

A conduct–based focus aligns with Section 230's purposes. "Congress enacted [Section 230] … for two basic policy reasons: to promote the free exchange of information and ideas over the internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *Zeran v. Am. Online, Inc.*, 129 F.3d. 327, 330 (4th Cir. 1997). Its protections apply to conduct relevant to those purposes.

Meta Ads' conduct is not. Its conduct is ad production—which constitutes pure commercial speech—not "core First Amendment speech" like that generated by Meta's SMP users. *See Valle Del Sol, Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (cleaned up). Due to its lesser status, courts permit regulation—even prohibition—of commercial speech. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("Commercial speech is not entitled to any

---

[7] Meta does not address any of Dr. Forrest's allegations regarding the difference between Meta Ads and Meta Inc. Instead, Meta seeks to sow doubt whether Meta Ads is even real, suggesting "Meta Ads" is just "a name Dr. Forrest created himself." Def. Mem. at 15. But the TAC is replete with allegations detailing how Meta Ads is a business distinct from Meta's platforms, including its function, its purpose, whom it serves, the conduct it is engaged in, the tools it uses, and the terms under which it operates. *See* Section II(B), *supra,* and TAC ¶¶ 7, 84-109. Meta does not address these allegations.

First Amendment protection if it is misleading or related to illegal activity.")

Here, Meta's defense hinges on the proposition that, in passing Section 230, Congress intended to immunize pure commercial speech like the Scam Ads—Ads that are undeniably misleading and illegal. But Section 230's meaning must be discerned from a "most faithful reading of its text." *Morrison*, 561 U.S. at 261 (cleaned up). "It is [the court's] function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve." *Id.* at 270. There is no textual basis to find that Section 230's purpose included protecting an internet advertising business whose sole purpose is the production of pure commercial speech. [8] Nor is there any basis for concluding that Congress intended to protect advertising businesses just because they happen to be owned by a company which also operates a genuine user platform. "Section 230(c)(1) limits liability based on the function the defendant performs, not its identity." *Force*, 934 F.3d at 81 (Katzmann, C.J., concurring in part). For this reason alone, the Court should find that Meta's advertising business is not a protected ICSP.

In keeping with Section 230's language and purpose, courts typically find that the businesses that fall within the definition of an ICSP are internet service providers, online message boards, website exchange systems, or search engines. *See F.T.C. v. LeadClick Media, LLC,* 838 F.3d 158, 174 (2d Cir. 2016); *Rigsby v. GoDaddy Inc.,* 59 F.4th 998, 1007 (9th Cir. 2023) (additional citations omitted); *In re Zoom Video Commc'ns Inc. Priv. Litig.,* 525 F. Supp. 3d 1017, 1029-30 (N.D. Cal. 2021). Meta Ads is none of these things. It is an advertising business. Meta Ads is not engaged in providing or enabling internet access to multiple users, and it is not capable of doing so. TAC ¶¶ 85, 91. Meta Ads' platform connects with only one customer at a time; it does not connect ad customers to users, or users to other users. *Id.* ¶ 91. Indeed, ad customers must leave Ads Manager to connect to users. *Id.*

*LeadClick Media, LLC*, 838 F.3d at 175-76, illustrates why Meta Ads cannot be considered an ICSP within the meaning of Section 230. There, the defendant LeadClick placed internet ads for clients, like Meta Ads does, on websites of "affiliate" networks. *Id.* at 162.

_____

[8] Meta Ads' business model was invented in late 2007, 10 years after Section 230's enactment.

LeadClick raised Section 230 as a defense to FTC false advertising claims, arguing it was an ICSP because it "routed consumers from its affiliates' sites to its ad clients' websites." *Id*. at 175. The court held that this was not the type of computer access contemplated by Section 230, because LeadClick was not an "internet service provider, website exchange system, online message board, or search engine." *Id*. The fact that LeadClick was *part* of a website that *did* provide such service was deemed insufficient in that case. The same is true here.

A conduct-specific approach to Section 230 is consistent with Judge Gonzalez Rogers' holding in *In re Social Media Adolescent Addiction/Personal Injury Product Liability Litigation*, No. 4:22-MD-03047-YGR, 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) ("*SMAA*"). There, the court rejected both sides' "all or nothing approach" to Section 230, holding that:

> the application of Section 230 is more nuanced. The Court must consider the *specific conduct* through which the defendants allegedly violated their duties to plaintiffs. Here, plaintiffs allege a wide array of conduct through which defendants allegedly failed in their duty to create a safe product for users or to warn about defects. Accordingly, the Court uses a conduct-specific approach to the analysis.

