1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    ANDREW FORREST,                          Case No.  22-cv-03699-PCP

8                    Plaintiff,

9            v.                               **ORDER GRANTING IN PART
                                              MOTION TO DISMISS**
10   META PLATFORMS, INC.,
                                              Re: Dkt. No. 104
11                   Defendant.

12

13          Dr. Andrew Forrest brings this action against Meta Platforms, Inc. arising from Facebook

14   ads that allegedly show him endorsing fraudulent cryptocurrency and other investment products.

15   Dr. Forrest seeks damages and an injunction on several common law claims. For the reasons that

16   follow, Meta's motion to dismiss is denied in part and granted in part.

17   **I.      Background**

18          The following facts from the complaint are accepted as true in resolving Meta's motion.

19          Dr. Forrest is a prominent Australian businessman and philanthropist. He is the founder

20   and executive chairman of Fortescue Metals Group and has donated more than $7 billion AUD to

21   charity. He has received many honors and is widely recognized in Australia.

22          Dr. Forrest did not use social media before 2014, when he discovered that his image had

23   been used to create "imposter" pages on Facebook (the social media platform operated by Meta)

24   that purported to belong to him.[1] Dr. Forrest investigated and learned that these pages were created

25   by scammers using false identities. He then brought the matter to Meta's attention. Meta assured

26

27   _____

28   [1] Meta was previously known as Facebook, Inc. For clarity, this order follows the convention of
     the complaint: "Meta" refers to the company and "Facebook" refers to its social media platform.

him it would take steps to stop the imposter pages. Dr. Forrest did not want to be on social media but at Meta's urging he set up a "verified" Facebook page. Meta then took down some but not all of the imposter pages.

Beginning in 2019, Dr. Forrest learned that ads using his name and likeness to endorse cryptocurrency and other fraudulent investment products were appearing on Facebook. Some were accompanied by fake testimonials from investors who said they turned $250 into millions in a matter of months. Others included doctored "deepfake" videos of Dr. Forrest. Dr. Forrest learned about these scam ads from victims. He paid for an investigation of these ads and determined that the advertisers were located outside the United States, including in Eastern Europe and Southeast Asia. Many Australian Facebook users have fallen prey to the ads featuring Dr. Forrest. The complaint includes several examples of victims who lost tens or hundreds of thousands of dollars.

In May 2019, Dr. Forrest communicated with a senior Meta executive in Australia. Dr. Forrest demanded that Meta prevent further dissemination of the ads. The executive emailed Dr. Forrest to offer a "direct line" for reporting content "so that we can move quickly to take down these scam ads." First Amd. Compl., Dkt. No. 101, ¶ 72. Meta's attorneys later wrote to Dr. Forrest saying that Meta had "adjusted their detection mechanisms" to ferret out misleading ads that featured him. In November 2019, after scam ads continued, Dr. Forrest wrote an open letter to CEO Mark Zuckerberg.

Dr. Forrest alleges that scam ads continue to appear on Meta's platforms in Australia.

A big part of Meta's business is selling ads. Meta sells ads not only on its own platforms but also on other channels like third-party websites and apps. Advertisers and social media users interact with Meta differently. The two groups must agree to different terms, for example.

Meta offers a suite of tools for producing ads. Advertisers access these tools from a separate platform. The tools prompt advertisers for input. Advertisers must first create a business page and supply payment and contact information. They can then select the goal for an ad and an audience to target. Meta also offers tools that can improve the look of ads to increase their appeal. Meta does not review ads before they are completed and paid for.

1   Dr. Forrest alleges that Meta's software ultimately determines what completed ads look

2   like and who sees them. One tool, for example, takes the images, videos, text, and audio that the

3   advertiser supplies and "mixes and matches them" to change how the ad looks and improve

4   performance. Compl. ¶ 120. This tool is enabled by default. It can adjust the appearance of an ad

5   based on how likely each viewer is to respond. The software can create videos from images and

6   can highlight key phrases from text. Dr. Forrest alleges that at least some of the scam ads he is

7   challenging were created using this tool. Another tool uses generative artificial intelligence to

8   automatically optimize an ad so that the audience will be more likely to interact with it. This AI

9   tool can add music, fine-tune visuals, and even add 3-D animation. In addition to determining the

10   appearance of an ad, Meta's software also determines which users are eventually shown the ad.

