# Hecker Fink LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.HECKERFINK.COM

DIRECT DIAL      212.763.0886
DIRECT EMAIL    jquinn@heckerfink.com

March 7, 2025

**VIA CM/ECF**

Hon. Virginia K. DeMarchi
United States District Court
Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

  Re: *Dr. Andrew Forrest v. Meta Platforms, Inc.*, No. 5:22-cv-03699-PCP (N.D. Cal.)

Dear Judge DeMarchi:

  Pursuant to Your Honor's Standing Order for Civil Cases, Plaintiff Dr. Andrew Forrest and Defendant Meta Platforms, Inc. ("Meta") respectfully submit this Joint Discovery Letter Brief.

## I.  STATEMENT OF DISPUTE

  This case concerns thousands of ads allegedly misappropriating Plaintiff's name and likeness to pitch cryptocurrency and other fraudulent financial schemes that ran on Meta's platforms in Australia from 2019 to the present ("Scam Ads"). Judge Pitts ordered expedited discovery and summary judgment briefing on Meta's Section 230 affirmative defense, including "whether Meta's ad systems were neutral tools . . . or whether the tools themselves contribute[] to the content of the ads," ECF 121 at 9. The parties now disagree over the reasonableness of Meta's search for Scam Ads and which categories of associated data Meta must produce.

## II.  PLAINTIFF'S POSITION

### A.  Meta's Insufficient Search

  There are two ways Plaintiff can show "Meta's ad systems . . . contribute[] to the content of the ads." ECF 121 at 9. *First*, Plaintiff can compare the inputs advertisers provided Meta to the ads it transmitted to users. *Second*, Plaintiff can learn how Meta's ad systems actually work—not just particular tools described on a public webpage, but Meta's entire set of software and AI tools, including front-end and back-end, automatic and optional, public and non-public—through internal documents showing their design, and data showing how they acted on the ads.

Plaintiff began the meet-and-confer process on September 16, 2024, writing Meta to ask whether "there [was] any obstacle to collecting and producing" all Scam Ad Inputs[1] and outputs. On September 27, Plaintiff inquired about preservation, location, and format of this material, referencing the Court's Rule 26(f) Checklist. Meta refused to answer, writing, "the ESI checklist is voluntary" and "does not require that Meta provide all the information you demand."

On November 21, Plaintiff served document requests seeking all Scam Ad Inputs, outputs, and associated data, including data about how Meta systems engaged in Content Modification or Optimization. In response, Meta attempted to flip its obligations onto Plaintiff: It agreed to produce *only* Scam Ads "identified by Plaintiff by valid identification number" and *only* data about Content Modification and Optimization Tools identified in the Third Amended Complaint ("TAC").

Plaintiff objected to Meta producing only Scam Ads Plaintiff identified, explaining that, as an outsider to Meta's systems, Plaintiff is at an obvious disadvantage in locating Scam Ads and pinpointing what Meta software contributed to them. In a January 9 meet-and-confer, Plaintiff asked why Meta could not use publicized technologies like its facial recognition program for catching "celeb-bait" scams. Meta stated this program was in pilot and raised vague privacy concerns (even though we represent Dr. Forrest). It promised to investigate but never provided meaningful follow-up.

On January 29, Meta announced its own plan: a purely text-based search for Scam Ads and review of a randomized sample. Never mind that Meta itself has explained scammers avoid obvious buzzwords, rendering text searching ill-suited for identifying scams. With respect to data showing how Meta's software engaged in Content Modification and Optimization, Meta agreed to produce only information showing whether an advertiser used two public ad tools and four features of a third—nothing about proprietary algorithms, AI systems, or non-public software, and nothing showing *how* any systems interacted with Inputs to produce and transmit Scam Ads.

Plaintiff declared impasse on January 31. That day, Meta offered to share its search terms, but did not provide information about other search capabilities or non-public ad systems. Plaintiff again objected to a text-only search and explained that Meta must produce documents showing how its software generally (not just publicly marketed tools) engages with Inputs to produce ads.

Lead counsel conferred on February 6. For the first time, Meta explained that Scam Ads are stored in "Hive," a data warehouse containing searchable tables, some of which hold Scam Ad text, text overlays, and video transcriptions. Meta also proposed to review all results of its text-only search. While reiterating objections, Plaintiff's counsel left cautiously optimistic. On February 11, Plaintiff wrote Meta for more information about its search capabilities (including "machine learning and near-match search tools" and "image analysis, facial recognition, and transcription software") and data in Hive, and suggested certain additions and improvements to their terms.

