1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    ANDREW FORREST,                 )
                                     )
6             Plaintiff,             )
                                     )
7    vs.                             )    Case No. C 22-03699-PCP
                                     )
8    META PLATFORMS, INC.,           )
                                     )
9             Defendant.             )
     _____)

10

11                                   San Jose, California
                                     Tuesday, March 18, 2025
12

13     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
       RECORDING 10:47-11:30/12:12-12:42 = 1 HOUR AND 13 MINUTES
14

15   APPEARANCES:

16   For Plaintiff:
                                     Hecker Fink LLP
17                                   350 Fifth Avenue
                                     63rd Floor
18                                   New York, New York 10118
                              BY:    JOHN C. QUINN, ESQ.
19                            BY:    AMIT JAIN, ESQ.

20                                   Hecker Fink LLP
                                     1050 K Street, Northwest
21                                   Suite 1040
                                     Washington, DC 20001
22                            BY:    JOYCE DELA PENA, ESQ.

23

24            (APPEARANCES CONTINUED ON NEXT PAGE)

25

2

```
1   For Plaintiff:
2                               Derek G. Howard Law Firm, Inc.
                                42 Miller Avenue
                                Mill Valley, California 94941
3                          BY:  DEREK G. HOWARD, ESQ.

4   For Defendant:
5                               Paul Weiss Rifkind Wharton &
                                  Garrison LLP
6                               535 Mission Street
                                24th Floor
                                San Francisco, California
7                                 94105
                           BY:  MEREDITH R. DEARBORN, ESQ.
8                          BY:  WALTER F. BROWN, ESQ.
                           BY:  JASMINE K. COOPER, ESQ.
9
                                Paul Weiss Rifkind Wharton &
10                                Garrison LLP
                                1285 Avenue of the Americas
11                              New York, New York 10019
                           BY:  PALOMA RIVERA, ESQ.
12
13  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
14                              Transcriber
                                echoreporting@yahoo.com
15
16
17
18
19
20
21
22
23
24
25
```

1  <u>Tuesday, March 18, 2025</u>                           <u>10:47 a.m.</u>

2                   P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4           THE CLERK:  Calling Case 22-CV-03699-PCP, Forrest

5  versus Meta Platforms, Inc., on for discovery hearing.

6      If the parties could state their appearances, please,

7  beginning with Plaintiff, and if you could please speak into

8  the microphone and identify yourself.  Thank you.

9           MR. QUINN:  Yes.  Good morning, your Honor.  John

10 Quinn from Hecker Fink on behalf of Plaintiff, Doctor Andrew

11 Forrest.

12          THE COURT:  Okay.  Good morning.

13     Anyone else?

14          MR. JAIN:  Yes.  Amit Jain, also on behalf of

15 Doctor Andrew Forrest.  Good morning.

16          THE COURT:  Okay.  Good morning.

17          MS. DELA PENA:  Good morning.  Joyce Dela Pena on

18 behalf of Doctor Andrew Forrest.

19          THE COURT:  Good morning.

20          MR. HOWARD:  Good morning, your Honor.  Derek

21 Howard for Plaintiff.

22          THE COURT:  Okay.  Good morning.

23          MS. DEARBORN:  Good morning, your Honor.  Meredith

24 Dearborn of Paul Weiss for Defendant Meta.  I'm joined by my

25 colleagues, Walt Brown, Paloma Rivera, and Kat Cooper.

4

1          THE COURT:  Okay.  Good morning.

2          MR. BROWN:  Good morning, your Honor.

3          THE COURT:  So this hearing is on two discovery

4   disputes, the matters at Dockets 186 and 187, and I

5   understand from looking at the docket that the parties

6   currently have a substantial completion for document

7   production deadline of March 31st.  Is that still the case?

8          MS. DEARBORN:  We actually have an agreement in

9   principle to extend that deadline by 60 days, your Honor.

10          THE COURT:  Okay.

11          MS. DEARBORN:  So we intend to get a stipulation

12   on file before the substantial completion deadline that

13   memorializes that agreement.

14          THE COURT:  Okay.  That's helpful to know.  And

15   would that also -- does that stipulation also contemplate

16   moving the fact discovery deadline?

17          MS. DEARBORN:  Yes, your Honor.  It would move all

18   deadlines in phase one by 60 days, approximately.

19          THE COURT:  Okay.  All right.  I did want to check

20   on that.

21      And I have, also, in preparation for this hearing, read

22   the order that Judge Pitts issued at Docket 121 granting, in

23   part, the motion to dismiss.

24      So I have in mind, I think, what is the context for

25   both of these disputes, and just by way of framing that

5

1  issue, and not that this is limiting your discovery, but the

2  fact question that Judge Pitts identified is whether Meta

3  materially contributed to the aspect of the content that is

4  allegedly illegal, and he noted in his order that

5  Plaintiff's allegations present a factual dispute regarding

6  whether Meta's ad systems were neutral tools that anyone

7  could use or misuse, or whether the tools themselves

8  contributed to the content of the ads, including to the

9  aspects of the content that are allegedly illegal.

10      So I understand that that's at least the framing in the

11  order on the motion to dismiss, and I found that helpful in

12  thinking about your disputes.  I don't know if you do, but

13  that was very helpful.

14      I'd like to start with the scam ads dispute at Docket

15  186, and there was a little footnote that indicated that

16  maybe some documents had been produced, you know, on the eve

17  of submission of this letter, and Plaintiff had not yet

18  reviewed them.  So can the Plaintiff just update the Court

19  on what is the status of this dispute?  Has there been any

20  narrowing of the issues for resolution?

21          MR. QUINN:  There has not been any narrowing of

22  the dispute, your Honor.  There has been some production in

23  accordance with the sort of unilateral approach that Meta

24  declared and then began on.  So, at present, to the best of

25  my information, they've produced 14 or 15 ads.

6

1    We've produced more to them than they've produced to

2  us, and otherwise have produced printouts of websites,

3  copies of websites, and some marketing materials that

4  reference certainly publicly branded and publicly described

5  tools.  That's what we have.

6         THE COURT:  Okay.  And just so that I'm clear,

7  what document requests are at issue?  I have, you know, the

8  attachments that list all of them, and it wasn't clear from

9  the Plaintiffs, as part of the submission, which document

10  requests you think are at issue.

11         MR. QUINN:  So, if we -- if we're starting with

12  the first part of the motion the Court described, which I

13  think essentially deals with the question of how to find the

14  scam ads at issue, I'd say the most relevant request, I

15  believe, is request number one, which is simply "Produce the

16  scam ads.  Produce the ads that misappropriated Doctor

17  Forrest's likeness, and the pitched cryptocurrency or

18  financial investment schemes."

19    So there are probably a number of requests that, in

20  different ways, are derivative of this effort to first go

21  find the ads at issue that are in Meta's possession, but

22  probably the most relevant document request would be the

23  first one.

24         THE COURT:  Okay.  And then sort of drilling down

25  further on that, and what the Plaintiff is seeking, the

1  Plaintiff is seeking all scam ads, meaning all ads that are

2  not, in fact, genuine advertisements by Doctor Forrest.  Is

3  that right?

4          MR. QUINN:  That is the request.  We are certainly

5  open to, you know, a reasonable approach.  I think the

6  concern we have --

7          THE COURT:  I'm just trying to -- I'm focusing on

8  the "what."

9          MR. QUINN:  Sure.

10          THE COURT:  So I'm sorry I'm taking this a little

11  piecemeal, but the "what."  So, in the first instance -- and

12  this is not the only thing you're asking for.  You want to

13  discover all scam ads during the relevant period of time?

14          MR. QUINN:  That's correct.

15          THE COURT:  Okay.

16          MR. QUINN:  That is the request.

17          THE COURT:  And did Doctor Forrest actually engage

18  in genuine advertising for anything?  Like, are there, like,

19  legitimate advertising using his name and likeness out

20  there, or is it the only content out there are, you know,

21  scam ads, things that are faked?

22          MR. QUINN:  The latter.

23          THE COURT:  Okay.

24          MR. QUINN:  There is no ad in which Doctor Forrest

25  consented to be used, of his name or likeness.

8

1        THE COURT:  Okay.  So it's not as if we're trying

2 to distinguish false ads from genuine ads?

3        MR. QUINN:  Correct.  I wouldn't rule out the

4 possibility that there might be a scam ad about something

5 other than these crypto products --

6        THE COURT:  I see.

7        MR. QUINN:  -- or that ran outside Australia.  So

8 I do want to be clear.

9        THE COURT:  Okay.

10        MR. QUINN:  We -- we're not trying to boil the

11 ocean.  If we got even a few ads every month over the

12 relevant period, we could narrow this to Australia.  What we

13 want, though, is to avoid a misleading collection of ads

14 that's over- and under-inclusive.

15        THE COURT:  Okay.  And do all the scam ads at

16 issue in the case include both Doctor Forrest's name and his

17 likeness, or are there some that only include his name and

18 not his likeness, some that only include his likeness and

19 not his name?

20        MR. QUINN:  Again, the latter, I think a number of

21 variations, based on what we've seen.  So there may be ones

22 that --

23        THE COURT:  The latter.  There were like three

24 options, so which one?

