# EXHIBIT A

John C. Quinn*
Amit Jain*
Hyatt Mustefa*
Jocelyn Hassel*
Tayonna Ngutter*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York
Telephone: (212) 763-0883
jquinn@heckerfink.com
ajain@heckerfink.com
hmustefa@heckerfink.com
jhassel@heckerfink.com
tngutter@heckerfink.com

Joshua Matz*
HECKER FINK LLP
1050 K Street NW | Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
jmatz@heckerfink.com

* *admitted pro hac vice*

*Attorneys for Plaintiff Dr. Andrew Forrest*

[ADDITIONAL COUNSEL ON SIGNATURE PAGE]

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| DR. ANDREW FORREST,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 5:22-cv-03699-PCP<br><br>**<u>PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS</u>** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Dr. Andrew Forrest ("Dr. Forrest" or "Plaintiff"), by and through his undersigned counsel, hereby requests that Defendant Meta Platforms, Inc. ("Meta" or "Defendant" and, together with Plaintiff, the "Parties") produce, in accordance with the Definitions and Instructions set forth herein, all documents requested below, at the offices of Hecker Fink LLP, 350 Fifth Avenue, 63rd Floor, New York, New York 10118, within thirty (30) days from the date of service of this First Request for Production of Documents (the "Requests"), unless otherwise agreed by the Parties or ordered by the Court.[1]

## I. DEFINITIONS

1. The term "***Account-Review***" shall mean and refer to any machine, system, technology, process, approach, or practice that Meta uses to review or assess Advertisers and/or Advertiser-Accounts.

2. The term "***Ad-Creative***" shall mean and refer to all visual, textual, and audio elements of an Advertisement, including but not limited to images, video, text and typography, text and visual hierarchy, layout, color scheme, whitespace, audio and music, animations, navigation elements, and any other design features or aspects of the appearance of an Advertisement.

3. The term "***Ad-Review***" shall mean and refer to any machine, system, technology, process, approach, or practice that Meta uses to review Advertisements, including but not limited to the Advertisement review process described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/help/204798856225114?id=649869995454285.

4. The term "***Ad-Set***" shall mean and refer to a group of Advertisements that share settings with respect to how, when, and where the Advertisements within the Ad-Set will run, including with respect to budgeting, bidding-strategy, placement(s), and/or target audience(s), as described on the Meta Blueprint webpage, currently available at https://www.facebook.com/business/learn/lessons/ad-set-level-overview.

---

[1] All capitalized terms shall have the meaning ascribed to them herein or, if not defined herein, the meaning ascribed to them in the Third Amended Complaint.

5. The term "***Advertisement***" shall mean and refer to any message, notice, or other content that appears on any Meta platform (*e.g.*, Facebook, Instagram), and/or on any other website or application through Meta's Audience Network, in exchange for a payment to Meta, or any draft of such message, notice, or other content, and including any version or iteration thereof, including as described on Meta's Business Help Center webpage, currently available at https://www.facebook.com/business/help/714656935225188?id=802745156580214.

6. The term "***Advertiser***" shall mean and refer to any user of Meta Ads Manager that creates, or begins or attempts to create, one or more Advertisements.

7. The term "***Advertiser-Account***" shall mean and refer to the individualized user account, and all corresponding Facebook and other pages, created, maintained, or used by an Advertiser, as described on Meta's Business Help Center webpage, currently available at https://www.facebook.com/business/help/407323696966570?id=649869995454285.

8. The terms "***Application Programming Interface***" or "***API***" shall mean and refer to any item or piece of software that enables two applications to interact with each other, or through which two applications interact with each other, including as described on the Meta Marketing API webpage, currently available at https://developers.facebook.com/docs/marketing-apis/overview/.

9. The terms "***Artificial Intelligence***" or "***AI***" shall mean and refer to any technological tools and/or techniques that use automated computation to perform tasks such as predictions, decisions, or recommendations, or creation or alteration of text, sound, still images, or video, which tools or techniques may include, but are not limited to, machine learning, natural language processing, or other software and algorithmic processes.

