UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

| | |
|---|---|
| FORREST,<br><br>Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. C 22-03699-PCP |

San Jose, California
Tuesday, August 12, 2025

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING 10:03 - 10:59 = 56 MINUTES

APPEARANCES:

For Plaintiff:

Hecker Fink LLP
350 Fifth Avenue
63rd Floor
New York, New York 10118
BY: JOHN C. QUINN, ESQ.

Hecker Fink LLP
1050 K Street, Northwest
Suite 1040
Washington, DC 20001
BY: JOYCE DELA PENA, ESQ.
BY: KAITLIN KONKEL, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

For Plaintiff:

Derek G. Howard Law Firm, Inc.
42 Miller Avenue
Mill Valley, California 94941
BY: DEREK G. HOWARD, ESQ.

For Defendant:

Paul Weiss Rifkind Wharton & Garrison LLP
535 Mission Street
24th Floor
San Francisco, California 94105
BY: WALTER F. BROWN, ESQ.

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
BY: PALOMA RIVERA, ESQ.
BY: ANNE E. SIMONS, ESQ.

Meta Platforms
One Meta Way
Menlo Park, California 94025
BY: ERIC MEIRING, ESQ.

Transcribed by:

Echo Reporting, Inc.
Contracted Court Reporter/ Transcriber
echoreporting@yahoo.com

Tuesday, August 12, 2025 10:03 a.m.

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK: Now calling Civil Case 22-03699, Forrest versus Meta Platforms, Inc.

Counsel, if you could please state your appearance, beginning with the Plaintiff.

MR. QUINN: Good morning, your Honor. John Quinn from Hecker Fink for Plaintiff, Doctor Andrew Forrest.

THE COURT: Good morning.

MS. DELA PENA: Good morning, your Honor. Joanne (phonetic) Dela Pena from Hecker Fink on behalf of Doctor Forrest.

THE COURT: Okay. Good morning.

MS. KONKEL: Kaitlin Konkel, Hecker Fink, on behalf of Doctor Forrest.

THE COURT: Okay. Good morning.

MR. HOWARD: Good morning, your Honor. Derek Howard for Doctor Forrest.

THE COURT: Okay. Good morning.

MR. BROWN: Good morning, your Honor. Walter Brown, Paloma Rivera, and Anne Simons from Paul Weiss on behalf of Meta Platforms. Joining us is Eric Meiring, counsel from Meta.

THE COURT: Okay. Good morning to you all, as

well.

We are here on two discovery disputes, one at Docket 239 and the other at Docket 240. With respect to the dispute at Docket 240, I've reviewed the request to conduct the proceedings under seal, and the opposition to that request, and I'm not inclined to seal the hearing as to the Docket 240 matter, because most of what seems to be presented in the letter is at a very high level, and I am not convinced that we can -- that we need to seal this matter in order to have a conversation, a productive conversation, about the details.

There's many things that are already in the public domain. There are no specific tables or logs that are revealed, and I would caution the parties as we go through that hearing, when we get there, to be very sensitive to that issue, but I think we can manage the hearing without sealing anything. But I would just suggest that both sides be vigilant and cautious, and alert me if there is something that must be said. When in doubt, raise the issue, but, in general, I think we can proceed publicly.

And so I'd like to start with the first dispute. this is the one at Docket 239, concerning Meta's design and review documents, and let me just start with a preliminary question for both sides. Am I correct that discovery in this case is still limited to discovery relating to the

affirmative defense under Section 230 that Meta is asserting?

MR. HOWARD: That's correct, your Honor.

MR. QUINN: That is correct, your Honor.

THE COURT: Okay.

MR. QUINN: And, if I may, my colleague, Ms. Konkel, will address this motion.

THE COURT: Okay. Very good. Thank you.

And your deadline for substantial completion of document production is now August 28th. Is that right?

MR. HOWARD: Correct.

THE COURT: Okay. Very good.

So, for this discovery dispute letter, I have to say the parties' presentation was a little bit confusing to me. I don't have a clear understanding of exactly what the Plaintiff is seeking, and what, if anything, the -- well, what the Defendants have produced, and how it differs, if at all, from what the Plaintiff is seeking, and I think, in part, that's both parties are referring to an exchange of letters that is not before me.

So you have some context that I do not, and I can't really figure out what the problem is, so I'd like to just focus on the "what" Plaintiffs are seeking first, and so I'm going to start with the design document category, which is referenced or connected to request for production 15, but it

sounds like there's been some movement or some evolution of what the demand is.

So let me just ask on the Plaintiff's side, could you just describe for me what the Plaintiff is seeking by way of design documents?

MS. KONKEL: Yes, your Honor. Kaitlin Konkel. Good morning.

THE COURT: Good morning.

MS. KONKEL: What we're seeking on design documents is what's requested in the RFPs, so "design documents" is a defined term, and we're asking for them by a fixed deadline, before substantial completion.

nnnnnnnnnnnnSo that's the other part of what we're requesting for both categories today, to clarify the substance of what we're entitled to, that we're entitled to the RFP request, subject to some specific narrowing that I can describe, and that we're entitled to those documents at some deadline before substantial completion, because so far we've received very few, and don't have any assurance that we'll be getting meaningful rolling productions to be able to evaluate sufficiency.

THE COURT: Okay. So let's put the timing question to the side for a moment and focus on the "what." The dispute, as presented to me, at least includes an issue about why the Plaintiff would need proposals, concepts,

product requirement documents, as opposed to the documents that actually reflect what these tools and processes do. That's not really addressed in the letter. So I'm trying to understand, if you're falling back on the definition of "design document" as it appears in the document request, why you need such a broad swath of material, when what you're -- I understand you really need is something that describes what these tools and processes do.

