Hecker Fink LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.HECKERFINK.COM

DIRECT DIAL 212.763.0886
DIRECT EMAIL jquinn@heckerfink.com

August 1, 2025

**VIA CM/ECF**

Hon. Virginia K. DeMarchi
United States District Court
Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Re: *Dr. Andrew Forrest v. Meta Platforms, Inc.*, No 5:22-cv-03699-PCP (N.D. Cal.)

Dear Judge DeMarchi:

Pursuant to Your Honor's Standing Order for Civil Cases, Plaintiff Dr. Andrew Forrest and Defendant Meta Platforms, Inc. respectfully submit this Joint Discovery Letter Brief.

## I. STATEMENT OF DISPUTE

Plaintiff contends that Meta has refused to search for or produce certain raw, native, digital data that would show how Meta's tools and processes acted upon advertiser Inputs to create Scam Ads. For example, Plaintiff contends that Meta's productions from its data-storage warehouse, Hive, consist of manual compilations and made-for-litigation documents that are insufficient to show how Meta's ad tools affected the Scam Ads. Meta contends that Plaintiff has mischaracterized its productions, which already contain native data in digital form, and which more than comply with Meta's discovery obligations.

## II. PLAINTIFF'S POSITION

Meta's material contribution can be assessed by comparing Inputs against outputs (*i.e.*, finished ads) and by analyzing code-orchestrated changes Meta's tools and processes made to ad content. This Court held that "discovery ought to encompass" how Meta's tools and processes affect an ad "from input to output," 3/18/25 Tr. at 61, and Plaintiff has sought: (1) all Scam Ad Inputs, (2) all outputs (the final versions of ads shown to End-Users), and (3) the data showing *how* Meta's tools and processes impact Inputs to create outputs. *See* RFPs 1-2, 9-12, 13-14.

In ten months of discovery—as Meta concedes below—Meta has produced (1) certain summary data about Scam Ad Inputs; (2) no outputs (*i.e.*, no finished ads); and (3) certain summary data showing which tools and processes "could be applied" to each Scam Ad, but not whether

those tools and processes were actually applied or what they did.[1] This is plainly insufficient to address "whether Meta's ad systems... contribute[] to the content of the ads," ECF 121 at 9.

For example, Meta provides a tool called Advantage+ Creative, which Meta's website explains relies on generative AI and makes "creative enhancements" to images, text, and other ad content.[2] But the data Meta is producing only confirm whether Advantage+ Creative "could be applied" to a rendered Scam Ad, without showing what "enhancements" the tool actually made. And because Meta has not produced any finished Scam Ad, Plaintiff cannot compare that against Inputs to assess what changes Advantage+ Creative made.

Native data, meaning the raw, digital data that Meta's advertising code directly manipulates, can answer this question. But Meta has refused to produce it. Instead, Meta has unilaterally undertaken a more analog process, as explained below, which results in the production of counsel-curated compilations of certain datapoints, drawn from preexisting summary tables, that do not address the critical material contribution question.

Meta should be ordered to produce the native data, as well as pertinent database schemas and information about queries Meta has run. Plaintiff has engaged and disclosed an expert who is qualified to develop appropriate queries to retrieve the native data, which Plaintiff understands involves a reasonable process and a manageable volume of data.

**A. Meta's Insufficient Searches and Deficient Productions**

Meta has said it stores much of its historical ad data in Hive, a data warehouse.[3] Hive stores native data, using "tables" to structure and summarize data. Hive's "schemas" explain how data and tables are linked to one another—in other words, the schemas are the architectural blueprints that describe how tables are structured, related, and retrieved. Other data, like original Ad Creative, or final rendered ads, may be stored in locations outside Hive. The end-to-end architecture of all Meta's data storage systems are described in the pertinent schemas, which are crucial to understanding how to find the data Plaintiff seeks.

