Hecker Fink LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.HECKERFINK.COM

DIRECT DIAL 212.763.0886
DIRECT EMAIL jquinn@heckerfink.com

October 3, 2025

**VIA CM/ECF**

Hon. Virginia K. DeMarchi
United States District Court
Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Re: *Dr. Andrew Forrest v. Meta Platforms, Inc.*, No 5:22-cv-03699-PCP (N.D. Cal.)

Dear Judge DeMarchi:

Pursuant to Your Honor's August 14, 2025 Order and September 16, 2025 Order, Plaintiff Dr. Andrew Forrest and Defendant Meta Platforms, Inc. respectfully submit this Supplemental Joint Discovery Letter Brief.

## I. STATEMENT OF DISPUTE

Plaintiff has reviewed the enum mapping data and Hive data that Meta produced following the August 14 order. Plaintiff contends that both show only that Meta's tools acted upon Inputs to create Scam Ads, but neither shows the concrete, raw changes the tools actually made, which is critical because Meta produced few Inputs and no outputs. Meta contends that its data production is sufficient to show what tools or processes impacted the alleged Scam Ads, and there is no [redacted] beyond what it has produced.

## II. PLAINTIFF'S POSITION

As this Court has recognized, to respond to Meta's Section 230 summary judgment motion, Plaintiff is entitled to discovery of "what tools or processes were applied to the ad, and what did those tools or processes do to the ad between 'input' and 'output.'" ECF 270 at 1. Because Meta has produced minimal Inputs and no outputs, Plaintiff asked the Court to order Meta to provide the raw, native data showing code-orchestrated changes Meta's tools and processes made to ad content. ECF 262 at 4.

At the August 12 hearing, Meta represented that it had already produced "exactly what [Plaintiff had] asked for," and that this already-produced data would "be sufficient for [Plaintiff] to understand what [he is] interested in with respect to optimization[] and content modification,"

once Plaintiff received "enum" mapping data—a Rosetta stone that would provide text strings for numerical values in the Hive data. 8/12/2025 Tr. at 40:18-21.

That was not the case. Plaintiff has matched text strings in the mapping data to enums in the Hive production and reviewed an additional production from yet another preexisting Hive table. None of these productions resolves the core problem. At most, the mapping and Hive data confirm that Meta's tools in fact acted upon Inputs to create Scam Ads. But none of the data shows the actual transformations that the tools made to Inputs. Given that Meta has produced no video Inputs—over 95% of the Scam Ads include video—and no outputs at all, Meta's failure to produce raw change data leaves Plaintiff and the Court with no way to tell which parts of a Scam Ad came from the advertiser and which from Meta.

Meta must do more. Meta's expert declaration admits that additional data, including about creative optimizations, exists in its "data production stores." Meta's documents confirm the same. Meta balks at searching for this data, but the burden Meta describes—working with subject-matter experts to locate and retrieve responsive data—is standard discovery practice and exactly what the Court instructed Meta to do in March. *See* 3/18/2025 Tr. 33:17-19.

**A. The Hive Data Is Patently Incomplete**

In producing Scam Ad data, Meta has relied primarily on Hive, a data storage warehouse comprised of pre-built "summary" tables that Meta engineers use to run analytics. Meta's expert explains that Hive is easier to search than other relevant data sources. Tobkes Decl. ¶ 1. But the produced Hive data is not even capable of answering "what tools or processes were applied" to most of the Scam Ads, let alone what changes those tools or processes made. ECF 270 at 1.

There are two key Hive datasets. On July 25, Meta produced data from the [redacted] table corresponding to enum values in the mapping data. On September 19—three weeks after it should have "complete[d] its production of Scam Ad data from the relevant data sources," ECF 259 at 2—Meta produced data from the [redacted] table, which also contains enum values. Both datasets are woefully incomplete—in fact, each confirms the incompleteness of the other.

