Hecker Fink LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.HECKERFINK.COM

DIRECT DIAL 212.763.0886
DIRECT EMAIL jquinn@heckerfink.com

February 9, 2026

**VIA CM/ECF**

Hon. Virginia K. DeMarchi
United States District Court
Courtroom 2 – 5th Floor
280 South 1st Street
San Jose, CA 95113

Re: *Dr. Andrew Forrest v. Meta Platforms, Inc.*, No. 5:22-cv-03699-PCP/VKD (N.D. Cal.)

Dear Judge DeMarchi:

Pursuant to Your Honor's Standing Order for Civil Cases, *see* Standing Order for Civil Cases at 3-4, Plaintiff Dr. Andrew Forrest and Defendant Meta Platforms, Inc. ("Meta") respectfully submit this Joint Discovery Letter Brief.

## I. STATEMENT OF DISPUTE

Plaintiff contends there are material deficiencies in Meta's discovery responses. New Reuters reporting—drawing on Meta documents—reveals that as ads progress from input to output, Meta numerically scores the likelihood the ad is fraudulent. This scoring is a highly relevant, objective measure of Meta's material contribution under Section 230.

Meta contends Plaintiff's veiled attempt to pursue new discovery should not be sustained. This Court already resolved Meta's Phase 1 discovery obligations and Meta has discharged those obligations without deficiencies. And Plaintiff's lack of diligence otherwise precludes him from establishing good cause to belatedly pursue new discovery into "fraud scoring."

## II. PLAINTIFF'S POSITION

### A. Relevant Background

After denying Meta's motion to dismiss, Judge Pitts directed the parties to conduct discovery for an "early summary judgment motion focused exclusively on the question of Section 230 immunity." 8/22/2024 Hr'g Tr. 42:11-12. Accordingly, Plaintiff served discovery requests

aimed at testing various theories of Meta's claimed immunity. As the Court knows, that discovery has largely concerned the tools and processes by which Meta—starting with advertiser inputs—creates different ad versions, alters and optimizes those versions, and renders outputs (final ads) to End-Users. Along with serving document requests, Plaintiff asked Meta to describe "the step-by-step process that occurs" between Input and output, including "all steps taken by Meta" (Interrogatory 1). Nowhere in Meta's response did Meta disclose that between Input and output, it numerically scores each advertisement for the likelihood of fraud. Nor did it produce fraud-scoring data for the Scam Ads, or any information about the fraud-scoring process.

Several Reuters exposés published in recent weeks have uncovered material deficiencies in Meta's discovery responses. A November article reveals that, after Meta creates different ad versions and alters and optimizes them differently—i.e., makes its contributions—it scores the resulting variants specifically for the likelihood of fraud.[1] Meta "only bans advertisers if its automated systems predict the marketers are at least 95% certain to be committing fraud." Where Meta believes an advertiser is engaged in fraud but is less than 95% certain, Meta runs the ad anyway—for a premium. Meta began imposing these "penalty bids" in 2024, well before Meta responded to the relevant discovery requests in 2025.

Reuters also reports that Meta knowingly optimizes ads it is virtually certain are fraudulent. Internal Meta documents estimated that it earned $3.5 billion every six months from ads posing "higher legal risk," "such as those falsely claiming to represent a... public figure," and that 10.1% of its 2024 revenue ($16 billion) came from scams and prohibited ads. With full knowledge of the pervasiveness of fraudulent ads, the company calculated—and then capped—how much revenue it was willing to lose by removing them.

On December 15, a second Reuters report tied this rampant fraud to specific tools at issue in discovery, describing how easily the journalist placed advertisements promoting get-rich-quick schemes.[2] That report recounts how Advantage+ (a tool central to discovery) used AI to generate "more enticing" variants, including suggesting new text that "violated Reuters policy against making false statements."

Two days later, Plaintiff sent Meta a detailed deficiency letter citing these articles. He explained that fraud scoring for post-optimization, pre-auction ad variants is essentially a scorecard for Meta's contributions, measuring how its optimizations affected the fraudulent aspects of an ad, and that fraud scores or penalty pricing assigned to Scam Ads would be responsive to his discovery requests. Meta blew past Plaintiff's requested response dates and ultimately waited almost six weeks to reply, nearly running out the discovery clock. Meta did not deny that it conducts ad-specific fraud scoring post-optimization and pre-output, but it refused to provide Scam Ad fraud

---

[1] "Meta is earning a fortune on a deluge of fraudulent ads, documents show," Reuters, https://www.reuters.com/investigations/meta-is-earning-fortune-deluge-fraudulent-ads-documents-show-2025-11-06/.

