Karen L. Dunn (*pro hac vice*)
kdunn@dirllp.com
Melissa F. Zappala (*pro hac vice*)
mzappala@dirllp.com
**DUNN ISAACSON RHEE LLP**
401 9th Street NW
Washington, DC 20004
Telephone: (202) 240-2900
Facsimile: (202) 240-2050

Meredith R. Dearborn (SBN: 268312)
mdearborn@dirllp.com
**DUNN ISAACSON RHEE LLP**
345 California Street, Suite 600
San Francisco, CA 94104-2671
Telephone: (202) 240-2900
Facsimile: (202) 240-2050

Walter F. Brown, Jr. (SBN: 130248)
wbrown@paulweiss.com
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101

Amy L. Barton (*pro hac vice*)
abarton@paulweiss.com
Thomas Patrick Cordova (*pro hac vice*)
pcordova@paulweiss.com
Anne Simons (*pro hac vice*)
asimons@paulweiss.com
Paloma Rivera (*pro hac vice*)
privera@paulweiss.com
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| DR. ANDREW FORREST, | Case No. 22-CV-03699-PCP (VKD) |
| Plaintiff, | **DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE** |
| v. | |
| META PLATFORMS, INC., | |
| Defendant. | Date:  April 16, 2026<br>Time: 10:00 am<br>Dept.: Courtroom 8, 4th Floor |
| | The Honorable P. Casey Pitts |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.    Plaintiff's Case Focused on Optimizations Only Beginning in September 2023 ...............................................................................2

    B.    As Plaintiff's Legal Theory Evolved, Meta Undertook Reasonable Preservation Efforts ...................................................................4

        1.    *Final Rendered Ads, or Data Sufficient to Recreate Them* ......4

        2.    *Delivery Table and Post-Impression Tables* ...........................5

    C.    Meta's Data Productions Relating to the Alleged Scam Ads ..............8

ARGUMENT ........................................................................................................10

I.    PLAINTIFF'S MOTION IS UNTIMELY......................................................10

II.    PLAINTIFF HAS FAILED TO MAKE OUT THE ELEMENTS OF SPOLIATION ...................................................................................13

    A.    Meta's Duty of Preservation ...............................................................13

    B.    Meta Took Reasonable Steps to Preserve Relevant Information.......13

        1.    *Final Rendered Ads, or Data Sufficient to Recreate Them* ....14

        2.    *Post-Impression and Delivery Tables* ...................................15

    C.    Meta Has Provided a Fair Substitute for the Data that Was Not Retained ...................................................................................17

III.    SANCTIONS HERE ARE NOT WARRANTED........................................20

    A.    There Should Be No Sanctions Under Rule 37(e)(1) Because There Is No Prejudice...................................................................20

    B.    Meta Did Not Intentionally Spoliate Any Data ...............................21

CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akkawi* v. *Sadr*,
No. 2:20-CV-1034-MCE (AC), 2023 WL 6541869 (E.D. Cal. Oct. 6, 2023)......................13

*AMC Tech., LLC* v. *Cisco Syst., Inc.*,
No. 11-cv-3403-PSG, 2013 WL 3733390 (N.D. Cal. July 15, 2013)...................................14

*BlackBerry Ltd.* v. *Facebook, Inc.*,
No. 18-cv-1844-GW (KLS), 2019 WL 13447227 (C.D. Cal. Sept. 30, 2019).....................24

*Burris* v. *JPMorgan Chase & Co.*,
No. 21-cv-16852, 2024 WL 1672263 (9th Cir. Apr. 18, 2024)...........................................23

*Duke* v. *City Coll. of S.F.*,
No. 19-cv-63270.-PJH (SK), 2021 WL 1164939 (N.D. Cal. Mar. 25, 2021).......................10

*Eagle Eyes Traffic Indus. USA Holding LLC* v. *E-Go Bike LLC*,
No. 21-cv-7097-TLT (THS), 2023 WL 6629802 (N.D. Cal. Oct. 10, 2023) .......................10

*In re Facebook Inc. Derivative Litigation*,
C.A. No. 2018-0307, 2025 WL 262194 (Del. Ch. Jan. 21, 2025) .......................................24

*In re Facebook, Inc. Consumer Privacy User Profile Litigation*,
655 F. Supp. 3d 899 (N.D. Cal. 2023) ...............................................................................24

*Glaukos Corp.* v. *Ivantis, Inc.*,
No. 18-cv-620, 2020 WL 10501850 (C.D. Cal. June 17, 2020)..........................................22

*In re Google Play Store Antitrust Litigation*,
664 F. Supp. 2d 981 (N.D. Cal. 2023) ...............................................................................23

*In re Google RTB Consumer Priv. Litig.*,
No. 21-cv-2155-YGR (VKD), 2025 WL 28641 (N.D. Cal. Jan. 3, 2025)............................11

*Gregory* v. *State of Montana*,
118 F.4th 1069 (9th Cir. 2024) ..........................................................................................22

*Herb Hallman Chevrolet, Inc.* v. *GM LLC*,
No. 22-cv-447-MMD (CLB), 2024 WL 3160746 (D. Nev. June 24, 2024).......................15

*hiQ Labs, Inc.* v. *LinkedIn Corp.*,
639 F. Supp. 3d 944 (N.D. Cal. Nov. 4, 2022) ...................................................................22

*Larios* v. *Lunardi*,
442 F. Supp. 3d 1299 (E.D. Cal. 2020)..............................................................................11

*Lopez* v. *Apple*,
No. 19-cv-4577-JSW (SK), 2024 WL 4561320 (N.D. Cal. May 31, 2024) .........................23

*Maziar* v. *City of Atlanta*,
No. 21-cv-2172, 2024 WL 2928534, at *5 (N.D. Ga. June 10, 2024).................................21

*In re Meta Pixel Healthcare Litigation*,
No. 22-cv-3580 (N.D. Cal. Feb. 20, 2025), Dkt. 880 ...........................................................24

*Muhammad* v. *Jenkins*,
No. 19-cv-7970-JAK (PVC), 2022 WL 4292341 (C.D. Cal. Aug. 26, 2022)
*adopted* 2022 WL 4292308 (Sept. 15, 2022).......................................................................11

*Oracle Am., Inc.* v. *Hewlett Packard Enters.*,
328 F.R.D. 543 (N.D. Cal. 2018)...............................................................................14, 15

*Phillips* v. *Netblue, Inc.*,
No. 05-cv-4401-SC, 2007 WL 174459 (N.D. Cal. Jan. 22, 2007) .......................................14

*Scalia* v. *County of Kern*,
658 F. Supp. 3d 809 (E.D. Cal. 2023)..................................................................................17

*Sinsukthaworn* v. *Cnty. of Napa*,
No. 22-cv-4644, 2025 WL 1433821 (N.D. Cal. May 19, 2025), *appeal filed*,
No. 25-3967 ........................................................................................................................20

*Smahi* v. *STMicroelectronics, Inc.*,
789 F. Supp. 3d 690 (N.D. Cal. 2025) ..................................................................................21

*Swensen* v. *Nationstar Mortgage LLC*,
No. 24-cv-553, 2025 WL 1635246 (W.D. Wash. June 9, 2025) .........................................23

*Van* v. *Wal-Mart Stores, Inc.*,
08-cv-5296-PSG, 2011 WL 62499 (N.D. Cal. Jan. 7, 2011)................................................14

*Zubulake* v. *UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................................14

**Other Authorities**

Fed. R. Civ. P. 37................................................................................................ *passim*

N.D. Cal. Civ. Local Rule 7-8(c)..........................................................................10, 11, 12

N.D. Cal. Civ. Local Rule 37.....................................................................................1, 3, 10, 12

Fed. R. Civ. P. Rules and Commentary § 34:22 .........................................................14

The Sedona Principles, Third Edition, 19 Sedona Conf. J. 1, 95 (2018).....................14, 15, 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff's spoliation motion is an untimely overreach filed more than three months after the October 29, 2025 fact discovery deadline. Plaintiff ignored the seven-day deadline set by Civil Local Rule 37-3, despite knowing about the allegedly spoliated data for months. This unreasonable delay alone warrants its denial. Even if considered on the merits, Plaintiff's motion fails the Rule 37(e) analysis.

