# EXHIBIT 2

# FILED UNDER SEAL

John C. Quinn (*pro hac vice*)
jquinn@heckerfink.com
Hyatt Mustefa (*pro hac vice*)
hmustefa@heckerfink.com
Jocelyn Hassel (*pro hac vice*)
jhassel@heckerfink.com
Tayonna Ngutter (*pro hac vice*)
tngutter@heckerfink.com
Tanveer Singh (*pro hac vice*)
tsingh@heckerfink.com
**HECKER FINK LLP**
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883

Joshua Matz (*pro hac vice*)
jmatz@heckerfink.com
Kaitlin Konkel (*pro hac vice*)
kkonkel@heckerfink.com
Joanne Grace Dela Peña (*pro hac vice*)
jdelapena@heckerfink.com
Brian Remlinger (*pro hac vice*)
bremlinger@heckerfink.com
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883

Leslie Brueckner (SBN: 140968)
lbrueckner@singletonschreiber.com
**SINGLETON SCHREIBER, LLP**
591 Camino de la Reina, Suite 1025
San Diego, CA 92108
Telephone: (619) 573-1851

Elizabeth Ryan (*pro hac vice*)
eryan@baileyglasser.com
**BAILEY & GLASSER LLP**
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730

Derek G. Howard (SBN: 118082)
derek@derekhowardlaw.com
**DEREK G. HOWARD LAW FIRM, INC.**
42 Miller Avenue
Mill Valley, CA 94941
Telephone: (415) 432-7192
Facsimile: (415) 524-2419

*Attorneys for Plaintiff Dr. Andrew Forrest*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| DR. ANDREW FORREST,<br><br>                    Plaintiff,<br><br>         v.<br><br>META PLATFORMS, INC.<br><br>                    Defendant. | Case No. 22-CV-03699-PCP (VKD)<br><br>**DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE** |

I, James Mickens, declare as follows:

1.      I am the Gordon McKay Professor of Computer Science at Harvard University, a co-director of Harvard's Berkman-Klein Center for Internet and Society, and a co-director of Harvard's Applied Social Media Lab. I have been retained by counsel for Plaintiff Dr. Andrew Forrest in this matter. I make this declaration based on my own personal knowledge, my review of documents provided to me by Plaintiff's counsel, and my review of documents and data provided to me by counsel for Meta Platforms, Inc. ("Meta").

2.      At a high level, my research expertise covers the domains of software architecture, distributed systems, and large-scale storage platforms. Software architecture refers to the design, implementation, and testing of complex pieces of software. An example of a complex piece of software is a distributed system; in a distributed system, multiple pieces of code running on different computers exchange messages via the Internet to coordinate their activity and achieve a common goal. For instance, the computers might want to provide a database which stores extremely large amounts of information, with each server storing a portion of the information. A multi-server database like this is an example of a large-scale storage platform. Large-scale storage platforms are used by companies like Google, Amazon, and Meta to hold and query search engine data, user emails, and data related to advertising (e.g., the advertising videos shown to users).

3.      I received a bachelor's degree in computer science from the Georgia Institute of Technology, and a PhD in computer science from the University of Michigan. Post-graduation, I spent seven years as a researcher in the Distributed Systems Research Group at Microsoft Research. Before joining Harvard in 2015, I was also a visiting professor at MIT, where I worked with the Parallel and Distributed Operating Systems research group.

4.      As a researcher and a teacher, I have extensive experience with software engineering, distributed systems, and large-scale storage platforms. For example, I regularly teach an undergraduate course on operating system design, and a graduate-level course on computer security that focuses on a variety of security challenges in distributed systems. Harvard recognized my teaching excellence in these areas by naming me a Harvard College Professor in 2022.

1

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

5.      I have also published research related to software engineering, distributed systems, and large-scale storage platforms. For example, I have published 10 papers at the Symposium on Networked Systems Design and Implementation, a top conference in the field of distributed systems. As a result of my strong track record of distributed systems research, I was nominated to serve as a Program Chair for the conference in 2021; I accepted the nomination and helped to supervise the review of the hundreds of papers submitted to the conference. While at Microsoft, I was also a member of the Distributed Systems Research Group, where I did academic-style research as well as applied research in collaboration with product groups.

