IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FORREST, | ) CV-22-3699-PCP |
| | ) |
| PLAINTIFF, | ) SAN JOSE, CALIFORNIA |
| | ) |
| VS. | ) APRIL 16, 2026 |
| | ) |
| META PLATFORMS, INC., | ) PAGES 1-37 |
| | ) |
| DEFENDANT. | ) |
| | ) |
| ________________________________ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE P. CASEY PITTS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF: HECKER FINK, LLP
350 FIFTH AVENUE, STE 63RD FLOOR
NEW YORK, NY 10118
**BY: JOHN CHARLES QUINN**

FOR THE PLAINTIFF: DEREK G. HOWARD LAW FIRM, INC.
42 MILLER AVENUE
MILL VALLEY, CA 94941
**BY: DEREK HOWARD**

APPEARANCES CONTINUED ON THE NEXT PAGE

OFFICIAL COURT REPORTER: SUMMER FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)

FOR THE PLAINTIFF: HECKER FINK, LLP
1050 K STREET NW, STE 1040
WASHINGTON, DC 20001
**BY: JOANNE DELA PENA**
**BRIAN REMLINGER**

FOR THE DEFENDANT: PAUL WEISS, LLP
535 MISSION STREET, 24TH FL
SAN FRANCISCO, CA 94105
**BY: WALTER BROWN**

FOR THE DEFENDANT: DUNN ISAACSON RHEE, LLP
401 9TH STREET, NW
WASHINGTON, DC 20004
**BY: MELISSA ZAPPALA**

FOR THE DEFENDANT: PAUL WEISS, LLP
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019
**BY: ANNE SIMONS**

SAN JOSE, CALIFORNIA APRIL 16, 2026

P R O C E E D I N G S

(COURT CONVENED AT 9:00 A.M.)

**THE CLERK:** CALLING CASE NUMBER 22-3699. FOREST VERSUS META PLATFORMS. IF COUNSEL COULD PLEASE APPROACH THE PODIUMS AND STATE THEIR APPEARANCES BEGINNING WITH THE PLAINTIFF.

**MR. QUINN:** GOOD MORNING, YOUR HONOR.

JOHN QUINN FROM HECKER FINK ON BEHALF OF DR. ANDREW FORREST.

**THE COURT:** OKAY. GOOD MORNING.

**MR. BROWN:** GOOD MORNING, YOUR HONOR.

WALTER BROWN FROM PAUL WEISS ON BEHALF OF META. I'M ACCOMPANIED BY MY COLLEAGUE, ANNE SIMONS FROM PAUL WEISS AND MELISSA ZAPPALA FROM DUNN ISAACSON RHEE.

WE ALSO HAVE OUR CLIENT WITH US, JIMMY DOAN.

**THE COURT:** GOOD MORNING.

SO WE ARE HERE ON THE PLAINTIFF'S MOTION FOR SANCTIONS SO I WILL HEAR FROM PLAINTIFFS FIRST AND THEN I WILL GIVE THE DEFENDANT AN OPPORTUNITY TO RESPOND.

**MR. QUINN:** THANK YOU, YOUR HONOR. MAY IT PLEASE THE COURT.

IN 2019, META'S LAW DEPARTMENT RECEIVED A LETTER FROM COUNSEL FOR DR. FORREST. THE LETTER SAID THERE ARE SCAM ADS MISAPPROPRIATING MY NAME AND LIKENESS TO PITCH CRYPTO SCAMS,

THEY ARE ALL OVER YOUR PLATFORM, THERE ARE MANY OF THEM, I CAN'T FIND THEM ALL, I DEMAND THAT YOU FIND THEM AND TAKE THEM DOWN OR I WILL SUE YOU.

IN RESPONSE TO THAT LETTER, META DID NOTHING. IN A CASE ABOUT SCAM ADS, IT MADE NO EFFORT TO PRESERVE THE ADS, IT PRESERVED NO DATA.

**THE COURT:** LET ME -- I'VE READ THE BRIEFING CAREFULLY AND I'M WELL AWARE OF THE UNDERLYING FACTS AS THEY HAVE BEEN PRESENTED. I MEAN, I THINK -- MY FIRST QUESTION IS GIVEN WHERE WE ARE AT THIS POINT, WHY IS SOME VERSION OF WHETHER WE CALL IT AN INFERENCE, PRESUMPTION, WHATEVER META HAS PROPOSED IN RESPONSE TO ITS MOTION, WHY IS THAT NOT SUFFICIENT TO ADDRESS THE PREJUDICE RESULTING FROM ANY ALLEGED SPOLIATION?

**MR. QUINN:** FOUR PRINCIPAL REASONS, YOUR HONOR. AND LET ME SAY, THE INFERENCE IS HELPFUL, AS THE COURT KNOWS, WE PROPOSED IT, BUT IT DOESN'T GET US ALL THE WAY THERE FOR FOUR PRINCIPAL REASONS.

THE FIRST HAS TO DO WITH OUTPUT DATA. THE FINAL RENDERED ADS THEMSELVES, BEFORE OR THE INSTRUCTIONS, THE CODE THAT IS NECESSARY TO RECREATE THEM PIXEL BY PIXEL.

**THE COURT:** RIGHT. I MEAN, THAT -- I UNDERSTAND WE DON'T HAVE THAT. MY UNDERSTANDING FROM THE SYSTEMS IS THAT, AT MOST, THERE WAS ONLY A SMALL SAMPLING. AND YOU MAY HAVE A CLAIM ABOUT THE FAILURE TO PRESERVE WHAT WAS IN THAT SAMPLING DATA, BUT AS TO THE REMAINDER, THERE WASN'T A SYSTEM IN PLACE

IN 2019 OR OTHERWISE TO KEEP ALL OF THESE, CORRECT?

**MR. QUINN:** I THINK THAT IS CORRECT, THERE WAS NO SYSTEM TO PLACE TO KEEP ALL OF THEM.

**THE COURT:** SO IN ORDER TO DO THAT, WE ARE NOT REALLY TALKING ABOUT DESTRUCTION OF EVIDENCE, THERE IS A QUESTION OF WHETHER THERE IS A PRESERVATION ISSUE TO WHETHER SAYING THEY ACTUALLY HAD TO IMPLEMENT AN ENTIRELY NEW SYSTEM TO KEEP DATA THAT THEY WERE NOT OTHERWISE MAINTAINING OR GENERATING, RIGHT? I'M NOT SURE THAT'S A PRESERVATION QUESTION.

**MR. QUINN:** WELL WE PUT IN AN AFFIDAVIT FROM OUR EXPERT ON THE REPLY WHO EXPLAINS THAT THE CODE, THERE IS SORT OF A RED HERRING AROUND THESE VISUAL REPRESENTATIONS, BUT THE CODE ITSELF WHICH TELLS THE APP OR PROGRAM ON THE USER SIDE PIXEL BY PIXEL WHAT TO PUT IN THE BOX OF THE AD, SO THE CODE IS WHAT WE NEED. THAT CODE IS 1'S AND 0'S, THE CODE IS WRITTEN BY META, SO THEY SURELY POSSESS IT, IT SITS ON THEIR BACK END SERVERS AND THEN IT IS SENT FROM THE BACK END SERVERS OUT TO THE APPS AND PROGRAMS THAT ARE ALSO STILL PART OF THE META SOFTWARE ECOSYSTEM. SO IT'S JUST BITS OF CODE ALL WITHIN THEIR SOFTWARE. THEY ALREADY CACHE THOSE INSTRUCTIONS ON THE BACK END SERVERS IN A NUMBER OF DIFFERENT CIRCUMSTANCES.

ONE OF THEM IS THERE ARE THESE AUCTIONS WHEN A USER'S DEVICE IS READY FOR AN AD. AND META OFTEN -- THE DOCUMENTS TALK ABOUT THIS, OFTEN BUNDLES THESE ADS TOGETHER. SO IT WILL QUEUE UP FOUR ADS TO SHOW TO THAT USER, FOR WHATEVER, PATIO

FURNITURE, WHATEVER THEY ARE INTERESTED IN. IF THE USER SCROLLS AND SEES JUST ONE AD AND THEN CLOSES THE DEVICE, THE REMAINING THREE ADS REMAIN QUEUED UP AND CACHED IN THE SERVER AND READY FOR THE NEXT TIME, THE ADVERTISER HAS ALREADY PAID FOR THEM. SO A LOT OF THE INSTRUCTIONS ARE ALREADY SITTING CACHED IN THE BACK END SERVERS.

EVEN AFTER THE AD RUNS, THEY ARE CACHED IN A NUMBER OF CIRCUMSTANCES. AND THEY ARE, AS THE COURT POINTS OUT, ALSO BEAMED BACK, SAMPLED IN CERTAIN WAYS AND BEAMED BACK TO THE BACKUP SERVERS.

SO THEY LIVE IN THE SYSTEM IN QUITE A FEW DIFFERENT PLACES AND THERE WAS NO EFFORT MADE TO PRESERVE THEM IN ANY WAY. THERE IS A SAMPLING PROTOCOL THAT DECIDES WHICH SAMPLED INSTRUCTIONS TO SEND BACK AND OUR EXPERT EXPLAINS IT'S NOT VERY DIFFICULT TO TWEAK THAT PROTOCOL TO SEND BACK THE INSTRUCTIONS ABOUT FORREST ADS.

SO IT WAS EMINENTLY DOABLE ON THE TECHNOLOGICAL FRONT WITH RESPECT TO THE OUTPUT DATA AND THAT DATA IS CRITICALLY IMPORTANT FOR A COUPLE OF REASONS.

