UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW FORREST,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No.  22-cv-03699-PCP

**ORDER GRANTING IN PART MOTION FOR SANCTIONS**

Re: Dkt. No. 313, 314, 337, 347

Plaintiff Andrew Forrest moves for sanctions on the basis of defendant Meta Platforms, Inc.'s alleged spoliation of evidence. For the reasons below, the Court finds that Meta spoliated evidence resulting in prejudice to Forrest, necessitating a curative sanction.

## BACKGROUND

Forrest is suing Meta for misappropriation and negligence based on the publication of Facebook ads that showed him endorsing fraudulent cryptocurrency and other investment products ("scam ads"). Forrest first began pursuing his claims against Meta in August 2019. That month, his counsel sent a letter to Meta demanding that it address the scam ads, placing it on notice of the potential for litigation related to the scam ads, and demanding that Meta "take all reasonable steps to preserve all data about the Advertisements, their timetable, their viewership, the identity of any related advertisers, and any other related data."

In this action, which was originally filed in 2022, Meta asserts an affirmative defense under Section 230 of the Communications Decency Act, which insulates "interactive computer service[s]" from liability for publishing "information provided by another information content provider." 47 U.S.C. § 230. Accordingly, the parties stipulated to a bifurcated discovery schedule, with the first phase focusing solely on Meta's Section 230 defense. After several extensions by the

Court, that first phase of fact discovery closed on February 13, 2026. One week later, Forrest filed a motion for sanctions under Rule 37(e) based on Meta's alleged spoliation of evidence.

Resolving Meta's Section 230 defense requires determining whether and to what extent Meta itself contributed to the allegedly unlawful aspects of the scam ads (e.g., their misappropriation of Forrest's likeness and negligent harm to Forrest and the public). Four types of data, only some of which Meta has allegedly spoliated, are relevant to that determination.

*Inputs.* The ad-creation process starts with the "inputs" provided by third-party advertisers, for which Meta cannot be held liable under Section 230. The parties represent that Meta has preserved all of the input data for each of the roughly 28,000 scam ads at issue.

*Potential Optimizations.* Next is the universe of "potential optimizations" that could have been applied to any given scam ad in Meta's system before the ad was rendered to an end user. Again, the parties represent that Meta has preserved this potential-optimization data for all of the scam ads.

*Actual Optimizations.* From the large universe of potential optimizations, only a small number of "actual optimizations" were applied to any specific scam ad that was rendered to an end user. The actual-optimization data shows what kinds of changes Meta made to a particular ad—for example, zooming and cropping an image, choosing the text overlaying an image, or splicing a video to determine which portions would appear in the thumbnail shown to end users.

The information is split across two datasets. The first dataset documents the optimizations applied to all rendered impressions, while the second documents only those optimizations that are applied to ads resulting in end-user interactions (i.e., clicks). Although the former dataset has existed since 2023, Meta did not begin preserving that dataset until more than two years later in 2025, by which point much of the relevant data had been automatically deleted. As a result, just 14% of the relevant information from that dataset remains. While Meta preserved the second dataset, the information therein covers only the minority of rendered scam ads with which end users interacted.

Meta represents that it failed to preserve the full actual-optimization data because Meta simply did not know that it possessed such data. Only after "Meta conducted additional

United States District Court
Northern District of California

investigation into the ad creation and delivery process" beginning "[i]n late summer 2024," and then "continued to develop its factual understanding" throughout 2024 and early 2025, did it realize that the data might exist. Thereafter, "Meta worked with numerous subject-matter experts to develop an understanding of the process of creating and delivering an ad," which led it to "redouble[] its efforts to identify potential … data logging the optimizations delivered with ads" and to discover the actual-optimization data. Conspicuously, the timing of "Meta's" renewed investigation coincides with Meta's engagement of new counsel in the summer of 2024. Forrest argues that it was Meta's new counsel who were unaware of (and belatedly discovered) the actual-optimization data, but that Meta knew of the data all along.