2023 WL 7524912, at *11 (emphasis added). The *SMAA* court went on to find that claims such as lack of parental controls or robust age verification are not subject to Section 230 because they are based on conduct that is not equivalent to speaking or publishing activity. *Id*. at *16-17 (parental controls); *id*. at *12 (robust age verification). With its conduct-based focus Section 230 is analogous to statutes like the McCarran–Ferguson Act, 15 U.S.C. § 1012, which immunizes from federal regulation the "conduct" or "activities" of the business of insurance, not insurance companies. *See Group Life & Health Ins. Co. v. Royal Drug Co*., 440 U.S. 205, 219 (1979).

Here, Meta does not meaningfully address Dr. Forrest's allegations that Meta Ads is not an ICSP within the meaning of Section 230. Nor does it address the TAC's factual allegations that Meta Ads is operationally distinct from the parts of Meta Inc. that provide internet services to its users. Because an affirmative defense may only be considered on a Rule 12(b)(6) motion where the defense is "apparent from the face of the [c]omplaint," *Holomaxx Techs. v. Microsoft*

*Corp.*, 783 F. Supp. 2d 1097, 1103 (N.D. Cal. 2011)**,** Meta's Section 230 defense must be rejected. *See F.T.C. v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 276 (D. Conn. 2013) (where complaint did not allege that defendant was an ICSP, court denied motion to dismiss on Section 230 grounds, because "[a]t the very least, plaintiffs should have the opportunity to develop facts, during discovery" showing what LeanSpa's ad process involved).[9]

None of the cases cited by Meta addresses whether an advertising business like Meta Ads is immune under Section 230. *Sikhs for Justice, Inc. v. Facebook, Inc.,* 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015), *Loomer v. Zuckerberg*, No. 22-cv-02646-LB, 2023 WL 6464133, at *12 (N.D. Cal. Sept. 30, 2023), and *Ebeid v. Facebook, Inc.*, No. 18-cv- 07030, 2019 WL 2059662, at *3 (N.D. Cal. May 9, 2019), all involved challenges to content moderation by Facebook *the platform* brought by users who were banned or whose content was blocked or taken down. These cases have no bearing on Meta Ads' status as an ICSP, both because none involves advertising or Meta Ads, and because in each of them the plaintiff either conceded or did not dispute that the ICSP test was met.[10]

Even the cases Meta cites that involve some aspect of advertising do not support its contention that Meta Ads is an ICSP. In *Calise v. Meta Platforms, Inc*., No. 21-cv-06186-JSW, 2022 WL 1240860 (N.D. Cal. Apr. 27, 2022) (brought by users deceived by fraudulent ads),

---

[9] *See also CYBERsitter, LLC v. Google Inc*., 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012) (denying motion to dismiss trademark infringement claims where issue of whether internet search engine service provider met "material contribution" test for Section 230 immunity involved fact questions not susceptible to resolution on motion to dismiss); *J.S. v. Village Voice Media Holdings, L.L.C*., 184 Wash. 2d 95, 103 (2015) (denial of motion to dismiss because fact finding was needed as to whether the website helped develop illegal content for purposes of Section 230).

[10] Meta misleadingly cites *Sikhs for Justice* as holding "that the fact that an entity allegedly '*generates revenue as an advertising agency'* does not change that the entity also 'provides or enables computer access by multiple users to a computer service.'" Def. Mem. at 15 (emphasis added). But the italicized quote Meta attributes to the *Sikhs* court appears nowhere in the decision. *Lloyd v. Facebook, Inc*., No. 21-cv-10075-EMC, 2022 WL 4913347, at *8 (N.D. Cal. Oct. 3, 2022), involving ADA and privacy claims, similarly had nothing to do with whether Meta's advertising business was an ICSP. And *Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093, 1097 (9th Cir. 2019), involved user content and did not address whether Meta Ads is an ICSP.

and *Newton v. Meta Platforms, Inc*., No. 23-cv-00116-JD, 2023 WL 5749258, at *2 (N.D. Cal. Sept. 6, 2023) (brought by advertisers whose ads were banned), the parties did not allege that Meta Ads was a distinct business and *agreed* for purposes of the motion to dismiss that the ICSP test was met. And in *Ynfante v. Google LLC*, No. 22-cv-6831 (JGK), 2023 WL 3791652 at *3 (S.D.N.Y. June 1, 2023), the complaint acknowledged that "the advertisement was produced by a third party who then submitted the advertisement to Google for publication" — which is assuredly not this case.