11   Dr. Forrest filed this lawsuit against Meta in September 2021 in California state court. He

12   asserts six California state law claims. Meta removed the case to this Court in June 2022. Dr.

13   Forrest is separately pursuing a private criminal prosecution against Facebook in Australia. This

14   case was stayed until November 2023 while the Australian proceeding progressed. Dr. Forrest

15   then filed the operative amended complaint, which Meta has moved to dismiss.

## II.   Legal Standard

17   A complaint that does not state a plausible claim upon which relief can be granted can be

18   dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when

19   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

20   defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "must be

21   supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the

22   complaint as true and construe the pleadings in the light most favorable to the nonmoving party."

23   *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

## III.   On this Rule 12(b)(6) Motion, Section 230 Does Not Bar Dr. Forrest's Claims.

25   Section 230(c)(1) of the Communications Decency Act provides that "[n]o provider … of

26   an interactive computer service shall be treated as the publisher or speaker of any information

27   provided by another information content provider." 47 U.S.C. § 230. An "interactive computer

28   service" is "any information service, system, or access software provider that provides or enables

United States District Court
Northern District of California

3

United States District Court
Northern District of California

computer access by multiple users to a computer server." *Id.* § 230(f). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.*

"Section 230(c)(1) is an affirmative defense." *Calise v. Meta Platforms, Inc.*, — F.4th ——, 2024 WL 2826231, at *3 (9th Cir. 2024). Meta thus bears the "burden of showing that § 230(c)(1) applies." *Id.* To survive a motion to dismiss, plaintiffs "simply need to plead facts demonstrating a potential factual dispute that could affect whether the defense applies." *Rabin v. Google LLC*, —— F. Supp. 3d ——, 2024 WL 1269313, at *2 (N.D. Cal. 2024). "Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 604 (9th Cir. 2018).

Meta argues that Section 230 bars all of Dr. Forrest's claims. But as explained below, Meta has not established beyond dispute that Section 230 provides an airtight affirmative defense to all of Dr. Forrest's claims. Meta's motion to dismiss based on Section 230 is therefore denied.

### A.     Section 230 Limits Liability in U.S. Courts for Actions Taken Abroad.

Dr. Forrest first argues that the Section 230 defense is not available to Meta at all in this case because all of the conduct giving rise to his claims took place outside of the United States. This argument fails because Section 230 establishes a liability rule for litigation in U.S. courts rather than a conduct rule that applies to actions taken outside the United States.

Courts presume that U.S. law does not apply extraterritorially. "It is a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016) (cleaned up). The Supreme Court "has established a two-step framework for deciding questions of extraterritoriality":

> The first step asks whether the presumption against extraterritoriality has been rebutted. It can be rebutted only if the text provides a clear indication of an extraterritorial application. If the presumption against extraterritoriality has not been rebutted, the second step … asks whether the case involves a domestic application of the statute. Courts make this determination by identifying the statute's focus and asking

1  whether the conduct relevant to that focus occurred in United States
2  territory. If it did, then the case involves a permissible domestic
   application of the statute.

3  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018) (cleaned up).

4  The text of Section 230 does not clearly indicate that it applies extraterritorially.

5  Accordingly, the question is whether this case involves a domestic application of the statute. As

6  the Ninth Circuit recently reasoned in *Gonzalez v. Google, LLC*, Section 230 limits liability rather

7  than directly governing behavior. *See* 2 F.4th 871, 888 (2021), *vacated*, 598 U.S. 617 (2023).[2] And

8  "because § 230(c)(1) focuses on limiting liability, the relevant conduct occurs where immunity is

9  imposed, which is where Congress intended the limitation of liability to have an effect, rather than

10  the place where the claims principally arose." *Id.* This case is being litigated in the United States,

11  so applying Section 230 as a defense to liability involves a *domestic* application of Section 230,

12  even if the actions that might otherwise create liability occurred elsewhere. *See id.* Meta is

13  therefore not foreclosed from invoking Section 230 as a defense to Dr. Forrest's allegations.