But on February 14, Meta shut down the parties' discussions, presenting a fait accompli: It would simply proceed with text searching. Meta rejected Plaintiff's efforts to understand its other search capabilities. Meta suggested Plaintiff serve discovery requests, though Meta might object—

---

[1] Capitalized terms are defined in the attached excerpts.

triggering months of delay. And Meta agreed to produce additional data only about two other public "tools" (not "systems," as Judge Pitts directed), proclaiming the "population of data to be settled."

In a second, February 21 lead counsel conference, Plaintiff again objected to Meta's text-only search and limits on data. On the latter, Meta backtracked slightly from its pronouncement that the "population of data" was "settled," giving the vaguest assurance it was still investigating. But at most, Meta said it would produce information about tools *it* believes implicate Section 230, which is insufficient (and which it has not done). Until today, Meta had yet to produce any Scam Ads, associated data, or engineering documents.[2]

### B.    Meta Must Reasonably Locate and Produce Crucial Data

#### 1.    *Meta must conduct a reasonable search for Scam Ads.*

By Meta's own account, its unilateral, text-only search is underinclusive and overinclusive. *First*, because scammers avoid buzzwords, Meta's approach omits large swaths of likeness-appropriating Scam Ads, which may provide different evidence (*i.e.*, Meta's systems may contribute differently to such ads than those using Plaintiff's name). As far back as 2019, Meta told Plaintiff that "celeb-bait ads are . . . not always easy to detect" because scammers "avoid using obvious keywords and names." Thus, Meta was using "images[] and other signals in both targeted searches and automated detection models" to identify Scam Ads. Simply put, for years Meta has used proprietary machine-learning, image-searching, and facial-recognition software to identify visual content—including fraudulent ads, given their nature.[3] This is not a situation where Meta lacks the underlying data, as in Meta's *Meta Pixel* citation, or where there is some speculative preservation question, as in Meta's *Taylor* citation. Nor is it sufficient for Meta to say its sophisticated scam and image identification tools are "not designed" (3x in the same exact words) for discovery. Meta trumpets that its tools can identify scam advertisements; it must make a reasonable effort here.

*Second*, Meta's text-only approach is *over*inclusive, yielding over half a million results, many mishits. Among other things, the TAC focuses on ads that ran in Australia, *see* TAC ¶ 1, but Meta's search runs worldwide. Now that Meta has completed this wasteful process (tellingly without any report on the results), Meta will surely argue that additional searches would be disproportionate. Meta should conduct a reasonable search now.

Moreover, Meta should *already have identified* numerous Scam Ads. As noted, since 2019, Meta has represented (through counsel) that it was "looking for" and "find[ing]" Scam Ads. Meta was obligated to preserve this evidence. It should be simple to produce these ads now.

---

[2] Late tonight, Meta produced documents that Plaintiff has not had the opportunity to review.
[3] *See, e.g.*, *Testing New Ways to Combat Scams*, https://about.fb.com/news/2024/10/testing-combat-scams-restore-compromised-accounts/; *Under the Hood: Photo Search*, https://engineering.fb.com/2017/05/22/ml-applications/under-the-hood-photo-search/; *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1268 (9th Cir. 2019) (discussing Meta's 15-year-old facial recognition feature).

> 2. *Meta must produce all Scam Ad data showing its Content Modification and Optimization.*

The central question is whether *Meta*—whatever the tool, software, system, or means—"contributed to the content of" Scam Ads. ECF 121 at 9. Meta has consistently dodged this question, insisting on limiting discovery to whether certain public "tools" identified by Plaintiff were used (not whether back-end Meta software was involved, and not *how* any software—marketed or not—was used). Even now, its position statement—despite Judge Pitts's broad reference to "systems"—again limits discovery to public "tools" (9x on page 7 alone).