25        MR. QUINN:  My apologies.

9

1          THE COURT:  Pick which one.  You tell me.

2          MR. QUINN:  There are some that have an image.

3    There are some that have his name.  There are some that

4    reference him without specifically using his name.  There

5    are some with misspellings.  There's all sorts of variation,

6    and what we've seen is just a sample from a few months that

7    prior counsel was able to kind of capture and flag and take

8    notes on in real time.  So --

9          THE COURT:  What I'm really focusing on is, are

10   there any ads that are image only?

11         MR. QUINN:  We believe that there are, yes.

12         THE COURT:  Okay.  And in terms of what you're

13   interested in, in discovery, you're interested only in ads

14   that were shown in Australia or to users who were located

15   physically in Australia?  How are you defining the

16   geographic boundary?

17         MR. QUINN:  We have communicated to Meta that our

18   focus is on the ads that were shown to users in Australia,

19   and that would be a perfectly acceptable limitation for

20   discovery purposes, from our perspective.

21         THE COURT:  Okay.  And, now, another part of what

22   the Plaintiff is seeking is discovery of how the tools for

23   ad creation work, if I'm not mistaken?

24         MR. QUINN:  That's right.  I think this is in some

25   ways the heart of the matter, in light of the issue, as your

10

1  Honor rightly framed it, and the question here is just --

2  you know, the advertiser sits down with a digital form in

3  front of them.  There's sort of an interface, and they begin

4  a process of creating an ad, and there's just all sorts of

5  things that Meta's software begins doing as advertisers put

6  inputs into that system.

7      As they type text, our understanding is there are

8  suggested completions to that text.  There are spellchecks

9  being run.  There are screens for child sex abuse material,

10  for terrorist content.  There are machine learning systems

11  running in real time as all this is happening.  We're being

12  told that there are limits to the extent to which those

13  inputs are being preserved in real time, before the draft is

14  saved up.

15      So the heart of this matter really is, from the moment

16  the advertiser begins that process, what is Meta doing and

17  contributing to that process, be it related to text, the

18  resizing and repixelation of images, the format of a

19  finished ad to make it more effective, more appealing to a

20  viewer?  That is the heart of the matter, so we've been --

21          THE COURT:  And let me just ask, do you have a

22  concern or suspicion that somehow Meta is taking some

23  advertiser's, some third party's, content input in the first

24  stage, and making it look more like Doctor Forrest, or

25  manipulating the image in such a way that it is doing the

1  things that make the content illegal?

2       MR. QUINN:  Yes, I think that is a question we

3  want to explore.  Our understanding is that, the moment an

4  image is uploaded to Meta's systems, there are a few things

5  that begin to happen automatically to deal with file size,

6  to deal with --

7       THE COURT:  Yes, but all of those things are like,

8  "Whatever," right?  Those are the content-neutral kinds of

9  things.  But are there -- what I'm trying to get at is, what

10 is -- what -- because the discovery will -- I'm trying to

11 figure out the boundary of appropriate discovery here.

12     But the thing that the Plaintiff really needs to show,

13 and Meta needs to not -- to show is not the case, in order

14 to succeed on their defense on this 230 -- Section 230

15 issue -- is that Meta is doing something to the content that

16 makes it more likely to be using the name or likeness of

17 Doctor Forrest.

18     And so, if the input were something -- you know,

19 "Here's a generic image of a man," and somehow Meta's tools

20 were manipulating that image to make it look more like

21 Doctor Forrest, for example, just hypothetically, that would

22 be something that would be very important for the Plaintiff

23 to discover, but things that -- I mean, not that you can't

24 know this, and maybe Meta has a very strong interest in

25 sharing with you all of the extremely content-neutral things

12

1  it does do, in its own defense, making an image clearer,

2  making an image have better contrast, you know, whatever it

3  is.

4      Are you -- would -- is your theory of the case that

5  that is actually something that is actionable or makes --

6  takes it out of the realm of 230 immunity, and so you need

7  discovery of those kinds of details?

8          MR. QUINN:  I guess I have two responses to that,

9  your Honor --

10          THE COURT:  Yes.

11          MR. QUINN:  -- one sort of legal and one more

12  factual.  On the legal question, and looking at Judge Pitts'

13  order -- this is ECF 121, at eight -- he restates the

14  operative question in that instance as whether Meta has

15  active involvement in deciding what ads look like and who

16  they are shown to.

17          THE COURT:  And then he goes on to elaborate the

18  content that is allegedly illegal.  So making the blue

19  bluer, hard to know that that would be actually making the

20  content illegal, right?

21          MR. QUINN:  Well, I think, if there is

22  misappropriating content, and Meta's systems are making it

23  more effective to more people, so that more people rely on

24  it, that is an argument we want to reserve the right to

25  press --

13

1          THE COURT:  Okay.  All right.

2          MR. QUINN:  -- on summary judgment and appeal,

3   but, even beyond that, on the factual side, if an image has

4   to be recropped and resized for the mobile platform, let's

5   say, and so there's an image of a bunch of financiers, and

6   Meta's systems come in and zoom in on it so that it's much

7   more clearly an image of Andrew Forrest, that is a material

8   contribution that has exacerbated the misappropriation.

9          THE COURT:  Okay.

10         MR. QUINN:  Presumably their systems are built to

11  do this because it makes the ads more effectiveness, and

12  thus their advertising more valuable to the advertisers, so

13  they're benefitting.  So, too, are the advertisers, and the

14  illegal nature of what's happening is getting worse, through

15  their system's contribution, and not because some what they

16  would call a "tool" is being toggled on or off, but just

17  because of what their systems do.

18      If Meta is making that material contribution, whether

19  it's doing it by way of a tool or a system or a feature

20  really should make more difference.  The question is whether

21  Meta is making that contribution, and manipulating images,

22  here at the outset of discovery, is something we think we

23  should be permitted to explore, and then text is a part of

24  this, too.  So there are, as we understand it -- again,

25  we're the outsiders here, but, you know, screens running to

14

1  detect words indicative of C-SAM or terrorist content, et

2  cetera.

3      I don't know that it's hard to imagine that those

4  systems, over time, as Andrew Forrest began complaining

5  about these ads, and his ads started to come down -- maybe

6  those screens learned that if you use the name "Forrest,"

7  that ad is much more likely to come down, and so, as the

8  advertiser is typing it in, they're suggesting different

9  words, or that -- we simply don't know, but we know that

10  there are screens running, and that advertiser inputs can be

11  changed before the advertisement is saved as a draft.

12      And so, given the discovery standards and the stage, we

13  think we should get pretty robust disclosure of those

14  systems.

15          THE COURT:  So, focusing on the ads again, putting

16  the tools to the side for a moment, do you agree with Meta

17  that it's essential to identify the ads -- in the first

18  instance, they referred to something called an "ad ID" that

19  then allows them to find other information in their systems

20  about that particular ad.  So do the parties agree that

21  it's -- you know, a goal is to identify all the scam ads so

22  that then the further discovery of individual ads can be

23  undertaken?

24          MR. QUINN:  Again, I've got two responses.  I

25  think I do agree it's important to identify a workable

1  universe of ads, and we need the right approach to do that,

2  and then there will be a derivative or a secondary question

3  of "Okay.  What did the tools, systems, software, you know,

4  do between the inputs for those ads and the finished ones

5  that ran?"

6          THE COURT:  Yes.

7          MR. QUINN:  We do have some requests -- and this

8  gets a little into the interrogatory issue -- to just

9  understand more generally, what are the tools and systems,

10 how they work, give us the basics on that, but, as to how

11 they affected particular ads, I agree.  That's downstream of

12 first identifying the ads.

13         THE COURT:  Okay.  So, if we focus on how to

14 identify the scam ads in the first place, what I understand

15 Meta to be saying is "We essentially relied on text.  So

16 we've done OCR-ing of images.  We've done video to text,

17 like, transcription, essentially," so basically focusing on

18 text, because -- and I'll explore this with Meta -- it's my

19 understanding that finding images without text is super

20 hard, right?  There's just no way to do it in the vast, you

21 know, like, number of images on the platform, to, like, find

22 an image of Doctor Forrest, right?

23     So, okay.  You seem not to accept -- or, rather, the

24 Plaintiff seems not to accept that representation, and

25 criticized the reliance on text, and I'd like to understand.

16

1   Presumably you have an expert.  I see, in the outline of

2   things that will happen in this case, experts.  So what

3   technique do you propose, if not the technique that relies

4   on text?

5             MR. QUINN:  So I keep having two responses to your

6   Honor's questions --

7             THE COURT:  It's okay.

8             MR. QUINN:  -- but two responses there, too.  So

9   the first is -- actually takes us back to October of 2019,

10  when Doctor Forrest had, you know, forcefully raised

11  complaints about these ads with Meta, and there was an

12  exchange of lawyer letters, and Meta's lawyers at White and

13  Case sent a letter to Doctor Forrest's counsel, and we've

14  got copies -- it's referenced in the third amended

15  complaint -- in which they say repeatedly -- and I'll quote

16  from it:

17             "The Facebook entities share your

18             client's frustration, and we have

19             allocated significant resources towards

20             tackling this issue.  We are improving

21             the technological tools to combat this

22             problem, including launching new machine

23             learning tools to detect these ads at

24             scale.  These efforts involve both

25             detection at scale specifically looking

17

1        for this type of ad."

2    It goes on --

3        THE COURT:  "This type of ad" meaning Doctor

4  Forrest scam ads in particular, or scam ads generally?

5        MR. QUINN:  This was specifically about Doctor

6  Forrest scam ads that he was insisting be taken down.  They

7  go on to say that their efforts:

8            "May include use of key words, images,

9            and other signals in both targeted

10           searches and automated detection

11           models."