10. The term "***associated with***" shall be afforded the broadest possible definition and shall include (by way of example and not as an exhaustive list) control over, access or use of, pertinence to, or connection with or relation to a matter discussed in any manner.

11. The term "***Audience***" shall mean and refer to the group of individuals to whom a Campaign or Advertisement is displayed or targeted, including through the host of features, services, tools, and products offered by Meta to deliver Advertisements "beyond the original

selected audience," as described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/help/414975413946182?id=1629569087788063.

12. The term "***Audience Network***" shall mean and refer collectively to Placements of Advertisements by Meta on platforms other than Meta's own platforms.

13. The term "***Campaign***" shall mean and refer to any group of Advertisements sharing common or similar settings and/or objectives, as described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/help/282701548912119?id=649869995454285.

14. The term "***Communication***" shall be afforded the broadest possible definition and shall include any transmission or exchange of information, content, or other expression of any kind between two or more persons or entities.

15. The term "***Content Modification***" shall mean and refer to any act or conduct of any kind by Meta that engages or interacts with an Input and affects in any manner the Ad-Creative.

16. The term "***Content Modification Tool***" shall mean and refer to any Meta feature, tool, product, or service that performs or engages in Content Modification.

17. The term "***Decision Document***" shall mean and refer to any Document containing, memorializing, discussing, or reflecting a decision by a Meta executive, supervisor, project manager, or other team or departmental leader within Meta relating to any feature, tool, product, or service.

18. The term "***Design Document***" shall mean and refer to any proposal, concept, design, or engineering Document relating to any feature, tool, product, or service, including any comments on such Documents.

19. The term "***Document***" is used in the broadest possible sense permissible under the Federal Rules of Civil Procedure and the Federal Rules of Evidence, and shall mean, without limitation, written, recorded, textual, or graphic material of any kind, type, nature, or description (whether in hardcopy, printed, or electronic form, including in any database or archival or other electronic system), including any Communication, that is, or has been, in Your possession, custody, or control. This definition shall include drafts or copies that contain any content, notes, comments,

or markings of any kind not found on the original documents or that are otherwise not identical to the original documents.

20. The term "***End-User***" shall mean and refer to any individual to whom a Scam Ad was displayed, presented, targeted, transmitted, or communicated.

21. The term "***Facial Recognition***" shall mean and refer to any technology that can be used to identify an individual's face in images or videos, including but not limited to technology relating to an initiative by Meta to "combat scams," as described in an October 21, 2024 press release currently available at https://about.fb.com/news/2024/10/testing-combat-scams-restore-compromised-accounts/.

22. The term "***FIRE***" shall mean and refer to Meta's Fraud Intelligence Reciprocal Exchange program, as described in an October 2, 2024 press release currently available at https://about.fb.com/news/2024/10/meta-partners-with-uk-banks-to-combat-scams/.

23. The term "***Flag***" shall mean and refer to any prompt, alert, notification, or other trigger for review, assessment, monitoring, evaluation, or discussion of a Scam Ad, Scam Advertiser, or Scam Advertiser-Account by Meta, or any indication of a potential Meta Policy violation by a Scam Ad, Scam Advertiser, or Scam Advertiser-Account.

24. The terms "***identity***" or "***identify***" shall mean (a) when used in reference to a natural Person, to state the full name, job title and/or role, and if known, present business address, present business email address, and present telephone number; (b) when used in reference to any entity, such as a partnership, joint venture, trust, or corporation, to state the full legal name of such entity, each name under which such entity does business, the entity's street address, the entity's telephone number, and the Identity of those Persons employed by or otherwise acting for such entity who are known or believed to possess the information responsive to the Request for which the entity was Identified; (c) when used in reference to a team, group, or department, to state the name by which Meta refers to the team/group/department, provide a brief description of the role, assignment, and authority of the team/group/department, and name the individual(s) responsible for such team/group/department or the relevant portion of such team/group/department; and (d) when used with respect to a Document, to Identify the Document by Bates number, if produced, or otherwise

to state its description, title, date, number of pages, subject matter, present location, the Identity of its author, the Identity of any Person who participated in its preparation, and the Identity of its present custodian.