MS. KONKEL: Yes, your Honor. So the RFP definition, as you noted, is any proposal, concept, design, or engineering documents. All of those types of documents are ones that describe the tools and that describe relevant information about how these tools work. So each of these tools started as an idea that's captured in a proposal document. Concept documents may describe how they fit in with the overall workflow that something --

THE COURT: Or how they were proposed to fit in, but maybe don't, actually. So what I'm -- here, let me put a fine point on it. Why do you need anything that has to do with, you know, somebody's design idea, a proposal, or a concept, as opposed to just what does the tool do now, what did it do during the relevant time period, and what are the documents sufficient to show that?

And the reason I frame it what way is because this -- I was getting a little bit of deja vu about this dispute, and

I looked back at my prior order at Docket 192, the one that you've been submitting status reports about every couple of weeks, and in that order, I asked the parties to confer specifically about the production of responsive documents sufficient to show what tools or other processes, automated or not, impacted the content of the ad in question from the input by a third party to the output to the end-user audience.

That's what I thought was the focus of what was necessary to be produced, and so I don't understand why the Plaintiffs are seeking design documents, proposals, conceptual things. Product requirement documents are just "What does the product team require in the tool?" It doesn't actually indicate what the tool -- what the as-built version of the tool is, or any of those things. So there must be something that is sufficient to show these things, without seeking this broader swath of discovery, and that's the part I'm not understanding.

MS. KONKEL: Yes, your Honor. Let me address that, because I think some of these issues may not actually be in dispute.

THE COURT: Okay.

MS. KONKEL: So the essence of what we're seeking is these design and engineering documents, these technical documents describing how the tools actually work. So far,

no matter how you define those, which subcategories you focus on, we've gotten very few, by our count fewer than 100, out of tens of thousands of documents produced, and, of course, we're only a couple weeks out from the substantial completion deadline. So our main concern is that, however you define them, we haven't received a meaningful production of these documents yet.

On the proposal and concept documents, I don't want to get too derailed by that, because we just had a conversation with opposing counsel before the conference, and they told us that the statement they made in their letter that they weren't producing proposal and concept documents, which -- that was the first time we heard it, when it was put into the letter brief. They told us that that's actually too broad a statement, and I'll let them speak for themselves, but we understand that they may not be disputing those categories.

So, your Honor, our focus was certainly on the technical design and engineering documents. We do think proposal documents and concept documents are the types of documents likely to have descriptions of the tools, but, if we're slicing and dicing here, what we really want is the more technical documents that describe how the tools work, and that's what we haven't been getting so far.

THE COURT: So what about source code? Has that

been made available?

MS. KONKEL: Not yet, your Honor. We recently heard for the first time that there's an expected production of source code, but we haven't received anything yet.

THE COURT: Because, in my view, it's not so much quantity, but quality of the documents. You could have a single document that describes in great detail exactly what you need, or you could have a situation where you just have to sort of discern it from different pieces. So the fact that it's fewer than 100 documents is really not very helpful or meaningful. It really matters, the type of documents that you have.

So among the things I would hope you would have is source code, and the kind of documentation of that source code that companies typically have. I saw somewhere in there a reference to internal wiki pages. Those are often among the most helpful documents, because those are the documents that internal folks will rely on to understand whatever the relevant tool or system is.

So, if you have those things, you know, I'm really interested in, what are you missing? And this is not a -- the dispute is not one that anyone sought to seal, but the "What don't you know that you think you ought to know?" is not really clear to me in those briefings. So can you put a finer point on that, without, again, publicly revealing

anything that you ought not to?

MS. KONKEL: Sure, sure. And some of the design documents, or documents we have identified as potential design documents, are designated as highly confidential, so I'll be a little general in my descriptions.

So we certainly agree, your Honor, about quality over quantity, and the issue here isn't just the small number. It's the documents in general are the very high level, and aren't the kind of technical documents that we know exist, because Meta's ad business couldn't function without it.

The engineering team, product team, design team collaborate all the time on these tools. They're constantly updated. They're improved. They're built. And the teams have to have a way to talk to each other that's technical, that's in writing, so they can look back at it, and these teams couldn't do their jobs. A new software engineer joining the team couldn't be on-boarded to the specific, you know, work that they'll be doing without documents to get up to speed.

And so we know these documents exist. What we're seeing in the production is both small in number and at a very high level of generality, for the most part. So that's the reason, your Honor, that we're asking for this deadline before substantial completion, because, as Meta has pointed out, we won't really be able to size up the sufficiency of

what we get on design documents until we have what Meta says is the whole set, and here the projection of when these documents will be produced, this very critical category of documents, has moved with the case schedule. So the substantial completion deadline moves out, and we're told, "We're working on it," you know, "You're not entitled to it before substantial completion."

And so here what we're trying to do is lay a marker down that's before substantial completion, that lets us size up these documents, you know, their technical documents. Hopefully, we will get more technical documents, and we can get our experts involved in reviewing them.

THE COURT: So, if you had source code, would that solve the problem? If your expert had access to the relevant source code, would that solve the problem?

MS. KONKEL: It would not solve the problem, your Honor, but source code is certainly one thing we expect to receive that's responsive to this request. Beyond that, there are all kinds of internal documents that these engineering and other teams use to build and improve the tools, and we're interested in those, as well, whether or not they qualify as source code.

THE COURT: And what is your priority? If not concept and proposal, or product requirements, what design documents do you know exist that you want to have produced

that you haven't received yet?