When Meta's tools and processes act upon advertiser Inputs to create ads, the changes made to those Inputs are orchestrated by code. This is where proof of material contribution lies—and Meta, which bears the burden on material contribution, must disclose that evidence. In addition, logs record system activities and when they occur, including changes orchestrated by code. Plaintiff understands that the data and logs showing these code-orchestrated changes can be retrieved and produced. Indeed, Plaintiff understands that these data are likely to fit on a single USB stick. Plaintiff has retained and disclosed an expert in querying complex data warehouse systems and navigating the interrelationships between native data and summary data. James

---

[1] Meta represented in a July 11 letter that it "may have some responsive data" showing which optimizations were applied to delivered Scam Ads, but this summary data at most goes to June 12, 2024, and Meta has yet to produce it.

[2] *See* About Advantage+ Creative, https://www.facebook.com/business/help/297506218282224?id=649869995454285.

[3] *See* Hive—A Petabyte Scale Data Warehouse using Hadoop, https://engineering.fb.com/2009/06/10/web/hive-a-petabyte-scale-data-warehouse-using-hadoop/.

Mickens, the Gordon McKay Professor of Computer Science at Harvard, has researched storage architectures for large-scale web services.

Meta has refused to provide the requested native data, schemas, queries run, and other technical information. Instead, Meta is searching only certain "summary tables," meaning preexisting tables that Meta engineers built during their day-to-day work to record whatever datapoints, frequency, and time-period they deemed appropriate. After searching selected summary tables, Meta produces information in counsel-curated Excel files.

For each Scam Ad produced, Meta has produced two summary documents. One appears to summarize (though does not provide natively) certain Inputs, along with other information about the ad's reach and impressions. This document lacks key native data, such as text formatting. The other document appears to list which tools and processes "could be applied," meaning which tools and processes may have acted upon the Inputs. That is it. Meta has produced no data showing what the tools and processes did. And Meta now claims below that it has no "pictorial representation[s]" of finished ads—all the more reason Meta must produce the native, code-orchestrated data.

During a July 15 lead-counsel conference, Meta at times suggested that the data it is producing is all it has. But when Plaintiff asked if Meta would admit this in response to a request for admission, counsel tellingly refused. It is implausible that a company whose business depends on effectively exploiting such data—to design and train its systems, to compare the effectiveness of different ad versions—has purged such valuable data. It is equally implausible that Meta—which stores, retrieves, and operates on component parts of Advertisements to display them to millions of End-Users every day—is unable to locate this data for the Scam Ads.

**B. Nat ve Scam Ad Data Is Critical to Assessing Meta's Material Contribution**

As outlined above, the derivative discovery Meta is producing is not capable of answering "whether Meta's ad systems... contribute[] to the content of the ads." ECF 121 at 9.[4] In such circumstances, courts have ordered the production of native data. In *In re Samsung Electronics*, for example, this Court required Apple to produce source code notwithstanding burden and confidentiality concerns, because "Apple [did] not demonstrate[] that the documents it [] produced already contain[ed] the kind of information necessary" to address the claims. 2022 WL 425579 (VKD), at *2 (N.D. Cal. Feb. 11, 2022). *See also Covad Commc'ns Co. v. Revonet, Inc.*, 258 F.R.D. 5, 11 (D.D.C. 2009) (ordering the forensic duplication of server, including a SQL database, because analysis of that information "is the very heart of this lawsuit.").

Moreover, the ESI Protocol, Federal Rules, and Sedona Principles support the production of native files here. The ESI Protocol provides that any producing party "shall provide" "the native or original file" upon written request, and that any "audio, video, and multi-media files will be produced in native format." ECF 179 at 16-17. Similarly, Rule 34(b)(2)(E) provides that a responding party may produce ESI "[a]s they are kept in the usual course of business," and the Sedona Principles warn responding parties against producing ESI "in a form of [their] choice,"

---

[4] Plaintiff reserves all rights with respect to Meta's inability to meet its own burden to sustain its Section 230 defense, and with respect to any preservation failures relating to data associated with the Scam Ads.

because doing so may require reproduction of "some or all of the information in an additional form." The Sedona Principles, Third Edition, 19 Sedona Conf. J. 1, 90 (2018).