*First*, the [redacted] table includes data for only a tiny sliver of Scam Ads. While the Relevant Time Period runs from January 1, 2019 to the present, this table covers only three months from November 2024 to January 2025. And while each date might have up to 13,000 "impressions"—instances when the ad was displayed to an End-User—only approximately 273 ad IDs are represented (out of approximately 28,300 Meta identified). Mickens Decl. ¶ 33.

*Second*, although [redacted] includes more Scam Ad IDs (still less than half) and spans August 2023 to January 2025 (one-fifth of the Relevant Time Period), each ID is associated with far fewer impressions. The gap is significant because each impression may receive different optimizations, or the same optimization may output different impressions. *Id.* ¶ 34. Thus, for the lion's share of impressions, Meta's production does not even show what tools or processes were applied to create the impression.

Other Hive data tables are also deficient. Dozens of field descriptions—Plaintiff's only means of understanding the tables' contents—are blank. Some descriptions point to inaccessible hyperlinks. Still others contain indecipherable descriptions. *Id.* ¶¶ 26-29. Furthermore, Meta did not produce data reflecting changes made by Meta's Marketing API tools, an interface separate from Ads Manager that allows advertisers to create larger numbers of ads programmatically.[1]

**B. Meta's Productions Do Not Show How Meta's Tools Changed Scam Ads**

The even more fundamental problem is that none of the data Meta produced explains what Meta's tools and processes actually did between input and output. The text strings in the mapping data do not answer this question; instead, they raise more questions. For example:

- The video-to-carousel optimization extracts segments of an advertiser-uploaded video and transforms it into a carousel of short clips, which can be displayed with text. Enum text strings for this optimization include "[redacted]" and "[redacted]." This does not explain which frames Meta extracted or what text it paired with them. *Id.* ¶¶ 42-45.

- The thumbnail optimization generates thumbnails from different video frames and selects one to display. Text strings for this optimization include "[redacted]" and [redacted] This does not explain what frames Meta transformed into images. *Id.* ¶¶ 46-49.

- Liquidity optimizations maximize variations by generating multiple ad components (images, text) and swapping them dynamically. Text strings for these optimizations include [redacted] and [redacted] To highlight: this appears to indicate that Meta's tools *changed Scam Ad text*. But this does not explain what text options were created, who created them, or which variation Meta displayed. Related enums like [redacted] reference generative AI tools but do not explain what inputs were given to [redacted] or what outputs it generated. *Id.* ¶¶ 50-53

- The image [redacted] optimization uses generative AI to "expand" an image by creating new pixels. Text strings for this optimization include [redacted] which do not convey what the AI-generated images looked like. *Id.* ¶¶ 54-57.

- Keyword optimizations extract and highlight certain keywords. Text strings for these optimizations include [redacted] and [redacted] This does not explain what keywords Meta extracted or how they appeared. *Id.* ¶¶ 58-61.

In short, as detailed further in Plaintiff's expert declaration, the text strings from the mapping data confirm that features and tools made changes, but do not show what those changes were. *Id.* ¶¶ 41-65. And while Meta's source code sheds some light on the capabilities of the tools,

[1] Plaintiff reserves his rights regarding this deficiency.

it does not speak to how those tools acted on the Scam Ads at issue.[2] Put simply, source code alone cannot answer whether Meta materially contributed to these Scam Ads. *Id.* ¶¶ 18-23.

**C. Additional Data Is Critical to Assessing Meta's Material Contribution**

Meta's own expert agrees that more data exists, including [redacted] *See* Tobkes Decl. ¶ 8. But because this data is something other than impression-by-impression data, Meta insists it should be excused from retrieving it. Not so. In the absence of Inputs and outputs for each Scam Ad, it is all the more important to capture any data Meta has retained concerning changes.[3]

Meta next claims that searching the production stores would be difficult and time-consuming. But its declaration describes—for the first time—that this database can be accessed using the "Ent Framework" by identifying relevant Ents and EntSchemas. *Id.* ¶¶ 10-11. Meta resists consulting with its subject-matter experts to determine what Ents to query, even though "actually talking to a human who knows" is standard discovery practice and what Meta should have been doing since March. 3/18/2025 Tr. 33:14. And Meta admits that it could develop an "engineering solution" to extract the data in mere "weeks." Tobkes Decl. ¶ 14. Meta should have taken this step months ago, and its delinquency is certainly no reason to relieve it of its discovery obligations in the final stretch.