[2] "Meta's 'Trusted Experts' helped me run scam ads on Facebook and Instagram," Reuters, https://www.reuters.com/investigations/metas-trusted-experts-helped-me-run-scam-ads-facebook-instagram-2025-12-15/.

scores or any information about that process.

### B. Meta's Must Supplement its Deficient Discovery

Plaintiff seeks to hold Meta to its Rule 26(e) obligations, which require a party to supplement or correct its discovery disclosures and responses when it learns they are "incomplete or incorrect." This duty "extends past the close of discovery." *In re Google RTB Consumer Priv. Litig.*, 2023 WL 3046793, at *2 (N.D. Cal. Apr. 21, 2023). Because the duty is ongoing and relates to *past* discovery requests, the Court need not change any existing deadline or authorize any new discovery—it need only set a deadline for Meta to remedy these deficiencies.

Here, the Reuters reporting revealed that Meta had failed to provide complete and correct responses to Plaintiff's interrogatories and RFPs. Plaintiff notified Meta of those deficiencies on December 17, triggering Meta's Rule 26(e) obligation to timely supplement. Specifically, Meta was and is required to provide information about fraud scoring and penalty pricing as part of "the step-by-step process that occurs" between Input and output, including "all steps taken by Meta" (Interrogatory 1). Such information is also responsive to Plaintiff's requests for documents identifying "every auction or bidding process involving a Scam Ad" (RFP 21).[3]

"Fraud scoring" is not a new request. Although Meta quibbles with terminology, it does not dispute that it engages in numerical fraud scoring [redacted] *See* Interrogatory 1. And Meta's arguments below opposing discovery undercut and defeat one another. Meta primarily argues that fraud scoring is a demand for "new discovery," which Plaintiff "raised *after* fact discovery closed." But Meta also makes the opposite argument—that [redacted] in Meta's Ad Delivery Stack called "ad quality," and Meta has already produced documents about it. Tellingly, though, Meta does not actually assert (nor could it) that it has provided discovery about fraud scoring. Indeed, the sole document it cites gives no indication that Meta numerically scores the likelihood of fraud specifically. *See* Exhibit 6. And its new claim that the "documents make clear that [redacted]" falls well short of disclosing, *in a case about fraudulent ads*, that it scores ads specifically for the likelihood of fraud.

Put simply, Meta's own arguments establish that fraud scoring is within the scope of existing discovery, and Meta has not met its discovery obligations with respect to it. This material deficiency requires prompt correction.

### C. Fraud Scoring Is Relevant to Section 230

Fraud scoring and bid-penalty pricing are relevant to Meta's Section 230 defense in two

[3] Information about fraud scoring is also responsive to Interrogatory 7 and RFPs 17, 29, and 32-37, concerning Ad-Review. Had Meta disclosed that Ad-Review involved numerical fraud scoring, Plaintiff would not have narrowed Interrogatory 7. *See* Dkt. 193. But because fraud scoring is clearly part of the Input-to-output process, there is no need to revisit the Ad-Review issues.

ways.

*First,* Meta's productions confirm that Meta creates different variants of ads and applies different creative optimizations, in different ways, to those variants. Fraud scores subsequently assigned to each variant are likely probative of the extent to which the particular optimizations applied to that variant contributed to the fraudulent aspects of the final ad. Meta's initial response—that the fraud score does not *affect* the contribution—gets the sequence backwards and ignores the point. The fraud score could measure the *effect* of the contribution. Otherwise, Meta puts the cart before the horse with premature merits arguments about imagined stacked optimizations and blue backgrounds—but a post-optimization scorecard of variant-specific fraud is plainly discoverable, and Plaintiff is entitled to discovery to assess its correlations for himself.