First, Meta cannot be sanctioned for destroying evidence it never possessed. Plaintiff mischaracterizes certain data at issue by contending that Meta destroyed "final rendered ads," but Meta never possessed such "final rendered ads." The visual renderings of "final" ads that are delivered to users are assembled and displayed *only on end-users' devices*—they were never in Meta's possession.

Second, Meta's preservation efforts were objectively reasonable in light of Plaintiff's evolving allegations. Aside from the final rendered ads that Meta never possessed, Plaintiff complains about allegedly missing data in three data tables Meta proactively disclosed to Plaintiff—two of which contain data regarding optimizations[1] that were applied at rendering ("Post-Impression Tables") and a third that contains data concerning optimizations selected for delivery ("Delivery Table").[2] But Meta did not have a duty to preserve the data contained in these tables beginning in August 2019. These tables relate to optimizations, and it was not until Plaintiff's September 2023 preservation letter that Plaintiff signaled what would become his focus on Meta's ad tools and optimizations, and their impact on ad content. And the Delivery Table did not even exist until March 24, 2023.

Further, Plaintiff distorts the nature and significance of both sets of tables. Plaintiff contends that he wants to "prosecute a misappropriation case that centers around what the Scam Ads looked like and what message they conveyed." Mot. at 15. But the Post-Impression Tables

---

[1] As used here, the term "optimizations" refers to certain tools and processes that may be applied to the text, image, or video (*i.e.*, creative content) or format of ads delivered on Meta's surfaces, such as Facebook Feed or Instagram Stories.
[2] Plaintiff refers to the "Delivery Table" as containing "Actual Optimization Data" in his Motion.

contain data relating to a small randomized sample of impressions delivered on Facebook. The Delivery Table, in turn, identifies the various optimizations that were selected for application to ads at the time they were assembled on end-users' devices. Neither would show exactly how the final rendered ads appeared to users. Overall, Meta engaged in a substantial, good-faith preservation effort and took reasonable steps to preserve large amounts of data relevant to the evolving allegations.

Third, Plaintiff is not prejudiced under Rule 37(e)(1) because any allegedly missing data can be replaced by other data Meta has produced. Further, to dispel any notion of prejudice, Meta is proposing that Plaintiff be permitted to presume that any optimization created for any rendered ad for which complete delivery data does not exist in Meta's productions was, in fact, used in a rendered ad. Because this substitute may afford Plaintiff a broader set of relevant optimizations to rely on than the alleged missing data which reflect only the optimizations that were, in fact, applied, there is no prejudice to cure.

Finally, even if the Court determines that Meta spoliated data, Plaintiff cannot establish the specific intent to deprive required for severe sanctions under Rule 37(e)(2). Plaintiff's accusation that Meta failed to retain relevant data in these tables due to some "litigation 'playbook,'" Mot. at 19, ignores both the unforeseeability of Plaintiff's shift in his theory of material contribution and the complexity of Meta's data systems. Further, Meta's lack of intent is demonstrated by its proactive disclosure of the limited retention periods of the Post-Impression and Delivery Tables and its immediate, good-faith efforts to locate and produce the requested data from alternative Hive tables. Even now, Meta has proposed a substitute that may be more advantageous to Plaintiff than any data that may have been lost. Plaintiff's demands for sanctions should be denied.

**STATEMENT OF FACTS**

A.    Plaintiff's Case Focused on Optimizations Only Beginning in September 2023

Plaintiff misleadingly suggests Meta has been on notice of the need to preserve data concerning optimizations and their impact on ads since 2019. Not so. From Plaintiff's 2019

letter until late 2023, Plaintiff was squarely focused on Meta's role in allowing third parties to run and target allegedly fraudulent ads on its platforms.

From Plaintiff's initial correspondence in 2019 through his Second Amended Complaint filed in June 2022 (the "SAC"), Plaintiff's only theory was that Meta was responsible for allowing alleged Scam Ads—concededly created by third-parties, Dkt. 1-3 ¶¶ 110, 112—to run on its platforms. *See, e.g., id.*; Dkt. 314-4; Declaration of Walter F. Brown, Jr. ("Brown Decl."), Exs. A at 3; B; C. Plaintiff also contended that Meta was somehow responsible for creating these alleged Scam Ads because Meta provided tools to target these alleged Scam Ads to users. *See, e.g., id.* The SAC mentioned only one specific Meta optimization tool, Dynamic Creative,[3] buried among generalized allegations about how ads are created and targeted. Dkt. 1-3 ¶ 128. Plaintiff's preservation correspondence was similarly focused on details concerning ads themselves. *See, e.g.,* Brown Decl., Ex. A at 3 (requesting that for specific ads, Meta preserve information about the identity of the advertiser and information about the distribution of the advertisement, such as a unique identifier, period of display, views, location of viewership, destination URL, snapshots of any destination URL content, and clicks data).

It was not until September 1, 2023, when Plaintiff sent Meta broad preservation requests, including requests to preserve data relating to the use of optimization tools such as Dynamic Creative and Advantage+ as related to certain alleged Scam Ads,[4] that Plaintiff conveyed an intent to focus on how Meta's ad tools acted on the creative content of ads. *Id.*, Ex. D. Plaintiff then confirmed this shift in his allegations with his Third Amended Complaint ("TAC") on December 1, 2023. *See* Dkt. 101.

---

[3] Dynamic Creative is a functionality available through Ads Manager, Meta's public ad creation interface, that allows an advertiser to upload multiple creative elements that can be mixed and matched to generate different ad variations. Brown Decl., Ex. H at 17.

[4] Meta defines Scam Ads as ads that "run on Meta's Australian social media platforms, in which [Plaintiff] falsely appears to be promoting fake cryptocurrency and other fraudulent financial schemes." Dkt. 101 ¶ 1. Meta identified 28,296 alleged Scam Ads. Brown Decl. ¶ 4 n.3. Plaintiff claims Meta set a "unilateral" cut-off date for the alleged Scam Ads as January 31, 2025. Mot. at 8. But the parties had to utilize some end date to facilitate Meta's searches. Meta informed Plaintiff of its cut-off date, and Plaintiff never challenged that limitation. Brown Decl.¶ 4 n.3. The time to do so has long passed. *See* N.D. Cal. Civ. L.R. 37-3.

B.    As Plaintiff's Legal Theory Evolved, Meta Undertook Reasonable Preservation Efforts

Meta has continuously taken reasonable steps to preserve information potentially relevant to Plaintiff's theory of material contribution as it has evolved over the years.  Plaintiff's allegations to the contrary rest on factual errors and misunderstandings about the data Meta has produced and the three categories of data allegedly spoliated:  (1) final rendered alleged Scam Ads ("Final Rendered Ads"), or data sufficient to recreate them; (2) two Hive[5] tables logging post-impression data (ad_post_impression_rendering_validation and ad_client_render_events; together, the "Post-Impression Tables"); and (3) one Hive table logging delivery data (fct_creative_delivery_metrics; the "Delivery Table").  As Plaintiff's focus turned to creative optimizations, Meta expended significant efforts investigating the process of ad creation and delivery, and associated relevant data.

1.    *Final Rendered Ads, or Data Sufficient to Recreate Them*

Meta took steps to preserve alleged Scam Ads as soon as it had sufficient information from Plaintiff to do so.  Plaintiff began identifying certain alleged Scam Ads and related pages to Meta in April 2023 and continued identifying additional ads over the next several months.  *See, e.g.*, Dkt. 314-7, 313-8, 314-8, and Brown Decl., Ex. D.  Each time, Meta took steps to preserve available ads and pages with valid IDs through its proprietary production tool, Switchboard.[6]  Brown Decl. ¶¶ 4–5.  But Meta could not preserve what Plaintiff alleges Meta destroyed, "final rendered Scam Ads," Mot. at 8, through Switchboard or otherwise, because Meta does not possess Final Rendered Ads in the first place.