6.      I have also been qualified as an expert in litigation related to the engineering, deployment, and security of complex pieces of software (both distributed and single-machine). For example, in *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal. 2020), and *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD (N.D. Cal. 2020), I testified on the architecture and the security of mobile operating systems (specifically, iOS and Android) and the associated first-party app stores (namely, the Apple App Store and the Google Play Store). In *United States et al. v. Google LLC*, Case No. 1:20-cv-03010-APM (D.D.C. 2020), I analyzed Google's Chrome browser and various parts of Google's distributed systems; a particular focus area was the infrastructure that Google built to receive candidate advertisements, store those advertisements until placement was needed, and then decide, for any particular ad slot, the best ad to show and how to deliver that ad to end-user device. Furthermore, in the case *In re Facebook Inc. Derivative Litigation*, Case No. 2018-0307-JTL (Del Ch. 2018), I specifically analyzed various distributed systems belonging to Meta, explaining to the court how complex APIs handled private user data.

**My Review and Analysis Regarding Plaintiff's Spoliation Motion**

7.      I understand that Plaintiff has filed a motion seeking relief in connection with Meta's spoliation of certain evidence. Specifically, I understand that Plaintiff argues that Meta destroyed and failed to preserve (1) final rendered Scam Ads, and/or data sufficient to recreate them, and (2) associated data in Hive, Meta's data warehouse, including data reflecting which of

its tools and processes made changes to inputs to create the final rendered Scam Ads.

8.    I understand that, with respect to the final rendered Scam Ads, Meta has argued that it never possessed "visual representations" of the final rendered Scam Ads, and that it would be infeasible for Meta to attempt to capture and store visual representations of every impression rendered on its platforms. An "impression" is an instance where Meta displays an ad to an end-user.

9.    In connection with my engagement as an expert in this matter, counsel for Dr. Forrest previously asked me to analyze and evaluate Meta's data production. Accordingly, during discovery, my work thus far has generally fallen into two categories: (1) a review of Meta's Source Code and design documents to understand generally the capabilities of Meta's tools and processes with respect to content modification and ad optimization; and (2) an evaluation of Meta's production to determine which Meta tools or processes were applied to the Scam Ads, and what those tools or processes did.

10.    I have also reviewed and analyzed Meta's data production with respect to the issues raised in Plaintiff's spoliation motion. Specifically, I have reviewed design documents produced by Meta that explain its advertising systems; included in those documents were ones that described specific optimizations and the general operation of Meta's distributed systems for creating, optimizing, and rendering an advertisement as an impression.

11.    I also reviewed, analyzed, and evaluated Scam Ad data produced by Meta. This data includes information for approximately 28,300 Scam Ads as prepared by Meta's litigation tool (Switchboard). The reviewed information also includes Hive data and other data that Meta retrieved from its data production stores.

12.    Based on my analysis of this discovery evidence, my first conclusion is that Meta possessed final rendered ads at the time that Meta transmitted to the end-user's device the information sufficient to display the ads. When I refer in this sentence to "final rendered ads," I am referring to the digital "instructions" necessary to render the ads. These instructions consist of computer code and are equivalent to the rendered ads themselves. They are assembled on Meta's

3

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

backend servers and, when transmitted to the end-user's device, allow the device to display the ad to the end-user. These instructions might include references to relevant creative files like images and videos that should be displayed within the ad. Meta has written the code that controls every step of this rendering process, and the rendered ads are displayed in a software ecosystem that Meta controls.

13.     I understand that Meta has stated it does not possess "visual representations" of the rendered ads. In my view, this is a red herring. The instructions dictate what should be visually displayed on an end-user's device. Even if Meta does not store a snapshot of the literal pixels that the end-user eventually sees, Meta nonetheless knows from the instructions what those pixels should look like.

14.     As detailed below, Meta could have easily retained these instructions. The instructions primarily consist of text information and would take up very little storage space. Storing this type of information is a common task that Meta undertakes every day as part of its advertising business. Such instructions would have allowed Plaintiff to recreate how Meta intended the ad to appear.