THIS ISN'T JUST ABOUT THE ASSEMBLY OF COMPONENTS THAT WE HAVE, THERE IS ALSO A WHOLE SET OF RENDERING STAGE OPTIMIZATIONS THAT MAKE MORE MATERIAL CONTRIBUTIONS. THESE ARE THINGS LIKE --

**THE COURT:** AGAIN, THAT'S WHERE I GUESS I'M A LITTLE CONFUSED BECAUSE ISN'T THE INFERENCE OR PRESUMPTION THAT'S BEEN

PROPOSED EFFECTIVELY ONE THAT SAYS LIKE, TO THE EXTENT YOU WANT TO SAY A PARTICULAR OPTIMIZATION WAS APPLIED, IT WAS APPLIED, AND SO WE CAN SORT OF ASSUME THE BEST CIRCUMSTANCES FOR YOUR CLIENT FROM THAT PERSPECTIVE; IS THAT NOT THE CASE?

**MR. QUINN:** NOT EXACTLY. I MAKE A DISTINCTION BETWEEN INTERIM OUTPUTS WHICH ARE THE PRODUCT OF CERTAIN OPTIMIZATIONS AND RENDERING STAGE OPTIMIZATIONS, THEY ARE SORT OF TWO DIFFERENT PARTS OF THE PIPELINE.

WE THINK OF THE PIPELINE IN THESE THREE STAGES: THERE ARE THESE INPUTS PROVIDED BY THE ADVERTISER, WE BASICALLY HAVE THOSE, THEN SOME OPTIMIZATIONS MAKE THEIR CHANGES SORT OF MID-PIPELINE WHILE THE AD IS BEING CREATED, AND FOR THOSE WE HAVE A BIG PILE OF THE OUTPUTS THAT THEY CREATED.

AND FOR THE VERY LAST THREE MONTHS OF THE DISCOVERY PERIOD, WE KNOW WHICH OF THOSE OUTPUTS GOT SHOWN TO SOMEBODY. NOW THAT'S A PROBLEM IN ITSELF IN LOTS OF WAYS. 2023 WAS REALLY THE KEY YEAR WHERE THE GENERATIVE AI TOOLS COME ONLINE, THE NUMBER OF SCAM ADS EXPLODES, META IS ALREADY ON RECORD IN ITS DEMURRER SAYING THIS IS A MATERIAL CONTRIBUTION CASE, AND THEY PRESERVE NOTHING.

BUT FOR A LATER PERIOD AFTER '23, WE GET DATA ABOUT THOSE INTERIM OUTPUTS, THE ALTERED COMPONENTS MADE BY THESE MIDSTREAM OPTIMIZATIONS. BUT THEN THERE IS A WHOLE FINAL PHASE OF RENDERING STAGE OPTIMIZATIONS, AND THEY ARE PRETTY SIGNIFICANT, THEY DO THINGS LIKE THEY TAKE A VIDEO AND THEY CHOP IT INTO

DIFFERENT PIECES AND THEY PUT CUTS AT DIFFERENT PLACES IN THE VIDEO, THAT COULD EASILY RAISE OR BURY A DISCLAIMER.

THEY CREATE OVERLAID TEXT, WHICH AS THIS COURT POINTED OUT I THINK AT THE MOTION TO DISMISS HEARING, CAN BE SIGNIFICANT, DISCLAIMERS CAN BE MORE OR LESS PROMINENT.

SO THOSE CHANGES ARE MADE BY RENDERING STAGE OPTIMIZATIONS AND WE CAN'T SEE AT ALL WHAT THOSE RENDERING STAGE OPTIMIZATIONS DID. WE DON'T --

**THE COURT:** I MEAN -- BUT DOES THE PRESUMPTION/INFERENCE NOT ADDRESS THAT BY SAYING, LET'S ASSUME THAT THE MAXIMUM RENDERING STAGE OPTIMIZATIONS WERE APPLIED? I MEAN ISN'T THAT -- IN SOME WAYS, YES, THE BEST VERSION OF THE ANSWER TO THIS QUESTION WOULD BE X HAPPENED, BUT IT SEEMS TO ME THEY ARE OFFERING IN SOME WAY THE POSITION MAYBE X MIGHT HAVE HAPPENED, Y MIGHT HAVE HAPPENED, Z MIGHT HAVE HAPPENED. WE CAN PRESUME ANY OF THESE MIGHT HAVE HAPPENED. I GUESS THAT'S WHERE I'M HAVING TROUBLE UNDERSTANDING EXACTLY WHAT IS MISSING IN TERMS OF THE PREJUDICE PIECE OR WHY THAT'S NOT SUFFICIENT TO ADDRESS THE PREJUDICE CONCERNS.

**MR. QUINN:** SO ON THAT OUTPUT DATA, THE COURT IS EXACTLY RIGHT, THE INFERENCE ESSENTIALLY SAYS IF A RENDERING STAGE OPTIMIZATION WAS TURNED ON, YOU CAN ASSUME IT ACTED -- IT CONTRIBUTED TO THE FINAL AD, AND THAT IT ACTED IN ACCORDANCE WITH ITS DESIGN DOCUMENTS.

THE TWO PROBLEMS ARE WITH THAT LAST PIECE. FIRST, AS OUR

EXPERT EXPLAINS, AND AS THE COURT I THINK JUST NOTED, IT'S SORT OF LIKE TRYING TO TAKE IN VAN GOGH'S STARRY NIGHT BY READING AN ART STUDENT'S PAPER ABOUT IT, OH IT HAS THESE VIVID COLORS AND IT USES THIS PARTICULAR BRUSH STROKE. THAT'S PRETTY PREJUDICIAL AS A WAY TO TRY TO UNDERSTAND WHAT STARRY NIGHT REALLY LOOKED LIKE.

THE OTHER PROBLEM IS THE DESIGN DOCUMENTS ARE ASPIRATIONAL, IT'S WHAT META IS HOPING THE TOOL WILL DO, IT'S WHAT IT'S SUPPOSED TO DO. BUT WE HAVE SEEN BITS AND PIECES OF DOCUMENTS IN THIS RECORD THAT SUGGESTS THE TOOLS OFTEN DO WHAT THEY ARE NOT SUPPOSED TO DO.

WE CITED AN EXAMPLE AS EXHIBIT N WHERE ONE OF THESE TOOLS PUT STRANGE APPENDAGES ON A LEGO CHARACTER, AND THE CLIENTS AT LEGO GOT PRETTY UPSET ABOUT IT. YOU KNOW, YOU PUT FEET ON OUR GINGERBREAD MAN, YOU HAVE RADICALLY CHANGED OUR CREATIVE.

SO IF WE ALL HAD TO ASSUME THAT TOOL DID WHAT IT WAS SUPPOSED TO DO, IT DIDN'T CAPTURE THAT INSTANCE WHERE THE LEGO MAN SUDDENLY HAS FEET, AND THE CLIENTS SAY THIS IS A RADICAL CHANGE TO OUR CREATIVE.

SO THERE IS THIS UNAVOIDABLE PREJUDICE IN NOT BEING ABLE TO SEE THESE ACTUAL OUTPUT RENDERING OPTIMIZATIONS OR HOW THE FINAL AD GOT ASSEMBLED AND PUT TOGETHER.

**THE COURT:** I GUESS ONE QUESTION IS COULD YOU USE THAT INFORMATION IN OPPOSITION TO SUMMARY JUDGEMENT, AT LEAST AT THAT POINT, TO DRAW A PARTICULAR INFERENCE FROM THE EVIDENCE

ABOUT HOW THE ADS THAT FEATURE DR. FORREST WORKED? PRESUMABLY THEY DIDN'T ADD FEET TO HIS EARS OR SOMETHING LIKE THAT.

**MR. QUINN:** I THINK IF WE HAD THE INFERENCE AND DO SUMMARY JUDGEMENT, SURELY WE WILL SAY THAT THOSE KINDS OF INFERENCES NEED TO BE DRAWN IN OUR FAVOR ON THAT MOTION, BUT AT THE END OF THE DAY WITHOUT ANY OUTPUT FROM THE RENDERING OPTIMIZATIONS, WITHOUT EVEN THOSE ALTERED COMPONENTS, AND WITHOUT THE INSTRUCTIONS AS TO HOW THEY ASSEMBLE THE AD, ALL OF WHICH WERE EMINENTLY STORABLE, AND IN FACT STORED IN MANY WAYS, WE HAVEN'T CURED THE PREJUDICE. AND 37(E)(1) SPEAKS OF CURING THE PREJUDICE.

SO THAT I THINK IS THE FIRST OF THE ISSUES WITH THE PREJUDICE, THIS OUTPUT DATA REALLY ISN'T CURED. AND OUR SUBMISSION WOULD BE THAT THE GEORGIA CASE WE CITED FROM THE DISTRICT OF ATLANTA IS A PRETTY GOOD MODEL FOR THAT WHERE THERE IS EVIDENCE LOST THAT MAY CREATE THE ISSUE OF FEDERAL FACT. THE ANSWER IS TO HOLD THAT THAT FACT EXISTS, THAT IS THE APPROPRIATE SANCTION THAT CURES THE PREJUDICE, THAT'S THE MAZIAR CASE THAT WE CITE IN OUR PAPERS.