*Outputs.* The "output" of the ad-creation process is the final ad rendered to an end user. Output data with full ad renderings, if available, would show not just *which* optimizations applied but *how* they applied. For example, the actual-optimization data might reveal that Meta cropped an image or spliced a video to create a thumbnail, but only the output data would show whether such cropping or splicing functioned to highlight or otherwise focus on Forrest. Meta represented in a January 2025 letter to Forrest that it retains versions of the final ads delivered to end users, but it reversed course in July 2025. Meta now maintains that it merely packages the individual components of each ad before delivering those components to end users' devices for final assembly and rendering in the Facebook app on individual devices. As a result, Meta contends, it "does not possess the [f]inal [r]endered [a]ds as delivered to the end-user in the ordinary course of business" and thus cannot produce such data to Forrest.

While Meta asserts that it "does not store *complete* packages of information necessary to render each impression of an ad" and thus cannot "recreate a visual representation of any of the … scam ads *exactly* as they would have been rendered," a Meta software engineer attested that "all the necessary components of an ad" are packaged by Meta itself prior to their delivery to end users' devices for assembly and rendering in the Facebook app. In other words, at some point before the rendering of each final scam ad, Meta's servers contained a data package containing all the constituent parts of that soon-to-be rendered ad. And Forrest's expert has attested that such full-ad data packages are cached on Meta's backend servers for at least a limited time after they

3

are created. For example, the expert explains, Meta's own documents indicate that it retains temporary copies of ads for which it has compiled final-assembly data in the expectation of imminent display to an end user, but which for some reason has not yet been shown to the end user. While a Meta software engineer attested that capturing and storing visual representations of final rendered scam ads would not have been feasible, Meta has not explained why it would be infeasible to retain the packages of ad components; it merely asserts that it did not do so in the ordinary course of business.

Although Meta does not possess all of the component data used to render scam ads, it has acknowledged the existence of other output data, which falls into two broad categories.

The "post-impression tables" were created in 2019 and capture data about a random sample of rendered impressions, including the optimizations that were applied to the rendered ads. This data is sent back to Meta from the Facebook app on an end user's device at the time an ad is rendered and is, according to Meta, the only data it receives about ads after they are rendered. The sample rate for the tables is miniscule, capturing only a small fraction of all rendered ads on Facebook. Meta asserts that it first "identified" (i.e., discovered) the post-impression tables in 2025 as part of the same renewed investigation—coinciding with Meta's change in counsel—that resulted in discovery of the actual-optimization data. Because the tables had short retention periods, no data remained for the relevant period at the time Meta purportedly discovered the tables.

The "interim outputs" are data reflecting individual components of scam ads (including images, videos, text, and other outputs) to which a Meta optimization has been applied. As the "interim" label suggests, the components reflected in the data were created prior to the final rendering of an ad. As a result, they exist only for certain midstream optimizations and do not reflect any final-stage optimizations that may have been applied prior to the rendering of a scam ad. Nor was every interim output ultimately rendered in a final ad—some were merely eligible for final delivery but never used. Meta has preserved the interim outputs, but no data exists from which to determine whether a particular interim output was ultimately rendered or whether it was subject to further modification by a final-stage optimization.

4

Forrest argues that Meta's failure to retain the actual-optimization data, post-impression tables, and the full packages of final-ad components that Meta delivered to end users' devices for assembly has prejudiced his ability to rebut its Section 230 defense. He also argues that such failures were intentional. Forrest thus seeks sanctions against Meta under Rules 37(e)(1) and 37(e)(2).