In short, because Meta Ads has not shown that it is an ICSP; Section 230 has no application to this case.

### 2.    The Scam Ads Are Not Supplied By "Another Information Content Provider."

Meta also argues that Section 230 affords it complete immunity because it is not a "content provider" as to the Scam Ads, claiming that the TAC "concedes" that the scammers supplied "the scam ads themselves." Def. Mem. at 16. Meta cites TAC ¶ 4 on this score. But what paragraph 4 says is that Meta Ads produces the Scam Ads using "*basic material* supplied by criminal scammers." No concession is made that the scammers supplied the content that was finally displayed – i.e., the *Ads themselves*. None of the other TAC provisions Meta cites supports the notion that the scammers alone supplied the ads, as is clear from the parentheticals themselves. Def. Mem. at 24-25. In fact, nearly the entire TAC is focused on how *Meta Ads* produces the Ads. *See generally* TAC § VII, ¶¶ 79, 119-132.

Of course, at this stage Dr. Forrest's allegations are necessarily based on the limited information Meta makes publicly available, and thus cannot reveal the full extent of Meta's control of the content of the Scam Ads. *See id*. ¶ 108 n.24. Moreover, Meta has refused to provide specific information about the ads and how they came to be approved and run. *Id*. ¶ 114, n.25. Even Meta's advertising customers are not privy to all that Meta Ads does to produce ads. *Id*. ¶ 133.

But Meta *itself* knows exactly what Meta Ads did and didn't do to produce the Scam Ads and how it contributed to them. Meta has stated to the Court that it has preserved the ESI

of recent ads. Thus Meta could easily demonstrate its alleged lack of contribution if it wants to. As with Meta's allegation that Meta Ads is an ICSP, it is Meta's burden to establish that it was *not* involved in the creation of the Ads, not Dr. Forrest's burden to show (pre-discovery) how it was. But Meta offers nothing. In light of Meta's silence on this issue, dismissal at this stage is unwarranted. *See F.T.C. v. LeanSpa*, 920 F. Supp. 2d at 276; *CYBERsitter v. Google*, 905 F. Supp. 2d at 1086 (motion to dismiss denied as premature where parties disputed whether misleading statements in ads were made by Google or by third party alone); *Nestle Purina PetCare Co. v. Blue Buffalo Co. Ltd*., No. 4:14-cv-00859-RWS, 2015 WL 1782661, at *8 (E.D. Mo. 2015) (denying motion to dismiss claims against advertiser where allegations were not "robust," because "it would be difficult for Blue Buffalo to plead many additional facts at this time without the benefit of discovery.").[11]

Moreover, Meta's contention that it merely supplies "neutral tools" to its advertising customers relies on an approach to Section 230 that has outstripped its usefulness in the present context. The "neutral tools" approach may have made sense in the past because it might have been burdensome for ICSPs to be responsible for every misuse of general purpose tools they offer to their users, including foreseeable misuses. But that approach developed in an era in which the neutral tools made available by internet service providers were relatively rudimentary and do not remotely resemble sophisticated software like Ads Manager, which transforms raw content into slick advertisements that Meta Ads customers never could have devised on their own.

Indeed, Dr. Forrest's allegations about Meta Ads' involvement with content here are nothing like the conduct in the cases cited by Meta (*see* Def. Mem. at 9-11). In *Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1268-69 (9th Cir. 2016), for example, Yelp created a star rating system that combined user feedback, and posted a review from another site. Here, in contrast, the TAC

---

[11] *See also Swift v. Zynga*, No. C 09-05443 SBA, 2010 WL 4569889, at *5 (N.D. Cal. Nov. 3, 2010) (denying motion to dismiss under Section 230 as premature where plaintiff did not concede that defendant was a "neutral website"); *Perfect 10, Inc. v. Google, Inc.,* No. 04-cv-9484 AHM (SHX), 2008 WL 4217837, at *8 (C.D. Cal. July 16, 2008) (Rule 12(b)(6) dismissal was premature even though "it is highly likely" that the plaintiff will have difficulty establishing that Google created or developed unlawful content) (citations omitted).