14  **B.    Meta Has Not Established its Section 230 Immunity Beyond Factual Dispute.**

15  Meta argues that Section 230 provides a defense to all of Dr. Forrest's claims. To invoke

16  this affirmative defense at the pleading stage, Meta must show that Dr. Forrest's allegations

17  establish beyond dispute:

18  (1) that Meta is a "provider … of an interactive computer service";

19  (2) that the challenged content is "information provided by another information content

20  provider"; and

21  (3) that Dr. Forrest's claims "treat" Meta as the "publisher or speaker" of that information.

22  *See Calise*, — F.4th at ——, 2024 WL 2826231, at *5.

23  As explained below, Dr. Forrest's allegations establish that Meta acted as an interactive

24  computer service provider. But the allegations leave a potential factual dispute as to whether the

---

[2] Because *Gonzalez* was vacated (albeit on other grounds), it is cited only for the persuasiveness of its reasoning. *See, e.g.*, *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1142 n.4 (9th Cir. 2023).

challenged ads are provided entirely by *another* information content provider. Accordingly, Meta cannot establish based on the pleadings alone that Section 230 provides an impenetrable defense.

> **1.     The Complaint Establishes that Meta's Ad Business Functioned as an Interactive Computer Service Provider.**

The first question is whether Dr. Forrest's complaint establishes that Meta is acting as a "provider … of an interactive computer service." Meta argues that courts have "uniformly held that Meta meets Section 230's 'interactive computer service provider' definition." Motion, Dkt. No. 104, at 15. In several of the cases Meta relies on, however, this question had been conceded. *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015). More importantly, whether an entity is an interactive computer service provider depends on context; there is no permanent all-encompassing "provider" status that indefinitely immunizes any entity deemed in a particular case to be one. As the language of Section 230 and opinions interpreting it make clear, an entity is shielded from liability only in its "*capacity* as a provider of an interactive computer service." *Rigsby v. GoDaddy Inc.*, 59 F.4th 998, 1008 (9th Cir. 2023) (emphasis added). That Meta may have been acting in an interactive-computer-service-provider capacity in the context of one case—or that the parties conceded as much—does not establish that Meta is *always* acting in that capacity in all other contexts. Here, Dr. Forrest disputes whether Meta was acting as an interactive computer service provider in operating its ad business.[3] So Meta can only succeed on its Section 230 defense if Dr. Forrest's allegations establish beyond dispute that Meta, in the context of these allegations, was in fact acting as such a provider.

They do so. The complaint alleges that "Meta Ads" "market[s] and sell[s] advertising to advertisers targeting the user community." Compl. ¶ 86. Through Meta's "Audience Network," according to the complaint, advertisers can pay to run ads even on "non-Facebook channels, including 'partner' sites, and third-party affiliated websites or mobile applications." Compl. ¶ 90.

---

[3] Dr. Forrest refers to this part of the business as "Meta Ads" for short. Compl. ¶¶ 4, 7. Meta takes issue with this shorthand, arguing that "Meta Ads" is not a distinct entity. Terminology is not what matters, though. Even if Meta Ads may not be a distinct legal entity, Dr. Forrest alleges that it is at least a distinct business from the other platforms operated by Meta.