Meta tried similar tactics before—and was sanctioned. *In re Facebook, Inc. Consumer Privacy User Profile Litigation* involved a claim that Meta disclosed user information to third parties. 655 F. Supp. 3d 899, 929 (N.D. Cal. 2023). The court "envisioned a process by which the parties would work together to determine what universe of data existed and, from there, determine what could have been shared." *Id.* Meta "short-circuited" that process by "consistently arguing that discovery was limited to information [it] admitted it" disclosed—an approach "obviously contrary to the right of the plaintiffs to test [Meta's] assertions in an adversarial litigation process." *Id.*

### C. Proposed Resolution

The Court should order Meta to utilize image-search, machine-learning, near-match, and/or other reasonably available software to conduct a diligent and reasonable search for Scam Ads in its possession, custody, or control. For each Scam Ad identified, the Court should order Meta to produce data that would show (1) all Inputs and actual system outputs; (2) all Meta systems and software that engaged in Content Modification and Optimization; and (3) how such systems or software impacted each Scam Ad.

Alternatively, the Court should order Meta to answer:

1. Explain Meta's existing search and review technologies, including but not limited to machine-learning, near-match and vector searches, image analysis, facial recognition, and natural-language processing. Explain the cost and technical feasibility of using each tool in discovery.
2. Name each table, database, repository, or indexing system that contains or tracks Scam Ad Inputs, outputs, or associated data.
3. For every table, database, repository, or indexing system named in #2, describe its purpose and the types of metadata or indexing methods used to categorize or identify data within.
4. Describe all efforts made to identify Scam Ads since 2016, including capabilities used, records generated, and data preserved.

## III. DEFENDANT'S POSITION

### A. Meta's Proposed Search Methodology is Reasonable

Meta repeatedly offered Plaintiff solutions to resolve his dispute without Court intervention, but Plaintiff rejected Meta's reasonable offers without any attempt at compromise.

Meta is taking more than reasonable and proportional measures to identify and produce alleged Scam Ads featuring Plaintiff's name or likeness. Meta has conducted searches using 41 broad terms—that Meta offered to Plaintiff for consideration—over two structured data tables containing <u>ads published using Ads Manager, from 2019 to the present</u>, and has agreed to <u>review every hit for responsiveness</u>. Once Meta has identified a Scam Ad, it will produce the available ad creative, inputs, and related metadata. Our search methodology, which Meta disclosed to Plaintiff, is reasonable and consistent with the parties' ESI Order [ECF 179], the Federal Rules, and the Sedona Principles. Plaintiff's position that any text-based search is insufficient because Meta must have some additional way to identify alleged Scam Ads is contrary to law and wrong as a matter of fact. Plaintiff's proposed resolution and alternative relief should be denied.

Plaintiff's first document requests–served in November 2024–sought all ads featuring Plaintiff's name and likeness and all metadata relating to those ads, regardless of whether those ads were actually scams or not.[4] (Ex. 2, Requests Nos. 1 and 2.) Following lengthy meet and confers, Meta explained to Plaintiff that it was conducting the following reasonable search for Scam Ads and associated data relevant to Meta's Section 230 defense.

Meta is searching data tables that contain information about <u>ads published using Ads Manager</u> during the period relevant to the case. These tables contain "ad text" (the words accompanying an ad and OCR'd text from images) and "video text" (transcriptions of videos used in ads).

Information <u>about</u> the Scam Ads, such as tools used by advertisers and ad images, is stored in multiple <u>other</u>, <u>separate</u> repositories that contain these "inputs" and metadata. To query these repositories, Meta must identify a valid ad identification number ("AdID") for each Scam Ad.[5] Through Meta's searches for Scam Ads, Meta will obtain the requisite AdIDs.

To execute its search for Scam Ads, Meta developed 41 broad terms, designed to capture ads even if they used Plaintiff's nickname or misspelled his name.[6] Its search across ad text and video text for the period January 1, 2019 to January 31, 2025 resulted in more than 500,000 ads. As Plaintiff notes, Meta did not limit the search to Australia, or restrict its search to only ads that were actually seen by a user. Considering proportionality, Meta reasonably proposed reviewing a randomized statistical sample, which Plaintiff rejected; Meta is thus manually reviewing <u>every result</u>. Meta started this process—despite Plaintiff's avowed intention to involve the Court—in light of the upcoming deadline for substantial completion of document discovery. Incredibly, Plaintiff calls this a "wasteful" process, but Meta's over 100 reviewers have already reviewed all 500,000-plus ads.