12   So that's five years ago they put in writing, through

13  counsel, "We are using machine learning, key words,

14  automated detection, and images to find Forrest scam ads."

15  The same letter talks about how to serve the right entities.

16  There is no question litigation is coming at this point.  So

17  one of our first questions has been "Well, why don't we

18  start by producing everything you found, and presumably

19  preserved, about that effort?"  We've had no meaningful

20  response to that point.

21       THE COURT:  You mean the blocking of scam ads, ads

22  that never made it onto the platform?

23       MR. QUINN:  Well, they -- these letters say that

24  they're also searching historically, "We're finding the ads

25  that are out there."

18

 1          THE COURT:  I see.  Okay.

 2          MR. QUINN:  So all of that should have been

 3  preserved, and all of those tools, which they're

 4  representing, then, they're going to use to find Forrest

 5  scam ads, should presumably be available and even better

 6  now, five years later.

 7          THE COURT:  Okay.

 8          MR. QUINN:  So that's --

 9          THE COURT:  But you don't -- so you're relying on

10  the statements in the letter, but not -- you don't have a

11  particular technique, such as your expert might have

12  suggested, about how to go about -- and I'm principally

13  focusing on what I think is the hard problem of image only,

14  and I wonder if you actually have any examples of image-only

15  ads.

16      You say they exist, where it's image only, not texts

17  that refer to a name or a misspelling or something like

18  that, or any kind of key word that would be sort of unique

19  to Doctor Forrest, in the sense that you could rely on that

20  key word to find it.  So do you have examples of image-only

21  scam ads?

22          MR. QUINN:  Not at my fingertips.

23          THE COURT:  But you've seen it?

24          MR. QUINN:  I'd have to kind of huddle with our

25  team.

19

1          THE COURT:  Okay.

2          MR. QUINN:  My understanding is that --

3          THE COURT:  It seems very odd that it could be an

4    effective scam ad without Doctor Forrest's name, unless he's

5    so recognizable to an Australian audience that all you need

6    is his face.  Maybe that's the case.

7          MR. QUINN:  Having spent a few days in Sydney for

8    client meetings, there is some sense of real celebrity

9    around him, and nicknames and all of that, but I -- to the

10   question about the expert search, I short of share -- you

11   know, I always hesitate to come into court and say, you

12   know, what, exactly, is it we're asking for, and to not

13   really concretely know the answer, and we simply don't.  We

14   just have this letter from five years ago that says they

15   have these tools.

16         THE COURT:  Have you asked your expert?

17         MR. QUINN:  Well, we've got some consulting

18   experts, but nobody that knows Facebook's, you know,

19   proprietary systems or anything.

20         THE COURT:  Okay.  Well, I mean, Facebook, yes,

21   has proprietary stuff, but there's, you know, technology in

22   the world, right, that we hear about.  I don't know if

23   Facebook has any of it, but let's assume that it has access

24   to whatever fancy stuff might be out there.  I would expect

25   the Plaintiff to say, "Look.  This is the kind of thing that

20

1  you should use.  It's not going to cost a million dollars,

2  or a billion dollars, or whatever, to try an AI to do this.

3  This is what you should do."

4          MR. QUINN:  Yes.  I think --

5          THE COURT:  Conversely, Meta might say, "Yes,

6  that's nice, but that would cost a huge amount of money for

7  us to train an AI system to identify this particular human

8  from amongst the vast quantity of images that we have.  It's

9  not like cat videos.  It's harder."  And so I can't resolve

10  this in a vacuum, right?  So that's why I was asking.  Does

11  the expert have a technique that he or she has proposed, or

12  that you have shared with Meta, for how to find these

13  things?

14          MR. QUINN:  Yes.  The language that we've used

15  consistently is "image search," "facial recognition," "near

16  match and vector searching."  We've asked Meta, "Can you

17  help us on -- you said you have these tools.  Help us

18  understand them."  And the answer consistently, in always

19  the same language, is "They were not designed for that

20  purpose."

21          THE COURT:  Okay.  Well, I'll explore that a

22  little bit further with Meta.

23      So, right now, if I understand it, in terms of the

24  number of scam ads identified, we have a total of 14, plus

25  some additional number that the Plaintiff have themselves

21

 1 identified?

 2        MR. QUINN:  So the history here is that Doctor

 3 Forrest's counsel earlier in the case was making efforts in

 4 real time, over the course of several months, to identify

 5 scam ads and keep track of them.  Sometimes they see an ad,

 6 and it is removed from Ads Manager.  Sometimes it's gone

 7 when they go back the next day.

 8     So there's this very imperfect sort of work product

 9 around tracking those ads, a lot of which was done in real

10 time.  We've been going through that.  We did, helpfully,

11 reach an agreement with Meta that they wouldn't argue waiver

12 around the work product issues there, so we could just sort

13 of give them what we have as it's organized.

14        THE COURT:  Okay.

15        MR. QUINN:  Those efforts led to an allegation in

16 the third amended complaint that there were, just during

17 that period of a few months, 1,154 scam ads, and, again,

18 that's just a period of a few months.  We don't have 1,154,

19 you know, screenshots and copies.  We've got notes and lists

20 and ad IDs.  So we're rolling those things to them as we are

21 able to do that, but, ultimately, it could be thousands of

22 ads, which is partly why --

23        THE COURT:  Okay.  But for discovery -- and

24 probably -- maybe this is not a good statement, but I

25 suspect that, for dealing with the Section 230 issue, you

22

1  don't need, literally, every single ad -- you may need that

2  for other aspects of the case -- but that you would just

3  need, at a minimum, some sort of representative sample,

4  sufficiently representative that you could make claims about

5  what was done, what Meta's contribution was, was it material

6  or not?  Then the parties would have enough of a data set to

7  make those arguments.  Is that fair?

8          MR. QUINN:  I think that's certainly fair.

9          THE COURT:  Okay.

10         MR. QUINN:  The challenge -- not the challenge.

11  The focus from our side is to ensure genuine

12  representativeness over time --

13         THE COURT:  Yes.  Sure.

14         MR. QUINN:  -- because Facebook's ad contributing

15  tools get better over time, but also their own screens on

16  those tools make it better over time.  The scammers and the

17  systems may learn to avoid the buzzwords over time.

18         THE COURT:  Okay.

19         MR. QUINN:  So, as long as it's genuinely

20  representative, we're -- the last thing we want is to sort

21  of boil the ocean and have hundreds of thousands of

22  documents dumped on us, either.

23         THE COURT:  Okay.  So where are we?  So there

24  might be thousands of ads that actually happened, but, in

25  terms of representative sample over time?  So, so far, I've

23

1  only heard that there are 14 ads that have been identified

2  by Meta.  So what do we have -- what -- how many, and over

3  what relevant domain do we have scam ads for which there are

4  ad IDs that would allow further discovery?  What does that

5  look like, whether for Meta or from the Plaintiff, or both?

6          MS. DEARBORN:  I can answer that question, your

7  Honor, unless, Mr. Quinn, do you want to?

8          THE COURT:  Okay.  If that's all right.

9          MR. QUINN:  From Meta's perspective, sure.

10          MS. DEARBORN:  Sure.  So, your Honor, I want to

11  start with what we have done.  So we have applied broad

12  search terms across the creative text.  That is --

13          THE COURT:  Okay.  I just -- I'm sorry.  I just

14  want to know the number, and then I'll come back to Meta,

15  because I have a lot of questions.

16          MS. DEARBORN:  I apologize, your Honor.  I should

17  have answered directly.

18          THE COURT:  So do we -- what is it?  Is it 14?  Is

19  it --

20          MS. DEARBORN:  It's 230,000.

21          THE COURT:  Okay.  Two hundred and thirty thousand

22  scam ads?

23          MS. DEARBORN:  Alleged scam ads, yes.

24          THE COURT:  Okay.

25          MS. DEARBORN:  Two hundred and thirty ads (sic)

24

1 that we have identified through our search.  We have

2 reviewed over half a million ads, your Honor, that hit on

3 our search terms, and the work is done.  We had 100

4 reviewers.  We have now identified 230 ads.

5     Now, I want to be clear.  A lot of those ads contain

6 very duplicative text, we believe, so we don't think that

7 that's a true number, but, nonetheless, that is the number

8 that we have found.

9          THE COURT:  Okay.  And these are 230 ads with the

10 ad ID information?

11          MS. DEARBORN:  Two hundred thirty thousand.  Thank

12 you.  Two hundred and thirty thousand.  We've got Section

13 230, and 230,000 in this case.

14          THE COURT:  Okay.  Now, is it 230 ads or 230 --

15          MS. DEARBORN:  Two hundred and thirty thousand,

16 your Honor.

17          THE COURT:  -- thousand ads?  Okay.  That's what I

18 thought I heard the first time, and that's a lot of ads.

19 Okay.  And -- but are these -- is what you have found, you

20 know, the data that you have -- does it allow you then to

21 investigate each individual ad?  Not that I'm suggesting

22 that you must do that, but that -- you have the data that

23 you would need?

24          MS. DEARBORN:  Yes, your Honor.

25          THE COURT:  And what period of time does the

25

1  230,000 span?  Does it span the entire -- I think the

2  parties agree on the relevant time period.  It's like 2019

3  to present?