25. The term "***Input***" shall mean and refer to any and all data and information provided by an Advertiser to Meta, or made available to Meta from or concerning the Advertiser, in connection with the creation of an Advertisement, whether actively or passively, and whether knowingly or unknowingly, including but not limited to any Ad-Creative provided by the Advertiser, as well as any settings, classification codes, configurations, directives, or instructions provided or set by the Advertiser.

26. The term "***Meta***" shall mean and refer to Defendant Meta Platforms, Inc. and all of its agents, employees, contractors, vendors, members, officers, directors, executives, principals, representatives, subsidiaries, affiliates, related companies, predecessor companies, assigns, attorneys and/or all persons authorized or purporting to act on its behalf.

27. The term "***Meta Ads Manager***" shall mean and refer to Meta's interface for creating, storing, managing, revising, optimizing, and tracking Advertisements (including but not limited to Meta Advantage), including as described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/tools/ads-manager.

28. The term "***Meta Advantage***" shall mean and refer to any of Meta's automated features, tools, services, or products that engage or interact with or affect Advertisements, including but not limited to Advantage+ and Advantage+ Creative. Some of these are described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/help/733979527611858.

29. The term "***Optimization***" shall mean and refer to any act or conduct of any kind by Meta with the goal or effect of affecting the Audience of, or User Engagement with, an Advertisement.

30. The term "***Optimization Tool***" shall mean and refer to any Meta feature, tool, product, or service that performs or engages in Optimization.

31. The term "***Performance Evaluation***" shall mean and refer to any assessment of, or metrics or compilations of data or information related to, how users interact with an Advertisement, including but not limited to anomaly analysis, and as described on the Meta Business Help Center webpage, currently available at https://www.facebook.com/business/help/318580098318734?id=369013183583436.

32. The terms "***Person***" or "***Persons***" shall mean and refer to natural persons, as well as all other entities including, but not limited to, corporations, limited liability companies, partnerships, associations, firms, joint ventures, organizations, governmental agencies or bodies or any division, department or unit thereof.

33. The term "***Placement***" shall mean and refer to the location (including any specific URL, where applicable) where an Advertisement is displayed, presented, transmitted, or communicated, whether on a platform, webpage, or mobile application, or other application on any device.

34. The term "***Plaintiff***" shall mean Plaintiff Dr. Andrew Forrest.

35. The term "***Policy***" shall mean and refer to any Meta policy, principle, initiative, rule, or other statement that purports to govern, compel, constrain, or affect: (a) Meta's conduct in connection with its advertising platforms and/or advertising business, or (b) the conduct of any of Meta's customers, users, or partners with respect to Meta's advertising platforms and/or advertising business.

36. The term "***Review Document***" shall mean and refer to any Document related to any assessment or evaluation concerning risk, trust and safety, integrity, counter-abuse, security, or other similar review with respect to any Meta feature, tool, product, or service, as well as all process reports or analyses, activity and data flow analyses, or similar compilations of data and information, and including any comments on such Documents.

37. The term "***Scam Ads***" shall mean and refer to Advertisements that use Plaintiff's name or likeness, including (for the avoidance of doubt) all drafts, versions, and iterations thereof, and including all Scam Ads as defined in the Third Amended Complaint.

38. The term "***Scam Advertiser***" shall mean and refer to any Advertiser that creates or begins or attempts to create a Scam Ad.

39. The term "***Scam Advertiser-Account***" shall mean and refer to the Advertiser-Account created, maintained, or used by a Scam Advertiser.

40. The terms "***Third Amended Complaint***" or "***TAC***" mean the Third Amended Complaint filed on December 1, 2023, ECF 101.