MS. KONKEL: Your Honor, I would describe them as the kinds of technical documents that the engineering, product, and design teams use to build and improve these tools. Meta knows what it has, and, of course, we don't, but these documents are the foundation of its business. We know they exist, and what we've gotten so far would not allow Meta engineers to do their jobs.

THE COURT: Okay. So let's move on to the review documents, which cross-references the request for production 16. There seemed to be some confusion in the responses, the written responses, that Meta made to that request, about what review was intended.

So I understand there's a category called "ad review," which is about how Meta reviews ads, and then I read your RFP and the discussion in the discovery dispute letter, and it seemed to me that you were talking about something entirely different, which was Meta's review of how its own tools and processes work or don't work, or their flaws.

So could you just clarify, what review documents are you after, and how do those review documents relate to this one issue that is the subject of discovery?

MS. KONKEL: Yes, your Honor. So the review documents, the history is essentially the same as the design documents. So the parties started from the RFP definition.

There was narrowing to the content modification and optimization tools, but no other narrowing. So the operative definition is the one from the RFPs that references evaluations concerning risk, trust and safety, integrity, counter-abuse, security, other similar review, and there's a long list of other things.

And the purpose of requesting these documents, your Honor, is that they also describe the tools, and they describe the evaluation Meta has done of the tools that's relevant to how they're operating and the experience users are having. So we think there's relevant content in there, possibly less technical than the design documents, but still very relevant and responsive to the issues in this case.

We didn't understand there to be any dispute on that definition until more recently, when we followed up to ask why there weren't any review documents in the production, and that's when we learned that Meta has been using a different, unilaterally narrowed, definition.

THE COURT: Okay. But, again, the only point is to figure out how these tools and processes work, and whether or not Meta makes a material contribution to ad content. So you're not really interested in anything else about the review, except that subject. Is that right?

MS. KONKEL: The most likely relevance, your Honor, would be that, in describing an evaluation of the

tools, the document would describe the tools themselves, describe relevant aspects of the tools, and certainly, as you know, other parts of the review documents would be more relevant in the next phase, beyond the Section 230 issues.

THE COURT: Okay. But we're not doing discovery about that right now, so it would only be -- so it seems like the focus is the same. It's documents sufficient to show what the tools do, how they work, and what contribution, if any, Meta makes --

MS. KONKEL: That's --

THE COURT: -- right? That's it?

MS. KONKEL: That's fair, your Honor, although I would say the RFP definition, we believe, should control the scope. There was no dispute over the RFP definition the parties reached.

THE COURT: Well, but there is now. So I have to -- I'm trying to figure out what you want me to order, and it seems like there is a dispute about the scope of it, and a misunderstanding between the parties about what was being requested or what was being promised.

Maybe that's not how you see it, but I'm having trouble figuring out what the dispute is, as I indicated before, and my goal is to order, if necessary, production of documents that are responsive to sort of how I framed the issue back in my prior order at Docket 192, so that you all are ready

to brief the summary judgment issue, because I think Judge Pitts will be very unhappy if we don't get to that point in a timely fashion. So that's what we need to do, and so I'm looking for something concrete to direct.

So, with that sort of objective in mind, is there anything more specific, again leaving aside for the moment the timing question, specific documents that you have gleaned from discovery that you know exist, that you want me to order Meta specifically to produce, that will get at this issue?

MS. KONKEL: Yes, your Honor. So the relevant part of the documents is as you describe. It's that the review documents describe the tools. The part I think we have a disagreement about is whether specific subcategories within review documents should be cut out, even if they describe the tools and are relevant to material contribution, and the Section 230 issues.

So Meta's definition, the narrow definition, is essentially just the first part of the RFP definition. They've cut out counter-abuse, security, other similar review, and the whole last part of the definition, and there just isn't any basis in the parties' negotiations for that narrowing. So, right now, a security or counter-abuse evaluation that describes the tools in a way that's relevant to material contribution, it would be cut out through no

agreement by the parties, no order by the Court, and that's something we just learned about very recently, that they had done that narrowing on their own.

THE COURT: Okay. There's another issue that's raised, the timing issue, and then the -- I guess two issues that are raised -- this privilege log issue. So, on the timing issue, so the 15th is not very far from now. It's three days from now, right? So you want me to order them to produce something in three days?

MS. KONKEL: That is no longer our request, your Honor.

THE COURT: Okay.

MS. KONKEL: I think we recognize, of course, those dates were proposed at a time of -- before the hearing was set, and before these issues played themselves out. So, you know, a couple weeks from today, I think, would be fine with us.

The main issue is that it be before substantial completion, because what we've heard again and again on both of these categories is "You're not entitled to anything now. Your request is premature, because we're working on it, and you'll get it later on in the discovery period." So we'd like to have a chance to size up the sufficiency of these productions, particularly given the differences in the parties' understanding of scope, to make sure we're getting

what we think we should be getting.

THE COURT: Do you have depositions scheduled?

MS. KONKEL: No, we don't, your Honor.

THE COURT: Okay. And once you have substantial completion of document discovery, you have a fact discovery cutoff of October 29th, so you have two months, during which time I presume you'll be doing depositions. Is that the expectation? We don't know?

MR. QUINN: It's still under some internal discussion.

THE COURT: Okay. All right.

MR. QUINN: We haven't had that conversation between the parties.

THE COURT: Okay. And then this privilege log issue, that again seems to possibly be a disconnect between the parties about what Meta plans to do, what it doesn't plan to do, but the parties have not, as I understand it, agreed to any kind of interim deadline for the exchange of privilege logs. Is that correct?