Meta cannot dodge its discovery obligations with vague claims of complexity or undue burden. It contends that Hive "does not support centralized searches," and that its data production stores cannot be accessed by "simple 'queries.'" That misses the point. Centralized or not, simple or not, Plaintiff's expert is ready to develop appropriate searches, database-by-database, source-by-source if necessary, once Meta shares pertinent schemas, queries, and other relevant information. At bottom, a database *exists* to hold data and be queried, and Meta's are no different. While Meta argues its own engineers are the best experts, it refuses to ask them to find the data Plaintiff seeks—the argument seems to be, Plaintiff shouldn't develop queries, because we can, even though we won't. Meta has unilaterally limited its search to certain summary data, declared that anything more is too "difficult and time-consuming," and that Plaintiff should be satisfied with the data Meta has produced, even though it does not create a record sufficient to assess material contribution. Nor can Meta continue to claim every question Plaintiff asks is inappropriate "discovery on discovery," given its production deficiencies. *See Taylor v. Google LLC*, 2024 WL 4947270 (VKD), at *2 (N.D. Cal. Dec. 3, 2024).

**Proposed resolution**.

(1) Meta must produce the requested native data, including raw data from Hive and other relevant sources, finished ads, and any logs reflecting how Meta's tools and processes affected an ad "from input to output";

(2) Meta must provide by August 15 all pertinent schemas of any relevant data that reside within Hive or other relevant sources; and

(3) Meta must disclose all SQL or other queries it has run to identify responsive information.

## III. DEFENDANT'S POSITION

Plaintiff's claims that Meta's searches are insufficient and its productions are deficient—because he is allegedly not receiving the information necessary to understand the inputs and outputs for the alleged Scam Ads—are both premature and incorrect. Meta has been diligently investigating and producing data in accordance with the scope of discovery agreed upon by the parties, consistent with the Court's guidance. Meta's productions are providing the type of information Plaintiff seeks based on Meta's reasonable searches of ESI sources most readily accessible. As Plaintiff concedes, these productions contain information about the advertisers' inputs, the tools chosen by the advertiser, and creative optimizations related to the alleged Scam Ads. Plaintiff's request for the production of data in a different format—as well as his request for discovery on Meta's discovery efforts—should be rejected.

### A. Meta Has Been Diligently Searching for and Producing Responsive Data

Meta's productions relating to the alleged Scam Ads consist of information from two readily accessible sources of responsive data. First, Meta has produced Excel exports of native

data from fields within Hive tables that reflect inputs, outputs, and data associated with the alleged Scam Ads. For most of the responsive data relating to the alleged Scam Ads specifically sought in this case, Hive is the most comprehensive source of data that can be readily accessed for the relevant period. However, Hive is not structured to support centralized searches across all tables. Identifying responsive data within Hive is a complicated process, requiring that subject-matter experts identify the Hive table and fields containing responsive data within that Hive table and confirm the data captures the intended information.

Through this process, Meta has conducted an extensive investigation for data points that address the agreed-upon scope of discovery. To the extent available, the Hive data produced reflects, among other things: (i) whether an advertiser opted into using certain tools to create each alleged Scam Ad; (ii) the creative optimizations that could be applied to the alleged Scam Ad during delivery, including those based on the advertiser's selections in Ads Manager; and (iii) which creative optimizations were applied to the alleged Scam Ads for delivery.[5] Meta's production of Hive data is also ongoing.

Meta is producing responsive Hive data in Excel, a reasonably usable format expressly contemplated by the ESI Order.[6] *See* Stip. & Order re: Disc. of Electronically Stored Information ("ESI Order"), ECF 179, App. 1 ¶10. Meta is not altering the native data within the Hive data fields.

Meta has also produced families of files containing components of ad creative (i.e., certain image, videos, and text) and responsive data points associated with the alleged Scam Ads from Meta's production data stores, which are produced using Meta's proprietary production tool ("Switchboard"). This information is produced in a reasonably usable and comprehensible format.