Nor can Meta dodge its obligations by mischaracterizing Plaintiff's position as a request to "rummage" through its data systems. Plaintiff seeks an order directing *Meta* to produce the data he has been requesting for months: Inputs, outputs, and the raw data showing changes Meta's tools and processes made. If Meta's engineers are unwilling or unable to retrieve the additional data, Plaintiff's expert can assist.

**Proposed Resolution**

(1) Meta must produce the requested native data, including raw data from Hive, logs, and data from any other relevant sources reflecting how Meta's tools and processes affected an ad "from input to output";

(2) Meta must provide by October 17 all pertinent and complete schemas of any relevant data that reside within Hive or other relevant sources;

(3) Meta must make available to Plaintiff's expert by October 17 a subject-matter expert (or experts) on Meta's ad storage systems, including but not limited to Hive and the data production stores.

## III. DEFENDANT'S POSITION

For the first time (without providing Meta an opportunity to investigate before briefing the Court), Plaintiff alleges specific deficiencies in Meta's data production and suggests additional

---

[2] Ad-specific data is critical, including because Meta's AI-driven tools are non-deterministic, meaning they can produce different outputs when given the same inputs.

[3] Plaintiff reserves his rights with respect to any preservation failures relating to Scam Ad data.

data would cure them. Plaintiff is wrong. First, Meta has produced data sufficient to show what tools or processes impacted the content of the alleged Scam Ads. Meta has also produced source code and other documents explaining the functionality of Meta's ad tools and processes that can impact content. Second, Meta is not aware of any other raw, code-manipulated data that is reasonably accessible and reflects creative optimizations that could be or were applied to an alleged Scam Ad during delivery beyond what Meta has produced from Hive (which contains native data). Plaintiff's demand for additional data is thus unsupported. His extraordinary request that Meta provide a subject-matter expert to enable him to attempt to develop searches of Meta's data sources should be rejected.

### A. Meta Has Produced Data in Compliance With its Discovery Obligations

No dispute exists that Meta has made a substantial production—40+ gigabytes of Hive data reflecting inputs, outputs, and changes to ads; source code; documents including internal wikis; components of ad creative; and what Meta understands to be the original images uploaded by advertisers.[1] Meta believes this production demonstrates what tools or processes impacted the content of the alleged Scam Ads and explains the functionality of Meta's tools and processes; Plaintiff complains it is not enough.

Plaintiff argues two tables are incomplete.[2] Meta informed Plaintiff in July that [redacted]. After extensive investigation, Meta identified delivery tables logging impression-by-impression data.[3] Meta produced all existing relevant data from three tables for the time period. These tables contain [redacted] Ad IDs from [redacted] alone.[4]

Plaintiff also disregards Meta's production of [redacted], which includes details concerning [redacted]. This data indicates [redacted], although [redacted].

Plaintiff also identifies Hive tables he believes contain unproduced responsive data.[5] (Mickens Decl. ¶¶ 72-76.) Most of those tables were sources for ones that Meta already produced,

---

[1] Meta's investigation into the feasibility of producing what it understands to be the original videos uploaded by advertisers is ongoing.

[2] Plaintiff also claims that other Hive data is deficient. Plaintiff argues he does not understand the data due to field descriptions that are blank or indecipherable, or contain inaccessible links. But Meta has produced the "pertinent and complete schemas" for the fields produced as they existed in the ordinary business. That is enough. *See Ujhelyi* v. *Vilsack*, 2014 WL 4983550, at *4 (N.D. Cal. Oct. 6, 2014), *aff'd*, 695 F. App'x 285 (9th Cir. 2017) ("A party, however, is not required to create a document where none exists."). Separately, the Hive production does contain data relating to alleged Scam Ads that used Marketing API, which only number 14 in any event.

[3] Plaintiff raises that [redacted] contains fewer impressions than [redacted]. This is because it contains only [redacted].