*Second,* Plaintiff pleaded and expects to argue at summary judgment that because Meta had scores showing that particular advertisers were fraudsters and nevertheless partnered with them and affirmatively enhanced and optimized their ongoing frauds, Meta was acting as a corrupt ad agency rather than a publisher, and Section 230 does not apply. The immunity adheres only when "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024). Evidence about Meta's knowing enhancement of ads it knows are fraudulent goes to this core requirement. *See* TAC ⁋ 234 (alleging Meta was "knowingly acting as an advertising agency for the Scam Advertisers"). If Meta is not doing what publishers do, Meta is not immune. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Plaintiff does not seek to redefine the contours of Phase One discovery,[4] but he is entitled to basic discovery about fraud scoring and bid-penalty pricing to build these arguments before Meta's immunity is decided.

Finally, if the Court were to apply a good-cause standard, Plaintiff has met it. Meta's discovery gave no indication it conducts fraud scoring, and Plaintiff has diligently pursued this issue since the Reuters reports disclosed this omission (after the close of general fact discovery), including through review of existing discovery, consultation with experts, and this filing. The correction he seeks is targeted and not unduly prejudicial, and it is difficult to imagine evidence more relevant than a material contributor's own scorecard of post-contribution fraud.

### D. Proposed Resolution

(1) Meta must supplement/correct its production to provide, for the Scam Ads, all fraud scores, penalty bids, and related data;

(2) Meta must supplement/correct its response to Interrogatory 1 to describe (a) the fraud-scoring process and the penalty-bid process, including data, signals, metrics, or other considerations used in both; and (b) whether Meta retained ad-specific fraud scores and penalty bids both in general and with respect to the Scam Ads; and

(3) Any relief this Court deems appropriate.

[4] Plaintiff reserves all rights to explore these issues more in Phase Two.

## III. DEFENDANT'S POSITION

This Court should reject Plaintiff's request for discovery into what he calls "fraud scoring." *First*, this Court has already resolved Meta's Phase 1 discovery obligations, and Meta has fulfilled those obligations—no supplementation is required. *Second*, because Plaintiff only pursued discovery into "fraud scoring" *after* fact discovery closed, he must establish good cause to do so. Plaintiff's lack of diligence precludes such a showing.

### I. Meta has fulfilled its Phase 1 discovery obligations, as defined by this Court.

Plaintiff's demand for supplementation should be rejected because Meta fulfilled its Phase 1 discovery obligations—which the parties agreed concerns only material contribution—and the time for Plaintiff to move to compel has passed.

By way of background, through Ad Review, Meta employs tools and strategies to review advertisements for compliance with its advertising policies and standards. *See* Ex. 5 at 11. Meta may reject or take down advertisements when it determines they do not comply with those standards. *See id.*

Meta objected to Plaintiff's discovery requests concerning Ad Review as irrelevant to Phase 1 discovery. *See* Ex. 2 at 18, 20, 24-28. Phase 1 is "directed to facts bearing on Meta's section 230 immunity defense," Dkt. 273 at 1, and limited to "what tools or other processes (whether automated or not) impacted the content of [each alleged scam ad], from the 'input' by a third party to the 'output' to the end user or audience," Dkt. 192 at 1.

Plaintiff moved to compel Meta's response to Interrogatory No. 7, which instructs Meta to "[d]escribe Meta's Ad-Review process step-by-step." Dkt. 187. This Court delineated Meta's obligations with respect to Ad Review.

> [W]hat I think would . . . forestall further discovery . . . is if there were some definitive statement that there's nothing about the ad review process that actually affects -- it's either before the ad gets in, or -- and it doesn't affect any current ad – it's either yes or no, the ad gets in or doesn't get in -- and it doesn't affect any subsequent ad in terms of the content of the ad.

Dkt. 193 at 55.

Accordingly, Meta supplemented its response to Interrogatory No. 7. Meta described Ad Review, and stated that it is [redacted][5] Ex. 5 at 11.

[redacted] the Ad Delivery Stack. [redacted]. The Ad Delivery Stack [redacted]

[5] Perhaps for that reason, Plaintiff does not seek additional discovery into Meta's ad review process.

including an auction, [redacted] Meta's auction relies on multiple factors [redacted] One factor is called "ad quality." One aspect of ad quality [redacted] is known as a [redacted] Although Plaintiff appears to equate ad quality with "fraud scoring," Meta does not have any process that it refers to as "fraud scoring" in the Ad Delivery Stack.