Final Rendered Ads existed only on end-user devices.  Meta does not create or store on

---

[5] Hive is a data warehouse comprising millions of data tables that are used for data analysis, business intelligence, and reporting.  Brown Decl. ¶ 9.  Hive is Meta's most readily accessible source of historical ad data for production.  *Id.*

[6] Switchboard is used to preserve and produce various creative components of ads (*e.g.*, text, image, and/or video) and ad metadata (*e.g.*, impressions, clicks, reach, and demographic information concerning users who received the ad).  *Id.* ¶ 5.  Meta's statement in its January 21, 2025 letter, Dkts. 313-9, 314-9, that it retains versions of ads delivered to end-users referred to Switchboard preservations, Brown Decl. ¶ 6.  After further investigation, Meta explained to Plaintiff in July 2025 that while Meta uses Switchboard to produce the ad components, Meta does not possess the Final Rendered Ads as delivered to the end-user in the ordinary course of business.  *Id.*

its servers visual representations of rendered impressions,[7] nor has it at any point during the relevant period. Declaration of Robert Tobkes ("Tobkes Decl.") ¶ 6; Declaration of Qiliang Zhu ("Zhu Decl.") ¶ 6. Ads are not assembled on Meta's servers, but rather on the end-user's device. Tobkes Decl. ¶ 4; Zhu Decl. ¶ 4. When an end-user browses Facebook or Instagram, their device sends a request to Meta's servers for an ad. Tobkes Decl. ¶ 5; Zhu Decl. ¶ 5. Meta's delivery system then locates an ad to deliver and determines the optimizations to apply. *Id.* Meta packages the components of the ad (*e.g.*, text, a link to the image or video to be displayed, optimizations) and delivers that information to the end-user's device. *Id.* Code on the end-user's device then assembles and renders the ad. Tobkes Decl. ¶ 4; Zhu Decl. ¶ 4. Accordingly, the rendered impression only ever exists on the end-user's device. Tobkes Decl. ¶¶ 4–6; Zhu Decl. ¶¶ 4–6.

Nor is Meta aware of any "data sufficient to recreate" Final Rendered Ads, Mot. at 7, since such recreation is functionally not possible. Meta does not store complete packages of information necessary to render each impression of an ad. Tobkes Decl. ¶ 9; Zhu Decl. ¶ 9. But in any event, it is not possible to recreate a visual representation of any of the 28,296 alleged Scam Ads exactly as they would have been rendered on an end-user's device when delivered during the relevant period. Tobkes Decl. ¶ 10; Zhu Decl. ¶ 10.

2.    *Delivery Table and Post-Impression Tables*

Until Plaintiff's September 1, 2023 letter requesting preservation of data related to the use of ad tools on alleged Scam Ads, there was no reason for Meta to consider preservation of optimization data as it was not a focus of Plaintiff's theory of material contribution. But after that time, Meta worked to investigate and preserve appropriate data sources.

By September 2023, Meta had preserved an anonymized version (all_ads_details_anon) of a table it later produced from (all_ads_details) because that table logs a broad set of information concerning ads delivered on Meta's surfaces.[8] Brown Decl. ¶ 11. That table

---

[7] An "impression" is each instance where Meta renders (*i.e.*, displays) an Advertisement to an end-user's screen. *See* https://www.facebook.com/business/help/675615482516035, last visited March 22, 2026.
[8] The version of the table that Meta produced from, all_ads_details, had an indefinite retention during the relevant period. Brown Decl. ¶ 11.

included information relevant to the focus of Plaintiff's claims prior to September 2023, but also happened to include data relating to the optimizations selected by advertisers for any alleged Scam Ad. *Id.*

In late summer 2024, Meta conducted additional investigation into the ad creation and delivery process, including investigation into data reflecting optimizations. *Id.* ¶ 8. Meta also searched for additional relevant data in Hive tables. *Id.* This was no easy feat. Meta has millions of Hive data tables used for data analysis, business intelligence, and reporting that could contain ad data. *Id.* ¶ 9. Identifying relevant data within Hive is a complicated process, requiring identifying and working with subject-matter experts to identify the specific Hive table and particular fields containing relevant data within that Hive table, and to confirm the data captures the intended information. *Id.* ¶ 10. As a result of this investigation, Meta identified and preserved additional Hive tables in September and October 2024, including dim_ad_creative_optimization, which logs optimizations created and eligible for delivery for ads. *Id.* ¶ 12.

As Meta continued to develop its factual understanding as related to Plaintiff's allegations in the TAC, it learned on March 5, 2025 that optimizations an advertiser selected during ad creation might not necessarily be delivered, and that separate data existed concerning optimizations applied to rendered (*i.e.*, delivered) ads. *Id.* ¶ 13. Ads on Meta's platforms go through complex back-end processes that result in the creation and storage of various ad components and optimizations and the selection of which components and optimizations to deliver with each impression of an ad. *Id.* As part of its ongoing investigation, Meta worked with numerous subject-matter experts to develop an understanding of the process of creating and delivering an ad, which is briefly summarized below:

1.  Advertiser Creation:  An advertiser creates an ad in Ads Manager, defined at Meta as an L1 object, and the advertiser can opt into various optimizations. *Id.*, Ex. H at 7, 9–11. An advertiser presses "publish" to complete the ad creation process in Ads Manager. *Id.* at 11.

2. <u>Generation of Ad Components</u>:  Meta then creates at least one iteration of that ad, known as an L0.  *Id.*  For each L0, Meta may generate creative optimizations, including ones based on the selections made by an advertiser in Ads Manager (*e.g.*, Advantage+ creative enhancements), and store them with the L0 for potential future delivery.  *Id.* at 11–13.

3. <u>Ad Delivery</u>:  Meta's ad delivery system, the Ad Delivery Stack, determines which L0 is delivered to an end-user as an impression and which creative optimizations are applied to that L0, through a series of algorithmic ranking systems and rules.  *Id.* at 13.  An impression is otherwise known as a "rendered ad."  *Id.* at 14.

In light of this information, Meta redoubled its efforts to identify potential Hive data logging the optimizations delivered with ads.  Brown Decl. ¶ 14.  Meta identified the Delivery Table on April 28, 2025 and preserved it on April 29, 2025.  *Id.*  This table logs data identifying ads that were delivered as impressions and the optimizations applied to those ads.  *Id.*  Meta extracted the data that was then available for the alleged Scam Ads at issue, which covers about three months of the relevant period, from November 2024 through January 2025, and produced it to Plaintiff on July 25, 2025.  *Id.* ¶ 15.  Although Plaintiff complains about supposed deficiencies in Meta's preservation efforts going back to 2019, the Delivery Table was not created until March 24, 2023.  *Id.* ¶ 14.  The table also only identifies *what* optimizations were applied to an ad—it does not contain information showing *how* the optimizations appeared as applied to the ad.  *Id.* ¶ 16.  In other words, it does not contain any visual representations of what the optimizations looked like as applied, and therefore does not show what ads looked like as delivered impressions.  *Id.*

Nevertheless, given the relevance of the Delivery Table to Plaintiff's material contribution theory, Meta disclosed to Plaintiff in a July 11, 2025 letter that the Delivery Table existed, that it had a limited retention period due to its size, and that Meta only had about three months of data available in the table for the relevant time period.  Dkts. 313-13, 314-14 at 5.  Meta also informed Plaintiff that it was working to identify and produce any additional responsive ad delivery data it could locate.  *Id.*

Meta continued to look for additional data concerning optimizations applied to delivered

impressions of alleged Scam Ads. Brown Decl. ¶ 18. In the end of May 2025, as part of that investigation, Meta identified another table, ad_convs_annotated_v2_offsite, which provides information concerning the optimizations delivered for certain impressions of the alleged Scam Ads, and produced available data in this table relating to the alleged Scam Ads to Plaintiff on September 19, 2025. *Id.* This production captures data relating to impressions of over 11,000 alleged Scam Ads. *Id.*

Meta also identified the Post-Impression Tables. *Id.* ¶ 19. These tables capture certain data about a random sample of rendered impressions that the Facebook application on an end-user's device sends back to Meta at the time of rendering, including the optimizations that were applied to the ad. Declaration of Tom Cheng ("Cheng Decl.") ¶ 5. Plaintiff's motion elides that these tables are heavily sampled. As of December 17, 2025, the sample rate of the ad_post_impression_rendering_validation table was 0.15%. *Id.* ¶ 6. This means that only 0.15% of the impressions delivered on Facebook daily would be logged in the table. *Id.* The sampling of ad_client_render_events is similarly limited—0.22% as of December 17, 2025. *Id.* Even this limited data requires significant storage space. Each of the Post-Impression Tables logs hundreds of gigabytes of data every day, and thus they have limited retention periods (as of December 17, 2025, 60 days and 30 days, respectively). *Id.* ¶ 8.