**How Meta Renders Advertisements**

15.     The high-level process for ad generation is initiated by an end-user device like a smartphone or a laptop. First, the end-user loads an *app* or a *web page* that sources ads from Meta; in the rest of this document, I will just use the term "app" for simplicity. Because the app sources ads from Meta, the app must include code—written by Meta—to send an ad request to one of Meta's *frontend servers*. The frontend server lives in a Meta datacenter and coordinates the communication between (1) Meta's ad request code in the end-user's app, and (2) the rest of Meta's *backend servers*. For example, some backend servers store the advertising images and videos that advertisers want to show end-users. ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████ other backend servers assemble the final list of instructions that should be sent to an end-user's app so that the app can display a final rendered ad. These instructions are not just sent

4

to the end-user's app, but also to various ███████████████████████████; the cached copies of the instructions ████████████████████████████████ For example, █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

16.        The instructions that a frontend server assembles do not contain the literal final rendered ads that an end-user sees. Instead, the instructions describe how the user-side Meta code should build the ad, conceptually saying things like, "The end-user should be shown a Nike ad which contains these specific images, with specific header text and caption text overlayed at the top and bottom of the images." In this example, the instructions typically would not directly contain images of Nike shoes, but would instead contain "pointers" to the selected multimedia. A "pointer" is just a name for a specific digital file which allows code to download that file. In everyday life, the URLs that a person types into a browser's address bar are examples of pointers. As Meta's frontend server assembles the instructions for an ad, the frontend server works with the backend server to determine which pointers should be included in the instructions, and how the referenced images, videos, and other content should eventually be displayed on an end-user device.

17.        When Meta's code in the user-facing app receives the instructions from the front-end server, the Meta code follows the instructions, fetching any external content (like an image or video) that is relevant to the ad, and then displaying the content on the end-user's device as specified by the instructions.

**Meta Possessed and Could Have Retained the Instructions Needed to Render the Scam Ads**

18.        As I explained above, Meta wrote the code for the frontend servers, the code for the backend servers, and the ad-rendering code that runs on an end-user's device. So, when an end-user's device renders a particular ad (thereby showing that ad to the end-user), Meta must know everything about the contents of the ad and how it should appear, because Meta built every part of the computational infrastructure that determines what the end-user's device will display.

5

19.   In my expert opinion, it was feasible for Meta to retain the instructions needed to render the Scam Ads.

20.   First, Meta already retains these instructions (albeit temporarily). As I explained earlier, Meta temporarily stores the instructions in the form of "cached ads," which memorialize the backend work that was necessary to assemble an ad. For example, in the document bearing the Bates stamp META-0008778, Meta explains how Meta keeps ██████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████ .

21.   In my expert opinion, it would have been feasible and simple for Meta to write code that would have identified Scam Ads and captured their rendering instructions. Indeed, I understand Meta identified the Scam Ads in this litigation by conducting text searches of Hive tables of text extracted from ads that had already been rendered. Meta could have used a similar approach to identify Scam Ads on the front-end, either before or at the time those ads were rendered. For example, when advertisers initially uploaded raw creative files to Ads Manager, Meta could have run text searches on those creatives for terms relevant to Dr. Forrest. Alternatively, at the time of rendering, Meta could have run similar text searches on the creative data referenced by ad instructions. Regardless, once Meta had identified (and/or as Meta identified) advertisements of interest, Meta could easily have instructed its systems to store all rendering instructions for the identified ads.

22.   It also would not have been technically infeasible or even difficult for Meta to store this data for the Scam Ads. There is a difference in size between a complete final-rendered ad and the instructions needed to reconstruct that ad. For example, if an ad contains a video that is megabytes in size, we would expect the complete rendered ad to be megabytes in size. However (and importantly), the instructions needed to render the same ad would be far smaller—perhaps a few hundred bytes in size (there are one million bytes in one megabyte). In the context of this

6

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

particular legal matter, I understand that the 28,296 Scam Ads that Meta identified were rendered in approximately 83 million impressions. Assuming that the rendering instructions for each impression were about 300 bytes in size, the total size of the instructions for all Scam Ad impressions would amount to approximately 25 gigabytes; that number would likely be smaller by at least a factor of two once file compression had been applied. By comparison, the base iPhone model offers 256 gigabytes of storage. It would be well within Meta's capabilities to store these instructions.