SO THAT'S THE FIRST ISSUE, WE CAN'T REALLY SOLVE THE PROBLEM ON OUTPUT DATA. THE SECOND IS A SIMPLE PRINCIPLE THAT META ALSO SHOULD NOT BE PERMITTED AT SUMMARY JUDGEMENT OR AT ANY POINT IN THIS LITIGATION TO BENEFIT FROM THE ABSENCE OF THIS INFORMATION, EITHER BY MAKING AN ARGUMENT ABOUT THE ABSENCE OF EVIDENCE THAT COULD HAVE BEEN PRESERVED OR BY

POINTING TO SUCH AN ABSENCE IN REBUTTING A SHOWING THAT DR. FORREST MADE. FOR EXAMPLE, IF WE CITED THE LEGO DOCUMENT --

**THE COURT:** I GUESS ONE QUESTION IS, IS THAT -- THEY SAY THEY DON'T INTEND TO DO THAT. IS THAT AN ISSUE THAT IS BETTER DEALT WITH, YOU KNOW, IF THEIR REPLY ON SUMMARY JUDGEMENT TRIES TO MAKE AN ARGUMENT LIKE THAT AND YOU CAN SAY NO. IF WE ARE DOWN THE ROAD AND YOU SAY, YOUR HONOR, YOU ARE AWARE THE REASON WE CAN'T RESPOND IS X.

AND I MEAN, DOES IT -- PART OF BOTH ON TERMS OF THINKING ABOUT WHETHER THERE IS A PARTICULAR -- WHETHER I SHOULD CONCLUDE THAT THERE IS A MATERIAL DISPUTE OF FACT AND WHETHER I SHOULD CONCLUDE THAT THEY CATEGORICALLY CAN'T RELY ON THIS ABSENCE OF EVIDENCE, I MEAN IT STRIKES ME THAT THOSE SEEM TO BE ISSUES THAT ARE BETTER DEALT WITH IN THE PARTICULAR CONTEXT OF THE BRIEFING OR TRIAL OR WHERE IT'S ARISING AS OPPOSED TO MAKING A CATEGORICAL RULING AT THIS TIME, RIGHT, TO SAY SHOW ME IN YOUR OPPOSITION TO SUMMARY JUDGEMENT ON THE SECTION 230 GROUNDS, WHAT IS AVAILABLE AND WHAT INFERENCES CAN BE DRAWN IN YOUR FAVOR ON THE BASIS OF THE INFERENCE THAT'S BEEN PROPOSED?

AND IF THERE IS IN FACT AN ISSUE THAT YOU CAN'T RESPOND TO BY VIRTUE OF THE QUESTION OF EVIDENCE NOT BEING AVAILABLE BECAUSE IT WAS NOT MAINTAINED, EXPLAIN IT TO ME AT THAT POINT AS OPPOSED TO SORT OF ASKING ME AT THIS POINT BEFORE I EVEN HAVE REALLY FULLY GOTTEN INTO THE QUESTION OF SUMMARY JUDGEMENT

ON SECTION 230 OR OTHERWISE TO SORT OF DRAW THAT SORT OF CONCLUSION.

WHY IS THAT NOT THE RIGHT WAY TO THINK ABOUT HOW TO HANDLE THIS MATTER?

**MR. QUINN:** I CERTAINLY HEAR THE COURT'S POINT AND IF THAT WERE THE COURT'S DECISION WE WOULD PROCEED ACCORDINGLY, AND THAT IS WORKABLE, TO BE SURE.

I THINK FROM PLAINTIFF'S PERSPECTIVE THE FACT THAT META ESSENTIALLY AGREES THAT THIS SORT OF PRECLUSION -- THAT THEY SHOULDN'T BE PERMITTED TO REFER TO THIS EVIDENCE REALLY DOES COUNSEL IN FAVOR OF ENTERING THAT ORDER NOW AND ALLOWING THE PARTIES TO HAVE THAT GUIDANCE IN PREPARING ALL OF THE BRIEFING.

ALSO AS META SORT OF MAKES THE POINT ITSELF, THE SPOLIATION RULES AND THE LOCAL RULES CONTEMPLATE DEALING WITH THESE ISSUES AND IMPOSING THE SANCTIONS AND FIXING THOSE CONSEQUENCES QUICKLY WHEN THE ISSUE RIPENS. WHEN THE ISSUE IS RIPE, THE FACTS ARE CLEAR, WE ARE ALL CLEAR, SO OUR VIEW WOULD BE THAT'S A 37(E)(1) SANCTION AND NOW IS THE TIME, PRIOR TO THE BRIEFING, TO GET THAT GUIDANCE AND FRAMEWORK IN PLACE.

**THE COURT:** LET ME ASK YOU BECAUSE META HAS EXPRESSED ITS WILLINGNESS TO SORT OF AGREE TO SOME KIND OF PRESUMPTION INFERENCE, WHATEVER WE WANT TO CALL IT, TO ADDRESS SORT OF THE ISSUES WE ARE FACING. IS THERE ANY NEED TO ADDRESS 37(E)(2), TO REACH THE QUESTION -- I MEAN, IF THEY WEREN'T -- IF YOU WERE SEEKING AN ADVERSE INFERENCE AND THEY WERE OPPOSING THAT, THE

RULE SAYS I NEED TO FIND AN INTENT TO DEPRIVE YOU OF THAT EVIDENCE IN ORDER TO DRAW THAT INFERENCE. WE DON'T SEEM TO NEED THAT BECAUSE OF SORT OF THE LITIGATION POSITION THE PARTIES ARE TAKING.

SO IS THERE ANY NEED FOR ME TO DETERMINE WHETHER THERE WAS IN FACT AN INTENT TO DENY YOUR CLIENT ACCESS TO THIS EVIDENCE AS OPPOSED TO PERHAPS JUST GROSS NEGLIGENCE IN THE HANDLING OF MATERIAL?

**MR. QUINN:** LET ME GIVE YOU TWO ANSWERS TO THAT QUESTION, YOUR HONOR.

FIRST, THE COURT IS CERTAINLY RIGHT THAT MOST OF THE RELIEF WE'VE SOUGHT AND THE RELIEF WE ARE CURRENTLY TALKING ABOUT IS RELIEF THE COURT CAN AND SHOULD ENTER UNDER 37(E)(1) ON A FINDING OF SPOLIATION AND PREJUDICE.

**THE COURT:** I MEAN, THERE IS A QUESTION ABOUT THAT, RIGHT, BECAUSE YOU ARE SEEKING AN INFERENCE AND THEY TALK ABOUT INFERENCES IN (E)(2) AND SAY YOU NEED TO FIND INTENT, BUT THEY HAVE SAID WE WILL ACCEPT AN INFERENCE.

SO I'M NOT SURE IF THEY WOULDN'T HAVE DONE THAT, WE MIGHT BE IN (E)(2) LAND, BUT IT SEEMS LIKE THEY HAVE SORT OF CONCEDED WE CAN TALK ABOUT INFERENCES WITHOUT WORRYING ABOUT ME HAVING TO FIND THERE WAS AN INTENT TO DEPRIVE YOU OF THIS EVIDENCE.

**MR. QUINN:** I AGREE COMPLETELY. AND I HAVE GIVEN THIS PIECE A LOT OF THOUGHT, AS THE COURT HAS SURELY NOTED. WE SOUGHT THIS INFERENCE UNDER 37(E)(2) BECAUSE WE DID THINK OF IT

AS AN ADVERSE INFERENCE. THIS IS AN INFERENCE WE ARE DRAWING IN THE ABSENCE OF EVIDENCE THAT IS FAVORABLE TO THE PARTY THAT DIDN'T FAIL TO PRESERVE THAT EVIDENCE, RIGHT? SO WE CONCEPTUALIZED IT AS AN ADVERSE INFERENCE, OF COURSE IT'S NOT THE STANDARD ADVERSE INFERENCE, JUST GENERALLY ASSUME THE MISSING EVIDENCE IS NEGATIVE TO THE PARTY, IT'S VERY TAILORED TO THE DATA THAT WE DO HAVE, THE DATA WE DON'T HAVE, ONE CAN USE THE WORD "PRESUMPTION."

SO I THINK META HAS TRIED TO SLIDE IT INTO THE 37(E)(1) BOX AND PLAINTIFF HAS NO OBJECTION TO THAT, RIGHT, WE WILL TAKE --

**THE COURT:** THEY WOULD LIKE ME TO DO THAT IN ORDER TO SAY THERE IS NO PREJUDICE SO THERE'S NO SPOLIATION WHATSOEVER, THAT'S WHAT THEY ARE HOPING FOR, SO IT'S A LITTLE DIFFERENT POSITION.

**MR. QUINN:** THEY DID TRY TO TUCK IT INTO THE DATA REPLACEABILITY ARGUMENT, AND OBVIOUSLY TO ACKNOWLEDGE THAT WE NEED TO -- AN INFERENCE IS TO ACKNOWLEDGE THE DATA CAN'T BE REPLACED. BUT THEY PUT UP QUITE A FIGHT ABOUT IT NOT BEING A 37(E)(2) INFERENCE AND ARE A LITTLE BIT MORE SILENT AS TO IT BEING A 37(E)(1) INFERENCE, SO I TOOK THAT TO PERHAPS SUGGEST THAT IT WOULD BE AN INFERENCE THEY WOULD BE OKAY WITH UNDER (E)(1), AND IF SO, PLAINTIFF IS OKAY WITH THAT.

AND I DO THINK IT'S A TAILORED, CURATIVE REMEDY TO GAPS IN THE RECORD AND THE COURT HAS WIDE DISCRETION ON (E)(1). SO WE

DO THINK THAT'S APPROPRIATE AND THE PARTIES ARE LARGELY IN AGREEMENT ABOUT SOME VERSION OF THAT INFERENCE. ALSO THE ORDER WE TALKED ABOUT, OUR POTENTIAL ORDER PRECLUDING THEM REFERRING TO THE ABSENCE OF EVIDENCE, THAT'S SORT OF A STANDARD (E)(1) SANCTION AS WOULD BE A COSTS AWARD, AS WE THINK WOULD BE APPROPRIATE HERE, AS TO THE INFERENCE AND WHY IT'S NOT FULLY SUFFICIENT.