**LEGAL STANDARD**

A party engages in sanctionable misconduct triggering Rule 37(e) when it (1) "fail[s] to take reasonable steps to preserve" electronically stored information that (2) "should have been preserved in anticipation or conduct of litigation," and (3) when such information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Once a court is satisfied that a party has engaged in such misconduct, it conducts a two-tiered analysis to determine the appropriate sanction. The most severe sanctions—adverse inferences and terminating sanctions— are available only if the court finds "that the party acted with the intent to deprive another party of the [lost] information's use in the litigation." Fed. R. Civ. P. 37(e)(2). "[T]he intent required by Rule 37(e)(2) is most naturally understood as involving the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Gregory v. Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024) (citation modified). Lesser sanctions are available if the court "find[s] prejudice to another party from loss of the information," and those sanctions must be "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The preponderance-of-the-evidence standard applies to spoliation motions under Rule 37. *Smahi v. STMicroelectronics, Inc.*, 789 F. Supp. 3d 690, 694 (N.D. Cal. 2025).

**ANALYSIS**

**I.    Forrest's motion is timely.**

Under the local rules, a spoliation motion must be filed within seven days of the fact discovery cutoff, Civ. L.R. 37-3, and "as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate," Civ. L.R. 7-8(c). Forrest filed his motion exactly seven days after the final fact discovery cutoff and shortly after Meta's final document production and service of supplemental discovery responses. Meta nonetheless argues

5

United States District Court
Northern District of California

that Dr. Forrest's motion is untimely. Its arguments fail.

First, Meta argues that the relevant fact discovery cutoff date was October 29, 2025, because the Court extended fact discovery after that date only for the limited purpose of allowing Meta to complete production of certain interim-output data. Meta argues that, because Forrest alleges spoliation of data other than the interim outputs, he was required to file his motion within one week of October 29, 2025. But the relevant local rule makes clear that the fact discovery cutoff that triggers the spoliation-motion clock "is the date by which *all* responses to written discovery are due." Civ. L.R. 37-3 (emphasis added). Here, all discovery responses were not due until February 13, 2026.

Second Meta argues that Forrest failed to file his motion "as soon as practicable" after it was apparent that "the motion [was] appropriate" because Forrest knew of Meta's alleged spoliation much earlier than February 2026. *See* Civ. L.R. 7-8(c). But as discussed below, a critical part of the spoliation analysis is determining whether and how the spoliation prejudiced the movant. And Forrest could not reasonably determine the precise extent to which Meta's spoliation prejudiced his ability to oppose Meta's Section 230 defense until Forrest knew what replacement data Meta would produce. So it was not "appropriate" to file the motion until Meta produced the final interim-output data.

Forrest's motion is therefore timely.

## II.     Meta spoliated evidence.

Spoliation occurs when a party (1) "fail[s] to take reasonable steps to preserve" electronically stored information that (2) "should have been preserved in anticipation or conduct of litigation," and (3) when such information "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). Forrest has demonstrated each element.

### A.     Meta had a duty to preserve data concerning the rendered scam ads and the optimizations applied thereto beginning in 2019.

A party has a duty to preserve evidence that it knows or should know is relevant to a claim or defense of any party in the litigation, and that duty arises as soon as the party knows that litigation is probable. *In re Napster Inc. Copyright Litigation*, 462 F. Supp.2d 1060, 1068 (N.D.

United States District Court
Northern District of California

Cal. 2006) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). Here, Meta's duty to preserve relevant evidence arose in August 2019, when Forrest's counsel sent a letter to Meta demanding that it address the scam ads, placing it on notice of the potential for litigation related to the scam ads, and expressly demanding that Meta "take all reasonable steps to preserve all data about the Advertisements, their timetable, their viewership, the identity of any related advertisers, and any other related data."

Meta concedes that its general preservation duty with respect to the scam ads arose in 2019. But it argues that it had no duty to preserve evidence relating to the use of Meta's optimizations in such scam ads until 2023, when Meta contends that Forrest first began focusing on such optimizations. In essence, Meta argues that it had no duty to preserve what Forrest had not yet asked for.