alleges that Meta Ads produced and optimized the ads itself, not just summarized or cut and pasted others' content. Even based on the limited information Dr. Forrest has been able to learn about Meta Ads' contribution to the Scam Ads without the benefit of any discovery, this case presents a level of involvement that readily distinguishes all of the cases cited by Meta for the proposition that it merely provides "neutral tools" to its advertisers, and raises issues of fact about its role that cannot be resolved on a motion to dismiss.[12]

### 3. Meta Ads Is Not A "Publisher" With Respect To The Scam Ads.

Section 230 is also inapplicable here because this lawsuit does not challenge the actions of a "publisher" within the meaning of Section 230. Rather, Dr. Forrest challenges Meta Ads' acts as an advertising business that occurred *before* the fraudulent ads even became "content" or ever reached its social media platforms. *See* TAC ¶¶ 108, 119, 162. As the Ninth Circuit said in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019), "[w]e look [] to what the duty… actually requires… whether [it] would necessarily require [the] company to monitor third-party content." Under these allegations, it would not.

The TAC alleges that Meta Ads fails to reject prospective advertising clients through the use of simple, effective tools designed to identify and reject ad clients who: (1) cannot verify themselves as authentic businesses by supplying a real name, address or phone number (TAC ¶¶ 110, 146); (2) fail to produce evidence they hold the license necessary to advertise and sell financial products in the advertisers' selected market for dissemination (*id*. ¶¶ 147, 156-62); and (3) seek to produce financial and investment product ads depicting Dr. Forrest's name, or still or video images. *Id*. ¶¶ 138-45, 164-67. These allegations all involve conduct that occurs before any content is even created. As such they cannot implicate protected publishing activity

---

[12] Other cases cited by Meta are similarly distinguishable. In *Calise*, 2022 WL 1240860, the plaintiffs did not even allege that Meta "played a role in creating the unlawful ads." In *Rigsby v. GoDaddy Inc.,* 59 F.4th 998, 1009 (9th Cir. 2023), the defendant's alleged misconduct merely consisted of providing a third party a domain name. In *Dyroff*, 934 F.3d at 1099, users were merely given "blank text boxes in which they could post and share experiences, questions, and answers." And in *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 321 (D.D.C. 2012), the defendant was merely alleged to have "encouraged [the Third Palestinian Intifada Facebook page] ... by failing to remove" a Facebook page "in a timely manner."

—"deciding whether to publish, withdraw, postpone, or alter content"—by a genuine ICSP. *See SMAA*, 2022 WL 7524912, at *14 (discussing how recommendation of adult chat partner to child was not publishing activity because it was "distinct from the recommendation or publication of content") (citation omitted).

And, importantly, Meta Ads customers are not the same as Meta users. When Meta Ads customers initiate the ad process through Ads Manager, they supply basic information about their identity and business. At that point there is no content. Because there is no content, rejection of a Meta Ads customer at this point could not be "speaking or publishing," nor is there any content to "fix." *SMAA*, 2023 WL 7524912, at *13-15.

Because Dr. Forrest's claims arise from Meta's acts as an ad business, not as a publisher, this case is distinguishable from cases where websites were simply passive conduits allowing users to post user-created content without even review or approval. *See, e.g., Force*, 934 F. 3d at 69-70 (Facebook did not review or suggest edits to the Hamas related content posted by its users). Here, Dr. Forrest alleges that Meta produced and was paid for the Scam Ads. The Scam Ads "don't magically become lawful" when they get posted online. *Roomates.com*, 521 F 3d at 1164, and Section 230 does not attach.

*In re Facebook, Inc.*, 625 S.W.3d 80, 94 (Tex. 2021), which Meta cites, does not involve ad content produced by Meta Ads. The only case cited by Meta to support its overbroad publishing argument, *Ripple Labs Inc. v. YouTube LLC*, No. 20-cv-02747-LB, 2020 WL 6822891 (N.D. Cal. Nov. 20, 2020), was decided solely on the question of YouTube's alleged "material contribution" to content placed by scammers on highjacked YouTube user channels —it did not address the question of publishing immunity. *Id.* at *6-7. (YouTube did not "materially contribute" to the scam (and create content) by awarding a "verification badge[,]" or "by allowing advertisers to display views that the video received.").

In short, Meta's argument that it is merely a publisher lacks merit and should be rejected.