1    The complaint specifically alleges that Meta Ads makes it possible for multiple "[c]ustomers

2    advertising in Australia" to "run" ads on Meta's own social media platforms as well as third-party

3    websites and mobile applications. Compl. ¶¶ 88–90. These allegations establish that Meta

4    "provide[d] or enable[d] computer access by multiple users to a computer server" in operating its

5    ad business, making it an interactive computer service for the purposes of Section 230.[4]

6         As the Ninth Circuit has noted, the definition of "interactive computer service" is

7    "relatively expansive." *Rigsby*, 59 F.4th at 1007. The Ninth Circuit has recognized that this term

8    "has been construed broadly to effectuate the statute's speech-protective purpose." *Id.* (quoting

9    *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015)). Ultimately, even interpreting

10   Dr. Forrest's allegations in the light most favorable to him, the complaint's allegations are

11   sufficient to establish beyond any factual dispute that Meta is acting in an interactive-computer-

12   service-provider capacity in operating its advertising business. Meta can therefore establish the

13   first element of a Section 230 defense.

14              **2.       The Complaint Does Not Establish that the Challenged Ads Were
                           Provided Exclusively by Another Information Content Provider.**

15

16        The next question is whether the challenged ads are limited to "information provided by

17   *another* information content provider." 47 U.S.C. § 230(c) (emphasis added). An "information

18   content provider" is any entity "responsible, in whole or in part, for the creation or development of

19   information provided through … any other interactive computer service." *Id.* § 230(f). "[A]n

20   'interactive computer service' qualifies for immunity" only for statements or publications for

21   which the service "does not also function as an 'information content provider.'" *Rigsby*, 59 F.4th

22   at 1007. A provider "may lose immunity … by making a material contribution to the creation or

23   development of content." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016). Meta

24   therefore cannot invoke Section 230 to protect it from claims that "treat it as the publisher or

25   speaker of its own content—or content that it created or developed in whole or in part—rather than

26

27   _____

28   [4] The complaint asserts that Meta Ads does not "provide or enable computer access by multiple users to a computer server within the meaning of 47 U.S.C. § 203(f)(2)," Compl. ¶ 91, but this is a legal conclusion which the Court can ignore at this stage.

United States District Court
Northern District of California

1   the publisher or speaker of entirely third-party content." *Calise*, — F.4th at ——, 2024 WL

2   2826231, at *9.

3          Dr. Forrest's complaint does not allege that the scam ads are Meta's "own content" or that

4   Meta created them entirely on its own, but he does allege that Meta contributed to their

5   production. The important question, however, is whether he sufficiently alleges that Meta

6   "*materially* contributed" to the creation of the ads. *Calise*, — F.4th at ——, 2024 WL 2826231, at

7   *9 (emphasis added). The Ninth Circuit has "interpreted the phrase 'creation or development in

8   whole or in part' in § 230(f)(3) to mean that a website helps to develop unlawful content if it

9   contributes materially to the alleged illegality of the conduct." *Id.* (cleaned up). In other words, the

10  service must specifically contribute to the aspect of the content that is allegedly illegal.

11         Here, Dr. Forrest's complaint alleges that Meta "produces … ads using basic material

12  supplied by criminal scammers to its automated Ads Manager application." Compl. ¶ 4. It alleges

13  that "Meta's Ads Manager software drives and ultimately determines what the completed, paid-for

14  ads will look like." Compl. ¶ 119. The complaint also alleges that Meta offers several additional

15  tools that can automatically adjust the appearance and content of an ad, including by "mix[ing]

16  and match[ing]" ad components like images, videos, text, and audio and by using generative

17  artificial intelligence to "automatically optimize[] ads to versions the audience is more likely to

18  interact with." Compl. ¶¶ 120–23 (cleaned up).