---

[4] The September letters Plaintiff cites did not concern "whether Meta was able to produce" this information, but were directed at ancillary issues Plaintiff has since abandoned. We did not receive a single Rule 34 request until November 21, 2024.

[5] In 2019, Meta informed Plaintiff that its enforcement systems were being used to <u>block</u> Scam Ads, not that it was searching for and saving them in a separate, segregated repository. While ad creative is retained in the normal course of business per Meta's current policy, identifying specific ads for production <u>out</u> of those repositories poses an entirely different technical challenge.

[6] Plaintiff's "additions and improvements" to Meta's search was a set even broader than proposed by Meta. Meta is addressing those suggestions according to the procedures in the ESI Order, § 5(a).

Hecker Fink LLP

6

Meta's reasonable search is exactly what modern discovery contemplates. Yet Plaintiff refuses to take "yes" for an answer.

*First*, Plaintiff theorizes that Meta must have some better way to identify alleged Scam Ads than text searches. That speculation is unwarranted. The agreed-upon ESI Order (§ 5) expressly permits parties to use search terms to identify responsive documents, and does not require Meta to employ any other methodology. Nevertheless, we have investigated and determined that Meta does not have reasonably available tools to conduct additional searches. The technologies that Plaintiff recites ("machine-learning, near-match and vector searches, image analysis, facial recognition, and natural-language processing") are not designed to identify relevant documents for purposes of discovery in litigation.

For example, Plaintiff raised Meta's recent introduction of facial recognition technology to combat scam ads. When Meta reviews an ad—such as when an ad is created, edited, or reported—and detects potential scam content, Meta may use facial recognition technology to determine whether the ad contains any user participating in Meta's facial recognition protection program, without identifying the specific user. This technology is not designed to search across Meta's entire ad population to identify images or videos of specific individuals. This Court has recognized that not every Meta tool is fit to be used in discovery. *See In re Meta Pixel Healthcare Litig.*, 22-cv-03580-WHO (VKD) (ECF 223, 278) (denying plaintiffs' request for an order compelling Meta to search websites even though plaintiffs speculated that Meta's "Facebook Crawler" could be used for that purpose).

Because the technology Plaintiff suggests is not designed to be used for the purpose he claims, Plaintiff's proposed resolution would require Meta to develop an entirely new tool. Moreover, Plaintiff's blanket demand does not account for privacy and related issues that must be carefully considered with any use of facial recognition.[7] Plaintiff cites no case that requires the disproportionate resolution he seeks, particularly given the reasonableness of Meta's proposed methodology. Courts have routinely rejected one party's demand that another methodology be used even when it might be considered more efficient and better. *See, e.g.*, *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, No. 16-MD-02691-RS (SK), 2016 WL 7336411, at *2 (N.D. Cal. Oct. 14, 2016) (refusing to compel the use of TAR instead of search terms). And in any event, Plaintiff has not established that any methodology he suggests is actually more efficient or better.

*Second*, Plaintiff has asked a litany of questions about Meta's data storage practices, apparently attempting to audit the reasonableness of Meta's search. This kind of "discovery on discovery" is disfavored, and not warranted here. *Taylor* v. *Google LLC*, No. 20-cv-07956-VKD, 2024 WL 4947270, at *2 (N.D. Cal. Dec. 3, 2024) (DeMarchi, J.) ("Mere speculation about missing evidence is insufficient to allow discovery on discovery."). Instead, the Sedona Conference Principles, which the ESI Order incorporates (§ 2), state that "neither a requesting party nor the court should proscribe or detail the steps that a responding party must take to meet its discovery obligations." The Sedona Principles, 3d. Ed., Sedona Conf. J. 1, 123 (2018).

---

[7] *See, e.g.*, https://tinyurl.com/fa4ustvs; https://tinyurl.com/29sj75sa; https://tinyurl.com/2z98ru2n; https://tinyurl.com/4rnvxkpe; https://tinyurl.com/mr37a96z.

### B. Ads Manager Tools that Impact Content are Publicly Available

The TAC focused on the Ads Manager tools—and so did the Court. Judge Pitts has not, as Plaintiff insinuates, "directed" that discovery focus broadly on Meta's systems. Instead, Judge Pitts focused on whether "the tools themselves" were neutral or instead contributed to the allegedly unlawful content. ECF 121 at 9.