4          MS. DEARBORN:  Correct, your Honor.

5          THE COURT:  Okay.  So what -- do these 230,000 ads

6  span that whole period of time?

7          MS. DEARBORN:  Yes, your Honor.

8          THE COURT:  Okay.  All right.  So, good.  That's

9  good news.  And it seems to me like that's a -- that's

10  progress.  So, when I asked --

11          MR. QUINN:  I agree.  That's the first --

12          THE COURT:  When I asked about, you know, what's

13  the status of the dispute, it sounds like there's been some

14  tremendous progress.  So maybe I should go talk to Meta

15  next -- is that fair? -- and see what they have to say about

16  some of these other items of concern.

17          MR. QUINN:  Of course.

18          THE COURT:  Okay.

19          MR. QUINN:  We welcome that, your Honor.

20          THE COURT:  Okay.  Great.  All right.

21      So let's hear more about the 230,000 ads, and what Meta

22  believes it can or cannot provide by way of further

23  discovery about those ads.

24          MS. DEARBORN:  Sure.  So, your Honor, again,

25  it's -- I've been reminded that it's approximately

1 230,000 --

2        THE COURT:  Fine.

3        MS. DEARBORN:  -- but no, we have identified,

4 again, millions of ads run on Meta's ad services every day.

5 So, in order to conduct a reasonable inquiry, a reasonable

6 discovery search in this case, we have to first find a

7 repository within Meta that contains a historical set of

8 those ads.  We found it, happily, and in -- let me take one

9 step back.

10     We also have to make sure that that repository is, A,

11 queryable, and, B, when we query it, it returns a valid ad

12 ID, because then we have to go to separate repositories in

13 order to use that ID to gather all of the additional

14 information about those ads that Plaintiffs have asked for.

15 So, happily, we found those repositories.  There are two

16 tables within a central data warehouse that Meta has.

17     Those -- that repository was searchable to text terms.

18 So we crafted a set of 41 very broad text search terms.  We

19 shared those search terms with the Plaintiff.  They never

20 seriously engaged with us on whether or not those search

21 terms were sufficient, although they raised a few questions.

22     We have agreed to add some search terms based on those

23 questions, according to our ESI protocol.  Instead, the

24 position that the Plaintiffs are taking in this case is that

25 no text-based search could ever be sufficient to satisfy

1  Meta's obligation under Rule 26, and we think that is a

2  position that is both untethered to law and also wrong as a

3  matter of fact.

4      I want to be very clear with the Court on a few points.

5  First, we have not found in our reasonable search any

6  better-suited repository for locating alleged scam ads than

7  the ones that we are searching now.  We have also not

8  identified any better-suited technology for searching for

9  historical ads featuring Doctor Forrest's name or likeness

10 than the text searches we are using now.

11          THE COURT:  Okay.  Can I ask you about that one?

12          MS. DEARBORN:  Yes.

13          THE COURT:  Okay.  So let's assume that your

14 search terms are broad and, you know, over-inclusive.  So,

15 if you got 500,000 hits, approximately, and you reviewed all

16 of them, and you ended up with 230,000 genuine scam ads, I

17 guess, legitimate -- I don't know -- responsive scam ads --

18 okay.  So that was a big effort, and you've done that, and

19 you've got that.  Okay.

20      So the question is, is text sufficient if there are ads

21 that were image only?  Which I find, again, a little bit

22 hard to believe that someone would go to the effort of doing

23 a fake ad using Doctor Forrest's likeness and not his name,

24 because -- well, who knows?  But, to the extent there are

25 ads like that -- and maybe I should just ask, have you

28

1  happened to find any in your own searching, any

2  likeness-only ads?

3          MS. DEARBORN:  We have found ads that feature

4  Doctor Forrest's likeness in a video, but our searches are

5  capturing that, and here's why.

6          THE COURT:  The video to text?

7          MS. DEARBORN:  Yes, exactly, your Honor.

8          THE COURT:  So it will have his name, or it will

9  have words that are searchable?

10          MS. DEARBORN:  Yes, your Honor, precisely.  So our

11  text searches are not searching -- so, when a published --

12  so, when an advertiser decides to publish an ad on Ads

13  Manager, they supply what is called the "creative," which is

14  an image and the text accompanying the ad.  That's all

15  supplied by the advertiser, as I think your Honor correctly

16  noted before.  The -- it can be an image or a video.

17      Our text searches are searching not only the text that

18  is supplied by the advertiser, but also any OCR text from a

19  still image.  So, for example, if Doctor Forrest is standing

20  on a stage in an image, and it says, "Minderoo Foundation,"

21  our search -- I would need to double-check our search terms,

22  but we searched for those kinds of things.  So that text to

23  image would have been captured, and then, in addition,

24  we've -- we are also searching a transcription of the video

25  that is supplied with the ad, as well.

1          THE COURT:  Right.

2          MS. DEARBORN:  So --

3          THE COURT:  I'm imagining a situation where there

4   is none of those things.  There's no words that appear on

5   the screen that could be OCR-ed and then text-searched.

6   There's no video -- there's no audio associated with video

7   that could be transcribed and then text-searched.  It's just

8   an image.  Okay?  So have you come across any ads like that?

9          MS. DEARBORN:  So I'm hesitant to make a

10  categorical representation --

11         THE COURT:  Yes.  Okay.

12         MS. DEARBORN:  -- because I personally have not

13  laid eyes on all of these ads, your Honor.

14         THE COURT:  Yes.

15         MS. DEARBORN:  So I am not -- I can't -- I don't

16  think I can make a representation on that, one way or the

17  other, but I think your Honor's concern is one that we have

18  investigated, which is, is there a better way to look for

19  ads allegedly featuring Doctor Forrest's name or likeness?

20         And when I say, "Text," the searches that we have come

21  up with, because of how our databases are configured, as

22  well as the methodologies that we've figured out how to

23  query them, that -- what we've got is the best we have.  We

24  have investigated other potential ways to identify ads

25  featuring Doctor Forrest's name or likeness, and we have

30

1  come up short.

2      So, just to identify one technology that, in the sort

3  of string citations of "techie" words that we keep hearing

4  from the other side, they have asked that we look into

5  facial recognition technology.  We cannot use facial

6  recognition technology for these purposes, and that's for

7  three reasons.

8      First, our facial recognition program, which I'm -- I

9  actually have the block post that the Plaintiffs have cited.

10 I'm happy to hand it up to the Court, if the Court is

11 interested in it.  The way that program works is that it

12 creates -- or we have a list of all consenting participants

13 in that program -- and, by the way, Doctor Forrest, to our

14 knowledge, has not elected to participate in that program,

15 nor has he created a verified page that would allow us to

16 have him participate in that program.  They've never told us

17 that that's not true.

18     But, nonetheless, we have all of the participants in

19 this program, and then our facial recognition technology, as

20 part of our enforcement against ads that violate Meta's

21 terms and policies, right?  We would apply that facial

22 recognition in order to figure out whether or not there is a

23 match to anyone in that entire population.  So it doesn't

24 give us, you know, "Yes, this ad features Doctor Forrest.

25 Take it down."  Instead, it says, "This ad, you know, up or

31

1  down, it matches on one of a host of individuals who have

2  consented to participate in this program."

3           THE COURT:  And so it's not individual-specific or

4  image-specific?

5           MS. DEARBORN:  Correct.

6           THE COURT:  Could it -- okay.  I see.

7           MS. DEARBORN:  So that's number one, and, your

8  Honor, this October 2019 letter which has come up multiple

9  times, and which actually predated the complaint by, I

10 believe, two years, we actually said this precise thing to

11 Doctor Forrest at that time.  We said, "We can't look for

12 individual" -- "That's not the way this technology works."

13      The second reason, your Honor, is that, again, the

14 databases that we need to query in order to identify the

15 various components of the ads, including inputs and outputs,

16 those are only searchable by ad ID.  We cannot search those

17 using any other technology, text searches, you know, image

18 searches, whatever.  That's not how those databases are set

19 up.  So it's not a -- it's not -- we can't query it that

20 way.

21      And the third, your Honor, is that facial

22 recognition -- and we said this in our letter -- facial

23 recognition technology implicates privacy concerns and data

24 misuse concerns.

25           THE COURT:  Yes.

32

1       MS. DEARBORN:  And so we can't -- okay.

2       THE COURT:  Yes.  No, I understand that, that

3  part.  So I'm actually interested in the question of whether

4  there are any existing Meta tools, features, that might be

5  used as a proxy for finding things that might have gotten

6  missed by text, and I'm tending to think there's, like,

7  very, very few such things, but let's just hypothetically

8  say there's a tranche of image only.

9       MS. DEARBORN:  Yes.

10      THE COURT:  Seems like image tagging, or maybe,

11 once you've identified the 230,000 scam IDs, there's some

12 way that you can use that data set to identify similar, and

13 what I'm -- what I have in mind is not "Let's train an AI

14 just on Doctor Forrest," which would be, I think,

15 prohibitively expensive, and not something that the

16 Plaintiff is asking about, but whether existing systems

17 would allow for that.  So I used the example -- I don't use

18 Facebook.  I have no -- I have plenty of cases involving

19 Meta, but -- so I know what I know just because -- not from

20 actual use.