41. The term "***Third Party***" shall mean and refer to any individual or entity that is not included in the definition of the terms "Plaintiff," "Scam Advertiser," or "Meta."

42. The term "***User Engagement***" shall mean and refer to the manner in which an Audience member, whether on or off Meta's platforms, views or interacts with any Advertisement, including, but not limited to, how frequently, for how long, and in what manner.

43. The term "***User Interface***" shall mean and refer to the means by which users interact with Meta's platforms or systems, including interfaces, webpages, and software.

44. The terms "***You***" and "***Your***" shall refer to Meta, as defined above.

## II. GENERAL INSTRUCTIONS

1. These Requests seek production of all Documents and Communications described, in their entirety, along with any attachments, drafts, and non-identical copies. A Document or Communication with handwritten, typewritten, or other recorded notes, editing marks, etc., is not and shall not be deemed identical to one without such notes, marks, modifications, additions, or deletions.

2. The use of the singular shall be deemed to include the plural and vice versa.

3. The use of the present tense shall be deemed to include the past tense with reference to the Relevant Time Period. Accordingly, for example, the definition of "Ad-Review" as "any machine, system, technology, process, approach, or practice that Meta uses to review Advertisements" includes any such machine, system, technology, process, approach, or practice that Meta used at any point during the Relevant Time Period.

4. The connectives "***and***" and "***or***" shall be construed disjunctively or conjunctively if necessary to bring within the scope of Request or Requests all information that might otherwise be construed to be outside of its scope.

5. Except as otherwise defined herein, capitalized terms have the meanings ascribed to them in the Third Amended Complaint.

6. For each Request herein, all undefined terms used in the Requests shall be construed in an ordinary common-sense manner and not in a hyper-technical, strained, overly literal, or otherwise restrictive manner.

7. If You object to the production of a Document in relation to a specific Request, state with specificity the legal and factual basis for Your objection(s) with respect to such Request. You should produce Documents responsive to all portions of that Request that do not fall within the scope of Your objection.

8. If you object to the production of any Document on the ground that the Document is privileged or subject to other protection or immunity from discovery, You should identify each document withheld or any portion(s) withheld consistent with any stipulation reached by the parties or ordered by the Court regarding electronically stored information (an "ESI Protocol Agreement"). In such circumstances You also must comply with the Local Rules of the Northern District of California and any applicable Standing Orders of the Judges assigned to this case, including but not limited to setting forth in detail the facts upon which an assertion of privilege is based and/or providing a privilege log. If the parties do not reach an ESI Protocol Agreement, You should specify each document withheld, or any portion(s) withheld by setting forth as applicable, for each:

a) the name of each author, writer, sender, creator, or initiator of such Document or thing, if any;

b) the name of each recipient, addressee, or party for whom such Document or thing was intended, if any;

c) the date of such Document, if any, or an estimate thereof, and so indicating that a date is an estimate if no date appeared on said Documents;

d) the type of Document (*e.g.*, letter, chart, memorandum, etc.) and the general subject matter described in the Documents; and

e) the claimed grounds for privilege or other limitations on discovery.

9. You must produce all Documents in Your possession, custody, or control which are responsive to these Requests.

10. As the term "possession" pertains to email, chat, or other messaging systems, the term includes, but is not limited to, all Communications contained or available to You through such systems, including journaling, backup, retention, and archival systems, and including:.

a. "deleted" Communications which have not been permanently deleted, including those in any sub-directories irrespective of the title of such sub-directories;

b. "sent" Communications, including all sub-directories irrespective of the title of such sub-directories; and

c. "received" Communications, including all sub-directories irrespective of the title of such sub-directories.

As the term "possession" pertains to websites, tools, interfaces, or other software, the term includes, but is not limited to, all content, data, or information contained in or available to You through or in connection with such websites, tools, interfaces, or software.

11. Each Request should be construed independently and without reference to any other Request. Each Request should be responded to fully whether or not You consider such Request or some portion thereof duplicative with another Request.