MS. KONKEL: That's right, your Honor. So the issue here, again, is having an interim opportunity to evaluate sufficiency and to challenge potential claims, in this case privilege claims. Right now we have -- and Meta has told us this -- we have no review documents in the production, because they've taken the category of review

documents they've identified and held them all back, because some might be privileged. That's what we've been told.

And so we have no non-privileged review documents to see what they intend to produce, and we have no privilege log to challenge the claims of privilege that we think they don't have a basis in law, and so we're asking for an interim deadline for both of those things for the same reasons, your Honor, to have an opportunity to evaluate.

THE COURT: And would that be a mutual deadline, so the Plaintiff would also have to provide a privilege log on an interim basis, as well?

MS. KONKEL: We could certainly do that, your Honor. Right now, based on our privilege review, we haven't identified any documents that we've determined are privileged that haven't been logged. They're documents like communications with counsel after the filing of the complaint, but, under the ESI order --

THE COURT: I see.

MS. KONKEL: -- aren't required to be logged.

THE COURT: Okay.

MS. KONKEL: But certainly we would expect to also be complying with the standing order that requires rolling privilege logs as you identify privileged documents.

THE COURT: Okay. All right. Very good.

Let me turn to Meta, and I'd like to begin with just

the high-level question of, what have you produced that shows the tools or processes that impact content, and how they work?

MR. BROWN: Yes. So, your Honor, we've been in the process of producing a number of categories of documents, some of which you referred to in our discussion earlier. We are producing wiki. These are a large portion of the production, and they are, as you note, some of the key documents in terms of the design of the tools and how they work. We are producing on-boarding documents, some of which are also in wiki form. We're producing workplace notes. We're producing Figmas (phonetic).

THE COURT: I'm sorry. What?

MR. BROWN: Figmas.

THE COURT: What are Figmas?

UNIDENTIFIED SPEAKER: They're diagrams that show the flow of the ad pool stream, the processes they have for advertising.

THE COURT: Okay.

MR. BROWN: And our production is ongoing. We've produced, I think, probably about, you know, 40 percent of what we're going to produce, and we expect to complete the production by the substantial completion deadline. We are not holding back anything, with the exception that your Honor talked about at the beginning of the hearing

concerning concepts and proposals.

We agree that the relevant inquiry here is how the tools work, and how they can or cannot materially contribute to the content, but we have agreed to produce concept or proposal documents to the extent they were earlier in time and relate to actual changes or designs that were implemented, and not something that talks about the future that may never happen.

THE COURT: I see. Okay. So all of this is ongoing, to be done by August 28th. This is the key part of the discovery. This is the essential discovery that needs to be produced before you can proceed to the next phase of the case, so I'm a little surprised that only 40 percent of it has been produced.

This is the kind of information where you ask a human, and you say, "What are the documents that show how these tools and processes work, what they are, how they work?" And so this should be priority number one for Meta, and I will be very surprised and disappointed if they are not completely produced, 100 percent, by August 28th, your substantial completion deadline, because this is the core of what's necessary here.

You left off your list source code. When will source code be produced, if at all?

MR. BROWN: So there has not been a request for

source code in the context of these document requests. We had a discussion in January, and counsel indicated and stated that source code was not sufficient to address these issues, and so there's been no further discussion about source code since that time, with the exception of mapping data that we are producing to counsel shortly, in which we indicated we created source code, and we're going to need to treat it as such in the production, but, beyond that, there's been no further discussion of source code.

THE COURT: Okay. Well, that's a little puzzling, but I would just say, if, in Meta's view, source code is the documentation that shows how these things work, these tools and processes work, it would be odd if you weren't making that available, if that is sort of the -- how should I put it? -- the definitive evidence of how your tools and processes work.

If they don't want to look at it, they don't have to look at it, but, if that's available -- I mean, maybe there are better sources, and I certainly would leave that to Meta's judgment, if you have the documents, but, if there's a gap in the documents that you can't discern certain details of the operation, and you have that information in source code, it would seem odd as a response to a document request seeking that category of information that you wouldn't make it available. So that's all I'll say about

that. They don't have to look at it if they don't want to, but least you will have made it available.

So, you know, I am, as I said, very interested in having this production completed in a timely way, and the test will be whether you feel comfortable, Meta feels comfortable, representing to Judge Pitts that you have, in fact, produced all of this information, because the question will be called when the briefing happens, and if the folks on the other side say, "We can't understand how X happens" or "how Y happens," or, you know, "what this step in the process is," that will be a problem.

So I'm just making -- you know, putting a real fine point on it here. So do you feel, based on your representations to me, that the production you've outlined, that is in progress and will be completed by August 28th, will accomplish that?

MR. BROWN: We do, your Honor.

THE COURT: Okay. And is there anything that is being withheld by -- because of some privilege, that will not be documented in a log, at least, you know, relatively contemporaneously with your completion of the production?

MR. BROWN: No, your Honor, and let me just speak to the review documents that are subject of the log issue. We did not hold back a category of documents. We identified in our review and production documents that would fit this

category, that have indicia on them, and we are still examining those documents, and determining whether they are, in fact, privileged and need to be logged, or redacted, but it's not as if we have made a categorical determination that this group of documents is not going to be produced or is going to be privileged. We're in the process of assessing that with respect to these documents, and as soon as that is done, we will produce what's producible and log what's logable.

THE COURT: And will that be done by August, as well?

MR. BROWN: We can commit to that.

THE COURT: Okay.