**B. Meta Has Fulfilled Its Discovery Obligations, and Plaintiff is Not Entitled to Discovery on Discovery**

Meta's production of data from Hive, along with components of ad creative and data points from production data stores, is consistent with the Sedona Principles. Hive is a data warehouse used for data analysis, business intelligence, and reporting. Hive logs ad data on a table-by-table basis in the ordinary course of business and in a manner that allows for analysis. Ad data from Meta's production data stores can be logged in Hive in an accessible and organized format. As noted above, for most of the responsive data specifically sought in this case, Hive is the most readily accessible source of historical ad data for production. Switchboard enables the production of certain readily accessible and responsive ad creative and data points from Meta's production data stores. Plaintiff complains that there are no "finished ads," but as we informed Plaintiff, Meta does not retain in the ordinary course of business a pictorial representation of all ads as delivered to or viewed by users. Accordingly, Meta has produced what is reasonably available. *See* Sedona Principles, The Sedona Conference, 19 Sedona Conf. J. 1, 134 (2018) ("The primary sources of

---

[5] Plaintiff suggests that Meta no longer has access to the native data for the alleged Scam Ads. Meta has advised Plaintiff of instances where data is not available or retained.

[6] Meta has also complied with the requirement to produce spreadsheets, audio files, video files, and multi-media files, in native format. *See* ESI Order, App. 1 ¶ 8.

electronically stored information to be . . . produced should be those readily accessible in the ordinary course.").

Plaintiff's claims that he is nonetheless entitled to "native data" separate from what Meta has produced and intends to produce are thus misplaced.

*First*, Plaintiff now defines "native data" to mean the "raw, digital data that Meta's advertising code directly manipulates." To be clear, the data in Hive concerning the creative optimizations (which include Advantage+ creative enhancements) that could be applied to the alleged Scam Ads for delivery results from the logging of raw data from the production data stores. Meta's productions of responsive Hive data to date (and upcoming productions) provide information reflective of creative optimizations related to the alleged Scam Ads from input to output, to the extent such data is available.

*Second*, Plaintiff's unbounded request for *all* "native data" relating to the alleged Scam Ads misunderstands how Meta's data is organized and the burden of extracting data beyond what Meta is already producing. The data in the production data stores are not organized in a centralized manner and not accessible by simple "queries." Nor are the production data stores limited to only ad data, they also contain data related to Meta's other services (e.g., organic, unpaid content). The means of extracting *all* data from the production data stores associated with a single ad (let alone the approximately 28,000 ads at issue) does not exist in the ordinary course of business. The taking of "forensic images of drives and computers" ordered by the court in *Covad Communications Company* is wholly dissimilar from the difficult and time-consuming investigation, identification, and extraction of data from Meta's production stores that would be required to meet Plaintiff's request. *Covad Commc'ns Co.* v. *Revonet, Inc.*, 258 F.R.D. 5, 9-10 (D.D.C. 2009). *In re Samsung Electronics Co, Ltd.* is similarly inapposite. 2022 WL 425579 (VKD), at *2 (N.D. Cal. Feb. 11, 2022) (ordering production of source code because the documents produced did not contain the necessary information and the responding party had not demonstrated undue burden).

Plaintiff also insinuates that its own expert, who is unfamiliar with Meta's systems, is somehow better placed to "develop appropriate queries" to locate and produce data than Meta's own engineers who are the experts in Meta's systems. This position is nonsensical and inconsistent with the Federal Rules and Sedona Principles. *See* Fed. R. Civ. P. 34(a), Advisory Committee Notes to the 2006 amendments to Rule 34 (explaining that Rule 34(a) is not meant to "create a routine right of direct access to a party's electronic information system"); *see also Covad*, 258 F.R.D. at 14 (noting the court could not "find any authority in the cases to date that permit a court to conclude that allegations of deficiencies in themselves automatically require a forensic search"); Sedona Principles, at 127-129 (noting that Rule 34 inspections "are disfavored" and "are likely to be particularly ineffective"); Sedona Principles, at 120 ("[A] responding party . . . is generally best situated to determine and implement appropriate procedures, methodologies, and technologies" for producing ESI). Indeed, Plaintiff does not indicate how its expert would identify the responsive Hive tables or fields to query, even if he could develop a query. And Plaintiff's own statement that Meta displays ads to "millions" of users contradicts the reasonableness of Plaintiff's request—the amount of data Meta collects for billions of ads is enormous and not easily identified and extracted.