[4] Plaintiff's expert claims he must review *every* impression for *every* Scam Ad (Mickens Decl. ¶ 16), but such scale is not necessary, especially given this Court's guidance that sampling would provide a sufficient dataset to make arguments about material contribution. (Mar. 18, 2025 Hr'g Tr. 22:02-07.)

[5] The "logs" Plaintiff references are Hive tables.

so we believe Plaintiff already has the necessary data from those tables. Nevertheless, Meta is confirming the tables identified do not contain additional data that would address Plaintiff's alleged deficiencies.[6] Plaintiff also suggested additional repositories of ad data might exist (including impression and thumbnail data).[7] (Mickens Decl. ¶¶ 69-70.) Meta is investigating whether additional responsive data associated with these sources exists and, if so, the feasibility of pulling from them.

Plaintiff also argues the enum mapping does not show exactly what changed in the alleged Scam Ads. Plaintiff's expert spends much of his declaration identifying optimizations he says do not demonstrate how the ads were actually impacted, and seeks "code-manipulated data" to approximate a rendered ad.[8] (Mickens Decl. ¶¶ 36-65, 78.) But Plaintiff already has all such data that Meta understands exists as to the alleged Scam Ads. The enum values Plaintiff already possesses [redacted]. (Tobkes Decl. ¶ 15.) Based on Meta's extensive investigations, we understand the optimization enums are the [redacted]. The production stores do not [redacted]. (*Id.*) To the extent data concerning [redacted] exists in Hive—which is the means of logging this information on a historical basis in the ordinary course of business (*id.*)—Meta has produced such data. The [redacted] optimization data is logged from the production stores into Hive ([redacted]), and Plaintiff already possesses it. Meta need not produce it again in a different format. *See* Fed. R. Civ. P. 26(b)(2)(E)(iii) ("A party need not produce the same electronically stored information in more than one form.").

Plaintiff cannot will into existence additional information just because he is unsatisfied with the data Meta stores in the ordinary course of business. Meta has met its discovery obligations, and Plaintiff has not identified a deficiency that would be rectified with his unbounded request for additional data. *See Alivecor, Inc.* v. *Apple, Inc.*, 2023 WL 2224431, at *2 (N.D. Cal. Feb. 23, 2023) ("[P]erfection in ESI discovery is not required; rather a producing party must take reasonable steps to identify and produce relevant documents.").

### B. Plaintiff's Request To Query Meta's Data Sources Should Be Rejected

Because the production stores [redacted], Plaintiff's request to access Meta's data sources to search for ill-defined additional data that would show how Meta's ad tools and processes impacted ads should be rejected. Such a request is unwarranted—Meta's extensive investigation has yielded a production of reasonably accessible data sufficient to show the operation of Meta's ad tools and processes.

---

[6] [redacted] They thus contain no data concerning the alleged Scam Ads during the relevant period.

[7] He further speculates additional data would be available on the [redacted] level. (Mickens Decl. ¶ 78.) But Meta identified the alleged Scam Ads on the [redacted] level, and associated [redacted] IDs are provided in several Hive tables and the Switchboard production.

[8] Meta does not otherwise address Plaintiff's claims about certain enum values because this is a discovery motion concerning the sufficiency of Meta's production, not on issues of material contribution.

Moreover, Plaintiff greatly undersells the difficulty and burden of searching the production stores,[9] and that burden is not justified in light of the data likely to be located. Pulling a single data point related to an ad from the production stores [redacted] ("Ent") [redacted]. (Tobkes Decl. ¶¶ 8-11.) Understanding an Ent, and whether it will pull the specific data point one is interested in, requires working with subject-matter experts and engineers, whose knowledge can be limited to a single ad tool (e.g., text generation). (*Id.* at ¶ 12.) A bespoke engineering solution would then have to be created for every Ent identified in order to extract the data for all of the alleged Scam Ads and consolidate the data in an accessible format. (*Id.* at ¶ 14.)