In August 2025, Meta described the Ad Delivery Stack in response to Plaintiff's Interrogatory No. 1, which sought a step-by-step analysis of the life-cycle of an advertisement. *See* Exhibit 4 at 1-2, 6-7. Plaintiff complains that Meta did not detail ad quality in its response. But there was no reason for Meta to do so. After motion practice, the parties agreed that Meta's response would be limited to aspects of the life-cycle that can affect an advertisement's content, consistent with the scope of Phase 1. Meta has not identified evidence that ad quality affects how [redacted], or that ad quality contributes to [redacted] in the Ad Delivery Stack. Meta has also not identified evidence that ad quality impacts [redacted]. Nothing in Plaintiff's submission—or the Reuters' reporting cited—suggests otherwise.

Plaintiff argues specifically that RFP No. 21 and Interrogatory No. 1 are deficient and must be supplemented to include "fraud scoring." *See supra* at 3. But Meta objected to producing documents in response to RFP No. 21 as, among other things, outside the scope of Phase 1 discovery. And Meta served a robust response to Interrogatory No. 1. Plaintiff's deadline to move to compel on both requests expired on November 5, or seven days after the close of fact discovery. *See* Civil L.R. 37-3. Meta fulfilled its discovery obligations as to these requests, and Plaintiff's untimely demand should be rejected.

## II. Plaintiff cannot establish good cause to pursue belated discovery.

In actuality, Plaintiff demands new discovery into "fraud scoring." Because fact discovery closed on October 29, 2025,[6] *see* Dkt. 233 at 2, Plaintiff must establish good cause to pursue this request. *See* Civil L.R. 37-3; Fed. R. Civ. P. 16(b)(4). "In assessing whether there is good cause to modify a scheduling deadline, courts principally consider whether a party has demonstrated diligence." Dkt. 299 at 3. Also pertinent is the likelihood that discovery will lead to relevant evidence. *See, e.g.*, *Sun Grp. U.S.A. Harmony City, Inc.* v. *CRRC Corp.*, 2024 WL 2193311, at *5 (N.D. Cal. 2024).

Plaintiff has not acted with the diligence good cause demands. Meta produced documents concerning the Ad Delivery Stack generally, and ad quality specifically, as early as May 2025. Documents Meta produced identified, *inter alia*, that the Ad Delivery Stack uses ad quality [redacted]. *See, e.g.*, META-0105928, at -31 (produced August 22, 2025). At the recent Lead Counsel Conference, Plaintiff confirmed he had reviewed the materials Meta produced

---

[6] This deadline was subsequently extended only for the completion of Meta's data investigation, *see* Dkts. 301 at 1; 298 at 4, which is unrelated to "fraud scoring."

concerning the Ad Delivery Stack.[7] Yet Plaintiff did not seek additional information or documents concerning the Ad Delivery Stack or ad quality before fact discovery closed. *See AbCellera Biologics Inc.* v. *Bruker Cellular Analysis, Inc.*, 2025 WL 2021885, at *3 (N.D. Cal. 2025).

Plaintiff offers various excuses for his failure to seek discovery concerning "fraud scoring" sooner. None holds water.

*First*, Plaintiff suggests reporting only recently revealed that "fraud scores" indicate whether Meta "materially contributed to the unlawfulness of content." *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024) (citation omitted). He claims that "[f]raud scores subsequently assigned to each variant are probative of the extent to which the particular optimizations applied to that variant contributed to the fraudulent aspects of the final ad." *Supra* at 4. That is unpersuasive. Plaintiff has not identified how the "fraud score" is informative as to Meta's alleged contribution to the misappropriation of his name or likeness specifically. Plaintiff's chief complaint is that advertisements associated with certain "fraud scores" were delivered as impressions. But that is the province of Phase 2 discovery. Moreover, a single "fraud score" assigned to "each variant" [redacted] as a whole means the impact *vel non* of each optimization cannot be assessed individually based on that score. To follow Plaintiff's logic to its absurd conclusion, even if the only optimization was a blue background with all other content inputted by the advertiser, a high "fraud score" would mean Meta contributed to the fraudulent aspect of the advertisement. And the argument that the scoring delta is probative falsely assumes Meta's tools and processes always create a variant. On the contrary, [redacted] can be created when [redacted] Plaintiff cannot rely on this argument in support of this discovery.