When Meta identified the Post-Impression Tables, they did not contain any data from the relevant time period as a result of their short retention periods. Brown Decl. ¶ 20; Cheng Decl. ¶ 8. Given the heavily-sampled nature of these tables, they potentially would not have contained data concerning any alleged Scam Ads. *Id.* Meta nonetheless disclosed them to Plaintiff on October 17, 2025. *Id.*

C.    Meta's Data Productions Relating to the Alleged Scam Ads

Separate from the allegedly spoliated data, Meta has produced an expansive trove of data concerning the alleged Scam Ads and optimizations that Meta created for those ads. Brown Decl. ¶¶ 21–23. Meta has produced components of each alleged Scam Ad, including text, URL landing page, and images or videos, along with certain ad metrics like impressions, clicks, and reach, from Switchboard. *Id.* ¶ 7. Meta produced millions of rows of data spanning hundreds

of columns from 18 separate Hive tables, including data identifying the creative components of an ad (dim_ad_creatives) and data that identifies which optimizations were created and eligible for delivery of an ad (dim_ad_creative_optimization). *Id.* ¶ 21.

Meta also produced extensive information to show not just *what* optimizations could have been applied to ads, but *how* the optimizations operated. *Id.* ¶ 22. After conferring with Plaintiff on a list of optimizations, Meta investigated whether its "Production Stores"[9] contained "Interim Outputs" for this list of optimizations. *See id.*, Ex. E at 37:10–13, 40:24–41:4; *see also* Dkt. 284. Meta will use the term "Interim Outputs" to refer to images, videos, text, and other outputs that reflect the application of a Meta optimization (*e.g.*, an image reflecting cropping or filters, or portions of advertiser text selected for highlighting). To allow Meta the time needed to complete this additional data investigation and production of Interim Outputs, this Court granted two extensions of the October 29, 2025 fact discovery deadline, limited to that purpose. Dkts. 287, 301.

During that limited extended discovery period, Meta produced exports of data from several "Ents" in the Production Stores: EntAdCreativeOptimizationInfo, EntAdAsset, EntAdImageSubstitutes, and EntAdVideoSubstitutes. Brown Decl. ¶ 22. These exports contain data that identify which optimizations from Plaintiff's list were created and eligible for delivery for a given alleged Scam Ad. *Id.*, Ex. H at 12–13, 19–39. They also contain information about the Interim Outputs. *Id.* In some cases, the exports provide the Interim Outputs themselves, such as text reflecting the application of the text generation optimization, together with the advertiser-provided text.[10] *See, e.g.*, *id.* at 19. In other cases, they provide an identifier that points to an Interim Output image or video that could be retrieved from another location in the Production Stores. *Id.* at 12. Meta extracted from its Production Stores and produced all available image and video Interim Outputs identified in EntAdAsset, EntAdImageSubstitutes,

---

[9] "Production Stores" is the framework that Meta uses to store, among other things, ad media and metadata used in the delivery of ads. Dkts. 274-4, 275-5. Information in the Production Stores is accessible through objects called "Ents." Brown Decl., Ex. H at 12.
[10] Meta's Text generation optimization uses Meta's Generative AI models to generate up to five variations of primary text and headline text based on the advertiser's original text. Brown Decl., Ex. H at 10.

and EntAdVideoSubstitutes that related to the optimizations Plaintiff asked Meta to investigate pursuant to Judge DeMarchi's October order.[11]  Brown Decl. ¶ 22.

Although Plaintiff dismisses the production of this information as "bits of multimedia or pieces of ads" that "lack a clear record of what optimizations made what changes," Mot. at 13, the exports and metadata produced with the Interim Outputs enable both Plaintiff and the Court to evaluate how the relevant optimizations impacted the content of the alleged Scam Ads.  *See* Brown Decl., Ex. H at 12–13; *see, e.g.*, *id.*, Ex. G.  Optimizations that require the creation of new assets, such as Image generation or video cropping, cannot be created in the Ad Delivery Stack.  *Id.*, Ex. H at 24, 26–28; Zhu Decl. ¶ 11.  The available Interim Outputs will thus reflect how the optimization impacted the alleged Scam Ad had it been delivered.  Zhu Decl. ¶ 11.

## ARGUMENT

### I.    **Plaintiff's Motion Is Untimely**

Plaintiff was obligated to comply with the timing requirements under Civil Local Rules 7-8(c) and 37-3.  He complied with neither, and Plaintiff's Motion should be denied as untimely.

Under Civil Local Rule 37-3, spoliation motions must be filed within seven days after the discovery cut-off.  N.D. Cal. Civ. L. R. 37-3.  Courts have required strict compliance with Local Rule 37-3.  *See Eagle Eyes Traffic Indus. USA Holding LLC* v. *E-Go Bike LLC*, No. 21-cv-7097-TLT (THS), 2023 WL 6629802, at *1 (N.D. Cal. Oct. 10, 2023) (explaining that Local Rule 37's "formulation is prohibitory" and untimely discovery motions are "not permitted"); *Duke* v. *City Coll. of S.F.*, No. 19-cv-63270.-PJH (SK), 2021 WL 1164939 at *2 (N.D. Cal. Mar. 25, 2021) (denying discovery motion filed 19 days after Civil Local Rule 37-3 deadline).  Here, Plaintiff should have filed his motion following the October 29, 2025 close of fact discovery

---

[11] As Meta reported to Plaintiff, certain of the optimizations identified by Plaintiff for investigation do not create Interim Outputs in the ordinary course of business because the optimizations are performed at the time the ad is rendered to a user.  Brown Decl., Ex. F at 3, 5. For example, an overlay optimization can be applied at rendering, but uses text that is provided or adopted by the advertiser in Ads Manager.  *Id.*, Ex. H at 29–33.  Although there are no Interim Outputs reflecting the application of these optimizations, no new images or videos are generated during the Ad Delivery Stack process related to those creative optimizations that may be applied at rendering.  Zhu Decl. ¶ 11.  Such optimizations apply on top of previously generated assets. *Id.*

Case 5:22-cv-03699-PCP   Document 355   Filed 04/13/26   Page 15 of 29

deadline. *See* Dkt. 233. Plaintiff was thus required to file any motion by November 5, 2025, but failed to do so.

Civil Local Rule 7-8(c) also requires that a spoliation motion be brought "as soon as practicable after . . . learn[ing] of the circumstances that [he] alleges make the motion appropriate." "It is well-established that 'unreasonable delay can render a spoliation motion untimely.'" *Muhammad* v. *Jenkins*, No. 19-cv-7970-JAK (PVC), 2022 WL 4292341, at *7 (C.D. Cal. Aug. 26, 2022) (citation omitted), *adopted* 2022 WL 4292308 (Sept. 15, 2022); *Larios* v. *Lunardi*, 442 F. Supp. 3d 1299, 1305–06 (E.D. Cal. 2020) (denying spoliation motion filed almost nine months after the close of fact discovery and collecting cases across federal courts doing the same) (citation omitted); *accord In re Google RTB Consumer Priv. Litig.*, No. 21-cv-2155-YGR (VKD), 2025 WL 28641, at *5 (N.D. Cal. Jan. 3, 2025) (denying spoliation motion as untimely in part because the plaintiff did not show "that they brought the motion 'as soon as practicable' after learning the grounds for the motion").

Plaintiff indisputably knew of the alleged preservation issues months before filing this motion. Plaintiff concedes that Meta first disclosed the limited Delivery Table data and lack of Final Rendered Ads in July 2025, and the lack of data in the Post-Impression Tables in mid-October 2025. Mot. at 8. Meta also reported during the October 21, 2025 conference before Judge DeMarchi that it produced some delivery data, but not all, and that it did not have Final Rendered Ads. Brown Decl., Ex. E at 18:3–19:1. At that conference, Plaintiff raised concerns about preservation, *id.* at 26:18–19, but waited months to bring his Motion.