23.     I understand that Meta claims that even if it had retained the rendering instructions for the Scam Ads, it could not use these instructions to recreate a visual representation of the Scam Ads "exactly as they would have been rendered on an end-user's device when delivered during the relevant period." Opp. at 5. What I understand Meta to be saying here is that Meta cannot account for unpredictable variations in end-user devices that might impact "exactly" how an end-user experiences an ad. For example, an end-user may use magnification on their phone, such that the phone only displays an enlarged view of a specific portion of a page; as another example, an end-user might configure their operating system to display all visual content in black and white. It is true that Meta cannot account for all possible variations a priori. However, this observation is irrelevant to the legal matter at hand, which revolves around the *intrinsic content* of the ads. The rendering instructions necessarily contain information sufficient to reconstruct how Meta *intended* the ad to be viewed by end-users.

24.     Sitting here today, if (1) a human or a piece of code has the instructions for rendering a particular ad, and (2) all of the referenced (i.e., "pointed to") files are still available at the referenced locations, then (3) a human or piece of code can reconstruct what the final rendered ad would look like. The ability to perform such reconstruction is naturally helpful for a company that runs an adtech business. For example, a well-run adtech company is intrinsically motivated to show ads that users will enjoy, but prevent users from seeing harmful ads that, e.g., contain disturbing imagery or links to harmful websites. Both of these goals are helped if the adtech provider can reconstruct an ad at the time of ad delivery or during post-hoc analysis.

7

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

**The Final Rendered Scam Ads Would Have Provided the "Ground Truth" To Assess How Meta Altered and Optimized the Scam Ads**

25.     As I understand it, a key question in this legal matter is the following: when an end-user looked at a final rendered Scam Ad, what did the end-user see? Determining what end-users saw cannot be achieved through inspection of source code, design documents, and fragmentary data from Hive tables, for the same reason that one could not reconstruct a van Gogh painting simply by reading a diary entry of van Gogh that described the subject of the painting, the position of the subject, and the types of paint that van Gogh intended to use. The diary entry would be helpful for understanding van Gogh's high-level artistic goal, but the diary entry would be insufficient *to actually reconstruct and analyze the painting that van Gogh created*. Similarly, in the context of this legal matter, it is helpful to know what Meta's algorithms are for, say, its Text Improvements feature, which utilizes AI to select key text and display that text directly around the ad in prominent overlays, headlines, and footers. The algorithms provide general scoping for what Meta *might have done* to a particular advertiser-submitted creative. However, absent the actual text and creative Meta selected and information about the visual qualities of the overlays, footers, or headlines (e.g., font size and color), it is impossible to know how real-life end-users saw the images in the context of final rendered ads.

26.     Even small adjustments Meta makes to a text overlay, or to the final appearance of an ad generally, can have a profound impact on user engagement; ensuring ads are readable and appear professional, and match the native look of the Instagram or Facebook platforms, can result in higher engagement and more effective ads overall.

**Meta Could Have Retained Post-Impression Data For the Scam Ads**

27.     I understand that Plaintiff has argued in his motion that Meta should have preserved the data in two Hive tables that retain post-impression information about ads, the ad_post_impression_rendering_validation and ad_client_render_events tables ("post-impression tables").

28.     I also understand that Meta has explained that these tables "capture certain data

8

about a random sample of rendered impressions, including the optimizations that were applied to the ad for a given impression's delivery. This data is sent back to Meta from the Facebook application on an end-user's device at the time of rendering." Cheng Decl. ¶ 5.

29.    Meta's ability to "sen[d] back" information from the Facebook application on an end-user's device demonstrates its control over the code that renders the ad on the application and its ability to access data about rendering. Likewise, this further confirms Meta's ability to "sen[d] back" the rendering instructions for rendered impressions, as discussed above.