SO I THINK THE COURT CAN DO ALL OF THAT ON (E)(1) AND SHOULD. IS THERE A NEED TO REACH (E)(2)? ULTIMATELY, THERE WILL BE, I DON'T THINK THERE IS A NEED TO REACH IT IN THIS MOMENT, BUT THE COURT CAN, ON THIS RECORD, AND WE THINK SHOULD, LOPEZ PROVIDES A PRETTY GOOD ROADMAP FOR THAT WHERE A HIGHLY SOPHISTICATED COMPANY WITH TREMENDOUS TECHNOLOGICAL CAPABILITY HAS BEEN DOWN THIS VERY ROAD BEFORE, CHASTISED BY THIS VERY COURT BY FAILING TO PRESERVE HIVE TABLES, AND THESE ARE ALL THE FACTS THE COURT NOTED IN LOPEZ AND THEN SAYS THAT THE FAILURE TO SUSPEND ITS OWN AUTO-DELETION POLICIES AMOUNTS TO INTENT, ESPECIALLY WHEN YOU COMBINE IT WITH A PATTERN OF OBFUSCATION AND FALSE REPRESENTATIONS.

AND THERE, IF I MAY, I WOULD JUST HIGHLIGHT THAT IN MARCH OF 2023, THEY STOOD BEFORE JUDGE DAVILA AND SAID WE ARE CURRENTLY PRESERVING EVERYTHING RESPONSIVE TO THE "SUPER BROAD REQUEST" THAT PLAINTIFF HAS SERVED ON US.

BY THEIR OWN ADMISSION, THEY WEREN'T PRESERVING ANYTHING WHEN THEY STOOD BEFORE THIS COURT AND SAID THAT. THAT IS A

PRETTY GLARING FALSE REPRESENTATION TO MAKE TO A FEDERAL COURT, AND AN INTENT SANCTION IS THE WAY TO HOLD THEM ACCOUNTABLE FOR THAT.

AND WE THINK THAT'S APPROPRIATE ON THIS RECORD AND WILL NEED TO BE DECIDED, BECAUSE IF A JURY IS EVER TO BE INSTRUCTED THAT THEY CAN DRAW AN ADVERSE INFERENCE, THERE WILL NEED TO BE AN INTENT FINDING.

NOW IN LOPEZ JUDGE KIM SAID THE JURY CAN DEAL WITH THAT LATER, THIS COURT COULD DO LIKEWISE, WE DON'T NEED TO DO THAT NOW, BUT WE CAN, AND THE RECORD HAS RIPENED, AND AS META ARGUES, THIS IS THE RIGHT TIME TO MAKE THESE DECISIONS.

IF I MAY, YOUR HONOR, I WANT TO HIGHLIGHT THE TWO KEY POINTS ABOUT THE PREJUDICE.

**THE COURT:** YEAH, I WAS GOING TO ASK YOU ABOUT THE PREJUDICE WITH RESPECT TO THE INTERIM DATA ISSUE AS OPPOSED TO THE FINALIZED OUTPUT ISSUE.

**MR. QUINN:** SO TWO ISSUES WITH THE PRESERVATION OF THE INTERIM OUTPUTS, AND I THINK WE ARE TALKING ABOUT THE DELIVERY TABLE AS THE PARTIES HAVE NOW SORT OF DEFINED IT, THE TWO ISSUES WITH THAT TABLE: ONE, IT'S NOT QUITE SUFFICIENT. EVEN WITH THE KIND OF PILE OF INTERIM OUTPUT COMPONENTS THAT WE HAVE; AND TWO, IT WAS PRESERVED MUCH TOO LATE. AND THE SNAPSHOT WE HAVE IS BY NO MEANS A REPRESENTATIVE ONE.

**THE COURT:** RIGHT. IT'S THE QUESTION OF THE PREJUDICE QUESTION AS TO THOSE IN COMBINATION, AGAIN WITH

WHAT'S BEEN PROPOSED AS A PRESUMPTION.

**MR. QUINN:** CORRECT.

THE PRESUMPTION IS MEANT TO SORT OF DEAL WITH THEIR FAILURE TO PRESERVE THE DELIVERY TABLE SOONER THAN THEY DID. THAT DOESN'T QUITE DEAL WITH THE FACT THAT THE DELIVERY TABLE HAS SOME SERIOUS LIMITATIONS TO IT THAT WOULD HAVE BEEN SOLVED BY THE FINAL INSTRUCTIONS.

SO LET ME PUT IT THIS WAY, THERE IS THIS PILE OF INTERIM OUTPUTS THAT THESE TOOLS HAVE CREATED, ONLY A FRACTION GET ACTUALLY PUT INTO A FINAL AD AND SHOWN TO SOMEBODY. MANY OF THESE OPTIMIZATIONS CREATE MULTIPLE OUTPUTS.

SO LIKE THE THUMBNAIL TOOL, TAKES A VIDEO AND IT SELECTS THE STATIC IMAGE FROM THAT VIDEO THAT IS APPEARING ON THE SCREEN BEFORE THE USER PRESSES PLAY. OBVIOUSLY IT WOULD BE SIGNIFICANT IN A MISAPPROPRIATION CASE IF THAT STATIC IMAGE WERE A BIG PHOTO OF DR. FORREST'S FACE VERSUS SOMETHING ELSE. AND THE THUMBNAIL TOOL WOULD MAKE THAT DECISION.

NOW THE THUMBNAIL TOOL CREATES A LOT OF DIFFERENT THUMBNAILS THAT ALL SIT IN THIS PILE. ONLY ONE OF THEM GETS PICKED AND PUT INTO THAT FINAL AD. THE DELIVERY TABLE DOESN'T TELL US THAT, THE DELIVERY TABLE WILL SAY THE THUMBNAIL TOOL MADE A CONTRIBUTION BUT IT DOESN'T TELL US WHICH THUMBNAIL GOT PUT INTO THE FINAL AD, FOR THAT WE WOULD HAVE TO HAVE THE FINAL INSTRUCTIONS.

THE SECOND ISSUE IS THE LATE PRESERVATION. AND THE

INFERENCE AIMS TO DEAL WITH THAT, BUT I DO THINK IT'S WORTH HIGHLIGHTING THAT IT WAS APRIL 2025 BEFORE THEY PRESERVED THIS TABLE, AND AT THAT TIME, META HAD ALREADY WIPED EVERYTHING UP TO NOVEMBER OF 2024.

SO IN THE CASE, YOU KNOW, META IS ON RECORD IN 2022 SAYING THIS IS A MATERIAL CONTRIBUTION CASE. 2023 IS WHEN THE GEN AI TOOLS ROLL OUT. I WILL REPRESENT TO THE COURT THE NUMBER OF SCAM ADS EXPLODED. I MEAN 20X PER MONTH UP INTO THE THOUSANDS PER MONTHS, AND THEY RAGED FOR A YEAR. AND THEN THIS COURT DENIES THE MOTION TO DISMISS IN JUNE '24, THAT'S WHEN PAUL WEISS GETS ENGAGED, THEY GO IN, THEY DO SOME INVESTIGATING, YOU KNOW, THEY ACTUALLY BEGIN TO TAKE SOME STEPS. THAT'S A PARTY HOPING TO WIN THE MOTION TO DISMISS AND DOING ZERO ON PRESERVATION UNTIL THE MOTION TO DISMISS IS DECIDED, BEING REACTIVE. IT'S A SERIOUS VIOLATION. AND THEN EVEN WHEN THEY DO, IT STILL TAKES QUITE A BIT OF TIME.

SO IN A CASE WHERE THE RECORD IS, 2023 IN PARTICULAR, IS KEY, THE TOOLS ARE RAGING, THE SCAM ADS ARE RAGING, WE'VE GOT NO DATA IN THE DELIVERY TABLE.

SO THE INFERENCE IS MEANT TO DEAL WITH THAT BUT WE ARE STILL SEEING A REAL SLANTED RECORD IN THAT SENSE. AND THERE IS A SECOND SLANT BY VIRTUE OF THE FAILURE TO PRESERVE THE FINAL OPTIMIZATION DATA, LIKE IF YOU THINK OF EACH AD AS GOING THROUGH A PIPELINE FROM THE INPUT WHERE, BY DEFINITION, NO CHANGES HAVE BEEN MADE YET, ALL THE WAY THROUGH AN OUTPUT WHERE

ALL THE CHANGES HAVE BEEN MADE, WE'VE GOT LESS AND LESS VISIBILITY AS THE AD GOES THROUGH THAT PIPELINE, IT'S A RECORD ALMOST SLANTED TO PREVENT A FINDING OF MATERIAL CONTRIBUTION. AND AGAIN, THE INFERENCE DOESN'T QUITE DEAL WITH THAT FINAL OUTPUT PROBLEM.

SO WE THINK THE FINDING OF AN ISSUE OF MATERIAL FACT IS THE BEST WAY TO DEAL WITH THAT, IF NOT WE WOULD WANT THE INFERENCE, THE FINDING OF SPOLIATION, WHICH IS IMPORTANT FOR A LOT OF REASONS, INCLUDING THAT THERE MAY BE OTHER PHASES TO THIS CASE, WE THINK WILL BE, AND IT'S NOT CLEAR TO US RIGHT NOW TODAY THAT ALL THE AD DATA WE WILL NEED IN PHASE TWO IS BEING PRESERVED, SO A FINDING NOW IS IMPORTANT.

AND WE WOULD NEED COSTS, AS I MENTIONED.

**THE COURT:** OKAY. THANK YOU.

LET ME HEAR FROM META.