Meta is wrong. As already noted, a party must preserve evidence it knows or *should know* is relevant to any party's claim *or defense*. So the duty is triggered whenever it becomes objectively "reasonably foreseeable" that evidence will be relevant in the litigation. *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1145 (N.D. Cal. 2012) (citing *Micron Tech.*, *Inc. v. Rambus*, *Inc.*, 645 F.3d 1311, 1320 (9th Cir. 2011)). That may, of course, occur when "an opposing party … explicitly request[s] preservation of some information." *Al Otro Lado, Inc. v. Nielsen*, 328 F.R.D. 408, 416 (S.D. Cal. 2018). "However, a future litigant is not required to make such a request, and a failure to do so does not vitiate the independent obligation of an adverse party to preserve such information if the adverse party knows or should know" of its relevance to current or impending litigation. *Apple*, 881 F. Supp. 2d at 1136–37.

Accordingly, the fact that Forrest may not specifically have demanded that Meta preserve evidence concerning the scam ads' use of optimizations is inapposite. What matters is whether "a reasonable party" in these circumstances "would have reasonably foreseen" that data concerning the optimizations would be relevant to any party's claim or defense. *Micron,* 645 F.3d at 1320. The answer is clearly yes. Any reasonable social media company in 2019 would have foreseen that claims based on the content the company published would give rise to a Section 230 defense. Indeed, just one month after receiving Forrest's letter, Meta (née Facebook) moved to dismiss

United States District Court
Northern District of California

another action in this district by arguing that the plaintiff there "s[ought] to hold Facebook liable as a publisher or speaker of third-party content" and "Facebook [wa]s immune from such claims under Section 230(c)(1) of the [Communications Decency Act]." Motion to Dismiss Amended Complaint at 4, *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020) (No. 18-cv-7041-LHK). And any reasonable social media company—let alone one as sizeable as Meta that reportedly employs hundreds of in-house attorneys—would know that its tools for optimizing or otherwise altering published content would be relevant (indeed, central) to the availability of Section 230 immunity.[1] So Meta certainly knew or should have known that data concerning the use of its optimizations in connection with the scam ads would be relevant to the litigation over Forrest's claims. Accordingly, Meta had a duty to preserve such data beginning in 2019 or as soon thereafter as the data became available. And in any event, Meta does not dispute that it had a duty beginning in 2019 to preserve data concerning the scam ads actually rendered to end users to the extent such data was available.

**B.  Meta failed to take reasonable steps to preserve data that it should have preserved beginning in 2019.**

Meta also did not take reasonable steps to preserve the actual-optimization or output data.

As to the full actual-optimization dataset, Meta correctly argues that it had no duty to preserve the dataset prior to its creation in 2023. But Meta did not begin to preserve that data until over two years later, in 2025. Meta argues that this was reasonable because "[i]t took time to investigate Meta's complex ad creation and delivery system." That is simply not credible. It may have taken Meta's current *counsel* time to investigate Meta's systems after being engaged in June 2024, but it is not reasonable to assert that Meta itself (the party with the preservation duty) needed two years to learn about its own data. As noted already, Meta is a large and sophisticated company that employs numerous in-house attorneys. There is no justification for the failure of

---

[1] To be certain, until June 2024 Meta's in-house attorneys may have believed that Section 230 provided Meta with an ironclad defense that would result in the dismissal of Forrest's complaint before any discovery was undertaken. That belief was mistaken. *See Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024) (denying motion to dismiss premised on Section 230 immunity). And a party cannot justify disregarding its evidence-preservation obligations on the basis of its mistaken view of the law.

Meta's in-house counsel to conduct a reasonable investigation of the ad creation and delivery system prior to Meta's retention of its current outside counsel.[2]

As to the post-impression tables, Meta argues that it was unaware of such data until 2025. Again, that is not credible and appears to conflate the extent of counsel's knowledge with the extent of Meta's knowledge. Meta also asserts that retention would not have been reasonable because of the immense size of those tables, which each "log several hundred gigabytes of data every day." Even assuming that requiring preservation of such large amounts of data would be unreasonable, that is not what Forrest argues was required. Meta needed to preserve only the entries for the scam ads, which Meta concedes were a very small percentage of the post-impression table data. Forrest's expert has explained that it would have been entirely feasible for Meta to do so, and Meta has not argued that filtering for the scam ad entries would be technologically unfeasible or unduly burdensome.