### C.    Dr. Forrest Has Stated Viable Claims For Relief

#### 1.    Dr. Forrest Has Stated A Viable Misappropriation Claim

Dr. Forrest has more than sufficiently stated a claim for misappropriation of name and likeness under California common law, which requires that he plead: (1) the defendant's use of the plaintiff's identity; (2) appropriation of the plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Maxwell v. Dolezal*, 231 Cal.App.4th 93, 97 (2014). Meta challenges only the first two elements of this claim, Def. Mem. at 24-25, but these attacks fall flat.

Meta first asserts that Dr. Forrest does not allege that *Meta* used his name and likeness, only that the Scammers did. This is incorrect. The TAC alleges throughout that Meta Ads produced and is still producing ads that misuse Dr. Forrest's image and voice. *See* TAC ¶¶ 54, 79, 118-32, 215-18 (detailing Meta Ads' production process). This meets the pleading burden. *See Waits v. Frito-Lay, Inc*., 978 F.2d 1093, 1110 (9th Cir. 1992) (upholding misappropriation claims against company and its advertising agency that was involved in ads). Meta knew the Scam Ads contain misappropriated images of Dr. Forrest, and that Dr. Forrest never consented to the use of his image to sell cryptocurrency and other financial products. *See* TAC ¶¶ 69 – 83 (detailing all the ways Meta has been notified of, and has even acknowledged, the misappropriation); *id*. ¶ 145. Yet Meta Ads continued to produce the ads, accept payment for them, and deliver them to Meta's SMPs and other third-party sites. *Id*. ¶ 216.

The allegations regarding Meta Ads' producing conduct make this case distinct from *Cross v. Facebook, Inc*., 14 Cal.App.5th 190, 210 (2017), which Meta cites. Def. Mem. at 24. There, Facebook displayed ads next to third party content that misused the plaintiff's name and likeness. *Id*. at 210. The ads did not misuse the plaintiff's likeness, making *Cross* irrelevant to the facts here. *Perfect 10*, 2010 WL 9479060, at *8, similarly involved ads placed on third party blogger pages, but the ads did not misuse the plaintiff's likenesses.[13]

---

[13] Unlike bloggers, advertising agencies may be held liable for false or fraudulent ads when they "participated in the design and creation of those ads." *Nestle Purina PetCare,* 2015 WL 1782661 at *8; *LeadClick,* 838 F.3d at 176 (advertiser can be liable based on its knowing participation in fraudulent ads).

Meta's second argument, that the TAC does not sufficiently allege that it misappropriated Dr. Forrest's likeness for its own "advantage or benefit," simply ignores contrary allegations in the TAC. The TAC describes the ways in which Meta specifically benefits financially from the Scam Ads, including by: charging ad customers to produce and run ads on Meta's platforms (TAC ¶ 217); increasing user engagement by using ads that appropriate images of well-known individuals like Dr. Forrest and imply his endorsement (*id*. ¶ 218); and placing ads with third-party websites (*id*. ¶ 216). Moreover, each time a user engages with an ad featuring Dr. Forrest, Meta gains more data, which it can use to its own benefit (*id*. ¶ 118). Meta thus directly benefits from the ads and their content.

The digital nature of Meta makes this case entirely distinct from the print advertising claims in *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998). Def. Mem. at 25. There, the Court held that Sports Illustrated did not benefit from misappropriation in an ad because the benefit it received—payment for advertising space—was unrelated to the ads' content. Of course, unlike Sports Illustrated, Meta does not just sell advertising space. And here, Meta benefits *because of* the content of the Ads, through increased engagement and increased data capture, both of which are inapplicable to a printed magazine like Sports Illustrated. Thus Dr. Forrest has adequately stated a claim for misappropriation.