19         Meta counters that these allegations are "erroneous[]." Motion at 16, and argues that many

20  of Dr. Forrest's allegations do not establish that Meta develops the ads it publishes. But this is a

21  quintessential factual disagreement, and the Court must at this stage draw all reasonable inferences

22  in Dr. Forrest's favor. Although Dr. Forrest does not clearly allege how Meta's ad tools work or

23  contribute to the challenged ads, he does allege that the tools affect ad content in a manner that

24  could at least potentially contribute to their illegality. Dr. Forrest alleges not simply that Meta

25  provided "neutral tools" which may have been used by other parties for "unlawful purposes," *cf.*

26  *Calise*, — F.4th at ——, 2024 WL 2826231, at *9–10, but that Meta has "active involvement" in

27  deciding what ads look like and who they are shown to and that its automated tools "supercharge

28  Meta's ability to produce and drive the Scam Ads to vulnerable viewers," which has "been a

United States District Court
Northern District of California

8

substantial factor in the continuing production, dissemination, and success" of the challenged ads. Compl. ¶¶ 126, 135. These allegations present a factual dispute regarding whether Meta's ad systems were neutral tools that anyone could use (or misuse) or whether the tools themselves contributed to the content of the ads, including to the aspects of the content that are allegedly illegal. Meta has not demonstrated that there can be no dispute, based on the allegations in the complaint, that all of the scam ads are in fact exclusively provided by another information content provider or that Meta's only contributions to the ads are entirely unrelated to the aspects of the ads that allegedly make them illegal. Meta has therefore failed to meet its burden of establishing a Section 230 affirmative defense for purposes of this Rule 12(b)(6) motion.

## IV. Dr. Forrest Has Adequately Pleaded Some of His Claims.

Dr. Forrest asserts six California state law claims against Meta. The parties do not dispute that California law governs each of these claims. Dr. Forrest has agreed to dismiss his promissory estoppel claim voluntarily without prejudice subject to a tolling agreement. Meta has moved to dismiss the five remaining claims. For the following reasons, Meta's motion to dismiss the misappropriation and negligence claims is denied, but its motion to dismiss the negligent failure to warn, unjust enrichment, and declaratory judgment claims is granted.

### A. The Misappropriation Claim Is Adequately Pleaded.

Dr. Forrest's first cause of action is a California common law claim for misappropriation of his name and likeness. Under California law, a "common law misappropriation claim is pleaded by alleging: (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Maxwell v. Dolezal*, 231 Cal. App. 4th 93, 97 (2014). Meta argues that Dr. Forrest has failed to adequately plead the first two elements.

First, Meta argues that Dr. Forrest has not alleged facts showing that Meta, as opposed to the users who created the ads at issue, ever "used" Dr. Forrest's identity. This argument parallels Meta's claim that the ads were provided entirely by other information content providers. This is again a factual dispute that the Court cannot resolve in Meta's favor at this stage.

The cases Meta relies on are distinguishable. In *Cross v. Facebook, Inc.*, for example, the California Court of Appeal considered a complaint alleging that Facebook displayed ads alongside Facebook pages that had been created by third parties. 14 Cal. App. 5th 190, 209 (2017). The court concluded that the allegation that Facebook "displayed advertisements next to pages created by third parties who were using [plaintiff's] name and likeness to critique his business practices" was not sufficient to establish that Facebook, rather than these third parties, had used the plaintiff's identity. *Id.* Here, though, the allegations are not just that Meta "displayed unrelated ads … adjacent to … content that allegedly used [plaintiff's] name and likeness" and that was "created by third-party users." *See id.* Instead, Dr. Forrest claims that Meta itself played a role in *producing* the ads—ads which themselves allegedly misappropriated Dr. Forrest's identity. At this stage, Dr. Forrest has adequately pleaded the use element of his misappropriation claim.

Second, Meta argues that Dr. Forrest has failed to allege that Meta misappropriated his identity to its own advantage. Obviously, Meta derives some benefit when it is paid to display ads. But the question is whether specifically including Dr. Forrest's likeness in the content of an ad provided any additional benefit to Meta, or whether the "benefit … received—payment for the advertising space—was unrelated to the contents of the advertisement." *See Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998). Dr. Forrest asserts that "Meta gained a commercial advantage through its misappropriation because the Scam Ads kept its users engaged due to public interest in Dr. Forrest." Compl. ¶ 218. Dr. Forrest distinguishes digital advertising from traditional print ads or billboards, asserting that "Meta profits from engagement," and that because "Dr. Forrest is a well-known public figure, … ads featuring him and his image generate engagement." Compl. ¶ 118. In other words, Dr. Forrest claims that Meta profited *more* from ads that included his likeness than it would have if the ads had not. This is enough to adequately plead that the alleged misappropriation was to Meta's advantage.