On January 29, Meta provided Plaintiff a list of over 13 data points that it agreed to produce for each individual Scam Ad for which it has a valid AdID, if that information exists and is feasible to collect. This includes information about tools identified in the TAC and more, including Advantage+ Creative (including generative AI tools), and certain ad targeting tools such as Detailed Targeting (even though it remains Meta's position that targeting is irrelevant to Section 230).

After a reasonable investigation (which we told Plaintiff we were conducting), Meta has not to date identified any other tool that affects the content of advertisements that is not available in Ads Manager. *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 655 F. Supp. 3d 899, 929 (N.D. Cal. 2023), which Plaintiff cites and involved the imposition of sanctions after three years of contentious discovery between the parties, is inapposite. Meta urged Plaintiff to provide it with specific Ads Manager tools, which are publicly-facing, that Plaintiff believed were in scope for which Meta was not providing data. Plaintiff refused.

Regarding "back-end" software, it is not clear what Plaintiff is referring to. But Meta has agreed to produce documents "sufficient to show the operation of relevant portions of Ads Manager, and how those tools may affect the content of Advertisements on Meta's services." *See, e.g.,* Ex. 2, Request No. 11. Meta is also searching for and producing available design documents relating to the tools. *Id.*, Request No. 15. Should Plaintiff identify an additional data point relevant to Section 230 (or should Meta's ongoing investigation reveal one), we will search for and produce non-privileged information about those tools and the alleged Scam Ads' use of them, to the extent it exists and is reasonable to obtain.

### IV. WHETHER THE COURT SHOULD HOLD A HEARING

#### A. Plaintiff's Position

The Court should conduct a hearing. A hearing would assist the Court in resolving the dispute because the issues are highly technical in nature, Meta's proprietary systems add even greater complexity, and Meta has refused to provide basic information necessary to narrow or resolve the dispute. The parties would also benefit from the Court's engagement and guidance now on the key gating issues discussed in this letter brief, which will significantly impact the rest of discovery in this phase of the litigation.

#### B. Defendant's Position

Meta submits that a hearing is unnecessary.

V.  **CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY**

Document discovery is to be substantially completed by March 31, 2025. Fact discovery is to be completed by May 30, 2025. The parties submitted, and the Court approved, a schedule in which expert discovery occurs in parallel with early summary judgment briefing, as follows:

| Event | Deadline |
| --- | --- |
| Meta's Motion for Summary Judgment on Section 230 defense and opening expert report (if applicable) | July 15, 2025 |
| Dr. Forrest's Opposition to Meta's Summary Judgment Motion; Dr. Forrest's Cross-Motion for Partial Summary Judgment (if applicable); and Dr. Forrest's opening expert report (if applicable) | August 29, 2025 |
| Meta's Reply in Further Support of Summary Judgment; Opposition to Dr. Forrest's Cross-Motion for Partial Summary Judgment (if applicable); and rebuttal expert report (if applicable) | September 29, 2025 |
| Dr. Forrest's Reply in Further Support of Partial Summary Judgment (if applicable) and rebuttal expert report (if applicable) | October 29, 2025 |

VI.  **COMPLIANCE WITH MEET-AND-CONFER REQUIREMENT**

Lead counsel conferred by video conference on February 6, 2025 and February 21, 2025. John Quinn of Hecker Fink represented Dr. Forrest. Karen Dunn, Meredith Dearborn, and Amy Barton of Paul, Weiss represented Meta. The parties agreed to extend the Court's five-day filing deadline to March 7, 2025.

VII.  **ATTACHMENTS**

The following discovery requests and responses are attached to this letter:

- Exhibit 1:  Plaintiff's First Set of Requests for Production of Documents

- Exhibit 2:  Defendant Meta Platforms Inc.'s Responses and Objections to Plaintiff's First Set of Requests for Production of Documents

Hecker Fink LLP

9

| | |
|---|---|
| Dated: March 7, 2025 | HECKER FINK LLP |
| | By: _/s/ John C. Quinn_<br>John C. Quinn<br>Attorney for Plaintiff<br>Dr. Andrew Forrest |
| Dated: March 7, 2025 | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
| | By: _/s/ Walter F. Brown_<br>Walter F. Brown<br>Attorney for Defendant<br>Meta Platforms, Inc. |