21      But, if there is an ability to identify and tag cat

22 videos, is there a similar -- is that feature available to

23 use what you know about Doctor Forrest to identify and tag

24 Doctor Forrest things?  That's a question.  Does this apply

25 to other existing techniques, whether or not they're in this

33

1 particular database or not, but are there existing

2 techniques that could be deployed to, without undue burden,

3 find these things?

4          MS. DEARBORN:  Yes.  Not that we have found in a

5 reasonable search, your Honor.

6          THE COURT:  Okay.

7          MS. DEARBORN:  We have -- you know, we are trying

8 to identify the best way to find historical ads that are

9 stored in our databases, and we have not identified any

10 better way.

11          THE COURT:  Yes.  Okay.  You keep saying, "Based

12 on a reasonable search."  What I have in mind in cases like

13 this is actually talking to a human who knows, right?  So

14 talking to a human is sort of my go-to thing for

15 complicated -- that's why I asked the Plaintiff, you know,

16 "Have you talked to your expert?"  Like, what do your expert

17 human engineers know about this problem, and is there a way

18 that they would suggest that you could use an existing tool

19 or feature to identify things that might have gotten missed?

20          MS. DEARBORN:  Yes.  I can assure your Honor that

21 we have talked to many humans in the course of this case,

22 including subject matter experts on our facial recognition

23 technology, subject matter experts on other potential

24 methodologies.  Again, we have not -- you know, we have not

25 identified any better way to search our historical ads

34

1  population.

2       And I keep coming back to this, your Honor, because I

3  think that this is an important distinction that the

4  Plaintiff has not appreciated.  There is a difference

5  between us querying historical databases that store ads that

6  have run on Meta's services -- that's Instagram and Facebook

7  and the like -- and preventing or blocking ads that are --

8  have not yet run on the services, but are potentially

9  violative of our policies.  Those are two totally different

10 questions.

11          THE COURT:  And they're different questions

12 because of the technique deployed, and I'm just -- I'm

13 speculating here, but I can imagine that there would be a

14 difference, in even an expert system, understanding what

15 constitutes fake versus not fake.  There would be things

16 about how the image is put together, or the text applied, or

17 whatever, that would be not content-specific, per se, like

18 as in "This is an individual person," but that would just be

19 a signifier of "Fake ad," and if that's what you're --

20 because I didn't understand the reference in your papers,

21 and I think that the Plaintiff maybe didn't, either.

22      Just saying it's not designed for discovery doesn't

23 really tell me anything.  But is that what you're trying to

24 communicate, that it's a different type of technology that

25 actually can't be deployed for this purpose?

1        MS. DEARBORN:  Yes, your Honor.  That's precisely

2  it, and that is exactly what this October 19th letter is all

3  about.  It's about forward-looking enforcement efforts to

4  prevent alleged scam ads or, frankly, any ad that violates

5  our terms.  We brought up terrorism and C-SAM and these

6  other things.

7        THE COURT:  Yes.

8        MS. DEARBORN:  Those have nothing to do with this

9  case, but, nonetheless, we do attempt to enforce our

10  policies, to ensure that the ads that are -- to the best of

11  our ability -- that are running on our systems are not

12  violating them.

13      And so our ad review system -- which I actually believe

14  that our ad review system is outside of the focus of phase

15  one of this case -- I think that the efforts that we make to

16  prevent alleged scam ads are not part of phase one.  It

17  doesn't have to do with Section 230.  But, nonetheless, our

18  ad review system relies on automated technology to review

19  the millions of ads that run across Meta's platforms.

20      They -- we apply hundreds, hundreds, of signals to

21  detect violations of ad policies, exactly as your Honor

22  identified.  Those signals don't necessarily have to do with

23  the content of the ad.  We potentially also do the -- you

24  know, if the originator of that particular ad had violated

25  our policies before -- other signals are taken into account

1  to determine whether or not this ad may violate one of any

2  number of Meta's policies or not.  That is a different

3  question from "Okay.  How do we find ads featuring this

4  specific individual within Meta's historical repository

5  where it stores that?," just totally different questions.

6          THE COURT:  Okay.  So I appreciate that.  I

7  actually think that the fact that you have identified

8  230,000 or so is great.  I mean, it's great because it

9  allows the parties to move forward.

10     If you have valid ad IDs for those, you know, a

11 significant percentage of those, what -- you refer to in

12 your papers, on behalf of Meta, "related metadata."  So what

13 is the data that you can identify and produce to the

14 Plaintiffs, having identified the ad ID, that will allow

15 them to answer the question of "How did it go from input to

16 output, and what did Meta contribute"?

17         MS. DEARBORN:  Yes.  Your Honor, I actually have a

18 list of those data -- of those data points, if your Honor

19 would be interested.

20         THE COURT:  Have you shared that with the

21 Plaintiff?

22         MS. DEARBORN:  Yes.

23         THE COURT:  Okay.

24         MS. DEARBORN:  This is -- I'm happy to share with

25 them a copy.  This is a list that we've shared in letters.

1  It's just compiled.

2          THE COURT:  I mean, I'm happy to look at it,

3  although I may not know what it means, but I would like to

4  understand, like, is this complete?  So you can hand it out.

5          MS. DEARBORN:  May I approach?

6          THE COURT:  Sure.  Sure, sure.  Thanks.  Okay.

7          MS. DEARBORN:  Your Honor, just -- if I can

8  briefly address the number for a minute, the notion that the

9  Plaintiffs would amenable to a representative sample is

10 actually -- that's the first we've heard of it.  We offered

11 a representative sampling approach in January.

12         THE COURT:  But maybe a representative sample of

13 14 was not particularly attractive.  So now that --

14         MS. DEARBORN:  That was not what we were --

15         THE COURT:  Yes.  No.  I think, moving forward,

16 this is what we should do.  We should figure out if there

17 can be a representative sample, unless you would like

18 230,000, you know, pieces of data from a database, which is

19 perhaps not -- and that's a bad sign -- well, not a bad

20 sign.  Maybe that's a good sign.

21     But we may be interrupted soon, so I'm trying to get to

22 the bottom of at least this one before we have to take a

23 pause, here.  But this is -- this set of data points is what

24 Meta would propose to share with the Plaintiff?

25         MS. DEARBORN:  This is -- to be clear, these are

38

1  the data points that we have agreed to find and produce, if
2  they -- we can -- if we are able to do so after a reasonable
3  search.  So this is the --

4          THE COURT:  Okay.  What does that mean, "do so
5  after a reasonable search"?  What does that mean?

6          MS. DEARBORN:  So we are still investigating the
7  feasibility of just the -- literal technical feasible of
8  gathering some of these data points, and so I don't want to
9  over-promise, but this is -- so long as we can find these
10 through a reasonable search, and we will be communicating,
11 hopefully, with the Plaintiffs on this point -- these --
12 this is the list of data points that we have agreed to
13 provide.

14     And I think, your Honor, this begins to touch on the
15 second part of this dispute, which is the -- what tools are
16 in scope for phase one.  With your Honor's indulgence, can
17 I --

18         THE COURT:  Well, before we get to that, can I
19 just ask about the geographic limitation?  Does the 230,000
20 include, like, everything, everywhere, or is it specific to
21 an Australian audience?

22         MS. DEARBORN:  It sure does, your Honor, because
23 it includes everyone, everywhere, because the Plaintiffs had
24 never told us before today that they were only interested in
25 ads that ran in Australia.

39

1          THE COURT:  But could you narrow it as was
2    described by Mr. Quinn?  Like, you could do it by geography?
3          MS. DEARBORN:  I'm looking at Ms. Rivera, because
4    she's our technical expert sitting at this table.  She's the
5    person.  We can try, is the answer that I have.
6          THE COURT:  Okay.  Because that might be the first
7    step.  Narrow it by geography, figure out a representative
8    sample that spans the correct years, and then figure out
9    what -- which of these categories are available and
10   meaningful to your effort, and I -- what you're really -- I
11   think you all agree that you're focusing on what happens
12   between the input from the third party and the output to the
13   user who sees the ad.
14       That's what you're trying to figure out, what happens,
15   and the data points that will allow you to know that is what
16   you're trying to achieve here, and I think that the tools
17   issue, which tools, comes up when we get to the
18   interrogatory answers, as well.  So maybe, if you -- with
19   your indulgence, I would like to take a break now, deal with
20   my jury -- yes? -- and then -- sorry to make you all wait.
21   Feel free to go grab a coffee or whatever, and then you can
22   come back, and we'll deal with the interrogatory issue.
23       But I think this is great progress, and I'm encouraged
24   by it, and I continue -- hope you continue to discuss it.
25   Okay?

40

1    So we'll revisit this.  What do you think, 30 minutes?
2  I don't know.  So about 30 minutes, if you wouldn't mind.
3  Okay.  Thank you very much.
4         MS. DEARBORN:  Thank you, your Honor.
5         MR. QUINN:  Of course.  Thank you, your Honor.
6      (Pause while the Court heard other matters.)
7         THE CLERK:  Remain seated and come to order.
8  Court is back in session.
9         THE COURT:  All right.  Thank you very much for
10  your patience.
11    Okay.  So I think where we left off is I had suggested
12  we talk about the interrogatories as a vehicle for
13  addressing the question about, you know, the tools, and what
14  the scope of that kind of production out to be.  So, if
15  that's okay, I'll just proceed to that issue.
16         MR. QUINN:  If I may, your Honor?
17         THE COURT:  Yes.
18         MR. QUINN:  The parties have had a productive
19  discussion during the break, which I'm happy to just update
20  the Court on, very tentatively, but if it's somehow --
21         THE COURT:  Sure.  Okay.  If you think that would
22  be helpful, sure.
23         MR. QUINN:  So what we've proposed, and what we've
24  started discussing -- and everyone would need to firm this
25  up and speak to clients, but just to keep the Court fully

41

1 apprised -- would be that, as a process forward on this scam

2 ad search issue, perhaps we could get some access to basic

3 information about the 230,000 ads that have been identified,

4 so not that we need copies of each one, but, if there's a

5 chart of their dates or that sort of thing, that we could

6 then identify for them what we believe to be an appropriate

7 narrowed sample as to which we would request the backup

8 information, and that we would just, you know, work through

9 that process collaboratively.