12. These Requests are continuing in nature. If at any time during the pendency of the above-captioned action You obtain or become aware of any additional Documents responsive to these Requests, or if additional information You or any persons acting on Your behalf obtain would augment, clarify, or otherwise modify Your responses, You are required to supplement Your responses and produce such additional Documents.

## III. RELEVANT TIME PERIOD

The relevant time period for all Documents and information responsive to these Requests is January 1, 2019 to the present (the "Relevant Time Period"), unless otherwise specified by the

individual Request, agreed upon by the Parties, or directed by a subsequent Order of the Court. However, Documents and information created outside of the time period, but which relate to the subject matter of the operative Third Amended Complaint, should be deemed responsive to the Requests. Thus, if any Request relates to a policy or business practice employed, a Document transmitted or viewed, a product or service that existed, or an event that occurred during the Relevant Time Period, but which was first drafted, conceived, designed, discussed, tested, implemented, sent, received, or used before or after the Relevant Time Period, You are required to provide Documents and information from outside the Relevant Time Period insofar as they relate to such policy, practice, document, product, service, or event.

## IV. REQUESTS

**REQUEST NO. 1**:

Every Scam Ad.

**REQUEST NO. 2**:

For each Scam Ad, Documents sufficient to show all metadata.

**REQUEST NO. 3**:

For each Scam Ad, Documents sufficient to identify the Scam Advertiser(s) and Scam Advertiser-Account(s) associated with the Scam Ad.

**REQUEST NO. 4**:

For each Scam Ad, Documents sufficient to identify the date on which the Scam Advertiser commenced the process of creating the Scam Ad, the date on which the Scam Advertiser completed the process of creating the Scam Ad, the date on which Meta approved and/or authorized the Scam Ad, the date on which the Scam Ad was enabled and/or available for Placement by Meta and/or by the Scam Advertiser, the date of the first Placement of the Scam Ad, and the date of the last Placement of the Scam Ad.

**REQUEST NO. 5**:

For each Scam Ad, Documents sufficient to show any User Interface and Application Programming Interface used by the Scam Advertiser to create, modify, or review the Scam Ad.

**REQUEST NO. 6**:

For each User Interface and API responsive to Request No. 5, Documents sufficient to identify any prompt or solicitation by Meta for Input from the Scam Advertiser.

**REQUEST NO. 7**:

For each User Interface and API responsive to Request No. 5, Documents sufficient to show which fields of Inputs were mandatory for the Scam Advertiser to provide and which fields of Inputs were optional.

**REQUEST NO. 8**:

For each Scam Ad, Documents sufficient to show all Inputs.

**REQUEST NO. 9**:

For each Scam Ad, Documents sufficient to show all data and information collected by or inferred by or made available to Meta from a source other than the Scam Advertiser that was used or had any role in or effect on the Ad-Creative, Ad-Review, Content Modification, Optimization, Placement, selection or determination of Audience, or Performance Evaluation, or that otherwise impacted the Scam Ad, including Documents sufficient to identify the source(s) of such data and information.

**REQUEST NO. 10**:

For each Scam Ad, Documents sufficient to identify all of the software, machine learning, or AI tools that processed any Inputs, or that processed any data or information responsive to Request No. 9, including but not limited to any Content Modification Tools or Optimization Tools.

**REQUEST NO. 11**:

For each Scam Ad, Documents sufficient to identify any Meta Ads Manager features, tools, products, or services that were available for use by the Scam Advertiser, including but not limited to any Content Modification Tools or Optimization Tools.

**REQUEST NO. 12**:

For each Scam Ad, Documents sufficient to identify any Meta Ads Manager features, tools, products, or services that were used or enabled by the Scam Advertiser, including but not limited to any Content Modification Tools or Optimization Tools, and including Documents sufficient to

identify whether the features, tools, products, or services were enabled by default or affirmatively enabled by the Scam Advertiser.

**REQUEST NO. 13**:

For each Scam Ad, Documents sufficient to show all Content Modification.