MR. BROWN: And, again, it's not as if we have a privilege log we're holding back.

THE COURT: Okay.

MR. BROWN: We want to get this to them as soon as we reasonably can, and we believe we can do that in that time frame.

THE COURT: Okay. All right. I mean, in terms of how we resolve this dispute, I'm just going to order that, in compliance with my prior order, these documents that I've defined be produced by August 28th, together with a privilege log associated with any documents withheld on that basis.

That gives the Plaintiff at least two months to do whatever additional fact discovery is necessary, to question witness about whether these are, in fact, the complete documents, to serve follow-up requests, if you need to, to raise questions with the Defendants about missing information, to review source code, if you need to.

So I'm not sure that moving that August 28th date up a week is really meaningful, if what you're really after is complete, accurate production of what I think are essential documents. And I've said that many times now, so I think that Meta has got the message that these things must be produced, and I hope that's all that needs to be said. I'll do a written order, but I think that resolves this matter.

Is there anything else that the Plaintiff would like to argue on this point, having heard Meta's arguments and representations?

MS. KONKEL: Yes, your Honor, just a couple points. First of all, we're very happy with an August 28th deadline. The issue for us is not necessarily a specific date, but, rather, having a fixed date. The August 28th deadline will allow us to count on that for the design review documents and the privilege log, even if the substantial completion deadline or the overall case schedule moves, and that's what we've been concerned about, that it has moved in the past, it may move again, and, if it moves

again now, we want to still have that August 28th deadline to rely on.

THE COURT: Okay.

MS. KONKEL: The second point is on the source code. Of course we want the source code, if it's responsive to the request for design documents. The conversations opposing counsel referred to from back in January, I believe I know the letter they're referring to, which is a letter from us saying -- after they attempted to narrow the definition of "design documents" only to source code, saying, "That's not enough. There may be other documents that are relevant. Source code alone is not sufficient." That certainly wasn't an agreement to exclude source code. It was a position that source code and other documents would be responsive. So we'd like any source code they have.

And then the last point, your Honor, is, there was a new issue raised today before this conference, and to some extent just now in counsel's argument, about a cutoff date for design documents, or whether they're before or after a certain date.

We were told this morning for the first time that Meta is not producing design documents after a date in January of 2025, and that's not something we had heard before, and also not consistent with the relevant period of January 2019 to the present, and we just want to take the position on the

record that the relevant period applies to both parties' productions. We haven't agreed to any such narrowing.

THE COURT: So this is sometimes a complication. So, at some point, you have to be done with your document production, and so a particular date in the past to the present implies sort of a constant obligation to produce, and you are after a substantial completion date. So usually there's a rational sort of cutoff date that everybody can agree to, so you can apply search terms and do whatever you need to do. This is not really a search terms issue, I suspect, but, in general, that's how these things are resolved.

So, if the parties haven't talked about this, I suggest that you talk about some practical way to resolve this dispute about the cutoff date, because there has to be some cutoff date. Maybe it will require updating, if there's some, you know, significant change in the way things happen that's relevant to the case. Otherwise, you'd have to have some way to stop, in order to accomplish completion of discovery.

So I would encourage you to talk about that. Maybe January 2025 is not the right date. Maybe something closer to where we are right now is. But I'm not able to resolve that for you based on the record that I have. But please do sort that out, so it doesn't delay things any further.

MS. KONKEL: Understood, your Honor.

THE COURT: All right. Anything else? Yes, from Meta.

MR. BROWN: I just want to clarify. What we have explained to counsel this morning is that, with respect to concept and proposal documents, that we are not producing documents that would relate to future proposals, future concepts. That was the clarity issue.

THE COURT: Okay. That seems sensible, but it should be -- your production should reflect the relevant period of time that bears on the dispute, and figuring out, like, how to define the bookends is important, and you should engage in that, if you haven't already.

I'd like to move on to the next dispute, which is at Docket 240, and this has to do with the request by the Plaintiff for raw data, showing what Meta did or didn't do to ad inputs before they became ad outputs. So, again keeping in mind that we want to be circumspect about anything that is truly confidential here, I think we can engage on the subject.

Let me ask a preliminary question from the Plaintiffs. Are the Plaintiffs -- is the Plaintiff interested in information for each of the -- what I understand are 28,000 scam ads? And who is arguing this?

MR. QUINN: I'll argue this one, your Honor.

THE COURT: Okay. All right. Thank you.

MR. QUINN: Yes, and our understanding is that, in developing what are called "sequel queries" or "structured query language queries," you know, it's relatively straightforward to identify the universe and then pull the data. So it's not like some manual process, where some individual has to go gather them up, and we do believe that it should cover the waterfront of the scam ads at issue, because tools are changed all the time.

Scam ads took place over an extended period of time, and so there may have been material contribution happening at one point in time that wasn't happening in others, and it's, given that we're all dealing with software systems, relatively straightforward to do that, and I think negotiating some narrower category would actually be more cumbersome than just providing the code-level data.

THE COURT: Okay. So, before we kind of get into the weeds on that issue, my understanding from our prior dispute about scam ads was that, in order to figure out what information goes with a particular ad, you need the ad ID. So are there ad IDs for all 28,000 scam ads?

MR. QUINN: My understanding is yes, and our understanding of that issue has gotten a little more complex, in the sense that our understanding -- and, again, we're more limited here -- is that there are ad IDs

associated with information in certain repositories, as well as additional IDs that may link into Creative repositories, et cetera. So the ad ID is the beginning, and there may be other IDs that link into other data sources, trying to be, again, very high-level here.