Plaintiff is also not entitled to "all" schemas of relevant structured data and "all SQL or other queries" Meta has run to identify responsive information.[7] Requests for discovery on discovery are not warranted without identifying a specific production deficiency. *See Taylor* v. *Google, LLC*, 2024 WL 4947270, at *2 (N.D. Cal. Dec. 3, 2024). Plaintiff has not made that showing. Regardless, Plaintiff's request for "all" schemas is unreasonable and based on a misunderstanding of how Meta's structured data is organized. Hive has millions of data tables and, as noted above, does not support centralized searches to identify all responsive data. For the responsive data being produced, Meta is providing the internal fields and descriptions that Meta keeps in the ordinary course of business on a table-by-table basis. In addition, Plaintiff's request for the queries Meta has run to identify responsive data are protected work product. *Rembrandt Diagnostics, LP* v. *Innovacon, Inc.*, 2018 WL 692259, *7-8 (S.D. Cal. Feb. 2, 2018) (acknowledging that a request for "queries or filters used" has "the potential to implicate attorney-client or work product privileges").

## IV. WHETHER THE COURT SHOULD HOLD A HEARING

### A. Plaintiff's Position

The Court should conduct a hearing on this critical and central issue. A hearing would assist the Court in resolving the dispute because the issues are technical in nature, Meta's proprietary systems add even greater complexity, and Meta has refused to provide Plaintiff with basic information necessary to narrow or resolve the dispute. The Court's guidance on past disputes has been productive in resolving the parties' disputes.

### B. Defendant's Position

Meta does not believe a hearing is necessary given Meta's existing efforts to search for and produce responsive data associated with the alleged Scam Ads. Meta intends to continue making rolling productions in the coming weeks.

## V. CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY

Document discovery is to be substantially completed by August 28, 2025. Fact discovery is to be completed by October 29, 2025. The parties submitted, and the Court approved, a schedule in which expert discovery occurs in parallel with early summary judgment briefing, as follows:

| Event | Deadline |
|---|---|
| Substantial completion of document production | **August 28, 2025** |
| Completion of fact discovery | **October 29, 2025** |

[7] For the first time in this letter, Plaintiff requests "logs reflecting how Meta's tools and processes affected an ad 'from input to output.'" Meta is unclear what Plaintiff means.

| | |
|---|---|
| Meta's Motion for Summary Judgment on Section 230 defense and opening expert report(s) (if applicable) | **December 15, 2025** |
| Dr. Forrest's Opposition to Meta's Summary Judgment Motion; Cross-Motion for Partial Summary Judgment (if applicable); and opening expert report(s) (if applicable) | **January 30, 2026** |
| Meta's Reply in Further Support of Summary Judgment; Opposition to Dr. Forrest's Cross-Motion for Partial Summary Judgment (if applicable); and rebuttal expert report(s) (if applicable) | **March 2, 2026** |
| Dr. Forrest's Reply in Further Support of Partial Summary Judgment (if applicable) and rebuttal expert report(s) (if applicable) | **April 1, 2026** |

## VI. COMPLIANCE WITH MEET-AND-CONFER REQUIREMENT

Lead counsel conferred by video conference on July 15, 2025. John Quinn of Hecker Fink represented Dr. Forrest. Melissa Felder Zappala of Dunn Isaacson Rhee LLP and Walter F. Brown and Amy L. Barton of Paul, Weiss, Rifkind, Wharton & Garrison LLP represented Meta.

## VII. ATTACHMENTS

The following discovery requests and responses are attached:

- Exhibit 1: Plaintiff's First Set of Requests for Production of Documents
- Exhibit 2: Defendant Meta Platforms Inc.'s Responses and Objections to Plaintiff's First Set of Requests for Production of Documents

Dated: August 1, 2025

HECKER FINK LLP

By: */s/ John C. Quinn*
John C. Quinn
Attorneys for Plaintiff
Dr. Andrew Forrest

Dated: August 1, 2025

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Walter F. Brown*
Walter F. Brown
Attorneys for Defendant
Meta Platforms, Inc.