Plaintiff's expert claims he can shoulder this burden. But it is an unworkable and extraordinary solution to allow a third party such access to Meta's production stores and employees. This effort would have to be undertaken by Meta. And given that [redacted] (*see id.* at ¶ 15), requiring Meta to undertake such a burdensome exercise is not justified.

In sum, the production stores [redacted], nor other data that is reasonably accessible. Plaintiff's request to develop searches to locate additional data should be rejected. Such an examination is neither warranted nor proportional to the needs of the case, especially since Meta has already produced the relevant, reasonably accessible data identified as responsive to Plaintiff's requests.

### C. Proposed Resolution

1. Meta will investigate the specific additional data sources identified by Plaintiff to determine whether they contain additional data that would remedy his alleged deficiencies, and whether producing from such sources is feasible and proportional.

2. Otherwise, Meta believes its production is sufficient, and Plaintiff's demands to search Meta's production stores are either fruitless or not proportional or necessary to address Plaintiff's complaints.

## IV. WHETHER THE COURT SHOULD HOLD A HEARING

### A. Plaintiff's Position

The Court should conduct a hearing on this critical and central issue. A hearing would assist the Court in resolving the dispute because the issues are technical in nature, Meta's proprietary systems add even greater complexity, and Meta has refused to provide Plaintiff with basic information necessary to narrow or resolve the dispute. The Court's guidance on past disputes has been productive in resolving the parties' disputes.

---

[9] *See also* Aug. 12, 2025 Hr'g Tr. 29:2-30:10 (developing queries to extract data from Meta's data sources is "not as uncomplicated as [Plaintiff] make[s] it sound").

### B. Defendant's Position

Meta does not believe a hearing is necessary because Meta's production complies with its discovery obligations and Plaintiff is not entitled to the extraordinary remedy of developing searches to attempt to identify additional data.

## V. CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY

Document discovery was to be substantially completed by August 28, 2025. Fact discovery is to be completed by October 29, 2025. The parties submitted, and the Court approved, a schedule in which expert discovery occurs in parallel with early summary judgment briefing, as follows:

| **Event** | **Deadline** |
|---|---|
| Substantial completion of document production | **August 28, 2025** |
| Completion of fact discovery | **October 29, 2025** |
| Meta's Motion for Summary Judgment on Section 230 defense and opening expert report(s) (if applicable) | **December 15, 2025** |
| Dr. Forrest's Opposition to Meta's Summary Judgment Motion; Cross-Motion for Partial Summary Judgment (if applicable); and opening expert report(s) (if applicable) | **January 30, 2026** |
| Meta's Reply in Further Support of Summary Judgment; Opposition to Dr. Forrest's Cross-Motion for Partial Summary Judgment (if applicable); and rebuttal expert report(s) (if applicable) | **March 2, 2026** |
| Dr. Forrest's Reply in Further Support of Partial Summary Judgment (if applicable) and rebuttal expert report(s) (if applicable) | **April 1, 2026** |

## VI. COMPLIANCE WITH MEET-AND-CONFER REQUIREMENT

Lead counsel conferred by video conference on September 4, 2025. John Quinn of Hecker Fink represented Dr. Forrest. Melissa Felder Zappala of Dunn Isaacson Rhee LLP and Amy L. Barton of Paul, Weiss, Rifkind, Wharton & Garrison LLP represented Meta.

## VII. ATTACHMENTS

The following declarations and discovery requests and responses are attached:

- Exhibit 1: Declaration of James Mickens
- Exhibit 2: Plaintiff's First Set of Requests for Production of Documents
- Exhibit 3: Defendant Meta Platforms Inc.'s Responses and Objections to Plaintiff's First Set of Requests for Production of Documents
- Exhibit 4: Declaration of Robert Tobkes

Dated: October 3, 2025

HECKER FINK LLP

By: */s/ John C. Quinn*
John C. Quinn
Attorneys for Plaintiff
Dr. Andrew Forrest

Dated: October 3, 2025

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Walter F. Brown*
Walter F. Brown
Attorneys for Defendant
Meta Platforms, Inc.