*Second*, Plaintiff now "expects to argue" that Meta was not acting as a "publisher" for purposes of Section 230 because of Meta's "knowing enhancement of ads it knows are fraudulent." *Supra* at 4. Plaintiff never sought to explore this "ad agency" theory in discovery, despite having alleged it in his Third Amended Complaint, filed in December 2023. *See* Dkt. 101 ¶ 234. It is now too late. In any event, "[t]he parties . . . agreed" that Phase 1 discovery would "focus[] on whether and how Meta allegedly materially contributed to the allegedly illegal content." Dkt. 164 at 4. Whether Meta is a publisher under Section 230 is entirely different from material contribution. *See Calise*, 103 F.4th at 738.

## IV. <u>WHETHER THE COURT SHOULD HOLD A HEARING</u>

### A. Plaintiff's Position

The Court should conduct a hearing. The issues may be technically complex given that they involve Meta's proprietary systems. In addition, the Court's guidance on past disputes has been productive in resolving the parties' disputes, particularly where, as here, Meta has refused to provide Plaintiff with basic information necessary to narrow or resolve the dispute.

---

[7] Plaintiff complains that these materials "give[] no indication that Meta assesses and numerically scores the likelihood of fraud specifically." *Supra* at 3. But the documents make clear that [redacted] are [redacted]. *See, e.g.*, META-0105928, at -31. Plaintiff had every opportunity to timely seek discovery into Meta's auctions, and did not do so.

### B. Defendant's Position

Meta does not believe a hearing is necessary. This Court has already adjudicated Meta's Phase 1 discovery obligations, which Meta has discharged. Plaintiff cannot establish good cause to seek discovery concerning "fraud scoring" now that the deadline for fact discovery has passed.

## V. CUT-OFF DATES FOR FACT AND EXPERT DISCOVERY

The parties sought, and the Court approved, an extension of the case schedule as follows:

| Event | Deadline |
|---|---|
| Completion of fact discovery | **February 13, 2026** |
| Meta's Motion for Summary Judgment on Section 230 defense and opening expert report(s) (if applicable) | **March 31, 2026** |
| Dr. Forrest's Opposition to Meta's Summary Judgment Motion; Cross-Motion for Partial Summary Judgment (if applicable); and opening expert report(s) (if applicable) | **May 26, 2026** |
| Meta's Reply in Further Support of Summary Judgment; Opposition to Dr. Forrest's Cross-Motion for Partial Summary Judgment (if applicable); and rebuttal expert report(s) (if applicable) | **July 3, 2026** |
| Dr. Forrest's Reply in Further Support of Partial Summary Judgment (if applicable) and rebuttal expert report(s) (if applicable) | **August 4, 2026** |

## VI. COMPLIANCE WITH MEET-AND-CONFER REQUIREMENT

Lead counsel conferred by video conference on February 2, 2026. John Quinn of Hecker Fink represented Dr. Forrest. Walter F. Brown Jr. and Amy L. Barton of Paul, Weiss represented Meta. The parties agreed to file this dispute letter on February 9, 2026.

## VII. ATTACHMENTS

The following discovery requests are attached:

- Exhibit 1: Plaintiff's First Set of Requests for Production
- Exhibit 2: Meta's Responses and Objections to Plaintiff's First Set of Requests for Production
- Exhibit 3: Plaintiff's First Set of Interrogatories
- Exhibit 4 (under seal): Meta's Supplemental Responses & Objections to Plaintiff's Interrogatories No. 1 and 8
- Exhibit 5 (under seal): Meta's Supplemental Responses to Plaintiff's Interrogatories No. 4, 6, 7
- Exhibit 6 (under seal): META-0105928

Dated: February 9, 2026

HECKER FINK LLP

By: */s/ John C. Quinn*
John C. Quinn
Attorney for Plaintiff
Dr. Andrew Forrest

Dated: February 9, 2026

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: */s/ Walter F. Brown*
Walter F. Brown
Attorney for Defendant
Meta Platforms, Inc.