Plaintiff attempts to demonstrate good cause for failing to comply with both local rules by claiming that he could not assess the scope of the alleged preservation failures until February 6, 2026, the deadline for Meta's production of Interim Outputs. *See* 313-4, 314-1 ¶ 42. But that argument does not excuse his failure to comply with either Civil Local Rules 7-8(c) or 37-3.

First, Judge DeMarchi already found the October 29, 2025 discovery deadline applicable to the very issues Plaintiff raises in his motion. In November 2025, Plaintiff provided Meta with proposed Requests for Admission (RFAs) seeking admissions regarding Meta's alleged spoliation. *See* Dkt. 293. Judge DeMarchi denied Plaintiff's request to serve the majority of the

META'S OPPOSITION TO PLAINTIFF'S MOTION
FOR SANCTIONS RE: SPOLIATION OF EVIDENCE         - 11 -          CASE NO. 5:22-CV-03699-PCP (VKD)

RFAs on the grounds that "first phase" discovery had closed October 29, 2025, except as to Meta's ongoing Interim Outputs investigation and production and an issue with Plaintiff's privilege logging, and Plaintiff had been on notice of the alleged spoliation prior to that date. Dkt. 299 at 2–3. Judge DeMarchi permitted Plaintiff to serve a small subset of the RFAs relating to the Post-Impression Tables because Plaintiff did not have notice of the alleged spoliated data in sufficient time to serve RFAs. Dkt. 299 at 3–4. But nothing prevented Plaintiff from bringing a spoliation motion on that data by November 5. Instead, Plaintiff still waited over a month beyond Meta's January 5, 2026 RFA answers to file his spoliation motion. *See* Dkts. 313-14, 314-15.

Second, although the parties extended fact discovery, it was for the limited purpose of allowing Meta to complete the Court-mandated investigation into Interim Outputs. *See* Dkt. 299 at 2. The allegedly spoliated data does not relate to any Interim Output that Meta produced after the close of fact discovery on October 29, 2025.[12] The Interim Outputs provide information on *how* the optimizations were applied to components of the alleged Scam Ads, while the Delivery Table and Post-Impression Tables merely identify *what* optimizations were delivered without any visual renderings. The Interim Outputs relate to post-creation, pre-delivery data, not the delivery data Plaintiff alleges was spoliated.[13] Neither of Plaintiff's data dispute letters in August and October 2025 framed his requests as related to the now-alleged spoliation, Dkts. 240-3, 262, 274, 275-3, and Meta's investigation and production of Interim Outputs after the October 29, 2025 deadline was not intended to cure any alleged spoliation. *See infra* at 18 n.17, 20–21.

Having failed to show good cause for his delay, Plaintiff's Motion is untimely under Local Rules 7-8(c) and 37-3 and should be denied for that reason.

---

[12] Meta had previously made clear that its investigations into Production Stores would not remediate the data no longer contained in the Post-Impression and Delivery Tables. *See* Dkts. 274-4 at 2 (noting that the Production Stores "do not contain impression-level data concerning creative optimizations that were applied to ads."), 275-5.

[13] Indeed, Plaintiff represented to the Court that these Interim Outputs "post ads manager pre-rendering are the ones [he is] most interested in" because he understood that "the most material contributions" are made just after creation "as opposed to at the stage of rendering." Brown Decl., Ex. E at 35:6–10.

## II.   **Plaintiff Has Failed to Make Out the Elements of Spoliation**

While the Court need not reach the merits of Plaintiff's Motion for the reasons explained above, Plaintiff has also failed to meet his burden with respect to the elements of spoliation of evidence. Plaintiff bears the burden of proving his spoliation claim by a preponderance of the evidence. *Akkawi* v. *Sadr*, No. 2:20-CV-1034-MCE (AC), 2023 WL 6541869, at *1 (E.D. Cal. Oct. 6, 2023). Meta had no duty to preserve comprehensive optimization data before Plaintiff provided notice that such issues would be relevant to his claims. After that point, Meta took reasonable preservation steps in light of the notice and facts available to it at the time. Meta is further affirmatively offering a fair substitute for any allegedly missing data, which addresses replacement of data concerns. The Court should therefore find that Plaintiff has not met his burden with regard to the elements of spoliation.

### A.   Meta's Duty of Preservation

Meta accepts that Plaintiff's preservation correspondence, beginning in 2019, and his filing of this lawsuit on September 17, 2021, followed by three amended complaints, triggered a preservation duty. But as set forth below, Plaintiff vastly overstates and misrepresents the scope of Meta's duty during that time period.

### B.   Meta Took Reasonable Steps to Preserve Relevant Information

Meta took reasonable steps to preserve relevant evidence. As to the Final Rendered Ads, there can be no failure to preserve evidence that Meta never possessed. And the fact that Meta did not suspend auto-deletion policies on three Hive tables contained in Meta's vast data warehouses in time to preserve data in them from the relevant time period does not contradict the fact that Meta took reasonable steps to preserve data related to Plaintiff's claims dating back to 2019.

While reasonable steps, in light of the notice provided to a litigant, must be taken, the Federal Rules of Civil Procedure do not require that every scrap of paper (or data) be identified and preserved. *See* Fed. R. Civ. P. 37(e) Adv. Comm. Notes (2015) (noting that "[d]ue to the ever-increasing volume of [ESI] and the multitude of devices that generate such information, perfection in preserving all relevant [ESI] is often impossible," and "'reasonable steps' . . . does

not call for perfection"); *accord* The Sedona Principles, Third Edition, 19 Sedona Conf. J. 1, 95 (2018) (organizations "need not preserve every email or electronic document," as "requir[ing] such broad preservation would cripple organizations that almost always are involved in litigation, and make discovery even more costly and time-consuming"); *AMC Tech., LLC* v. *Cisco Syst., Inc.*, No. 11-cv-3403-PSG, 2013 WL 3733390, at *3 (N.D. Cal. July 15, 2013) ("[T]he scope of this duty [to preserve] is not limitless."). A party is only obligated to preserve what it "knows or reasonably should know" may be relevant to a litigation. *Oracle Am., Inc.* v. *Hewlett Packard Enters.*, 328 F.R.D. 543, 549–50 (N.D. Cal. 2018) (noting that "even when a claim is anticipated, the full scope of preservation may not be reasonably foreseeable"); *Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (a party must preserve "what it knows, or reasonably should know" is relevant or likely to be requested in discovery) (citation modified). Proportionality informs the evaluation of reasonableness. *See* 19 Sedona Conf. J. at 95–96.

### 1.    *Final Rendered Ads, or Data Sufficient to Recreate Them*

Plaintiff's claim that Meta "failed to retain *any* final rendered Scam Ads," Mot. at 11, ignores a critical fact: Meta does not create or store renderings of ad impressions on its servers. Tobkes Decl. ¶¶ 4–6; Zhu Decl. ¶¶ 4–6. Ads are assembled on end-users' devices, and thus Meta never possessed any final rendering of the alleged Scam Ads. *Id.* There is no preservation or spoliation issue as to the Final Rendered Ads because "[o]ne cannot keep what one does not have." *Phillips* v. *Netblue, Inc.*, No. 05-cv-4401-SC, 2007 WL 174459, at *3 (N.D. Cal. Jan. 22, 2007). Plaintiff may wish Meta had such renderings, but it did not, and Meta had no obligation to create new records for discovery in this case. 1 Federal Rules of Civil Procedure, Rules and Commentary § 34:22 ("The responding party is not required to create a document that does not exist.") (citations omitted); *accord Van* v. *Wal-Mart Stores, Inc.*, 08-cv-5296-PSG, 2011 WL 62499, at *1 n.1 (N.D. Cal. Jan. 7, 2011) ("A party responding to a Rule 34 document request cannot be compelled to prepare or create new documents.") (citations omitted).

Plaintiff also claims to seek data sufficient to recreate each rendered impression of a Scam Ad. Mot. at 7–8. Again, such information—that is, the package of information needed to

render each impression of every ad run by Meta—is not stored by Meta.  Tobkes Decl. ¶ 9; Zhu Decl. ¶ 9.  In any event, it would not be possible to reconstruct ad impressions exactly as they would have appeared on user devices when delivered during the relevant period.  Tobkes Decl. ¶ 10; Zhu Decl. ¶ 10.