30.    Meta also states that the post-impression tables capture a random sample of data about rendered impressions. Cheng Decl. ¶ 5.

31.    In my expert opinion, it would have been feasible for Meta to write code that would have identified Scam Ads and captured for all identified Scam Ads the type of data captured in the post-impression tables at issue here. In the general course of its business, Meta already saves post-impression data on a sampled basis. That sampling can be accomplished in at least two different ways. First, Meta may have created a system that always sends post-impression data back to Meta's servers, a sample of which is stored in the post-impression table. Second, Meta may randomly determine, pre-rendering, when data about a particular rendered ad should be sent back to Meta's servers for storage in the post-impression table. Either way, Meta could easily have set its systems to require all such information about each identified Scam Ad to be stored.

**Meta's Search For Relevant Hive Tables**

32.    I understand that Meta began its investigation of data in its Hive database by September 2023, which is the data warehouse that Meta uses to conduct business analytics. I understand that Hive contains millions of data tables used for data analysis, business intelligence, and reporting.

33.    I understand that Meta has stated that it was aware of Plaintiff's "intent to focus on how Meta's ad tools acted on the creative content of ads" as of September 1, 2023 (Opp. at 3); that it identified and preserved the dim_ad_creative_optimization table, which logs optimizations created and eligible for delivery for ads, in September or October 2024 (Opp. at 6); and that it

9

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

identified and preserved the fct_creative_delivery_metrics table, which logs optimizations applied to rendered impressions, in April 2025 (Opp. at 7).

34.     Given my expertise in software architecture, distributed systems, and large-scale storage platforms (including data-storage systems utilized by large-scale advertising companies like Meta), I believe that Meta's slowness in identifying key tables with relevant information is far outside the norm. So-called "hyperscale" companies like Meta, Google, and Microsoft have built a variety of distributed systems for storing and querying extremely large amounts of information; see, for example, publicly-disclosed systems like Google's Spanner,[1] Microsoft's Cosmos,[2] and Meta's own Tao,[3] Tectonic,[4] and Hive.[5]

35.     In the context of this legal case, documents produced by Meta also describe various internal databases that Meta has built to store large amounts of data (e.g., see ███████, which is specifically used to hold advertising-related data).

36.     Based on my professional experience and the information available to me in this case, I am not aware of any reason that would justify Meta's lengthy delays of a year, a year and a half, and more in identifying and preserving the relevant Hive tables.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on April 7, in Boston, Massachusetts.

[1] *See* David F. Bacon et al., *Spanner: Becoming a SQL System*, SIGMOD '17: Proceedings of the 2017 ACM International Conference on Management of Data 331-43 (2017), https://doi.org/10.1145/3035918.3056103.

[2] *See* Conor Power et al., *The Cosmos Big Data Platform at Microsoft: Over a Decade of Progress and a Decade to Look Forward*, 14 Proceedings of the VLDB Endowment 3148, 3148-61 (2021), https://vldb.org/pvldb/vol14/p3148-jindal.pdf.

[3] *See* Nathan Bronson et al., *TAO: Facebook's Distributed Data Store for the Social Graph*, 2013 USENIX Annual Technical Conference 49, 49-60 (2013), https://www.usenix.org/system/files/conference/atc13/atc13-bronson.pdf.

[4] *See* Satadru Pan et al., *Facebook's Tectonic Filesystem: Efficiency from Exascale*, 19th USENIX Conference on File and Storage Technologies 217, 217-31 (2021), https://www.usenix.org/system/files/fast21-pan.pdf.

[5] *See* Ashish Thusoo et al., *Hive – A Warehousing Solution over a Map-Reduce Framework*, 2 Proceedings of the VLDB Endowment 1626, 1626-29 (2009), https://www.vldb.org/pvldb/vol2/vldb09-938.pdf.

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)

Dated:  April 7, 2026

Boston, Massachusetts                     James Mickens

DECLARATION OF JAMES MICKENS IN SUPPORT OF PLAINTIFF DR. ANDREW FORREST'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS RE: SPOLIATION OF EVIDENCE | CASE NO. 22-CV-03699-PCP (VKD)