**MR. BROWN:** THANK YOU, YOUR HONOR.

WE THINK THE COURT IN ITS INITIAL COMMENTS IS LOOKING AT THIS CORRECTLY IN TERMS OF WHERE ARE WE TODAY, WHERE ARE WE RIGHT NOW?

AND THERE'S TWO BUCKETS OF DATA HERE THAT THEY ARE REALLY TALKING ABOUT AND I THINK WE ARE MUDDLING THEM A LITTLE BIT SO I JUST WANT TO BREAK THIS OUT A BIT.

WE HAVE THE FINAL RENDERED ADS AND THEN WE'VE GOT THE OPTIMIZATION DATA CAPTURED IN THE DELIVERY TABLES AND THE POST-IMPRESSION TABLES, TWO VERY DIFFERENT THINGS.

THE FINAL RENDERED AD SAYS WE WILL CALL THAT THEIR STARRY NIGHT VAN GOGH. IT DOESN'T EXIST, IT DIDN'T EXIST AT META, NEVER EXISTED --

**THE COURT:** WELL, YOU HAD A SAMPLING OF THEM, CORRECT? I MEAN, THERE WAS A DATABASE MAINTAINED, THAT WERE SENT BACK AND SAMPLED AND THAT WAS NOT --

**MR. BROWN:** THAT WAS POST-IMPRESSION DATA OF THE ADS THAT WERE RUN, NOT A VISUAL DEPICTION OF THE ADS.

**THE COURT:** BUT YOU DID NOT MAINTAIN THE POST-IMPRESSION DATA THAT WAS SAMPLED, CORRECT?

**MR. BROWN:** WE DID NOT MAINTAIN THE POST-IMPRESSION DATA THAT WAS SAMPLED UNTIL WE PUT IT ON HOLD, THAT'S CORRECT.

**THE COURT:** SO WE ARE MISSING, WHAT, FOUR YEARS, FIVE YEARS OF THAT DATA?

**MR. BROWN:** I DON'T KNOW THE PRECISE TIME, BUT YES, THERE WAS A VERY SMALL AMOUNT OF DATA.

NOW AS WE HAVE INDICATED, IT'S HIGHLY SIMPLE SAMPLED, IT IS CREATED FOR PURPOSES OTHER THAN LITIGATION, FOR BUSINESS PURPOSES.

**THE COURT:** RIGHT. BUT AT LEAST THAT'S SOMETHING. I MEAN, IT WAS IN YOUR POSSESSION AND IT WAS NOT MAINTAINED --

**MR. BROWN:** CORRECT. AND THAT'S OF COURSE WHY WE ARE OFFERING THIS INFERENCE. BUT MY POINT IS THAT TABLE -- THOSE TABLES WITH THE POST-IMPRESSION DATA AND THE DELIVERY TABLE, NEITHER OF THOSE GROUPS OF TABLES WERE GOING TO SHOW THE FINAL

RENDERED ADS, THAT WAS NEVER GOING TO BE IN THAT TABLE, IT'S DATA, IT'S NUMBERS, AND IT'S NOT VISUAL DEPICTIONS.

THAT DOESN'T EXIST, THEY HAVE PIVOTED IN THEIR REPLY BRIEF NOW TO SUGGEST THAT THE INSTRUCTIONS AND THE CODE AT THE TIME WOULD HAVE ALLOWED THAT TO HAPPEN WITH PROFESSOR MICKENS OFFERING THAT OPINION. I CAN HAVE MY COLLEAGUE, MS. SIMONS EXPLAIN WHY THAT DOESN'T WORK, IT WOULD HAVE REQUIRED US REALLY TO BUILD A ROCKET SHIP, AND IT'S JUST NEVER GOING TO RESULT IN WHAT THEY WERE LOOKING FOR.

BUT I THINK IT'S IMPORTANT TO PUT THAT PIECE OF THIS ASIDE, THE FINAL RENDERED ADS THAT WERE A VISUAL DEPICTION.

**THE COURT:** I MEAN, AND THAT MAY BE THE CASE. THEIR ARGUMENT IN SOME WAYS WOULD BE LIKE, WELL, YOU MIGHT HAVE THOUGHT ABOUT TRYING SOMETHING, WHETHER IT WAS SAMPLING A GREATER AMOUNT OF THIS MATERIAL TO FIGURE OUT WHICH ADS RELATED TO DR. FORREST OR WHETHER IT WAS TO SEE THERE WAS SOME WAY TO MAINTAIN THIS MATERIAL TO SEE IF IT DEALT WITH DR. FORREST, YOU KNOW, NOTHING HAPPENED, THERE WAS JUST SIMPLY NO EFFORT TO MAINTAIN ANY OF THIS FOR FOUR TO SIX YEARS OF THIS LITIGATION, IS THEIR ESSENTIAL POSITION, CORRECT?

**MR. BROWN:** WELL IT WOULD HAVE -- I DON'T KNOW THAT -- I CAN SAY NO ONE THOUGHT OF IT, THERE WAS NO EVIDENCE ANYONE THOUGHT ABOUT IT. I SUPPOSE YOU COULD SAY SOMEONE SHOULD HAVE THOUGHT ABOUT IT, BUT IT IS NOT SOMETHING THAT WAS EVER DONE IN THE ORDINARY COURSE OF BUSINESS, NOT SOMETHING

THAT'S EVER DONE FOR ANY PURPOSES, AND IT WOULD HAVE REQUIRED --

**THE COURT:** WELL, THE SAMPLING WAS. I MEAN, WE JUST TALKED ABOUT THAT, THAT WAS IN THE ORDINARY COURSE OF BUSINESS AND AS FAR AS THE TAKE, IS JUST LIKE, THE DATABASE WAS REALLY BIG, SO STARTING TO DO MANY -- WHETHER THAT WAS TO DO AN INTERIM HOLD AND GO THROUGH IT AND FIGURE OUT WHAT NEEDED TO BE KEPT, YOU KNOW, THERE ARE OTHER ALTERNATIVES TO JUST ENTIRELY STOPPING AUTO-DELETION OF A DATABASE, AND IT SEEMS LIKE HERE THE TAKE IS JUST HIVE IS REALLY COMPLICATED AND WE JUST WEREN'T REALLY GOING TO GO TOO DEEP INTO HIVE, IT WOULD TAKE TOO MUCH TIME.

**MR. BROWN:** SO NO ONE MADE THAT DECISION WITH RESPECT TO THIS CASE, THE SAMPLING IS DONE FOR OTHER PURPOSES. AND AGAIN, THIS IS FOR THE DATA, NOT THE FINAL RENDERED ADS AND THE DEPICTIONS, BUT I HEAR YOUR HONOR.

BUT I THINK -- SO IF YOU PUT ASIDE THE FINAL RENDERED ADS FOR A MOMENT AND FOCUS ON THE DELIVERY TABLE AND THE POST-IMPRESSION TABLES, WE BELIEVE THE INFERENCE WE'VE OFFERED, AND AGAIN THIS IS AN INFERENCE TO CURE ANY POTENTIAL PREJUDICE, IT'S NOT AN ADVERSE INFERENCE UNDER 37(E)(2), I CAN CERTAINLY SPEAK TO THE ISSUE OF INTENT IF THE COURT WISHES, BUT WE BELIEVE -- WE ARE CONFIDENT THAT THE INFERENCE ADDRESSES ANY POTENTIAL PREJUDICE WITH RESPECT TO BOTH THE DELIVERY TABLE AND THE POST-IMPRESSION TABLES.

IT'S AN INCREDIBLY BROAD INFERENCE, IT IS -- WELL ALL RECORD EVIDENCE, IT'S SOURCE CODE, IT'S NOT JUST SORT OF ASPIRATIONAL SOURCES, BUT THEY CAN PRESUME THAT EVERY SINGLE OPTIMIZATION THAT AN ADVERTISER OPTED INTO OR DECLINED TO OPT OUT OF WAS IN FACT DELIVERED, AND THAT COUPLED WITH THE RECORD EVIDENCE AND THE SOURCE CODE, THEY CAN MAKE WHATEVER ARGUMENTS THEY WANT --

**THE COURT:** CAN I -- DO YOU AGREE THAT PART OF THE INFERENCE WOULD BE THAT, YOU KNOW, TO THE EXTENT THAT THE OPTIMIZATION COULD HAVE, BUT YOU KNOW, RIGHT NOW IT'S PHRASED AS IT WORKED AS OPERATED.

DO YOU AGREE THAT PART OF THAT INFERENCE WOULD BE IF AN ELEMENT OF THAT WAS FOCUSING ON DR. FORREST IN THE THUMBNAIL AS OPPOSED TO ANY OF THE OTHER PEOPLE WHO MIGHT HAVE BEEN INCLUDED OR CUTTING OUT A PORTION OF A VIDEO THAT FOCUSED ON DR. FORREST'S DISCUSSION AS OPPOSED TO OTHER PORTIONS OF THE VIDEO, DO YOU AGREE THAT THAT INFERENCE CAN BE DRAWN UNDER THIS APPROACH?

**MR. BROWN:** IF THE TOOL IS CAPABLE OF THAT, YES.

**THE COURT:** OKAY.

**MR. BROWN:** AND SO WE REALLY BELIEVE THIS INFERENCE ADDRESSES ANY POTENTIAL PREJUDICE. WE'VE HAD DISCUSSIONS WITH COUNSEL, BUT I THINK -- I DON'T THINK THERE'S REALLY ANY DAYLIGHT BETWEEN THE INFERENCE WE ARE PROPOSING AND THE ONE THEY ARE ASKING FOR. THEY MAY QUIBBLE WITH WHETHER IT DOES THE

JOB OR NOT, WE BELIEVE IT DOES.