Finally, as to other output data, Meta argues that it did not routinely create or retain complete data about final renderings of Facebook ads except in the post-impression tables. Thus, Meta contends, there was no data about final renderings to preserve. As discussed above, however, Meta's own software engineer attested that all of the component data necessary to render each ad exists in a single package on its servers at some point in time before being transmitted to an end user's device for final rendering. And Forrest's expert attested that such "instructions" (i.e., the data used to render an ad) flow through Meta's backend servers en route to end users' devices and are temporarily "cached" in those servers for a time after an ad is rendered. The weight of the evidence thus supports a finding that Meta had, and could have preserved, final-rendering data for the scam ads but chose not to do so.

---

[2] That is particularly true given the repeated warnings Meta has received from other courts about its deficient document-retention practices. *See, e.g.*, *In re Facebook Inc. Derivative Litig.*, No. 2018-0307, 2025 WL 262194, at *9, 12–13 (Del. Ch. Jan. 21, 2025) (imposing sanctions against a c-suite executive at Meta for failing to take reasonable steps to identify likely sources of relevant evidence and preserve such evidence); Order at 1, *In re Meta Pixel Healthcare Litigation*, No. 22-CV-3580 (N.D. Cal. Feb. 20, 2025), Dkt. No. 880 (finding that "Meta acted in conscious disregard of its obligations" to preserve "key data"); *BlackBerry Ltd. v. Facebook, Inc.*, No. 18-CV-1844, 2019 WL 13447227, at *7 (C.D. Cal. Sept. 30, 2019) (finding that Meta was "at fault in failing to preserve … datasets" that were "lost due to routine data retention/destruction policies" that Meta failed to suspend).

The choice not to retain data that was concededly on its servers, despite a duty to preserve such data, was unreasonable. That Meta would not usually retain such data for more than a short period is immaterial. Parties often must alter their usual document-retention practices for the purpose of preserving evidence. And the available record suggests that Meta cached fully packaged output data for at least a temporary period after delivery to end users' devices, such that preservation merely required suspending the auto-deletion protocol for that cache. It is well established that a litigant "is obligated to suspend [an auto-deletion policy] and implement a litigation hold to ensure the preservation of relevant documents after the preservation duty has been triggered." *Apple*, 881 F.Supp.2d at 1137.

### C.    The data cannot be restored or replaced through additional discovery.

Neither the actual-optimization data nor the output data can be replaced through additional discovery.

Meta offers the potential-optimization data as a substitute for the actual-optimization data. But as discussed above, the former shows only what optimizations could *potentially* be applied to a particular scam ad, while the latter show the optimizations actually used.

As to the output data, Meta argues that it need not provide data that would allow Forrest "to recreate what any rendered scam ad looked like or what changes Meta's tools and process actually made" to such ads because neither the post-impression tables nor the actual-optimization data "contain … images or videos." But Meta is conspicuously silent as to whether the post-impression tables contained component data that could substantially re-create the final visual renderings or at least provide significant insight into what those renderings looked like. And the declaration of a Meta's software engineer suggests that they did, explaining: "The data in these tables is used to verify whether ads are rendering on Facebook as expected and to assist in identifying and debugging rendering issues." The data likely could only verify whether ads are rendering as expected if it could be used to substantially recreate rendered ads.

Meta also argues, again, that the post-impression tables "would have, at most, contained information about only a very small sample of the alleged scam ads." But even a handful of rendered scam ads could be probative of the operation of Meta's in-house optimizations in

United States District Court
Northern District of California

contributing to the misappropriation of Forrest's likeness. And as discussed above, Meta likely could have preserved the full packages of ad-component data that were delivered to end users' devices for final assembly for *every* scam ad.