### 2. Dr. Forrest Has Stated A Viable Claim For Negligence And Negligent Failure To Warn.

Meta argues that Dr. Forrest's negligence-based claims are not cognizable because Meta "does not owe a duty to users—including Dr. Forrest—to control the actions of third party scam advertisers." Def. Mem. at 18. Putting aside that Dr. Forrest is not a "user" with respect to the Scam Ads, this argument fails because he seeks to hold Meta liable for its *own* misconduct related to the Scam Ads, not for the misconduct of third parties.[14]

Meta ignores Dr. Forrest's myriad allegations describing the ways in which Meta's

---

[14] Meta mischaracterizes Dr. Forrest's allegations when it contends that "third parties 'produced' the Scam Ads, not Meta." Def. Mem. at 18; *see also id*. at 18-19 (claiming that "Plaintiff's own allegations show—at base—that he seeks to hold Meta liable for third-party users having posted those ads on Facebook."). Dr. Forrest specifically alleges that Meta *itself* produces the Scam Ads. *See* TAC ¶¶ 108-118.

deeply flawed advertising software directly enabled criminal fraudsters to profit by misappropriating images of public figures like him. *See* TAC ¶¶ 4, 8, 90, 108-18. Without Meta's active role in producing the Scam Ads, the criminal fraudsters' advertising scams would never have gotten off the ground. These allegations are more than sufficient to show that Meta itself "created a risk of harm to another or permitted the risk of such harm to increase." *SMAA*, 2023 WL 7524912, at *36; *see also Ileto v. Glock Inc.*, 349 F.3d 1191, 1209 (9th Cir. 2003) (allowing negligence claim against gun manufacturer, even though the plaintiff's injuries were inflicted by third parties, where plaintiff alleged that the gun manufacturer's conduct was a "substantial factor" in causing the victims' injuries); *Hacala v. Bird Rides, Inc.*, 90 Cal.App.5th 292, 311 (2023) (allowing negligence claim against scooter manufacturer brought by pedestrian injured by rental scooter left on a sidewalk by unknown third party, where plaintiff "allege[d] sufficient facts that, if proven, would support a finding that [the manufacturer's] conduct [in failing to remove abandoned scooters] *contributed* to the risk of harm that resulted in plaintiffs' injuries.") (emphasis in original); *Social Media Cases*, JCCP 5255 (Cal. Super. Ct. Oct. 13, 2023), at 44-45 (**attached hereto as Exhibit 1**) (holding that plaintiffs alleging that, as children or minor teenagers, they became addicted to various social media platforms stated a claim for negligence based on allegations that plaintiffs were harmed by defendants' own conduct).[15]

Meta does not mention any of this case law. Instead, it relies on cases holding that, where the defendant "did *not* engage in active conduct that increased the risk of harm to plaintiffs," negligence claims involving third-party conduct are non-cognizable absent a "special relationship" between the plaintiff and defendant. *See Melton v. Boustred*, 183 Cal.App.4th 521, 535 (2010) (emphasis added). But the law is clear that where—as here—a negligence claim is grounded upon the defendant's *own conduct* in increasing the risk of harm

---

[15] In *SMAA*, 2023 WL 7524912, at *37-38, the court ultimately dismissed the plaintiffs' negligence claims seeking to hold internet providers liable for designing a product that "attracts, enables, and facilitates child predators." There, *unlike here*, plaintiffs merely alleged that defendants "know or had reason to know" that predators used their sites, whereas Dr. Forrest alleges that Meta's negligence is directly responsible for the Scam Ads being created in the first place.

from third parties, no special relationship is required. *Hacala,* 306 Cal.Rptr.3d at 916, 90 Cal.App.5th at 312.[16]

Beyond that, Meta's argument fails because there *is* a special relationship between Dr. Forrest and Meta. Dr. Forrest contacted Meta in 2019 to demand that it take action to stop further Scam Ads featuring his misappropriated image. TAC ¶ 70. In a letter dated October 18, 2019, Meta specifically promised to "work cooperatively with [Dr. Forrest] *to stop third party advertisers from running the policy-violating advertisements at issue, and to remove such advertisements* from the Facebook Service." *Id.* ¶ 76 (emphasis added). This alone is more than sufficient to establish a special relationship. *See Seo v. All Makes Overhead Door*, 97 Cal.App.4th 1193, 1203 (2002) (recognizing that "[a] special relationship may also arise out of a statutory duty or a contractual duty … [and] out of a voluntary assumption of a duty upon which a person reasonably relies.") (citation omitted); *cf. Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1200 (N.D. Cal. 2009) (holding that there was no contractual relationship between Google and plaintiff where (unlike here) "there is no allegation that Google ever promised Plaintiff or anyone else, in any form or manner, that it would enforce its Content Policy."). Moreover, Meta represented in the same letter that it was actively deploying specific tools and features to stop Scam Ads. TAC ¶ 75. That, too, supports a finding of a duty here. *See Delgado v. Trax Bar and Grill*, 36 Cal.4th 224, 249 (2005); *see also Rickley v. Goodfriend*, 212 Cal.App.4th 1136, 1156-57 (2013) ("A defendant who enters upon an affirmative course of conduct affecting the interests of another is regarded as assuming a duty to act, and will be