Separately, Meta argues that Dr. Forrest's misappropriation claim, which has a two-year statute of limitations, is time barred because it accrued in 2014 when it first came to Dr. Forrest's attention that his image was being used on Facebook. This argument fails. Although the complaint alleges that Dr. Forrest's learned beginning in 2014 that his image was being used by scammers

setting up "imposter" pages purporting to belong to Dr. Forrest, that is not the alleged misappropriation that underlies this claim. Instead, Dr. Forrest's claim is based on the alleged use of his identity in ads as opposed to pages, and the complaint alleges that Dr. Forrest learned about these ads around March 2019. Although under the "single-publication rule" a plaintiff is limited to a single potential action "for any single edition" of a publication, "[t]he rule does not address the issue of repeated publications of the same ... material over a substantial period of time." *See Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 478, 481 (2009). And here, while Dr. Forrest does assert that both imposter pages and scam ads on Facebook misappropriated his identity, the allegations do not suggest that these various uses of his likeness constituted even repeated publications of the same material as opposed to different material. Accordingly, the complaint does not establish that Dr. Forrest's misappropriation claim is time barred.

Because each of its challenges fails at this stage, Meta's motion to dismiss the misappropriation claim is denied.

### B.  The Negligence Claim Is Adequately Pleaded.

Dr. Forrest's next claim is for negligence. He asserts that Meta breached its duty to the general public, including Dr. Forrest, to design and run its ad business in a "commercially reasonable manner," a duty it breached in several ways, including producing the challenged ads, operating in a way that facilitated scam ads, and using defective screening and review procedures.

"To state a claim for negligence in California, a plaintiff must establish the following elements: (1) the defendant had a duty, or an obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks, (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages." *Dent v. Nat'l Football League*, 902 F.3d 1109, 1117 (9th Cir. 2018).

There is a "statutory presumption of duty" in California. *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 144 (2018). "The general rule in California is that everyone is responsible for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person. In other words, each person has a duty to use ordinary care and is liable for injuries caused by his failure to exercise reasonable care in the circumstances." *Cabral v.*

11

1   *Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) (cleaned up). The rule is codified in Section

2   1714 of the Civil Code, which provides: "Everyone is responsible, not only for the result of his or

3   her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or

4   skill in the management of his or her property or person."

5        "The court may depart from the general rule of duty ... if other policy considerations

6   clearly require an exception." *Regents of Univ. of Cal. v. Super. Ct.*, 4 Cal. 5th 607, 628 (2018).

7   Factors that can "justify excusing or limiting a defendant's duty of care" include "the

8   foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the

9   closeness of the connection between the defendant's conduct and the injury suffered, the moral

10  blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the

11  burden to the defendant and consequences to the community of imposing a duty to exercise care

12  with resulting liability for breach, and the availability, cost, and prevalence of insurance for the

13  risk involved." *Id.* (quoting *Rowland v. Christian*, 69 Cal. 2d 108, 113 (Cal. 1968)).

14       Meta does not argue that an exception from the general presumption of duty is warranted

15  here under the *Rowland* factors. Instead, Meta again argues that the complaint establishes that the

16  challenged ads were entirely created by third parties, and that Meta is under no duty to control the

17  conduct of third parties except in the presence of a special relationship. But this is again a

18  premature factual retort to Dr. Forrest's allegation that Meta *did* play an active role in creating the

19  ads he challenges. Meta provides no other basis for dismissing Dr. Forrest's general negligence

20  claim, so its motion to dismiss this claim is denied. And because Dr. Forrest has plausibly alleged

21  that Meta played an active role in creating the ads at issue, the Court need not at this stage decide

22  whether Dr. Forrest has alleged a relationship between Meta and its users sufficient to impose

23  upon Meta a duty to control third-party advertisers even if it did not help create the ads.