10      And I think we could kind of reserve the question until

11 we've had that initial look at things, of whether there may

12 be some kind of image-only, no spoken or written or imaged

13 text of any kinds, ads that we would need a different

14 solution for, but, in view of this, you know, new

15 information that there are 230,000, and that they span the

16 date range, perhaps we could reserve the image-only

17 question, start there, and, with some basic information,

18 work to identify a narrowed and representative sample.

19            THE COURT:  Okay.  So, if that's -- I'm assuming

20 that both parties would like to spend time doing, which

21 makes sense to me -- what I think might be useful is for me

22 to give you a date to report back, and so how long would you

23 suggest?  And this would be, let's say, on Docket 186, the

24 dispute about the document production relating to scam ads,

25 and the information like metadata and other information

42

about those ads, and the process.

How long do you need to report back?

        MR. QUINN:  Throwing it out there, 14 days, we
could get the status report?

        MS. DEARBORN:  That sounds reasonable to us, your
Honor, and we obviously need to investigate the feasibility
of all of this, but I'm happy to report back to the Court in
14 days.

        THE COURT:  Okay.  So I'll just set a -- I'll do a
short order that sets that as a deadline, and you could use
it as a date by which you would submit a stipulation about
what you plan to do, or simply a status report.  What I
don't want is, like, "Let's re-brief our discovery letter
again."  I have in mind something a little bit more concise.
And if we need further proceedings, we can attend to it
then.  I'll invite you to tell me.

    Okay.  So that would be for what's principally at issue
in Docket 186, and then, if we move to Docket 187, which is
about the interrogatories, maybe I should just ask if there
are any updates on this dispute.

    Let me ask what the -- for the Plaintiffs.  Have there
been any amendments or other updates?

        MR. QUINN:  Once again, two brief points, your
Honor.  First, on the proposal we've just outlined on the
path forward, I think, as to Docket 186, it would still

43

1  leave two issues open.

2      One is the question of the October 2019 correspondence,

3  and what was done, and what exists or was preserved around

4  those efforts, and the other is this question of what

5  metadata, ultimately, we will get about the ads identified,

6  and there's a very significant dispute remaining there.

7              THE COURT:  Well, that's this --

8              MR. QUINN:  I agree that it relates to the

9  interrogatory, as well.

10             THE COURT:  I mean, that's this data points

11  document.  So have the parties not conferred, or is there a

12  crystalized dispute about the data points document?

13             MR. QUINN:  Yes, your Honor, and I think it

14  relates principally to the last bullet, or the last primary

15  bullet, on page one, where the information that's being

16  given -- this is about "What did Meta software actually

17  do?" -- is limited unilaterally to lowercase T, "tools,"

18  which they have refused to define for us.

19             THE COURT:  Wait, wait.  On the -- you're talking

20  about this (indicating)?

21             MR. QUINN:  Correct, your Honor, the last sort of

22  primary bullet before the indentations begin.

23             THE COURT:  I see.  I see.

24             MR. QUINN:  So, as to the question of what Meta

25  software of any kind interacted with inputs or produced

44

1  outputs, they've only agreed to give us information about

2  lowercase T, "tools," all of which are public-branded things

3  that get described by the marketing team to advertisers, and

4  that advertisers can turn on and off, and that Meta has

5  decided, unilaterally, are relevant to the 230 issue, where

6  the parties do have some legal disputes.

7         THE COURT:  Okay.

8         MR. QUINN:  So we think all the software.

9         THE COURT:  So I think this dovetails with the

10  stuff that's asked about in the interrogatory, so I'd like

11  to use it as a vehicle, because, you know, my basic theme

12  about discovery, not just in this case but generally, is,

13  you know, ask for what you need, not, literally, the kitchen

14  sink, right?

15      So we need -- you need to ask for what you need, and

16  that's what I'm trying to figure, is what do you -- what do

17  you actually need?  So -- okay.  So have there been any

18  updates on the interrogatories?

19         MR. BROWN:  And let me address this, your Honor.

20  Walter Brown.  So we just discussed with counsel in the

21  hallway that we are prepared to amend and supplement our

22  responses to interrogatories two, three, and five, next

23  week, the 25th.  We had offered to do that --

24         THE COURT:  And that's what you put in your

25  letter.

45

1          MR. BROWN:  And -- but we're going to do it.  We

2    didn't reach an agreement to do that a couple weeks ago, but

3    we're going to do it anyway, and it's going to be narrative

4    responses.

5          THE COURT:  Okay.

6          MR. BROWN:  So we will likely, as well, identify

7    Bates numbers of documents, but we will provide narrative

8    responses to two, three, and five, which get at this very

9    issue, I think, that we've just being talking about, about

10   the tools.

11       Separately, with respect to interrogatory number eight,

12   we will supplement in short order.  I can't promise you that

13   we're going to have it by next week, but it will be not long

14   on the heels of that.

15         THE COURT:  Okay.

16         MR. BROWN:  So that's the update with respect to

17   those.  I think interrogatories one, four, and six, we

18   think, are sort of classic interrogatories, where a 33(d)

19   response is appropriate, but, with respect to the others,

20   we're going to go ahead and give narrative responses.

21         THE COURT:  Okay.  You know, given the hour, I'm

22   going to just start by sharing with you my impressions from

23   reading the papers, and then we'll discuss from there,

24   because -- and my goal here is to problem-solve, so that we

25   get to a resolution, so that's why I'm doing it this way.

46

1       So I went through all of the interrogatories that are

2   in dispute -- that's one through nine -- and I looked at

3   them, and I looked at the responses that were provided by

4   Meta, and I'm just going to make an observation that some of

5   these interrogatories do seem like they are likely to be

6   best answered by documents, and others don't.

7       And for the ones that seem to be answerable by

8   documents, likely by documents, it is not consistent with

9   Rule 33(d) to just say, "I'm going to answer by documents,"

10  and not actually identify documents, and I just will make

11  the observation that the answers to the interrogatories were

12  due on December 23rd.  That was almost three months ago, and

13  if the parties didn't stipulate to an extension of that

14  deadline, then, you know, the answers are late.  They just

15  are.

16      And so just saying you will make a 33(d) response is

17  not really consistent with the rules, but, moving on from

18  that, if I look at interrogatory number one, this

19  principally refers to the process by which three things

20  happen, content modification, optimization, and placement.

21  I worry that optimization and placement are a little broader

22  than what Judge Pitts had in mind.

23      I'm not even sure I know what optimization has to do

24  with the material contribution issue to content, or what

25  placement has to do with the material contribution issue as

47

1  framed in the order, although I believe this probably goes

2  back to your comments earlier, Mr. Quinn, about, well, you

3  think that might actually be the kind of thing that would

4  not -- that would destroy immunity, or would prevent

5  immunity from attaching, is if it were a placement, for

6  example, that increased the likelihood someone will click on

7  it.  I have my doubts, but I'm not your presiding judge.

8      So maybe some discovery about that is warranted at this

9  stage, so the parties can tee that up for Judge Pitts, but

10  content -- let's say content modification -- that's a

11  defined term -- that seems to be fairly within the scope of

12  what everyone, I think, would agree is discoverable, and

13  just taking interrogatory number one as an example, I think

14  there's a problem with how Meta has responded to

15  interrogatories like this.  So there's a statement that

16  says:

17          "Subject to and without waiving any of

18          the foregoing, et cetera, et cetera,

19          objections, Meta will conduct a

20          reasonable search proportional to the

21          needs of this case, and produce any

22          non-privileged documents sufficient to

23          ascertain the answer to this

24          interrogatory."

25      So, essentially, Meta is treating this interrogatory

48

number one as a document request, and I don't think that

that's an appropriate way to treat a document request like

this, because the answer to interrogatory number one does

not depend on Meta's -- the outcome of Meta's reasonable

search for privileged/non-privileged documents.

     If the answer to the request is not in a document, I

think Meta would still have an obligation to answer.

Likewise, if the answer to interrogatory number one is in a

privileged document, nevertheless, you don't have to produce

that document, but you would have to supply the facts that

are contained in that privileged document.  So it doesn't

really fairly meet an interrogatory like this, that says,

"Describe the step-by-step process," to answer in this way.

     I could totally see an answer that says, "We actually

have a document that describes the step-by-step process.

Here.  Look at this flowchart, this diagram, this narrative

description, and some kind of engineering specification,

that fully answers it," but you're not relieved of the

obligation to fully answer this interrogatory, at least as

to content modification, leaving aside optimization and

placement, simply because your reasonable search doesn't

turn up a document that answers it.  That's just -- so I

just wanted to alert you to that concern I have about the

mode of answering, and that is not just interrogatory number

one.  It's a number of the -- a number of other ones.