**REQUEST NO. 14**:

For each Scam Ad, Documents sufficient to show all Optimization.

**REQUEST NO. 15**:

For each feature, tool, product, or service responsive to Requests No. 10, 11, or 12, all Design Documents.

**REQUEST NO. 16**:

For each feature, tool, product, or service responsive to Requests No. 10, 11, or 12, all Review Documents.

**REQUEST NO. 17**:

For each feature, tool, product, or service responsive to Requests No. 10, 11, or 12, all Communications or Decision Documents that relate to any risk that the feature, tool, product, or service (or Advertisers' actual or potential uses of the feature, tool, product, or service) might pose to Advertisers, End-Users, Third Parties or Meta, including but not limited to any risk relating to potential misappropriation of likeness or fraud.

**REQUEST NO. 18**:

For each feature, tool, product, or service responsive to Requests No. 10, 11, or 12 that utilizes machine learning and/or Artificial Intelligence, Documents sufficient to show all training, including but not limited to the initial data sets used for training; dates or date range of initial training; data sets used for subsequent training; dates or date ranges of subsequent training; any input models, including primary intended use and any identified out-of-scope use; and data instrumentation.

**REQUEST NO. 19**:

For each feature, tool, product, or service responsive to Requests No. 10, 11, or 12 that utilizes machine learning and/or Artificial Intelligence, Documents sufficient to show any

instructions, prompts, or prompt iteration from Meta related to the Ad-Creative, targeting, Content Modification, Optimization, Placement, selection of Audience, Ad-Review or Performance Evaluation; any predictive and/or adaptive analytics reporting and analyses; and verification and validation analyses.

**REQUEST NO. 20**:

For each Scam Ad, Documents sufficient to identify any Campaign associated with the Scam Ad, including but not limited to Campaign-level, Ad-Set-level, or Ad-level workflows for each Scam Ad.

**REQUEST NO. 21**:

Documents sufficient to identify every auction or bidding process involving a Scam Ad.

**REQUEST NO. 22**:

For each auction or bidding process responsive to Request No. 21, Documents sufficient to show all participants, bids, and acquisition costs.

**REQUEST NO. 23**:

For each Scam Ad, Documents sufficient to show all Placement(s), whether on a Meta platform or Audience Network platform.

**REQUEST NO. 24**:

For each Scam Ad, Documents sufficient to identify the number of End-Users to whom the Scam Ad was displayed, presented, or transmitted.

**REQUEST NO. 25**:

Documents sufficient to identify and show each of the fields or categories of data and information collected or inferred by or made available to Meta concerning each End-User, including but not limited to Documents sufficient to identify the source(s) of such field or category of data and information.

**REQUEST NO. 26**:

For each Scam Ad, Documents sufficient to show all User Engagement.

**REQUEST NO. 27:**

For each Scam Ad, Documents sufficient to show, following the first Placement, any Content Modification or Optimization based on data or information concerning User Engagement.

**REQUEST NO. 28**:

For each Scam Ad, Documents sufficient to show all Performance Evaluation.

**REQUEST NO. 29**:

For each Scam Ad, Documents sufficient to show any action taken by Meta as a result of Performance Evaluation, including but not limited to any Content Modification, Optimization, Ad-Review, or change relating to Audience or Placement, or any change to a Content Modification Tool or Optimization Tool.

**REQUEST NO. 30**:

Documents sufficient to show any Policy that relates to any Scam Ad, including but not limited to any Policy containing requirements that relate to any Scam Ad, any Policy containing restrictions that relate to any Scam Ad, and any Policy that relates to Meta's review or assessment of any Scam Ad or of any data or information associated with any Scam Ad.

**REQUEST NO. 31**:

For each Scam Advertiser, all contractual agreements, including terms of service, between the Scam Advertiser and/or Meta.

**REQUEST NO. 32**:

Documents sufficient to identify any Scam Ad that was identified for or subject to Ad-Review.