THE COURT: Yes. And I have to say, I have had the fortune, slash, misfortune, of being the discovery magistrate judge on other cases involving Meta and its documents, and I hazard a guess that it is not as uncomplicated as you make it sound, and I'm just going to leave it at that, because I think that one of the concerns I have here is that, to the extent Plaintiff wants to know what sequel queries or whatever searches Meta has done, that's highly unusual, right?

What you need is the actual data. Okay. So that requires some understanding or some conversation between the parties about what data is available, and the data that you want is the data that shows what happened to the input ad for each of the 28,000 ads before it became the output ad, right? So, in your conversations, do you have an understanding of what data sources contain that information? Have you had that conversation between the parties?

MR. QUINN: We have some understanding of it, to some degree, from conversations between the parties, and also from our own work with consulting experts and review of

developer websites and other white papers that Meta's engineers have published.

The conversation between the parties, candidly, has been fairly limited, because we've asked now for months for, for example, database schemas that just show the architecture of these databases and how they interact with each other, and Meta has refused to provide those, notwithstanding Sedona principle three. We have been asking for logs that would show what tools did, and system logs that would show that for each ad. They're not agreeing to produce that material.

So the schemas really are the key. I take the Court's point on the queries Meta itself has run. We're asking for those, and think they're appropriate here, given the insufficiency of what we're getting, but the schemas are step one. We have experts that can help design the right queries to pull the data we need, but they need database schemas, and Meta simply will not turn them over to us. Meta has really limited the parties' ability to have a meaningful conversation about these issues.

THE COURT: And is source code something that you believe will reveal -- well, will reveal the information about the data sources that you need? I mean, so I'm trying to see if there's another way to get at it. If you had access to the source code, could your expert go and look at

it and say, "We need this log, this log, and this log, and that's how we'll be able to connect the dots between ad ID at input stage and, you know, the output"?

MR. QUINN: It certainly sounds like a helpful step. I'm not sure it's a sufficient one, and our understanding is that the schemas really are the sine qua non, that without access to the pertinent schemas that are touching the data sources we do know about, which, you know, we could sidebar and get into specifics, because there are some that we understand in terms of ads being rendered and delivered to users, Creative assets that are larger files being warehoused, databases that sit in between them and interlink with these things that are able to move things around -- you know, we have some understanding of that, of that architecture, and the source code about how the tools operate within it may be helpful, but, in order to ensure that we pull that data, our understanding is that the database schemas are what's really critical to that.

THE COURT: And what period of time do these 28,000 scam ads span?

MR. QUINN: They cover the relevant period, and we've sought injunctive relief, and understand that this is an ongoing problem.

THE COURT: So it's continuing.

MR. QUINN: Correct, your Honor.

THE COURT: All right. I'm going to switch over to Meta and ask bout what's been produced, because there was a reference to an Excel spreadsheet in the papers which is an extraction of some other data source, and it's not clear to me -- well, the Plaintiff just says it's not sufficient, it doesn't have sufficient information.

I'm not sure who I should be addressing, who's handling this argument, but I'd like to understand why, if it's the case, Meta has declined to identify the database schema or, if it's not a database schema, the relevant schema, and the implicated data sources, whether they be logs or something else, that reflect what happened to each ad ID as it goes through the tool or is acted on.

MR. BROWN: Your Honor, we believe we have done -- we have -- I think your Honor is well familiar with Hive (phonetic), and we have produced an Excel export from Hive, the data warehouse, which is the most comprehensive source of data that can be readily accessed for the relevant time frame. It's a -- the purpose of Hive is to log, add data on a table-by-table basis, in an accessible and organized format that permits analysis. It is native data. We haven't done anything to the data. We haven't altered it or manipulated it. We've simply exported it from Hive, where it had been entered and logged from its original source, the productions.

THE COURT: Hive sometimes has limitations, and doesn't -- because it's a business tool, doesn't necessarily log all of the things that a plaintiff might be interested in, and so one of the things I'm trying to sort out here is whether the Plaintiffs are asking for information that is not in Hive, and I don't know the answer to that question from your papers.

MR. BROWN: We believe that the information they are requesting is all in Hive. It is in numerical codes. There is mapping of those numerical codes as to the values that indicate the Creative optimization and what the numerical codes stand for. We've indicated to counsel that we will produce that mapping, but we treat it as source code, and so we need to treat as such, but we believe that everything is encompassed in the native data export from Hive that addresses the optimization and content modification tools, and -- with respect to each of these 28,000 ads.

THE COURT: So the Plaintiffs argue in their -- in the discovery dispute letter that the data that you've provided shows what tools could be applied to a particular ad, not what was actually applied, and not what the tool or process actually did. So there's not really a response to that, except to say, "We've produced what's reasonably accessible."

So I still don't know the answer to the question of, have you produced information that actually says what happened to a particular ad, who did it, how it was done, what the optimization or enhancement was, and what the output result was?

MR. BROWN: In part, and I'll let Ms. Paloma (sic) address this in a little more detail.

THE COURT: Okay. Very good.

MS. RIVERA: Hi, your Honor. So we have produced -- the Creative optimizations that we've been discussing are the discrete tools and processes that were applied to the ad that show the enhancements that were made to the ad. Plaintiff has not yet seen that, as of the ad mapping, as we mentioned earlier.

THE COURT: I'm sorry. They haven't seen that because what?

MS. RIVERA: It is under the amended -- second amended protective order. It is considered source code. And so we haven't issued the process of providing to them that mapping, so they can see those textual values corresponding to the native data that they've received to date from Hive.