## 2.   *Post-Impression and Delivery Tables*

Plaintiff also alleges that Meta failed to take reasonable steps to preserve evidence by not suspending the auto-deletion of the Post-Impression and Delivery Tables, claiming that the Post-Impression Tables "could well contain" relevant data about alleged Scam Ads, and that had Meta suspended the auto-deletion of the Delivery Table in August 2019, the data would be complete as to delivered optimizations for the full relevant time period.  Mot. at 11–12.  As an initial matter, the Delivery Table was not created until March 24, 2023.  Brown Decl. ¶ 14.  There can be no preservation failure before the table even existed.  Even after it and the Post-Impression Tables existed, however, the fact that Meta did not discover these tables earlier and suspend their retention policies does not preclude a finding that Meta took reasonable preservation efforts.

It was reasonable that Meta did not locate or place the Post-Impression and Delivery Tables on hold earlier because between his 2019 letters and September 1, 2023 preservation letter, Plaintiff focused on Meta's allowance of alleged Scam Ads on its platforms and its targeting them to end-users, including in his efforts to preempt Meta's anticipated Section 230 defense.  *See, e.g., id.*, Ex. B ¶ 80.  Plaintiff did not raise substantive and specific allegations concerning the impact of Meta's creative optimizations on the alleged Scam Ads until the December 2023 TAC, following his September 1, 2023 preservation request.  *See supra* Section A.  A party's preservation efforts should extend to discovery that it can foresee would be relevant, but Meta was under no obligation to place on hold Hive tables related to creative optimizations when Plaintiff had given no indication he intended to focus on claims about such optimizations.  *See* 19 Sedona Conf. J. at 95 (organizations "need not preserve every email or electronic document"); *Oracle Am.*, 328 F.R.D. at 549.  For example, in *Herb Hallman Chevrolet, Inc.* v. *GM LLC*, No. 22-cv-447-MMD (CLB), 2024 WL 3160746, at *6–7 (D. Nev. June 24, 2024), where the plaintiff's pre-litigation correspondence focused on one theory of

liability and its complaint then raised additional theories, the court found it was objectively reasonable that the defendant assumed the allegedly spoliated ESI would not be the basis of the plaintiff's additional eventual allegations and denied plaintiff's spoliation motion.  So too here.

As the litigation continued, Meta conducted additional investigation into the ad creation and delivery process, including investigation into data reflecting optimizations.  Brown Decl. ¶ 8–23.  It took time to investigate Meta's complex ad creation and delivery system to understand where relevant data might be stored among Meta's decentralized Hive storage system.  Meta first identified the Delivery Table at the end of April 2025, preserved it, extracted the data that was available as to the alleged Scam Ads for the relevant time period, and worked to identify alternative sources of data concerning delivered optimizations.  *Id.* ¶¶ 14–15, 18–19.  As part of that additional investigation, Meta identified the ad_convs_annotated_v2_offsite table, from which it produced data relating to over 11,000 rendered ads, and the Post-Impression Tables, which did not contain data for the relevant time period due to their limited retention periods.  *Id.* ¶¶ 18–20; Cheng Decl. ¶ 8.  Meta disclosed the non-retention of each of the three tables promptly and worked diligently to identify as much similar data as possible.  Dkts. 313-13, 314-14 at 5; Brown Decl. ¶ 20.  These efforts are entirely consistent with Meta's obligation to make reasonable, good-faith efforts to identify and preserve relevant evidence, based on its understanding of the scope of the case at the time.  *See* 19 Sedona Conf. J. at 95 (recognizing that "[p]reservation obligations may expand . . . as the contours of claims and defenses are clarified during the pendency of a matter").  In the face of limited notice regarding the scope of a litigation, "[i]t is important not to be blinded . . . by hindsight arising from familiarity with the action as it is actually filed."  Fed. R. Civ. P. 37(e) Adv. Comm. Notes (2015).

Finally, as to the Post-Impression Tables, it would not have been proportional to put these tables on hold for six years and counting.  *Id.* ("Another factor in evaluating the reasonableness of preservation efforts is proportionality.").  Plaintiff ignores that these tables are highly sampled and consume hundreds of gigabytes of storage a day.  Cheng Decl. ¶ 9.  The chances that any impression of an alleged Scam Ad would appear in the tables are exceedingly low, and even if one or two impressions of an alleged Scam Ad were captured, that would not provide a full

picture of delivered impressions for that one single ad, let alone all the ads at issue in the litigation.[14]

C.    Meta Has Provided a Fair Substitute for the Data that Was Not Retained

To prevail on his motion, Plaintiff must establish that the lost ESI that allegedly should have been preserved "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Meta has provided data that it believes provides a fair substitute to the Delivery Table that mitigates the missing optimization data contained in the Delivery Table.[15]  Plaintiff's arguments to the contrary fail.

Plaintiff first argues that none of the data that Meta produced would "allow Plaintiff to recreate what any final Scam Ad looked like or what changes Meta's tools and process actually made as each final Scam Ad came together." Mot. at 12.  But only Final Rendered Ads would show what a final delivered alleged Scam Ad looked like to an end-user, and those never existed at Meta for the alleged Scam Ads at issue. Tobkes Decl. ¶¶ 4–6; Zhu Decl. ¶¶ 4–6.  Neither the Post-Impression Tables nor the Delivery Table would have provided Plaintiff with the allegedly missing information—these are Hive tables that contain no images or videos.  Moreover, the Post-Impression Tables would have, at most, contained information about only a very small sample of the alleged Scam Ads. *See* Cheng Decl. ¶ 7.

Plaintiff's assertion that none of the data that Meta produced provides a "complete and fair" substitute for the missing optimization data from the Delivery Table,[16] Mot. at 12–13, ignores that Meta's production of optimization data from dim_ad_creative_optimization,

---

[14] Plaintiff complains that the data from ad_convs_annotated_v2_offsite "cover[s] less than half the Scam Ads and fail[s] to capture all optimizations that could have been—and likely were—applied to other impressions not represented in those tables" and therefore is an insufficient substitute for the Delivery Table. Mot. at 15. The ad_convs_annotated_v2_offsite table contains data concerning 267,483 impressions of 11,167 alleged Scam Ads. Brown Decl. ¶ 18. If Plaintiff believes that that is an insufficient portion of impression data to be useful, the Post-Impression Tables would suffer from the same defect, likely magnified given the sample rates.

[15] Rule 37(e) does not contain the "complete and fair substitute" standard Plaintiff cites from *Scalia* v. *County of Kern*, 658 F. Supp. 3d 809, 816 (E.D. Cal. 2023). Moreover, in *Scalia*, the court concluded evidence was not a "complete and fair substitute" when the substitute evidence was categorically different from the lost evidence, which is not the case here. *See id.*

[16] To the extent that Plaintiff suggests that Meta claims that the Interim Outputs are a substitute or replacement for the Final Rendered Ads, he is incorrect. Meta never possessed Final Rendered Ads, and therefore could not have spoliated them. *See supra* Section II.B.1. As such, Meta is not obligated to provide a replacement for Final Rendered Ads.

EntAdCreativeOptimizationInfo, and EntAdAsset (the "Eligible Optimizations Data").  The data contained in dim_ad_creative_optimization and EntAdCreativeOptimizationInfo includes the *exact same* type of optimization data that was available in the Delivery Table, Brown Decl. ¶ 23, and it is more inclusive as to relevant optimizations, as Plaintiff concedes, Mot. at 12.  These data sources together identify the menu of eligible optimizations that *were generated and could be applied* to an alleged Scam Ad for delivery *and* Interim Outputs associated with those optimizations.[17]   Brown Decl., Ex. H at 11–14.  Because Meta's production of the Eligible Optimizations Data contains information about the optimizations that were generated and further contains Interim Outputs or identifiers to Interim Outputs that demonstrate what many of the optimizations looked like, *id.*, it contains more relevant data about optimizations than is contained in the Delivery Table.