**THE COURT:** SO ARE YOU COMFORTABLE, ASSUMING YOU ARE COMFORTABLE WITH SOME KIND OF INFERENCE, WITH THE MODIFIED VERSION THAT WAS PROPOSED IN THE REPLY BRIEF?

**MR. BROWN:** YES, YOUR HONOR.

**THE COURT:** OKAY.

**MR. BROWN:** AND LIKEWISE, WE ARE COMFORTABLE REPRESENTING TO THE COURT AND TO COUNSEL THAT WE DO NOT INTEND TO, IN OUR LITIGATION OF THE SECTION 230 DEFENSE, ARGUE THAT THE ABSENCE OF ANY DATA IS TO OUR ADVANTAGE. THAT'S NOT SOMETHING WE INTEND TO DO.

**THE COURT:** AND DOES THAT INCLUDE ARGUMENT TO THE JURY IF WE ULTIMATELY CONCLUDE THAT THERE IS A FACTUAL ISSUE THAT HAS TO BE RESOLVED BY THE JURY THAT BEARS UPON YOUR DEFENSE UNDER SECTION 230?

**MR. BROWN:** YES.

**THE COURT:** OKAY.

**MR. BROWN:** I WANT TO ADDRESS THE ISSUE OF INTENT.

LET ME JUST START BY SAYING THIS, WE WOULD MUCH RATHER HAVE THIS DATA, WE BELIEVE IT WOULD FACILITATE OUR DEMONSTRATION THAT META DID NOT MATERIALLY CONTRIBUTE.

**THE COURT:** I MEAN, I'M NOT SURPRISED, I WAS EXPECTING AT THE TIME I ASKED FOR AN EARLY MOTION ON SUMMARY JUDGEMENT UNDER SECTION 230 THAT META WOULD HAVE EVERYTHING IN ITS POSSESSION TO PUT FORTH A MOTION FOR SUMMARY JUDGEMENT IN A

MATTER OF MONTHS. I THINK THAT WAS TWO YEARS AGO AT THIS POINT GIVEN WHERE WE ARE IN THE CASE.

AND I UNDERSTAND THAT YOU WERE NOT COUNSEL EARLIER ON IN THE CASE, THERE IS BEEN A SHIFT IN COUNSEL, SO I UNDERSTAND THAT POSITION, THE QUESTION IS REALLY MOSTLY WHAT HAPPENED BEFORE YOUR LAW FIRM BECAME INVOLVED IN THIS MATTER, CORRECT?

**MR. BROWN:** WE HAVE LAID OUT IN OUR PAPERS THE CHRONOLOGY. I MEAN, I THINK THE LAWSUIT WAS EVOLVING, AND REALLY I THINK UNTIL 2023 --

**THE COURT:** SO I MEAN, ON THAT FRONT I WILL HAVE TO BE VERY FRANK WITH YOU, YOU KNOW, AS I WAS READING YOUR OPPOSITION, BEFORE EVEN READING THEIR REPLY BRIEF MY THOUGHT WAS THEY -- META HAD TO BE CERTAIN THAT THEY WERE GOING TO ASSERT A SECTION 230 DEFENSE IN THIS CASE WHICH IS AN AFFIRMATIVE DEFENSE AND SO THEY SHOULD HAVE KNOWN -- THEY LIKELY WERE ON NOTICE FROM THE MOMENT THEY GOT THAT FIRST LETTER THAT EVIDENCE REGARDING THE EXTENT TO WHICH THEY WERE OR WERE NOT INVOLVED IN THE CREATION OF THE ADS AS OPPOSED TO THEIR MERE PUBLISHING WOULD BE RELEVANT.

I MEAN, I HAD THAT THOUGHT BEFORE THEY THOUGHTFULLY PUT IT IN THEIR REPLY BRIEF AS WELL, AND I -- SO YOU KNOW, I DON'T KNOW ANY CASE THAT HASN'T INVOLVED A SECTION 230 DEFENSE IN A DECADE, SO --

**MR. BROWN:** WELL LET ME SAY THIS, YOUR HONOR, I THINK IT'S ONE THING TO CONTEMPLATE THAT THERE MIGHT BE A SECTION 230

DEFENSE, IT'S ANOTHER THOUGH TO CONTEMPLATE THAT IT'S GOING TO BE A DEFENSE TO AN ALLEGATION THAT WE MATERIALLY CONTRIBUTED TO THE CREATION OF THE ILLEGAL CONTENT.

AND IF YOU LOOK AT --

**THE COURT:** THAT'S THE CORE OF THE ANALYSIS UNDER SECTION 230, RIGHT, AND HAS BEEN FOR A WHILE. IT'S NOT AN ENTIRELY NEW LAW THAT I WAS MAKING IN THIS CASE.

**MR. BROWN:** NO, BUT THEIR THEORY IN THE EARLY PLEADINGS WAS THAT BY TARGETING THE ADS AND BY USING INFORMATION ABOUT END USERS TO TARGET THE ADS, WE WERE CURATING THEM IN A WAY THAT INVOLVED US BEING INVOLVED IN THE CREATION NOT BY THE USE OF THE TOOLS. AND IT REALLY WASN'T --

**THE COURT:** BUT I MEAN, IT'S -- AGAIN, THEY WERE SORT OF TRYING TO PRE-PREVIEW HOW THEY THOUGHT THAT YOU WOULD ASSERT A SECTION 230 AFFIRMATIVE DEFENSE, WHICH IS AN AFFIRMATIVE DEFENSE. SO YOU KNOW, THEY MIGHT HAVE HAD A DIFFERENT TACK AT SOME POINT, BUT ULTIMATELY THERE WAS ALWAYS GOING TO BE ABOUT WHETHER YOUR CLIENT WAS ENTITLED TO AN AFFIRMATIVE DEFENSE UNDER SECTION 230.

**MR. BROWN:** NO, I HEAR YOU BUT I JUST WANT TO POINT OUT THAT IT WAS NOT UNTIL SEPTEMBER OF '23 WHEN THEY FOR THE FIRST TIME MENTIONED AD TOOLS.

AND THEN THE ENSUING DECEMBER --

**THE COURT:** THEY MENTIONED SOMETHING IN SEPTEMBER '22, AM I RIGHT ABOUT THAT? THE DEMURRER RESPONSE

PERHAPS, OR I DON'T KNOW -- SOMETHING IN THE DEMURRER BRIEFING.

**MR. BROWN:** ABOUT SECTION 230, BUT NOT IN THE -- NOT I DON'T THINK SPECIFICALLY IN THE CONTEXT OF THE AD TOOLS. THERE MIGHT HAVE BEEN A PASSING REFERENCE.

BUT BE THAT AS IT MAY, NOTHING WITH RESPECT TO THESE AD TOOLS THAT WE ARE TALKING ABOUT NOW WAS PRESERVED AT THAT TIME AND I DON'T THINK THERE'S DISPUTE THERE.

THAT'S NOT TO SAY NOTHING WAS HAPPENING. EARLY ON, THERE WAS A LITIGATION HOLD, THERE WAS A CANONICAL TABLE PUT ON HOLD OF DATA WITH RESPECT TO ALL ADS, IT DOESN'T NECESSARILY INCLUDE THE OPTIMIZATION TOOL DATA COMPREHENSIVELY BUT THAT WAS PUT ON HOLD IN HAD 2023.

**THE COURT:** IN 2023?

**MR. BROWN:** YES. WHEN WE BEGAN --

**THE COURT:** SO NOTHING BEFORE 2023?

**MR. BROWN:** IN TERMS OF THE DATA FOR THE ADS, THAT'S CORRECT.

**THE COURT:** OKAY.

**MR. BROWN:** THE -- THERE WAS ALSO AN EFFORT MADE TO PRESERVE INDIVIDUAL ADS WHEN WE RECEIVED AD ID'S FROM META AND THROUGH A SWITCHBOARD PRESERVATION WE DID THAT, ULTIMATELY WE PRESERVED ALL RELEVANT POPULATION, THERE WAS 28,000 ADS AND THOSE WERE ALL PRESERVED IN SWITCHBOARD WHICH HAS A SUBSTANTIAL AMOUNT OF DATA.

SO THERE WAS PLENTY GOING ON, BUT THE FACT REMAINS AND

IT'S NOT IN DISPUTE THAT UNTIL WE GOT INVOLVED AND BEGAN DOING ADDITIONAL INVESTIGATION TO TRY TO UNDERSTAND THE LIFE CYCLE OF THE CREATION AND DELIVERY OF AN AD, UNDERSTANDING THE COMPLEXITY OF IT AND THE VASTNESS OF IT, THAT WE IDENTIFIED THESE TABLES.

AND IT WASN'T JUST SIMPLY A MATTER OF ALL THE SUDDEN REALIZING ALL THESE TABLES EXIST, IT WAS PULLING THREADS. AND WE IDENTIFIED AT ONE POINT IN 2025 THAT THE ADS -- THAT THE OPTIMIZATIONS THAT WERE SELECTED BY AN ADVERTISER FOR DELIVERY MIGHT NOT ACTUALLY BE DELIVERED, AND IT WAS AT THAT POINT THAT WE THEN FOCUSED ON THE DELIVERY TABLES AND --

**THE COURT:** RIGHT. I UNDERSTAND THAT AND I UNDERSTAND THAT -- I MEAN, IN SOME WAYS YOU MAY HAVE A MUCH STRONGER ARGUMENT ABOUT WHAT HAPPENED BETWEEN YOU GETTING INVOLVED AND THERE BEING SOME PERIOD OF DELAY BETWEEN GETTING INVOLVED AND RECOGNIZING VARIOUS DATA TABLES THAT NEEDED TO BE PRESERVED AND DOING SO.