Finally, Meta argues that it has offered a fair substitute for all the lost data in the form of a proposed inference. But Meta cites no authority for the proposition that an inference can "replace[]" data within the meaning of Rule 37(e) so as to preclude a finding of spoliation. Instead, the rule contemplates using inferences only as a remedy once spoliation has already been established. *See* Fed. R. Civ. P. 37(e)(2) (authorizing a court that finds spoliation with intent to deprive to "presume that the lost information was unfavorable to the [spoliating] party").

For all these reasons, the Court finds that Meta spoliated the evidence in question.

III. **Sanctions under Rule 37(e)(1) are appropriate because Meta's spoliation prejudiced Forrest.**

Rule 37(e)(1) authorizes a court, "upon finding prejudice to another party from the loss of information," to "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Prejudice exists where, as here, "the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). "Courts in the Ninth Circuit have found prejudice where another party's failure to produce documents forced the non-spoliating party to 'rely on incomplete and spotty evidence.'" *Facebook, Inc. v. OnlineNIC, Inc.*, No. 19-cv-7071, 2022 WL 2289067, at *10 (N.D. Cal. Mar. 28, 2022).

Here, Meta's spoliation has prejudiced Forrest by depriving him of evidence potentially relevant to demonstrating Meta's contributions to the allegedly unlawful content of the scam ads and thus defeating Meta's claim of entitlement to Section 230 immunity. The spoliation of the actual-optimization data leaves Forrest without evidence to show which potential optimizations were actually used in the rendering of each scam ad. And the loss of output data (including the post-impression tables) deprives Forrest of evidence showing *how* the optimizations impacted rendered scam ads—i.e., whether and how the applied optimizations affected the content.

11

Meta insists that the interim-output data it produced cures any prejudice from the loss of other output data because it "consist[s] of images and videos reflecting the actual application of optimizations (e.g., the crop applied to an image or video), the text optimizations, or data reflecting the application of the optimization (e.g., the coordinates for a crop)." But Meta elsewhere concedes that interim outputs are available only for some optimizations and ads, leaving no or only partial output data for other scam ads.

The Court therefore concludes that a curative sanction is appropriate under Rule 37(e)(1). At the hearing, the parties suggested that two such sanctions would appropriately address much of the prejudice caused by Meta's spoliation. The Court concurs and awards both sanctions.

First, in moving for summary judgment and at trial, Meta is "precluded from affirmatively arguing or otherwise using [Forrest]'s failure to make certain showings that [he] could have made if [Meta] had access to the [spoliated] data." *Lopez v. Apple, Inc.*, No. 19-CV-04577, 2024 WL 4561320, at *9 (N.D. Cal. July 17, 2024).

Second, the Court shall rely on the following inference in ruling on Meta's motion for summary judgment and shall so instruct the jury at trial:

> For any ad for which complete delivery data does not exist in the Delivery Table, every optimization that was created for that ad, as reflected in the Eligible Optimizations Data [i.e., potential-optimization data], was used in a rendered ad. For optimizations with Interim Outputs, each Interim Output that was created by an optimization reflects the application of that optimization and was used in a rendered ad. For any optimization for which the Eligible Optimizations Data reflects that an optimization was created, but that optimization did not create Interim Outputs because that optimization acts at rendering, the optimization worked in the manner documented in Meta's documents, record evidence, and/or source code during the relevant period of January 1, 2019 to January 31, 2025, as applicable for the dates the alleged Scam Ad at issue was delivered as an impression. For any image input or video input associated with an ad, any Interim Output created for that image input or video input, as reflected in EntAdImageSubstitutes and EntAdVideoSubstitutes, was used in a rendered ad.