---

[16] The cases cited by Meta, *see* Def. Mem. 19, involving websites are all distinguishable, either because they do not involve negligence claims, *see Beckman v. Match.com, LLC*, 743 F. App'x 142, 143 (9th Cir. 2018), or because they involve harm caused exclusively by user postings, not by independent negligent behavior of the defendant. *See, e.g., Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1100 (9th Cir. 2019) (holding that "Experience Project's features amounted to content-neutral functions that did not create a risk of harm"); *Jackson v. Airbnb, Inc.*, 654 F. Supp. 3d 990, 995 (C.D. Cal. 2023) (disallowing negligence claim against Airbnb where plaintiff failed adequately to allege that Airbnb "increased the risk of harm beyond what existed without the undertaking."); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (dismissing claim against website where "the complaint nowhere alleges or even suggests that Facebook provided, created, or developed any portion of the content that Klayman alleges harmed him").

1   liable for negligent acts or omissions because one who undertakes to do an act must do it with

2   care.").

3          Meta also suggests that, to the extent there is a special relationship between Dr. Forrest

4   and Meta, it cannot give rise to a duty to warn Meta's *users* (with whom there is no such

5   relationship). Def. Mem. at 20 n.6. That argument improperly assumes that the only

6   beneficiaries of such a warning would be Meta's users, not Dr. Forrest. In reality, Dr. Forrest's

7   failure-to-warn claim is akin to that approved by the Ninth Circuit in *Doe v. Internet Brands,*

8   *Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). Here, information supplied by Dr. Forrest and others,

9   which does not require a detailed investigation but rather a self-produced warning not involving

10  changes to user content, does not fall with Section 230's protections. Dr. Forrest would directly

11  benefit from such a warning because it would put users on notice and affirmatively disclaim the

12  Ads' validity, thereby mitigating the damage to Dr. Forrest's reputation from them.

13                **3.      Dr. Forrest Has Stated A Viable Unjust Enrichment Claim.**

14         Unjust enrichment "applies where plaintiffs, having no enforceable contract,

15  nevertheless have conferred a benefit on defendant which defendant has knowingly accepted

16  under circumstances which make it inequitable for the defendant to retain the benefit without

17  paying for its value." *LeBrun v. CBS Television Studios, Inc.,* 68 Cal.App.5th 199, 209 (2021)

18  (citation and internal quotations omitted). This equitable doctrine extends to the facts here

19  because Dr. Forrest has unwittingly been the victim of the unlawful use of his name and image

20  due to a fraud such that he is entitled to relief. *Am. Master Lease LLC v. Idanta Partners, Ltd.*,

21  225 Cal.App.4th 1451, 1482-83 (2014).

22         *Roadrunner Intermodal Services, Inc. v. T.G.S. Transportation, Inc.*, No. 1:17-cv-

23  01207-DAD-BAM, 2021 WL 2188138, at *14 (E.D. Cal. May 28, 2021), which Meta cites, is

24  inapplicable because there the court found that the plaintiff did not confer anything of value to

25  the defendant at his own expense, and thus any profits reaped by the defendant lacked

26  proximate cause. Here, the alleged causal connection is clear and foreseeable. Meta became a

27  knowing third-party pilferer of Dr. Forrest's value, receiving consideration from the Scammers

28  for its participation. *See* TAC ¶¶ 255-257. Meta's argument that this claim should be dismissed

because it seeks duplicative remedies misrepresents the law. *See Astiana v. Hain Celestial Group Inc.*, 783 F.3d 753, 762-63 (9th Cir. 2015).

### 4. Dr. Forrest Has Stated A Viable Claim For Declaratory Relief.

For the reasons discussed in Section II(A), a genuine controversy exists as to whether Meta should succeed in its use of judicial arbitrage to deny Australians their substantive rights under Australian law, or whether principles of comity should prevail. This Court should exercise its inherent discretion to declare that Meta cannot assert Section 230 as an affirmative defense to any of Dr. Forrest's claims, as the Scam Ads continue to harm him. *See Wacker v. Hammerking Productions Inc.,* 608 F. Supp. 3d 947, 965 (C.D. Cal. 2022) (citing Declaratory Judgment Act: "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. § 2201(a).) The relevant inquiry for such a judgment is whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* Here, the TAC more than adequately supports sufficient immediacy—namely four years of Scam Ads misusing Dr. Forrest's name and image that continue to this day—and no action by Meta.