24       **C.      The Negligent Failure To Warn Claim Is Dismissed with Leave To Amend.**

25       Dr. Forrest next claims that Meta negligently failed to warn its Australian users that the

26  challenged ads were fraudulent. Dr. Forrest asserts that because Meta failed to warn its users about

27  the ads, Dr. Forrest (and not just the unwarned users) suffered monetary and other harms.

28

United States District Court
Northern District of California

12

As an initial matter, to the extent Dr. Forrest challenges Meta's failure to warn based on Meta's *own* involvement in producing the challenged ads, this claim merges with his general negligence claim against Meta.  Although the complaint is not entirely clear, the Court therefore interprets the failure-to-warn claim as challenging only Meta's failure to warn its users about content provided by third parties.

"[A]s a general rule, one person owe[s] no duty to control the conduct of another, nor to warn those endangered by such conduct," but "the courts have carved out an exception to this rule in cases in which the defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct." *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 435 (1976) (cleaned up).

As alleged here, the people "whose conduct needs to be controlled" are the third-party advertisers, and the primary "foreseeable victim[s] of that conduct" are Meta's Australian users. At most, Dr. Forrest is a secondary victim, harmed only indirectly based on the direct injury to misled Meta users. Although Dr. Forrest argues that there was a sufficient "special relationship" between himself and Meta, the question under *Tarasoff* is whether there was a special relationship between either Meta and third-party advertisers or between Meta and its users that would place it under a duty to warn users about actions taken by advertisers. On this question Dr. Forrest's allegations as now formulated are not clear, nor is the chain of causation between Meta's alleged failure to warn users and any harm to Dr. Forrest himself. The negligent failure to warn claim is therefore dismissed with leave to amend.

### D.      The Unjust Enrichment Claim Is Dismissed With Leave To Amend.

Dr. Forrest next asserts a claim for unjust enrichment and seeks disgorgement of Meta's revenue from the challenged ads. Meta argues that this claim merely duplicates Dr. Forrest's legal claims. Meta is wrong that restitutionary claims must be dismissed at the pleading stage whenever they parallel tort or other legal claims. *See* Fed. R. Civ. P. 8(d)(2). But to state a claim Dr. Forrest must assert that the remedies available for his legal claims will be inadequate. *See In re Meta Pixel Tax Filing Cases*, ⸺ F. Supp. 3d ⸺, 2024 WL 1251350, at *9 (N.D. Cal. 2024) (discussing

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). Because he has not done so, the unjust enrichment claim is dismissed with leave to amend.

      **E.      The Declaratory Judgment Is Dismissed Without Leave To Amend.**

Dr. Forrest's final claim seeks a declaratory judgment that Meta cannot assert a Section 230 defense to his other claims. This question will necessarily be litigated in resolving those other claims. Accordingly, the declaratory judgment claim is duplicative and will be dismissed. This dismissal is without leave to amend and without prejudice to any arguments either party might raise regarding Section 230 defense at a later stage.

**V.     Conclusion**

For the foregoing reasons, Meta's motion to dismiss is granted in part. An amended complaint, should Dr. Forrest wish to file one addressing the claims that have been dismissed with leave to amend, will be due July 11, 2024.

Both discovery and Meta's deadline to answer Dr. Forrest's complaint are currently stayed. By July 1, 2024, Meta may file a motion of up to five pages requesting that this stay be extended and indicating the status of the Australian proceedings. If no motion is filed by that date, the stay will be lifted in full and Meta's answer to the present complaint (or response to any amended complaint, if one is filed) will be due July 25, 2024.

      **IT IS SO ORDERED.**

Dated: June 17, 2024

P. Casey Pitts
United States District Judge

14