49

1    So, you know, my sense on interrogatory number one is,
2  you can't use 33(d) exclusively unless you have a document
3  that completely answers this interrogatory, and the same
4  would be true for, for example, interrogatory number two,
5  "List and describe every product or service or tool provider
6  used by Meta that can affect in any way the content or
7  display of an advertisement."  I mean, the "or display" is
8  too broad, perhaps, but you may not have a document that
9  lists all such things, right?  So you may just need to say,
10  "These are all the tools that we have that an advertiser --
11  that, if we have an ad creative that's submitted to our
12  system, these are the things that will -- that can be used
13  to manipulate it."
14    Now, if you can say definitively, "No ad involving
15  Doctor Forrest that was a scam used any tools other than
16  these," okay, but I don't think you're in a position to say
17  that right now.  So you may have to just list, or give a
18  document that lists, completely, all of the tools that will
19  modify, can be used to modify, are used by Meta to modify,
20  the content, again leaving aside display for the moment.
21    So, again, this one, interrogatory number two, seems
22  not amenable to 33(d), and I would say the same for number
23  three and number five.
24        MR. BROWN:  Your Honor, those are the
25  interrogatories that I indicated we're planning on providing

50

1  narrative about.

2        THE COURT:  A narrative, yes.  So I'm just kind

3  of -- this is like my overview.  Number seven would be the

4  same, and number and number nine.  The two that I thought

5  are, like, definitely, probably, for sure, 33(d), because

6  they seem to be looking for org charts, would be number four

7  and number six.  It sounds like the Plaintiff is looking for

8  an org chart.

9       Now, I'm not sure if it's, you know, contemporaneous

10  org chart, and org chart over the last relevant time period.

11  I don't know.  But, to the extent that the Plaintiff is

12  looking for "Whose deposition do I take?," an org chart may

13  be entirely appropriate, or you could identify the people,

14  but -- so that was my sense, is that you -- it's not

15  appropriate to treat an interrogatory as a de facto document

16  request, unless it really is something that is fully

17  described in a document.  That was just my sense.

18       Now, I think some of these are too broad, right?  I'm

19  not entirely sure what they encompass, from their

20  description, and even their deposition.  There may be some

21  room for discussion and debate amongst us here about that

22  issue, but that was just my sense, and so maybe that's

23  consistent with the -- you know, the proposed amendments

24  that Meta says that it wishes to make, but I'm not sure that

25  that goes far enough, just two, three, and five, and

51

1  possibly eight, but I think maybe one, as well.

2          MR. BROWN:  Yes.  So I think our intention was to

3  respond to one with documents, identifying them as such,

4  that we believe would contain the response, but -- and to

5  the extent those documents would not be adequate and

6  sufficient, we would provide a narrative response.

7          THE COURT:  Yes.  I think that's also --

8          MR. BROWN:  So I think our belief is that they

9  will, on one.

10          THE COURT:  Yes.  Okay.  I think that's an

11  appropriate approach, a combination of narrative and

12  something more detailed in a document.  That could be

13  totally fine, but you will need to actually provide a

14  narrative if the documents don't completely answer.

15      So, if that -- and that's just my sense of it, and I

16  would like to understand more from the Plaintiff about the

17  optimization and placement, because those do seem to

18  encompass a scope of technologies, tools, systems that are

19  really much farther afield from Section 230 than what I

20  understood.  So could you elaborate on the optimization and

21  placement aspect of, let's just say, interrogatory number

22  one?

23          MR. QUINN:  Yes, your Honor.  So I think there's a

24  phrase the parties have used in some of our discussions

25  about this, and the phrase is "feedback loop," and part of

52

1   what's driving that thinking on our end in some of this is

2   pursuant to conversations with, you know, consulting experts

3   and the like, is that, you know, the ads aren't on a

4   conveyor belt, where they get created, finalized, published,

5   and never changed again.

6       These things get refined constantly in real time.

7   They're sent out in AB testing to small pockets of users.

8   How those users engage with them is tracked.  That, in turn,

9   can affect the shape of that same ad, which is then run

10  to --

11          THE COURT:  The "shape."  The content?

12          MR. QUINN:  Yes, the content, the appearance, the

13  particular text or colors that are used, and that is what

14  the placement and optimization terms are about.  We have

15  narrowed, in the meet-and-confer process, both

16  interrogatories seven and eight to seek this information

17  only insofar as the results of the ad review or the

18  performance evaluation are violation to the systems that are

19  engaging with the inputs of new ads that are being created.

20  It's all sort of --

21          THE COURT:  And is there agreement on that?  Are

22  you representing there's agreement on the scope of

23  interrogatories seven and eight at this point?

24          MR. QUINN:  I think -- I don't want to speak for

25  Meta.  I think they've accepted that narrowing, although at

53

1  times expressed some confusion about the term "feedback

2  loop."  So I don't know that we are fully in agreement on

3  that.  It's something we offered, to try to narrow seven and

4  eight and tie it to --

5           THE COURT:  Okay.  Because that caught my

6  attention, as well.  Maybe that is a good place.

7       So ad review and performance evaluation, I'm not sure

8  what those are, but I made a note that says the threshold

9  question is whether either of these, review or performance

10  evaluation, result in some change, modification, in the

11  content of the ad, and that seems to -- before you get,

12  like, vast discovery about all of these processes, I think

13  it would be appropriate to get discovery on that threshold

14  question as to each of them, and whatever -- you know,

15  whether it's an interrogatory answer in narrative form, by

16  document, or something else, getting that question answered

17  first, before you get step-by-step process of all this

18  stuff, which may be totally irrelevant to this question, at

19  least at this stage -- I think you're calling it "phase

20  one" -- it's not a good use of your time.

21       So have you reached agreement, then, on seven and

22  eight, as to that issue?

23           MR. QUINN:  My understanding is that the feedback

24  loop narrowing was more our proposal than the parties'

25  agreement, and the only nuance I might make to what your

54

1  Honor just expressed is, our view is that the information

2  would be relevant if the data resulting from the performance

3  evaluation or the ad review can affect the content of that

4  ad that was evaluated or reviewed, or the next one that's in

5  the process of being created.

6          THE COURT:  The next one about Doctor Forrest?

7          MR. QUINN:  Correct.

8          THE COURT:  Okay.

9          MR. QUINN:  That if every ad that uses a

10 particular image of him, as coming down, results in a flag

11 or a screen or a change to that image the next time, then

12 that is the feedback loop we're asking for.

13         THE COURT:  Okay.  So let's just focus on seven

14 and eight for now, and I don't know, Mr. Brown, if you're

15 going to be the one who's addressing this, these issues, but

16 what about just answering that -- what I'm calling the

17 "threshold relevance" question?

18         MR. BROWN:  Yes.  We can answer that question, I

19 think, your Honor, in a narrative form.

20         THE COURT:  Okay.

21         MR. BROWN:  The -- we've agreed, actually, to get

22 back to them on eight, and look into this further.

23         THE COURT:  And what about seven?

24         MR. BROWN:  Seven, we've stood on our objection

25 that it's just not relevant to --

55

1          THE COURT:  But could you say why?  Like, could

2    you say -- because right now you --

3          MR. BROWN:  Yes, yes, because it doesn't alter the

4    content.  But we can put that into an interrogatory

5    response, if that's what the Court thinks would be

6    appropriate.

7          THE COURT:  Well, what I'm wondering is, if --

8    and, again, I'm not sure if you have a 33(d) kind of -- so

9    what I think would be helpful, and would forestall further

10   discovery, at least further ordering of discovery on my

11   part, is if there were some definitive statement that

12   there's nothing about the ad review process that actually

13   affects -- it's either before the ad gets in, or -- and it

14   doesn't affect any current ad -- it's either yes or no, the

15   ad gets in or doesn't get in -- and it doesn't affect any

16   subsequent ad in terms of the content of the ad.

17       That's the -- what I'm calling the "threshold

18   statement," and if there was just like a "because" after

19   your statement of "It's not relevant," "It's not relevant

20   because," that might be sufficient, because then I'd really

21   be turning to the Plaintiff and saying, you know, "They

22   described what this is.  It's publicly -- is there a public

23   description of it as well?  What's your basis for thinking

24   that it's otherwise?," you know, before we get expansive

25   discovery into this system or performance evaluations.

56

1  They're not really modifying content.  So I would encourage

2  the parties to proceed in that fashion, so that we can kind

3  of narrow the focus.

4          MR. BROWN:  I understand, and I think we can give

5  the "because."

6          THE COURT:  Okay.  While we're on scope, I also

7  thought interrogatory number nine -- well, I didn't entirely

8  understand it:

9          "List and describe every Meta Advantage

10          feature, tool, product, or service that

11          was used in connection with any of the

12          scam ads."

13      So that, to me, seems too broad, by virtue of the "used

14  in connection with," because there could be lots of things

15  used in connection with a scam ad that have nothing to do

16  with this sort of content manipulation, enhancement,

17  modification, et cetera, or even placement.

18      I mean, it just seems too broad, and there must --

19  maybe this interrogatory nine, what you really want is

20  encompassed by other requests, and you don't actually need

21  this, anyway, because, if you get the answers to one and two

22  and three and five, et cetera, that will be sufficient.