**REQUEST NO. 33**:

Documents sufficient to show any method by which any Scam Ad was identified for or subject to Ad-Review, including any Flag, the reason or basis for such Flag, and the individuals, entities, or processes that caused the Flag or otherwise identified the Scam Ad for Ad-Review.

**REQUEST NO. 34**:

Documents sufficient to identify the features, tools, products, or services involved in the Ad-Review process, including any User Interface or API used by the Scam Advertiser in connection with the Ad-Review process.

**REQUEST NO. 35**:

For each Scam Ad that was identified for or subject to Ad-Review, Documents sufficient to show all determinations made or actions taken by Meta with respect to the Scam Ad, the Scam Advertiser, or the Scam Advertiser-Account, including but not limited to any Content Modification, Optimization, Placement, selection or determination of Audience, or Performance Evaluation.

**REQUEST NO. 36**:

For each Scam Ad that was identified for or subject to Ad-Review, Documents sufficient to show whether and how any data or information related to the Scam Ad, the Scam Advertiser, or the Scam Advertiser-Account was put into, made or remained available to, or removed from any Optimization Tool or Content Modification Tool.

**REQUEST NO. 37:**

For each Scam Ad that was identified for or subject to Ad-Review, Documents sufficient to show any change to the availability or functionality of any Meta Ads Manager product, service, feature, or tool available to the Scam Advertiser.

**REQUEST NO. 38**:

For each Scam Advertiser, Documents sufficient to identify all Advertiser-Accounts associated with the Scam Advertiser.

**REQUEST NO. 39**:

Documents sufficient to identify and show each of the fields or categories of data and information collected or inferred by or made available to Meta in connection with each Scam Advertiser and each Scam Advertiser-Account, including Documents sufficient to identify the source(s) of such field or category of data and information.

**REQUEST NO. 40**:

For each Scam Advertiser-Account, Documents sufficient to identify all other Advertisements and Campaigns associated with the Scam Advertiser-Account.

**REQUEST NO. 41**:

Documents sufficient to identify any Scam Advertiser-Account that was identified or Flagged for Account-Review.

**REQUEST NO. 42**:

Documents sufficient to show the reason or basis for which any Scam Advertiser or Scam Advertiser-Account was identified or Flagged for Account-Review.

**REQUEST NO. 43**:

For each Scam Advertiser or Scam Advertiser-Account that was identified for or subject to Account-Review, Documents sufficient to show any changes in the data or information available to or used by any Optimization Tools or Content Modification Tools, or any changes to the functionality or use of any Optimization Tools or Content Modification Tools, with respect to any Advertisements by the Scam Advertiser or associated with the Scam Advertiser-Account.

**REQUEST NO. 44**:

All Communications related to any Scam Ad.

**REQUEST NO. 45**:

All Communications involving or related to any Scam Advertiser and/or Scam Advertiser-Account.

**REQUEST NO. 46**:

Documents (including but not limited to organizational charts) sufficient to identify the names and roles of all individuals, teams, groups, and/or departments involved with Meta Ads Manager, including but not limited to those involved in developing, implementing, or troubleshooting features, tools, products, or services within Meta Ads Manager; those involved in marketing Meta Ads Manager; those involved in setting, enforcing, or updating Policies relevant to Advertisements; and those involved with Ad-Review, and including any vendors, contractors, or Third Parties.

**<u>REQUEST NO. 47</u>**:

All Documents related to Meta's Section 230 defense.

**<u>REQUEST NO. 48</u>**:

Documents sufficient to identify all private litigation related to Meta's advertising business in which Meta was a party during the Relevant Time Period, including but not limited to lawsuits brought by Meta against Advertisers, such as lawsuits involving cloaking, as well as lawsuits brought against Meta, such as the lawsuits involving Yusaku Maezawa, Rafal Brzoska, Wissam al Mana, and John de Mol.

**<u>REQUEST NO. 49</u>**:

All Documents produced by Meta in all private litigation responsive to Request No. 48.