THE COURT: Okay. So the short answer is Meta hasn't actually produced this information. They've produced something that requires additional information to interpret,

and that additional information hasn't been produced?

MS. RIVERA: Correct, your Honor. We are in the process of trying to get that to Plaintiff as soon as possible.

THE COURT: But that would require a source code-type review. They'd have to -- whatever provisions you've made for review of source code, it would be under that rubric?

MS. RIVERA: Correct, your Honor. However, we did offer to Plaintiff to provide them with the source code on non-copyable paper, pursuant to the second amended protective order, and bypass computer review, in order to get them to it in a more expeditious manner.

THE COURT: Okay. And are you representing that, once that additional information is provided in the manner that you've described, it will be possible for Plaintiff to say, for a given ad and its associated ad ID, what happened to that ad between input and output?

MS. RIVERA: Your Honor, we can represent that it reflects the Creative optimizations that were applied to that ad, that were applied for delivery or -- and that could be applied, as a more general matter, of the menu. In terms of what Plaintiff will make of that information, I mean, it is what impacted the ad when it entered, once it was published, and these are the Creative optimizations that are

applied to that ad.

THE COURT: When you say, "These are the Creative optimizations that are applied," do you mean applied by Meta, applied by the ad proponent, the ad creator? Because that's a question. What did Meta do, versus what did someone using a Meta tool do to their own ad?

MS. RIVERA: Understood, your Honor. These optimizations are derived from the advertisers' inputs and ads manager, based on their selections and what is input into in terms of the Creative, and these are tools or processes that are applied based on those inputs. For example, the Creative optimizations encompass the enhancements derived from events across Creative.

THE COURT: So give me an example, if you could.

MS. RIVERA: And to be clear, I think this discussion, and some of the discussion we've already had, is confidential in terms of the details. I'm happy to continue.

THE COURT: Isn't this described -- any person who does an ad will know what it can do, what that ad creator can do, "I can enhance this text. I can do something fancy with graphics." I mean, those things are transparent to the ad creator, are they not?

MS. RIVERA: Correct. However, these Creative optimizations are Meta's proprietary tools that are used

within their internal processes for generating ads.

THE COURT: But are they -- are the tools only invoked and activated based on a user, but -- let me just ask the question better. Will the information you're going to provide allow the Plaintiff to distinguish whether a particular optimization happens based on user input or Meta's own whatever, initiative?

MS. RIVERA: I will not -- we will not make a complete representation as to the entire scope of the Creative optimizations. It is our understanding that it will give Plaintiff insight as to what enhancements were applied to the ad.

THE COURT: Okay. Not just what could be applied, but what were actually applied to a given ad. So you have ad ID number one. What was it -- what happened to that after its input, before it got to its output? Will the Plaintiff be able to tell from the information that you provide for that ad what happened to it, who did it, how it happened, what happened?

MS. RIVERA: They will be able to tell the Creative -- and I know I'm using the same --

THE COURT: Yes.

MS. RIVERA: -- term, terminology.

THE COURT: The relevant information is what I'm asking, the stuff that's relevant to your case.

MS. RIVERA: Yes. This -- the information about the Creative optimizations is what is relevant in terms of the tools or processes that may or may not have impacted the Creative, the content.

THE COURT: And forgive me. You all know this case way better than I do. So, if I'm missing out on something that you think I should be interesting better, forgive me, but when will this additional information be made available to the Plaintiff?

MS. RIVERA: We are endeavoring to do it as soon as possible. Plaintiff informed us that they would like to view this information on the computer, source code computers. Now we are initiating negotiations on that front, in order to make that available to them.

THE COURT: Can that just be August 28th, since you have to produce other things by August 28th, as well?

MR. BROWN: I don't know if we can commit to that. I mean, we need to confer. We just learned last night that they want to view this on a laptop, not on non-copyable paper, so I think we're going to need to confer and get back to them about --

THE COURT: But doesn't your ESI order provide the -- or your protective order -- provide the procedures for this kind of review? It should be pretty straightforward, and also something that is pretty core to

the case. So I would say August 28th should be the -- you know, the latest date on which this is made available. I don't know what negotiation needs to happen, maybe in terms of timing, like, "When do you want to come?," but it should be ready to go, if I'm not mistaken.

I mean, I don't see any reason to delay, if you have all the information, because right now you have all the relevant ad IDs, so you can find whatever it is, and this Excel sheet with the export information is comprehensive as to those 28,000 ad IDs. Is that right?

MS. RIVERA: Your Honor, the data that is available goes back to 2022, and that is the earliest that that data existed in that table.

THE COURT: I see. Okay. All right. Anything else you'd like me to know about Meta's side of this dispute and the production?

MR. BROWN: I don't think so, your Honor. I mean, I think our view is we have given them exactly what they've asked for, which is native data, and it will be sufficient for them to understand what they're interested in with respect to optimizations and content modification with respect to each of the examples.

THE COURT: But only once they're able to see this additional information you haven't shared yet?

MR. BROWN: From the mapping.

THE COURT: Yes. Okay. Let me turn back to the Plaintiff. So, having heard that explanation, that there's more coming, and that then all will be revealed once you have access to this information, it sounds like it's worth a try, with your expert in tow. Do you disagree?

MR. QUINN: I agree that it absolutely needs to happen, and should have happened a long time ago, but it is quite clear to us it will not be sufficient, and that we will need code-level information. I do have a lot of context here, and we'll be mindful of the protective order, but I hear many of these comments quite differently, and understand the very carefully selected language.