Accordingly, the Eligible Optimizations Data is a fair substitute for the missing optimization data from the Delivery Table.  But to dispel any doubt, Meta proposes that the Court and Plaintiff may infer the following[18]:

> For any ad for which complete delivery data[19] does not exist in the Delivery Table, every optimization that was created for that ad as reflected in the Eligible Optimizations Data, was used in a rendered ad.  For created optimizations with Interim Outputs, the Interim Outputs reflect the application of that optimization and that the Interim Output was used in a rendered ad.  For any optimization for which the Eligible Optimizations Data reflects

---

[17] Plaintiff's argument that the Interim Outputs are not a substitute for the Delivery Table is misplaced.  *See* Mot. at 13.  The Delivery Table contains no visual representations of optimizations or ads.  That is, it does not show *how* any optimization actually made changes to the alleged Scam Ads.  But the Interim Outputs are relevant to the issue of Section 230.  Plaintiff's argument that the Interim Outputs "lack a clear record of what optimizations made what changes" is incorrect.  As described *supra,* at Section C, the Interim Outputs can be tied back to the relevant optimization using produced metadata.  *See, e.g.*, Brown Decl., Ex. G.
[18] This proffer is similar to a suggestion made by Judge DeMarchi at the October 21, 2025 discovery hearing.  Brown Decl., Ex. E at 19:19–24.  Meta made this offer to Plaintiff on March 18, 2026 in exchange for Plaintiff withdrawing his motion.  Brown Decl. ¶ 24.  Plaintiff has not accepted or responded to Meta's proposal.  *Id.*
[19] For an ad to have complete delivery data, this means the ad only received impressions during the time period for which there is data from the Delivery Table, which means the table contains the complete set of optimizations that were applied to the ad for delivery.  Meta produced first and last impression dates for the alleged Scam Ads in a Hive table named fct_admarket_ad_stats.  Brown Decl. ¶ 17.

that an optimization was created, but Interim Outputs are not created in the ordinary course of business, the optimization worked in the manner documented in Meta's documents, record evidence, and/or source code during the relevant period of January 1, 2019 to January 31, 2025, as applicable for the dates the alleged Scam Ad at issue was delivered as an impression. For any original image or video associated with an ad, any Interim Output created for those images or videos as reflected in EntAdImageSubstitutes and EntAdVideoSubstitutes, were used in a rendered ad.

To be clear, Meta's proposal is not a proposed adverse inference under Federal Rule of Civil Procedure 37(e)(2). While certain of the adverse inferences Plaintiff seeks under Rule 37(e)(2) regarding the optimizations applied to each alleged Scam Ad appear similar to Meta's proposal, Plaintiff's proposal is untethered from the Interim Outputs Meta produced showing how the optimizations impacted the alleged Scam Ads and the operation of the optimizations during the relevant time period. Plaintiff's presumption that the optimizations "acted to the fullest extent possible given the capabilities described in Meta's documents, source code, and record evidence," Mot. at 20, is a vague standard that would be difficult to enforce and that signals an intent to cherry-pick record evidence to spin out worst-case-scenarios, ignoring the voluminous data (including Interim Outputs) and documents Meta has produced. Meta's proposal therefore sets reasonable and necessary limitations to any inferences regarding the optimizations applied to the alleged Scam Ads.

In sum, Meta's production of the Eligible Optimizations Data, along with the aforementioned proposed inference, plainly replace the optimization data that was not retained from the Delivery Table. Under Meta's proposal, Plaintiffs will be permitted to assume that a broader set of optimizations than what would have been identified in the Delivery Table was utilized by the alleged Scam Ads.[20]

---

[20] Plaintiff claims it is "even worse" that the Eligible Optimizations Data contain more permutations of optimizations than optimization data in the Delivery Table and the ad_convs_annotated_v2_offsite table. Mot. at 12. It is not clear why that is, particularly as some of the examples Plaintiff gives, such as smart caption, which relates to the location of the placement of a caption text box on an advertiser's image, Brown Decl., Ex. H at 20, cannot possibly be evidence of material contribution. In any event, Meta's proposal should alleviate Plaintiff's concerns about this supposed discrepancy.

III.    **Sanctions Here Are Not Warranted**

For the reasons set forth above, Plaintiff has not met his burden to show that Meta spoliated evidence and therefore the Court need not address whether sanctions are warranted. Even if Plaintiff could make out a claim that Meta engaged in spoliation, the sanctions he seeks are not warranted because Plaintiff has shown neither prejudice nor intent.[21]

A.    There Should Be No Sanctions Under Rule 37(e)(1) Because There Is No Prejudice

Before this Court may impose sanctions available under Federal Rule of Civil Procedure 37(e)(1), the Court must find "prejudice to another party from loss of the information." Fed. R. Civ. P. 37(e)(1). If there is a finding of prejudice, the Court may order measures to cure the prejudice, but they must be "no greater than necessary." *Id.* The prejudice inquiry looks to whether the party's actions "impaired [the moving party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Sinsukthaworn* v. *Cnty. of Napa*, No. 22-cv-4644, 2025 WL 1433821, at *15 (N.D. Cal. May 19, 2025) (citation modified), *appeal filed*, No. 25-3967. Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other," rather the court has the discretion to determine prejudice. *Id.* (citation modified). Because Plaintiff has suffered no prejudice, no sanctions under Rule 37(e)(1) are warranted.

Plaintiff claims he is prejudiced because the allegedly spoliated tables preclude him from understanding how Meta's Generative AI optimizations impacted the alleged Scam Ads. Mot. at 16. But that argument has no relevance to the Post-Impression and Delivery Tables. Those tables only identify *whether* an optimization was utilized, and do not provide any information regarding the actual execution of the optimization. In any event, the Interim Outputs produced by Meta contain this information because they consist of images and videos reflecting the actual application of optimizations (*e.g.*, the crop applied to an image or video), the text optimizations, or data reflecting the application of the optimization (*e.g.*, the coordinates for a crop). So while

---

[21] Because Meta never possessed the Final Rendered Ads, these materials are not ESI as defined by the Federal Rules of Civil Procedure and are not subject to Rule 37(e). Even if the Court were to consider the appropriateness of sanctions, it would not need to address intent, as Meta could not have intentionally or otherwise destroyed data it never possessed.

not a substitute for the Post-Impression and Delivery Tables, Meta's Interim Outputs production resolves this claim of prejudice.

Even if the Court were to find prejudice, Meta's proposed inference is sufficient to cure any prejudice suffered by Plaintiff for the reasons discussed *supra*.  Plaintiff's proposed sanctions are otherwise unnecessary.  Plaintiff first requests that the Court determine there is a "genuine issue of triable fact" with respect to Meta's Section 230 defense and therefore resolve the motion in Plaintiff's favor.  Mot. at 16–17.  This sanction is unnecessary because unlike in *Maziar* v. *City of Atlanta*, Mot. at 17, Plaintiff is not being "deprive[d] [] of access to other evidence that may have created disputed issues of material fact."  No. 21-cv-2172, 2024 WL 2928534, at *5 (N.D. Ga. June 10, 2024).  Meta's proposed inference regarding the use of created optimizations and associated Interim Outputs provides Plaintiff with a greater number of relevant optimizations as evidence to argue disputes of material fact.

Plaintiff also requests that Meta be "preclude[ed] . . . from affirmatively arguing that Plaintiff has failed to make certain showings that would have turned on the missing data, or from relying on the absence of data it destroyed in moving for summary judgment or at trial."  Mot. at 17.  This sanction is also unnecessary in light of Meta's proposed inference.  And in any event, Meta does not intend to rely on the fact that there is "missing" data in support of its Section 230 defense.

Plaintiff lastly requests the fees and costs Plaintiff has incurred in bringing his motion.  This remedy is unnecessary because Plaintiff has suffered no prejudice from the purported spoliated evidence and therefore no sanctions under Rule 37(e)(1) are warranted.

B.    Meta Did Not Intentionally Spoliate Any Data

Before this Court may impose the severe sanctions available under Federal Rule of Civil Procedure 37(e)(2), Plaintiff must also establish that the opposing party "acted with the intent to deprive [the plaintiff] of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2); *see also Smahi* v. *STMicroelectronics, Inc.*, 789 F. Supp. 3d 690, 694 & n.3 (N.D. Cal. 2025) (Hon. Pitts) (explaining that the intent requirement is satisfied only where evidence shows a party engaged in "the willful destruction of evidence with the purpose of avoiding its discovery by an

adverse party") (citing *Gregory* v. *State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024)).  This is a "demanding specific-intent standard."  *Gregory*, 118 F.4th at 1072, 1077–80.  Accordingly, negligence, gross negligence, and even recklessness are insufficient to justify the imposition of Rule 37(e)(2) sanctions.  *Id.* at 1080.  Plaintiff fails to meet this standard.