THE QUESTION IS, YOU KNOW, WHY DID THAT NOT HAPPEN IN 2019, 2020, 2021, 2022? WHETHER USING -- IF THERE WAS OUTSIDE COUNSEL INVOLVED AT THAT TIME, WHETHER THEY WERE DOING THAT, OR REALLY IT'S ON -- META IS NOT A SMALL COMPANY, IT HAS A RATHER LARGE LEGAL DEPARTMENT, IT HAS FOLKS WHOSE JOB IS TO DO THAT AND IT CAN PRESUMABLY, ENTIRELY INTERNALLY HAVE THE CONVERSATIONS THAT IT NEEDS TO HAVES WITH THE ENGINEERS TO FIGURE OUT WHAT IS GOING ON AND WHAT WE NEED TO BE PRESERVING.

WHETHER IT'S EVIDENCE OF INTENT OR NOT, I THINK THE OTHER CASES THEY HAVE CITED AT LEAST ARE SUGGESTIVE OF A PATTERN OF NOT TAKING VERY SERIOUSLY THE NEED DO THAT WHEN THE POTENTIAL FOR LITIGATION BECOMES APPARENT.

**MR. BROWN:** AGAIN, YOU KNOW, THERE SIMPLY WASN'T, I THINK, A RECOGNITION ABOUT THE EXISTENCE, SIGNIFICANCE OF THOSE TABLES AT THAT TIME. AND WHEN --

**THE COURT:** AND MAYBE THERE WASN'T, MAYBE THE INCLINATION IS THAT THERE WAS A WILLFUL IGNORANCE ABOUT THAT ISSUE, BECAUSE IF YOU WERE TO FIGURE IT OUT YOU WOULD START PRESERVING IT AND SUDDENLY PEOPLE WOULD HAVE ACCESS TO IT. THERE ARE DIFFERENT CONCLUSIONS THAT CAN SORT OF BE DRAWN FROM THE RECORD, THAT'S OPINION PUT BEFORE ME.

**MR. BROWN:** RIGHT. BUT I THINK IF YOU CAN COME BACK TO THE POINT I MADE AT THE BEGINNING ON OUR DISCUSSION OF INTENT, WE WOULDN'T WANTED TO HAVE THIS DATA UNAVAILABLE, WE COULD HAVE USED IT AND WE COULD USE IT NOW. AND THERE WOULD BE NO REASON WHY WE WOULD GO THROUGH AN EXERCISE OF CONSIDERING AND DECLINING TO TAKE STEPS TO PRESERVE DATA THAT'S ULTIMATELY GOING TO BE HELPFUL TO US.

AND THAT'S THE STANDARD --

**THE COURT:** WELL, I MEAN -- RIGHT. MAYBE IN THIS CASE THAT'S THE CASE. AGAIN, MAYBE THERE IS A BROADER DESIRE TO NOT HAVE DATA MAINTAINED THAT MIGHT BE LESS USE IN THIS CASE, AND MAYBE THAT HELPS YOU IN (E)(2), BUT THE QUESTION OF

THERE IS STILL A REAL QUESTION ABOUT THE ADEQUACY OF META'S DATA PRESERVATION RESPONSE, META'S ABILITY TO HONOR ITS DATA PRESERVATION OBLIGATIONS IN THE FACE OF POTENTIAL LITIGATION.

**MR. BROWN:** UNDERSTOOD, YOUR HONOR. AND I'M NOT HERE TO TELL YOU IT WAS PERFECT, IT WAS NOT. AND FOR THAT REASON WE HAVE OFFERED AN INFERENCE THAT WE BELIEVE CURES ANY POTENTIAL PREJUDICE FROM THE UNAVAILABILITY OF THE DATA THAT WE ARE TALKING ABOUT HERE TODAY.

AND JUST TO AGAIN HIGHLIGHT THE INTENT ISSUE, I MEAN, YOU KNOW WELL THE STANDARD, YOU ISSUED AN OPINION IN A CASE SCM MICROELECTRONICS YOU ARE VERY FAMILIAR WITH.

**THE COURT:** A SMASHED USB DRIVE.

**MR. BROWN:** YES, A LITTLE DIFFERENT.

**THE COURT:** WE DON'T HAVE THAT EXACTLY HERE.

**MR. BROWN:** RIGHT. BUT EVEN THERE, YOU DIDN'T FIND INTENT, RIGHT, I THINK YOU FOUND A FACTUAL QUESTION, IF I'M RECALLING.

**THE COURT:** AND WE ARE HAVING AN EVIDENTIARY HEARING ON THAT ISSUE BECAUSE THESE THINGS CAN BE QUESTIONS OF CREDIBILITY. SO PERHAPS IF I NEED TO DO THAT, THAT MIGHT BE WHERE WE END UP ON THIS QUESTION.

**MR. BROWN:** WELL WE CERTAINLY HOPE NOT. AND WHAT I WOULD SAY IS THE STANDARD IS A WILLFUL DESIRE TO PREVENT THE EVIDENCE FROM BEING AVAILABLE IN THE LITIGATION.

AND I THINK THERE'S JUST SIMPLY NO EVIDENCE OF THAT. THE

STANDARD IS NOT NEGLIGENCE OR GROSS NEGLIGENCE OR EVEN RECKLESSNESS, IT'S A VERY, VERY HIGH STANDARD. AND AS I'VE SAID, WE WOULD LOVE TO HAVE THIS DATA, IT WOULD HELP US, AND WE DON'T HAVE IT. WE WOULD HAVE HAD NO REASON TO WANT TO DESTROY IT.

THIS IS NOT A MATTER OF PEOPLE CONSCIOUSLY THINKING, WELL THIS TABLE EXISTS, WE ARE NOT GOING TO PUT IT ON HOLD. THE AWARENESS DEVELOPED OF THE TABLES AND THE EXISTENCE OF DATA, STEPS WERE TAKEN IMMEDIATELY. AND THE NOTION THAT WE MISREPRESENTED TO THE COURT, THAT WAS JUST AN INCORRECT STATEMENT THAT WE CORRECTED ULTIMATELY, IT WAS NOT ATTEMPTED OBFUSCATION, IT WAS AN ERROR.

**THE COURT:** HOW DO I THINK ABOUT THE KNOWLEDGE STANDARD IN THE CONTEXT OF META AS A WHOLE? IS THE KNOWLEDGE OF ANY PARTICULAR OF EMPLOYEE IMPUTED TO META AS A WHOLE FOR PURPOSES OF THIS ANALYSIS OR DO I NEED TO FIND THIS RATIFICATION OF A PARTICULAR INDIVIDUAL'S VIEWS?

**MR. BROWN:** YEAH, I DON'T THINK THAT THE KNOWLEDGE OF A LOW LEVEL SOFTWARE ENGINEER IS GOING TO NECESSARILY BE IMPUTED TO META, WE HAVEN'T BRIEFED THAT ISSUE BUT I DON'T THINK THAT'S THE STANDARD, I THINK THERE'S GOT TO BE A HIGHER LEVEL RECOGNITION IN THE ORGANIZATION, AND I DON'T THINK EVERY PIECE OF KNOWLEDGE TO EVERY EMPLOYEE REGARDLESS OF --

**THE COURT:** I MEAN, THERE ARE CERTAINLY CONTEXT WHERE THAT IS THE CASE.

SO I GUESS -- I MEAN, IT JUST STRIKES ME -- AGAIN, IT'S NOT AN ISSUE THAT'S BEEN DIRECTLY RAISED BUT THERE MAY BE SOME -- AN INTERESTING QUESTION THAT IS POSED BY THIS. IF ULTIMATELY THERE IS A NEED, WHETHER NOW OR AT TRIAL TO MAKE A DETERMINATION AS TO THIS QUESTION, IF I CONCLUDE FOR NOW THAT I DON'T NEED TO AND I DECIDE NOT TO DO SO AT THIS TIME THEN WE MAY HAVE TO ACTUALLY HAVE SOME BRIEFING ON FIGURING OUT WHO CAN COME IN AND TESTIFY ON BEHALF OF META AND HOW DO I TREAT THAT TESTIMONY.

**MR. BROWN:** OKAY. BUT I REALLY -- EVEN IF YOU WERE TO CONCLUDE, AND I DON'T KNOW THAT THIS IS THE LAW, THAT KNOWLEDGE OF ANY SOFTWARE ENGINEER WAS IMPUTABLE, I THINK YOU WOULD HAVE TO FIND A SOFTWARE ENGINEER WHO HAD KNOWLEDGE OF THE EXISTENCE OF THIS DATA AND MADE A DECISION NOT TO PRESERVE IT, RIGHT. I MEAN, THAT REALLY IS THE STANDARD, THE WILLFUL EFFORT TO DEPRIVE THE OTHER SIDE OF THE EVIDENCE. AND SO EVEN IN A VICARIOUS LIABILITY THEORY, I DON'T KNOW THAT THAT WOULD WORK UNDER 37(E)(2).

AND AGAIN, OUR VIEW IS WE WOULDN'T HAVE DONE THAT BECAUSE WE WOULD LIKE TO HAVE THIS DATA IF WE COULD. THEY ARE NOW GOING TO BE ABLE TO ARGUE ON SUMMARY JUDGEMENT VERY EXPANSIVELY ABOUT EVERY ONE OF THESE OPTIMIZATIONS AND WE ARE NOT GOING TO BE IN A POSITION WITH THIS INFERENCE TO PUSH BACK ON THAT FRONT.

**THE COURT:** OKAY. THANK YOU.

I WILL GIVE YOU A COUPLE MINUTES FOR REBUTTAL IF THERE'S ANYTHING ELSE YOU WOULD LIKE TO OFFER.