In light of the parties' agreement to these sanctions, and because the Court concludes that they likely suffice to cure the prejudice stemming from Meta's spoliation, the Court denies Forrest's request for the more extreme sanction of finding that a genuine dispute of material fact

United States District Court
Northern District of California

exists at to Meta's Section 230 defense, precluding summary judgment on that issue.[3] But the Court "may determine during [a later stage of the] litigation, including at trial, that [Meta]'s failure to preserve [evidence] has prejudiced [Forrest] in ways that cannot be anticipated now" and may impose additional sanctions as needed to remedy such prejudice. *Id.*

## IV.    Sanctions under Rule 37(e)(2) are not proper at this stage.

Forrest argues that in lieu of issuing sanctions under Rule 37(e)(1), the Court should instead sanction Meta pursuant to Rule 37(e)(2). Whereas Rule 37(e)(1) requires only a finding of "prejudice," Rule 37(e)(2) requires "finding that [Meta] acted with the intent to deprive [Forrest] of the [spoliated] information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Whether Meta acted intentionally to deprive Forrest of key evidence is a close question. To be certain, Meta and its counsel failed to take reasonable steps to retain data that Meta should have known would be highly relevant to what was foreseeably the primary issue in this action: Meta's Section 230 defense. Even after engaging its current counsel and undertaking a renewed investigation (almost five years after Forrest first demanded that Meta begin preserving evidence), Meta did not identify or begin to retain actual-optimization or post-impression data for another ten months. Its conduct exhibits gross negligence with respect to the duty of preservation. But "even grossly negligent behavior" does not suffice to show the requisite intent. Fed. R. Civ. P. 37(e)(2), advisory committee's note to 2015 amendment. And the fact that Meta's spoliation occurred due to "a passive failure to halt an automatic deletion process" weighs against a finding of intent, *Est. of Bosco by & Through Kozar v. Cnty. of Sonoma*, 640 F. Supp. 3d 915, 929 (N.D. Cal. 2022), as does the fact that Meta "did not selectively preserve some" electronically stored information, *Lopez*, 2024 WL 4561320, at *8. Other signs favor a finding of intentional spoliation, including Meta's sophistication and other courts' recent determinations that Meta has "consciously disregarded" its preservation duties in other cases. *See, e.g.*, Order at 1, *In re Meta Pixel Healthcare Litigation*, No. 22-CV-3580 (N.D. Cal. Feb. 20, 2025), Dkt. No. 880.

---

[3] Meta opposed the first sanction (i.e., the prohibition on its affirmative argumentation concerning Forrest's failure to make certain showings) only on the basis that it does not plan to assert such arguments. And Meta expressly agreed to the second sanction (i.e., the inference).

Because the factual question of intent is a close one on which reasonable minds may disagree, the Court concludes that the issue is best left to the jury. *See Lopez*, 2024 WL 4561320, at *8. Thus, at trial, the jury shall be instructed that, "if it finds that [Meta] acted with the intent to deprive [Forrest] of the [spoliated] information's use in the litigation, the jury may infer from the loss of the information that it was unfavorable to [Meta]." *Id.* at *9.

Forrest's request for sanctions under Rule 37(e)(2) is therefore denied without prejudice.

## V.    Forrest is entitled to an award of fees and costs.

Finally, Forrest requests an award of fees and costs incurred as a result of Meta's spoliation, including the fees and costs attendant to the additional discovery necessitated by such spoliation and Forrest's pursuit of sanctions. "The Court may award attorney's fees" under Rule 37(e)(1) "so long as they are compensatory rather than punitive in nature." *Youngevity Int'l v. Smith*, No. 3:16-CV-704, 2020 WL 7048687, at *5 (S.D. Cal. July 28, 2020) (citing *Spence v Lunada Bay Boysr*, 806 F. App'x at 568 (9th Cir. 2020)). Meta argues that such an award is inappropriate here only because Forrest "has suffered no prejudice from the purported spoliated evidence." Because the Court has already concluded that Forrest has suffered prejudice, the Court agrees that an award of fees and costs is appropriate. The parties are ordered to meet and confer as to the amount of such an award. If the parties reach agreement, they shall stipulate to an award of fees and costs within 30 days of this order. If they are unable to reach agreement, Forrest shall file a motion for fees and costs within 35 days of this order.