### D. Dr. Forrest's Claims Are Not Time Barred.

Meta's argument that Dr. Forrest's misappropriation and unjust enrichment claims are time barred, Def. Mem. at 15-16, is based on its erroneous assertion that "Plaintiff admits in his TAC that he has been aware of the alleged scam ads" since 2014. The TAC makes clear that Dr. Forrest did not learn of the Scam Ads until 2019. *See* TAC ¶ 54. Meta's contention to the contrary is based on allegations in the TAC relating to *imposter pages*—not advertisements—that featured Dr. Forrest's image. *Id.* ¶¶ 44-52. Dr. Forrest included those allegations in the TAC to show that Meta was on notice that internet scammers were targeting him several years before the Scam Ads started appearing on Facebook and that it made certain promises to Dr. Forrest to protect him from fraud on its platforms, *not* because he is seeking damages for those imposter pages (he isn't). The statute of limitations accordingly did not begin to run on Dr.

Forrest's original claims until Spring 2019, and the persistence of the Scam Ads constitutes a continuing harm.

### E.    Meta's Attempt To Preempt Future Amendments Should Be Rejected.

Finally, Meta suggests that Dr. Forrest should be preemptively denied leave to amend because Section 230 renders any amendment futile. But for the reasons described above, Meta has not met its burden to show that Section 230 even applies. And it is premature to decide that additional facts could not cure pleading defects, if any were found. This is not a case like those cited by Meta, where amending would be futile because the complaint itself admits the facts that require dismissal. In the event that the Court finds any deficiency in the allegations of the TAC, Dr. Forrest would request leave to amend to address the deficiency.

## IV.    CONCLUSION

For all of the foregoing reasons, Meta's motion to dismiss should be denied in its entirety. Meta cannot claim that it lacks the ability to prevent fraudulent advertisements such as those featuring Dr. Forrest. Meta has successfully stopped fraudulent scam ads featuring other public figures when sued in jurisdictions that do not have any equivalent to Section 230. *See* Dutch Court Orders Facebook to Remove Fake Bitcoin Ads (cointelegraph.com). Meta should not be allowed to use Section 230 as an excuse to continue to inflict harm on Dr. Forrest and the countless Australians who have fallen victim to the Scam Ads.

Dated: March 7, 2024

**BAILEY & GLASSER LLP**

*/s/ Elizabeth Ryan*
Elizabeth Ryan (admitted *pro hac vice*)
eryan@baileyglasser.com
John Roddy (admitted *pro hac vice*)
jroddy@baileyglasser.com
176 Federal Street, 5th Floor
Boston MA 02110
T: 617.439.6730
F: 617.951.3954

Leslie Brueckner (SBN 140968)
lbrueckner@baileyglasser.com
Arthur Bryant (SBN 208365)
abryant@baileyglasser.com
1999 Harrison Street, Suite 660
Oakland, CA 94612
T: 510.272.8000
F: 510.463.0291

Katherine E. Charonko (admitted *pro hac vice*)
kcharonko@baileyglasser.com
209 Capitol Street
Charleston WV 25301
T: 304.345.6555
F: 304.342.1110

Elizabeth L. Stryker (admitted *pro hac vice*)
estryker@baileyglasser.com
94 Long Street, Suite 200
Westover WV 26501
T: 304.594.0087
F: 304.594.9709

**DEREK G. HOWARD LAW FIRM, INC.**
Derek G. Howard (Bar No. 118082)
derek@derekhowardlaw.com
Ashley M. Romero (Bar No. 286251)
ashley@derekhowardlaw.com
42 Miller Avenue
Mill Valley, CA 94941
T: 415.432.7192
F: 415.524.2419

*Attorneys for Plaintiff Dr. Andrew Forrest*

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:22-CV-03699-PCP

**CERTIFICATE OF SERVICE**

This is to certify that on March 7, 2024 a copy of the foregoing was served upon counsel of record for Defendant via the Court's ECF system.

*/s/ Elizabeth Ryan*
Elizabeth Ryan

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COMPLAINT
CASE NO. 5:22-CV-03699-PCP