23  But, if there was something I'm missing about the scope of

24  nine, I'm happy to hear from you on it.

25          MR. QUINN:  I would agree with the Court that

57

1  there may be some overlap in practice.  We're trying to come

2  at the same issue from two different angles, in part because

3  the parties, I think, have different proffered standards or

4  legal understandings of what it might meant to affect

5  content, and some of this was on display at the 1282

6  hearing, right?

7      This was actually the ground on which Meta was seeking

8  an interlocutory appeal that actually -- the legal question

9  there was an unsettled one, and so we're trying to make sure

10 we've got discovery on the broadest version of that.  The

11 parties haven't always agreed to approach discovery that

12 way.

13     So the earlier interrogatories are trying to ask, in

14 general, "Tell us what the tools are that can affect content

15 that engage with inputs," but then there is a catchall,

16 because we understand how Meta thinks pretty narrowly about

17 those questions, to say, "Well, just give us everything

18 that -- all the software that dealt with these scams, that

19 interacted with the inputs or that affected the outputs."

20         THE COURT:  Yes.  Yes.  I think that's too broad.

21 So I would encourage the -- I don't think it's appropriate

22 for Meta to just say, "Our view of what counts as not

23 materially contributing" -- or, you know, "Our view about

24 that material contribution versus not material contribution

25 should guide discovery," because there is a dispute.

58

1    So I think it has to be sufficiently broad to encompass
2   both parties' views, without becoming, like, ridiculously
3   irrelevantly over-broad.  That's the inartful way of saying
4   don't ask for what you don't actually need, because it's
5   just not going to be plausible to say, "I'm going to put the
6   ad in this corner of the screen, versus that corner of the
7   screen," and that's content.  I just -- well, maybe I'm
8   wrong.  Maybe I'm wrong.  Maybe that is content.  I
9   shouldn't say.

10        MR. QUINN:  Well, I think, to be clear -- I don't
11  know that our position reaches quite that far, but, as I
12  understand Meta's position, it has been that unless Meta
13  selected the words, Meta suggested using Doctor Forrest's
14  name, or Meta introduced the photo of him, then it's not
15  materially contributing, as a matter of law, whereas our
16  view is no, if you zoom in on a picture, if you highlight it
17  more, if you select from among different pieces of text, if
18  you punch it up in a way that enhances the message the
19  advertiser created with reference to Forrest, all of those
20  would be material contributions, and we've just never
21  really --

22        THE COURT:  And there's a distinction between
23  providing a tool that a user can use to do all those things
24  and Meta doing it itself, and the parties need to have
25  enough of a basis to explore that issue in front of Judge

59

1 Pitts.

2          MS. DEARBORN:  May I respond, your Honor?

3          THE COURT:  Yes.  Yes, please.

4          MS. DEARBORN:  I just want to be clear.  I do not

5 believe that there is actually a discovery dispute before

6 the Court that would reach this distinction.

7          THE COURT:  Okay.

8          MS. DEARBORN:  It is true, as Mr. Quinn indicated,

9 that we do not believe that any of our tools materially

10 contribute to the allegedly unlawful content of these ads.

11 It is also true, I believe, that we have a legal dispute

12 over the scope of Section 230, but that is not how we

13 have -- that is not what is guiding our responses to these

14 discovery requests.

15     And, as you'll see from our answers to each of these

16 discovery requests, we have agreed to provide documents

17 sufficient to show the operation of relevant portions of Ads

18 Manager, and how those tools may affect the content of

19 advertisers on Meta's services, which I believe is precisely

20 the formulation that you are identifying.

21          THE COURT:  Well, but there's the rub, is that you

22 limit -- let's just look at interrogatory number one, the

23 response to that, "Operation of relevant portions of Ads

24 Manager."  Does that encompass content modification,

25 optimization, and placement, as described in interrogatory

60

1    number one, using those defined terms?

2            MS. DEARBORN:  And I --

3            THE COURT:  It seemed to me it didn't.  It was

4    narrower.

5            MS. DEARBORN:  Okay.  And I think I can address

6    the Court's concern on this.  Meta has not identified any

7    tool, public or not, that may not -- may even theoretically

8    affect the allegedly unlawful content of ads, meaning the

9    image and use of Doctor Forrest's name and likeness, that is

10   not included in the set of tools that are within --

11   contained within Ads Manager.  This is -- I mean, I -- we

12   are not artificially -- I am not attempting to play word

13   games with the Court or with Plaintiffs.

14           THE COURT:  Yes.

15           MS. DEARBORN:  We are not artificially limiting

16   discovery to tools that are already publicly available.

17   That is not where we started the inquiry.  We believe that

18   the only tools that even might theoretically affect the

19   content of ads are contained within Ads Manager, which

20   should not be a surprise to the Court.  These are the tools

21   that we provide advertisers that would allow them to publish

22   ads on our systems.  Because they are supplying the

23   creative, of course those are the tools that are relevant.

24       We also think that this is absolutely what Judge Pitts

25   identified as the key focus of phase one in his motion to

61

1  dismiss order.  That order is all about Ads Manager, and the

2  allegations in the complaint are all about Ads Manager.

3  We -- yes.

4          THE COURT:  Yes.  The allegations in the complaint

5  are about Ads Manager, but what I think might be a slight

6  bit of daylight between Meta's position and Plaintiff's is

7  that Plaintiffs know what they know, and don't know what

8  they don't know.

9      So what I think is a fair description of what the

10 discovery ought to encompass is from input to output, and

11 it's not limited to just "What can the third party do with

12 certain tools?"  It's input to output.  And if there's some

13 automatic process or some conditional process that Meta

14 applies, "If this, then this, we do this," or if a

15 particular setting -- there are lots of "ifs."

16         So, if Meta is doing anything, whether it's a tool the

17 third party can use or not between input and output, that's

18 the scope of discovery, and if there's something that

19 happens after output in this performance evaluation context

20 that then feeds back into that same category of ads, scam

21 ads or ads from this person, you know, that would be

22 encompassed as well.

23     So that's where I -- when I looked at your response, I

24 was like, "I'm not sure there is alignment."  You know, I

25 think it might be -- it may not be narrow, but it didn't

62

1   sound as broad as I thought it ought to.

2         MS. DEARBORN:  I understand, and I think that the

3   delta here is that, again, we have not identified any tool.

4   We just don't believe secret tools exist, right?  There's --

5         THE COURT:  Okay.  But there's tools, and there's

6   just processes that are not tools, and I think -- you know,

7   I don't want to create a disagreement where there is none.

8   There may not be any disagreement.  But we shouldn't get

9   hung up on the word "tools."

10        If tools was the only thing that was alleged in the

11  complaint, because that's the only thing that's visible to

12  the Plaintiff, okay, fine, but I think, if you -- if it --

13  this all circles back to Judge Pitts, and he finds out that,

14  in addition to tools that third parties can use, Meta runs a

15  whole bunch of automatic processes for any ads, or ads of

16  certain types, or whatever, "An ad that contains an image of

17  a man will be modified in this way," like, something like

18  that, maybe unbeknownst to the third party, that's exactly

19  what I think Judge Pitts would like to know.

20        And so you should not exclude that, and you should not

21  get hung up on terminology, either.  That doesn't mean that

22  Plaintiffs get discovery on the entire platform, and all

23  systems and features.  That's not appropriate.  It's between

24  point A and point B, the input and the output.  That's what

25  I think you need to focus on.

63

1     And so, again, there may be a document that completely

2  describes that.  There may be a human or humans you need to

3  consult in order to provide a narrative response, maybe

4  supplemented by documents, but, whatever you need to do, I

5  think that's what is fairly required by interrogatory number

6  one, I suggest to you.  That's how I would decide this, this

7  issue.

8     Now, the question about what to do.  I like the fact

9  that you all are -- continue to work through these issues,

10 and may actually reach agreement.  Would it be appropriate

11 to ask you to report back to the Court, also, on

12 interrogatories number one through nine in 14 days, with

13 that other status report on Docket 186?

14         MR. BROWN:  Yes.  We can certainly do that with

15 respect to a status report.

16         THE COURT:  Yes.  And, you know, given that you've

17 stipulated to it, it may not be granted, but let's assume

18 that it's granted, you know, some extension of time for

19 discovery.  That may be the most effective way to get what

20 you want, get what you need, and not be unduly burdened.

21    So why don't I include 187 in the status report

22 request, and I will invite you at that time to also suggest

23 whether further proceedings are needed or you have

24 additional guidance that you need from the Court, but,

25 hopefully, having shared with you my thoughts, that might

64

1 help move things along.

2     Is there anything else that you would like to address

3 with the Court today, from the Plaintiff?

4         MR. QUINN:  No, your Honor.  Very grateful for the

5 Court's guidance.  Thank you.

6         THE COURT:  Okay.  Anything else from the

7 Defendant?

8         MS. DEARBORN:  Nothing from us, your Honor, and we

9 also thank the Court for its time.

10         THE COURT:  Okay.  Well, and thank you very much

11 for staying longer.  I appreciate it.  Okay.

12         MR. BROWN:  Thank you.

13         THE COURT:  This matter is concluded.

14         THE CLERK:  Court is concluded.

15     (Proceedings concluded at 12:42 p.m.)

16

17

18

19

20

21

22

23

24

25

65

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16      Echo Reporting, Inc., Transcriber

17          Friday, March 21, 2025

18

19

20

21

22

23

24

25