**<u>REQUEST NO. 50</u>**:

All final judgments, consent decrees, or settlement agreements in all private litigation responsive to Request No. 48.

**<u>REQUEST NO. 51</u>**:

Documents sufficient to identify all government investigations, inquiries, enforcement actions, prosecutions, consent decrees, and/or settlements related to Meta's advertising business during the Relevant Time Period. Such investigations, inquiries, enforcement actions, prosecutions, consent decrees, and/or settlements include but are not limited to the United States Federal Trade Commission ("FTC") Order to File a Special Report pursuant to the resolution, dated December 11, 2020, entitled "Resolution Directing Use of Compulsory Process to Collect Information Regarding Social Media and Video Streaming Service Providers' Privacy Practices"; the FTC investigation regarding advertising for fraudulent products and scams; the Australian Competition and Consumer Commission lawsuit against Meta regarding crypto scam advertisements; the Japanese government investigation/enforcement action regarding scam advertisements; the European Court of Justice action involving Max Schrems regarding processing of personal data for advertisements without user consent; and the Netherlands Authority for Consumers and Markets action regarding personalized advertisements based on consumer data.

**<u>REQUEST NO. 52</u>**:

All Documents produced by Meta in all government investigations, inquiries, enforcement actions, prosecutions, consent decrees, and/or settlements responsive to Request No. 51.

**<u>REQUEST NO. 53</u>**:

All final judgments, consent decrees, or settlement agreements in all government investigations, inquiries, enforcement actions, prosecutions, consent decrees, and/or settlements responsive to Request No. 51.

**<u>REQUEST NO. 54</u>**:

Documents sufficient to show Meta's Policies, processes, and practices with respect to FIRE, as it relates to Advertisements.

**<u>REQUEST NO. 55</u>**:

All Documents relating to both FIRE, on the one hand, and Dr. Forrest and/or any of the Scam Ads, Scam Advertisers, or Scam Advertiser-Accounts, on the other hand.

**<u>REQUEST NO. 56</u>**:

Documents sufficient to show Meta's Policies, processes, and practices with respect to Meta's Facial Recognition systems in connection with Advertisements.

**<u>REQUEST NO. 57</u>**:

All Documents relating to both Meta's Facial Recognition systems, on the one hand, and Dr. Forrest and/or any of the Scam Ads, Scam Advertisers, or Scam Advertiser-Accounts, on the other hand.

November 21, 2024
New York, New York

**HECKER FINK LLP**
John C. Quinn*
jquinn@heckerfink.com
Amit Jain*
ajain@heckerfink.com
Hyatt Mustefa*
hmustefa@heckerfink.com
Jocelyn Hassel*
jhassel@heckerfink.com
Tayonna Ngutter*
tngutter@heckerfink.com
350 Fifth Avenue, 63rd Floor
New York, New York
Telephone: (212) 763-0883

Joshua Matz*
jmatz@heckerfink.com
1050 K Street NW | Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883

**SINGLETON SCHREIBER**
Leslie Bruckner (SBN 140968)
lbrueckner@singletonschreiber.com
591 El Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 573-1851

**BAILEY & GLASSER LLP**
Elizabeth Ryan*
eryan@baileyglasser.com
John Roddy*
jroddy@baileyglasser.com
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730

Katherine E. Charonko*
kcharonko@baileyglasser.com
209 Capital Street
Charleston, WV 25301
Telephone: (304) 345-6555

Elizabeth L. Stryker*
estryker@baileyglasser.com
94 Long Street, Suite 200
Westover, WV 26501
Telephone: (304) 594-0087

* *admitted pro hac vice*

**DEREK G. HOWARD LAW FIRM, INC.**
Derek G. Howard (SBN 118082)
derek@derekhowardlaw.com
Ashley M. Romero (SBN 286251)

ashley@derekhowardlaw.com
42 Miller Avenue
Mill Valley, CA 94941
Telephone: (415) 432-7192

*Attorneys for Plaintiff Dr. Andrew Forrest*