But let me try to just zoom out, if I may. We've talked all the way since March, maybe before, about inputs, outputs, and the changes in between. It's now clear to us what we're getting, right? The early productions were printouts of websites. We're actually seeing what they're really giving us now.

We are not getting inputs. We're not getting inputs. We're getting summary data from tables in Hive that have some text in it. It's not formatted the way the advertiser provided it. They can't answer the question whether that text has already been acted upon or not. Sometimes it's a string of random question marks that don't map to what the ultimate video shows.

So we actually aren't getting inputs, nor are we getting outputs. Meta has not produced to us a single finished ad, and we heard for the first time in this joint letter that they don't actually have the finished rendered ad, the way people saw it. So we're not going to get inputs. We're not going to get outputs. There is a lot of code that acted on these ads, and that code is how the software talks to each other and will show what these tools did. They're not letting us even get schemas that would help us go find that.

THE COURT: Clearly, that's the other dispute. I mean -- well, no.

MR. QUINN: We see the schemas as a precursor to getting the code-level information about changes, which now --

THE COURT: But they just said that they were going to give you the code.

MR. QUINN: So --

THE COURT: That's the additional information that's coming, that I just heard, that will allow you to take this Excel spreadsheet, look at the additional information, map it, and understand all.

MR. QUINN: What we understand -- and I have examples. I can come up to the bench. We've shared them with counsel just before the hearing. There's a spreadsheet

right now that says, "Here are the tools that were eligible for use." We understand that there are numerical codes that can be translated to say, "Here are the tools that actually did something."

There is no representation that we're getting any data about "Here is what the tool did. This is the image that was uploaded. They turned on image generation or image enhancement, and here's what it did to that image." There's no representation that this will even show that. We're just going to move from "Advantage Plus Creative was turned on" to "Advantage Plus Creative did something," not what it did.

THE COURT: And so is it the Plaintiff's view that the information exists and is not being shared, or that it does not exist?

MR. QUINN: It is our understanding that the code-level information exists that shows how the tools actually affected Creative, and we've got an expert that can both help figure out how to query that and help translate it.

THE COURT: Okay. So, you know, I will have to say it's kind of impossible for me to resolve this disagreement on the record that I have. In other matters that require getting into the weeds on this thing, where the parties fundamentally disagree about the "what" and the "how," is -- I invite submissions of your respective

experts' declarations or, in the case of Meta, you know, knowledgeable employee with the kind of information -- it doesn't have to be your outside expert, but whomever can tell me what's available and how it's revealed in your production.

So my suggestion for you all, and this might be my tentative conclusion as to resolving this dispute, is that I will require Meta to make available the source code, or code, or whatever the information is that requires the special handling, available to Plaintiff and his expert for inspection no later than August 28th, and hopefully sooner, and then, once the expert has had an opportunity to review the code, or whatever has been provided, and can explain to the Court in more detail why it's insufficient, if it's insufficient, and the proposal for what is needed in order to get at the relevant information, I'll entertain that declaration, and, conversely, I'll permit Meta to respond in defense of what's been provided, or explaining why it's sufficient, or not reasonably available, or whatever it is that you want to say to me about it.

But I think the essential first step is for Meta to complete its production, the production it intends to address this information, and it may turn out that it's sufficient, and you'll be able to talk to each other and figure it out, and, if not, then I'll invite you to come

back to me, and, you know, the easiest way for me to address this is, frankly, to have a supplemental discovery dispute letter that attaches the declarations.

So I hope you can work -- with that guidance, you can work out how to submit it. If you have competing proposals about how to submit and what to submit and that kind of thing, go ahead and submit them in advance. I don't want to have an auxiliary dispute fighting about that. But that's how I think we should get there, is that additional submission.

Does Meta have any further thoughts on that point?

MR. BROWN: Well, not on that point, your Honor, but I did want to ask counsel here -- we have offered to produce the mapping, which we consider to be the source code, in non-copyable paper, to expedite this process, and I'd just like to know why that's not acceptable, because it could move this along much more rapidly.

THE COURT: I could let counsel address that, but paper that encompasses 28,000 ad IDs might be a little hard to deal with in non-electronic form.

MS. RIVERA: What we would be producing is the mapping, of the numerical mapping --

THE COURT: I see. Okay. All right.

MS. RIVERA: -- so it is not of the 28,000.

THE COURT: Got it. Understand.

MR. BROWN: Very bite-sized.

THE COURT: Any reason the Plaintiff would not like to have mapping in paper?

MR. QUINN: Our understanding is, with these kinds of materials, dealing with them electronically is much easier for these experts, as they try to understand them, but we can consult with our expert. Perhaps we can get the paper first, and then do the computer, as needed.

THE COURT: Sure.

MR. QUINN: We will try to move this forward expeditiously, and we appreciate --

THE COURT: Okay. Nothing prevents Meta from producing paper as a first step, but, if it's necessary to make it, whatever the "it" is, available in the sort of source code protective order form, I encourage you to make arrangements to do that, because we just -- we need to complete this process of discovery, and this is pretty essential.

Okay. I think that will resolve this dispute for now, subject to further submissions, if necessary. Is there anything else that either party would like to address regarding Docket 240?

MR. QUINN: Nothing further from the Plaintiff, your Honor. Thank you.

MR. BROWN: Nothing further from Meta, your Honor.

THE COURT: Okay. Thank you very much for your arguments, and I will get you some short orders with this additional guidance and resolution promptly.

This matter is concluded.

(Proceedings concluded at 10:59 a.m.)

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



Echo Reporting, Inc., Transcriber

Thursday, March 14, 2025