Plaintiff presents no evidence that Meta took any affirmative steps to delete the Post-Impression or Delivery Tables.  To the contrary, the evidence affirmatively demonstrates that Meta did *not* act with the intent to deprive Plaintiff of the Post-Impression or Delivery Tables.  Meta disclosed the retention issues to Plaintiff, attempted to identify and produce alternative tables containing similar information, and produced all data it was able to locate.  And Meta is offering a compromise proposal here that may even benefit Plaintiff as even Plaintiff concedes the Eligible Optimizations Data contain more permutations of optimizations that he identified than the Delivery Table itself.  Mot. at 12.  Undeterred, Plaintiff argues that there is circumstantial evidence from which intent may be inferred, but Plaintiff's arguments fall flat.

First, Plaintiff argues that Meta knew the allegedly missing data was central to the litigation.  Mot. at 18.  A knowing failure to preserve the data, however, is alone insufficient to establish the specific intent required under Rule 37(e)(2).  *See hiQ Labs, Inc.* v. *LinkedIn Corp.*, 639 F. Supp. 3d 944, 975–77 (N.D. Cal. Nov. 4, 2022) (holding that specific intent may be inferred from a knowing failure to preserve only when combined with additional circumstances).  Here, the earliest Meta could have understood that Plaintiff intended to focus on optimizations was September 2023 and, as Meta's investigation into relevant data evolved, Meta did not identify the Post-Impression and Delivery Tables as containing potentially relevant data until the data in those tables had already been deleted.  Brown Decl. ¶¶ 13–20.  *Glaukos Corp.* v. *Ivantis, Inc.*, No. 18-cv-620, 2020 WL 10501850 (C.D. Cal. June 17, 2020), cited by Plaintiff, is distinguishable.  There, the court inferred intent when the defendant in a patent infringement suit *instituted*―as opposed to failing to suspend―an automatic deletion policy of known relevant emails the same year it retained patent litigation counsel.  *Id.* at *5–6.

Second, Plaintiff contends that Meta's purportedly obfuscatory conduct supports an inference of intent, pointing to two examples.  Neither example shows obfuscatory conduct.

Plaintiff first cites Meta's statement to the Court on March 23, 2023 that it was taking steps under the applicable federal rules to preserve relevant data. Mot. at 19. That statement does not establish that Meta knew at the time that it was failing to preserve relevant data or that it believed it was not complying with its preservation obligations. To that point, the Delivery Table was not created until the day after that hearing. Brown Decl. ¶ 14.

Plaintiff next relies on a statement Meta made in January 2025 that it had retained versions of ads displayed to end-users. Mot. at 5. However, Meta later clarified the statement to explain that Meta does not possess Final Rendered Ads. Brown Decl. ¶ 6. Such conduct is the opposite of obfuscation.[22] *See, e.g.*, *Swensen* v. *Nationstar Mortgage LLC*, No. 24-cv-553, 2025 WL 1635246, at *6 n.5 (W.D. Wash. June 9, 2025) (finding correcting a statement did not support finding of spoliation when plaintiffs presented no evidence that it was anything but a correction).

Third, Plaintiff asserts that Meta's sophistication and experience with preservation obligations support a finding of intent. Mot. at 18–19. But Meta's sophistication and experience do not establish an intent to deprive Plaintiff of relevant information. In *Lopez* v. *Apple*, No. 19-cv-4577-JSW (SK), 2024 WL 4561320, at *7 (N.D. Cal. May 31, 2024), cited by Plaintiff, the court found sufficient evidence to submit the question of intent to a jury only after identifying several additional factors, including that the defendant changed its retention policy after being served with the complaint to substantially narrow preservation of ESI. Likewise, in *In re Google Play Store Antitrust Litigation*, 664 F. Supp. 2d 981, 992–93 (N.D. Cal. 2023), the court pointed to factors not found here, including an affirmative decision not to suspend automatic deletion policies for custodians' chats, downplaying the absence of data, and making untruthful representations to the court about the ability to preserve the data. In contrast, Meta did not change an automatic deletion policy or make an affirmative decision not to suspend such a policy. Rather, by the time Meta identified the Delivery Table as capturing potentially relevant data, and

[22] The actions supporting intent in *Burris* v. *JPMorgan Chase & Co.*, No. 21-cv-16852, 2024 WL 1672263 (9th Cir. Apr. 18, 2024) bear no resemblance to Plaintiff's allegations. In affirming sanctions under Rule 37(e)(2), the Ninth Circuit noted that the district court found that plaintiff engaged in "systematic efforts" to destroy an array of ESI, including wiping a device the day before he was required to produce it. *Id.* at *2 (citation modified). No such facts exist here.

took steps to suspend the automatic deletion, certain historical data in the table was no longer available to preserve. Meta preserved and produced what data it could, and promptly searched for alternative sources. Brown Decl. ¶¶ 14–15, 18–20. Similarly, by the time Meta identified the Post-Impression Tables, the tables did not contain data from the relevant time period due to preexisting automatic deletion policies. *Id.* ¶ 20.

Finally, Plaintiff attempts to portray Meta as a serial intentional spoliator. Mot. at 18–19. But Plaintiff exaggerates the findings of the cases he cites or simply gets them wrong. *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, 655 F. Supp. 3d 899 (N.D. Cal. 2023) did not involve a spoliation issue. *In re Facebook Inc. Derivative Litigation*, C.A. No. 2018-0307, 2025 WL 262194 (Del. Ch. Jan. 21, 2025) involved a sanctions motion against two individual defendants, not Meta. In *BlackBerry Ltd.* v. *Facebook, Inc.*, No. 18-cv-1844-GW (KLS), 2019 WL 13447227, at *7 (C.D. Cal. Sept. 30, 2019), the court denied the motion for evidentiary sanctions and spoliation, finding that Plaintiff had failed to prove prejudice and intent. Similarly, in *In re Meta Pixel Healthcare Litigation*, No. 22-cv-3580 (N.D. Cal. Feb. 20, 2025), Dkt. 880, the court did not find that Meta purposefully destroyed evidence.[23]

## **CONCLUSION**

For the reasons set forth above, Plaintiff has failed to make out his case for the requested sanctions for Meta's alleged spoliation of ESI, and no sanctions should be issued. If this Court determines any sanction is needed to address any prejudice to Plaintiff, the Court should, at most, accept Meta's proposed approach regarding the delivery of optimizations and reject Plaintiff's proposed sanctions.

Dated: March 23, 2026

By: */s/ Walter F. Brown, Jr.*
Karen L. Dunn (*pro hac vice*)
kdunn@dirllp.com
Melissa F. Zappala (*pro hac vice*)
mzappala@dirllp.com
**DUNN ISAACSON RHEE LLP**
401 9th Street NW
Washington, DC 20004
Telephone: (202) 240-2900
Facsimile: (202) 240-2050

---

[23] Plaintiff's citation to argument in a redacted sanction motion in another matter about different data has no bearing on this case and should be disregarded.

Meredith R. Dearborn (SBN: 268312)
mdearborn@dirllp.com
**DUNN ISAACSON RHEE LLP**
345 California Street, Suite 600
San Francisco, CA 94104-2671
Telephone: (202) 240-2900
Facsimile: (202) 240-2050

Walter F. Brown, Jr. (SBN: 130248)
wbrown@paulweiss.com
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
535 Mission Street, 25th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101

Amy L. Barton (*pro hac vice*)
abarton@paulweiss.com
T. Patrick Cordova (*pro hac vice*)
pcordova@paulweiss.com
Anne Simons (*pro hac vice*)
asimons@paulweiss.com
Paloma Rivera (*pro hac vice*)
privera@paulweiss.com
**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Jacob M. Heath (SBN: 238959)
jheath@orrick.com
**ORRICK, HERRINGTON &
SUTCLIFFE LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: (650) 614-7400
Facsimile: (650) 614-7401

*Attorneys for Defendant Meta Platforms, Inc.*