**MR. QUINN:** THANK YOU, YOUR HONOR. FIVE QUICK POINTS. I WILL BE BRIEF.

FIRST ON THE FINAL RENDERING INSTRUCTIONS, THAT'S NOT A PIVOT, IT'S IN THE OPENING BRIEF AT PAGE 7. WE HAVE BEEN FOCUSED ON THE CODE THAT INSTRUCTS THE APPS, HOW TO ASSEMBLE THE FINAL AD FOR SOME TIME.

THE COURT ASKED A GOOD QUESTION THERE, YOU MIGHT HAVE THOUGHT ABOUT TRYING SOMETHING, THEY ALSO MIGHT HAVE THOUGHT ABOUT TALKING TO US OR TALKING TO JUDGE DEMARCHI OR TALKING TO THE COURT ABOUT IT INSTEAD OF GIVING EVERYBODY A LOT OF FALSE ASSERTIONS AND MAKING ALL THESE CHOICES UNILATERALLY, A POINT THAT JUDGE KIM POINTED OUT IN LOPEZ.

NUMBER TWO, 230 IS A DEFENSE, AND MATERIAL CONTRIBUTION ISN'T SOME PLAINTIFF'S REJOINDER, THE SECOND ELEMENT OF THE AFFIRMATIVE DEFENSE IS THAT THIS CONTENT WAS PROVIDED BY A DIFFERENT INFORMATION CONTENT PROVIDER, SO IT'S HARD WIRED INTO THE TEST.

THE TABLE OF CONTENTS IN OUR SECOND AMENDED COMPLAINT SAY NOTHING OF THE BODY, TALKS ABOUT META'S CONTRIBUTIONS TO CONTENT, AS DID THEIR DEMURRER WHICH WAS JANUARY OF 2022 AND THEN STILL NOTHING HAPPENED FOR YEARS.

THIRD POINT THERE WERE TALK OF STEPS IN 2023, THEY WERE WOEFULLY INSUFFICIENT. WHEN THEY STOOD IN FRONT OF

JUDGE DAVILA AND MADE THAT ADMITTEDLY INCORRECT STATEMENT, THEY SAY THE VERY NEXT DAY WE LAUNCHED THE DELIVERY TABLE. IT ACTUALLY SOUNDS A LITTLE FISHY TO ME BUT THE KEY THE POINT IS THEY LAUNCHED THE TABLE THE NEXT DAY AND PUT A VERY SHORT RETENTION PERIOD ON IT.

SO THEY STOOD BEFORE THIS COURT AND SAID THEY ARE PRESERVING AND MADE AN AFFIRMATIVE DEFENSE NOT TO AND PUT A DELETION IN PLACE. THAT WAS MARCH 2023.

FOURTH, THERE WAS SOME TALK JUST NOW ABOUT THE IMPUTATION QUESTION BECAUSE WE KEEP HEARING "WE IDENTIFIED," THERE IS NO EVIDENCE IN THE RECORD THESE TABLES ARE KNOWN ONLY TO LOW LEVEL PEOPLE. I DON'T THINK THERE'S ANY LEGAL SUPPORT FOR THE NOTION THAT ONE SINGLE INDIVIDUAL MUST HAVE THE KNOWLEDGE AND MAKE THE CHOICE. ZUBULAKE AND ALL THE CASES THAT APPLY MAKE CLEAR IT'S THE PARTY'S OBLIGATION AND THE TRADITIONAL IMPUTATION AND CORPORATE KNOWLEDGE DOCTRINES APPLY.

FIFTH AND FINALLY, IN TERMS OF WHY DID THIS HAPPEN, I THINK THE COURT ASKED, THE KEY QUESTION WAS WHY WERE NO STEPS TAKEN EARLIER? THE TIMING HERE, ALONE, MAKES THAT VERY CLEAR, THIS WAS A PARTY WHO WAS HOPING THEY WOULD WIN THE MOTION TO DISMISS AND DIDN'T TAKE ANY STEPS TO THINK ABOUT PRESERVATION OF EVIDENCE UNTIL IT WAS OVER.

THAT WAS A PROFOUND BREACH. AND I KNOW META THINKS OF 230 AS A MAGIC SWORD, BUT IT WASN'T UNTIL AFTER THAT THEY ACTUALLY THOUGHT ABOUT --

**THE COURT:** I THINK THE INTERESTING PART IN OFFERING THAT, YOU ARE UNDERMINING YOUR CLAIM OF 37(E)(2), AREN'T YOU? IF THE STORY IS THEY JUST WERE SO CERTAIN THEY WERE GOING TO WIN ON SECTION 230 THAT THEY WEREN'T WORRIED ABOUT THEIR PRESERVATION OBLIGATIONS, THAT'S A LITTLE DIFFERENT FROM SAYING, AND WE ACTUALLY DID THIS BECAUSE WE DIDN'T WANT YOU TO GET THAT DATA, THEY WERE JUST SAYING WE DIDN'T HAVE TO DO IT BECAUSE WE WERE GOING TO WIN UNDER SECTION 230.

I MEAN, THERE IS A TENSION THERE, IS THERE NOT?

**MR. QUINN:** I HEAR THE COURT'S POINT BUT I HAVE TWO RESPONSES TO THAT. ONE, THERE IS STILL AN INTENTIONAL CHOICE BEING MADE. WE ARE GOING TO PUT THESE DELETION PERIODS IN PLACE, WE ARE GOING TO DELETE THIS EVIDENCE.

**THE COURT:** RIGHT. MY QUESTION IS -- IT'S NOT JUST THAT YOU WERE ACTING INTENTIONALLY, IT'S THAT YOU WERE ACTING INTENTIONALLY FOR THE PURPOSE OF DEPRIVING THE OTHER PARTY OF ACCESS TO THE DATA.

**MR. QUINN:** WELL EVEN AFTER THE MOTION TO DISMISS IS DENIED, IT'S NOT UNTIL APRIL '25 THERE'S ANY EFFORT ON THE DELIVERY TABLE, DESPITE META KNOWING ABOUT IT, THERE IS NEVER ANY EFFORT ON FINAL INSTRUCTIONS.

SO THAT KIND OF CASE-SPECIFIC, TAILORED AND INTENTIONAL CHOICE IS BEING MADE EVEN AFTER THE MOTION TO DISMISS IS DENIED.

BUT EVEN BEFORE THAT, IF THEY ARE CHOOSING TO SPOLIATE

EVIDENCE, THE FACT THAT THEY MIGHT REST ON AN OVERCONFIDENT NOTION OF 230 DOESN'T IMMUNIZE THE INTENTIONALITY OF THAT CHOICE, WHETHER IT'S TO DEPRIVE US OR REGULATORS OR ANYBODY ELSE OF THAT DATA, THEY ARE MAKING A CHOICE TO NOT HAVE THE DATA ANYMORE AND THEY KNOW ABOUT THIS LITIGATION. THAT COULD BE INTENT.

**THE COURT:** THAT AGAIN, THAT IS NOT QUITE (E)(2) STANDARD. SO I TAKE YOUR POINT, BUT THANK YOU.

**MR. QUINN:** THANK YOU, YOUR HONOR.

**THE COURT:** IT LOOKED LIKE YOU MIGHT HAVE ONE THING TO SAY.

**MR. BROWN:** YES, JUST ONE THING, WHICH IS THAT WHEN WE STOOD IN COURT AS HE REFERENCED, AND IT WASN'T US, BUT OTHER LAWYERS. WE WEREN'T AWARE OF THE DELIVERY TABLE. SO THE FACT THAT IT WAS PUT ON -- CREATED AND ASSIGNED CERTAIN RETENTION PERIODS AFTER, THAT'S A DISCONNECT.

AGAIN, IT GETS BACK TO YOUR POINT, WHAT IS META -- META IS A BIG -- BUT IN TERMS OF OUR REPRESENTATION TO THE COURT AND KNOWLEDGE THAT WOULD HAVE GONE BACK TO META ABOUT IT, THAT DIDN'T HAPPEN.

**THE COURT:** I MEAN, THERE'S A LOT, AND NONE OF THE COUNSEL ARE HERE ANYMORE, SO IN SOME WAYS WHETHER I HAVE TO GET INTO THE QUESTION OF WHAT COUNSEL AT THE TIME KNEW AND WHETHER WHAT THEY WERE BEING TOLD AND THEIR RELATIONSHIP WITH THE INTERNAL META FOLKS, I'M NOT SURE I NEED TO GET THAT.

BUT I APPRECIATE THE BRIEFING AND ARGUMENTS. I'VE HEARD MORE ABOUT HIVE TABLES IN THIS AND OTHER CASES IN THE LAST TWO MONTHS THAN I EVER DID BEFORE IN 2026, SO --

**MR. BROWN:** THE BLESSING OF BEING IN THE NORTHERN DISTRICT OF CALIFORNIA.

**THE COURT:** THAT'S IT. I HAVE NEVER HEARD OF HIVE TABLES AND NOW I'M THINKING ABOUT THEM ALL THE TIME AND WRITING ABOUT THEM ALL THE TIME.

**MR. QUINN:** AT LEAST NO ONE DROPPED ONE IN THE SWIMMING POOL.

**THE COURT:** I WILL TAKE THE MOTION UNDER SUBMISSION AND AIM TO GET A DECISION OUT FORTHWITH. THANK YOU.

IS THERE ANYTHING ELSE WE NEED TO DO TODAY IN THIS MATTER?

**MR. QUINN:** NOTHING FURTHER FROM THE PLAINTIFF, YOUR HONOR. THANK YOU.

**MR. BROWN:** NO, YOUR HONOR. THANK YOU.

**THE COURT:** THANK YOU. HAVE A GOOD MORNING.

(PROCEEDINGS CONCLUDED AT 9:49 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.



SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

DATED: APRIL 16, 2026