## VI.    Meta's sealing requests are denied without prejudice.

In connection with Forrest's motion for sanctions and the related briefing, the parties filed several sealing motions concerning information that Meta seeks to withhold from the public. *See* Dkt. Nos. 313, 337, 347. Meta subsequently asked to alter certain of the sealing requests submitted on its behalf by Forrest. *See* Dkt. Nos. 329, 360. The "compelling reasons standard" applies to these requests. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016); *Charles v. Target Corp.*, No. 20-CV-07854-HSG, 2022 WL 3205047, at *3 (N.D. Cal. July 6, 2022) (noting that a motion for sanctions related to spoliation is "more than tangentially related to the merits" and therefore subject to the compelling-reasons standard).

14

The Court previously denied Meta's sealing requests "to the extent the seek to redact the briefing on [Forrest]'s motion for sanctions" because Meta failed to provide "the 'specific factual support' necessary to justify sealing," particularly in light of the strong public interest in "access to motions and briefs," which are "essential to the public's 'understanding [of] the judicial process.'" Dkt. No. 352 (quoting *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).

For the same reasons, the Court denies Meta's sealing requests as to information discussed in this order. Much of this information has already become publicly available due to the unsealing of Forrest's motion and the subsequent briefing. And Meta has not demonstrated that disclosure of the information in this order will result in specific harms that are so significant as to outweigh the public's particularly strong interest in understanding the Court's reasoning in this case, which has been the subject of considerable public attention.

Meta's remaining sealing requests—i.e., its requests as to the exhibits to the briefing on Forrest's motion for sanctions—are denied without prejudice. Compelling reasons may exist for certain of Meta's proposed redactions. *See Ctr. for Auto Safety*, 809 F.3d at 1097 (explaining that compelling reasons may exist to seal "sources of business information that might harm a litigant's competitive standing"). But as Forrest's responses to Meta's sealing requests note, the proposed redactions also appear to cover information that is already in the public domain. Other redactions have no apparent connection to Meta's professed compelling reasons for sealing—for example, Meta cites the need to protect "information about [its] proprietary ad optimization systems and processes" as requiring redaction of details about its early communications with Forrest that do not disclose any technical information. Meta's sealing requests are thus overbroad. *See* Civ. L.R. 79-5(c)(3) (instructing that sealing requests must be "narrowly tailored to seal only the sealable information"). And even for proposed redactions that concern technical information of a plausibly sensitive nature, Meta's explanations are often conclusory, resting on general assertions of a need to protect certain broad categories of information rather than articulating the specific harm that will arise from disclosure of particular details about Meta's ad-creation and -delivery processes. *See* Civ. L.R. 79-5(c)(ii) (requiring a party seeking to seal information to

provide "a specific statement of … the injury that will result if sealing is denied).

Meta may submit a revised sealing motion as to the exhibits to the briefing on Forrest's motion for sanctions within 30 days of this order. Failure to limit proposed redactions to genuinely sensitive information and to specify the harms that will result from disclosure of particular information (not broad categories) may result in denial of the revised motion in full.

## CONCLUSION

For the foregoing reasons, Forrest's motion for sanctions (Dkt. No. 314) is GRANTED in part and DENIED in part, and the parties' sealing requests (Dkt. Nos. 313, 337, 347) are DENIED without prejudice. The parties shall stipulate to an award of fees and costs stemming from Meta's spoliation within 30 days of this order, or Forrest shall file a motion for such fees and costs within 35 days of this order. Meta shall file a renewed sealing motion within 30 days.

**IT IS SO ORDERED.**

Dated: August 10, 2026

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

16